JOHN F. DAUM (SBN 52313)
jdaum@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6111
Facsimile: (213) 430-6407

JONATHAN D. HACKER (*Pro hac vice* pending)
jhacker@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

Attorneys for Defendant
EXXON MOBIL CORPORATION

[*Counsel Listing Continued on Next Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| NATIVE VILLAGE OF KIVALINA and CITY OF KIVALINA,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>EXXON MOBIL CORPORATION; BP P.L.C.; BP AMERICA INC.; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORPORATION; CHEVRON U.S.A., INC.; CONOCOPHILLIPS COMPANY; ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY; PEABODY ENERGY CORPORATION; THE AES CORPORATION; AMERICAN ELECTRIC POWER COMPANY, INC.; AMERICAN ELECTRIC POWER SERVICES CORPORATION; DTE ENERGY COMPANY; DUKE ENERGY CORPORATION; DYNEGY HOLDINGS, INC.; EDISON INTERNATIONAL; MIDAMERICAN ENERGY HOLDINGS COMPANY; MIRANT CORPORATION; NRG ENERGY; PINNACLE WET CAPITAL CORPORATION; RELIANT ENERGY, INC.; THE SOUTHERN COMPANY; AND XCEL ENERGY, INC.,<br><br>                    Defendants. | CASE NO.  C 08-01138 SBA<br><br>**NOTICE OF MOTION AND MOTION OF CERTAIN OIL COMPANY DEFENDANTS TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Time:    December 9, 2008, 1:00 P.M.<br>Ctrm.:   Courtroom 3, 1301 Clay Street, Oakland, California<br>The Honorable Saundra B. Armstrong |

RONALD L. OLSON (SBN 44597)
Ronald.Olson@mto.com
DANIEL P. COLLINS (SBN 139164)
Daniel.Collins@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071-1560
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

JEROME C. ROTH (SBN 159483)
Jerome.Roth@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, CA  94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

Attorneys for Defendant
SHELL OIL COMPANY

ROBERT MEADOWS (*Pro hac vice*)
rmeadows@kslaw.com
TRACIE J. RENFROE (*Pro hac vice*)
trenfroe@kslaw.com
JONATHAN L. MARSH (*Pro hac vice*)
jlmarsh@kslaw.com
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, TX  77002-5213
Telephone:     (713) 751-3200
Facsimile:     (713) 751-3290

LISA KOBIALKA (SBN 191404)
lkobialka@kslaw.com
KING & SPALDING LLP
1000 Bridge Parkway, Suite 100
Redwood City, CA  94065
Telephone:     (650) 590-0700
Facsimile:     (650) 590-1900

Attorneys for Defendants
CHEVRON CORPORATION and
CHEVRON U.S.A. INC.

STUART A. C. DRAKE (*Pro hac vice*)
sdrake@kirkland.com
ANDREW B. CLUBOK (*Pro hac vice*)
aclubok@kirkland.com
SUSAN E. ENGEL (*Pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5173
Facsimile:  (202) 879-5200

ELIZABETH DEELEY (SBN 230798)
edeeley@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:  (415) 439-1861
Facsimile:  (415) 439-1500

Attorneys for CONOCOPHILLIPS COMPANY

MATTHEW HEARTNEY (SBN 123516)
Matthew.Heartney@aporter.com
ARNOLD & PORTER LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, CA  90017-5844
Telephone:  (213) 243-4150
Facsimile:  (213) 243-4199

PHILIP H. CURTIS (*Pro hac vice*)
Philip.Curtis@aporter.com
MICHAEL B. GERRARD (*Pro hac vice*)
Michael.Gerrard@ aporter.com
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399

Attorneys for BP AMERICA INC. AND BP
PRODUCTS NORTH AMERICA INC.

1

## TABLE OF CONTENTS

2

Page

3

TABLE OF AUTHORITIES ....................................................................................... ii

4

NOTICE OF MOTION AND MOTION .................................................................... 1

5

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

6

INTRODUCTION ...................................................................................................... 1

FACTUAL ALLEGATIONS ...................................................................................... 2

7

ARGUMENT .............................................................................................................. 3

8

I.     PLAINTIFFS FAIL TO STATE A NUISANCE CLAIM BECAUSE THE
9          FACTUAL ALLEGATIONS FAIL TO ESTABLISH THAT DEFENDANTS'
           EMISSIONS WERE AN ACTUAL OR LEGAL CAUSE OF PLAINTIFFS'
10         INJURIES ......................................................................................................... 4

11         A.    PLAINTIFFS DO NOT ALLEGE FACTS SUFFICIENT TO
                 ESTABLISH CAUSATION-IN-FACT ................................................. 6

12         B.    PLAINTIFFS FAIL TO ALLEGE FACTS SUFFICIENT TO
                 ESTABLISH LEGAL CAUSATION .................................................... 8
13

II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE FEDERAL COMMON
14         LAW OF NUISANCE ....................................................................................... 9

15         A.    THE FEDERAL COMMON LAW DOES NOT RECOGNIZE
                 PRIVATE NUISANCE CLAIMS FOR GREENHOUSE GAS
16               EMISSIONS ....................................................................................... 9

17         B.    CONGRESS HAS DISPLACED ANY AUTHORITY OF
                 FEDERAL COURTS TO DEVELOP THEIR OWN COMMON
18               LAW RULES TO REGULATE GREENHOUSE GAS
                 EMISSIONS ..................................................................................... 15
19

III.   PLAINTIFFS FAIL TO STATE A CONSPIRACY OR CONCERT OF ACTION
20         CLAIM ........................................................................................................... 20

21     CONCLUSION ........................................................................................................ 21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Alaska v. Native Village of Venetie Tribal Government*,
  522 U.S. 520 (1998) ............................................................................................... 15

*Alden v. Maine*,
  527 U.S. 706 (1999) ............................................................................................... 15

*Bell Atlantic Corp. v. Twombly*,
  127 S. Ct. 1955 (2007) ............................................................................................. 3

*Bunker Hill Co. Lead & Zinc Smelter v. EPA*,
  658 F.2d 1280 (9th Cir. 1981) ............................................................................... 18

*Canyon County v. Syngenta Seeds, Inc.*,
  519 F.3d 969 (9th Cir. 2008) ................................................................................... 4

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ......................................................................................... 20, 21

*Chevron U.S.A. Inc. v. NRDC*,
  467 U.S. 837 (1984) ............................................................................................... 18

*City of Milwaukee v. Illinois*,
  451 U.S. 304 (1981) ......................................................................................... passim

*Committee for Consideration of Jones Falls Sewage System v. Train*,
  39 F.2d 1006 (4th Cir. 1976) ................................................................................. 12

*County of Oneida v. Oneida Indian Nation*,
  470 U.S. 226 (1985) ............................................................................................... 16

*Erie Railroad v. Tompkins*,
  304 U.S. 64 (1938) ........................................................................................... 10, 12

*Exxon Shipping Co. v. Baker*,
  __ S. Ct. __, 2008 WL 2511219 (2008) ................................................................ 19

*Georgia v. Tennessee Copper Co.*,
  206 U.S. 230 (1907) ..................................................................................... 12, 13, 14

*Illinois v. City of Milwaukee*,
  406 U.S. 91 (1972) ........................................................................... 10, 11, 12, 14, 15

*Illinois v. Outboard Marine Corp.*,
  680 F.2d 473 (7th Cir. 1982) ................................................................................. 20

*In re Exxon Valdez*,
  270 F.3d 1215 (9th Cir. 2001) ............................................................................... 18

*In re Hanford Nuclear Reservation Litigation*,
  521 F.3d 1028 (9th Cir. 2008) ............................................................................... 17

*In re MTBE Products Liability Litigation*,
  379 F. Supp. 2d 348 (S.D.N.Y. 2005) ..................................................................... 8

*In re MTBE Products Liability Litigation*,
  447 F. Supp. 2d 289 (S.D.N.Y. 2005) ..................................................................... 7

ii

**TABLE OF AUTHORITIES**
(Continued)

Page

*In re Oswego Barge Corp.,*
    664 F.2d 327 (2d Cir. 1981)..................................................16, 17

*International Paper Co. v. Ouellette,*
    479 U.S. 481 (1987)................................................................5

*Isbrandtsen Co. v. Johnson,*
    343 U.S. 779 1952) ..............................................................17

*Jackson v. Johns-Manville Sales Corp.,*
    750 F.2d 1314 (5th Cir. 1985)................................................12

*Jesinger v. Nevada Federal Credit Union,*
    24 F.3d 1127 (9th Cir. 1994)..................................................19

*Kasza v. Browner,*
    133 F.3d 1159 (9th Cir. 1998)................................................17

*Limestone Development Corp. v. Village of Lemont,*
    520 F.3d 797 (7th Cir. 2008)....................................................3

*Massachusetts v. EPA,*
    127 S. Ct. 1438 (2007)..............................................12, 17, 18

*Medallion TV Enterprises, Inc. v. SelecTV of California, Inc.,*
    627 F. Supp. 1290 (C.D. Cal. 1986)........................................21

*Medellin v. Texas,*
    128 S. Ct. 1346 (2008) ..........................................................10

*Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,*
    453 U.S. 1 (1981)..............................................10, 11, 14, 17, 19

*Missouri v. Illinois,*
    180 U.S. 208 (1901)........................................................12, 14

*Missouri v. Illinois,*
    200 U.S. 496 (1906)........................................................13, 14

*Mobil Oil Corp. v. Higginbotham,*
    436 U.S. 618 (1978)........................................................17, 19

*MVMA v. N.Y. State Dep't of Environmental Conservation,*
    17 F.3d 521 (2d Cir. 1994)....................................................19

*National Audubon Society v. Dep't of Water,*
    869 F.2d 1196 (9th Cir. 1988)..............................10, 11, 12, 13, 19

*New Jersey v. New York,*
    283 U.S. 473 (1931)..............................................................13

