1   RONALD L. OLSON (SBN 44597)
    Ronald.Olson@mto.com
2   DANIEL P. COLLINS (SBN 139164)
    Daniel.Collins@mto.com
3   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue, 35th Floor
4   Los Angeles, CA  90071-1560
    Telephone:    (213) 683-9100
5   Facsimile:    (213) 687-3702

6   JEROME C. ROTH (SBN 159483)
    Jerome.Roth@mto.com
7   MUNGER, TOLLES & OLSON LLP
    560 Mission Street
8   San Francisco, CA  94105-2907
    Telephone:    (415) 512-4000
9   Facsimile:    (415) 512-4077

10  Attorneys for Defendant
    SHELL OIL COMPANY

11  [*Counsel Listing Continued on Next Page*]

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                     OAKLAND DIVISION

15  NATIVE VILLAGE OF KIVALINA and CITY        CASE NO.  C 08-01138 SBA
    OF KIVALINA,
16                                             **NOTICE OF MOTION AND
                    Plaintiffs,                MOTION OF CERTAIN OIL
17                                             COMPANY DEFENDANTS TO
            vs.                                DISMISS PLAINTIFFS'
18                                             COMPLAINT PURSUANT TO FED.
    EXXON MOBIL CORPORATION; BP P.L.C.;        R. CIV. P. 12(b)(1);
    BP AMERICA, INC.; BP PRODUCTS NORTH        MEMORANDUM OF POINTS AND
19  AMERICA, INC.; CHEVRON CORPORATION;        AUTHORITIES**
    CHEVRON U.S.A., INC.; CONOCOPHILLIPS
20  COMPANY; ROYAL DUTCH SHELL PLC;
    SHELL OIL COMPANY; PEABODY ENERGY          Time:    December 9, 2008, 1:00 P.M.
21  CORPORATION; THE AES CORPORATION;          Ctrm.:   Courtroom 3, 1301 Clay Street,
    AMERICAN ELECTRIC POWER COMPANY,           Oakland, California
22  INC.; AMERICAN ELECTRIC POWER              The Honorable Saundra B. Armstrong
    SERVICES CORPORATION; DTE ENERGY
23  COMPANY; DUKE ENERGY CORPORATION;
    DYNEGY HOLDINGS, INC.; EDISON
24  INTERNATIONAL; MIDAMERICAN ENERGY
    HOLDINGS COMPANY; MIRANT
25  CORPORATION; NRG ENERGY; PINNACLE
    WEST CAPITAL CORPORATION; RELIANT
26  ENERGY, INC.; THE SOUTHERN COMPANY;
    AND XCEL ENERGY, INC.,
27                  Defendants.

28

1  JOHN F. DAUM (SBN 52313)
jdaum@omm.com
2  O'MELVENY & MYERS LLP
400 South Hope Street
3  Los Angeles, CA 90071-2899
Telephone: (213) 430-6111
4  Facsimile: (213) 430-6407

5  JONATHAN D. HACKER (*Pro hac vice pending*)
jhacker@omm.com
6  O'MELVENY & MYERS LLP
1625 Eye Street, NW
7  Washington, DC 20006-4001
Telephone: (202) 383-5300
8  Facsimile: (202) 383-5414

Attorneys for Defendant
9  EXXON MOBIL CORPORATION

10

11

12

13  STUART A. C. DRAKE (*Pro hac vice*)
sdrake@kirkland.com
14  ANDREW B. CLUBOK (*Pro hac vice*)
aclubok@kirkland.com
15  SUSAN E. ENGEL (*Pro hac vice*)
KIRKLAND & ELLIS LLP
16  655 Fifteenth Street, N.W.
Washington, D.C. 20005
17  Telephone: (202) 879-5173
Facsimile: (202) 879-5200
18
ELIZABETH DEELEY (SBN 230798)
19  edeeley@kirkland.com
KIRKLAND & ELLIS LLP
20  555 California Street
San Francisco, CA 94104
21  Telephone: (415) 439-1861
Facsimile: (415) 439-1500
22  Attorneys for CONOCOPHILLIPS COMPANY

23

24

25

26

27

28

ROBERT MEADOWS (*Pro hac vice*)
rmeadows@kslaw.com
TRACIE J. RENFROE (*Pro hac vice*)
trenfroe@kslaw.com
JONATHAN L. MARSH (*Pro hac vice*)
jlmarsh@kslaw.com
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, TX 77002-5213
Telephone:     (713) 751-3200
Facsimile:     (713) 751-3290

LISA KOBIALKA (SBN 191404)
lkobialka@kslaw.com
KING & SPALDING LLP
1000 Bridge Parkway, Suite 100
Redwood City, CA 94065
Telephone:     (650) 590-0700
Facsimile:     (650) 590-1900

Attorneys for Defendants
CHEVRON CORPORATION and
CHEVRON U.S.A. INC.

MATTHEW HEARTNEY (SBN 123516)
Matthew.Heartney@aporter.com
ARNOLD & PORTER LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4150
Facsimile: (213) 243-4199

PHILIP H. CURTIS (*Pro hac vice*)
Philip.Curtis@aporter.com
MICHAEL B. GERRARD (*Pro hac vice*)
Michael.Gerrard@ aporter.com
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
Telephone: (212) 715-1000
Facsimile: (212) 715-1399

Attorneys for BP AMERICA INC., AND
BP PRODUCTS NORTH AMERICA INC.

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ............................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................ 4

    A.    The Political Branches' Efforts to Formulate a National Policy on Global Climate Change ........................................................................... 4

        1.    Early Congressional Activity ...................................................... 5

        2.    U.S. Participation in International Negotiations and Protocols ................. 6

        3.    Recent Developments .................................................................. 7

            a.    U.S. International Efforts ............................................. 7

            b.    Federal Domestic Initiatives ...................................... 8

    B.    Plaintiffs' Complaint ............................................................................ 10

III.  ARGUMENT .................................................................................................... 13

    A.    Plaintiffs' Global Warming Claims Raise Nonjusticiable Political Questions .............................................................................................. 13

        1.    A Case Presents a Political Question if Any One of the Six Alternative Tests Set Forth in *Baker v. Carr* Is Satisfied ........................ 15

        2.    Plaintiffs' Theory That Defendants' Emissions Were at a Level That "Wrongfully" Contributed to Global Warming Raises Inherently Political Questions ................................................... 16

            a.    Determining "Wrongful" Levels of Emissions Would Require the Court to Make Initial Policy Judgments That Are Inherently Political in Nature ................................. 16

            b.    There Are No Judicially Manageable Standards for Determining What Emissions "Wrongfully" Contribute to Global Warming ................................................................. 20

            c.    Judicial Promulgation of Climate Policy Would Interfere with Issues of Foreign Policy Committed to the Political Branches ............................................................................ 22

        3.    Plaintiffs' Theory for Attributing Fault Raises Inherently Political Questions ................................................................................ 24

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3    4.    Plaintiffs' Reliance on "Civil Conspiracy" and "Concert of Action" Does Nothing to Avoid the Political Question Doctrine ........................... 28

4

B.    Plaintiffs Cannot Demonstrate Article III Standing ................................ 29

5

6    1.    To Establish Article III Standing, Plaintiffs Must Plead Sufficient Facts to Show That Their Injuries Are "Fairly Traceable" to Defendants' Conduct .................................................................. 30

7

8    2.    Plaintiffs Have Not Pleaded Sufficient Facts to Establish That Their Alleged Injuries Are "Fairly Traceable" to Defendants' Emissions ........ 31

9    a.    Because Plaintiffs Allege That Greenhouse Gas Emissions Are Undifferentiated in the Global Atmosphere, Plaintiffs' Injuries Cannot Be Fairly Traced to Defendants' Emissions, As Opposed to Those of Third Parties .......................................... 32

10

11

12    b.    Plaintiffs Cannot Demonstrate "Fair Traceability" for the Additional Reason That the Alleged Line of Causation From Emission to Injury Is Too Attenuated ........................................... 37

13

IV.    CONCLUSION ........................................................................................ 40

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- ii -

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Allen v. Wright*,
468 U.S. 737 (1984) ........................................................................................ *passim*

*Alperin v. Vatican Bank*,
410 F.3d 532 (9th Cir. 2005) .......................................................................... *passim*

*Antolok v. United States*,
873 F.2d 369 (D.C. Cir. 1989) ................................................................................ 24

*Baker v. Carr*,
369 U.S. 186 (1962) ........................................................................................ *passim*

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007) .................................................................................... 31, 34

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................................... 30

*California v. General Motors Corp.*,
2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) .............................................. *passim*

*Center for Biological Diversity v. Brennan*,
2007 WL 2408901 (N.D. Cal. Aug. 21, 2007) ....................................................... 36

*Clegg v. Cult Awareness Network*,
18 F.3d 752 (9th Cir. 1994) ................................................................................... 31

*Comer v. Murphy Oil USA Inc.*,
1:05-CV-00436 (S.D. Miss. Aug. 30, 2007) ................................................... *passim*

*Connecticut v. American Elec. Power Co.*,
406 F. Supp. 2d 265 (S.D.N.Y. 2005) ............................................................ *passim*

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004) ................................................................................................. 4

*Corrie v. Caterpillar, Inc.*,
503 F.3d 974 (9th Cir. 2007) ................................................................. 5, 10, 13, 23

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ......................................................................................... 31, 38

*Dreiling v. American Express Co.*,
458 F.3d 942 (9th Cir. 2006) ................................................................................. 10

*EEOC v. Peabody W. Coal Co.*,
400 F.3d 774 (9th Cir. 2005) ................................................................................. 15

*Fleck & Assocs. v. City of Phoenix*,
471 F.3d 1100 (9th Cir. 2006) ............................................................................... 30

- iii -

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*,
         95 F.3d 358 (5th Cir. 1996) .................................................................................. 37

4

     *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*,
5         484 U.S. 49 (1987) .............................................................................................. 4

6    *Holmes v. Securities Investor Protection Corp.*,
         503 U.S. 258 (1992) ............................................................................................ 25

7

     *In re Sunset Bay Assocs.*,
8         944 F.2d 1503 (9th Cir. 1991) ............................................................................ 28

9    *Japan Whaling Ass'n v. American Cetacean Soc'y*,
         478 U.S. 221 (1986) ...................................................................................... 13, 17

10

     *Lujan v. Defenders of Wildlife*,
11        504 U.S. 555 (1992) .................................................................... 30, 31, 32, 33, 37

12   *Massachusetts v. EPA*,
         127 S. Ct. 1438 (2007) ................................................................................. *passim*

13

     *Mingtai Fire & Marine Ins. Co. v. United Parcel Serv.*,
14        177 F.3d 1142 (9th Cir. 1999) ............................................................................ 22

15   *Natural Resources Defense Council v. Southwest Marine, Inc.*,
         236 F.3d 985 (9th Cir. 2000) .............................................................................. 36

16

     *No GWEN Alliance of Lane County, Inc. v. Aldridge*,
17        855 F.2d 1380 (9th Cir. 1988) ............................................................................ 13

18   *Pony v. County of Los Angeles*,
         433 F.3d 1138 (9th Cir. 2006) ............................................................................ 39

19

     *Prescott v. County of El Dorado*,
20        298 F.3d 844 (9th Cir. 2002) ........................................................................ 30, 38

21   *Pritikin v. Department of Energy*,
         254 F.3d 791 (9th Cir. 2001) .............................................................................. 35

22

     *Public Int. Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*,
23        913 F.2d 64 (3d Cir. 1990) ................................................................................. 36

24   *Schneider v. Kissinger*,
         412 F.3d 190 (D.C. Cir. 2005) ................................................................ 20, 21, 24

25

     *Simon v. Eastern Ky. Welfare Rights Org.*,
26        426 U.S. 26 (1976) ...................................................................................... *passim*

27   *Sinochem Int'l Co. Ltd. v. Malaysia Intern. Shipping Corp.*,
         127 S.Ct. 1184 (2007) ........................................................................................ 13

28

- iv -

**TABLE OF AUTHORITIES**
(continued)

Page

*Smelt v. County of Orange*,
447 F.3d 673 (9th Cir. 2006)..................................................................... 30

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001)..................................................................... 28

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)..................................................................................... 30

*Texas Independent Producers & Royalty Owners Ass'n v. EPA*,
410 F.3d 964 (7th Cir. 2005)..................................................................... 37

*United States v. Mandel*,
914 F.2d 1215 (9th Cir. 1990)................................................................... 16

*United States v. Pink*,
315 U.S. 203 (1942)................................................................................... 22

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
454 U.S. 464 (1982)................................................................................... 31

*Vieth v. Jubelirer*,
541 U.S. 267 (2004)......................................................................... 21, 24, 25

*Wang v. Masaitis*,
416 F.3d 992 (9th Cir. 2005)..................................................................... 20

*Warth v. Seldin*,
422 U.S. 490 (1975)....................................................................... 35, 38, 39

*Whitmore v. Arkansas*,
495 U.S. 149 (1990)................................................................................... 31

**STATE CASES**

*American Motorcycle Ass'n v. Superior Court*,
20 Cal. 3d 578 (1978) ............................................................................... 27

**FEDERAL STATUTES**

42 U.S.C. § 7403 ............................................................................................. 6

42 U.S.C. § 16293 ........................................................................................... 8

Energy Policy Act of 1992,
Pub. L. No. 102-486, 106 Stat. 2776 (1992)............................................... 6

Energy Security Act,
Pub. L. No. 96-294, 94 Stat. 611 (1980)..................................................... 5

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(1); MEMO. OF P'S & A'S—C-08-1138 SBA

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

Global Change Research Act,
15 U.S.C. § 2931, *et seq.* ........................................................................ 6

4

Global Climate Protection Act,
5
Pub. L. No. 100-204, Title XI, 101 Stat. 1407 (1987) ........................ 5, 6

6

National Climate Program Act of 1978,
15 U.S.C. § 2901, *et seq.* ........................................................................ 5

7

8

Pub. L. No. 105-276, 112 Stat. 2461 (1998) ............................................ 7

9

Pub. L. No. 106-74, 113 Stat. 1047 (1999) .............................................. 7

Pub. L. No. 106-377, 114 Stat. 1141 (2000) ............................................ 7

10

Pub. L. No. 110-140, 121 Stat. 1492 (2007) ........................................... 8

11

**STATE STATUTES**

12

Alaska Stat. § 09.17.080 .................................................................... 27, 28

13

**TREATIES AND INTERNATIONAL MATERIALS**

14

United Nations Framework Convention on Climate Change,
15
S. Treaty Doc. No. 102-38 (1992) ........................................................ 6

16

Kyoto Protocol,
37 I.L.M. 22 (1998) ........................................................................... 6, 7

17

**LEGISLATIVE MATERIALS**

18

154 Cong. Rec. S5334 (June 6, 2008) ...................................................... 9

19

H.R. Rep. No. 102-474 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1953 ........ 6

20

H.R. 1590, Safe Climate Act of 2007 ...................................................... 9

21

S. Res. 98, 105th Cong. (1997) ......................................................... 7, 22

22

S. 280, Climate Stewardship and Innovation Act of 2007 ....................... 9

23

S. 309, Global Warming Pollution Reduction Act .................................. 9

24

S. 317, Electric Utility Cap and Trade Act of 2007 ............................... 9

25

S. 1766, Low Carbon Economy Act of 2007 .......................................... 9

26

S. 3036, Lieberman-Warner Climate Security Act .................................. 9

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3
United States General Accounting Office, *Alaska Native Villages: Most Are Affected by Flooding and Erosion, but Few Qualify for Federal Assistance* (Dec. 2003).......................................................................................................... 10

4

5

**EXECUTIVE AND ADMINISTRATIVE MATERIALS**

6
*Control of Emissions of New Highway Vehicles and Engines,* 68 Fed. Reg. 52922, 52928 (Sept. 8, 2003) ........................................... 5, 7, 8, 20, 23

7

8
Energy Information Administration, *Emissions of Greenhouse Gases in the U.S. 2006* ...................................................................... 11

9
Executive Order No. 13432, 72 Fed. Reg. 27717 (May 14, 2007) ...................................................... 8

10

11
Letter from EPA Administrator Stephen L. Johnson to Senators Boxer and Inhofe (Mar. 27, 2008) ................................................................................. 8, 9

12
Letter from President George W. Bush to Senators Hagel, Helms, Craig, & Roberts (Mar. 13, 2001) ............................................................................ 7

13
*President Bush Discusses Climate Change* (Apr. 16, 2008)...................... 9, 10

14
President Clinton, 2 PUB. PAPERS (1997) ............................................... 7, 22

15
Statement by the Press Secretary (Dec. 15, 2007) ................................. 7

16
Statement of Administration Policy on S. 3036 (June 2, 2008)................... 9

17
U.S. Army Corps of Engineers, Alaska District, *Alaska Village Erosion Technical Assistance Program: An Examination of Erosion Issues in the Communities of Bethel, Dillingham, Kaktovik, Kivalina, Newtok, Shishmaref, and Unalakleet* (Apr. 2006)................................................................................... 10, 12, 13

18

19

20
U.S. Dept. of Energy, *Major Economies Process on Energy Security and Climate Change*........................................................................... 8

21

**OTHER AUTHORITIES**

22
Anchorage Daily News, *PETA Wants Kivalina to Sue Meat Producers* (Mar. 5, 2008) ........................................................... 18

23

24
12 DAN B. DOBBS, THE LAW OF TORTS (2001) ....................................... 28

25
Intergovernmental Panel on Climate Change, *Climate Change 2007: Synthesis Report* ...................................................... 32, 34

26

27
National Academy of Sciences, Climate Change Science: *An Analysis of Some Key Questions* (2000) ..................................... 33

28

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(1); MEMO. OF P'S & A'S—C-08-1138 SBA

1

**TABLE OF AUTHORITIES**
**(continued)**

2

**Page**

3

Matthew Pawa, *Global Warming Litigation Heats Up*,
      TRIAL 18 (April 2008) ............................................................................................................. 27

4

Washington Post, *Senate Leaders Pull Measure on Climate* (June 7, 2008) ................................. 9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- viii -

1

**NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE that on December 9, 2008 at 1:00 P.M., or as soon thereafter as

4

counsel may be heard in Courtroom 3 of the above-captioned Court, located at 1301 Clay Street,

5

Oakland, California, 94612, Defendants Shell Oil Company, Exxon Mobil Corporation, Chevron

6

Corporation, Chevron U.S.A. Inc., ConocoPhillips Company, BP America Inc., and BP Products

7

North America Inc. ("Oil Company Defendants" or "Defendants") will and hereby do move to

8

dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1).