*New Jersey v. New York,*
    345 U.S. 369 (1953)..............................................................15

*North Dakota v. Minnesota,*
    263 U.S. 365 (1923)..............................................................13

*Oksner v. Blakey,*
    2007 WL 3238659 (N.D. Cal. 2007)........................................3

- iii -

1
2

**TABLE OF AUTHORITIES**
(Continued)

**Page**

3

*Oneida Indian Nation v. County of Oneida,*
 414 U.S. 661 (1974) ...................................................................................................... 15

4

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.,*
 185 F.3d 957 (9th Cir. 1999) .......................................................................................... 4

5

*Pacific Telephone & Telegraph Co. v. MCI Telecommunications Corp.,*
 649 F.2d 1315 (9th Cir. 1981) ....................................................................................... 21

6

*Rhode Island v. Massachusetts,*
 37 U.S. 657 (1838) ........................................................................................................ 12

7

*Sekco Energy, Inc. v. M/V Margaret Chouest,*
 820 F. Supp. 1008 (E.D. La. 1993) ............................................................................... 12

8
9

*Sprietsma v. Mercury Marine,*
 537 U.S. 51 (2002) ........................................................................................................ 19

10

*Texas v. Pankey,*
 441 F.2d 236 (10th Cir. 1971) ....................................................................................... 12

11

*Texas Industries, Inc. v. Radcliff Materials, Inc.,*
 451 U.S. 630 (1980) ...................................................................................................... 10

12

*United States v. Tenet Healthcare Corp,*
 343 F. Supp. 2d 922 (C.D. Cal. 2004) .......................................................................... 16

13
14

*United States v. Texas,*
 507 U.S. 529 (1993) ...................................................................................................... 17

15

**STATE CASES**

16

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd..,*
 7 Cal. 4th 503 (1994) .............................................................................................. 20, 21

17

*Chavers v. Gatke Corp.,*
 107 Cal. App. 4th 606 (2003) ........................................................................................ 21

18

*Christensen v. NCH Corp.,*
 956 P.2d 468 (Alaska 1998) .......................................................................................... 21

19
20

*City of St. Louis v. Benjamin Moore & Co.,*
 226 S.W.3d 110 (Mo. 2007) ........................................................................................... 8

21

*Fairbanks North Star Borough v. Rogers & Babler,*
 747 P.2d 528 (Alaska 1987) ............................................................................................ 4

22

*Lockwood Co. v. Lawrence,*
 77 Me. 297 (1885) ........................................................................................................... 7

23

*Martinez v. Pacific Bell,*
 225 Cal. App. 3d 1557 (1990) ......................................................................................... 8

24
25

*Maupin v. Widling,*
 192 Cal. App. 3d 568 (1987) ...................................................................................... 5, 8

26

*Mitchell v. Gonzales,*
 54 Cal. 3d 1041 (1991) ................................................................................................... 6

27

28

1

**TABLE OF AUTHORITIES**
(Continued)

2

3
**Page**

*Osborn v. Irwin Memorial Blood Bank,*
    5 Cal. App. 4th 234 (1992) ...................................................................... 5, 8

4

*Parks Hiway Enters. v. CEM Leasing, Inc.,*
    995 P.2d 657 (Alaska 2000) ......................................................................... 6

5

*Staton ex rel. Vincent v. Fairbanks Memorial Hospital,*
    862 P.2d 847 (Alaska 1993) .................................................................. 5, 6, 8

6

*Warren v. Parkhurst,*
    78 N.E. 579 (N.Y. 1906) ............................................................................... 7

7

*Woodyear v. Schaefer,*
    57 Md. 1 (1904) ............................................................................................ 7

8

9

10
**Statutes**
42 U.S.C. § 1618(a), (b) .............................................................................. 15

42 U.S.C. §§ 7408-7411 ............................................................................. 17

42 U.S.C. § 7602(g) .................................................................................... 17

11

12

13
**Rules**
Fed. R. Civ. P. 12(b)(6) ............................................................................ 1, 3

Fed. R. Civ. P. 12(b)(1) ................................................................................ 2

14

15

16
**Other Authorities**
Cal. Jur. 3d, Nuisances § 36 (2008) ............................................................. 8

Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort,* 71 U. Cin.
    L. Rev. 741 (2003) ...................................................................................... 14

W. Page Keeton et al., *Prosser & Keeton on Torts* (5th ed. 1984) ..................... passim

Restatement (Second) of Torts ................................................................. 5, 6

Jeremiah Smith, *Legal Cause in Actions of Tort,* 25 Harv. L. Rev. 103 (1911) ..................... 8

17

18

19

20

21

22

23

24

25

26

27

28

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(6); MEMO. OF P'S & A'S – C-08-1138 SBA

1

**NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3    PLEASE TAKE NOTICE that on December 9, 2008 at 1:00 P.M., or as soon thereafter as

4    counsel may be heard in Courtroom 3 of the above-captioned Court, located at 1301 Clay Street,

5    Oakland, California, 94612, Defendants Exxon Mobil Corporation, Shell Oil Company, Chevron

6    Corporation, Chevron U.S.A. Inc., ConocoPhillips Company, BP America Inc., and BP Products

7    North America Inc. ("Oil Company Defendants" or "Defendants") will and hereby do move to

8    dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

9    The Oil Company Defendants seek dismissal of the Complaint based on this Notice of

10   Motion and Motion, the attached Memorandum of Points and Authorities, the pleadings and

11   records on file in this action, such additional authority and argument as may be presented in any

12   Reply and at the hearing on this Motion, and such other matters of which this Court may take

13   judicial notice.

14

**MEMORANDUM OF POINTS AND AUTHORITIES**

15

**INTRODUCTION**

16   This case asserts tort claims without precedent in the annals of American law.  Plaintiffs

17   seek to hold a handful of U.S. businesses – including the Oil Company Defendants submitting

18   this motion – liable in damages, on nuisance and conspiracy theories, for what plaintiffs

19   themselves explicitly allege to be harms resulting from *centuries of all human activities across*

20   *the entire planet Earth*.  Even assuming the property losses plaintiffs assert could be traced to

21   human-induced changes in the global climate – itself a staggeringly difficult problem of factual

22   proof – no cognizable U.S. tort law, either federal or state, offers plaintiffs any basis for holding a

23   small collection of defendants liable for the supposed atmospheric effects of all historical human

24   industrial, commercial, agricultural, and residential activity worldwide.

25   In this memorandum, the Oil Company Defendants set forth three grounds on which

26   plaintiffs' claims must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6):  (1)

27   plaintiffs fail to plead facts supporting the causation element of their nuisance claims; (2)

28   plaintiffs cannot pursue a federal common law nuisance claim because such claims are limited to

1    claims *by States* seeking *injunctive relief*, and because federal common law in any event has been

2    displaced by a federal statute addressing the subject of greenhouse gas emissions; and (3)

3    plaintiffs' conspiracy and concert of action claims are purely derivative of their underlying

4    nuisance claims and do not survive dismissal of those claims.

5                                    **FACTUAL ALLEGATIONS**

6           For ease of reference, the Oil Company Defendants include a brief recitation of plaintiffs'

7    factual allegations as relevant to the instant memorandum but otherwise rely upon the background

8    discussion in the Oil Company Defendants' memorandum of law in support of their motion to

9    dismiss plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(1).

10          Plaintiffs allege that a long-building rise in atmospheric greenhouse gas concentrations is

11    changing the planet's climate: "human activity" across the Earth "since the dawn of the industrial

12    revolution" has increased greenhouse gas levels which, in turn, have caused the earth to retain

13    more heat; this global warming has led to changing weather patterns and has delayed the annual

14    formation of sea ice in the Arctic, leaving the village of Kivalina susceptible to fierce winter

15    storm activity; and storm activity has damaged plaintiffs' real property.  (Compl. ¶¶ 4, 16-17,

16    124-127, 132.)  Because carbon dioxide "persist[s] in the atmosphere for several centuries," "each

17    year's emissions" are "added to those that came before," creating planet-wide levels of

18    atmospheric greenhouse gases that are warming the entire Earth's climate.  (Compl. ¶ 125.)

19    Collectively, human activity worldwide has caused atmospheric carbon dioxide levels to

20    "increase[] by 35 percent" since "the 18th century."  (*Id.*)

21          Plaintiffs' own allegations thus make clear the cause of the global warming and property

22    damage they allege:  the activity of billions of persons over several hundred years.  What they do

23    not – and could not – allege is that this state of affairs can actually be traced to the handful of

24    companies they name in their suit.  Indeed, plaintiffs nowhere allege in terms that the Oil

25    Company Defendants (or even all the defendants) cause or caused global warming.  Rather,

26    plaintiffs claim that the defendants can be held legally liable for all of plaintiffs' property damage

27    because each Oil Company Defendant, and the defendants collectively, were "substantial

28    contributors to global warming" through greenhouse gas emissions from their operations.

                                          - 2 -

1   (Compl. ¶ 253; *see* Compl. ¶ 5.)  In other words, by plaintiffs' own account, it is not the

2   defendants' own activities that have made the planet warmer – those activities are merely *part of*

3   the "human activity that releases greenhouse gases," which, collectively over a period of two

4   centuries, has been "causing a change in the Earth's climate."  (Compl. ¶ 132; *see* Compl. ¶¶ 181-

5   184.)

6       Defendants' unspecified "contribution" to global warming nevertheless gives rise to

7   several claims for relief, in plaintiffs' view.  First is a federal common law claim for public

8   nuisance:  defendants' emissions allegedly interfere with "the rights to use and enjoy public and

9   private property in Kivalina."  (Compl. ¶ 250.)  Second, and in the alternative, plaintiffs allege

10  that defendants are liable under state-law private and public nuisance theories.  (Compl. ¶¶ 262-

11  267.)  Third and fourth, plaintiffs allege that certain defendants have conspired and acted in

12  concert to create, contribute to, or maintain a public nuisance of global warming.  (Compl.