9

By this motion, Defendants seek an order from this Court dismissing the case with

10

prejudice. This motion is based on this Notice of Motion and Motion, the attached Memorandum

11

of Points and Authorities, the Declaration of Daniel P. Collins ("Collins Decl.") filed

12

concurrently herewith and the attachments thereto, the pleadings and records on file in this action,

13

such additional authority and argument as may be presented in any Reply and at the hearing on

14

this Motion, and such other matters of which this Court may take judicial notice.

15

Pursuant to Section C of this Court's Standing Order (as revised June 16, 2008),

16

Defendants, through counsel, certify that, as contemplated in the stipulation previously filed with

17

the Court on May 8, 2008, counsel for Defendants and counsel for Plaintiffs met and conferred

18

telephonically on May 19, 2008, concerning, *inter alia*, the grounds to be asserted in this motion.

19

**MEMORANDUM OF POINTS AND AUTHORITIES**

20

**I.    INTRODUCTION**

21

This case is anything but typical. Plaintiffs seek to establish that certain segments of the

22

U.S. energy industry are responsible for all injuries allegedly caused by global warming—

23

including the coastal erosion of Plaintiffs' remote Alaskan fishing village of Kivalina. While

24

Plaintiffs' allegations represent a sharp departure from settled legal principles, these Plaintiffs are

25

not the first to try them out. Three different courts have considered similar lawsuits alleging that

26

various corporations, including many of the defendants here, are liable for damages caused by

27

global warming. Each court has reached the same conclusion: adjudicating such a suit would

28

impermissibly invite the judiciary to craft global warming policy, a task that the Constitution

1   reserves to the political branches of government.  *See California* v. *General Motors Corp.*

2   ("*GMC*"), No. C-06-5755-MJJ, 2007 WL 2726871 at *8 (N.D. Cal. Sept. 17, 2007) (Jenkins, J.),

3   *appeal pending*, No. 07-16908 (9th Cir.); *Connecticut* v. *American Elec. Power Co.* ("*AEP*"), 406

4   F. Supp. 2d 265, 270-74 (S.D.N.Y. 2005), *appeal pending*, No. 05-5104 (2d Cir.); *see also Comer*

5   v. *Murphy Oil USA Inc.*, 1:05-CV-00436 (S.D. Miss. Aug. 30, 2007) (Oral Ruling on Motion to

6   Dismiss and Written Order of Dismissal) (respectively, Collins Decl., Exs. B, C) (dismissing the

7   case based on both the political question doctrine and lack of Article III standing), *appeal*

8   *pending*, No. 07-60756 (5th Cir.).  This Court should reach the same conclusion here.

9        The extraordinary nature of Plaintiffs' theory is apparent from the "global" nature of their

10  claims.  According to Plaintiffs, the *worldwide* accumulation of greenhouse gases over the last

11  several centuries has produced global warming that has "affected the thickness, extent, and

12  duration of sea ice" around Kivalina; this loss of sea ice, in turn, "subject[s] Kivalina to coastal

13  storm waves and surges," and these "storms and waves are destroying the land upon which

14  Kivalina is located."  Complaint ("Compl."), ¶¶ 16, 185.  Although Defendants' emissions

15  represent only a fraction of the total greenhouse gas emissions that have been produced by

16  innumerable persons and entities throughout the world "since the dawn of the industrial

17  revolution in the 18th century," *id.*, ¶ 125, Plaintiffs seek to hold Defendants liable for all of the

18  assertedly global-warming-induced storm damage incurred by Kivalina.  By singling out

19  Defendants' greenhouse gas emissions—from lawful energy production that is vital to the

20  national economy—as somehow having been "unreasonable," *id.*, ¶ 250, Plaintiffs effectively

21  attempt to make Defendants alone the insurers for damage assertedly caused by emissions

22  produced over generations of human activity in every part of the globe.

23       Plaintiffs' suit founders on two fatal constitutional and *jurisdictional* objections.  *First*,

24  Plaintiffs' allegations raise inherently nonjusticiable political questions that the judiciary lacks the

25  authority to resolve.  Plaintiffs' theory assumes that some emissions of greenhouse gases are

26  lawful, while others are not.  But no statute or regulation sets forth standards of any kind for

27  determining what levels of greenhouse gas emissions are excessive for which activities.  To

28  adjudicate Plaintiffs' claims, this Court would have to make that determination on its own—

- 2 -

1    retroactively, no less—without guidance from the political branches.  As three other district

2    courts have recognized, the only way a court could perform this task is by weighing myriad

3    competing policy considerations—economic, foreign policy, and environmental, among others—

4    that are non-legal in nature and inappropriate for judicial resolution.  By what yardstick would the

5    Court assess what level of greenhouse gas emissions is "too much" for a particular activity?  How

6    would the Court weigh the competing effects of such a de facto capping of emissions on the

7    economy, the national security, and the Nation's foreign policy?  At what point do increases in

8    energy prices, disruption to the national economy, and increased dependence upon foreign oil

9    become sufficiently great as to outweigh the asserted benefits of limiting the energy sector's

10   emissions to what Plaintiffs think is reasonable (as opposed, for example, to limiting emissions

11   elsewhere or adopting other alternative measures)?  Plaintiffs' effort to enlist this Court in

12   effectively setting greenhouse gas emissions standards for the United States (if not the world as a

13   whole) would directly contravene the principle that large-scale societal change should be

14   developed through the democratic process, where competing and incommensurate policy trade-

15   offs can be made.

16        *Second*, Plaintiffs lack standing under Article III to raise their claims because they allege

17   no facts showing that their injuries are "fairly traceable" to the actions of Defendants.  Plaintiffs'

18   theory of global-warming liability, as set forth in the Complaint, forecloses proof of the very

19   causal connection the Constitution requires.  By Plaintiffs' own account, countless entities and

20   persons emit greenhouse gases throughout the world and have done so for hundreds of years, and

21   it is only the overall accumulation of these gases in the atmosphere that allegedly produces global

22   warming, which in turn assertedly contributed to the injuries of which Plaintiffs complain.

23   Because Plaintiffs' own theory is that their injuries were caused by an undifferentiated mixing of

24   gases from innumerable sources, including billions of independent third-parties not before the

25   Court, Plaintiffs cannot establish that their injuries are "fairly traceable" to *Defendants'*

26   emissions.  Plaintiffs also lack standing because the causal chain they advance is far too

27   attenuated to satisfy Article III standards.  Plaintiffs lay out a theory that begins with Defendants'

28   greenhouse gas emissions and ends with an Alaskan island facing increased storm damage, a

- 3 -

1   causal chain requiring multiple tenuous intermediate leaps all along the way.  Article III clearly

2   demands more.

3        What Plaintiffs attempt to style as an ordinary tort suit is thus an improper attempt to

4   wrest from the political branches the authority to make the fundamental choices required to

5   develop global warming policy.  Centuries of tort law offer no examples of even remotely

6   comparable questions being adjudicated by courts, and Plaintiffs' reliance on the lingo of torts—

7   "nuisance" and "proximate cause"—is wholly insufficient to paper over the resulting justiciability

8   problems.  The political branches of government have devoted substantial effort to considering

9   the proper approach to global warming, including negotiating with foreign counterparts in the

10  interest of developing appropriately balanced global solutions.  It is not the province of the courts

11  to intermeddle in these efforts when the strictures of Article III are not met.

**II.    STATEMENT OF FACTS**

    **A.    The Political Branches' Efforts to Formulate a National Policy on Global Climate Change**

15       The President and Congress have devoted increasing attention over the last thirty years to

16  the complex policy issues associated with global warming, carefully researching and evaluating

17  how government regulation could affect the economy, national security, and foreign relations.

18  These extensive efforts reflect the fact that global warming presents challenges of an entirely

19  different order from other environmental issues.  For one thing, the primary greenhouse gas—

20  carbon dioxide—differs in obvious respects from conventional "pollutants"; for example, it is

21  produced every time a person exhales.  Moreover, assessing the significance of particular

22  emissions of greenhouse gases involves a level of complexity that greatly transcends that

23  associated with a single-point source discharging a pollutant into a discrete body of water, *see,*

24  *e.g.*, *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 53-54 (1987)

25  (discussing the Clean Water Act), or the remediation of a single piece of property damaged by

26  environmentally hazardous substances, *see*, *e.g.*, *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543

27  U.S. 157, 160-63 (2004) (discussing Comprehensive Environmental Response, Compensation

28  and Liability Act (CERCLA)).  Plaintiffs emphasize in their Complaint that global warming is a

- 4 -

1   *global* phenomenon, caused by the accumulated effects of activities throughout the world since

2   the 18th century.  Compl., ¶ 125, 255.  That greenhouse gases are emitted around the world, by

3   every industrial, agricultural, residential, and governmental concern, and indeed by every person,

4   only serves to make the policy tradeoffs inherent in any environmental regulation that much more

5   pronounced.  As the EPA has commented, "[i]t is hard to imagine any issue in the environmental

6   area having greater 'economic and political significance' than regulation of activities that might

7   lead to global climate change."  *Control of Emissions of New Highway Vehicles and Engines*, 68

8   Fed. Reg. 52922, 52928 (Sept. 8, 2003) (hereinafter "*Control of Emissions*").  The justiciability of

9   Plaintiffs' claims must accordingly be assessed against the backdrop of the political branches'

10  decades-long efforts in this area.  Notably, the political branches thus far have declined to adopt

11  emission caps or standards, largely because of competing economic, energy, and foreign policy

12  concerns.[1]

### 1.    Early Congressional Activity

14      Early congressional efforts concerning global climate change centered on researching and

15  understanding the issue.  Congress focused primarily on non-regulatory policy approaches, and

16  expressly declined to adopt binding emission reduction measures in the absence of a

17  comprehensive international regime.

18      For example, in 1978, Congress established a "national climate program" to improve

19  understanding of global climate change through research, data collection, and international

20  cooperation.  National Climate Program Act of 1978, 15 U.S.C. § 2901, *et seq.*  Two years later,

21  Congress directed the Office of Science and Technology Policy to engage the National Academy

22  of Sciences in a study of the "projected impact, on the level of carbon dioxide in the atmosphere,

23  of fossil fuel combustion, coal-conversion and related synthetic fuels activities."  Energy Security

24  Act, Pub. L. No. 96-294, tit. VII, § 711, 94 Stat. 611, 774-75 (1980).  Underscoring the need for a

25  comprehensive approach to this multi-faceted and inherently global issue, Congress in 1987

26  enacted the Global Climate Protection Act, Title XI of Pub. L. No. 100-204, 101 Stat. 1407,

---

27  [1] The relevant actions taken by the political branches are properly subject to judicial notice in
    determining whether a political question is presented.  *Corrie v. Caterpillar, Inc.*, 503 F.3d 974,
28  978 n.2 (9th Cir. 2007).

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(1); MEMO. OF P'S & A'S—C-08-1138 SBA

1    which ordered the Environmental Protection Agency ("EPA") to propose a "coordinated national

2    policy on global climate change," *id*., § 1103(b), and directed the State Department to work

3    "through the channels of multilateral diplomacy" to coordinate efforts addressing global climate

4    change, *id*., § 1103(c).

5          In 1990, Congress enacted the Global Change Research Act, which established a ten-year

6    research program for global climate issues.  15 U.S.C. §§ 2931-2938.  Congress also amended the

7    Clean Air Act in 1990, stating that the United States' domestic approach to global climate change

8    is "to develop, evaluate and demonstrate *nonregulatory* strategies and technologies for air

9    pollution prevention."  42 U.S.C. § 7403(g) (emphasis added).  Congress stated that "[n]othing in

10   this subsection shall be construed to authorize the imposition on any person of air pollution

11   control requirements."  *Id.*

12         Mindful of the profound impacts that would result from limitations on greenhouse gases,

13   Congress in 1992 directed the Energy Department to report on "the feasibility and economic,

14   energy, social, environmental, and competitive implications, including implications for jobs," of

15   stabilizing and reducing greenhouse gas emission levels.  Energy Policy Act of 1992, Pub. L. No.

16   102-486, § 1601(5), 106 Stat. 2776, 3002.  Congress's stated strategy was to "analyze the

17   important technical and policy issues that will enable us to make wiser decisions on more

18   dramatic and possibly higher cost actions which should be undertaken only in the context of

19   concerted international action."  H.R. REP. No. 102-474, pt. 1, at 152 (1992), *reprinted in* 1992

20   U.S.C.C.A.N. 1953, 1975.

21                   **2.      U.S. Participation in International Negotiations and Protocols**

22         As Congress passed the Energy Policy Act of 1992, President George H.W. Bush signed,

23   and the Senate ratified, the United Nations Framework Convention on Climate Change

24   ("UNFCCC").  The UNFCCC was a conceptual agreement among 154 nations to reduce

25   atmospheric concentrations of carbon dioxide and other greenhouse gases for the purpose of

26   "prevent[ing] dangerous anthropogenic [*i.e.*, human-induced] interference with the [Earth's]

27   climate system."  S. TREATY DOC. No. 102-38, art. 2, p.5 (1992).  Member nations of the

28   UNFCCC subsequently negotiated and adopted the Kyoto Protocol on December 11, 1997, which

- 6 -

1  called for mandatory limits or reductions in greenhouse gas emissions for developed nations, but

2  *not* for developing countries (such as China and India).  *See* 37 I.L.M. 22 (1998).

3       President Clinton signed the Kyoto Protocol, but did not present it to the Senate for

4  ratification, having stated that the "United States will not assume binding obligations unless key

5  developing nations meaningfully participate in this effort."  Remarks at the National Geographic

6  Society, 2 PUB. PAPERS 1408, 1410 (Oct. 22, 1997).  By a 95-0 vote, the Senate adopted a

7  resolution objecting to any international protocol that would result in serious harm to the United

8  States economy or that exempted developing countries from binding greenhouse gas limits or

9  reductions.  S. RES. 98, 105th Cong. (1997).  Thereafter, Congress passed a series of

10  appropriations bills that effectively barred the EPA from implementing the Kyoto Protocol.  *See*,

11  *e.g.*, Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080

12  (1999); Pub. L. No. 106-377, 114 Stat. 1141, 1441A-41 (2000).