13  ¶¶ 268-282.)  According to plaintiffs, although emissions from the businesses they have named

14  have only contributed in some unspecified way to the centuries of human activities worldwide

15  that allegedly caused global climate change, these companies must be made to pay for all the

16  property damage plaintiffs attribute to this multi-century worldwide phenomenon.  (Compl. ¶ 67.)

17                              **ARGUMENT**

18      Under Rule 12(b)(6), "a motion to dismiss should be granted if the plaintiff is unable to

19  articulate 'enough facts to state a claim to relief that is plausible on its face.'"  *Oksner v. Blakey*,

20  2007 WL 3238659, at *2 (N.D. Cal. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct.

21  1955, 1960 (2007)).  In determining whether the complaint states a "plausible" claim, allegations

22  of fact are what matters – "labels and conclusions" are meaningless, and "a formulaic recitation

23  of the elements of a cause of action will not do."  *Twombly*, 127 S. Ct. at 1964-65; *see Oksner*,

24  2007 WL 3238659, at *2; *see also Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 802-03

25  (7th Cir. 2008) ("a defendant should not be forced to undergo costly discovery unless the

26  complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a

27  substantial case").

28      Plaintiffs' allegations, taken as true for purposes of this motion, fail to give rise to any

                                    - 3 -

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(6); MEMO. OF P'S & A'S – C-08-1138 SBA

1  legally cognizable claims for several reasons.  *First*, their nuisance claims fail because plaintiffs

2  do not and cannot allege facts from which to establish any plausible claim that the Oil Company

3  Defendants were the factual and legal cause of plaintiffs' property damage.  *Second*, their federal

4  common law claim fails because only States can assert federal common law nuisance claims, and

5  the Clean Air Act in any event has displaced the authority of federal courts to create federal

6  common law rules to regulate air pollution and climate change.  *Third*, their "conspiracy" and

7  "concert of action" claims fail because they are not independent torts, but simply are means of

8  assigning secondary or derivative liability for an underlying tortious act.  These secondary

9  liability claims thus necessarily fall along with the primary nuisance claims.

10

11  **I.    PLAINTIFFS FAIL TO STATE A NUISANCE CLAIM BECAUSE THE FACTUAL ALLEGATIONS FAIL TO ESTABLISH THAT DEFENDANTS' EMISSIONS WERE AN ACTUAL OR LEGAL CAUSE OF PLAINTIFFS' INJURIES.**

12

13         The legal and factual flaws in plaintiffs' basic nuisance claims are numerous; this section

14  focuses only on the most glaring legal defect in their theory:  they do not and cannot allege facts

15  establishing that the Oil Company Defendants' conduct was an actual and legal *cause* of the

16  injuries plaintiffs assert.  According to plaintiffs themselves, the true cause of global warming,

17  and thus of their injuries, is not defendants' emissions, but *all greenhouse-gas emitting "human*

18  *activity" worldwide since the dawn of the Industrial Revolution*.  (Compl. ¶ 132.)  As explained

19  below, no legal principle allows plaintiffs to hold a handful of defendants, plucked from among

20  all the world's innumerable greenhouse-gas emitters, liable in tort for all property damage

21  allegedly caused by hundreds of years of human activity.  *See Canyon County v. Syngenta Seeds,*

22  *Inc.*, 519 F.3d 969, 982-83 (9th Cir. 2008) (affirming dismissal of complaint for failure to plead

23  facts sufficient to establish causation); *Or. Laborers-Employers Health & Welfare Trust Fund v.*

24  *Philip Morris, Inc.*, 185 F.3d 957, 962-64 (9th Cir. 1999) (same).

25         Causation is an "essential element" of any tort.  W. Page Keeton et al., *Prosser & Keeton*

26  *on Torts* § 41, at 263 (5th ed. 1984) ("*Prosser & Keeton*").  But causation does not, of course,

27  encompass any and all acts that contributed in some way to the creation of a given event.  *See*

28  *Fairbanks N. Star Borough v. Rogers & Babler*, 747 P.2d 528, 532 (Alaska 1987) ("[t]he event

1    without millions of causes is simply inconceivable").  "As a practical matter, legal responsibility

2    must be limited to those causes which are so closely connected with the result and of such

3    significance that the law is justified in imposing liability."  *Prosser & Keeton* § 41, at 264; *see*

4    Restatement (Second) of Torts § 431 cmt. a ("Restatement").

5            To distinguish those antecedent causal factors for which legal liability may be assigned

6    from the universe of factors giving rise to any given event, courts generally ask two questions:

7    "whether the defendant's conduct was the 'cause in fact' of the injury; and, if so, whether as a

8    matter of social policy the defendant should be held legally responsible for the injury."  *Osborn v.*

9    *Irwin Mem'l Blood Bank*, 5 Cal. App. 4th 234, 252 (1992); *see Staton ex rel. Vincent v. Fairbanks*

10   *Mem'l Hosp.*, 862 P.2d 847, 851 & n.7 (Alaska 1993) (causation involves "[t]wo distinct prongs":

11   "actual causation, and a more intangible legal policy element"); *Prosser & Keeton* § 42, at 272-73

12   ("Once it is established that the defendant's conduct has in fact been one of the causes of the

13   plaintiff's injury, there remains the question whether the defendant should be legally responsible

14   for the injury.").[1]  The latter, policy-based inquiry is often referred to as "legal" or "proximate"

15   cause.  *See Vincent*, 862 P.2d at 851 n.7; *Prosser & Keeton* § 42, at 273.[2]

16           As elaborated below, plaintiffs do not and cannot allege facts showing that defendants'

17   contributions to centuries of greenhouse gas emissions from worldwide human activities were an

18   actual or proximate cause of plaintiffs' injuries.

---

20   [1] Plaintiffs have not identified the source of law they believe governs their state-law
     claims, but it is possible that those claims will be separately governed by the distinct and variable
21   tort laws of every U.S. and foreign jurisdiction in which defendants have greenhouse-gas emitting
     facilities.  *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) (source state's law governs
22   water-pollution nuisance claim).  Although defendants take no position on the resolution of the
     choice-of-law question at this time, disposition of this motion is nevertheless proper because,
23   while state tort rules conflict in various ways, plaintiffs' claims cannot proceed under the most
     basic causation principles applicable in any state and under federal common law, no matter how
24   those principles are articulated.  For convenience, this brief relies primarily on precedents from
     California and Alaska, as well as the Restatement and authoritative hornbooks, all of which
25   illustrate basic causation rules generally followed in all U.S. jurisdictions.

26   [2] Some authorities, including most prominently the Restatement, use "legal" or
     "proximate" cause to refer to all causal events that can result in legal liability, as opposed to those
27   events that are only causal in a "philosophic" sense.  Restatement § 431 cmt. a.  Such authorities
     then generally divide the broad category of legal or proximate cause into the same factual and
28   policy prongs employed elsewhere.  *See Prosser & Keeton* § 41, at 264; *Maupin v. Widling*, 192
     Cal. App. 3d 568, 573 (1987).

### A.    Plaintiffs Do Not Allege Facts Sufficient To Establish Causation-In-Fact.

States vary in how they articulate the actual cause or cause-in-fact requirement, but most – including California and Alaska – employ some version of the "substantial factor" test set forth in §§ 431-433 of the Restatement.  *See Vincent*, 862 P.2d at 851-52; *Parks Hiway Enters. v. CEM Leasing, Inc.*, 995 P.2d 657, 666 (Alaska 2000) (applying "substantial factor" test to nuisance claim); *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1052-53 (1991); *see also Prosser & Keeton* § 41, at 267-68.  Normally an act will be a "substantial factor" in causing an injury only when the injury would not have happened but for the act.  Restatement § 432(1); *Vincent*, 862 P.2d at 851; *Mitchell*, 54 Cal.3d at 1052.  Where a plaintiff claims injury allegedly caused by more than one actor, the defendant's act is deemed a "substantial factor" if it "by itself was sufficient to cause the injury."  *Vincent*, 862 P.2d at 851; *see* Restatement § 432(2).  In short, to be a substantial factor in causing an injury, a defendant's act must be either a necessary or sufficient cause of the injury.

Plaintiffs do not allege that either is true here.  They obviously cannot allege that global warming never would have happened but for any one defendant's emissions, nor do they allege that global warming would not have happened but for all the defendants' emissions.  Global warming, they say, is the product of *all* human activity for at least two centuries.  *See supra* at 2-3.  Defendants' emissions, they say, did no more than "substantially contribute" to atmospheric changes, in some unquantified, unspecified, and undefined way.  That is not enough to satisfy the legal requirements of causation – as just noted, a "contribution" to an event, even a "substantial contribution," qualifies as a *legal cause* of the event only if the contributing act was, by itself, necessary or sufficient to bring about the event.  Plaintiffs make no such allegation here.

Plaintiffs instead apparently seek to evade this fundamental causation requirement on an extraordinary theory of all-humanity joint liability:  all human actors and entities that emit greenhouse gases would be deemed joint tortfeasors, but only a small subset – defendants here – would be held liable for all the harms caused by centuries of man-made greenhouse gas emissions across the planet.  Plaintiffs ground this theory mainly on inapposite cases involving river pollution and similar situations, where each polluter's own individual contribution was harmless

1   in itself – *i.e.*, neither necessary nor sufficient to cause plaintiffs' injury – but where all the

2   contributions combined to create pollution sufficiently harmful to injure the plaintiff. *See Prosser*

3   *& Keeton* § 52, at 354 ("If several defendants independently pollute a stream, the impurities

4   traceable to each may be negligible and harmless, but all together may render the water entirely

5   unfit for use."); *see, e.g., In re MTBE Prods. Liab. Litig.*, 447 F. Supp. 2d 289, 301 (S.D.N.Y.