13           **3.**     **Recent Developments**

14                **a.**     **U.S. International Efforts**

15       The Bush Administration has opposed the Kyoto Protocol because it exempts developing

16  nations who are major emitters, fails to address two major pollutants, and would have a negative

17  economic impact on the United States.  Letter from President George W. Bush to Senators Hagel,

18  Helms, Craig, & Roberts (Mar. 13, 2001), *available at* <http://www.whitehouse.gov/news/

19  releases/2001/03/20010314.html>.  The Bush Administration's policy "emphasizes international

20  cooperation and promotes working with other nations to develop an efficient and coordinated

21  response to global climate change."  *Control of Emissions*, 68 Fed. Reg. at 52933.

22       On December 15, 2007, the Bush Administration agreed to the "Bali Roadmap," which

23  sets out an agenda for two years of diplomatic negotiations on a new global agreement to reduce

24  greenhouse gas emissions.  *See* Statement by the Press Secretary (Dec. 15, 2007), *available at*

25  <http://www.whitehouse.gov/news/releases/2007/12/20071215-1.html>.  In doing so, the

26  Administration emphasized that, "for these negotiations to succeed, it is essential that the major

27  developed *and developing* countries be prepared to negotiate commitments, consistent with their

28  national circumstances, that will make a due contribution to the reduction of global emissions."

1    *Id.* (emphasis added).  The Administration also reiterated that "any arrangement must also take

2    into account the legitimate right of the major developing economies and indeed all countries to

3    grow their economies, develop on a sustainable basis, and have access to secure energy sources."

4    *Id.*  These negotiations are well underway in a series of "Major Economies Meetings."  *See* U.S.

5    Dept. of Energy, *Major Economies Process on Energy Security and Climate Change*, *available*

6    *at*, <http://www.eere.energy.gov/international/major_economies.html>.

### b.    Federal Domestic Initiatives

8         While the political branches have been working with the international community to

9    develop a global solution to climate change, they also have been active in developing domestic

10    policies on the subject.  In February 2002, President Bush announced a voluntary, incentive-

11    driven approach intended to reduce domestic greenhouse gas emission intensity levels by 18% by

12    2012.  *See Control of Emissions*, 68 Fed. Reg. at 52931-52932.  Consistent with this voluntary

13    policy, the EPA refused to issue new mandatory rules on motor vehicle greenhouse gas emissions

14    for climate change purposes, stating that it did not possess authority under the Clean Air Act to do

15    so, and that, in any event, it would have declined to exercise such authority for scientific and

16    policy reasons.  *Id.* at 52925-52933.

17         After the Supreme Court held in *Massachusetts v. EPA*, 127 S. Ct. 1438 (2007), that the

18    EPA did in fact possess such authority under the Clean Air Act, President Bush issued an

19    Executive Order calling for cooperation among agencies with respect to motor vehicle

20    greenhouse gas emissions.  Exec. Order No. 13432, 72 Fed. Reg. 27717 (May 14, 2007).  On

21    December 19, 2007, Congress enacted new legislation that, *inter alia*, increases fuel economy

22    standards in part to reduce greenhouse gas emissions from motor vehicles and directs the

23    Secretary of Energy to conduct research aimed at developing new approaches "to capture and

24    sequester, or use[,] carbon dioxide to lead to an overall reduction of carbon dioxide emissions."

25    Pub. L. No. 110-140, § 702, 121 Stat. 1492, 1705 (amending 42 U.S.C. § 16293).  The EPA also

26    continues to take a lead role in addressing global climate change.  On March 27, 2008, the EPA

27    announced that it will request, through an Advanced Notice of Proposed Rulemaking, public

28    input on possible regulations on greenhouse gas emissions under the Clean Air Act.  *See* Letter

- 8 -

1   from EPA Administrator Stephen L. Johnson to Senators Boxer and Inhofe (Mar. 27, 2008),

2   *available at* <http://epw.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=

3   48cc5c7d-56ef-426b-ba32-d027aad08eb6>.

4         Meanwhile, Congress continues actively to debate whether, and to what extent, the U.S.

5   should undertake efforts to mandate reductions in domestic greenhouse gas emissions in the

6   absence of binding commitments from major developing economies, such as China and India.

7   Most notably, the Lieberman-Warner Climate Security Act (S. 3036)—which, *inter alia*, would

8   have set *prospective* mandatory caps on domestic greenhouse gas emissions—was debated on the

9   floor of the Senate in June 2008.  However, the bill was ultimately blocked after opponents of the

10   measure defeated an effort to end debate on a key amendment to the bill.  *See* Washington Post,

11   *Senate Leaders Pull Measure on Climate*, at A3 (June 7, 2008), *available at* <http://www.

12   washingtonpost.com/wp-dyn/content/article/2008/06/06/AR2008060600333.html>; *see also* 154

13   Cong. Rec. S5334 (June 6, 2008) (Senate vote defeating effort to close debate on sponsor's

14   substitute amendment for S. 3036).  In addition, shortly before the Senate's action, the White

15   House issued a statement explaining the reasons for the President's opposition to the bill and

16   affirming his intention to veto it if passed by Congress.  *See* <http://www.whitehouse.gov/omb/

17   legislative/sap/110-2/saps3036-s.pdf>.  Notably, neither the Lieberman-Warner bill, nor any of

18   the other major global-warming bills introduced in the current Congress,[2] would create

19   *retroactive* liability for emissions of the sort Plaintiffs ask the Court to create here.

20         The Executive Branch likewise continues actively to consider measures aimed at

21   addressing global warming.  On April 16, 2008, President Bush announced that the United States

22   would endeavor to stop the growth of U.S. greenhouse gas emissions by the year 2025.  *See*

23   *President Bush Discusses Climate Change* (Apr. 16, 2008), *available at* <http://www.whitehouse.

24   gov/news/releases/2008/04/20080416-6.html>.  Citing the need for a "rational, balanced

25   approach" that would "reduce greenhouse gases, reduce our dependence on oil, and keep our

---

26   [2] *E.g.*, Climate Stewardship and Innovation Act of 2007, S. 280 (Sens. Lieberman and McCain);
Safe Climate Act of 2007, H.R. 1590 (Reps. Waxman and Allen); Low Carbon Economy Act of

27   2007, S. 1766 (Sens. Bingaman and Specter); Electric Utility Cap and Trade Act of 2007, S. 317
(Sens. Feinstein and Carper); Global Warming Pollution Reduction Act, S. 309 (Sens. Sanders

28   and Boxer).

- 9 -

1   economies vibrant," the President explained that "America's national plan will be a

2   comprehensive blend of market incentives and regulations to reduce emissions by encouraging

3   clean and efficient energy technologies." *Id.* The President also reiterated the longstanding

4   position that the United States would be willing to commit to a binding international agreement

5   only if other major greenhouse gas producers (such as China and India) would do the same. *Id.*

6   The President also emphasized that, given the "far-reaching impact" of any decision to reduce

7   greenhouse gas emissions, the matter "should not be left to unelected regulators and judges but

8   should be debated openly and made by the elected representatives of the people they affect." *Id.*

9       **B.    Plaintiffs' Complaint**

10      It is against this backdrop of substantial and ongoing political branch activity with respect

11  to greenhouse gas emissions and global climate change that Plaintiffs ask this Court to decide

12  whether Defendants can and should be held liable, based on their emissions of greenhouse gases

13  over the past several decades, for harms allegedly caused by global warming.  Plaintiffs are the

14  Native Village of Kivalina and the City of Kivalina, the self-described "governing bodies" of a

15  small Alaskan village of 400 persons located north of the Arctic Circle.  Compl., ¶ 1.  The

16  present-day village is situated at the tip of a slender barrier island that is exposed to extreme

17  Arctic weather conditions.  *See* U.S. Army Corps of Engineers, Alaska District, *Alaska Village*

18  *Erosion Technical Assistance Program: An Examination of Erosion Issues in the Communities of*

19  *Bethel, Dillingham, Kaktovik, Kivalina, Newtok, Shishmaref, and Unalakleet* 21-23 (Apr. 2006)

20  (Collins Decl., Ex. D) (hereinafter "*Alaska Village Erosion*"); United States General Accounting

21  Office, *Alaska Native Villages: Most Are Affected by Flooding and Erosion, but Few Qualify for*

22  *Federal Assistance* 29-30 (Dec. 2003) (Collins Decl., Ex. E).[3]

23      According to Plaintiffs' Complaint, Defendants have "for many years" emitted

24  "greenhouse gases," such as carbon dioxide and methane.  Compl., ¶¶ 3, 163-80.  As a result of

25  _____

26  [3] Plaintiffs cite both of these governmental reports in their Complaint, *see* Compl. ¶ 185 & n.60;
    *id.*, ¶ 186 & n.61, and they are thus appropriate subjects for judicial notice against the party
    whose pleading references them.  *See Dreiling v. American Express Co.*, 458 F.3d 942, 946 n.2
27  (9th Cir. 2006) (court considering a motion to dismiss "may consider documents referred to in the
    complaint"); *see also Corrie*, 503 F.3d at 979 (in considering whether a case presents a political
28  question a court may "tak[e] into consideration facts beyond the complaint").

- 10 -

1    these emissions—which are generated through such economically vital activities as oil

2    exploration, electricity generation, and refining, *id*., ¶¶ 163-80—Defendants have "contribut[ed]

3    to global warming," *id*., ¶ 2, and thus must be held singularly "responsible" for the "special

4    injuries" suffered by Plaintiffs, namely, increased erosion to Kivalina's barrier island caused by

5    winter storms that previously would have been buffered by sea ice (which sea ice, Plaintiffs

6    contend, has been reduced by global warming), *id*., ¶¶ 3, 4, 16, 185.

7         The numbers alleged in Plaintiffs' Complaint, together with those in the other documents

8    they cite, give some context to Plaintiffs' allegation that Defendants "are substantial contributors

9    to global warming." Compl., ¶ 260. Plaintiffs explicitly allege specific numbers for the total

10   tonnage (in "carbon dioxide equivalents") of all of the alleged 2006 greenhouse gas emissions of

11   the Oil Company Defendants except for ExxonMobil (but apparently including, in some

12   instances, affiliated companies not before the Court). *See*, *e.g.*, *id.*, ¶¶ 23, 29, 34, 46; *see also id.*,

13   ¶ 23 n.1 (explaining that carbon dioxide equivalent is "the universal unit of measurement used to

14   indicate the global warming potential of each of the six greenhouse gases"). The total of these

15   four numbers (converting them from short tons into metric tons) is approximately 275.2 million

16   metric tons. Compl., ¶ 23, n.2 (numbers in Complaint are shown in short tons). But another

17   document referenced in the Complaint reveals that in the United States alone, total anthropogenic

18   (man-made) U.S. emissions of greenhouse gases in 2006 totaled approximately 7075.6 million

19   metric tons of carbon dioxide equivalent, meaning that the alleged emissions of the four

20   companies amount to less than 4% of the U.S. total. *See* Energy Information Administration,

21   *Emissions of Greenhouse Gases in the U.S. 2006* at 1 (Collins Decl., Ex. F) (hereinafter

22   "*Emissions of Greenhouse Gases*") (cited in Compl., ¶ 167, n.45, which gives the web address for

23   the 2006 report, but incorrectly describes it as the 2005 report). That same report estimates (using

24   only carbon dioxide figures) that the U.S. share of anthropogenic emissions is approximately 22%

25   of the worldwide total, *id*. at 6, meaning that Plaintiffs' idea of a "substantial contribution" for

26   these four companies is one that amounts to less than 1% of worldwide anthropogenic emissions.

27   In addition, because Plaintiffs allege that greenhouse gas emissions have been accumulating in

28   the atmosphere "since the dawn of the industrial revolution in the 18th century," Compl., ¶ 125,

1    these companies' emissions would be yet an even smaller fraction than 1%.

2            Unsurprisingly, Plaintiffs' Complaint does not allege that Defendants' fraction of

3    emissions by itself caused them any injury, but only that Defendants' alleged emissions

4    contributed to global warming "*in combination with emissions and conduct of others*" who are

5    not before the Court. Compl., ¶ 255 (emphasis added). Moreover, Plaintiffs do not allege that

6    they can trace any of the alleged effects of global warming (including their alleged injuries) to

7    any specific emissions of Defendants. On the contrary, the Complaint asserts that "greenhouse

8    gas emissions resulting in global warming are inherently interstate in nature," *id.*, ¶ 254, and that

9    Defendants' emissions "rapidly mix in the atmosphere" and "inevitably merge[] with the

10   accumulation of emissions in California and in the world," *id.*, ¶¶ 10, 254. Plaintiffs thus seek to

11   impose liability for emissions in a manner that is unbounded by temporal or geographic

12   limitations: the Complaint seeks damages for "defendants' *past and ongoing* contributions to

13   global warming," *id.*, ¶ 6 (emphasis added), arising from all of Defendants' operations "*no matter*

14   *where such operations are located*," *id.*, ¶ 254 (emphasis added). Indeed, even though Plaintiffs

15   allege injury to property north of the Arctic Circle, they rely on Defendants' alleged emissions

16   activity *in California* to justify their filing this suit in a forum far from home, with no particular

17   connection to their claims. *See*, *e.g.*, *id.*, ¶ 10.

18           Based on these allegations, the Complaint seeks wide-ranging monetary damages and

19   purports to assert, under "federal common law" and "applicable" (though unspecified) state law,

20   causes of action for public and private nuisance, civil conspiracy, and concert of action. Compl.,

21   ¶¶ 6, 249-82. Plaintiffs' alleged damages consist of injury to their property and the costs of

22   relocating the entire village. *E.g.*, *id.*, ¶ 266. Plaintiffs seek these damages notwithstanding that

23   "[e]rosion issues are not the only reasons why [Kivalina] want[s] to relocate," as village residents

24   want to leave their barrier island for the additional reason that "their current location has made it

25   infeasible for them to have running water and sewer hookup," a scenario that has "little to do

26   with" erosion. *See Alaska Village Erosion*, *supra*, (Collins Decl., Ex. D) at 3. Plaintiffs also

27   pursue this suit now, against these Defendants, even though "[t]he community has long assumed

28   that the island would succumb to natural forces, and that [it] would have to move." *Id.* at 24.

- 12 -

1   Indeed, discussions about relocating the village have been going on for decades. *See id.*

2   ## III.    **ARGUMENT**

3   ### A.    **Plaintiffs' Global Warming Claims Raise Nonjusticiable Political Questions**

4   Under the system of separated powers that is the hallmark of our constitutional

5   government, the judiciary has no authority to "'formulate national policies or develop standards

6   for matters not legal in nature'"; those matters are committed for resolution to the Legislative and

7   Executive Branches. *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230

8   (1986) (citation omitted).  As a result, the courts lack jurisdiction over "those controversies which

9   revolve around" such legislative or executive policy choices. *Id.* (citation omitted); *see also*

10  *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 981-82 (9th Cir. 2007) (political question doctrine

11  implicates "a court's power under Article III to hear a case" and precludes courts from making

12  policy decisions that belong to political branches); *see also No GWEN Alliance of Lane County,*

13  *Inc. v. Aldridge*, 855 F.2d 1380, 1384 (9th Cir. 1988) (political question doctrine bars courts from

14  deciding, for example, "the merits of national defense policy").[4]  Adjudication of Plaintiffs'

15  claims would violate these settled principles by improperly requiring this Court to resolve at least

16  two political questions.

17  *First*, to adjudicate Plaintiffs' claim that Defendants should be held liable for "their

18  emissions of large quantities of greenhouse gases" that "contribut[e] to global warming," Compl.,

19  ¶¶ 2-3, the Court would have to take upon itself the task of defining what quantities of carbon

20  dioxide and methane were *wrongfully* emitted by each Defendant throughout the world over the

21  course of many decades.  This question, however, inescapably involves initial political judgments

22  of the sort that only the political branches can make.  To determine what constitutes a wrongful

23  level of emissions, the Court would have to determine—without any guidance from the political

24  branches—what amount of greenhouse gases Defendants *should* have emitted, taking into

25  account (1) any resulting contribution to global warming from these emissions; (2) the very

---

26  [4] Because the political question doctrine, like standing, goes to the Court's Article III jurisdiction

27  over the matter, these threshold jurisdictional issues can be resolved in any order.  *Sinochem Int'l Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 127 S.Ct. 1184, 1191 (2007) (although jurisdictional questions generally must be resolved before addressing the merits, "there is no mandatory

28  'sequencing of jurisdictional issues'") (citation omitted).