6   2005); *Warren v. Parkhurst*, 78 N.E. 579, 582 (N.Y. 1906); *Woodyear v. Schaefer*, 57 Md. 1, 9-

7   11 (1904); *Lockwood Co. v. Lawrence*, 77 Me. 297, 306-10 (1885). Those cases have no

8   application here. They involve pollution of a particular location (such as a river or groundwater

9   area, or a localized air environment) by emissions of noxious chemicals from a discrete set of

10  polluters, which together are the entire source of the pollution. In those unique circumstances,

11  each individual contributor "is deemed to have caused the harm," and courts have allowed

12  plaintiffs to "sue any entity that contributed to the commingled product that caused their injury."

13  *MTBE*, 447 F. Supp. 2d at 301. Typically all the contributors are named as defendants in such

14  cases, but if not, as the *MTBE* court noted, it is only because the named defendants "can implead

15  other responsible parties." *Id.* at 301-02.

16      Applied here, the theory invoked in those cases would mean that every "contributor" to

17  atmospheric greenhouse gas concentrations – *i.e.*, every human and commercial actor on the

18  planet, by plaintiffs' own account – would be "deemed to have caused the harm." Plaintiffs thus

19  would be entitled to sue any one contributor – perhaps a farmer driving a tractor in Nebraska, or a

20  shrimp fisherman running his boat off the Mississippi Gulf shore. The defendants likewise would

21  be entitled to implead all the billions of other worldwide contributors to the alleged harm. The

22  point, of course, is not that these are simple procedural maneuvers demonstrating why this case

23  can be treated just like a traditional pollution nuisance case. Just the opposite: the obvious

24  impossibility of treating this case like a traditional nuisance case demonstrates why it is *not* a

25  traditional nuisance case. Far from being an effort to hold an identifiable group of polluters liable

26  for a discrete nuisance caused entirely by that group, this case is an effort to hold a carefully

27  selected subgroup of U.S. businesses liable for an alleged nuisance caused by *everybody on the*

28  *planet* over several centuries' time, ignoring all other contributors to the harm, including car and

- 7 -

1    truck drivers, construction and farming vehicle operators, manufacturing plants, and foreign

2    emitters of all kinds.  There is simply no precedent for labeling every actor on Earth a tortfeasor,

3    and then seeking to impose damages liability for the consequences of all human activity on one,

4    two, or two dozen select actors.  *See In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 372

5    (S.D.N.Y. 2005) ("Cases applying the rule of concurrent wrongdoing typically involve a small

6    number of tortfeasors, such that the imposition of joint and several liability does not cause

7    disproportionate hardship to the defendants"); *cf. City of St. Louis v. Benjamin Moore & Co.*, 226

8    S.W.3d 110, 116 (Mo. 2007) (rejecting theory of causation that "risks exposing … defendants to

9    liability greater than their responsibility and may allow the actual wrongdoer to escape liability

10   entirely").

11          **B.       Plaintiffs Fail To Allege Facts Sufficient To Establish Legal Causation.**

12          Even where a given act is a cause-in-fact of an injury, it will not result in liability unless it

13   is also a "proximate" or "legal" cause of the injury.  *See Martinez v. Pacific Bell*, 225 Cal. App.

14   3d 1557, 1565-66 (1990) (proximate cause required for nuisance claims); Cal. Jur. 3d, Nuisances

15   § 36 (2008) (same).  The basic proximate cause question is whether the act was "so significant

16   and important a cause that the defendant should be legally responsible."  *Vincent*, 862 P.2d at 851

17   (quoting *Prosser & Keeton* § 42, at 273); *see Osborn*, 5 Cal. App. 4th at 252.  Because "both

18   significance and importance turn upon conclusions in terms of legal policy," proximate cause "is

19   primarily a problem of law," not fact.  *Prosser & Keeton* § 42, at 273; *see Maupin*, 192 Cal. App.

20   3d at 573 (proximate cause is "question of law and social policy").  Under this principle, "[i]f the

21   force [the defendant] set in motion, has become, so to speak, merged in the general forces that

22   surround us . . . it can be followed no further.  Any later combination of circumstances to which it

23   may contribute in some degree is too remote from the defendant to be chargeable to him."

24   *Vincent*, 862 P.2d at 851 n.8 (quoting Jeremiah Smith, *Legal Cause in Actions of Tort*, 25 Harv.

25   L. Rev. 103, 112 (1911)).

26          There is no basis in law for assigning to the few defendants in this case all legal

27   responsibility for two centuries of worldwide human activity that allegedly has given rise to

28   climate change.  By plaintiffs' own account, defendants' emissions "merged in the general forces

                                                - 8 -

1   that surround us," making no more than some indeterminate contribution to the "combination of

2   circumstances" that allegedly resulted in plaintiffs' harm.  Indeed, the connection between

3   defendants' conduct and that harm could hardly be more attenuated.  Plaintiffs allege that each

4   company emits greenhouse gases, which combine with gases emitted by natural sources and

5   countless unnamed persons, companies, and other human actors around the world, all going about

6   the routine activities associated with human life over the past two hundred years.  (Compl. ¶¶ 3,

7   125.)  The emissions from all these sources over all that time combine in the atmosphere,

8   allegedly resulting in the earth's retention of excessive heat.  (Compl. ¶ 123.)  Tertiary factors

9   then come into play exacerbating the warming effect.  (Compl. ¶ 127.)  The warming attributable

10   to greenhouse gases then inhibits the development of winter sea ice off the Alaskan coast, which

11   leaves Kivalina more vulnerable to winter storm activity.  (Compl. ¶ 185.)  Finally, recurring

12   storms erode the land Kivalina is built on.  (Compl. ¶ 4.)

13         Those allegations do nothing whatsoever to demonstrate that defendants' emissions made

14   such a contribution to the chain of events that defendants themselves – alone among all the

15   world's emitters – can be singled out to bear all the legal consequences of more than two

16   centuries' worth of human activity.  Plaintiffs might just as well have targeted steel mills in

17   Pennsylvania, concrete plants in Georgia, farmers in the San Joaquin Valley, or a defendant class

18   of all U.S. car and truck owners.  Any designation of defendant greenhouse-gas emitters would be

19   as arbitrary as this one, and equally inadequate to establish legal causation.  Plaintiffs' nuisance

20   claims should be dismissed with prejudice.

21
22   **II.**    **PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE FEDERAL COMMON LAW OF NUISANCE.**

23
24        **A.**    **The Federal Common Law Does Not Recognize Private Nuisance Claims For Greenhouse Gas Emissions.**

25         No court has ever recognized a federal common law nuisance claim of the sort asserted by

26   plaintiffs here.  Precedents of the U.S. Supreme Court and other courts make clear that a federal

27   common law nuisance claim may be asserted only by *a State* seeking *injunctive relief*, *i.e.*,

28   abatement of the nuisance.  Because plaintiffs here are not States, and they do not seek abatement,

1    their federal common law nuisance claim must be dismissed as a matter of law.

2        Plaintiffs' nuisance claim has no basis in those tiny shards of federal common law that

3    survived the Supreme Court's holding in *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), that

4    "[t]here is no federal general common law." *Id.* at 78. Since *Erie*, courts have been required to

5    "start with the assumption that it is for Congress, not federal courts, to articulate the appropriate

6    standards to be applied as a matter of federal law." *City of Milwaukee v. Illinois*, 451 U.S. 304,

7    317 (1981) ("*Milwaukee II*"); *cf. Medellin v. Texas*, 128 S. Ct. 1346, 1362 (2008) ("Our Framers

8    established a careful set of procedures that must be followed before federal law can be created

9    under the Constitution – vesting that decision in the political branches, subject to checks and

10   balances."). There are but a "few and restricted" instances in which the presumption against

11   federal common lawmaking can be overcome, including (1) cases "in which Congress has given

12   the courts the power to develop substantive law," and (2) cases "in which a federal rule of

13   decision is necessary to protect uniquely federal interests." *Tex. Indus., Inc. v. Radcliff Materials,

14   Inc.*, 451 U.S. 630, 640 (1980) (quotations and citations omitted). Neither of these exceptions has

15   any application here.

16       The first category can be easily dismissed: nobody contends that Congress has

17   affirmatively authorized the courts to regulate greenhouse gas emissions. *Cf. Nat'l Audubon

18   Soc'y v. Dep't of Water*, 869 F.2d 1196, 1202 (9th Cir. 1988) ("Congress has not authorized the

19   courts to develop a substantive law of air pollution."). The second category, too, can be

20   dismissed: as the Ninth Circuit has held, "there is not 'a uniquely federal interest' in protecting

21   the quality of the nation's air." *Id.* at 1203. In the absence of a *sovereign State* as plaintiff

22   asserting that pollution interferes with the use or enjoyment of its territory, courts have no

23   authority to create a federal common law nuisance tort. *Id.* at 1205.

24       Plaintiffs appear to base their claim principally on *Illinois v. City of Milwaukee*, 406 U.S.

25   91 (1972) ("*Milwaukee I*"), where the Supreme Court acknowledged the possibility that "federal

26   'common law'" might "give rise to a claim for abatement of a nuisance caused by interstate water

27   pollution." *Milwaukee II*, 451 U.S. 304, 307 (1981); *see also Middlesex County Sewerage Auth.

28   v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 21 (1981) (describing *Milwaukee I*). But as the Ninth

- 10 -

1    Circuit made clear in *Audubon* – and as many other precedents confirm – federal common law

2    nuisance claims are available only to sovereign States seeking injunctive relief.

3    In *Audubon*, the Ninth Circuit rejected an environmental group's attempt to bring a federal

4    nuisance claim against the Los Angeles Department of Water and Power to enjoin the Department

5    from diverting streams away from a California lake, a diversion which allegedly caused "dust

6    storms" polluting both California and Nevada air.  The court held that plaintiffs' nuisance claims

7    were not cognizable under federal common law because, *inter alia,* they did not implicate the

8    "uniquely federal interests" necessary to permit creation of a federal common law claim.