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(1); MEMO. OF P'S & A'S—C-08-1138 SBA

1   significant competing concerns about national energy policy and foreign policy (including the

2   concern that self-imposed caps reduce U.S. leverage in negotiating agreements with other

3   nations), as well as the negative effects that imposition of mandatory domestic emissions caps

4   would have on the national economy; (3) the extent to which comparable reductions in

5   greenhouse gases could be more effectively achieved through other and different domestic

6   regulatory measures that are more broadly targeted; and (4) how these balances might reasonably

7   have been struck at different points in time over the past several decades.  As the Supreme Court

8   recently stated, the courts "have neither the expertise nor the authority to evaluate these policy

9   judgments." *Massachusetts*, 127 S. Ct. at 1463.

10      *Second*, even assuming the Court could somehow set standards for determining how much

11  greenhouse gas emissions for energy production are too much, Plaintiffs' claims still raise a

12  further political question.  In order for *Plaintiffs* to have a cause of action, they must show, not

13  merely that Defendants' conduct was wrongful in the abstract, but also that the alleged wrongful

14  emissions were sufficiently causally connected to Plaintiffs' injuries to warrant the imposition of

15  liability from Defendants to Plaintiffs.  But there are no judicially manageable standards for

16  determining how to assign liability for particular injuries that are assertedly caused by global

17  warming.  Plaintiffs allege that the greenhouse gases emitted worldwide over the last several

18  centuries by innumerable persons and enterprises "rapidly mix in the atmosphere and cause an

19  increase in the atmospheric concentration of carbon dioxide and other greenhouse gases

20  *worldwide*."  Compl., ¶ 254 (emphasis added).  Because Plaintiffs' own theory is that causation is

21  mediated (in a highly attenuated fashion) through the contributions of billions of persons to an

22  undifferentiated and global pool of emissions that has accumulated over centuries, the inevitably

23  *ad hoc* policy judgments and trade-offs that would have to be made to assign fault can only be

24  done by a legislature and not by a court.

25      Unsurprisingly, every court to have considered similar allegations of global warming

26  injury has found them nonjusticiable under the political question doctrine.  *See GMC*, 2007 WL

27  2726871 at *8 (suit alleging that defendant auto manufacturers produced vehicles that emitted

28  greenhouse gases, leading to global warming); *AEP*, 406 F. Supp. 2d at 270-74 (suit alleging that

- 14 -

1  defendant utilities emitted greenhouse gas, leading to global warming); *Comer* v. *Murphy Oil*

2  *USA Inc.*, *supra*, (Oral Ruling on Motion to Dismiss) (Collins Decl., Ex. B) at 34-41 (suit alleging

3  that defendant oil and energy companies' greenhouse gas emissions heated the Gulf of Mexico,

4  exacerbating the strength of Hurricane Katrina).

### 1.    A Case Presents a Political Question if Any One of the Six Alternative Tests Set Forth in *Baker* v. *Carr* Is Satisfied

7  From its earliest days, the federal judiciary has held that "political questions" are reserved

8  for the political branches of government, and are not the proper domain of courts.  *See generally*

9  *Baker v. Carr*, 369 U.S. 186, 210-17 (1962) (reviewing history of "political question" doctrine).

10  Firmly rooted in fundamental constitutional principles of separation of powers, *see Corrie*, 503

11  F.3d at 980 (citing *Baker*, 369 U.S. at 210), the political question doctrine "'excludes from

12  judicial review those controversies which revolve around policy choices and value determinations

13  constitutionally committed for resolution to the halls of Congress or the confines of the Executive

14  Branch,'" *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 784 (9th Cir. 2005) (quoting *Japan*

15  *Whaling Ass'n*, 478 U.S. at 230).  The doctrine thus precludes courts from endeavoring to address

16  policy matters that are inappropriate for judicial resolution.  *Baker*, 369 U.S. at 210.

17  The controlling standards for determining whether a case raises a nonjusticiable political

18  question were set forth in *Baker v. Carr*.  The Supreme Court identified six independent and

19  alternative formulations that characterize a case as falling within that doctrine:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; *or* [2] a lack of judicially discoverable and manageable standards for resolving it; *or* [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; *or* [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; *or* [5] an unusual need for unquestioning adherence to a political decision already made; *or* [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

26  *Id.* at 217 (emphasis added).  If any "one of these formulations is inextricable from the case at

27  bar," the court should dismiss the suit as nonjusticiable on the ground that it involves a political

28  question.  *Id.*; *see also Alperin v. Vatican Bank*, 410 F.3d 532, 547 (9th Cir. 2005) ("[A]ny single

- 15 -

1    [*Baker*] test can be dispositive"); *United States v. Mandel*, 914 F.2d 1215, 1222 (9th Cir. 1990)

2    ("Implicating any one of these factors renders a question 'political' and thus nonjusticiable.").

3    **2.    Plaintiffs' Theory That Defendants' Emissions Were at a Level That "Wrongfully" Contributed to Global Warming Raises Inherently Political Questions**

4

5    Plaintiffs' Complaint confirms that all of their claims are based on the premise that

6    Defendants emitted too large a quantity of greenhouse gases.  The *sole* injuries alleged by

7    Plaintiffs are that, due to changes in "the thickness, extent, and duration of sea ice that forms

8    along Kivalina's coast," Kivalina is more vulnerable to storms, which "now routinely batter

9    Kivalina and are destroying its property to the point that Kivalina must relocate or face

10   extermination."  Compl., ¶ 185.  The Complaint alleges that these changes in sea ice formation

11   are due to "[r]ising temperatures caused by global warming."  *Id*.  Global warming, in turn, "is

12   caused by emissions of greenhouse gases."  *Id*., ¶ 133.  And because "Defendants contribute to

13   global warming through their emissions of large quantities of greenhouse gases," the Complaint

14   alleges that they should be held legally responsible for Plaintiffs' storm-related injuries.  *Id*., ¶ 3.

15   In challenging Defendants' emissions, Plaintiffs pointedly do *not* focus on any

16   geographically specific activities of the Defendants.  They do not, for example, contend that

17   Defendants took any action in the immediate vicinity of Kivalina that had any sort of direct and

18   specific impact on that village.  On the contrary, Plaintiffs' theory is that the emissions of

19   "greenhouse gases from defendants' operations, *no matter where such operations are located*,

20   rapidly mix in the atmosphere and cause an increase in the atmospheric concentration of carbon

21   dioxide and other greenhouse gases *worldwide*."  Compl., ¶ 254 (emphasis added).

22   Accordingly, to adjudicate Plaintiffs' claims, the Court necessarily would have to

23   determine what lesser quantity of emissions the Defendants should have been releasing over the

24   last several decades.  As every court confronted with similar claims has found, this issue raises a

25   nonjusticiable political question.

26   **a.    Determining "Wrongful" Levels of Emissions Would Require the Court to Make Initial Policy Judgments That Are Inherently Political in Nature**

27

28   The third *Baker* test is triggered when it is impossible to decide a case "without an initial

- 16 -

1    policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217.  This

2    test recognizes that, while the judiciary may *effectuate* regulatory programs that the political

3    branches have adopted, *see Massachusetts*, 127 S. Ct. at 1463 (holding that Clean Air Act

4    imposed certain limits on EPA's authority to decline to adopt global-warming-based motor

5    vehicle emissions standards), the courts "'are fundamentally underequipped to *formulate* national

6    policies or develop standards for matters not legal in nature.'" *Japan Whaling*, 478 U.S. at 230

7    (citation omitted) (emphasis added).  Put simply, the nature, complexity, scope, and multi-faceted

8    implications of some problems call for an initial exercise of legislative or executive policy

9    judgment before the courts may intervene.

10           That is the case here.  As then-Judge Jenkins concluded in rejecting analogous claims

11   against the automobile industry, the third *Baker* test "largely controls the analysis in the current

12   case due to the complexity of the initial global warming policy determinations that must be made

13   by the elected branches prior to the proper adjudication" of the plaintiffs' suit.  *GMC*, 2007 WL

14   2726871 at *6.  Plaintiffs, of course, identify no statute or regulation that supports their claims

15   and that could provide the necessary predicate policy judgments that could guide courts in

16   determining when the emission of greenhouse gases crosses the line from lawful energy

17   production to unlawful, liability-attaching conduct.  But in the absence of such a legislatively

18   created framework that reflects and incorporates the political branches' evaluation and weighing

19   of the competing concerns implicated by the worldwide phenomenon of global warming, the

20   courts "*have neither the expertise nor the authority to evaluate these policy judgments*."

21   *Massachusetts*, 127 S. Ct. at 1463 (emphasis added).

22           Consideration of the specific policy questions that Plaintiffs seek to foist upon the Court

23   demonstrates how inappropriate this matter is for judicial resolution.  In order to determine the

24   supposedly optimal amount of greenhouse gas emissions that Defendants *should* have been

25   emitting from energy production—so as not to "*unreasonably* interfere with the use and

26   enjoyment of Plaintiffs' properties," Compl., ¶ 265 (emphasis added)—the Court would have to

27   weigh and evaluate a variety of competing policy judgments that are entirely non-legal in nature.

28   Among other things, the Court necessarily would have to determine what level of reduced energy

1   production would properly balance the concerns about climate change with such competing

2   considerations as the health of the national economy, the need for energy independence, the effect

3   on national security, and the effect on foreign relations (including the ability to secure multi-

4   lateral agreements).  *See AEP*, 406 F. Supp. 2d at 272-73; *GMC*, 2007 WL 2726871 at *8.

5          Moreover, this balancing of competing concerns could not be done in isolation, with a

6   myopic focus only on the U.S. oil and energy industries.  Because Plaintiffs allege that *all*

7   greenhouse emissions from *all* sources "rapidly mix in the atmosphere" and that Defendants'

8   emissions could have an impact on global warming only "in combination with emissions and

9   conduct of others," Compl., ¶¶ 254-55, any evaluation of the optimal level of emissions from

10  Defendants' energy activities is inescapably a *comparative* judgment—in other words, one must

11  consider the relative contributions to emissions reductions that are appropriate from all sectors of

12  the economy, not just the energy sector.  *See AEP*, 406 F. Supp. 2d at 273 (noting that one of the

13  "initial policy determinations" that would have to be made is *which* industries and activities

14  should be expected to reduce their comparative emissions); *cf.* Anchorage Daily News, *PETA*

15  *Wants Kivalina to Sue Meat Producers* (Mar. 5, 2008), *available at* <http://www.adn.com/

16  news/alaska/story/335887.html> ("People for the Ethical Treatment of Animals faxed a letter to

17  the Kivalina mayor this week alleging that raising animals for food creates 40 percent more

18  greenhouse gases than all the world's cars, trucks, planes and ships combined.").

19         On top of all this, the Court would have to make judgments *retroactively* with respect to

20  decades' worth of emissions.  Plaintiffs' Complaint is explicitly based on the *aggregate* impact of

21  all of the greenhouse gas emissions that have occurred "since the dawn of the industrial

22  revolution."  Compl., ¶ 125.  As Plaintiffs explain, "[a] large fraction of carbon dioxide emissions

23  persist in the atmosphere for several centuries, and thus have a lasting effect on climate.

24  Atmospheric concentrations of carbon dioxide and other greenhouse gases continue to increase as

25  each year's emissions are added to those that came before."  *Id*.  Plaintiffs' Complaint thus does

26  not call for a single judgment as to the propriety of one particular set of emissions at one point in

27  time.  Rather, Plaintiffs' theory would require an assessment of what levels of emissions

28

1    Defendants "should" properly have been releasing from a wide variety of activities over a period

2    of several decades or more.

3         These policy questions and numerous others thus must be answered (either explicitly or

4    implicitly) before the Court could even hope to determine whether liability can and should attach

5    to Defendants' actions.  But the responsibility for making these sorts of judgments and balancing

6    these competing interests—with their potentially enormous implications for the Nation's

7    economy and foreign affairs—lies with the policymaking branches of our government, not the

8    judiciary.  As the *GMC* court concluded in rejecting a comparable global-warming claim,

9    "adjudication of Plaintiff's claim would require the Court to balance the competing interests of

10   reducing global warming emissions and the interests of advancing and preserving economic and

11   industrial development," but the "balancing of those competing interests is the type of initial

12   policy determination to be made by the political branches, and not this Court."  2007 WL

13   2726871 at *8; *see also AEP*, 406 F. Supp. 2d at 272-73; *Comer v. Murphy Oil USA*, *supra*, (Oral

14   Ruling on Motion to Dismiss) (Collins Decl., Ex. B) at 40 (explaining that adjudication of

15   plaintiffs' claim would require a court to do exactly "what *Baker versus Carr* told [it] not to do,

16   and that is to balance economic, environmental, foreign policy, and national security interest[s]

17   and make an initial policy determination of a kind which is clearly nonjudicial").

18        The difficulty and impropriety of a court making the initial policy determinations that

19   adjudication of Plaintiffs' suit would require is underscored by the political branches' ongoing

20   efforts to formulate an appropriate policy response to the many issues raised by global warming.

21   *See AEP*, 406 F. Supp. 2d at 273 ("Looking at the past and current actions (and deliberate

22   inactions) of Congress and the Executive within the United States and globally in response to the

23   issue of climate change merely reinforces [the] opinion that the questions raised by Plaintiffs'

24   complaints are [non-justiciable] political questions."); *GMC*, 2007 WL 2726871 at * 8 ("The

25   political branches' actions and deliberate inactions in the area of global warming further highlight

26   this case as one for nonjudicial discretion.").  As explained at length above, the political branches

27   have been grappling for many years and on many fronts with the difficult and complex task of

28   fashioning an appropriate response to global warming, and they have thus far failed to establish

- 19 -

1  fixed standards (much less retroactive ones) for appropriate levels of greenhouse gas emissions.

2  *See supra* at 4-10; *see also Massachusetts*, 127 S. Ct. at 1448-49 (describing evolution of

3  executive and legislative policy on global warming).  It would be inappropriate for the courts to

4  attempt to resolve these sorts of questions where, as here, the political branches are continuing

5  actively to consider the political judgments necessary for their resolution, and it would be

6  especially inappropriate for the courts to purport to resolve them in a manner that is inconsistent

7  with the judgments made by the political branches thus far.

8       Moreover, these ongoing policy debates within the elected branches amply demonstrate

9  that responding to global climate change brings to the fore a wide range of rival considerations—

10  domestic economic prosperity, national security, and environmental responsibility, among

11  others—that are inherently political in nature, nuanced in dimension, and ever-changing in their

12  relative importance, as particular events (such as war and economic slowdown) inevitably modify

13  the Nation's priorities.  As the EPA has observed, "[i]t is hard to imagine any issue in the

14  environmental area having greater 'economic and political significance' than regulation of

15  activities that might lead to global climate change."  *Control of Emissions*, 68 Fed. Reg. at 52928.

16       Put simply, Plaintiffs seek to have the judiciary do precisely what the political question

17  doctrine forbids—namely, to determine matters that are "not the stuff of adjudication, but of

18  policymaking."  *Schneider v. Kissinger*, 412 F.3d 190, 197 (D.C. Cir. 2005).[5]

19       **b.    There Are No Judicially Manageable Standards for**
         **Determining What Emissions "Wrongfully" Contribute to**
20       **Global Warming**

21       For similar reasons, Plaintiffs' claims are likewise barred under *Baker*'s second test,

22  which requires dismissal when there is "a lack of judicially discoverable and manageable

23  standards" for adjudication.  *Baker*, 369 U.S. at 217; *see Wang v. Masaitis*, 416 F.3d 992, 996

24  _____

25  [5] That Plaintiffs' Complaint seeks damages and not injunctive relief makes no difference to the
    application of the political question doctrine in this case.  The principal political question here

26  arises not from the particular remedy requested, but rather from the *theory of liability* asserted—
    to find Defendants' emissions wrongful, the courts would have to make political judgments that

27  can be made only by the political branches.  The court in *GMC*—in which the plaintiffs sought
    money damages—reached precisely this conclusion, holding that "regardless of the relief sought,
    the Court is left to make an initial decision as to what is unreasonable in the context of carbon

28  dioxide emissions."  *GMC*, 2007 WL 2726871 at *8.

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(1); MEMO. OF P'S & A'S—C-08-1138 SBA

1    (9th Cir. 2005) (considering second and third *Baker* factors together); *Alperin*, 410 F.3d at 544

2    (explaining that "in practice," the analyses under the independent *Baker* tests "often collaps[e]

3    into one another").