9    *Audubon*, 869 F.2d at 1202.  A "uniquely federal interest," the court explained, "exists only in

10   such narrow areas as those concerned with [1] the rights and obligations of the United States, [2]

11   interstate and international disputes implicating the conflicting rights of states or our relations

12   with foreign nations, and [3] admiralty cases."  *Id.*

13   None of those interests was implicated in *Audubon* and none is implicated here.

14   Admiralty, of course, is as irrelevant here as it was there.  So too are "rights and obligations of the

15   United States."  *Audubon* makes clear that those interests are limited to "rights and obligations of

16   the United States *as sovereign*," which is what "required application of federal law" in prior

17   cases.  *Id.* at 1204; *see id.* at 1203 (describing cases involving the Federal Government's own

18   contractual rights and commercial paper obligations).  Thus, although the plaintiffs asserted

19   "some unquantified federal interest in protecting the nation's air quality," that interest did not

20   suffice to allow creation of a federal common law nuisance claim because it "d[id] not necessarily

21   involve the authority and duties of the United States *as sovereign*" thereby "making application of

22   [state] law inappropriate."  *Id.* at 1204 (emphasis added).  Likewise here, plaintiffs' "air

23   pollution" nuisance claims are not based on, and do not implicate, sovereign rights of the United

24   States requiring the application of federal law.

25   Nor does this case implicate the type of "interstate dispute" deemed sufficient in *Audubon*

26   to allow application of federal common law.  Such cases, the Ninth Circuit emphasized, include

27   "only those interstate controversies which involve *a state* suing sources outside of its own

28   territory."  *Id.* at 1205 (emphasis added); *see also Sea Clammers*, 453 U.S. at 21 (*Milwaukee I* did

- 11 -

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(6); MEMO. OF P'S & A'S – C-08-1138 SBA

1   not create "a cause of action ... brought under federal common law by *a private plaintiff, seeking*

2   *damages*" (emphasis added)).  *Audubon* confirms that interstate controversies involve "uniquely

3   federal interests" for purposes of federal common law only when a sovereign State is asserting its

4   own sovereign right in the quality of its air.  869 F.2d at 1204-05; *see also Jackson v. Johns-*

5   *Manville Sales Corp.*, 750 F.2d 1314, 1324-25 (5th Cir. 1985) (dispute must "involve the rights

6   and duties of states as discrete political entities," making it inappropriate for state law to control);

7   *Comm. for Consideration of Jones Falls Sewage Sys. v. Train*, 539 F.2d 1006, 1010 (4th Cir.

8   1976) (federal common law of public nuisance is limited to disputes asserting rights of States);

9   *Sekco Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1013-14 (E.D. La. 1993)

10  (private party cannot assert public nuisance action under federal common law).[3]

11          No State is a party to this case, nor are "the environmental rights of a State" at issue.

12  *Milwaukee I*, 406 U.S. at 107 n.9 (quotation omitted). There are thus no "uniquely federal

13  interests" here, even though the issue may extend beyond the borders of a single State, and even

14  across all States.  "The enactment of a federal rule in an area of national concern ... is generally

15  made not by the federal judiciary, purposefully insulated from democratic pressures, but by the

16  people through their elected representatives in Congress."  *Audubon*, 869 F.2d at 1201; *see*

17  *Jackson*, 750 F.2d at 1324-25 ("Clearly, if federal courts are to remain courts of limited powers as

18  required under *Erie*, a dispute ... cannot become 'interstate,' in the sense of requiring the

19  application of federal common law, merely because the conflict is not confined within the

20  boundaries of a single state.").  Outside such recognized federal common-law domains as

---

21          [3] These cases follow from Supreme Court precedents tying the recognition of limited

22  federal common law remedies to the fact that States surrendered certain rights upon entering the
    Union and now lack the means for resolving interstate disputes – means which they possessed

23  before surrendering their rights as independent sovereigns.  *Cf. Massachusetts v. EPA*, 549 U.S.
    497, 127 S. Ct. 1438, 1454 (2007) ("When a State enters the Union, it surrenders certain

24  sovereign prerogatives.  Massachusetts cannot invade Rhode Island to force reductions in
    greenhouse gas emissions.").  For example, the Court created a remedy for boundary disputes

25  between States in *Rhode Island v. Massachusetts*, 37 U.S. 657, 724 (1838), because the States had
    surrendered their "power ... to settle a controverted boundary between themselves ... or in any

26  department of the government," other than the courts.  In *Missouri v. Illinois*, 180 U.S. 208
    (1901) ("*Missouri I*"), and in *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907) – both

27  pre-*Erie* decisions – the Supreme Court held that the States could seek abatement for
    transboundary nuisance disputes, because the States had surrendered their authority to "forcibl[y]

28  abate[] ... outside nuisances."  *Id.*

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(6); MEMO. OF P'S & A'S – C-08-1138 SBA

1  admiralty, courts are authorized to create federal common law as a "necessary expedient"

2  (*Milwaukee II*, 451 U.S. at 314; *Audubon*, 869 F.2d at 1204) only when the rights and obligations

3  of federal and State sovereigns are involved.  No such interests are implicated here.

4      Indeed, even where sovereign States are involved, the Supreme Court has cautioned that

5  only "*some … demands*" to *abate* alleged nuisances warrant the creation of federal common law.

6  *Tennessee Copper*, 206 U.S. at 237 (emphasis added).  A State may properly seek an *injunction*

7  for "a public nuisance of simple type," *North Dakota v. Minnesota*, 263 U.S. 365, 374 (1923),

8  including, for example, where city garbage washes up on a neighboring State's beaches, *New*

9  *Jersey v. New York*, 283 U.S. 473, 476 (1931), where "noxious gas" directly destroys crops,

10  *Tennessee Copper*, 206 U.S. at 236, and where city sewage is deposited in public waterways used

11  downstream for drinking, agriculture and manufacturing, *Missouri v. Illinois*, 200 U.S. 496, 517

12  (1906) ("*Missouri II*").

13      The claims in such "simple nuisance" cases could not differ more starkly from the claims

14  involved here.  Plaintiffs allege that the accumulation of greenhouse gas emissions over hundreds

15  of years has created a greenhouse effect, which has allegedly caused average global temperatures

16  to increase, which has allegedly caused arctic ice to form later in the year than it otherwise would,

17  which has allegedly reduced a protective barrier against storms, which has allegedly resulted in

18  more storm damage to the Plaintiffs' village, which in turn allegedly requires the expenditure of

19  hundreds of millions of dollars for relocation.  (Compl. ¶¶ 1-4, 123-31.)  Plaintiffs assert that one

20  of countless contributing factors in this centuries-long global phenomenon – *i.e.*, defendants'

21  worldwide carbon dioxide and methane emissions – mixes indiscriminately in the global

22  atmosphere with natural elements and gases produced for more than a hundred years by billions

23  of other individuals, firms, and governments not before this Court, and allegedly contributes in

24  some indeterminate degree to global harm through a hopelessly attenuated chain of causation.

25  The application of federal common law to address and regulate such a phenomenon would draw

26  this Court into a vast morass of hotly contested environmental policy issues bearing no

27  resemblance to the simple adjudication of a common tort claim.  *See Milwaukee II*, 451 U.S. at

28  317, 325 (recognizing that federal courts applying "vague and indeterminate nuisance concepts

- 13 -

1   and maxims of equity jurisprudence" are ill-equipped to confront problems like interstate

2   pollution, which is "particularly unsuited to the approach inevitable under a regime of federal

3   common law").

4       Additionally, plaintiffs are seeking only monetary damages – not abatement of the

5   nuisance.  (Compl. ¶ 6 & "Relief Requested")  The Supreme Court has never held that a plaintiff

6   may bring a federal common law nuisance action seeking damages rather than abatement.  *See*

7   *Sea Clammers*, 453 U.S. at 10-12 & nn.17, 21 (reserving the question).  To the contrary, several

8   precedents suggest that damages would not be available.  *See Milwaukee I*, 406 U.S. at 108 n.10

9   ("[T]he kind of *equitable* relief to be accorded lies in the discretion of the chancellor." (emphasis

10  added)); *Tennessee Copper*, 206 U.S. at 237-38 (noting "the difficulty of valuing [the type of

11  rights at issue in a federal common law public nuisance action] in money"); *Missouri I*, 180 U.S.

12  at 244 ("The grounds of this jurisdiction, in cases of … public nuisances, is the ability of courts *of

13  equity* to give a more speedy, effectual and permanent remedy than can be had at law." (emphasis

14  added)).  There is no basis for moving "considerably beyond" prior precedent in this case by

15  creating a damages remedy.  *Sea Clammers*, 453 U.S. at 10; *see also* Donald G. Gifford, *Public

16  Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741, 745-46 (2003)

17  ("Historically, public nuisance most often was not regarded as a tort, but instead as a basis for

18  public officials to pursue criminal prosecutions or seek injunctive relief to abate harmful conduct.

19  Only in limited circumstances was a tort remedy available to an individual, and apparently never

20  to the state or municipality.").