4         As the Ninth Circuit has recognized, the second *Baker* inquiry requires the courts to "ask

5    whether they have the legal tools to reach a ruling that is 'principled, rational, and based upon

6    reasoned distinctions.'" *Alperin*, 410 F.3d at 552 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 278

7    (2004) (plurality op.)). Here, Plaintiffs' suit inescapably would require the Court to separate out

8    permissible, "reasonable" greenhouse gas emissions that are the acceptable byproduct of an

9    appropriate level of economically valuable activities by worthy industries, from those

10   inappropriate emissions that constitute "a substantial and unreasonable interference" with the

11   right to enjoy public and private property. *See* Compl., ¶ 250. But, in the absence of the sort of

12   initial policy guidance discussed above, there are simply no legal standards by which courts could

13   attempt to intelligibly undertake this exercise. *See GMC*, 2007 WL 2726871 at *15 ("The Court

14   is left without guidance in determining what is an unreasonable contribution to the sum of carbon

15   dioxide in the Earth's atmosphere."). Indeed, Congress and the Executive Branch have been

16   struggling for years to develop appropriate legal standards; that the political branches have not yet

17   done so does not somehow suddenly make this task appropriate for resolution by the judiciary.

18        Although Plaintiffs apparently believe that the common law of torts can somehow supply

19   the necessary legal framework for reasoned judicial decision-making in this case, that is wrong.

20   The rhetorical assertion that the Court need only determine whether Defendants' emissions

21   constitute a "substantial and unreasonable interference" with Plaintiffs' property does not resolve

22   the political question, but merely restates it. Such a "recasting" of political questions "in tort

23   terms does not provide standards for making or reviewing [such] judgments." *Schneider*, 412

24   F.3d at 197; *Alperin*, 410 F.3d at 562 (noting that "slave labor claims" pleaded in tort "present no

25   mere tort suit," and dismissing those claims under the political question doctrine). Indeed, Judge

26   Jenkins in *GMC* squarely rejected this precise argument that the common law of nuisance could

27   provide a satisfactory set of legal principles sufficient to avoid dismissal under *Baker*'s second

28   factor. Citing the unique "national and international policy issues" implicated in a global-

- 21 -

1   warming nuisance suit, Judge Jenkins explained that nuisance law simply does not provide courts

2   with "a manageable method of discerning the entities that are creating and contributing to the

3   alleged nuisance." *GMC*, 2007 WL 2726871 at *15; *see also AEP*, 406 F. Supp. 2d at 272

4   (rejecting contention that plaintiffs' global warming suit was "simple nuisance claim of the kind

5   courts have adjudicated in the past").

6
7               **c.     Judicial Promulgation of Climate Policy Would Interfere with
                         Issues of Foreign Policy Committed to the Political Branches**

8               Any effort by a court to assign liability to specific industries for the effects of global

9   climate change would also be barred under the first *Baker* test, because it would intrude upon the

10  political branches' constitutionally committed authority over foreign policy.  As *Baker* itself

11  makes clear, numerous cases have applied the political question doctrine to matters "touching

12  foreign relations."  369 U.S. at 211.  This is in accord with our constitutional design, as "[i]t is

13  axiomatic that 'the conduct of foreign relations is committed by the Constitution to the political

14  departments of the Federal Government; [and] that the propriety of the exercise of that power is

15  not open to judicial review.'"  *Mingtai Fire & Marine Ins. Co. v. United Parcel Serv.*, 177 F.3d

16  1142, 1144 (9th Cir. 1999) (quoting *United States v. Pink*, 315 U.S. 203, 222-23 (1942)).

17              Several Congresses and various Presidents have by now actively considered the

18  interrelationship between global climate change and foreign affairs.  As discussed above, *supra*,

19  at 5-10, the political branches have refused to adopt emissions caps *without agreement that*

20  *developing nations be willing to participate in greenhouse gas reduction.  See* S. RES. 98, 105th

21  Cong. (1997); President Clinton, 2 PUB. PAPERS at 1410.  The political branches' continued

22  refusal thus far to establish limits on greenhouse gas emissions without commitments from

23  countries such as China and India rests on two stated considerations.  First, the political branches

24  have recognized that efforts to address global warming will be successful only if they are global

25  in approach.  As President Clinton observed, "[i]f the entire industrialized world reduces

26  emissions over the next several decades but emissions from the developing world continue to

27  grow at their current pace, concentrations of greenhouse [gases] in the atmosphere will continue

28  to climb."  *Id*.  Second, the political branches have also recognized that if the United States acts

- 22 -

1    without international cooperation, it could find itself in an inferior bargaining position during any

2    future diplomatic attempts to address climate change.  As the EPA has explained, "[u]nilateral

3    EPA regulation of [greenhouse gas] emissions could … weaken U.S. efforts to persuade key

4    developing countries to reduce the [greenhouse gas] intensity of their economies.…  Any

5    potential benefit of EPA regulation could be lost to the extent other nations decided to let their

6    emissions significantly increase in view of U.S. emission reductions." *Control of Emissions*, 68

7    Fed. Reg. at 52931.

8        By asking this Court to establish (retroactively) appropriate levels of greenhouse gas

9    emissions for the particular U.S. corporations before this Court, Plaintiffs would have this Court

10    override the considered foreign policy judgment of the political branches and, in effect, award to

11    the Nation's counterparts in the rapidly developing world the sort of one-sided emissions caps

12    that they have been unable to obtain by diplomatic means.  The request is entirely improper.  *See*

13    *GMC*, 2007 WL 2726871 at *14 (finding first *Baker* test applicable because "the political

14    branches have weighed in on the issue, and have made foreign policy determinations regarding

15    the United States' role in the international concern about global warming"); *see also Corrie*, 503

16    F.3d at 984 (because decision to award foreign aid to Israel is foreign policy judgment committed

17    to political branches, suit based on an aspect of that aid was nonjusticiable under political

18    question doctrine).

19        To the extent that Plaintiffs' Complaint seeks to address any emissions by Defendants in

20    other countries, Compl., ¶ 10, adjudication of Plaintiffs' suit could also result in the inappropriate

21    extraterritorial imposition of American (judge-crafted) emissions standards on point sources in

22    other nations, confounding the attempts of foreign governments to regulate greenhouse gases

23    within their sovereign territories, thereby producing international tension with the United States.

24    The political question doctrine is designed to prevent courts from becoming embroiled in such

25    matters of foreign affairs, which are constitutionally assigned to the President and Congress.  *See*

26    *GMC*, 2007 WL 2726871 at *14.[6]

---

27    [6] The remaining three *Baker* tests are also implicated here for substantially the same reasons

28    discussed above.  *See Alperin*, 410 F.3d at 544 (noting that the *Baker* factors often overlap).  Any
      attempt by a court to assess liability against Defendants for injuries caused by global warming

1

2

### 3.    Plaintiffs' Theory for Attributing Fault Raises Inherently Political Questions

3    Even assuming that a court *could* fashion manageable standards from which to determine

4    the level of greenhouse gas emissions that Defendants *ought* to have produced over the last

5    several decades, it would still encounter a further "sea of imponderables," *Vieth*, 541 U.S. at 290,

6    in determining whether and how liability for *Plaintiffs'* alleged injuries should be allocated

7    among all of the companies and persons who "wrongfully" emit greenhouse gases all over the

8    world.  This issue raises additional political questions, and in particular runs afoul of the second

9    and third *Baker* tests.

10    Specifically, even assuming that the Court could coherently settle upon the point at which

11    greenhouse gas emissions for specific activities, at various points in time and in various places,

12    had crossed the line and become tortious, the Court would still need to determine whether

13    *Defendants'* supposedly wrongful levels of emissions are sufficiently connected to Plaintiffs'

14    alleged injuries to warrant the imposition of liability *from Defendants to Plaintiffs*.  That raises a

15    further political question, as the *GMC* court specifically noted:  "The Court is left without

16    guidance in determining what is an unreasonable contribution to the sum of carbon dioxide in the

17    Earth's atmosphere, *or in determining who should bear the costs associated with the global*

18    *climate change that admittedly result[ed] from multiple sources around the globe*."  2007 WL

19    27226871 at *15 (emphasis added).

20    The Complaint seeks to paper over these problems by including boilerplate allegations

21    that Defendants' wrongful emissions "are a direct and proximate contributing cause" of Plaintiffs'

22    injuries and that Defendants should be "jointly and severally liable."  Compl., ¶¶ 251, 260.  But as

23    the D.C. Circuit has observed, the artifice of "recasting" political questions "in tort terms does not

24    provide standards for making or reviewing [such] judgments."  *Schneider*, 412 F.3d at 197; *see*

25    _____

26    would demonstrate a profound lack of respect for the political branches' policy decisions (foreign and otherwise) on the issue of global climate change, and would seriously undermine those decisions already made (fourth and fifth *Baker* tests).  It would likewise result in multiple

27    branches of the federal government taking inconsistent stances on the same issue (sixth *Baker* test), even though "the questions presented here 'uniquely demand single-voiced statement of the

28    Government's views.'"  *AEP*, 406 F. Supp. 2d at 274 (quoting *Baker*, 369 U.S. at 211).

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(1); MEMO. OF P'S & A'S—C-08-1138 SBA

1    *also Antolok v. United States*, 873 F.2d 369, 383 (D.C. Cir. 1989) (Sentelle, J., concurring) ("As

2    plaintiffs view the cause, these are simply questions of tort liability and damages—obviously

3    matters within normal judicial competence.  Were we to follow plaintiffs' view, there would

4    hardly be a political question doctrine left.").  Plaintiffs' invocation of "proximate causation" and

5    "joint and several liability" is not sufficient to avoid the political question inherent in attributing

6    fault for particular global-warming-induced injuries.

7         As Defendants have explained in their separate motion to dismiss under Fed. R. Civ. P.

8    12(b)(6), Plaintiffs cannot satisfy the minimum requirements of proximate causation, such as the

9    requirement for "some direct relation between the injury asserted and the injurious conduct

10   alleged."  *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992).  But the

11   proximate causation inquiry requires more:  "[a]t bottom, the notion of proximate cause reflects

12   'ideas of what justice demands, or of what is administratively possible and convenient.'"  *Id*.

13   (citation omitted).  In the unique context of a *global* phenomenon in which, according to

14   Plaintiffs' allegations, *all* emissions from *all* sources around the world "mix in the atmosphere"

15   over many centuries into a "worldwide" blending of gases that only in the aggregate, and over

16   time, causes particular injury, an initial *legislative* judgment would be required to fix attributions

17   of fault that are consistent with "what justice demands" and "what is administratively possible

18   and convenient."  Just as in the Article III standing context a lack of the requisite "fair

19   traceability" between a defendant's conduct and a plaintiff's injury can be cured, in some cases,

20   only by Congress's articulation of "'chains of causation that will give rise to a case or controversy

21   where none existed before,'" *Massachusetts*, 127 S. Ct. at 1453 (citation omitted); *see infra* at 36,

22   so too here, only a legislative articulation of rights and liabilities can sort out the inherently

23   intractable problem of assigning fault for allegedly contributing (along with literally everyone

24   else in the world) to a phenomenon that purportedly contributes (in varying degrees) to particular

25   injuries.  *See also infra* at 32-37.  Only a legislature can make the sort of *ad hoc* distinctions that

26   would be necessary to differentiate in law what Plaintiffs allege is undifferentiated in fact.  "Laws

27   promulgated by the Legislative Branch can be illogical, inconsistent, and ad hoc; laws

28

- 25 -

1    pronounced by the courts must be principled, rational, and based on reasoned distinctions."

2    *Vieth*, 541 U.S. at 278 (plurality op.).

3          Contrary to what Plaintiffs may contend, assigning fault for particular injuries is not

4    simply a matter of figuring out which entities have released more greenhouse gases than others.

5    Rather, there is no available legal apparatus that is capable of dealing with the enormous number

6    of causal factors at play (every industrial, agricultural, and governmental entity, and indeed every

7    person emits greenhouse gases), and the severe issues of proximate causation that Plaintiffs' suit

8    presents. *See Comer v. Murphy Oil USA*, *supra*, (Oral Ruling on Defendants' Motion to Dismiss)

9    (Collins Decl., Ex. B) at 39-40 ("[T]his is a case in which the plaintiffs directly ask this Court to

10    attribute fault to these defendants under standards that as of yet do not exist.").  Any attempt to

11    assign responsibility for Plaintiffs' injuries to particular emissions would thus inevitably return to

12    policy considerations about who *should* bear liability for what level of contribution to the

13    purported effects of greenhouse gases (whether liability should be assessed on each producer,

14    only certain industries, or the entire world); which victims of alleged global-warming-enhanced

15    erosion should receive compensation from whom for what injuries; and the relative

16    blameworthiness of Defendants' emissions (as well as the relative utility of Defendants'

17    otherwise lawful activities) as compared to the myriad other factors that also contributed to the

18    injury in question.  Simply put, in this case a court is not "capable of granting relief in a reasoned

19    fashion."  *Alperin*, 410 F.3d at 553.

20          Plaintiffs' appeal to joint and several liability principles fares no better.  Even assuming

21    *arguendo* that that standard could be applied here, it would simply amplify the magnitude of the

22    political questions at the heart of this case.  Given Plaintiffs' allegations concerning the

23    undifferentiated nature of cumulative global greenhouse gas emissions, *see* Compl., ¶¶ 10, 125,

24    254, Plaintiffs' Complaint presumably rests on the remarkable and completely unprecedented

25    suggestion that Defendants alone can be held jointly and severally liable for *all* injuries allegedly

26    caused by global warming at any time and throughout the world.  But if Plaintiffs' theory would

27    internalize all liability for all global warming injuries in a single set of industries in a single

28    country, that only serves to underscore how dramatically Plaintiffs seek to use the courts to set

- 26 -

1    national (if not worldwide) energy policy in utter disregard of the competing economic, national

2    security, and foreign policy concerns.

3         There is another important respect in which Plaintiffs' invocation of joint and several

4    liability fails to evade the political question doctrine.  Application of joint and several liability

5    would simply mean that Defendants would have to add to this litigation all other emitters of

6    greenhouse gases.  *See, e.g.*, *American Motorcycle Ass'n v. Superior Court*, 20 Cal. 3d 578, 598

7    (1978) (under doctrine of equitable indemnity, defendant can assert a cross-complaint to obtain

8    indemnity from other defendants (including defendants not listed in the complaint) on a

9    "comparative fault basis").  The Court would thus inevitably confront the inherently political task

10   of trying to allocate liability among the parties.  *See GMC*, 2007 WL 2726871 at *15 ("[T]he

11   Court is left without a manageable method of discerning the entities that are creating and

12   contributing to the alleged nuisance.  In this case, there are multiple worldwide sources of

13   atmospheric warming across myriad industries and multiple countries.").  The enormously

14   unwieldy nature of what would easily become the largest and most complex litigation in the

15   annals of jurisprudence would dramatically illustrate the complete "lack of judicially discoverable

16   and manageable standards for resolving it."  *Baker*, 369 U.S. at 217.

17        Finally, the issue of which State's laws should apply to these claims presents another

18   intractable layer of complexity that magnifies the unmanageability of the case and the need for an

19   initial political judgment by the elected branches.  While Plaintiffs' Complaint conspicuously

20   avoids informing the Court of the applicable state law in this case, counsel for Plaintiffs has

21   elsewhere suggested that it is "the law of the state"—and presumably the country—"where the

22   source of the pollution is located."  Matthew Pawa, *Global Warming Litigation Heats Up*, TRIAL

23   18, 22 (April 2008).  Unsurprisingly, the laws of the States differ quite dramatically in their rules

24   for allocating fault in tort suits.  For example, many States, including Alaska, have adopted

25   "pure" several (but not joint) liability schemes that require courts and juries to calculate "the

26   percentage of the total fault" that is to be allocated to each plaintiff, defendant, third-party

27   defendant, and all other persons, and to enter judgment against each defendant based only on the

28   percentage of fault for which it is responsible.  Alaska Stat. §§ 09.17.080(a)(2), (d).  Thus, Alaska

- 27 -

1   specifically requires that "[i]n determining the percentages of fault, the trier of fact shall consider

2   both the nature of the conduct of each person at fault, and the extent of the causal relation

3   between the conduct and the damages claimed." *Id.* § 09.17.080(b). This sort of task would be

4   impossible enough with respect to all of the responsible emitters in a single State over the course

5   of many decades; but that, of course, would allocate responsibility for only the activities of that

6   State's emitters. There is still the further, larger problem of emitters in other States, under

7   possibly other rules, and the additional problem of what to do about emitters in foreign countries

8   (even assuming the highly dubious proposition that the Court has the power to define the

9   standards of liability or allocation for those emissions). And then the Court would have to figure

10  out—without any help from the political branches—how to amalgamate all of this complexity

11  into an overall composite determination that a particular industry's contribution to global

12  warming is responsible to a specified degree for a particular injury. One could scarcely contrive a

13  more unmanageable controversy.