21      Finally, there is no basis for extending the federal common law of nuisance to these

22  particular plaintiffs, a municipality and a Native tribe.  As Supreme Court precedent makes clear,

23  the basis for federal common law remedies rests on the States' relinquishment of sovereign

24  warmaking powers that would otherwise be used to resolve intersovereign disputes in exchange

25  for entering into the Union and receiving the rights and protections attendant to statehood.[4]  As a

26      [4] *See supra* note 3; *see also Missouri II*, 200 U.S. at 520-21 ("It may be imagined that a
    nuisance might be created by a State upon a navigable river like the Danube, which would
27  amount to a *casus belli* for a State lower down, unless removed.  If such a nuisance were created
    by a State upon the Mississippi, the controversy would be resolved by the more peaceful means of
28  a suit in this court."); *Missouri I*, 180 U.S. at 241 (Court must provide remedy because the State's

1    mere instrumentality of the State, the City of Kivalina has no independent right to conduct

2    statecraft and is thus not entitled to consideration from the federal government for a bargain it did

3    not make. *Cf. Alden v. Maine*, 527 U.S. 706, 756 (1999) (although Congress may not subject a

4    State to suit in its own courts, no such constitutional right extends to municipalities).[5]

5         The Native Village of Kivalina has no more authority to cloak itself in the State's

6    sovereignty than does the City. While the Supreme Court has held that Indian Tribes may assert

7    "aboriginal" property rights under federal common law, *Oneida Indian Nation v. County of*

8    *Oneida*, 414 U.S. 661, 676 (1974), Alaskan Native Villages do not hold "aboriginal" property

9    rights. The Alaska Native Claims Settlement Act ("ANCSA") – which was enacted "to end the

10   sort of federal supervision over Indian affairs that had previously marked federal Indian policy,"

11   *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 523-24 (1998) – extinguished all

12   aboriginal claims to Alaska land, 42 U.S.C. § 1618(a), and then reconveyed title to "village

13   corporations," *id.* § 1618(b). Plaintiff Native Village of Kivalina therefore holds title to its land

14   by federal conveyance, and like the property rights of municipalities and private parties, such title

15   rights are governed by state property law. *Oneida Nation*, 414 U.S. at 676 (distinguishing

16   aboriginal property rights (an issue of federal law) from property rights by federal conveyance,

17   which are governed by state property law). Because the Native Village cannot claim the status of

18   a sovereign State, its claims do not create uniquely federal interests necessitating the application

19   of federal common law.

20        **B.    Congress Has Displaced Any Authority Of Federal Courts To Develop Their
            Own Common Law Rules To Regulate Greenhouse Gas Emissions.**

21

22        As the previous section demonstrated, no court has ever recognized a federal common law

23

24   "[d]iplomatic powers and the right to make war [had] been surrendered to the general
     government").

25        [5] Nor can a municipality represent the State as a whole, since municipalities within a
     single State may have conflicting interests. *See Milwaukee I*, 406 U.S. at 96-97 ("The City of
26   Philadelphia represents only a part of the citizens of Pennsylvania who reside in the watershed
     area of the Delaware River and its tributaries and depend upon those waters. If we undertook to
27   evaluate all the separate interests within Pennsylvania, we could, in effect, be drawn into an
     intramural dispute over the distribution of water within the Commonwealth." (quoting *New Jersey*
28   *v. New York*, 345 U.S. 369, 373 (1953))).

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(6); MEMO. OF P'S & A'S – C-08-1138 SBA

1    nuisance claim akin to plaintiffs' claim here. That is reason enough for the Court to reject

2    plaintiffs' claim, but there is another reason as well:  Congress has already enacted a statute

3    submitting the subject of nationwide greenhouse gas emissions and global warming to the

4    regulatory authority of a federal agency, thereby displacing the authority of courts to fashion their

5    own rules and standards governing the same subject under the guise of federal common law.

6           As a general matter, "federal courts create federal common law only as a necessary

7    expedient when problems requiring federal answers are not addressed by federal statutory law."

8    *Milwaukee II*, 451 U.S. at 319 n.14.  Thus a threshold question for any court considering the

9    creation of a federal common law cause of action is whether Congress has already enacted a

10   statute addressing the problem at issue.  Although this inquiry is sometimes framed as whether

11   the federal statute "preempts" federal common law, *see*, *e.g.*, *County of Oneida v. Oneida Indian

12   Nation*, 470 U.S. 226, 236-237 (1985), the standard for displacement of federal common law

13   differs significantly from the standard for preemption of state law.  Whereas preemption involves

14   federalism and concern for state sovereign rights, displacement of federal common law involves

15   only a federal separation of powers question – *i.e.*, "which branch of the Federal Government is

16   the source of *federal* law."  *Milwaukee II*, 451 U.S. at 319 n.14.  In answering that question,

17   courts "start with the assumption that it is for Congress, not federal courts, to articulate the

18   appropriate standards to be applied as a matter of federal law."  *Id.* at 317.  This rule reflects the

19   Supreme Court's longstanding "commitment to the separation of powers," which the Court has

20   described as "too fundamental to continue to rely on federal common law by judicially decreeing

21   what accords with common sense and the public weal when Congress has addressed the

22   problem."  *Id.* at 315.  Thus, "[w]hile federalism concerns create a presumption against

23   preemption of state law, including state common law, separation of powers concerns create a

24   presumption *in favor of* preemption of federal common law whenever it can be said that Congress

25   has legislated on the subject."  *In re Oswego Barge Corp.*, 664 F.2d 327, 335 (2d Cir. 1981)

26   (emphasis added); *accord United States v. Tenet Healthcare Corp.*, 343 F. Supp. 2d 922, 933

27   (C.D. Cal. 2004); *see also Milwaukee II*, 451 U.S. at 317 n.9 ("the very concerns about displacing

28   state law which counsel against finding pre-emption of *state* law in the absence of clear intent

- 16 -

1  actually suggest a willingness to find congressional displacement of *federal* common law").[6]

2      Unlike in the preemption context, the displacement question is not whether Congress has

3  "affirmatively proscribed" the asserted federal common law claim, *Milwaukee II*, 451 U.S. at 315,

4  or whether there is "evidence of a clear and manifest purpose" to displace federal common-law

5  rules, *id.* at 317. The question instead is simply "whether the legislative scheme 'spoke directly'"

6  to the issue before the court. *Id.* at 315 (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618,

7  625 (1978)). If Congress has "legislated on the subject," *Oswego Barge*, 664 F.2d at 335, that

8  legislation obviates the need for (and thus displaces) distinct judicial regulation of the same

9  subject through the imposition of judge-made common law rules.[7]

10     The question here, then, is whether Congress has directly addressed the subject of

11  greenhouse gas emissions and global warming. Because Congress has indeed spoken directly to

12  that subject in the Clean Air Act ("CAA") – by assigning regulatory responsibility over the issue

13  to the Environmental Protection Agency ("EPA"), as the Supreme Court recently held – this

14  Court cannot regulate the same subject by creating federal common law nuisance liability.

15     In *Massachusetts v. EPA*, the Supreme Court held that carbon dioxide falls within the

16  CAA's definition of an "air pollutant," *see* 127 S. Ct. at 1459-60 (citing 42 U.S.C. § 7602(g)),

17  and that the EPA therefore "has the statutory authority to regulate the emission of such gases

18  from new motor vehicles," *id.* at 1462. (The same definition of "air pollutant" applies to CAA

19  provisions addressing emissions from stationary sources. *See* 42 U.S.C. §§ 7408-7411.) The

20  Supreme Court recognized that the Congresses that drafted the CAA "might not have appreciated

21  the possibility that burning fossil fuels could lead to global warming." *Id.* Nevertheless, the

---

22      [6] Given the difference between federal statutory preemption of state law and federal statutory displacement of federal common law, this memorandum uses the term "displacement" rather than preemption to refer to the latter concept.

23

24      [7] The presumption in favor of displacement may have less force when the statute would "invade … long-established and familiar principles" of common law. *United States v. Texas,* 507 U.S. 529, 534 (1993) (quoting *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783 (1952)); *see also In re Hanford Nuclear Reservation Litig.*, 521 F.3d 1028, 1044 (9th Cir. 2008); *Kasza v. Browner*, 133 F.3d 1159, 1167-68 (9th Cir. 1998). But of course a private nuisance tort challenging worldwide carbon dioxide emissions and planetary climate change is neither "long-established" nor "familiar." *See Sea Clammers*, 453 U.S. at 10 (allowing a federal common law nuisance claim for damages would go "considerably beyond" prior precedent). The usual presumption favoring displacement therefore applies. *See Milwaukee II*, 451 U.S. at 317 & n.9.

25

26

27

28

- 17 -

1    Supreme Court held, "they did understand that without regulatory flexibility, changing

2    circumstances and scientific developments would soon render the Clean Air Act obsolete." *Id.*

3    Therefore, Congress "intentional[ly]" granted the EPA broad authority over "any" air pollutant in

4    order "to confer the flexibility necessary to forestall such obsolescence." *Id.* Based on that

5    conclusion, the Court held that the EPA erred in declining to consider whether carbon dioxide

6    endangers the public health or welfare.

7         Plaintiffs' complaint addresses precisely the subject already addressed by the CAA as

8    construed in *Massachusetts* – the regulation of greenhouse gas emissions allegedly contributing to

9    global warming. Plaintiffs would have this Court make not only the kind of environmental risk

10   and public health findings Congress committed to the EPA, but also the kind of regulatory

11   judgments the agency may make only upon satisfaction of certain prerequisites. But instead of

12   applying comprehensive administrative factfinding tools, technical expertise, and calibrated

13   regulatory mechanisms, the Court could act only through the "application of often vague and

14   indeterminate nuisance concepts" (*Milwaukee II*, 451 U.S. at 317) and the blunt remedy of

15   damages awards. The Ninth Circuit has already recognized that a federal common law nuisance

16   theory is displaced by the Clean Water Act because "a nuisance theory would enable a federal

17   district judge to substitute a different balancing of interests from the one made by the agency to

18   which Congress assigned the job in the [Clean Water Act's] NPDES permit system." *In re Exxon*

19   *Valdez*, 270 F.3d 1215, 1230-31 (9th Cir. 2001), *aff'd in relevant part*, *Exxon Shipping Co. v.*

20   *Baker*, __ S. Ct. __, 2008 WL 2511219 (2008); *see also Milwaukee II*, 451 U.S. at 325 ("Not only

21   are the technical problems difficult – doubtless the reason Congress vested authority to administer

22   the [Clean Water] Act in administrative agencies possessing the necessary expertise – but the

23   general area is particularly unsuited to the approach inevitable under a regime of federal common

24   law."). For the same reasons, federal common law nuisance liability is an inappropriate

25   supplement to the EPA's regulatory authority here.