14
                **4.    Plaintiffs' Reliance on "Civil Conspiracy" and "Concert of Action"**
15                      **Does Nothing to Avoid the Political Question Doctrine**

16          For several reasons, Plaintiffs allegations of a "civil conspiracy" and of liability based on

17  "concert of action," Compl., ¶¶ 268-82, cannot avoid or resolve the political questions that lie at

18  the heart of this lawsuit.

19          First, it is well settled that civil conspiracy and concert of action are not separate torts, but

20  rather are merely theories of secondary liability. *See Sprewell v. Golden State Warriors*, 266 F.3d

21  979, 992 (9th Cir. 2001); *In re Sunset Bay Assocs.*, 944 F.2d 1503, 1516 n.14 (9th Cir. 1991);

22  2 Dan B. Dobbs, THE LAW OF TORTS 936 (2001) ("Conspiracy is not a tort in itself; it reflects the

23  conclusion that each participant should be liable for the tortious course of conduct."). As a result,

24  these doctrines of secondary liability can operate only to extend to additional parties an

25  underlying liability that *otherwise* already exists. Accordingly, allegations of secondary liability

26  cannot cure a fatal deficiency in, or survive independently from, the alleged underlying torts; if

27  the predicate tort fails, there is nothing to which secondary liability can attach. Because

28  Plaintiffs' theories of liability in this case all would require resolution of nonjusticiable political

1    questions, *see supra* at 13-28, Plaintiffs' addition of allegations of joint conduct does not and

2    cannot make the underlying political questions justiciable.  *See* Collins Decl., Exs. A, C

3    (respectively, the Complaint and Written Order of Dismissal in *Comer v. Murphy Oil Co.*, *supra*)

4    (political question doctrine barred suit for global warming damages where plaintiffs asserted

5    causes of action for, *inter alia*, civil conspiracy).

6         Second, the allegations of Plaintiffs' own Complaint make clear that, as a factual matter,

7    all of Plaintiffs' theories unavoidably rest on nonjusticiable political questions.  Regardless of the

8    theory invoked (nuisance, civil conspiracy, or concert of action), the Complaint confirms that

9    Plaintiffs' *sole* theory of injury is that emissions-induced global warming caused damage to

10   Plaintiffs' property; as a result, *all* of their claims (including the causes of action for civil

11   conspiracy and concert of action) are dependent upon their allegations that Defendants' emissions

12   were greater than they otherwise should have been.  *See* Compl., ¶ 269 (civil conspiracy)

13   (alleging that "[t]he Conspiracy Defendants have engaged in agreements to participate in the

14   intentional creation, contribution to and/or maintenance of a public nuisance, global warming");

15   *id.*, ¶ 279 (concert of action) (alleging that "Defendants have engaged in and/or are engaging in

16   concert with each other over the creation, contribution to and/or maintenance of a public

17   nuisance, global warming").  Consequently, all of Plaintiffs' theories necessarily rest on the

18   untenable premise that this Court can decide what the "proper" level of greenhouse gas emissions

19   should have been over the last several decades.  Because the political question problem is thus

20   "inextricable from the case at bar," *Baker*, 369 U.S. at 217, Plaintiffs' Complaint must be

21   dismissed in its entirety.

22        **B.     Plaintiffs Cannot Demonstrate Article III Standing**

23        Plaintiffs' claims fail as a matter of law for the additional reason that, as their own

24   Complaint confirms, they cannot satisfy the standing requirements of Article III—specifically,

25   they cannot show that the alleged injuries are "fairly traceable" to Defendants' challenged

26   emissions.

27        For example, the Complaint does not state when and where on the planet the greenhouse

28   gas emissions that allegedly caused harm to Plaintiffs occurred.  Which, if any, of these alleged

- 29 -

1    injury-producing emissions were "excessive" at the time they occurred such that tort liability

2    could be based on them?  How can Plaintiffs' alleged injury be traced to any one of these

3    Defendants' emissions, as opposed to the emissions of the many other emitters on the planet,

4    dating back centuries?  Have Defendants' emissions actually caused an impact to Plaintiffs or

5    have they been offset by other factors or forces?  The Complaint is devoid of well-pleaded facts

6    necessary to answer these questions and to connect these Plaintiffs' claimed injuries to these

7    Defendants' alleged emissions; indeed, the Complaint itself makes clear that Plaintiffs cannot do

8    so.  Because, as a matter of law, Plaintiffs cannot satisfy all of the required elements for Article

9    III standing, their Complaint must be dismissed.

10           **1.    To Establish Article III Standing, Plaintiffs Must Plead Sufficient
                      Facts to Show That Their Injuries Are "Fairly Traceable" to**
11           **Defendants' Conduct**

12           The Supreme Court has long held that "the irreducible constitutional minimum of standing

13    contains three elements":  (1) the plaintiff must have suffered an injury-in-fact; (2) "there must be

14    a causal connection between the injury and the conduct complained of—the injury has to be

15    'fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the

16    independent action of some third party not before the court'"; and (3) it must be "'likely,'" rather

17    than simply "'speculative,'" that a favorable decision will redress the plaintiff's injury.  *Lujan v.*

18    *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights*

19    *Org.*, 426 U.S. 26, 41-42 (1976)); *see also Smelt v. County of Orange*, 447 F.3d 673, 682 (9th Cir.

20    2006).  The primary standing element at issue in this case is the second one—fair traceability.

21    This element, which the Supreme Court has defined as "the causation requirement" of standing,[7]

22    requires that the plaintiff's injury be "fairly traceable" to *the defendant's challenged conduct*

23    rather than to "the independent action of some third party not before the court."  *Bennett v. Spear*,

24    520 U.S. 154, 167 (1997).  In addition, an injury is not fairly traceable to the defendant's conduct

25    if the causal chain linking the two is "too attenuated."  *Allen v. Wright*, 468 U.S. 737, 757 (1984);

26    _____

27    [7] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 n.7 (1998); *see also Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1104 (9th Cir. 2006) (this element of standing requires "a fairly
      traceable *causal connection* between the alleged injury and the ... challenged conduct") (citation
28    omitted) (emphasis added).

- 30 -
OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(1); MEMO. OF P'S & A'S—C-08-1138 SBA

1  *see also Prescott v. County of El Dorado*, 298 F.3d 844, 846 (9th Cir. 2002) (fair traceability

2  requirement not satisfied where the "causal relationship is too remote").

3          Plaintiffs bear the burden of establishing the elements of Article III standing, including

4  fair traceability.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 & n.3 (2006); *Lujan*,

5  504 U.S. at 561.  They cannot satisfy that burden simply by presenting labels or conclusions or

6  generalized factual allegations.  *See*, *e.g.*, *Valley Forge Christian College v. Americans United for

7  Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982) ("The requirements of Art. III

8  standing are not satisfied merely because a party requests a court of the United States to declare

9  its legal rights, and has couched that request for forms of relief historically associated with courts

10  of law in terms that have a familiar ring to those trained in the legal process.").  Rather, as "an

11  indispensable part of the plaintiff's case," the elements of Article III standing "must be supported

12  in the same way as any other matter on which plaintiff bears the burden of proof."  *Lujan*, 504

13  U.S. at 561.  Thus, as with any other element of a plaintiff's claim, the plaintiff must plead

14  "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v.

15  Twombly*, 127 S. Ct. 1955, 1974 (2007), and "to raise a right to relief above the speculative

16  level," *id.* at 1965 (emphasis added).  The Federal Rules require "more than labels and

17  conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.*[8]

18          **2.      Plaintiffs Have Not Pleaded Sufficient Facts to Establish That Their
19                    Alleged Injuries Are "Fairly Traceable" to Defendants' Emissions**

20          As set forth below, Plaintiffs' theory of causation fails to satisfy the fair traceability

21  requirement in two respects.  First, their own Complaint confirms that they cannot trace their

22  alleged injuries to *Defendants' emissions*, as opposed to the independent emissions of countless

23  third parties occurring throughout the world over the last several centuries—not to mention other

24  potential competing causes of coastal erosion on barrier islands in northwestern Alaska.  Second,

---

25  [8] Accordingly, Plaintiffs' conclusory allegations of causation (*e.g.*, Compl., ¶163) are manifestly
26  inadequate to establish fair traceability, especially where (as here) the Complaint's factual
    allegations actually negate the fair traceability required by Article III.  *See Clegg v. Cult
27  Awareness Network*, 18 F.3d 752, 754-755 (9th Cir. 1994) (legal conclusions presented as factual
    allegations are insufficient to establish federal court's jurisdiction; *see also Whitmore v.
    Arkansas*, 495 U.S. 149, 155-156 (1990) ("A federal court is powerless to create its own
28  jurisdiction by embellishing otherwise deficient allegations of standing.").

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(1); MEMO. OF P'S & A'S—C-08-1138 SBA

1    Plaintiffs have failed to plead fair traceability for the additional reason that the alleged causal

2    chain between Defendants' emissions and Plaintiffs' damage is much too attenuated to satisfy

3    Article III standards.

4                          **a.    Because Plaintiffs Allege That Greenhouse Gas Emissions Are**
5                          ***Undifferentiated* in the Global Atmosphere, Plaintiffs' Injuries**
                           **Cannot Be Fairly Traced to *Defendants'* Emissions, As Opposed**
6                          **to Those of Third Parties**

7            It is well settled that there is no Article III standing where the plaintiff's injuries cannot be

8    fairly traced to the defendant's challenged conduct, as opposed to the independent actions of *third*

9    *parties* not before the court. *See, e.g.*, *Simon*, 426 U.S. at 41-42 ("the 'case or controversy'

10   limitation of Art. III still requires that a federal court act only to redress injury that fairly can be

11   traced to the challenged action of the defendant, *and not injury that results from the independent*

12   *action of some third party not before the court*") (emphasis added); *see also Lujan*, 504 U.S. at

13   560 (same). This principle controls this case. Global warming, as its name indicates, is a global

14   phenomenon: every person and entity on the planet is responsible for some emissions of

15   greenhouse gases. As established by Plaintiffs' own Complaint and the documents cited in it, the

16   levels of atmospheric greenhouse gases that Plaintiffs decry are the result of worldwide emissions

17   by many persons over a very long period of time. Thus, Plaintiffs' Complaint asserts that global

18   warming is the "'globally averaged *net effect of human activities since 1750*,'" *see* Compl., ¶ 161

19   (emphasis added) (quoting Intergovernmental Panel on Climate Change, *Climate Change 2007:*

20   *Synthesis Report* 37 (Collins Decl., Ex. G)), and that Defendants' emissions only "contribut[ed] to

21   global warming and caus[ed] injuries to" Plaintiffs "*in combination* with emissions and conduct

22   of others," Compl., ¶ 255 (emphasis added).[9] Moreover, Plaintiffs' Complaint and the materials

23   it cites also assert that greenhouse gases, once emitted into the atmosphere, are *undifferentiated*—

24   making them necessarily *untraceable* to any source—because they "rapidly mix in the

25   atmosphere" with gases emitted by persons all across the planet. *See* Compl., ¶ 254.[10] Plaintiffs

26   _____

[9] *See also Emissions of Greenhouse Gases*, *supra*, (Collins Decl., Ex. F) at 6, 11-25 (attributing
27   most greenhouse gas emissions to sources *other than* the challenged emissions of Defendants).

[10] *See also* Compl., ¶ 254 ("Carbon dioxide and other greenhouse gas emissions resulting in
28   global warming are inherently interstate in nature. Emissions of carbon dioxide and other

- 32 -

1    further expressly allege that carbon dioxide, once emitted, remains in the atmosphere for

2    "hundreds of years," *id*., ¶ 180; *see also id*., ¶ 125 (a "large fraction of carbon dioxide emissions

3    persist in the atmosphere for several centuries"), and that two-thirds of the increase in carbon

4    dioxide emissions occurred between the mid-18th century and 1980, *id*.  But if Plaintiffs cannot

5    identify *when* the particular emissions occurred that allegedly put in motion the events leading to

6    their injuries, they cannot hope to trace their injuries to *Defendants'* emissions, as opposed to

7    those of the many others that have emitted greenhouse gases over the last century or longer.

8    In view of the Complaint's allegations as to the undifferentiated nature of the greenhouse

9    gas emissions from all global sources, and their worldwide accumulation over long periods of

10   time, Plaintiffs' own pleading makes clear that there is no realistic possibility of *tracing* any

11   particular alleged effect of global warming to any *particular* emissions of any *specified* person,

12   entity, or group, at any specific point in time.  Taking the allegations of the Complaint as true,

13   there is no way to say which emissions—emitted by whom and at what time in the last several

14   centuries and at what place in the world—"caused" Plaintiffs' alleged global-warming related

15   injuries.  As the District Court in *Comer* held in dismissing analogous global-warming claims for

16   lack of the fair traceability required by Article III, the injuries alleged are not "attributable or

17   traceable to these individual defendants," but rather "are attributable to a larger group" that is

18   "not before this Court, not only within this nation but outside of our jurisdictional boundaries as

19   well."  *Comer v. Murphy Oil USA*, *supra*, (Oral Ruling on Motion to Dismiss) (Collins Decl., Ex.

20   B) at 36.

21   The lack of fair traceability is exacerbated by the fact that Plaintiffs must tie their alleged

22   global-warming related injuries, not merely to Defendants' emissions as a whole, but rather to

23   that *portion* of Defendants' emissions that were supposedly tortious.  *See Lujan*, 504 U.S. at 560

24

25   greenhouse gases from defendants' operations, no matter where such operations are located,
     rapidly mix in the atmosphere and cause an increase in the atmospheric concentration of carbon
26   dioxide and other greenhouse gases worldwide."); *id*., ¶ 10 (alleging that Defendants' emissions
     "do[] not remain localized and inevitably merge[] with the accumulation of emissions in
27   California and in the world"); *see also* National Academy of Sciences, *Climate Change Science:
     An Analysis of Some Key Questions* 10 (2000) (Collins Decl., Ex. H) (cited in Compl., ¶ 157,
28   n.36) ($CO_2$, and other long-lasting gases, are spread "throughout the lower atmosphere" within a
     year or more).

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(1); MEMO. OF P'S & A'S—C-08-1138 SBA

1  (injury must be fairly traceable "'to the *challenged* action of the defendant'") (quoting *Simon*, 426

2  U.S. at 41-42) (emphasis added).  As noted earlier, Plaintiffs' Complaint necessarily rests on the

3  premise that Defendants emitted *excessive* amounts of greenhouse gases.  *See supra* at 16-20.

4  (No one contends that greenhouse gas emissions can or should be reduced to zero.)  The

5  Complaint identifies no plausible way in which Plaintiffs could hope to fairly trace their global-

6  warming relating injuries to that *subset* of Defendants' greenhouse gas emissions that exceeded

7  some hypothetical "proper" level of emissions—as opposed to Defendants' proper emissions, and

8  the emissions (proper or wrongful) of everyone else in the world.  *See Twombly*, 127 S. Ct. at

9  1974 (plaintiff must plead "enough facts to state a claim to relief that is plausible on its face").

10  These already insurmountable fair traceability problems are compounded yet further by

11  the principle of "inertia":  as explained in the Intergovernmental Panel on Climate Change report

12  cited in Plaintiffs' Complaint (¶ 161), a stabilization in greenhouse gas levels would take at least

13  a "few decades" to slow increases in global temperatures, and even then "[s]mall increases in

14  global average temperatures could still be expected for several centuries."  *Climate Change 2007:*

15  *Synthesis Report*, *supra*, (Collins Decl., Ex. G) at 66.  Accordingly, even if Defendants (and the

16  rest of the world) had stopped emitting greenhouse gases decades ago, this "inertia" principle

17  suggests that global warming sufficient to have melted protective Arctic sea ice may well have

18  occurred anyway.  As a result, only by "unadorned speculation" could Plaintiffs hope to say that

19  greenhouse gases emitted in any particular *timeframe* caused their injuries.  *Simon*, 426 U.S. at

20  44.  It is, of course, essential to evaluating the reasonableness of any particular emissions to know

21  *which* emissions are at issue and at *what* point in time.  Plaintiffs' failure to trace their injuries to

22  particular wrongful levels of emissions by these Defendants at particular points in time confirms

23  their inability sufficiently to plead the fair traceability required by Article III.