26        The CAA "was intended comprehensively to regulate, through guidelines and controls, the

27   complexities of restraining and curtailing modern day air pollution." *Bunker Hill Co. Lead &*

28   *Zinc Smelter v. EPA*, 658 F.2d 1280, 1284 (9th Cir. 1981); *see also Chevron U.S.A. Inc. v. NRDC*,

- 18 -

1   467 U.S. 837, 848 (1984) (1977 amendments to CAA are "a lengthy, detailed, technical, complex

2   and comprehensive response to a major social issue."); *MVMA v. N.Y. State Dep't of Envtl.*

3   *Conservation*, 17 F.3d 521, 524-25 (2d Cir. 1994) (describing CAA as "one of the most

4   comprehensive pieces of legislation in our nation's history").  "Nothing in the Clean Air Act

5   suggests Congress intended to rely for enforcement of this Act upon a federal common law

6   remedy."  *Audubon*, 869 F.2d at 1202.  It therefore leaves no room for plaintiffs' attempt to seek,

7   through judicial lawmaking, a balancing of policy interests distinct from the balance struck by the

8   EPA pursuant to its statutory authority.

9         Nor is it relevant for purposes of displacement analysis that the EPA has only begun to act

10  or that plaintiffs may be dissatisfied with the pace or substance of the regulatory scheme

11  established by federal statute.  All that matters is that there *is* federal legislation addressing the

12  subject, which by definition reflects Congress's judgment about how federal law ought to address

13  the problem identified by the plaintiff.  In the CAA, Congress determined that the appropriate

14  method for addressing environmental effects of greenhouse gas and other emissions was to

15  delegate regulatory authority to the federal agency equipped with the expertise and tools to gather

16  information and balance competing policy concerns.  So far as federal common law is concerned,

17  that judgment is conclusive:  "Federal courts lack authority to impose more stringent [regulations]

18  under federal common law than those imposed by the agency charged by Congress with

19  administering this comprehensive scheme."  *Milwaukee II*, 451 U.S. at 320; *see also Jesinger v.*

20  *Nev. Fed. Credit Union*, 24 F.3d 1127, 1132 (9th Cir. 1994) (same); *accord Exxon Shipping Co.*

21  *v. Baker*, __ S. Ct. __, 2008 WL 2511219, at *10 n.7 (2008) (explaining that "common law

22  nuisance claims" in *Sea Clammers* and *Milwaukee II* were displaced because they "amounted to

23  arguments for effluent-discharge standards different from those provided by the [Clean Water

24  Act]").  Indeed, even if the EPA were to determine that certain emissions do *not* pose a danger to

25  the public health and welfare, the EPA's decision not to regulate "would have as much

26  [displacement] force as a decision to regulate."  *Sprietsma v. Mercury Marine*, 537 U.S. 51, 66

27  (2002); *see also Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978) (holding that despite

28  the absence of a "comprehensive maritime code," federal common law remedy is displaced by

- 19 -

"[t]he Death on the High Seas Act, [which] announces Congress' considered judgment on such issues as the beneficiaries, the limitations period, contributory negligence, survival and damages"); *Illinois v. Outboard Marine Corp.*, 680 F.2d 473, 478 (7th Cir. 1982) (declining to create common law to supplement a non-comprehensive federal congressional scheme and stating "[a]dopting this distinction [between a 'remedy' and mere action] … would be no different from holding that the solution Congress chose is not adequate").

If a party objects to a federal statute or regulations as insufficiently onerous or comprehensive, the proper response is to seek statutory or regulatory change – it is not to ask a court to impose its own separate regulatory approach by creating federal common law tort liability.  Plaintiffs' federal common law nuisance claim must be dismissed.

## III.    PLAINTIFFS FAIL TO STATE A CONSPIRACY OR CONCERT OF ACTION CLAIM.

While Counts I and II assert public and private nuisance claims, Counts III and IV do not assert substantive torts at all, but instead allege theories of secondary actor liability.  Specifically, Count III alleges a conspiracy among some (but not all) defendants to "participate in the intentional creation, contribution to and/or maintenance of a public nuisance, global warming," by "mislead[ing] the public with respect to the science of global warming," which would "delay public awareness of the issue" and prevent the public from "forc[ing] a change in the Conspiracy Defendants' behavior."  (Compl. ¶ 269.)  Count IV alleges a "concert of action" claim, which is merely a mechanism for pursuing a joint liability theory against all defendants collectively.[8]

Because plaintiffs' underlying federal and state tort claims fail, their claims that defendants conspired or acted in concert to commit those underlying torts necessarily fail as well.  Neither conspiracy nor concert of action is an independent cause of action – each theory is purely derivative of an underlying tort.  *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th

---

[8] The Supreme Court has expressed doubt over the viability of any concert of action claim.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994) ("[The concert of action theory] has been at best uncertain in application…. [T]he leading cases applying this doctrine are statutory securities cases, with the common-law precedents largely confined to isolated acts of adolescents in rural society." (quotation omitted)).

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(6); MEMO. OF P'S & A'S – C-08-1138 SBA

503, 514 (1994) ("Conspiracy is not an independent tort; it cannot create a duty or abrogate an immunity. It allows tort recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles."); *Pac. Tel. & Tel. Co. v. MCI Telecomm. Corp.*, 649 F.2d 1315, 1319 (9th Cir. 1981) ("Unlike its criminal counterpart … in order to be actionable [California law of civil conspiracy] requires [an] independently wrongful act and resulting damages."); *Christensen v. NCH Corp.*, 956 P.2d 468, 476 (Alaska 1998) ("adjunct theor[y]" of civil conspiracy "founder[s]" where primary tort is dismissed); *Chavers v. Gatke Corp.*, 107 Cal. App. 4th 606, 615 (2003) (applying reasoning of *Applied Equipment* to concert of action theory). Plaintiffs do not specify whether these claims are asserted under federal common law or state law, but the point holds either way. *See Central Bank*, 511 U.S. at 181 (citing *Prosser & Keeton* § 46, at 322-24) (concert of action); *Medallion TV Enters., Inc. v. SelecTV of Cal., Inc.*, 627 F. Supp. 1290, 1298 (C.D. Cal. 1986) (conspiracy).

Finally, plaintiffs' conspiracy claim must be dismissed because it seeks to hold certain defendants liable for activity that is protected by the First Amendment to the U.S. Constitution. Plaintiffs allege that these defendants sought to prevent legislative restrictions on their emissions by making or sponsoring false statements in the public and political debate over global warming. (Compl. ¶ 269.) But as explained in Part II.A. of the Utility Defendants' memorandum in support of their motion to dismiss Count III, the Petition and Speech Clauses of the First Amendment prohibit courts from adjudicating the truth or falsity of viewpoints expressed in a hotly contested public policy debate. Accordingly, plaintiffs' conspiracy claim cannot proceed.

## CONCLUSION

For the foregoing reasons, plaintiffs' claims should be dismissed with prejudice.

1    Dated:  June 30, 2008                          Respectfully Submitted,

2    MUNGER, TOLLES & OLSON LLP              O'MELVENY & MYERS LLP

3        By:  ____/S/ Daniel P. Collins____        By:  ____/S/ John F. Daum____
                    Daniel P. Collins                           John F. Daum
4
     Attorneys for Defendant                     Attorneys for Defendant
5    SHELL OIL COMPANY                       EXXON MOBIL CORPORATION

6
     KING & SPALDING LLP                     KIRKLAND & ELLIS LLP
7
         By:  ____/S/ Tracie J. Renfroe____        By:  ____/S/ Andrew B. Clubok____
8                   Tracie J. Renfroe                         Andrew B. Clubok

9    Attorneys for Defendants                    Attorneys for Defendant
     CHEVRON CORPORATION and CHEVRON     CONOCOPHILLIPS COMPANY
10   U.S.A. INC.

11   ARNOLD & PORTER LLP

12       By:  ____/S/ Matthew Heartney____
                    Matthew Heartney
13
     Attorneys for Defendants
14   BP AMERICA INC. AND BP PRODUCTS
     NORTH AMERICA INC.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(6); MEMO. OF P'S & A'S – C-08-1138 SBA

1

2

### CERTIFICATE OF SERVICE AND OF COMPLIANCE
### WITH THE COURT'S MEET-AND-CONFER REQUIREMENT

3

I hereby certify that on June 30, 2008, I caused a copy of the foregoing **NOTICE OF**

4

**MOTION AND MOTION OF CERTAIN OIL COMPANY DEFENDANTS TO DISMISS**

5

**PLAINTIFFS' COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6);**

6

**MEMORANDUM OF POINTS AND AUTHORITIES** and accompanying **PROPOSED**

7

**ORDER** to be delivered to counsel for plaintiffs via the Court's Electronic Case Filing system.

8

I also certify that counsel for the Oil Company Defendants met and conferred with

9

counsel for plaintiffs before filing this Motion, in compliance with the Court's Standing Order.

10

11

Dated:  June 30, 2008

12

_/S/ John F. Daum_____

13

John F. Daum

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF JOHN F. DAUM

2

 I, John F. Daum, submit the following declaration in support of the Motion of Certain Oil

3

Company Defendants To Dismiss Plaintiffs' Complaint Pursuant to Federal Rule of Civil

4

Procedure 12(b)(6):

5

1.     I am a partner of O'Melveny & Myers LLP, counsel for Exxon Mobil Corporation in this

6

case.

7

2.     I have personal knowledge of the matters stated herein.  If called as a witness, I could and

8

would testify truthfully and competently thereto under oath.

9

3.     Concurrence in the filing of this Motion has been obtained from each of the other

10

signatories.

11

 The foregoing is true and complete to the best of my knowledge.

12

 Executed this 30th day of June, 2008 at Los Angeles, California.