24  Plaintiffs' Complaint thus reveals a failure of fair traceability that is far beyond what has

25  been found inadequate by the Supreme Court and the Ninth Circuit in cases implicating the

26  independent actions of third parties.  *See*, *e.g.*, *Allen*, 468 U.S. at 756-59 (no standing to challenge

27  IRS's non-enforcement of policy denying tax-exempt status to racially discriminatory private

28  schools because attendance of plaintiffs' children in integrated schools depended not only on IRS

- 34 -

1    enforcement but on decisions by third parties, such as school officials and parents); *Simon*, 426

2    U.S. at 43 (holding that indigent plaintiffs lacked standing to challenge IRS policy according

3    favorable tax treatment to certain non-profit hospitals because the denial of service to indigents

4    could have "result[ed] from decisions made by the hospitals without regard to the tax

5    implications"); *Warth v. Seldin*, 422 U.S. 490, 505-06 (1975) (no standing to challenge zoning

6    ordinance because lack of low-income housing may have been attributable to builders'

7    unwillingness to build low-cost housing and to plaintiffs' financial situations); *see also Pritikin v.*

8    *Department of Energy*, 254 F.3d 791, 797 (9th Cir. 2001) (no Article III standing to challenge

9    Energy Department's failure to make budget requests for medical monitoring program; any

10   resulting injury to Plaintiff would depend critically on the independent decisions of a separate

11   agency, "a third party not before the court, to begin the medical monitoring program"). Indeed,

12   whereas all of those cases involved a *finite* number of additional actors, Plaintiffs' claims here

13   implicate the conduct of *all* individuals and entities on the planet, each of whom emitted their

14   own quantities and concentrations of greenhouse gases over varying periods of time. *See* Compl.,

15   ¶¶ 125, 161, 254. If standing did not exist in the much less complex third-party causation

16   scenarios of *Allen*, *Simon*, *Warth*, and comparable cases, there can be no standing here where the

17   traceability analysis must disentangle the role of billions of third-party emitters over centuries.

18          Plaintiffs' Complaint suggests that they believe that these problems can be evaded merely

19   by alleging that Defendants "contribute" to global warming, *see* Compl., ¶¶ 3, 251, 255, 260, and

20   that this alleged contribution, "in combination with emissions and conduct of others," has caused

21   injury to Plaintiffs, *id.*, ¶ 255. These conclusory labels do nothing to address the clear lack of fair

22   traceability; on the contrary, they simply beg the question, because *all* emitters likewise

23   "contribute" to global warming. *See*, *e.g.*, *Warth*, 422 U.S. at 504 (lack of fair traceability due to

24   role of independent third parties was not cured by allegation that the defendants' conduct "*ha[d]*

25   *contributed, perhaps substantially*, to the cost of housing" in the plaintiffs' locality) (emphasis

26   added). A theory that would give undifferentiated standing to sue almost anyone and everyone in

27   the whole world is the very antithesis of "fair traceability." The fatal lack of the required

28   traceability is likewise not cured by the allegation that Defendants are "*substantial* contributors to

- 35 -

1    global warming." Compl., ¶ 260 (emphasis added). Even setting aside the fact that the

2    Complaint has a very broad notion of what counts as "substantial," *see supra* at 11, Plaintiffs fail

3    to explain how the relative size of a party's emissions can do anything to cure the fact that *all*

4    worldwide emissions from all sources, occurring over very long periods of time, join together in

5    creating the aggregate levels of greenhouse gases allegedly necessary to cause Plaintiffs' injury.

6        Indeed, Plaintiffs' complete inability to establish traceability only serves to reinforce the

7    need for an initial policy decision by the political branches. *See supra* at 24-28. As the Supreme

8    Court recently reaffirmed, "'Congress has the power to define injuries and articulate chains of

9    causation *that will give rise to a case or controversy where none existed before.*'" *Massachusetts*,

10   127 S. Ct. at 1453 (citation omitted). Congress, for example, has exercised such power in the

11   Clean Water Act by defining (through permits and regulations) what levels of what substances

12   may be released by a party into a waterway and by providing that discharges in excess of the

13   permitted levels that contribute to injuries to another may give rise to liability. *See, e.g., Public*

14   *Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72

15   (3d Cir. 1990) (plaintiff in Clean Water Act action must show that "a defendant has 1) discharged

16   some pollutant *in concentrations greater than allowed by its permit* 2) into a waterway in which

17   the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) the

18   pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs") (emphasis

19   added); *see also Natural Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985,

20   995 (9th Cir. 2000) (following *Powell Duffryn* and its progeny). Here, of course, there is a

21   complete absence of any statutory scheme that would define the relevant wrongful emissions of

22   greenhouse gases, much less one that establishes which chains of causation associated with those

23   emissions should give rise to liability for what injuries to which persons. That sort of statutory

24   "authorization is of critical importance to the standing inquiry," *Massachusetts*, 127 S. Ct. at

25   1453, and its absence here is fatal to Plaintiffs' effort to establish traceability. *Cf. id.* at 1454-55

26   (relying critically on, *inter alia*, Congress's creation of statutory procedural rights in holding that

27   Massachusetts had standing to challenge the EPA's failure to regulate automobile emissions of

28   greenhouse gases); *Center for Biological Diversity v. Brennan*, No. 06-7062-SBA, 2007 WL

- 36 -

1    2408901 at *11 (N.D. Cal. Aug. 21, 2007) (holding that Congress's creation of statutory

2    procedural rights to participate in commenting on climate-change reports "relaxes a plaintiff's

3    burden on the traceability and redressability prongs of the Article III standing test" because

4    "'[t]he person who has been accorded a procedural right to protect his concrete interests can

5    assert that right without meeting all the normal standards'") (quoting *Lujan*, 504 U.S. at 572 n.7).

6        Moreover, it is telling that, even the statutorily based Clean Water Act cases *disallow*

7    standing based on geographically remote contributions to an alleged pollution injury:  the

8    plaintiffs in such cases must "demonstrate a more specific geographic or other causative nexus in

9    order to satisfy the 'fairly traceable' element of standing."  *Friends of the Earth, Inc. v. Crown*

10    *Cent. Petroleum Corp.*, 95 F.3d 358, 361 (5th Cir. 1996) (holding that eighteen-mile distance

11    from discharge to place of alleged impact on plaintiff was "too large to infer causation" for

12    standing purposes); *see also Texas Independent Producers & Royalty Owners Ass'n v. EPA*, 410

13    F.3d 964, 973 (7th Cir. 2005) (*en banc*) ("[T]o satisfy the 'fairly traceable' causation requirement,

14    there must be a distinction between the plaintiffs who lie within the discharge zone of a polluter

15    and those who are so far downstream that their injuries cannot fairly be traced to that defendant.")

16    (internal quotation omitted).

17        Plaintiffs' asserted injuries concededly cannot be "fairly traced" to any geographically

18    proximate contribution of greenhouse gases, because the Complaint alleges that any injuries were

19    caused only by an undifferentiated *worldwide* accumulation of greenhouse gases.  That Plaintiffs

20    could not satisfy even the *relaxed* standing requirements applicable to a congressionally created

21    liability regime only underscores their inability to establish Article III standing here, where *no*

22    statutory scheme is available that could possibly serve to relax the required chain of causation.

23        **b.    Plaintiffs Cannot Demonstrate "Fair Traceability" for the**
          **Additional Reason That the Alleged Line of Causation From**
24          **Emission to Injury Is Too Attenuated**

25        Plaintiffs' claims must be dismissed for the additional reason that "[t]he links in the chain

26    of causation between the challenged … conduct and the asserted injury are far too weak for the

27    chain as a whole to sustain [Plaintiffs'] standing."  *Allen*, 468 U.S. at 759.  Indeed, Plaintiffs'

28    allegations epitomize an impermissibly attenuated and speculative theory of causation:  the Oil

- 37 -

1   Company Defendants' exploration and production activities release greenhouse gases; those

2   emissions have joined with all of the other emissions of people and entities worldwide over the

3   past several centuries to increase greenhouse gas levels; those increased greenhouse gas levels,

4   together with other factors, contribute to overall global warming; global warming (together with

5   yet other factors) contributes to higher temperatures in the Arctic region; those warmer

6   temperatures have resulted in melting of sea ice that has acted in the past as a barrier against the

7   effects of coastal storms that occur in the Chukchi Sea; those storms (again, together with other

8   factors) have subjected the barrier reef (on which the Village of Kivalina is located) to waves and

9   surges that have resulted, over time, in the erosion of the reef; and the erosion of the reef (again,

10   together with other factors) poses a threat to the integrity of structures that make up the village,

11   allegedly necessitating relocation of Kivalina's residents. *See* Complaint, at ¶¶ 3, 10, 16, 123,

12   127, 130, 131, 185, 254.

13   Plaintiffs' proffered causal chain, to put it mildly, is "attenuated at best." *Allen*, 468 U.S.

14   at 757. Plaintiffs' theory of traceability contains too many links and relies on the conduct of too

15   many parties over too long a period of time and dispersed over too wide a geographic area. This

16   flaw is only magnified by the role of independent third parties and other competing influences.

17   *See id.* (no fair traceability where chain of causation was "highly indirect" and depended on

18   actions of third parties); *Prescott*, 298 F.3d at 846 (no standing where the alleged "causal

19   relationship is too remote" in light of the role of independent third parties); *see also supra* at 32-

20   37. At bottom, Plaintiffs' allegations improperly "rely on little more than the remote possibility,

21   unsubstantiated by allegations of fact, that their situation might have been better had [Defendants]

22   acted otherwise." *Warth*, 422 U.S. at 507.

23   Moreover, while the exact traceability standard may not be "susceptible of precise

24   definition," in "many cases the standing question can be answered chiefly by comparing the

25   allegations of the particular complaint to those made in prior standing cases." *Allen*, 468 U.S. at

26   751-52. In this regard, Plaintiffs' Complaint advances a causal chain that is exceedingly more

27   strained than those the courts have previously rejected. *See, e.g.*, *DaimlerChrysler*, 547 U.S. at

28   346 (theory that taxpayer was injured by tax breaks to corporation was too attenuated and

- 38 -

1  speculative to support Article III standing); *Allen*, 468 U.S. at 757-59 (holding that line of

2  causation between IRS's grant of tax exemptions to racially discriminatory schools and plaintiffs'

3  children attending segregated schools was too tenuous); *Pony v. County of Los Angeles*, 433 F.3d

4  1138, 1146 (9th Cir. 2006) (claim that attorney would have received higher fees if county

5  rescinded its alleged policy of only agreeing to lump-sum settlements was too speculative to be

6  fairly traceable and could not support standing); *see also supra* at 34-35 (discussing *Simon* and

7  *Warth*).

8  *    *    *

9  "[T]he standing inquiry requires *careful judicial examination of a complaint's*

10  *allegations*" to determine whether "the line of causation between the illegal conduct and injury

11  [is] too attenuated" to justify standing. *Allen*, 468 U.S. at 752 (emphasis added).  That is

12  consistent with the principle that standing questions are "threshold determinants of the propriety

13  of judicial intervention," *Warth*, 422 U.S. at 518, and are thus often resolved early in litigation,

14  preferably so as to prevent the expenditure of judicial resources where the court ultimately lacks

15  power to act.  Plaintiffs' inability to allege traceability here counsels strongly against judicial

16  involvement in a suit that is hardly of the sort "traditionally thought to be capable of resolution

17  through the judicial process." *Allen*, 468 U.S. at 752 (internal quotation omitted).[11]

18

19

20

21

22

23

24

25  _____

26  [11] Plaintiffs' allegations of conspiracy and concert of action—all of which rely on these same
    attenuated theories of causation to connect Defendants' alleged conduct (through Defendants'
    alleged emissions) to Plaintiffs' asserted injuries—do nothing to cure Plaintiffs' fatal lack of

27  standing.  And, as noted earlier, Plaintiffs' invocation of these theories of secondary liability,
    which are not independent causes of action, necessarily fail where (as here) the predicate torts

28  alleged are legally defective. *See supra* at 28-29.

OIL CO. DEFTS.' MOT. TO DISMISS UNDER RULE 12(b)(1); MEMO. OF P'S & A'S—C-08-1138 SBA

1  **IV.    <u>CONCLUSION</u>**

2         For the foregoing reasons, Plaintiffs' Complaint should be dismissed with prejudice.

3  Dated:  June 30, 2008                          Respectfully Submitted,

4  MUNGER, TOLLES & OLSON LLP          O'MELVENY & MYERS LLP

5      By:    */s/ Daniel P. Collins*                By:    */s/ John F. Daum*
                  Daniel P. Collins                            John F. Daum

6  Attorneys for Defendant                  Attorneys for Defendant
7  SHELL OIL COMPANY                      EXXONMOBIL CORPORATION

8  KING & SPALDING LLP                    KIRKLAND & ELLIS LLP

9      By:    */s/ Tracie J. Renfroe*                By:    */s/ Andrew B. Clubok*
10                Tracie J. Renfroe                          Andrew B. Clubok

   Attorneys for Defendants                 Attorneys for Defendant
11 CHEVRON CORPORATION and CHEVRON          CONOCOPHILLIPS COMPANY
   U.S.A. INC.
12
   ARNOLD & PORTER LLP
13
       By:    */s/ Matthew Heartney*
14                Matthew Heartney
   Attorneys for Defendants
15 BP AMERICA, INC., AND BP PRODUCTS
   NORTH AMERICA, INC.
16

17

18

19

20

21

22

23

24

25

26

27

28

- 40 -

1

## DECLARATION PURSUANT TO GENERAL ORDER 45, SECTION X

2    I, Daniel P. Collins, declare and attest, pursuant to this Court's General Order 45, section

3    X, subparagraph B, that I am an ECF User and the filer of this document and that concurrence in

4    the filing of this document has been obtained from each of the other signatories (in addition to

5    myself) shown on page 40 of this document.  I further declare and attest, pursuant to that same

6    subparagraph of General Order 45, that I will maintain records to support this concurrence for

7    subsequent production for the court if so ordered or for inspection upon request by a party until

8    one year after final resolution of the action (including appeal, if any).

9    I declare, under penalty of perjury under the laws of the United States of America, that the

10   foregoing is true and correct.

11   Dated June 30, 2008

12
          _____*/s/ Daniel P. Collins*_____
          Daniel P. Collins

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  RONALD L. OLSON (SBN 44597)
   Ronald.Olson@mto.com
2  DANIEL P. COLLINS (SBN 139164)
   Daniel.Collins@mto.com
3  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue, 35th Floor
4  Los Angeles, CA  90071-1560
   Telephone:     (213) 683-9100
5  Facsimile:     (213) 687-3702

6  JEROME C. ROTH (SBN 159483)
   Jerome.Roth@mto.com
7  MUNGER, TOLLES & OLSON LLP
   560 Mission Street
8  San Francisco, CA  94105-2907
   Telephone:     (415) 512-4000
9  Facsimile:     (415) 512-4077

10 Attorneys for Defendant
   SHELL OIL COMPANY

11 [Counsel Listing Continued on Next Page]

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                    OAKLAND DIVISION

15 NATIVE VILLAGE OF KIVALINA and CITY        CASE NO.  C 08-01138 SBA
   OF KIVALINA,
16                                             [PROPOSED] ORDER GRANTING
                 Plaintiffs,                   CERTAIN OIL COMPANY
17                                             DEFENDANTS' MOTION TO
          vs.                                  DISMISS PLAINTIFFS'
18                                             COMPLAINT PURSUANT TO FED.
   EXXON MOBIL CORPORATION; BP P.L.C.;         R. CIV. P. 12(b)(1)
   BP AMERICA, INC.; BP PRODUCTS NORTH
19 AMERICA, INC.; CHEVRON CORPORATION;         Time:    December 9, 2008, 1:00 P.M.
   CHEVRON U.S.A., INC.; CONOCOPHILLIPS        Ctrm.:   Courtroom 3, 1301 Clay Street,
20 COMPANY; ROYAL DUTCH SHELL PLC;             Oakland, California
   SHELL OIL COMPANY; PEABODY ENERGY           The Honorable Saundra B. Armstrong
21 CORPORATION; THE AES CORPORATION;
   AMERICAN ELECTRIC POWER COMPANY,
22 INC.; AMERICAN ELECTRIC POWER
   SERVICES CORPORATION; DTE ENERGY
23 COMPANY; DUKE ENERGY CORPORATION;
   DYNEGY HOLDINGS, INC.; EDISON
24 INTERNATIONAL; MIDAMERICAN ENERGY
   HOLDINGS COMPANY; MIRANT
25 CORPORATION; NRG ENERGY; PINNACLE
   WEST CAPITAL CORPORATION; RELIANT
26 ENERGY, INC.; THE SOUTHERN COMPANY;
   AND XCEL ENERGY, INC.,
27               Defendants.