13

14

 ___/S/ John F. Daum_____

15

 John F. Daum

16

17

18

19

20

21

22

23

24

25

26

27

28

1   JOHN F. DAUM (SBN 52313)
    jdaum@omm.com
2   O'MELVENY & MYERS LLP
    400 South Hope Street
3   Los Angeles, CA 90071-2899
    Telephone: (213) 430-6111
4   Facsimile: (213) 430-6407

5   JONATHAN D. HACKER (*Pro hac vice*)
    jhacker@omm.com
6   O'MELVENY & MYERS LLP
    1625 Eye Street, NW
7   Washington, DC 20006-4001
    Telephone: (202) 383-5300
8   Facsimile: (202) 383-5414

9   Attorneys for Defendant
    EXXON MOBIL CORPORATION

10  [*Counsel Listing Continued on Next Page*]

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                  OAKLAND DIVISION

14  NATIVE VILLAGE OF KIVALINA and CITY          CASE NO.  C 08-01138 SBA
    OF KIVALINA,
15                                               **ORDER RE: MOTION OF**
                    Plaintiffs,                  **CERTAIN OIL COMPANY**
16                                               **DEFENDANTS TO DISMISS**
            vs.                                  **PLAINTIFFS' COMPLAINT**
17                                               **PURSUANT TO FED. R. CIV. P.**
    EXXON MOBIL CORPORATION; BP P.L.C.; BP       **12(b)(6)**
    AMERICA INC.; BP PRODUCTS NORTH
18  AMERICA INC.; CHEVRON CORPORATION;
    CHEVRON U.S.A., INC.; CONOCOPHILLIPS
19  COMPANY; ROYAL DUTCH SHELL PLC;
    SHELL OIL COMPANY; PEABODY ENERGY
20  CORPORATION; THE AES CORPORATION;
    AMERICAN ELECTRIC POWER COMPANY,
21  INC.; AMERICAN ELECTRIC POWER
    SERVICES CORPORATION; DTE ENERGY
22  COMPANY; DUKE ENERGY CORPORATION;
    DYNEGY HOLDINGS, INC.; EDISON
23  INTERNATIONAL; MIDAMERICAN ENERGY
    HOLDINGS COMPANY; MIRANT
24  CORPORATION; NRG ENERGY; PINNACLE
    WET CAPITAL CORPORATION; RELIANT
25  ENERGY, INC.; THE SOUTHERN COMPANY;
    AND XCEL ENERGY, INC.,
26                  Defendants.

27

28

RONALD L. OLSON (SBN 44597)
Ronald.Olson@mto.com
DANIEL P. COLLINS (SBN 139164)
Daniel.Collins@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

JEROME C. ROTH (SBN 159483)
Jerome.Roth@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, CA  94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

Attorneys for Defendant
SHELL OIL COMPANY

ROBERT MEADOWS (*Pro hac vice*)
rmeadows@kslaw.com
TRACIE J. RENFROE (*Pro hac vice*)
trenfroe@kslaw.com
JONATHAN L. MARSH (*Pro hac vice*)
jlmarsh@kslaw.com
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, TX  77002-5213
Telephone:    (713) 751-3200
Facsimile:    (713) 751-3290

LISA KOBIALKA (SBN 191404)
lkobialka@kslaw.com
KING & SPALDING LLP
1000 Bridge Parkway, Suite 100
Redwood City, CA  94065
Telephone:    (650) 590-0700
Facsimile:    (650) 590-1900

Attorneys for Defendants
CHEVRON CORPORATION and
CHEVRON U.S.A. INC.

STUART A. C. DRAKE (*Pro hac vice*)
sdrake@kirkland.com
ANDREW B. CLUBOK (*Pro hac vice*)
aclubok@kirkland.com
SUSAN E. ENGEL (*Pro hac vice*)
sengel@kirkland.com
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5173
Facsimile:   (202) 879-5200

ELIZABETH DEELEY (SBN 230798)
edeeley@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1861
Facsimile:   (415) 439-1500

Attorneys for CONOCOPHILLIPS COMPANY

MATTHEW HEARTNEY (SBN 123516)
Matthew.Heartney@aporter.com
ARNOLD & PORTER LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, CA  90017-5844
Telephone: (213) 243-4150
Facsimile: (213) 243-4199

PHILIP H. CURTIS (*Pro hac vice*)
Philip.Curtis@aporter.com
MICHAEL B. GERRARD (*Pro hac vice*)
Michael.Gerrard@ aporter.com
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
Telephone: (212) 715-1000
Facsimile: (212) 715-1399

Attorneys for BP AMERICA INC., AND
BP PRODUCTS NORTH AMERICA INC.

1          Pursuant to the Motion of Certain Oil Company Defendants (ExxonMobil

2    Corporation, Shell Oil Company, Chevron Corporation, Chevron U.S.A. Inc.,

3    ConocoPhillips Company, BP America, Inc., and BP Products North America, Inc.

4    (collectively, the "Oil Company Defendants")) To Dismiss Plaintiffs' Complaint Pursuant

5    to Federal Rule of Civil Procedure 12(b)(6), and FOR GOOD CAUSE SHOWN, IT IS

6    HEREBY ORDERED:

7

8          Defendants' Motion To Dismiss is GRANTED and Plaintiffs' Complaint is DISMISSED

9    WITH PREJUDICE.

10

11         1.    Plaintiffs do not allege facts in support of their nuisance claims that would

12   establish that the defendants were the factual and legal cause of plaintiffs' property damage.

13   Causation is an essential element of a nuisance claim, *see, e.g.*, *Martinez v. Pacific Bell*, 225 Cal.

14   App. 3d 1557, 1565-66 (1990), yet plaintiffs cannot show that the defendants' conduct is either a

15   necessary or sufficient cause of their property damage. *See, e.g.*, *Osborn v. Irwin Mem'l Blood*

16   *Bank*, 5 Cal. App. 4th 234, 252 (1992); *Staton ex rel. Vincent v. Fairbanks Mem'l Hosp.*, 862

17   P.2d 847, 851 & n.7 (Alaska 1993). According to plaintiffs' own complaint, the true cause of

18   global warming is all greenhouse-gas emitting human activity worldwide since the dawn of the

19   Industrial Revolution, not the defendants' emissions. (Compl. ¶ 132.) Defendants' conduct

20   accordingly is not a substantial factor in causing their injury. *See* Restatement (Second) of Torts

21   §§ 431-433; *Parks Hiway Enters. v. CEM Leasing, Inc.*, 995 P.2d 657, 666 (Alaska 2000);

22   *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1052-53 (1991). Neither are defendants' activities the

23   legal cause of plaintiffs' injuries. On the facts as alleged by plaintiffs, defendants' emissions

24   have "merged in the general forces that surround us," *Vincent*, 862 P.2d at 851 n.8, and their

25   connection to plaintiffs' property damage is attenuated. Plaintiffs' nuisance claims must therefore

26   be dismissed.

27         2.    Plaintiffs cannot pursue a federal common law nuisance claim, both because any

28   such claim is available only to States seeking injunctive relief and because Congress has by

statute displaced the authority of federal courts to create common law rules in this area. "[I]t is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law." *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981). Plaintiffs do not contend that Congress has affirmatively authorized the courts to regulate greenhouse gas emissions. *Cf. Nat'l Audubon Soc'y v. Dep't of Water*, 869 F.2d 1196, 1202 (9th Cir. 1988) ("Congress has not authorized the courts to develop a substantive law of air pollution."). Nor is there "'a uniquely federal interest' in protecting the quality of the nation's air." *Id.* at 1203. In the absence of a sovereign State as plaintiff asserting that pollution interferes with the use or enjoyment of its territory, courts have no authority to create a federal common law nuisance tort. *Id.* at 1205. Moreover, any federal common law nuisance tort as may exist has never supported an action by non-State plaintiffs for damages. *See, e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91, 96-97, 108 n.10 (1972); *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237-38 (1907); *Missouri v. Illinois*, 180 U.S. 208, 241, 244 (1901); *Missouri v. Illinois*, 200 U.S. 496, 520-21 (1906). Finally, the Clean Air Act ("CAA") displaces the authority of courts to regulate nationwide greenhouse gas emissions and global warming through federal common law nuisance claims. The CAA "was intended comprehensively to regulate, through guidelines and controls, the complexities of restraining and curtailing modern day air pollution." *Bunker Hill Co. Lead & Zinc Smelter v. EPA*, 658 F.2d 1280, 1284 (9th Cir. 1981). And the CAA submits to the EPA the question whether and how greenhouse gas emissions should be regulated. *See Massachusetts v. EPA*, 127 S. Ct. 1438, 1459-62 (2007). Congress has thus "spoke[n] directly" to the issue, *see Milwaukee*, 451 U.S. at 315, and thereby displaced the authority of courts to fashion their own rules and standards governing the same subject under the guise of federal common law. *See id.* at 320 ("Federal courts lack authority to impose more stringent [regulations] under federal common law than those imposed by the agency charged by Congress with administering this comprehensive scheme.").

3.     Plaintiffs' conspiracy and concert of action claims are not independent torts, but simply means of assigning derivative liability for an underlying tortious act. *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994); *Pac. Tel. & Tel. Co. v. MCI*

1   *Telecomm. Corp.*, 649 F.2d 1315, 1319 (9th Cir. 1981); *Christensen v. NCH Corp.*, 956 P.2d 468,

2   476 (Alaska 1998); *Chavers v. Gatke Corp.*, 107 Cal.App.4th 606, 615 (2003).  These secondary

3   liability claims thus fall along with the primary nuisance claims.  Plaintiffs' conspiracy claims

4   also seek to impose liability for activity that is protected by the Petition and Speech Clauses of the

5   First Amendment to the U.S. Constitution, and must be dismissed for that reason as well.

6

7   DATED:  _____, 2008

8                                                       By: _____

9                                                            The Hon. Saundra Brown Armstrong
                                                                United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28