28

1  JOHN F. DAUM (SBN 52313)
   jdaum@omm.com
2  O'MELVENY & MYERS LLP
   400 South Hope Street
3  Los Angeles, CA 90071-2899
   Telephone: (213) 430-6111
4  Facsimile:  (213) 430-6407

5  JONATHAN D. HACKER (*Pro hac vice pending*)
   jhacker@omm.com
6  O'MELVENY & MYERS LLP
   1625 Eye Street, NW
7  Washington, DC 20006-4001
   Telephone:  (202) 383-5300
8  Facsimile:  (202) 383-5414

   Attorneys for Defendant
9  EXXON MOBIL CORPORATION

10

11

12

13 STUART A. C. DRAKE (*Pro hac vice*)
   sdrake@kirkland.com
14 ANDREW B. CLUBOK (*Pro hac vice*)
   aclubok@kirkland.com
15 SUSAN E. ENGEL (*Pro hac vice*)
   KIRKLAND & ELLIS LLP
16 655 Fifteenth Street, N.W.
   Washington, D.C. 20005
17 Telephone: (202) 879-5173
   Facsimile:  (202) 879-5200
18
   ELIZABETH DEELEY (SBN 230798)
19 edeeley@kirkland.com
   KIRKLAND & ELLIS LLP
20 555 California Street
   San Francisco, CA 94104
21 Telephone:  (415) 439-1861
   Facsimile:  (415) 439-1500
22 Attorneys for CONOCOPHILLIPS COMPANY

   ROBERT MEADOWS (*Pro hac vice*)
   rmeadows@kslaw.com
   TRACIE J. RENFROE (*Pro hac vice*)
   trenfroe@kslaw.com
   JONATHAN L. MARSH (*Pro hac vice*)
   jlmarsh@kslaw.com
   KING & SPALDING LLP
   1100 Louisiana Street, Suite 4000
   Houston, TX  77002-5213
   Telephone:     (713) 751-3200
   Facsimile:     (713) 751-3290

   LISA KOBIALKA (SBN 191404)
   lkobialka@kslaw.com
   KING & SPALDING LLP
   1000 Bridge Parkway, Suite 100
   Redwood City, CA  94065
   Telephone:    (650) 590-0700
   Facsimile:    (650) 590-1900

   Attorneys for Defendants
   CHEVRON CORPORATION and
   CHEVRON U.S.A. INC.

   MATTHEW HEARTNEY (SBN 123516)
   Matthew.Heartney@aporter.com
   ARNOLD & PORTER LLP
   777 S. Figueroa Street, 44th Floor
   Los Angeles, CA  90017-5844
   Telephone: (213) 243-4150
   Facsimile: (213) 243-4199

   PHILIP H. CURTIS (*Pro hac vice*)
   Philip.Curtis@aporter.com
   MICHAEL B. GERRARD (*Pro hac vice*)
   Michael.Gerrard@ aporter.com
   ARNOLD & PORTER LLP
   399 Park Avenue
   New York, New York  10022
   Telephone:  (212) 715-1000
   Facsimile:  (212) 715-1399

   Attorneys for BP AMERICA INC., AND
   BP PRODUCTS NORTH AMERICA INC.

23

24

25

26

27

28

1    On June 30, 2008, Defendants Shell Oil Company, Exxon Mobil Corporation, Chevron

2    Corporation, Chevron U.S.A. Inc., ConocoPhillips Company, BP America Inc., and BP Products

3    North America Inc. ("Defendants") filed a "Motion of Certain Oil Company Defendants to

4    Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(1)" ("Motion").  Upon

5    consideration of all of the moving, opposition, and reply papers, and the materials submitted

6    therewith, the files and records of this case, and the argument presented at the hearing on the

7    Motion, the Court grants the Motion and orders the Complaint dismissed with prejudice.

8    Plaintiffs are the Native Village of Kivalina and the City of Kivalina, the self-described

9    "governing bodies" of a small Alaskan village of 400 persons located north of the Arctic Circle.

10    Complaint ("Compl."), ¶ 1.  According to Plaintiffs' Complaint, Defendants have "for many

11    years" emitted "greenhouse gases," such as carbon dioxide and methane.  Compl., ¶¶ 3, 163-80.

12    Plaintiffs allege that, as a result of these emissions, Defendants have "contribut[ed] to global

13    warming," *id.*, ¶ 2, and thus must be held singularly "responsible" for the "special injuries"

14    suffered by Plaintiffs, namely, increased erosion to Kivalina's barrier island caused by winter

15    storms that previously would have been buffered by sea ice (which sea ice, Plaintiffs contend, has

16    been reduced by global warming), *id.*, ¶¶ 3, 4, 16, 185.

17    Plaintiffs' suit founders on two fatal constitutional and jurisdictional objections.

18    **I.    <u>Dismissal Is Required Under the Political Question Doctrine</u>**

19    Plaintiffs' allegations raise inherently nonjusticiable political questions that the judiciary

20    lacks the authority to resolve.  The controlling standards for determining whether a case raises a

21    nonjusticiable political question were set forth in *Baker* v. *Carr*, 369 U.S. 186 (1962).  The

22    Supreme Court identified six independent and alternative formulations that characterize a case as

23    falling within that doctrine:

24    [1] a textually demonstrable constitutional commitment of the issue to a
coordinate political department; *or* [2] a lack of judicially discoverable and

25    manageable standards for resolving it; *or* [3] the impossibility of deciding
without an initial policy determination of a kind clearly for nonjudicial

26    discretion; *or* [4] the impossibility of a court's undertaking independent
resolution without expressing lack of the respect due coordinate branches of

27    government; *or* [5] an unusual need for unquestioning adherence to a political
decision already made; *or* [6] the potentiality of embarrassment from

28    multifarious pronouncements by various departments on one question.

1   *Id.* at 217 (emphasis added).  If any "one of these formulations is inextricable from the case at

2   bar," the court should dismiss the suit as nonjusticiable on the ground that it involves a political

3   question.  *Id.*; *see also Alperin* v. *Vatican Bank*, 410 F.3d 532, 547 (9th Cir. 2005) ("[A]ny single

4   [*Baker*] test can be dispositive").  Adjudication of Plaintiffs' claims would violate these settled

5   principles by improperly requiring this Court to resolve at least two political questions.

6       *First*, to adjudicate Plaintiffs' claim that Defendants should be held liable for "their

7   emissions of large quantities of greenhouse gases" that "contribut[e] to global warming," Compl.,

8   ¶¶ 2-3, the Court would have to take upon itself the task of defining what quantities of carbon

9   dioxide and methane were *wrongfully* emitted by each Defendant throughout the world over the

10  course of many decades.  This raises a political question implicating all six of the *Baker* tests, and

11  especially the third, second, and first tests.

12      All of the theories in Plaintiffs' Complaint assume that some emissions of greenhouse gas

13  are wrongful, while others are not.  But no statute or regulation sets forth standards of any kind

14  for determining what levels of greenhouse gas emissions are excessive for which activities.  To

15  adjudicate Plaintiffs' claims, this Court would have to make that determination on its own—

16  retroactively, no less—without guidance from the political branches.  As three other district

17  courts have recognized, the only way a court could perform this task is by weighing myriad

18  competing policy considerations—economic, foreign policy, and environmental, among others—

19  that are non-legal in nature and inappropriate for judicial resolution.  *See California* v. *General*

20  *Motors Corp.* ("*GMC*"), No. C-06-5755-MJJ, 2007 WL 2726871 at *6 (N.D. Cal. Sept. 17, 2007)

21  (the third *Baker* test "largely controls the analysis in the current case due to the complexity of the

22  initial global warming policy determinations that must be made by the elected branches prior to

23  the proper adjudication" of the plaintiffs' suit), *appeal pending*, No. 07-16908 (9th Cir.); *id.* at

24  *13-*16 (also finding the first and second *Baker* tests applicable); *Connecticut* v. *American Elec.*

25  *Power Co.* ("*AEP*"), 406 F. Supp. 2d 265, 270-74 (S.D.N.Y. 2005), *appeal pending*, No. 05-5104

26  (2d Cir.); *see also Comer* v. *Murphy Oil USA Inc.*, 1:05-CV-00436 (S.D. Miss. Aug. 30, 2007)

27  (Oral Ruling on Motion to Dismiss and Written Order of Dismissal) (attached respectively, as

28  Exs. B and C to the Declaration of Daniel P. Collins submitted in support of the Motion)

- 2 -

1    (dismissing the case based on both the political question doctrine and lack of Article III standing),

2    *appeal pending*, No. 07-60756 (5th Cir.).

3    *Second*, even assuming that the Court *could* fashion manageable standards from which to

4    determine the level of greenhouse gas emissions that Defendants *ought* to have produced over the

5    last several decades, the Court would still have to determine whether and how liability for

6    *Plaintiffs'* alleged injuries should be allocated among all of the companies and persons who

7    "wrongfully" emit greenhouse gases all over the world.  This issue raises additional political

8    questions, and in particular runs afoul of the second and third *Baker* tests.  As the *GMC* court

9    explained:  "The Court is left without guidance in determining what is an unreasonable

10   contribution to the sum of carbon dioxide in the Earth's atmosphere, *or in determining who*

11   *should bear the costs associated with the global climate change that admittedly result[ed] from*

12   *multiple sources around the globe*."  2007 WL 27226871 at *15 (emphasis added).

13   **II.    Plaintiffs Lack Standing Under Article III**

14           The Complaint must be dismissed for the further reason that Plaintiffs lack standing under

15   Article III.  The "irreducible constitutional minimum of standing contains three elements":

16   (1) the plaintiff must have suffered an injury-in-fact; (2) "there must be a causal connection

17   between the injury and the conduct complained of—the injury has to be 'fairly … trace[able] to

18   the challenged action of the defendant, and not … th[e] result [of] the independent action of some

19   third party not before the court'"; and (3) it must be "'likely,'" rather than simply "'speculative,'"

20   that a favorable decision will redress the plaintiff's injury.  *Lujan v. Defenders of Wildlife*, 504

21   U.S. 555, 560-61 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42

22   (1976)).  The primary standing element at issue in this case is the second one—fair traceability.

23   This element requires that the plaintiff's injury be "fairly traceable" to *the defendant's challenged*

24   *conduct* rather than to "the independent action of some third party not before the court."  *Bennett*

25   *v. Spear*, 520 U.S. 154, 167 (1997).  In addition, an injury is not fairly traceable to the defendant's

26   conduct if the causal chain linking the two is "too attenuated."  *Allen v. Wright*, 468 U.S. 737, 757

27   (1984).  Plaintiffs' theories fail to satisfy the fair traceability requirement in both respects.

28           *First*, Plaintiffs' own Complaint confirms that they cannot trace their alleged injuries to

- 3 -

1  *Defendants' emissions*, as opposed to the independent emissions of countless third parties

2  occurring throughout the world over the last several centuries—not to mention other potential

3  competing causes of coastal erosion on barrier islands in northwestern Alaska.  Plaintiffs'

4  Complaint asserts that global warming is the "'globally averaged *net effect of human activities*

5  *since 1750*,'" *see* Compl., ¶ 161 (emphasis added) (citation omitted), and that Defendants'

6  emissions only "contribut[ed] to global warming and caus[ed] injuries to" Plaintiffs "*in*

7  *combination* with emissions and conduct of others," *id.*, ¶ 255 (emphasis added).  Moreover,

8  Plaintiffs' Complaint also asserts that greenhouse gases, once emitted into the atmosphere, are

9  *undifferentiated*—making them necessarily *untraceable* to any source:  "greenhouse gas

10  emissions resulting in global warming are inherently interstate in nature," *id.*, ¶ 254, and

11  Defendants' emissions "rapidly mix in the atmosphere" and "inevitably merge[] with the

12  accumulation of emissions in California and in the world," *id.*, ¶¶ 10, 254.  Plaintiffs further

13  expressly allege that carbon dioxide, once emitted, remains in the atmosphere for "hundreds of

14  years."  *Id.*, ¶ 180.  But if Plaintiffs cannot identify *when* the particular emissions occurred that

15  allegedly put in motion the events leading to their injuries, they cannot hope to trace their injuries

16  to *Defendants'* emissions, as opposed to those of the many others that have emitted greenhouse

17  gases over the last century or longer.

18       The lack of fair traceability is exacerbated by the fact that Plaintiffs must tie their alleged

19  injuries, not merely to Defendants' emissions as a whole, but rather to that *portion* of Defendants'

20  emissions that were supposedly tortious.  *See Lujan*, 504 U.S. at 560 (injury must be fairly

21  traceable "'to the *challenged* action of the defendant'") (quoting *Simon*, 426 U.S. at 41-42)

22  (emphasis added).  As noted earlier, Plaintiffs' Complaint necessarily rests on the premise that

23  Defendants emitted *excessive* amounts of greenhouse gases; they do not contend that greenhouse

24  gas emissions can or should be reduced to zero.  The Complaint identifies no plausible way in

25  which Plaintiffs could hope to fairly trace their global-warming relating injuries to that *subset* of

26  Defendants' greenhouse gas emissions that exceeded some hypothetical "proper" level of

27  emissions—as opposed to Defendants' proper emissions, and the emissions (proper or wrongful)

28  of everyone else in the world.  *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)

- 4 -

1   (plaintiff must plead "enough facts to state a claim to relief that is plausible on its face").

2   *Second*, Plaintiffs' claims must be dismissed for the additional reason that "[t]he links in

3   the chain of causation between the challenged … conduct and the asserted injury are far too weak

4   for the chain as a whole to sustain [Plaintiffs'] standing." *Allen*, 468 U.S. at 759.  Indeed,

5   Plaintiffs' allegations epitomize an impermissibly attenuated and speculative theory of causation:

6   the Oil Company Defendants' exploration and production activities release greenhouse gases;

7   those emissions have joined with all of the other emissions of people and entities worldwide over

8   the past several centuries to increase greenhouse gas levels; those increased greenhouse gas

9   levels, together with other factors, contribute to overall global warming; global warming (together

10  with yet other factors) contributes to higher temperatures in the Arctic region; those warmer

11  temperatures have resulted in melting of sea ice that has acted in the past as a barrier against the

12  effects of coastal storms that occur in the Chukchi Sea; those storms (again, together with other

13  factors) have subjected the barrier reef (on which the Village of Kivalina is located) to waves and

14  surges that have resulted, over time, in the erosion of the reef; and the erosion of the reef (again,

15  together with other factors) poses a threat to the integrity of structures that make up the village,

16  allegedly necessitating relocation of Kivalina's residents.  *See* Complaint, at ¶¶ 3, 10, 16, 123,

17  127, 130, 131, 185, 254.  Plaintiffs' proffered causal chain, to put it mildly, is "attenuated at

18  best." *Allen*, 468 U.S. at 757; *see also Prescott v. County of El Dorado*, 298 F.3d 844, 846 (9th

19  Cir. 2002) (no standing where the alleged "causal relationship is too remote" in light of the role of

20  independent third parties).

21      For the foregoing reasons, the Motion is GRANTED, and Plaintiffs' Complaint is

22  DISMISSED with prejudice.  IT IS SO ORDERED.

23  DATED: December _____, 2008

24                                  By:_____
                                         The Hon. Saundra B. Armstrong
25                                       United States District Judge

26

27

28

[PROPOSED] ORDER GRANTING OIL CO. DEFTS.' RULE 12(b)(1) MOT. TO DISMISS —C-08-1138 SBA