1  Samuel R. Miller (SBN 66871)
   srmiller@sidley.com
2  Paul L. Yanosy (SBN 233014)
   pyanosy@sidley.com
3  SIDLEY AUSTIN LLP
   555 California Street
4  San Francisco, California 94104
   Telephone:       (415) 772-1200
5  Facsimile:       (415) 772-7400

6  David T. Buente, Jr. (admitted *pro hac vice*)
   dbuente@sidley.com
7  Joseph R. Guerra (admitted *pro hac vice*)
   jguerra@sidley.com
8  SIDLEY AUSTIN LLP
   1501 K Street, N.W.
9  Washington, D.C. 20005
   Telephone:       (202) 736-8000
10 Facsimile:        (202) 736-8711

11
   **Attorneys For Defendants**
12 **AMERICAN ELECTRIC POWER COMPANY AND
   DUKE ENERGY CORP.**
13
   **[Counsel Listing Continued on Next Page]**
14
                    UNITED STATES DISTRICT COURT
15
                  NORTHERN DISTRICT OF CALIFORNIA
16
                          OAKLAND DIVISION
17

18 NATIVE VILLAGE OF KIVALINA and          )  Case No. 08-cv-1138-SBA
   CITY OF KIVALINA,                       )
19                                         )  Assigned to: Hon. Saundra B. Armstrong
                        Plaintiffs         )
20                                         )  **UTILITY DEFENDANTS' MOTION TO
                                           )  DISMISS**
21              vs.                        )
                                           )
22                                         )
   EXXONMOBIL, CORPORATION,                )  Date:    December 9, 2008
23                                         )  Time:    1:00 p.m.
                        Defendants         )  Place:   Courtroom 3, 3rd Floor
24 _____     )

25

26

27

28

THOMAS A. RECTOR (SBN 199173)
tarector@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: 415-626-3939
Facsimile: 415-875-5700

THOMAS E. FENNELL (*Pro hac vice*)
tefennell@jonesday.com
MICHAEL L. RICE (*Pro hac vice*))
mlrice@jonesday.com
JONES DAY
2727 N. Harwood Street
Dallas, TX 75201
Telephone: 214-220-3939
Facsimile: 214-969-5100

KEVIN P. HOLEWINSKI (*Pro hac vice*)
kpholewinski@jonesday.com
JONES DAY
41 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: 202-879-3939
Facsimile: 202-626-1700

**Attorneys for Defendant XCEL ENERGY INC.**

F. WILLIAM BROWNELL (*Pro hac vice*)
bbrownell@hunton.com
NORMAN W. FICHTHORN (*Pro hac vice*)
nfichthorn@hunton.com
ALLISON D. WOOD (*Pro hac vice*)
awood@hunton.com
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
Telephone: (202) 955-1500
Facsimile: (202) 778-2201

SHAWN PATRICK REGAN (*Pro hac vice*)
sregan@hunton.com
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, NY 10166-0136
Telephone: (212) 309-1000
Facsimile: (212) 309-1100

BELYNDA B. RECK (SBN 163561)
breck@hunton.com
HUNTON & WILLIAMS LLP
550 South Hope Street, Suite 2000
Los Angeles, CA 90071-2627
Telephone: (213) 532-2000
Facsimile: (213) 532-2020

**Attorneys for Defendants DTE ENERGY COMPANY, EDISON INTERNATIONAL, MIDAMERICAN ENERGY HOLDINGS COMPANY, PINNACLE WEST CAPITAL CORP., AND THE SOUTHERN COMPANY**

JEFFREY A. LAMKEN (SBN 154217)
jeffrey.lamken@bakerbotts.com
JEREMY LEVIN (SBN 210577)
jeremy.levin@bakerbotts.com
BAKER BOTTS LLP
The Warner
1299 Pennsylvania Ave., N.W.
Washington D.C. 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

**Attorneys for Defendants DYNEGY HOLDINGS INC. AND RELIANT ENERGY, INC.**

RICHARD K. WELSH (SBN 208825)
welshr@gtlaw.com
SCOTT BERTZYK (SBN 116449)
bertzyks@gtlaw.com
FELIX LEBRON (SBN 232984)
lebronf@gtlaw.com
KAMRAN SALOUR (SBN 247983)
salourk@gtlaw.com
GREENBERG TRAURIG LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

**Attorneys for Defendant The AES CORPORATION**

1

**TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES ............................................................................................................. iii

3   INTRODUCTION ............................................................................................................................. 1

4   BACKGROUND ............................................................................................................................... 4

5   ARGUMENT ..................................................................................................................................... 7

6   I.      THIS LAWSUIT RAISES NONJUSTICIABLE POLITICAL QUESTIONS ........................ 8

7
        A.      There Are No Judicially Discoverable Or Manageable Standards For
8               Resolving This Suit ................................................................................................. 10

9       B.      Resolution Of The Issue Of Liability In This Case Requires Initial Policy
                Decisions That Cannot Properly Be Made By The Judiciary ................................... 11
10
        C.      Imposition Of Liability In This Case Would Contradict The Judgments Of
11              The Political Branches ............................................................................................. 14

12  II.     PLAINTIFFS LACK STANDING ........................................................................................ 17

13      A.      Plaintiffs Have Failed To Plead Facts Establishing Article III Causation .............. 17

14      B.      Plaintiffs' Injuries Are Too Remote To Satisfy Article III Causation ..................... 20

15  III.    PLAINTIFFS HAVE NO FEDERAL CAUSE OF ACTION ................................................. 21

16
        A.      No Federal Common Law Cause Of Action Encompasses Plaintiffs' Claim ........... 21
17
        B.      Plaintiffs Necessarily Seek An Impermissible Expansion Of The Federal
18              Common Law Cause Of Action For Transboundary Pollution ................................. 24

19      C.      Any Federal Common Law Cause Of Action That Could Have Possibly
20              Encompassed Plaintiffs' Claims Has Been Displaced ............................................. 26

21              1.      Legislation addressing greenhouse gases and global warming ...................... 27

22              2.      Presidential implementation of foreign policy ............................................... 29

23  IV.     PLAINTIFFS' CLAIMS ARE TIME-BARRED ................................................................... 29

24  V.      PLAINTIFFS' STATE-LAW CLAIMS ARE PREEMPTED ................................................ 32

25
        A.      Plaintiffs' State-Law Claims Conflict With The Force Or Purpose Of
26              Congressional Enactments on Global Climate Change ............................................ 32

27      B.      Plaintiffs' State-Law Claims Conflict With And Impermissibly Undermine
                The Nation's Foreign Policy Approach To Global Climate Change .......................... 34
28

i

VI.    PLAINTIFFS CANNOT STATE VALID STATE-LAW CLAIMS ........................................35

    A.    Plaintiffs Cannot State Valid Nuisance Claims ....................................................35

        1.    Plaintiffs cannot establish a duty ...................................................36

        2.    Plaintiffs cannot establish proximate causation.............................38

        3.    Plaintiffs do not allege a unique injury ..........................................39

    B.    Plaintiffs' Concert-of-Action Claim Fails As A Matter Of Law ................................40

        1.    Concert of action is not an independent tort .................................41

        2.    The complaint does not properly plead concert of action..............................41

CONCLUSION..........................................................................................43

1

## TABLE OF AUTHORITIES

2

### CASES

3

4

*532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
750 N.E.2d 1097 (N.Y. 2001)............................................................................................40

5

6

*In re African-American Slave Descendants Litig.*,
471 F.3d 754 (7th Cir. 2006), *cert. denied*, 128 S. Ct. 92 (2007)................................20, 21

7

*Aktepe v. United States*,
105 F.3d 1400 (11th Cir. 1997) .......................................................................................9, 13

8

9

*Alaska ex rel. Yukon Flats Sch. Dist. v. Native Vill. of Venetie Tribal Gov't*,
101 F.3d 1286 (9th Cir. 1996), *rev'd on other grounds sub nom.*
522 U.S. 520 (1998)...............................................................................................................20

10

11

*Alaska v. Native Vill. of Venetie Tribal Gov't*,
522 U.S. 520 (1998)...............................................................................................................20

12

13

*Alexander v. Sandoval*,
532 U.S. 275 (2001).........................................................................................................24, 25

14

15

*Alperin v. Vatican Bank*,
410 F.3d 532 (9th Cir. 2005) .................................................................................................9

16

17

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
241 F.3d 696 (9th Cir. 2001) .........................................................................................35, 38

18

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996)...............................................................................................................34

19

20

*Baker v. Burbank-Glendale-Pasadena Airport Auth.*,
705 P.2d 866 (Cal. 1985) ......................................................................................................30

21

22

*Baker v. Carr*,
369 U.S. 186 (1962).........................................................................................................9, 11

23

24

*Barajas v. Bermudez*,
43 F.3d 1251 (9th Cir. 1994) ................................................................................................29

25

*Barron v. Reich*,
13 F.3d 1370 (9th Cir. 1994) ..................................................................................................8

26

27

*Beck Dev. Co. v. S. Pac. Transp. Co.*,
44 Cal. App. 4th 1160 (1996) ...............................................................................................30

28

*Bell Atl. Corp. v. Twombly*,

127 S. Ct. 1955 (2007) ...................................................................................................17, 18, 42

*Benefiel v. Exxon Corp.*,
959 F.2d 805 (9th Cir. 1992) .....................................................................................36, 38, 39

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ..............................................................................................................33

*In re Burbank Envtl. Litig.*,
42 F. Supp. 2d 976 (C.D. Cal. 1998) ....................................................................................39

*Bush v. Lucas*,
462 U.S. 367 (1983) ..............................................................................................................28

*Cadlo v. Owens-Illinois, Inc.*,
125 Cal. App. 4th 513 (2004) .........................................................................................41, 43

*California v. Gen. Motors Corp.*,
No. 06-5755, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007), *appeal pending*,
No. 07-16908 (9th Cir.) ................................................................................................ *passim*

*Camden County Bd. of Chosen Freeholders v. Baretta U.S.A. Corp.*,
123 F. Supp. 2d 245 (D.N.J. 2000), *aff'd*,
273 F.3d 536 (3d Cir. 2001) ..................................................................................................20

*Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*,
273 F.3d 536 (3d Cir. 2001) ..................................................................................................21

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ........................................................................................................24, 42

*Chance World Trading, E.C. v. Heritage Bank of Commerce*,
438 F. Supp. 2d 1081 (N.D. Cal. 2005), *aff'd*,
263 F. App'x 630 (9th Cir. 2008) ..........................................................................................43

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ..............................................................................................................13

*Chy Lung v. Freeman*,
92 U.S. 275 (1875) ................................................................................................................33

*Cipollone v. Liggett Group, Inc.*,
505 U.S. 504 (1992) ..............................................................................................................16

*City of Milwaukee v. Illinois*,
451 U.S. 304 (1981) ..............................................................................................10, 25, 27, 28

*Clegg v. Cult Awareness Network*,

iv

18 F.3d 752 (9th Cir. 1994) ...........................................................................................8, 17, 18

*Comer Oil v. Murphy Oil USA*,
No. 1:05-cv-00436-LG-RHW (S.D. Miss. Aug. 30, 2007), *appeal pending*,
No. 07-60756 (5th Cir.) ..................................................................1, 8, 13, 18, 19

*Connecticut v. Am. Elec. Power Co.*,
406 F. Supp. 2d 265 (S.D.N.Y. 2005), *appeal pending*,
Nos. 05-5104-cv & 05-5119-cv (2d Cir.) .....................................1, 8, 13, 17, 29

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001)........................................................................................24, 25

*Corrie v. Caterpillar, Inc.*,
503 F.3d 974 (9th Cir. 2007) ...............................................................................8, 16

*County of Oneida v. Oneida Indian Nation*,
470 U.S. 226 (1985)................................................................................................28

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000).................................................................................................34

*D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*,
628 P.2d 554 (Alaska 1981)....................................................................................36

*Davidson v. City of Westminster*,
649 P.2d 894 (Cal. 1982) ........................................................................................43

*DeNardo v. Corneloup*,
163 P.3d 956 (Alaska 2007)..............................................................................35, 36

*Deutsch v. Turner Corp.*,
324 F.3d 692 (9th Cir. 2003) ..................................................................................31

*In re Ditropan XL Antitrust Litig.*,
529 F. Supp. 2d 1098 (N.D. Cal. 2007) ..................................................................35

*Doleman v. Meiji Mut. Life Ins. Co.*,
727 F.2d 1480 (9th Cir. 1984) ................................................................................37

*E. Trading Co. v. Refco, Inc.*,
229 F.3d 617 (7th Cir. 2000) ..................................................................................41

*Ellison v. Plumbers & Steamfitters Union Local 375*,
118 P.3d 1070 (Alaska 2005).................................................................................43

*Erie R.R. v. Tompkins*,
304 U.S. 64 (1938)..................................................................................................22

*In re Exxon Valdez*,
No. A89-0095-CV (HRH), 1994 WL 182856 (D. Alaska Mar. 23, 1994)..........................................40

*In re Exxon Valdez*,
270 F.3d 1215 (9th Cir. 2001) .........................................................................................................38

*FDIC v. S. Prawer & Co.*,
829 F. Supp. 453 (D. Me. 1993) .......................................................................................................41

*Fiol v. Doellstedt*,
50 Cal. App. 4th 1318 (1996) ...........................................................................................................43

*Gardiner v. Sea-Land Serv., Inc.*,
786 F.2d 943 (9th Cir. 1986) ...........................................................................................................28

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000)...........................................................................................................................32

*Georgia v. Tenn. Copper Co.*,
206 U.S. 230 (1907)......................................................................................................................21, 22

*Gilder v. PGA Tour, Inc.*,
936 F.2d 417 (9th Cir. 1991) ...........................................................................................................31

*Guar. Trust Co. of N.Y. v. United States*,
304 U.S. 126 (1938)...........................................................................................................................29

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) .........................................................................................................41

*Healy v. Beer Inst., Inc.*,
491 U.S. 324 (1989)...........................................................................................................................34

*Herman Family Revocable Trust v. Teddy Bear*,
254 F.3d 802 (9th Cir. 2001) ...........................................................................................................31

*INS v. Chadha*,
462 U.S. 919 (1983)...........................................................................................................................10

*Illinois v. City of Milwaukee*,
406 U.S. 91 (1972)........................................................................................................................22, 25

*Illinois v. Outboard Marine Corp.*,
680 F.2d 473 (7th Cir. 1982) .......................................................................................................27, 28

*Impac Warehouse Lending Group v. Credit Suisse First Boston, LLC*,
No. 06-56024, 2008 WL 731050 (9th Cir. Mar. 17, 2008)..............................................................42

vi

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987) ..................................................................................................35

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
478 U.S. 221 (1986) ..................................................................................................13

*Jesinger v. Nev. Fed. Credit Union*,
24 F.3d 1127 (9th Cir. 1994) ....................................................................................28

*Kadic v. Karadzic*,
70 F.3d 232 (2d Cir. 1995) ........................................................................................16

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ..................................................................................................17

*Koll-Irvine Ctr. Prop. Owners Assocs. v. County of Orange*,
24 Cal. App. 4th 1036 (1994) ....................................................................................40

*Lane ex rel. Lane v. Halliburton Co.*,
— F.3d —, 2008 WL 2191200 (5th Cir. May 28, 2008) ............................................9

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..................................................................................................17

*In re Lupron Mktg. & Sales Practices Litig.*,
No. 01-CV-10861, 2004 WL 2070883 (D. Mass. Sept. 16, 2004) ...........................41

*Mangini v. Aerojet-General Corp.*,
230 Cal. App. 3d 1125 (Ct. App. 1991), *aff'd*,
912 P.2d 1220 (Cal. 1996) .........................................................................................30

*Mangini v. Aerojet-General Corp.*,
912 P.2d 1220 (Cal. 1996) .........................................................................................30

*Martinez v. Pac. Bell*,
225 Cal. App. 3d 1557 (1990) ...................................................................................36

*Massachusetts v. EPA*,
127 S. Ct. 1438 (2007) ........................................................................................ *passim*

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
379 F. Supp. 2d 348 (S.D.N.Y. 2005) .......................................................................37

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
453 U.S. 1 (1981) ......................................................................................................23

*Missouri v. Illinois,*
180 U.S. 208 (1901)...................................................................................21, 22

*Missouri v. Illinois,*
200 U.S. 496 (1906)...................................................................................22, 23

*N. Star Steel Co. v. Thomas,*
515 U.S. 29 (1995)............................................................................................29

*Nat'l Audubon Soc'y v. Dep't of Water,*
869 F.2d 1196 (9th Cir. 1988) .........................................................................27

*Navarro v. Block,*
250 F.3d 729 (9th Cir. 2001) .............................................................................8

*New Jersey v. New York,*
283 U.S. 473 (1931)....................................................................................22, 23

*No GWEN Alliance of Lane County, Inc. v. Aldridge,*
855 F.2d 1380 (9th Cir. 1988) ...........................................................................8

*Norgart v. Upjohn Co.,*
981 P.2d 79 (Cal. 1999) ..................................................................................30

*North Carolina ex rel. Cooper v. TVA,*
— F. Supp. 2d —, 2008 WL 553240 (W.D.N.C. Feb. 27, 2008) .....................35

*North Dakota v. Minnesota,*
263 U.S. 365 (1923).........................................................................................22

*Nw. Airlines, Inc. v. Transp. Workers Union of Am.,*
451 U.S. 77 (1981)............................................................................................25

*O'Melveny & Myers v. FDIC,*
512 U.S. 79 (1994) .....................................................................................14, 26

*Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.,*
185 F.3d 957 (9th Cir. 1999) ...........................................................................38

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,*
96 F.3d 1151 (9th Cir. 1996) ...........................................................................31

*Parks Hiway Enters. LLC v. CEM Leasing, Inc.,*
995 P.2d 657 (Alaska 2000)......................................................................35, 40

*Pittman by Pittman v. Grayson,*
149 F.3d 111 (2d Cir. 1998)............................................................................42

*Planned Parenthood Fed'n of Am., Inc. v. AID*,
838 F.2d 649 (2d Cir. 1988)..................................................................................9

*Pub. Util. Dist. No. 1 v. IDACORP Inc.*,
379 F.3d 641 (9th Cir. 2004) ..............................................................................32

*In re Related Asbestos Cases*,
543 F. Supp. 1152 (N.D. Cal. 1982) ....................................................................43

*Rhode Island v. Massachusetts*,
37 U.S. (12 Pet.) 657 (1838)................................................................................22

*Richard B. Levine, Inc. v. Higashi*,
131 Cal. App. 4th 566 (2005) ..............................................................................41

*Rowland v. Christian*,
69 Cal. 2d 108 (1968) ..........................................................................................36

*San Marcos Water Dist. v. San Marcos Unified Sch. Dist.*,
190 Cal. App. 3d 1083 (1987) .............................................................................29

*Scognamillo v. Credit Suisse First Boston LLC*,
No. C03-2061, 2005 WL 2045807 (N.D. Cal. Aug. 25, 2005), *aff'd*,
254 F. App'x 669 (9th Cir. 2007) ........................................................................43

*Shulz v. Neovi Data Corp.*,
152 Cal. App. 4th 86 (2007) ................................................................................43

*Sindell v. Abbott Labs.*,
607 P.2d 924 (Cal. 1980) .....................................................................................42

*Soliman v. Philip Morris Inc.*,
311 F.3d 966 (9th Cir. 2002) ...............................................................................29

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004).......................................................................................24, 25

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. 07-cv-1819, 2008 WL 426522 (N.D. Cal. Feb. 14, 2008) ...........................35

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
128 S. Ct. 761 (2008)...........................................................................................24

*Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*,
410 F.3d 964 (7th Cir. 2005) ...............................................................................19

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981)...........................................................................13, 24, 25, 26

ix

*In re Textainer P'ship Sec. Litig.*,
No. C-05-0969, 2005 WL 3801596 (N.D. Cal. Dec. 12, 2005)............................................43

*Tint v. Sanborn*,
211 Cal. App. 3d 1225 (1989) ...........................................................................................35

*United States v. E.C. Knight Co.*,
156 U.S. 1 (1895)...............................................................................................................22

*United States v. Lopez*,
514 U.S. 549 (1995)...........................................................................................................25

*United States v. Oswego Barge Corp.*,
664 F.2d 327 (2d Cir. 1981)...............................................................................................27

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) ........................................................................................8, 30

*United States v. Texas*,
507 U.S. 529 (1993)...........................................................................................................28

*Vieth v. Jubelirer*,
541 U.S. 267 (2004)...........................................................................................................10

*Weirum v. RKO Gen., Inc.*,
15 Cal. 3d 40 (1975) ..........................................................................................................36

*W. Va. ex rel. Dyer v. Sims*,
341 U.S. 22 (1951).............................................................................................................22

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) .............................................................................................7

*Wynn v. Nat'l Broad. Co.*,
234 F. Supp. 2d 1067 (C.D. Cal. 2002) ...............................................................41, 42, 43

*Young v. Aeroil Prods. Co.*,
248 F.2d 185 (9th Cir. 1957) .............................................................................................37

*Zschernig v. Miller*,
389 U.S. 429 (1968)...........................................................................................................33

## STATUTES AND REGULATIONS

Global Climate Protection Acto of 1987, Pub. L. No. 100-204, 101 Stat. 1407 ..................144, 24

Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776.........................................5

Pub. L. No. 105-276, 112 Stat. 2461 (1998)...........................................................................6

Pub. L. No. 106-74, 113 Stat. 1047 (1999)............................................................................6

Pub. L. No. 106-377, 114 Stat. 1441 (2000)..........................................................................6

Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 .................6, 15

15 U.S.C. §§ 2901 *et seq.*.........................................................................................5
15 U.S.C. § 2901 note.........................................................................................6, 16
15 U.S.C. §§ 2931-2938 .........................................................................................5
15 U.S.C. § 2932.........................................................................................5
15 U.S.C. § 2933.........................................................................................5
15 U.S.C. § 2936(3).........................................................................................5
15 U.S.C. § 2938(b)(1).........................................................................................15, 31
15 U.S.C. § 2952(a).........................................................................................6

28 U.S.C. § 1367(c).........................................................................................31

42 U.S.C. § 7403(g).........................................................................................5
42 U.S.C. § 13381(1).........................................................................................12, 15
42 U.S.C. § 13382.........................................................................................15
42 U.S.C. § 13384.........................................................................................15
42 U.S.C. § 13389.........................................................................................5, 15, 33

43 U.S.C. §§ 1601 *et seq.*.........................................................................................20

*Average Fuel Economy Standards for Light Trucks Model Years 2008-2011*, 71 Fed. Reg. 17566 (Apr. 6, 2006).........................................................................................6

Notice, *Control of Emissions from New Highway Vehicles and Engines,* 68 Fed. Reg. 52,922 (Sept. 8, 2003).........................................................................12, 14, 16, 18, 34

Cal. Civ. Code § 3490.........................................................................................30

Cal. Civ. Proc. Code § 338(b).........................................................................................29
Cal. Civ. Proc. Code § 361.........................................................................................31

## TREATY

Cession of the Russian Possessions in North America, U.S.-Russ., Mar. 30, 1897, 15 Stat. 539.........................................................................................19

## LEGISLATIVE HISTORY

151 Cong. Rec. S7033 (daily ed. June 22, 2005).........................................................................................33

xi

S. Res. 98, 105th Cong. (1997) ..................................................................................6, 14

H.R. Rep. No. 102-474, pt. I (1992), *reprinted in* 1992 U.S.C.C.A.N. 1954 ..................14, 34

**SCHOLARLY AUTHORITIES**

Dan B. Dobbs & Paul T. Hayden, *Torts and Compensation* (3d ed. 1997) ..........................10

Henry J. Friendly, *In Praise of Erie-And of the New Federal Common Law,* 39 N.Y.U. L. Rev. 383 (1964) .....................................................................................................24

Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741 (2003) ........................................................................................................30

W. Page Keeton, *Prosser and Keeton on Torts* (5th ed. 1984) ........................................38

**OTHER AUTHORITIES**

58 Am. Jur. 2d *Nuisance* (2002) ................................................................................36

*Impacts of a Warming Arctic: Arctic Climate Impact Assessment* (2004), *available at* http://www.amap.no/acia ...........................................................................................30

Transcript, *President Bush Discusses Global Climate Change* (June 11, 2001), *available at* http://www.whitehouse.gov/news/releases/2001/06/20010611-2.html ...........................7, 14

Restatement (Second) of Torts (1979) ................................................................. *passim*

Gov't Accountability Office, *Alaska Native Villages* (Dec. 2003), *available at* http://www.gao.gov/new.items/d04142.pdf..........................................................31, 39

IPCC Working Group II, Intergovernmental Panel on Climate Change, *IPCC Second Assesment: Climate Change 1995* (1995), *available at* http://www.ipcc.ch/pdf/climate-changes-1995/ipcc-2nd-assessment/2nd-assessment-en.pdf ...........................................................................30

Matthew F. Pawa, *Global Warming Litigation Heats Up*, Trial, Apr. 2008 .....................16

Kyoto Protocol, Dec. 10, 1997, 37 I.L.M. 22 ...............................................................6, 14

Memorandum from Robert E. Fabricant, EPA General Counsel, to Marianne L. Horinko, Acting Administrator (Aug. 28, 2003).........................................................................12

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on December 9, 2008, at 1:00 p.m. or as soon thereafter as it may be heard, in the above-entitled Court located at 1301 Clay Street, Oakland, California, before the Honorable Saundra B. Armstrong, Courtroom 3, third floor, defendants will and hereby do move this Court, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss with prejudice plaintiffs' claims (other than the conspiracy claim).

The grounds for this motion are that no court has subject matter jurisdiction over plaintiffs' claims as plaintiffs' suit raises nonjusticiable political questions and plaintiffs lack standing; and additionally that the complaint fails to state a claim upon which relief can be granted as plaintiffs lack a federal cause of action, their state law claims are preempted, they do not and cannot plead the required elements of a state-law nuisance or concert-of-action claim, and their claims (federal and state) are time-barred. This motion is based on this notice of motion, the accompanying memorandum of points of authorities, the pleadings and other papers on file in this action, and on such other argument as may be presented to the court on reply and at the time of hearing.

## INTRODUCTION

This is the fourth lawsuit in which a group of plaintiffs has sued seeking judicial redress for injuries allegedly caused by greenhouse gas emissions and global warming. The three earlier lawsuits were all dismissed on the pleadings because, at bottom, they inescapably required federal courts to usurp the responsibilities of the political branches to decide fundamental questions concerning the nation's economy, security, and foreign relations.[1] Because this lawsuit is no different, it should meet the same fate.

---

[1] *See California v. Gen. Motors Corp.*, No. 06-5755, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007), *appeal pending*, No. 07-16908 (Jenkins, J., presiding); *Comer Oil v. Murphy Oil USA*, No. 1:05-cv-00436-LG-RHW (S.D. Miss. Aug. 30, 2007), *appeal pending*, No. 07-60756 (5th Cir.) (attached at Exh. B to the Declaration of Daniel P. Collins in Support of Motion of Certain Oil Company Defendants to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(1), filed June 30, 2008, and attached hereto for the Court's convenience as Exh. 1); *Connecticut v. Am. Elec. Power Co.*, 406 F. Supp. 2d 265 (S.D.N.Y. 2005), *appeal pending*, Nos. 05-5104-cv & 05-5119-cv (2d Cir.).

1    Here, plaintiffs seek to blame certain U.S. energy companies for injuries plaintiffs claim to

2    have suffered because Arctic ice that once surrounded and protected the island they inhabit has

3    allegedly melted as a result of global warming. Plaintiffs allege that the phenomenon of global

4    climate change is caused by countless human activities throughout the planet. Nevertheless, they

5    seek damages under federal common law and state nuisance law based on defendants' alleged

6    contributions to this worldwide phenomenon. Plaintiffs' lengthy allegations, however, cannot

7    obscure the fundamental problems with their lawsuit: This Court cannot decide the question of fault

8    that lies at the heart of this case without making normative policy decisions that courts have neither

9    the constitutional authority, institutional competence nor manageable standards to address. As a

10   consequence, a series of interrelated principles mandates dismissal of this suit.

11   First, plaintiffs' claims raise nonjusticiable political questions. Because everyone on the

12   planet emits carbon dioxide, this suit requires the Court to determine that greenhouse gas emissions

13   beyond a certain level and by certain sources should be actionable. But, as the three other courts that

14   have confronted global warming tort suits have recognized, courts have no meaningful or

15   manageable standards for making such initial policy determinations. To hold that defendants' past

16   emissions were unreasonable, and thus tortious, this Court (or a jury) would have to determine (a)

17   the costs defendants would have incurred if they had fundamentally altered energy production in

18   order to achieve significant greenhouse gas reductions, (b) the economic and other societal

19   consequences that would have resulted from such costs, and (c) the risk that such reductions would

20   have been offset by increased emissions elsewhere. The Court (or jury) would then have to

21   determine that these societal costs and risks were outweighed by the risk of plaintiffs' alleged global

22   warming-related injuries. The "correct" balance of such broad-gauged and multifaceted societal

23   interests, however, is not a question of fact for a court or jury to decide. It is, instead, a fundamental

24   policy decision of a kind clearly for non-judicial discretion—a decision for which there are no

25   judicially manageable standards, and that the Constitution commits to the branches of government

26   that are accountable to the American people.

27   Second, plaintiffs lack standing. They do not and cannot allege that their claimed injuries—

28   *i.e.*, storm damage and erosion from a loss of Arctic sea ice that formerly protected their island—are

fairly traceable to these particular defendants.  In fact, plaintiffs' allegations contradict such a claim.  According to the complaint, plaintiffs' injuries are not attributable to the select group of companies they have sued, but to a homogeneous aggregation of countless worldwide emissions dating back decades and possibly centuries.  And their injuries are in all events simply too remote from the conduct of these defendants.  Indeed, the Supreme Court recently confirmed that the very types of allegations plaintiffs make here are insufficient to establish standing under the ordinary Article III requirements that apply to this suit.

Third, plaintiffs lack a federal cause of action.  The federal common law cause of action the Supreme Court created a century ago for transborder pollution permitted *States* to seek *injunctive relief* for nuisances of "*simple type*"— *i.e.*, those where immediately harmful or noxious substances cause severe localized harms directly traceable to an identifiable out-of-state source.  Plaintiffs cannot wedge their claims into this mold.  They are not States.  They seek damages, not injunctive relief.  And the novel and complex nuisance they allege differs in every respect from those of "simple type."  The emissions at issue are not immediately harmful or noxious, and global warming is alleged to cause planet-wide harms, none of which is directly traceable to any source.

Nor can courts expand the previously recognized cause of action to encompass plaintiffs' extraordinary claims.  Doing so would contravene the Supreme Court's repeated admonitions that courts cannot use their limited federal common lawmaking powers to create private damages actions or to resolve issues of high policy.  In addition, any expanded version of the federal common law cause of action that could encompass plaintiffs' claims has been displaced.  Congress has spoken directly to the subject of global warming through a series of laws that adopt a carefully calibrated mix of regulation, research, technology development incentives and multilateral negotiations.  Moreover, recognition of the damages action plaintiffs seek would effectively create *de facto* emissions limits and would thus interfere with the President's implementation of U.S. foreign policy, which seeks to use the prospect of mandatory U.S. emissions limits as a means of obtaining comparable commitments from developing countries such as China and India.

1         In addition to these fundamental defects, plaintiffs' suit is untimely.  Plaintiffs have long

2    known of their injuries and their injuries' alleged connection to global warming.  Yet they waited

3    years to file this suit.  Accordingly, all of their claims (both federal and state) are time-barred.

4         Plaintiffs' state law claims must also be dismissed for several additional reasons.  Those

5    claims are preempted by the same federal laws and foreign policy efforts that displace federal

6    common law.  Moreover, plaintiffs do not and cannot allege cognizable theories of legal duty or

7    proximate causation, which are fatal flaws warranting dismissal on the pleadings.  Their allegations

8    likewise state no independent concert of action claim.

9         Ultimately, plaintiffs cannot conceal the political questions their claims raise, and that they

10   are therefore seeking redress in the wrong forum.  As three other courts have correctly recognized,

11   suits based on unprecedented global warming theories of liability inescapably raise a host of

12   fundamental political questions that courts cannot resolve using vague maxims of nuisance law:

13   Which of the billions of worldwide emitters of greenhouse gases can be held liable in damages for

14   alleged global warming-related harms?  Which of the billions of people potentially affected by

15   global warming should have a damages remedy?  Under what standards?  These are questions of

16   high policy that, under our constitutional system, can be decided only by the political branches of

17   government, not the courts.

18   **BACKGROUND**

19       **1.  Plaintiffs' Allegations Concerning Global Warming.**  Plaintiffs are a municipality and

20   an Alaskan Native Village that seek damages for injuries they have allegedly sustained as a result of

21   global warming.  They allege that carbon dioxide and other greenhouse gases trap heat in the Earth's

22   atmosphere, thereby "causing a change in the Earth's climate."  Compl. ¶¶ 123, 132.  Over an

23   extended period of at least a century, this trapped heat allegedly raised the temperature of the

24   atmosphere, *id.* ¶¶ 123, 125, 127, which, in turn, melted glaciers and ice caps, raised ocean

25   temperatures, and caused sea levels to rise, *id.* ¶¶ 130-131.  Plaintiffs allege that increased

26   temperatures also caused a loss of sea ice, which leaves their island, Kivalina, more vulnerable to

27   waves, storm surges and erosion.  *Id.* ¶ 185.  The resulting damage has allegedly created an

28

1    unacceptable risk of flooding, which renders Kivalina uninhabitable and will require its

2    approximately 400 inhabitants to incur substantial relocation costs.  *Id.* ¶¶ 185-186.

3        **2.  The Federal Government's Response to Global Warming.**  Global warming "is not a

4    problem . . . that has escaped the attention of policymakers in the Executive and Legislative

5    Branches of our Government."  *Massachusetts v. EPA*, 127 S. Ct. 1438, 1463-64 (2007) (Roberts,

6    C.J., dissenting).  As early as 1978, Congress established a "national climate program" to improve

7    understanding of global climate change through research, data collection, assessments, information

8    dissemination, and international cooperation.  *See* National Climate Program Act of 1978, 15 U.S.C.

9    §§ 2901 *et seq*.  In 1990, Congress enacted the Global Change Research Act, 15 U.S.C. §§ 2931-

10   2938, which established a 10-year research program for global climate issues, *id.* § 2932, directed

11   the President to establish a research program to "improve understanding of global change," *id.*

12   § 2933, and provided for scientific assessments every four years that "analyze[] current trends in

13   global change," *id.* § 2936(3).  Two years later, Congress directed the Secretary of Energy to

14   conduct assessments related to greenhouse gases and report to Congress.  Energy Policy Act of

15   1992, Pub. L. No. 102-486, § 1604, 106 Stat. 2776, 3002 (codified at 42 U.S.C. § 13384).

16       Congress has done more, however, than merely mandate research into global climate change.

17   In the Clean Air Act ("CAA"), Congress authorized the Environmental Protection Agency ("EPA")

18   to regulate greenhouse gas emissions from new motor vehicles if it finds that they "'endanger [the]

19   public health or welfare.'"  *Massachusetts v. EPA*, 127 S. Ct. at 1459-60 (quoting 42 U.S.C.

20   § 7521(a)(1)).  And the 1990 amendments to that Act require EPA "to develop, evaluate, and

21   demonstrate nonregulatory strategies and technologies for air pollution prevention" addressing

22   carbon dioxide.  42 U.S.C. § 7403(g).

23       More recently, the Energy Policy Act of 2005 called for a "national strategy to promote the

24   deployment and commercialization" of technologies to reduce greenhouse gas intensity.  *See id.*

25   § 13389(c)(1).  The Energy Independence and Security Act of 2007 addresses greenhouse gas

26   emissions by, among other things, creating a number of vehicle-emissions reduction planning and

27   incentive programs, requiring an assessment of carbon sequestration methods, and creating grant

28   programs to accelerate research and development of non-carbon emitting technologies such as solar,

1    geothermal, marine and hydrokinetic energy.  *See* Pub. L. No. 110-140, §§ 101-136, 601-636, 711-

2    714, 121 Stat. 1492, 1498-1516, 1674-88, 1710-15 (2007) (codified at 42 U.S.C. chs. 149, 152, 329).

3    The latter statute also requires a 40% increase in automobile fuel efficiency by the year 2020, *id.*,

4    § 102(a), 121 Stat. at 1499 (codified at 42 U.S.C. § 32902)—a standard that is the functional

5    equivalent of an emissions standard, because "fuel economy is directly related to emissions of

6    greenhouse gases."  *Average Fuel Economy Standards for Light Trucks Model Years 2008-2011*, 71

7    Fed. Reg. 17566, 17659 (Apr. 6, 2006) (National Highway Transportation Safety Administration)

8    (codified at 49 C.F.R. pts. 523, 533, 537).

9           Beyond enacting this mix of regulatory authority, fuel efficiency standards, technology

10   incentives and research mandates, Congress has directed the executive branch to undertake

11   multilateral negotiations to ensure that U.S. domestic measures are adopted in the context of a

12   broader international response.  In the Global Climate Protection Act of 1987, Congress directed the

13   Secretary of State to coordinate U.S. negotiations concerning global climate change.  *See* 15 U.S.C.

14   § 2901 note; *see also id.* § 2952(a) (directing the President and Secretary of State in 1990 to "initiate

15   discussions" with other nations for agreements on climate research).  As a result of those

16   negotiations, President George H. W. Bush signed, and the Senate approved, the United Nations

17   Framework Convention on Climate Change ("UNFCCC"), which brought together a coalition of

18   countries to work toward a coordinated approach to address the international issue of global

19   warming.  *See* UNFCCC Homepage, *at* http://unfccc.int (last visited June 27, 2008).  Following

20   ratification of the UNFCCC, member nations negotiated the Kyoto Protocol, which called for

21   mandatory reductions in the greenhouse gas emissions of developed nations.  *See* Kyoto Protocol,

22   art. 3, annex I, Dec. 10, 1997, 37 I.L.M. 22.

23          Although President Clinton signed the Kyoto Protocol, it was not presented to the Senate.

24   Indeed, the Senate formally objected in an extraordinary 95-0 vote to any agreement that would

25   result in serious harm to the economy or that did not include provisions regarding the emissions of

26   developing nations.  *See* S. Res. 98, 105th Cong. (1997).  Thereafter, Congress enacted a series of

27   laws that affirmatively barred EPA from implementing the Protocol.  *See* Pub. L. No. 105-276, 112

28   Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106-377, 114

1    Stat. 1441, 1441A-41 (2000).  President George W. Bush also opposes the Protocol because it

2    exempts developing nations.  *See* Transcript, *President Bush Discusses Global Climate Change* (Jun.

3    11, 2001), *available at* http://www.whitehouse.gov/news/releases/2001/06/20010611-2.html.

4        **3. The Relief Plaintiffs Seek.**  Plaintiffs allege that global warming is caused by "human

5    activity that releases greenhouse gases," and that a large percentage of the carbon dioxide currently

6    in the atmosphere was released decades and even centuries ago.  Compl. ¶¶ 132, 125.  They further

7    allege that defendants' emissions "rapidly mix in the atmosphere" and "merge[] with the

8    accumulation of emissions . . . in the world."  *Id.* ¶¶ 254, 10.  Yet, despite the ubiquity of greenhouse

9    gas emissions, plaintiffs seek to single out defendants—19 domestic energy producers—and hold

10   them liable for the risk of flooding in Kivalina allegedly caused by global warming.  Alleging that

11   these defendants are "substantial contributors to global warming," *id.* ¶ 253, plaintiffs seek joint and

12   several damages under federal common law and state private and public nuisance for the costs of

13   relocating from Kivalina.  Plaintiffs have also filed derivative claims of "concert of action" against

14   all defendants, and "conspiracy" claims against eight defendants.  *See id.* ¶ 189 & Third Claim for

15   Relief.

16                                                 **ARGUMENT**

17       In this brief, all of the utility defendants[2] move to dismiss plaintiffs' claims (other than the

18   conspiracy claim[3]) pursuant to Rules 12(b)(1) and 12(b)(6).[4]  Under Rule 12(b)(1), this Court must

19   determine whether it has subject matter jurisdiction, and "may look beyond the complaint to matters

20   of public record" when making that determination.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.

21   2000).  "[T]he presence of a political question precludes a federal court, under article III of the

22

_____

23   [2] For purposes of this motion, the phrase "utility defendants" refers to American Electric Power
     Company, DTE Energy Corporation, Duke Energy Corporation, Dynegy Holdings, Inc., Edison
24   International, MidAmerican Energy Holdings Company, Pinnacle West Capital Corporation, Reliant
     Energy, Inc., The AES Corporation, The Southern Company and Xcel Energy, Inc.
25

26   [3] The subset of utility defendants named in the conspiracy claim have filed a separate brief seeking
     dismissal of that claim.
27

28   [4] In addition, certain utility defendants have filed a motion to dismiss under Rule 12(b)(2) for lack of
     personal jurisdiction, thus preserving another jurisdictional objection to this lawsuit.

1   Constitution, from hearing or deciding the case." *No GWEN Alliance of Lane County, Inc. v.*

2   *Aldridge*, 855 F.2d 1380, 1382 (9th Cir. 1988); *see also Corrie v. Caterpillar, Inc.*, 503 F.3d 974,

3   981-82 (9th Cir. 2007) (holding that the political question doctrine is "a *jurisdictional* limitation

4   imposed on the courts by the Constitution")  (emphasis added).  Under Rule 12(b)(6), this Court

5   must dismiss "where there is no cognizable legal theory or an absence of sufficient facts alleged to

6   support a cognizable theory."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  While all

7   allegations of fact must be taken as true and all reasonable inferences drawn in favor of plaintiffs, the

8   Court need not accept legal conclusions cast as factual allegations.  *Clegg v. Cult Awareness*

9   *Network,* 18 F.3d 752, 754-55 (9th Cir. 1994).  And, while the Court generally may not look beyond

10  the complaint when ruling on a Rule 12(b)(6) motion, it may consider matters of public record, such

11  as formal pronouncements by agencies and officials, *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir.

12  1994), as well as documents cited in the complaint itself, *see United States v. Ritchie*, 342 F.3d 903,

13  907-08 (9th Cir. 2003).  These standards mandate dismissal of this suit.

14  **I.     THIS LAWSUIT RAISES NONJUSTICIABLE POLITICAL QUESTIONS.**

15          Plaintiffs ask this Court to use the medium of a "nuisance" action to address an

16  unprecedented worldwide phenomenon with sweeping implications for the nation's economy,

17  security, and foreign relations.  Under our constitutional system, however, the complex issues raised

18  by global warming can be resolved only by the politically accountable branches of the federal

19  government, not by courts using judge-made principles.  Indeed, Congress is already grappling with

20  these issues, seeking—through a mix of regulatory authority, fuel efficiency standards, technology

21  incentives and research mandates—to craft a comprehensive national scheme while the executive

22  branch negotiates over a coordinated international response.  Allowing this suit to proceed would

23  undermine these efforts.  Accordingly, as the other district courts that have confronted global

24  warming tort claims have all recognized, suits such as this inescapably raise nonjusticiable political

25  questions. *See California v. Gen. Motors Corp.*, No. 06-5755, 2007 WL 2726871, at *6-16 (N.D.

26  Cal. Sept. 17, 2007); *Connecticut v. Am. Elec. Power Co.*, 406 F. Supp. 2d 265, 274 (S.D.N.Y.

27  2005), appeal pending, Nos. 05-5104-cv & 05-5119-cv (2d Cir.); *Comer Oil v. Murphy Oil USA*, No.

28

1   1:05-cv-00436-LG-RHW, at 39 (S.D. Miss. Aug. 30, 2007), *appeal pending*, No. 07-60756 (5th

2   Cir.) (attached as Exh. 1, hereafter "*Comer Order*").

3          Although there is no single "political question" formula, the Supreme Court has explained

4   that a case raises a nonjusticiable political question when any one of the following six factors is

5   present:

6          (1)  "a textually demonstrable constitutional commitment of the issue to a coordinate political
            department;"
7

8          (2)  "a lack of judicially discoverable and manageable standards for resolving it;"

9          (3)  "the impossibility of deciding without an initial policy determination of a kind clearly for
            nonjudicial discretion;"

10         (4)  "the impossibility of a court's undertaking independent resolution without expressing
            lack of the respect due coordinate branches of [the] government;"
11

12         (5)  "an unusual need for unquestioning adherence to a political decision already made;" and

13         (6)  "the potentiality of embarrassment from multifarious pronouncements by various
            departments on one question."

14  *Baker v. Carr*, 369 U.S. 186, 217 (1962).  In analyzing these factors, courts must make a

15  "discriminating inquiry into the precise facts and posture of the particular case," *id.*, focusing on the

16  nature of the issues or questions to be resolved, not the generic nature of the case.  *Planned*

17  *Parenthood Fed'n of Am., Inc. v. AID*, 838 F.2d 649, 655-56 (2d Cir. 1988) (examining "precise

18  issue"); *Alperin v. Vatican Bank*, 410 F.3d 532, 545 (9th Cir. 2005) ("question posed"); *Aktepe v.*

19  *United States*, 105 F.3d 1400, 1403 (11th Cir. 1997) (negligence-based wrongful death suit raised

20  nonjusticiable political questions); *Lane ex rel. Lane v. Halliburton Co.*, --- F.3d ---, 2008 WL

21  2191200, at *11 (5th Cir. May 28, 2008) (examining with "precision the elements" of plaintiffs'

22  cause of action and recognizing that tort suit can raise political questions).

23         Here, a discriminating analysis reveals that courts have no "discoverable and manageable

24  standards," *Baker* 369 U.S. at 217, for deciding liability in this case.  To develop such standards,

25  courts must make "initial policy determination[s]" that are non-judicial in nature and that are

26  committed by the Constitution to the political branches.  *Id.*  Moreover, imposition of liability would

27  contradict judgments the political branches have already made.  *Id.*  Each of these factors is

28  sufficient, by itself, to demonstrate that this case raises nonjusticiable political question, and must

9

1   therefore be dismissed.  *See INS v. Chadha*, 462 U.S. 919, 941 (1983) ("a political question may

2   arise when any one of the[se] circumstances is present").

3       **A.     There Are No Judicially Discoverable Or Manageable Standards For Resolving This Suit.**

4       Any "discriminating inquiry" into the "precise facts" of global warming makes clear that

5   courts have no discoverable or manageable standards for resolving the issue of fault raised by this

6   case.  Tort liability "turns on a finding that the defendant was at fault in some important sense," *i.e.*,

7   that its conduct can be deemed "wrong."  Dan B. Dobbs & Paul T. Hayden, *Torts and Compensation*

8   5 (3d ed. 1997).  The mere act of emitting a naturally occurring, ubiquitous substance such as carbon

9   dioxide, however, cannot be morally culpable; if it were, every human being would be engaged in a

10  "wrong" by virtue of breathing.  Accordingly, the Court must identify some "principled, rational,

11  and . . . reasoned" basis, *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality opinion), for

12  determining *which* worldwide emissions of greenhouse gases are tortious and which are not.

13      It is clear that "vague and indeterminate nuisance concepts," *City of Milwaukee v. Illinois*,

14  451 U.S. 304, 317 (1981) ("*Milwaukee II*") , provide no such standards.  Indeed, in prior global

15  warming cases, plaintiffs have invoked the principle that a party can be liable for contributing to a

16  nuisance even where the contribution is "relatively slight" and "by itself would not be . . .

17  unreasonable."  Restatement (Second) of Torts § 840E cmt. b (1979).[5]  Such a standard, however,

18  has no logical stopping point, and would mean that every individual on earth could be held liable for

19  contributing to this phenomenon.

20      The only way to avoid that absurd result would be to hold that certain carbon dioxide-

21  producing activities are more blameworthy than others, or that emissions above a certain level for

22  particular activities are societally unreasonable.  But existing tort principles provide no standards for

23  making such judgments.  *Gen. Motors*, 2007 WL 2726871, at *15 (courts are "without guidance in

24  determining what is an unreasonable contribution to the sum of carbon dioxide in the Earth's

25  atmosphere").  Instead, as defendants show next, such judgments are "initial policy determination[s]

26

27  _____
    [5] *See* California's Opening Br. at 30-31, 33, *California v. Gen. Motors Corp.*, Case No. 07-16908
28  (9th Cir. filed Jan. 31. 2008); Br. for Plaintiffs-Appellants at 55, *Connecticut v. Am. Elec. Power Co., Inc.*, No. 05-5104-cv (2d Cir. filed Dec. 15, 2005).

1    of a kind clearly for non judicial discretion" that are committed by the Constitution to the political

2    branches of the federal government.  *Baker*, 369 U.S. at 217.

3    **B.    Resolution Of The Issue Of Liability In This Case Requires Initial Policy**
        **Decisions That Cannot Properly Be Made By The Judiciary.**
4

5            A court cannot decide that defendants' past emissions were blameworthy in ways that

6    millions of other emissions were not, or that the amount of defendants' past emissions was

7    "unreasonable," without determining what the proper balance was between (a) the risk of global

8    warming-related harms and (b) the multifaceted societal costs that would have resulted if defendants

9    had fundamentally altered energy production in order to achieve significant greenhouse gas

10   reductions, as well as the risk that such costs would not have resulted in any meaningful benefit,

11   because any reductions would have been offset by emissions elsewhere.  The necessity of striking

12   such a balance in order to decide the question of "fault" can best be illustrated by assuming that

13   plaintiffs could prove, as a scientific fact, that the ice that formerly protected their island would not

14   have melted if the utility defendants had ceased generating electricity from fossil fuel-fired plants as

15   of a specific date, *e.g.*, 1980.  To find that the utilities had a tort-based duty to shut down all of those

16   plants, the Court or jury would have to weigh the massive economic and other societal dislocations

17   that such an abrupt shut-down would have entailed, and then decide that those costs were

18   outweighed by the risk that Kivalina would be subject to an unacceptable risk of flooding absent

19   such a shut-down.

20           Of course, it is inconceivable that a jury could find that the utility defendants' "failure" to

21   shut down all fossil fuel-fired plants in 1980 renders them liable in damages to plaintiffs.  Electricity

22   is indispensable to modern American life.  It is a primary input to virtually all economic activity.  It

23   powers innumerable safety devices and systems, prevents deaths from heat in summer and from cold

24   in winter, and powers our military and homeland security.  The list of critical uses of electricity is

25   nearly endless.  The consequences of shutting down defendants' fossil fuel-fired power plants,

26   therefore, would have been catastrophic for our citizens.  Only a legislature has the capacity and

27   authority to make the judgment that the threat of harm from global warming outweighs the

28   innumerable societal harms that would flow from such drastic action.

1     The necessity of making such a political judgment cannot be avoided merely by disavowing

2     this drastic remedy and alleging that defendants had a duty to adopt "alternatives to fossil fuel

3     combustion." Compl. ¶ 174. While plaintiffs allege that the costs of such technologies have

4     declined, *id.*, they do not allege that such alternatives would not have affected the cost or reliability

5     of electricity to millions of consumers. Nor could they. Congress has recognized that stabilizing

6     and reducing U.S. carbon dioxide levels has enormous "economic, energy, social, environmental,

7     and competitive implications, including implications for jobs." 42 U.S.C. § 13381(1). EPA has

8     likewise stated that significant reductions in U.S. carbon dioxide emissions will be achieved only if

9     U.S. power generation "undergo[es] widespread and wholesale transformations, affecting every

10    sector of the nation's economy and threatening its overall economic health." Memorandum from

11    Robert E. Fabricant, EPA General Counsel, to Marianne L. Horinko, Acting Administrator 9 (Aug.

12    28, 2003); *see also Control of Emissions from New Highway Vehicles and Engines*, 68 Fed. Reg.

13    52,922, 52,928 (Sept. 8, 2003) (the "production and use of fossil fuel-based energy undergirds

14    almost every aspect of the U.S. economy").

15    Thus, to conclude that defendants had a tort-based duty to achieve significant reductions in

16    carbon dioxide emissions by building wind farms or deploying solar energy, a court or jury would

17    have to determine the effects that these alternatives would have had on the cost and reliability of

18    electricity, and the resulting consequences on industries and businesses, low- and fixed-income

19    consumers, and essential safety systems. The court or jury would then have to decide that these

20    societal impacts were outweighed by the risk that defendants' emissions would contribute to global

21    warming in a manner that significantly increased the likelihood of plaintiffs' injuries, taking into

22    account the possibility that costly and societally disruptive emissions reductions would have been

23    offset by increased emissions elsewhere. *See Control of Emissions*, 68 Fed. Reg. at 52931 ("Any

24    potential benefit of [greenhouse gas] regulation could be lost to the extent other nations decided to

25    let their emissions significantly increase in view of U.S. emission reductions."). In addition, this

26    balance of societal costs and benefits would have to be compared against the cost/benefit calculus

27    associated with reducing other sources of carbon dioxide, because defendants' alleged failure to

28

1    reduce their carbon dioxide emissions cannot be deemed societally unreasonable if there were less

2    costly or less disruptive ways of avoiding plaintiffs' alleged harms.

3          There is, obviously, no way for a court or jury to determine the "correct" balance of such

4    broad and competing societal interests.  Such a judgment is a matter of political consensus, not

5    scientific proof.  Under the Constitution, the task of making such judgments is not assigned to the

6    courts.  Rather, "controversies which revolve around policy choices and value determinations [are]

7    constitutionally committed to the halls of Congress or the confines of the Executive Branch."  *Japan*

8    *Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  Indeed, the Supreme Court has

9    repeatedly explained that decisions that affect the safety or security of the nation "should be

10   undertaken only by those directly responsible to the people whose welfare they advance or imperil."

11   *Chi & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).  Issues of "high policy"

12   must be resolved

13           "within the legislative process after the kind of investigation,
14           examination, and study that legislative bodies can provide and courts
             cannot.  That process involves the balancing of competing values and
15           interests, which in our democratic system is the business of elected
             representatives."

16   *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 647 (1981) (quoting *Diamond v.*

17   *Chakrabarty*, 447 U.S. 303, 317 (1980)).

18         For these reasons, the other district courts that have confronted global warming tort claims

19   have concluded, correctly, that such claims cannot be adjudicated in the absence of an initial policy

20   determination that can be made only by the political branches.  *Gen. Motors*, 2007 WL 2726871, at

21   *7-8; *Connecticut*, 406 F. Supp. 2d at 272-74; *Comer Order* at 39-40.[6]  Plaintiffs' claims should be

22   dismissed for the same reasons here.

23

24

25   _____

     [6] Because the question of fault requires such inherently political judgments, the fact that plaintiffs
26   seek damages rather than injunctive relief in no way renders their claim justiciable.  *See Gen.*
     *Motors*, 2007 WL 2726871, at *8 (explicitly addressing issue); *Comer Order* at 39-40 (dismissing
27   tort-based suit for damages); *see also Aktepe*, 105 F.3d at 1403 (dismissing negligence-based
     wrongful death suit for damages because it raised nonjusticiable political questions).
28

1

2

### C. Imposition Of Liability In This Case Would Contradict The Judgments Of The Political Branches.

3 Imposition of liability would also contradict policy judgments the political branches have

4 made about the proper response to greenhouse gas emissions in light of competing economic,

5 environmental and foreign relations interests.  A finding of liability in this case would rest on,

6 among other things, a judgment that each defendant should have reduced emissions by some

7 specified amount, and that incurring the costs of such reductions would have been the societally

8 reasonable way of avoiding plaintiffs' injuries.  Congress and the President, however, have decided

9 that global warming should be addressed in a comprehensive, coordinated, and multilateral manner,

10 and that unilateral or *ad hoc* reductions entail undue harms *without* corresponding benefits.

11 Greenhouse gas emissions are not static.  One entity may decrease emissions while another

12 increases them, resulting in the same overall level of emissions.  *See Control of Emissions*, 68 Fed.

13 Reg. at 52931.  For that very reason, the political branches declined to adopt the Kyoto Protocol,

14 which sought to impose emissions caps on developed nations, but not developing ones like China

15 and India.  *See* Kyoto Protocol, art. 3, annex I, Dec. 10, 1997, 37 I.L.M. 22.  The President opposes

16 the Protocol because this asymmetry would have "a negative economic impact, with layoffs of

17 workers and price increases for consumers."[7]  The Senate cited these same concerns in urging

18 President Clinton, in a 95-0 vote, not to sign the Protocol.  *See* S. Res. 98, 105th Cong. (1997).  And,

19 before President's Bush's election, Congress used appropriations legislation to bar implementation

20 of the Protocol.  *See supra* at 6-7 (citing statutes).  Those actions are consistent with Congress's

21 longstanding strategy of requiring "dramatic and possibly higher cost [responses to global warming]

22 . . . *only in the context of concerted international action*."  H.R. Rep. No. 102-474, pt. I, at 152

23 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1954, 1975 (emphasis added); *see also* Pub. L. No. 100-204,

24 tit. XI, §§ 1102(3), 1103(a), 101 Stat. 1407, 1408 (1987) (codified at 15 U.S.C. § 2901 note)

25 (declaring that U.S. policy is to "identify technologies and activities to limit mankind's adverse

26 effect on the global climate . . . and . . . work toward [international] agreements").

27

28

---

[7] *See* Transcript, *President Bush Discusses Global Climate Change* (Jun. 11, 2001), *available at* http://www.whitehouse.gov/news/releases/2001/06/20010611-2.html.

1     In the absence of concerted international action, Congress has called for a comprehensive

2   national response that is sensitive to the economic implications of significant greenhouse gas

3   reductions.  The Energy Policy Act of 1992 directed the Secretary of Energy to assess various

4   options for reducing greenhouse gas emissions and to report on their "feasibility and economic,

5   energy, social, environmental, and competitive implications, including implications for jobs."  42

6   U.S.C. §§ 13381(1), 13384.  That Act also requires the Executive Branch to develop a plan for

7   "stabilization and eventual reduction in the generation of greenhouse gases."  *Id*. § 13382(a)(2), (g).

8   More recently, the Energy Policy Act of 2005 called for a "national strategy to promote the

9   deployment and commercialization" of technologies to reduce greenhouse gas intensity.  *See id.*

10  § 13389(c)(1).  And, as noted earlier, the Energy Independence and Security Act of 2007 creates

11  vehicle-emissions reduction planning and incentive programs, requires an assessment of carbon

12  sequestration methods, creates grant programs to accelerate research and development of non-carbon

13  emitting technologies, and adopts fuel efficiency standards that function as emissions standards for

14  automobiles."  *See* Pub. L. No. 110-140, §§ 101-136, 601-636, 711-714, 121 Stat. at 1498-1516,

15  1674-88, 1710-15 (codified at 42 U.S.C. chs. 149, 152, 329).

16     Thus, the political branches charged with managing foreign affairs and protecting both the

17  nation's economy and its environment have decided that, in the absence of emissions limits in

18  developing nations, mandatory U.S. reductions pose a risk of significant economic harm without

19  sufficient assurance of a corresponding environmental benefit.  Accordingly, Congress has ordered a

20  careful phasing-in of a functional emissions cap for automobiles, conferred authority on an expert

21  and politically accountable agency to determine whether and how to regulate greenhouse gas

22  emissions going forward, and promoted the development of new technologies.  A finding of liability

23  in this case, however, would inescapably entail a contrary judgment:  that defendants should have

24  significantly reduced their emissions by particular amounts years ago, and that any economic harms

25  caused by such reductions would have yielded worthwhile environmental benefits.

26     Nor is this the only conflict between plaintiffs' preferred response to global warming and that

27  adopted by the political branches.  Congress has called for "a coordinated national policy on global

28  climate change."  15 U.S.C. § 2938(b)(1).  Lawsuits like this, however, employ an uncoordinated

1    piecemeal approach, in which various plaintiffs select U.S. companies they deem blameworthy, and

2    ask for retroactive liability for failure to undertake emissions reductions that Congress and the

3    executive have thus far declined to require.  These suits would impose the burdens of regulation, *see*

4    *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 521 (1992) (Stevens, J.) ("regulation can be . . .

5    effectively exerted through an award of damages") (internal quotation marks omitted), with none of

6    its benefits; each jury award will simply reflect a judgment that a particular defendant's emissions

7    were "unreasonable," but will provide no guidance to others about what level would be reasonable.

8         Finally, judicially-compelled reductions of U.S. greenhouse gas emissions would contradict

9    the President's judgment about how to induce other nations to reduce their emissions.  The President

10   believes that, to implement Congress's directive to "work toward [international] agreements" on

11   issues of climate change, 15 U.S.C. § 2901 note, the prospect of mandatory U.S. emission limits can

12   be used as a bargaining chip in exchange for comparable restrictions by others.  If successful,

13   however, plaintiffs' claims would result in unilateral, judicially-compelled emissions reductions on

14   U.S. companies through the imposition of tort liability, *see Cipollone*, 505 U.S. at 521 (Stevens, J.),

15   and would thus conflict with the President's negotiating strategy.  *See Control of Emissions*, 68 Fed.

16   Reg. at 52931 (mandatory unilateral U.S. reductions could "weaken U.S. efforts to persuade key

17   developing countries to reduce the [greenhouse gas] intensity of their economies"); *Gen. Motors*,

18   2007 WL 2726871, at *14 (characterizing U.S. foreign policy as "deliberately elect[ing] to refrain

19   from any unilateral commitment to reducing [greenhouse gas] emissions domestically unless

20   developing nations make a reciprocal commitment").  Plaintiffs' counsel may believe the nation's

21   bargaining-chip strategy is "bizarre."  Matthew F. Pawa, *Global Warming Litigation Heats Up*, Trial

22   Apr. 2008, at 18, 20.  But the political question doctrine deprives courts of jurisdiction over suits,

23   such as this one, that cannot be adjudicated without "implicitly questioning, and even condemning,

24   United States foreign policy."  *Corrie*, 503 F.3d at 983-84.

25        All of the foregoing conflicts between the judgments of the political branches and those

26   plaintiffs will ask the Court to make confirm the inherently political nature of the issues raised by

27   this case—issues courts cannot resolve.  *See Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995)

28   (final three *Baker* factors apply where "judicial resolution of a question would contradict prior

16

1  decisions taken by a political branch"); *Connecticut*, 406 F. Supp. 2d at 274 ("Because the resolution

2  of the issues presented [*i.e.*, global warming] here requires identification and balancing of economic,

3  environmental, foreign policy, and national security interests, an initial policy determination of a

4  kind clearly for non-judicial discretion is required.") (internal quotations omitted); *Gen. Motors*,

5  2007 WL 2726871, at *14 (finding that "Plaintiff's federal common law global warming nuisance

6  tort would have an inextricable effect on interstate commerce and foreign policy-issues

7  constitutionally committed to the political branches of government").

8  **II.    PLAINTIFFS LACK STANDING.**

9        To have Article III standing, plaintiffs must have suffered an injury-in-fact that was caused

10  by defendants and is redressable by this Court. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560

11  (1992). Because this Court is presumed to lack Article III jurisdiction, plaintiffs must plead facts

12  sufficient to establish each of these indispensable elements. *Kokkonen v. Guardian Life Ins. Co. of*

13  *Am.*, 511 U.S. 375, 377 (1994). And these "[f]actual allegations must be enough to raise a right to

14  relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). "It is

15  not . . . proper to assume that [plaintiffs] can prove facts that [they] ha[ve] not alleged," and mere

16  "labels and conclusions, [or] a formulaic recitation of the elements of a cause of action will not do."

17  *Id.* at 1965, 1969 n.8 (omission in original; citation and internal quotation marks omitted). For that

18  reason, courts need not "accept legal conclusions cast in the form of factual allegations if those

19  conclusions cannot reasonably be drawn from the facts alleged." *Clegg*, 18 F.3d at 754-55.

20        Plaintiffs allege an injury—*i.e.*, flooding due to storm damage and erosion from a loss of

21  Arctic sea ice that formerly protected their island. But they do not and cannot allege that it was

22  defendants' emissions—and not "'the independent action of some third party not before the court,'"

23  *Lujan*, 504 U.S. at 560—that caused this injury. Moreover, plaintiffs' allegations make clear that

24  their alleged injuries are too remote from defendants' conduct to satisfy Article III's causation

25  requirement. The complaint should therefore be dismissed for lack of standing.

26       **A.    Plaintiffs Have Failed To Plead Facts Establishing Article III Causation.**

27        Plaintiffs have plainly failed to allege Article III causation. Their complaint sets forth

28  detailed allegations concerning global warming, Compl. ¶¶ 123-161, defendants' emissions, *id.*

1  ¶¶ 163-180, and plaintiffs' alleged injuries, *id.* ¶¶ 185-188.  But it recites no *facts* which, if proved,

2  would establish a non-speculative basis for finding that *defendants'* emissions caused plaintiffs'

3  injuries.  Instead, plaintiffs offer "formulaic recitation[s]," *Twombly*, 127 S. Ct. at 1965, of

4  causation, asserting that defendants' emissions "are a direct and proximate contributing cause" of

5  their injuries; that defendants, "individually and collectively, are substantial contributors" to those

6  injuries; and that their "injuries from each defendant's contributions to global warming are

7  indivisible."  Compl. ¶¶ 251, 253, 256.  These are bare "legal conclusions" masquerading as factual

8  allegations that cannot establish this Court's jurisdiction.  *Clegg*, 18 F.3d at 754-55.

9       The facts that plaintiffs do allege, moreover, establish that their alleged injuries are *not* fairly

10  traceable to defendants.  Plaintiffs allege that a "large fraction of carbon dioxide emissions persist in

11  the atmosphere for *several centuries*," and that nearly two-thirds of the atmospheric increase in this

12  gas over the past three centuries resulted from emissions dating from "the dawn of the industrial

13  revolution in the 18th century" to 1980.  Compl. ¶ 125 (emphasis added).  And plaintiffs do not

14  merely allege that global warming is caused by emissions that span hundreds of years.  They also

15  allege that it is caused by emissions from sources that span the planet.  Thus, they allege that

16  "combustion of fossil fuels"—not just fossil fuels produced or used by defendants—"add[] large

17  quantities . . . of carbon dioxide[] to the atmosphere," and that natural processes that remove carbon

18  dioxide "are unable to keep pace with *these emissions*."  *Id.* ¶ 126 (emphasis added); *see also id.*

19  ¶ 132 ("human activity that releases greenhouse gases is causing a change in the Earth's climate").

20  And plaintiffs admit that specific harms cannot be traced to defendants, because their emissions

21  "rapidly mix in the atmosphere" and "inevitably merge[] with the accumulation of emissions in

22  California and in the world."  *Id.* ¶¶ 254, 10; *see also Control of Emissions*, 68 Fed. Reg. at 52,927

23  (explaining that greenhouse gases mix in "relatively homogenous concentrations around the world").

24       For these very reasons, the *Comer* court dismissed a similar complaint for lack of standing,

25  ruling that the plaintiffs' injuries were not "fairly attributable" to many of the same defendants that

26  plaintiffs have sued here.  *Comer Order* at 36.  The court noted that everyone on the planet was

27  responsible to some degree "for the emission of [carbon dioxide] and ultimately greenhouse gases

28  which cause global warming."  *Id.*  The injuries asserted by plaintiffs in that case, therefore, were not

1  "traceable to these individual defendants but . . . instead . . . are attributable to a larger group that [is]

2  not before this Court, not only within this nation but outside of our jurisdictional boundaries as

3  well." *Id.* Here, too, plaintiffs' own allegations make clear that their alleged injuries are not fairly

4  traceable to these defendants, but to countless entities around the globe. *See also Tex. Indep.*

5  *Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 974 (7th Cir. 2005) (failure to account for

6  pollution attributable to others precluded traceability to one industry's discharges). Boilerplate

7  recitations that defendants' emissions "are a direct and proximate contributing cause of" plaintiffs'

8  injuries, Compl. ¶ 251, cannot mask this fatal defect.

9          Indeed, the decision in *Massachusetts* confirms that plaintiffs cannot establish causation.

10  Like plaintiffs here, Massachusetts claimed that domestic emissions contributed to global warming,

11  which caused harm to its land. *See* 127 S. Ct. at 1457-58. The Court held that Massachusetts could

12  seek judicial review of EPA's refusal to regulate greenhouse gas emissions from new motor vehicles

13  under the CAA "'*without meeting* all the normal standards'" of Article III standing. *Id.* at 1453

14  (emphasis added) (quoting *Lujan*, 504 U.S. at 572 n.7). In justifying the relaxed standing standards

15  it applied in that case to Massachusetts, the Court stressed that the statutory right to judicial review

16  was "of critical importance," *id.* (citing 42 U.S.C. § 7607(b)(1)), and that, as a State, Massachusetts

17  was entitled to "special solicitude in [the] standing analysis." *Id.* at 1454-55. The Court thus applied

18  *relaxed* standing standards because Massachusetts could not meet Article III's *normal* requirements.

19  *See id.* at 1466 (Court's relaxed standards are "an implicit concession that petitioners cannot

20  establish standing in traditional terms") (Roberts, C.J., dissenting).

21          Here, plaintiffs are not entitled to any relaxed standing rules: They are not States,[8] they

22  invoke no statutory right to judicial review of agency action, and they cannot rely on congressionally

23

24  [8] Plaintiffs did not join the Union on the same terms as States, and thus are not entitled to "special

25  solicitude" in the standing analysis. *See Massachusetts*, 127 S. Ct. at 1454-55 (terms on which they joined the Union justified "special solicitude" for States in the standing analysis). Instead, the 1867

26  Treaty of Cession is an agreement between the United States and *Russia* (not any Alaska Natives), and it provides that Alaska Natives "will be subject to such laws and regulations as the United States

27  may, from time to time, adopt." Cession of the Russian Possessions in North America, U.S. – Russ., art. 3, Mar. 30, 1867, 15 Stat. 539, 542. Moreover, in *Massachusetts* the Court relied on the State's

28  unique interest in "preserv[ing] its sovereign territory." 127 S. Ct. at 1454-55. Plaintiffs, by contrast, have no territorial sovereignty. In the Alaska Native Claims Settlement Act of 1971

*(Footnote continued)*

1    "'articulate[d] chains of causation.'"  *Id.* at 1453 (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J.,

2    concurring)).  Their allegations of causation thus fail as a matter of law to satisfy Article III's

3    "normal standards" for determining standing.

4         **B.    Plaintiffs' Injuries Are Too Remote To Satisfy Article III Causation.**

5         Plaintiffs' injuries are not fairly traceable to defendants' emissions for yet another reason:

6    their injuries are too remote from defendants' actions.  *See In re African-American Slave*

7    *Descendants Litig.*, 471 F.3d 754, 761 (7th Cir. 2006), *cert. denied*, 128 S. Ct. 92 (2007) (remoteness

8    is "a limitation on Article III standing").  Injuries are too remote to establish Article III causation

9    when they can be connected to the alleged wrongful conduct only by multiple links in an attenuated

10   chain of causation.  *See, e.g., Camden County Bd. of Chosen Freeholders v. Baretta U.S.A. Corp.*,

11   123 F. Supp. 2d 245, 257 (D.N.J. 2000), *aff'd*, 273 F.3d 536 (3d Cir. 2001).  Here, the alleged chain

12   of causation includes at least the following highly attenuated links:

13        (1)  defendants' operations emit carbon dioxide, Compl. ¶ 3;

14        (2)  those emissions "mix in the atmosphere" and "merge[] with the accumulation of
          emissions in California and in the world," *id.* ¶¶ 254, 10;

15
          (3)  these accumulated emissions—a large fraction of which were emitted decades and even
16        several centuries ago—trap heat, *id.* ¶¶ 123, 125;

17        (4)  over some unknown period of time, the pool of trapped heat raised the temperature of the
          atmosphere, *id.* ¶¶ 123, 127;
18
          (5)  increased atmospheric temperature has melted glaciers and ice caps, and raised ocean
19        temperatures, both of which cause sea levels to rise, *id.* ¶¶ 130-131;

20        (6)  increased temperatures have caused a loss of sea ice, *id.* ¶ 185;

21        (7) the loss of sea ice left Kivalina's coast more vulnerable to intervening storm surges and
          erosion, *id*;
22

23   (ANCSA), 43 U.S.C. §§ 1601 *et seq.*, the United States "revoked . . . existing reservations in
     Alaska" and "transferred reservation lands to private, state-chartered Native corporations, without
24   any restraints on alienation or significant use restrictions."  *Alaska v. Native Vill. of Venetie Tribal*
     *Gov't*, 522 U.S. 520, 524, 532 (1998).  ANCSA thus made Alaska Native Villages at most
25   "'sovereigns *without territorial reach*.'"  *Id.* at 526 (quoting *Alaska ex rel. Yukon Flats Sch. Dist. v.*
     *Native Vill. of Venetie Tribal Gov't*, 101 F.3d 1286, 1303 (9th Cir. 1996) (Fernandez, J.,
26   concurring)) (emphasis added); *see also* 101 F.3d at 1304 (Fernandez, J., concurring) (ANCSA
     "meant that the tribes . . . would *no longer have control or sovereign power over the land*."
27   (emphasis added)), *rev'd on other grounds sub nom.*, 522 U.S. 520 (1998).

28

1

2
(8) the resulting damage has created an unacceptable risk of flooding, which renders the island unsafe, *id.*

3
There are simply too many attenuated links in this asserted causal chain, spread over too long

4
and indefinite a period, for plaintiffs' alleged injuries to be deemed "fairly traceable" to defendants.

5
*See In re African-Am. Slave Descendants Litig.*, 471 F.3d at 759 (affirming dismissal for lack of

6
Article III standing where causal chain was "too long and ha[d] too many weak links for a court to

7
be able to find that the defendants' conduct harmed the plaintiffs at all"); *Camden County Bd. of*

8
*Chosen Freeholders v. Beretta U.S.A. Corp.*, 273 F.3d 536, 541 (3d Cir. 2001) (per curiam) (causal

9
chain with seven links was "too attenuated to attribute sufficient control to the manufacturers to

10
make out a public nuisance claim").  Plaintiffs lack standing for this reason as well.

11
### III.    PLAINTIFFS HAVE NO FEDERAL CAUSE OF ACTION.

12
Even if plaintiffs had standing, no federal cause of action encompasses their claims.  In prior

13
global warming suits, plaintiffs have invoked a narrow, judge-made remedy the Supreme Court

14
recognized a century ago—when the Constitution was thought to preclude any other branch of

15
government from addressing even a simple transboundary nuisance.  But this limited remedy, which

16
merely allows States to abate nuisances of "simple type," does not remotely encompass the

17
extraordinary "nuisance" claim plaintiffs assert.  Any attempt to expand that cause of action would

18
contravene the Supreme Court's repeated admonition that federal courts should no longer create or

19
expand federal causes of action.  And any expanded version of the cause of action that could

20
encompass plaintiffs' claims has been displaced by federal law that speaks directly to the issues

21
raised by plaintiffs' claims.

22
### A.    No Federal Common Law Cause Of Action Encompasses Plaintiffs' Claim.

23
Plaintiffs can identify no action for their purported federal common law claims, even if they

24
reach back over a century to cases that rest on now outmoded theories of federal common law.  In

25
*Missouri v. Illinois*, 180 U.S. 208 (1901) ("*Missouri I*"), and *Georgia v. Tenn. Copper Co.*, 206 U.S.

26
230 (1907) ("*Tennessee Copper I*"), the Court relied on a theory of constitutional necessity to create

27
causes of action for States to enjoin interstate water and air pollution.  The Court explained that, in

28
joining the Union, the States had surrendered their "[d]iplomatic powers and the right to make war."

1   *Missouri I*, 180 U.S. at 241; *see also Tennessee Copper I*, 206 U.S. at 237.  Thus, the States could no

2   longer abate nuisances originating outside their borders.  And the Court had held that Congress

3   lacked the power to regulate the types of intra-state activities that cause interstate pollution.  *See*,

4   *e.g.*, *United States v. E.C. Knight Co.*, 156 U.S. 1 (1895) (holding that Congress could not regulate

5   activities such as production, manufacturing, and mining).[9]

6          The Court stressed, however, that state demands to abate interstate pollution must be

7   examined with "caution."  *Tennessee Copper I*, 206 U.S. at 237.  The Court could recognize only

8   "*some* such demands," *id.* (emphasis added), and could not create a remedy for "every matter which

9   would warrant a resort to equity by one citizen against another."  *Missouri v. Illinois*, 200 U.S. 496,

10  520-21 (1906) ("*Missouri II*").  It was only "a public nuisance of *simple type* for which a *state* may

11  properly ask an injunction."  *North Dakota v. Minnesota*, 263 U.S. 365, 374 (1923) (emphasis

12  added); *see also Illinois v. City of Milwaukee*, 406 U.S. 91, 106 n.8 (1972) ("*Milwaukee I*") (same).

13         The Court's cases make clear that "simple type" nuisances involve immediately noxious or

14  harmful substances that cause severe, localized harms directly traceable to an out-of-state source.[10]

15  These "simple type" nuisances, the Court explained, entitled an injured State to "stand[] upon her

16  extreme rights," regardless of the "possible disaster to those outside the state."  *Tennessee Copper I*,

17  206 U.S. at 239.  Thus, even before the Court dramatically limited the use of federal common law in

18  *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), it developed "*exacting standards* of judicial

19  intervention" for interstate pollution cases.  *W. Va. ex rel. Dyer v. Sims*, 341 U.S. 22, 27 (1951)

20  ─────────────────────

21  [9] *Missouri I* relied on *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657 (1838), where the Court
    explained that, because States had surrendered their rights to make treaties or wage war and
22  Congress had no authority to adjust boundaries, *id.* at 724-26, "the judicial power is the *only* means
    left for legally adjusting . . . a controverted boundary," *id.* at 726 (emphasis added).  *Rhode Island*
23  relied on the Constitution's grant of jurisdiction over cases involving States to create the cause of
    action for boundary disputes.  *Id.* at 726-27.
24

25  [10] *See Tennessee Copper I*, 206 U.S. at 236 ("noxious gas" that destroyed forests, orchards and
    crops); *Missouri II*, 200 U.S. at 517 ("poisonous filth" into waterways used for drinking and
26  agriculture); *New Jersey v. New York*, 283 U.S. 473, 476-77 (1931) (ocean-dumping of "noxious,
    offensive and injurious materials" that caused "great and irreparable injury" to beaches); *North
27  Dakota*, 263 U.S. at 371-72 (flood waters that destroyed crops and arable land); *see also Gen.
    Motors*, 2007 WL 2726871, at *15 (summarizing these and other cases as involving "issues of local
28  concern" arising "from a source-certain nuisance originating in a neighboring state").

(emphasis added). By limiting the cause of action to States seeking injunctive relief for "simple type" nuisances, the Court ensured that it would not exceed the "inherent limitations of [the judiciary's] ability to deal with multifarious local problems," *id.*, or "take[] the place of a legislature" and decide difficult questions for which the Constitution's jurisdictional grants provide no guidance, *Missouri II*, 200 U.S. at 519-20.

Plaintiffs' claims clearly fall outside the narrow cause of action the Supreme Court created a century ago. In its transborder pollution cases, the Court has never recognized claims by non-State plaintiffs or claims for damages. To the contrary, in *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1 (1981), it noted that a federal nuisance claim for damages by a private party would go "considerably beyond [*Milwaukee I*], which involved purely *prospective relief* by a *state*." *Id.* at 10 (emphases added; citation omitted); *see also Gen. Motors*, 2007 WL 2726871, at *15 (noting that the Court's cases all involved claims for equitable relief). Moreover, the Supreme Court's rationale for creating the cause of action is wholly inapplicable here: Plaintiffs surrendered no sovereign rights in exchange for a judicial remedy, *see* note 8, *supra*, and are not beneficiaries of the Article III jurisdictional grants from which the Court derived the remedy.

Perhaps most importantly, plaintiffs have not pled a nuisance of "simple type." Far from alleging that immediately noxious or harmful substances are causing severe localized harms directly traceable to an out-of-state source, plaintiffs claim defendants are contributing to an unprecedented worldwide problem that cannot be traced to any particular sources, but is instead allegedly caused by countless activities around the globe. *See* Compl. ¶¶ 254-255 (defendants' emissions "rapidly mix in the atmosphere" and, "in combination with emissions and conduct of others, contribut[e] to global warming"); *id.* ¶ 10. The Supreme Court has never recognized a claim in which the contributions of countless non-parties were essential ingredients to the plaintiffs' alleged harm. *See Gen. Motors*, 2007 WL 2726871, at *15 (noting the "unprecedented" nature of a similar global warming claim). Instead, the Court has deemed actionable only those claims in which a State alleges that the defendants *alone* caused "great and irreparable injury," *New Jersey v. New York*, 283 U.S. 473, 476 (1931).

1

### B.    Plaintiffs Necessarily Seek An Impermissible Expansion Of The Federal Common Law Cause Of Action For Transboundary Pollution.

2

3        The "exacting standards" of the federal common law cause of action cannot be relaxed, and

4   the narrow scope of that cause of action cannot be broadened, to encompass plaintiffs' claims.  For

5   over 30 years, the Supreme Court has repeatedly held that federal courts should no longer create or

6   expand causes of action.  For example, although implying causes of action from statutes was a

7   classic exercise of federal common lawmaking power, *see, e.g.,* Henry J. Friendly, *In Praise of Erie–*

8   *And of the New Federal Common Law*, 39 N.Y.U. L. Rev. 383, 421 (1964), the Court has

9   emphatically repudiated the practice, *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001).  It has

10  likewise refused to expand causes of action previously implied from statutes.  *See, e.g.*, *Stoneridge*

11  *Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) (refusing to expand right of

12  action implied from federal securities laws); *Cent. Bank of Denver, N.A. v. First Interstate Bank of*

13  *Denver, N.A.*, 511 U.S. 164 (1994) (same).  Similarly, for more than two decades the Court has

14  "consistently refused to extend *Bivens* liability to any new context or new category of defendants."

15  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 67-68 (2001).  And, most recently, the Court declined to

16  create a federal common law cause of action for violations of international legal norms—even

17  though the Alien Tort Statute expressly authorized such judicial lawmaking.  "[A] decision to create

18  a private right of action," the Court emphasized, "is one better left to legislative judgment in the

19  great majority of cases."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004).

20        The Court has likewise held that federal courts cannot use their "limited" and "restricted"

21  authority to formulate federal common law to make significant policy decisions.  *Tex. Indus.*, 451

22  U.S. at  640.  Federal courts could not create a federal common law right to contribution in antitrust

23  actions because such a right is "a matter of high policy for resolution within the legislative process."

24  *Id.* at 647 (internal quotation marks omitted).  Similarly, federal courts could not create federal

25  common law tort standards for advisers to federally-insured thrifts, because weighing the relevant

26  factors is a task "for those who write the laws, rather than for those who interpret them."  *O'Melveny*

27  *& Myers v. FDIC*, 512 U.S. 79, 89 (1994) (internal quotation marks omitted).

28

1    The Court last re-affirmed the federal common law cause of action for transboundary

2   pollution in 1972, *see Milwaukee I*, 406 U.S. 91, before it "swor[e] off the habit" of creating causes

3   of action, *Alexander*, 532 U.S. at 287. There are thus very good reasons to doubt the continued

4   vitality of that cause of action.[11] Nevertheless, even if *Milwaukee I* is good law, the Supreme

5   Court's recent decisions preclude expanding the cause of action to provide a remedy for plaintiffs.

6    Notably, the Court's hostility towards implied causes of action has been aimed primarily at

7   *private* actions for *damages*. The Court has stressed that "bedrock principles of separation of powers

8   foreclose[] judicial imposition of a new substantive liability," even where "existing remedies do not

9   provide complete relief." *Malesko*, 534 U.S. at 69 (internal quotation marks omitted). The creation

10  of private damages actions "raises issues beyond the mere consideration whether underlying primary

11  conduct should be allowed." *Sosa*, 542 U.S. at 727; *see also Tex. Indus.*, 451 U.S. at 646-47

12  (refusing to recognize liability for contribution in antitrust cases); *Nw. Airlines, Inc. v. Transp.*

13  *Workers Union of Am.*, 451 U.S. 77, 98-99 (1981) (refusing to create right of contribution under

14  Title VII). Requests for injunctive relief, by contrast, do limit judicial consideration to "whether

15  underlying primary conduct should be allowed." Thus, plaintiffs' request that the Court extend the

16  constitutionally suspect interstate nuisance action to claims for damages by private parties would

17  involve precisely the type of judicial lawmaking the Supreme Court has renounced.

18   Moreover, expanding the cause of action to encompass the novel nuisance plaintiffs allege

19  would force this Court to make precisely the types of "high policy" decisions that it cannot make

20  under the rubric of federal common law. As discussed above, this Court can rule that the utility

21  defendants' emissions were "unreasonable," Compl. ¶ 250, or that these defendants breached a duty

22

23  [11] *Milwaukee I* relied on the theory that statutory remedies "are not necessarily the only federal
    remedies available," 406 U.S. at 103—the very theory the Court has since abandoned. *Alexander*,
24  532 U.S. at 287. Moreover, the theory of constitutional necessity that justified recognition of the
    cause of action has been vitiated, as Congress is now understood to possess plenary authority to
25  regulate intrastate activities affecting interstate air and water quality. *United States v. Lopez*, 514
    U.S. 549, 556 (1995) (in 1937, Court "ushered in an era of Commerce Clause jurisprudence that
26  greatly expanded the previously defined authority of Congress"). The Court's 1981 ruling that
    amendments to the Clean Water Act displaced the federal common law cause of action for interstate
27  water pollution, *Milwaukee II*, 451 U.S. 304, obviated any need for the Court to consider the
    continuing vitality of that cause of action.
28

to use "solar, wind, geothermal, and biomass . . . alternatives to fossil fuel combustion," *id.* ¶ 174, only by determining that the risks of plaintiffs' injuries outweighed the multifaceted economic and social costs of significantly reducing emissions from defendants' fossil fuel-fired plants by switching to new sources of energy, and the risks that such reductions would be offset by increased emissions elsewhere. *See* § I.B., *supra.* Federal common law cannot be invoked to resolve the less complex policy issues that underlie questions such as whether to recognize rights of contribution, *Tex. Indus.*, 451 U.S. at 647, or what standard of care governs advisers to federally-insured thrifts, *O'Melveny & Myers*, 512 U.S. at 89. *A fortiori*, federal common law cannot be invoked to resolve the far more sweeping and fundamental issues raised by plaintiffs' unprecedented claim that failure to effect a wholesale paradigm shift from fossil fuel consumption was tortious. *See Gen. Motors*, 2007 WL 2726871, at *12 (similar global warming claim compelled the court "to make the precise initial carbon dioxide policy determination[ ] that should be made by the political branches").

The decision in *Massachusetts v. EPA* confirms this. There, EPA argued that it should not exercise any regulatory authority that Congress had conferred upon it because, among other things, "regulating greenhouse gases might impair the President's ability to negotiate with key developing nations to reduce emissions, and . . . curtailing motor-vehicle emissions would reflect an inefficient, piecemeal" response to climate change. 127 S. Ct. at 1463 (internal quotation marks and citation omitted). The Court recognized that the judiciary has "*neither the expertise nor the authority to evaluate these policy judgments*." *Id.* (emphasis added). *Massachusetts* thus underscores the impropriety of expanding the previously recognized federal common law cause of action to encompass plaintiffs' novel claim, because doing so would require the Court to make precisely the types of policy judgments it has no authority to make.

C.     **Any Federal Common Law Cause Of Action That Could Have Possibly Encompassed Plaintiffs' Claims Has Been Displaced.**

Even apart from the federal courts' limited authority to recognize or expand federal causes of action, legislative action has long since foreclosed such judicial creativity here. Reflecting its longstanding aversion to judicial lawmaking, the Supreme Court has explained that, because "it is for Congress, not federal courts to articulate the appropriate standards to be applied as a matter of

26

1   federal law," courts should adopt a "*willingness* to find congressional displacement of federal

2   common law" whenever "Congress addresses [a] problem formerly governed by federal common

3   law." *Milwaukee II*, 451 U.S. at 317 & n.9, 315 n.8 (emphasis added and deleted); *see also Nat'l*

4   *Audubon Soc. v. Dep't of Water*, 869 F.2d 1196, 1201 (9th Cir. 1988); *United States v. Oswego*

5   *Barge Corp.*, 664 F.2d 327, 335 (2d Cir. 1981) ("separation of powers concerns create a presumption

6   *in favor of [displacement] of federal common law* whenever . . . Congress has legislated on the

7   subject") (emphasis added).[12]  For this reason, the Supreme Court held in *Milwaukee II*, that the

8   Clean Water Act displaced the federal common law nuisance action last recognized in *Milwaukee I*.

9   *See* 451 U.S. at 317.  Under *Milwaukee II*, "once Congress has addressed a national concern, our

10  fundamental commitment to the separation of powers precludes the courts from scrutinizing the

11  sufficiency of the congressional solution" or "holding that the solution Congress chose is not

12  adequate." *Illinois v. Outboard Marine Corp.*, 680 F.2d 473, 478 (7th Cir. 1982).  Here, the cause of

13  action plaintiffs invoke has been displaced by legislation directly addressing global warming, as well

14  as by the President's implementation of U.S. foreign policy on the subject.

15        **1.    Legislation addressing greenhouse gases and global warming.**

16        Congress has repeatedly "addressed [the] national concern," *id.* at 478, of greenhouse gas

17  emissions and global warming by adopting a series of laws that "'speak directly'" to these issues,

18  *Milwaukee II*, 451 U.S. at 315.  As discussed above, Congress addressed global warming by

19  conferring authority to regulate greenhouse gas emissions on EPA; mandating fuel efficiency

20  standards; funding development of some of the very technologies that, according to plaintiffs,

21  defendants had a tort-based duty to deploy in time to prevent a loss of Arctic sea ice; and mandating

22  scientific study and the development of a comprehensive national and international strategy to

23  address global warming in a cost-effective manner.  *See* § I.C., *supra*.  This multi-prong response to

24  a global problem is more than sufficient to displace any attempt to use a 100-year old judge-made

25  cause of action for "simple type" nuisances to attack global warming on a piecemeal, *ad hoc* and

26  indirect manner.

27  _____

    [12] We refer to "displacement" of federal common law to avoid confusion with the concept of
28  "preemption" of state law, which bars plaintiffs' state-law claims.  *See* § V *infra* .

1    The fact that Congress has not provided remedies for plaintiffs is irrelevant.  Just as courts

2    cannot deem Congress's response to national problems inadequate when deciding whether to create

3    or expand judicially-implied causes of action, they cannot make such judgments when deciding

4    whether to *retain* a judicially-implied cause of action.[13]  Decisions to create, expand or retain a

5    judge-made remedy all require a judgment about what "policy . . . is most advantageous to the

6    whole" of society.  *Bush v. Lucas*, 462 U.S. 367, 380 (1983) (internal quotation marks omitted).

7    Congress has thus far decided that the policy most advantageous to all is a carefully calibrated mix

8    of regulatory authority, research, technology development incentives, and multilateral negotiations.

9    This Court cannot second-guess that response by converting a cause of action for States to abate

10    "simple type" nuisances into a global warming damages remedy for non-state parties.

11    Where, as here, Congress "addresses [a] problem," *Milwaukee II*, 451 U.S. at 315 n.8, courts

12    must presume that judicially-created remedies are displaced unless Congress demonstrates a contrary

13    intent.[14]  Because Congress has demonstrated no such intent here, the federal common law cause of

14    plaintiffs invoke (or, more accurately, seek to expand) has been displaced.

15

16

---

17    [13] *See Gardiner v. Sea-Land Serv., Inc.*, 786 F.2d 943, 947 (9th Cir. 1986) ("where Congress has

18    spoken, courts need not pause to evaluate . . . opposing policy arguments . . . [for] Congress has struck the balance") (internal quotations omitted; other alterations and omissions in original);

19    *Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1132 (9th Cir. 1994) ("when Congress has

20    legislated on a question that is claimed to be appropriate for the creation of federal common law, courts must assume that Congress has articulated all of the governing federal standards") (internal

21    quotations omitted); *Outboard Marine*, 680 F.2d at 478 ("to find that Congress has not 'addressed the question' because it has not enacted a remedy against polluters . . . . would be no different from

22    holding that the solution Congress chose is not adequate[, which a court] cannot do").

23    [14] Statutes where Congress demonstrated such an intent can be found in *County of Oneida v. Oneida*

24    *Indian Nation*, 470 U.S. 226 (1985), and *United States v. Texas*, 507 U.S. 529 (1993).  The statute in *County of Oneida* codified a common law rule that Indian property rights cannot be extinguished

25    without the consent of the United States, and later statutes "contemplated suits by Indians asserting their property rights."  *Oneida*, 470 U.S. at 239-40.  In that case, Congress made clear that it did not

26    intend to displace the very cause of action in which the rule it was codifying would apply.  In *Texas*, a statute requiring private debtors to pay interest to the government did not displace the States'

27    federal common law duty to pay pre-judgment interest, because the purpose of the law was "to *enhance* the Government's debt collection efforts."  507 U.S. at 537-38 (emphasis added).

28

---

1

### 2. Presidential implementation of foreign policy.

The cause of action plaintiffs assert is also displaced because it conflicts with the President's implementation of U.S. foreign policy on global warming. As noted above, *see* § I.C., *supra*, the President believes mandatory U.S. reductions should be offered as a bargaining chip that could induce comparable restrictions by others. But if U.S. companies are subject to judicially compelled emissions reductions, the United States has less to offer in exchange for emissions reductions by other nations. Accordingly, the federal common law cause of action cannot be expanded to encompass plaintiffs' novel claims, because a "global warming nuisance tort would have an inextricable effect on . . . foreign policy." *Gen. Motors*, 2007 WL 2726871, at *13-14; *see also Connecticut*, 406 F. Supp. 2d at 272 (federal common law nuisance claim to address global warming would require court to "determine and balance the implications of such relief on the United States' ongoing negotiations with other nations").

### IV. PLAINTIFFS' CLAIMS ARE TIME-BARRED.

Finally, plaintiffs' federal claim must also be dismissed because it is time-barred. Plaintiffs' allegations and the documents they incorporate in their complaint show that they were aware of the factual basis of their claim no later than December 2003. Because they waited until February 2008 to bring this suit, their claim is barred by the applicable three-year limitations period. Where the "untimeliness is apparent on the face of the liberally construed complaint," the suit must be dismissed. *Soliman v. Philip Morris Inc.*, 311 F.3d 966, 971 (9th Cir. 2002).

As demonstrated above, no federal common law cause of action encompasses plaintiffs' claims. But if one did, it would be governed by California's statute of limitations under the "borrowing" rule that applies when Congress fails to provide a limitations period for a statutory cause of action. *Barajas v. Bermudez*, 43 F.3d 1251, 1255-56 (9th Cir. 1994); *see also N. Star Steel Co. v. Thomas*, 515 U.S. 29, 35 (1995). California requires an "action for trespass upon or injury to real property" to be brought within "three years." Cal. Civ. Proc. Code § 338(b).[15] That limitations

---

[15] Nor is either plaintiff exempt from statutes of limitations by virtue of its status. The City of Kivalina is a municipality, not a State, and thus is subject to statutes of limitations to the same extent as a private party. *See Guar. Trust Co. of N.Y. v. United States*, 304 U.S. 126, 135 n.3 (1938); *San Marcos Water Dist. v. San Marcos Unified Sch. Dist.*, 190 Cal. App. 3d 1083, 1087 (1987); *see also*

*(Footnote continued)*

1    period "begins to run upon creation of the nuisance." *Mangini v. Aerojet-Gen. Corp.*, 912 P.2d

2    1220, 1223 (Cal. 1996).[16] If a plaintiff cannot immediately discover the basis for the claim, it begins

3    to run when the plaintiff "has reason at least to suspect a factual basis for [the claim's] elements."

4    *Norgart v. Upjohn Co.*, 981 P.2d 79, 88 (Cal. 1999).

5        The complaint makes clear that plaintiffs were on notice of the elements of their claim at

6    least four years before they filed suit in February 2008. Plaintiffs allege that the atmospheric effects

7    of greenhouse gases such as those emitted by defendants have been known for decades. Compl.

8    ¶¶ 132-155. They also had reason to understand the alleged effects of global warming on their

9    island, and the need to relocate, as early as 2003. Indeed, their allegations on these subjects are

10   drawn directly from a December 2003 report by the Government Accountability Office. *See id.*

11   ¶ 185 (citing Gov't Accountability Office, *Alaska Native Villages* (Dec. 2003), *available at*

12   http://www.gao.gov/new.items/d04142.pdf ("GAO Report")). That 2003 report states that "[r]ising

13   temperatures have . . . affected the thickness, extent, and duration of sea ice that forms along

14

15   n.8, *supra*. Finally, although California Civil Code § 3490 provides that "'[n]o lapse of time can
     legalize a public nuisance,'" that provision applies only to "action[s] brought by a public entity to

16   *abate* a public nuisance," not to damages suits like this one. *Mangini v. Aerojet-Gen. Corp.*, 230
     Cal. App. 3d 1125, 1142-43 (1991) (emphasis added), *aff'd*, 912 P.2d 1220 (Cal. 1996); *Beck Dev.*

17   *Co. v. S. Pac. Transp. Co.*, 44 Cal. App. 4th 1160, 1216 (1996); *see also* Donald G. Gifford, *Public
     Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741, 781-82 (2003).

18

19   [16] Although California recognizes an exception for "continuing" nuisances, that exception applies
     only where the nuisance can be readily abated. *See Mangini*, 912 P.2d at 1229. Here, plaintiffs

20   allege that they must relocate due to the loss of critical sea ice, Compl. ¶¶ 184-187, and they
     nowhere allege that greenhouse gas concentrations, rising temperatures or loss of sea ice can be

21   abated in any way that would avoid their alleged relocation costs. To the contrary, documents
     incorporated in their complaint—which the Court may consider in ruling on a motion to dismiss, *see*

22   *Ritchie*, 342 F.3d at 907-08—state that greenhouse gases "will remain elevated above natural levels
     for centuries, even if emissions were to cease immediately," *Impacts of a Warming Arctic: Arctic*

23   *Climate Impact Assessment* 9 (2004), *available at* http://www.amap.no/acia, *cited in* Compl. ¶ 184,
     and that "climate-induced environmental changes cannot be reversed quickly, if at all, due to the

24   long time-scales associated with the climate system." IPCC Working Group II, Intergovernmental
     Panel on Climate Change, *IPCC Second Assessment: Climate Change 1995* at 28 (1995), *available*

25   *at* http://www.ipcc.ch/pdf/climate-changes-1995/ipcc-2nd-assessment/2nd-assessment.en.pdf, *cited*
     *in* Compl. ¶ 155. Because the alleged nuisance cannot be readily abated, it is considered a

26   "permanent nuisance," and plaintiffs were required to "bring one action for all past, present and
     future damage within three years" after the alleged nuisance was created. *Baker v. Burbank-*

27   *Glendale-Pasadena Airport Auth.*, 705 P.2d 866, 869 (Cal. 1985).

28

1   [Alaska's] western and northern coasts," leaving those coasts "more vulnerable to waves, storm

2   surges, and erosion," and leaving Kivalina "in imminent danger from flooding and erosion."  GAO

3   Report at 4, 8; *cf.* Compl. ¶ 185.  The complaint quotes the report for the proposition that, at the time

4   the report was issued *in 2003*, " '[r]emaining on the island . . . [wa]s no longer a viable option for the

5   community.' "  Compl. ¶ 185 (quoting GAO Report at 32).  Kivalina, the report stated, was already

6   "making plans to relocate," and "working with relevant federal agencies to locate suitable new

7   sites."  GAO Report at 4, 27-29.  Indeed, according to the report, "[r]elocation ha[d] been a topic of

8   discussion and study for Kivalina . . . for at least two decades."  *Id*. app. VIII, at 78.  Plaintiffs thus

9   "had reason at least to suspect a factual basis" for their claims no later than December 2003, but

10  failed to file this suit until more than four years later, in February 2008.  Consequently, their federal

11  claim is time-barred (and their state-law claim is as well).[17]

12                                        *  *  *

13          In short, plaintiffs can state no federal claim for relief.  Because this Court must dismiss

14  plaintiffs' putative federal claim, the Court need go no further.  It may decline jurisdiction over the

15  remaining state-law counts under 28 U.S.C. § 1367(c)—and must do so if the federal claim is

16  dismissed for clear want of subject-matter jurisdiction.  *See Gilder v. PGA Tour, Inc.*, 936 F.2d 417,

17  421 (9th Cir. 1991); *Herman Family Revocable Trust v. Teddy Bear*, 254 F.3d 802, 806 (9th Cir.

18  2001).  If the Court disposes of the federal claim on non-jurisdictional or prudential grounds,

19  however, it retains "discretion . . . to adjudicate the remaining [state-law] claims."  *Teddy Bear*, 254

20  F.3d at 806.  Here, the defects that doom plaintiffs' state-law claims are often closely related to the

---

21  [17] Plaintiffs' state-law nuisance claim is time-barred for the same reasons.  Because this suit was
22  filed in California, California's choice-of-law rules determine which State's statute of limitations
    applies.  *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996).  Those
23  rules "generally lead[] California courts to apply California law" to statute-of-limitations issues,
    especially where its limitations period bars a claim.  *Deutsch v. Turner Corp.*, 324 F.3d 692, 716-17
24  (9th Cir. 2003) (citations omitted).  California "has a substantial interest in preventing the
    prosecution in its courts of claims which it deems to be stale," *id.* at 717 (quotation marks omitted),
25  and nothing overrides that interest here.  Plaintiffs chose to file in California; and California's
26  borrowing statute, Cal. Civ. Proc. Code § 361, requires courts to apply the *shorter* of California's
    statute or the applicable foreign statute.  Because California's statute bars plaintiffs' claims,
27  however, there is no need to consider any other State's limitations period.  By arguing for
    application of California's statute of limitations, defendants do not concede that California law
28  applies to other issues, such as plaintiffs' substantive claims.  *See* n. 20, *supra*.

---

1    issues that plague their federal claim.  Having invested significant resources in evaluating and

2    addressing the federal claim, this Court could exercise its discretion in the interests of convenience,

3    fairness and judicial economy to address and dispose of the related state-law counts as well.

4    Accordingly, we address the defects in the state-law claims below.

5    **V.    PLAINTIFFS' STATE-LAW CLAIMS ARE PREEMPTED.**

6          Plaintiffs' state-law claims are preempted for many of the same reasons that their federal

7    claim is barred by the principles of displacement and the political question doctrine.  Massive state-

8    law damage awards would frustrate and conflict with Congress' intent to fashion a uniform,

9    coordinated, and comprehensive approach to global climate change, and with the President's

10   implementation of U.S. foreign policy.  *See Pub. Util. Dist. No. 1 v. IDACORP Inc.*, 379 F.3d 641,

11   649-50 (9th Cir. 2004) ("'conflict preemption' exists 'if there is an actual conflict between federal

12   and state law, or where compliance with both is impossible'") (quoting *Gadda v. Ashcroft,* 363 F.3d

13   861, 871 (9th Cir. 2004)).  Moreover, global climate change is predominantly a matter of federal

14   concern and cannot be addressed in any meaningful manner by varied state-law mandates.

15
16        **A.    Plaintiffs' State-Law Claims Conflict With The Force Or Purpose Of
               Congressional Enactments on Global Climate Change.**

17        Plaintiffs' state-law claims are preempted because they interfere with and frustrate the

18   method chosen by Congress for addressing global climate change.  In *Geier v. American Honda*

19   *Motor Co.*, 529 U.S. 861 (2000), for example, the Court found that a state tort action was preempted

20   because it would frustrate the federal scheme for passive restraints in automobiles.  The suit in that

21   case was predicated on the theory that manufacturers had a duty, under state tort law, to install

22   airbags.  But the Court held that claim preempted because such a duty "would have presented an

23   obstacle to the variety and mix of [other] devices that the federal regulation sought." *Id.* at 881.

24        So too here, any state-law damages award would necessarily be premised on a finding that a

25   defendant had exceeded some "acceptable" or "reasonable" cap on emissions, thus forcing each such

26   defendant to reduce emissions to that level to avoid additional damage awards.  *See Gen. Motors*,

27   2007 WL 2726871, at *8 (noting that case brought by California against car manufacturers seeking

28   damages for alleged contributions to global climate change "would require the Court to create a

32

1   quotient or standard" for carbon dioxide emissions).  Such a "lawsuit cap," however, would conflict

2   with Congress's method of addressing climate change.  As discussed above, Congress has ordered a

3   careful phasing-in of one type of emissions cap (for automobiles) and has conferred authority on an

4   expert and politically accountable agency to determine whether and how to regulate greenhouse gas

5   emissions.  *See* § I.B., *supra*.  Congress has repeatedly confirmed, moreover, that climate change

6   must be addressed on a comprehensive, national basis, that includes negotiations with other

7   nations.[18]  *Ad hoc* state tort damage awards, therefore, plainly frustrate Congress's decision to

8   develop a coordinated, comprehensive national scheme in which Congress itself, or a federal agency

9   exercising congressionally delegated authority, fashions appropriate emissions limits.

10       Moreover, in light of the futility of state-specific responses, there is simply no role for state

11   law in regulating activities that might lead to global climate change.  Certain areas are so uniquely

12   federal in nature that state law is preempted even in the absence of any conflict with federal law.

13   *Zschernig v. Miller*, 389 U.S. 429, 432 (1968) (foreign affairs); *Chy Lung v. Freeman*, 92 U.S. 275,

14   279-80 (1875) (immigration); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507-08 (1988) (liability

15   of government contractors).  Mandatory regulation of activities to address global climate change

16   necessarily falls into this category.  Only the federal government can, through national legislation

17   and international negotiations, compel meaningful reductions—*i.e.*, reductions coupled with

18   protections against offsetting increased emissions elsewhere.

19       The decision in *Massachusetts* confirms the uniquely federal nature of any response to global

20   warming.  The Court observed that "Massachusetts cannot invade Rhode Island to force reductions

21   in greenhouse gas emissions, it cannot negotiate an emissions treaty with China or India, and in

22   some circumstances the exercise of its police powers to reduce in-state motor-vehicle emissions

23   might well be pre-empted."  127 S. Ct. at 1454.  The "sovereign prerogatives" necessary to address

24

---

25   [18] *See* 15 U.S.C. § 2938(b)(1) (research findings to be provided to EPA so it can develop "a
coordinated *national* policy on global climate change") (emphasis added); 42 U.S.C. § 13389(c)(1)

26   (calling for a "*national* strategy to promote the deployment and commercialization" of technologies
to reduce greenhouse gas intensity) (emphasis added); 151 Cong. Rec. S7033, S7033 (daily ed. June

27   22, 2005) (resolution calling for "comprehensive and effective *national* program" that "will not
significantly harm the United States economy" and "will encourage comparable action by other

28   nations") (emphasis added).

---

33

the problem "are now lodged in the *Federal Government*." *Id*. (emphasis added).  Absent explicit

authorization from Congress, state tort law cannot redress a global phenomenon that affects billions

of people and can be resolved only through coordinated national and international measures.[19]

**B.    Plaintiffs' State-Law Claims Conflict With And Impermissibly Undermine The Nation's Foreign Policy Approach To Global Climate Change.**

Plaintiffs' state-law nuisance claim is also preempted because it would undermine the

nation's foreign policy approach to global climate change.  As discussed above, *see* § I.C., *supra*,

federal policy seeks *multilateral* reductions, *see, e.g.,*, Pub. L. No. 100-204, tit. XI, § 1102(5), 101

Stat. at 1408 (codified at 15 U.S.C. § 2901 note) (any response to global climate change "will

require vigorous efforts to achieve international cooperation"), in order to ensure that U.S.

businesses and consumers are not subjected to significant costs with no corresponding benefit if

other nations let their emissions significantly increase.  *See Control of Emissions*, 68 Fed. Reg. at

52931; H.R. Rep. No. 102-474, pt. I, at 152, *reprinted in* 1992 U.S.C.C.A.N. at 1975 (requiring

"dramatic and possibly higher cost [responses to global warming] . . . *only in the context of*

*concerted international action*") (emphasis added).  And the President believes the prospect of

mandatory U.S. emissions limits is a bargaining chip to be offered in exchange for limits by others.

State tort actions interfere with each aspect of this policy.  The coercive impact of the

massive damages award plaintiffs seek is designed to compel the adoption of *unilateral* emission

standards.  This gives the President "less to offer" other countries, and thus "less . . . diplomatic

leverage," than Congress intended.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 377

(2000).  And it creates precisely the risk of significant costs without corresponding benefits that

federal policy seeks to avoid.  Plaintiffs' state-law claims thus "'stand[] as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress,'" *id*. at 373 (quoting

*Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)), and are therefore preempted.

---

[19] A State cannot use its tort law to govern out-of-state conduct.  *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 585 (1996) (no state may use tort system "as a means of imposing its regulatory policies on the entire Nation").

## VI.    PLAINTIFFS CANNOT STATE VALID STATE-LAW CLAIMS.

Plaintiffs' state-law claims must also be dismissed because they cannot establish essential elements of a nuisance, including breach of a cognizable duty, proximate causation, and unique injury.  They have also failed to state any viable concert-of-action theory.

### A.    Plaintiffs Cannot State Valid Nuisance Claims.

No matter which state law applies, a nuisance claim is a type of tort.  *See* Restatement (Second) of Torts § 822 cmt. a (nuisance is a form of tort liability); *see also Tint v. Sanborn*, 211 Cal. App. 3d 1225, 1233 n.1 (1989) ("nuisance is an older tort than negligence") (quotation marks omitted); *Parks Hiway Enters. LLC v. CEM Leasing, Inc.*, 995 P.2d 657, 667 (Alaska 2000).[20]  Thus, as with other torts, proximate causation and duty are essential elements of a nuisance claim.  *See Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 706 (9th Cir. 2001) (dismissing common law claims, including nuisance, for lack of proximate cause); *DeNardo v. Corneloup*, 163 P.3d 956, 961 (Alaska 2007) (nuisance liability requires breaching a duty of care);

---

[20] Plaintiffs have failed to specify the state law under which they are suing, which is itself a reason to dismiss the complaint.  *See*, *e.g.*, *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1101 (N.D. Cal. 2007) (dismissing complaint because "ability to plead a claim for unjust enrichment may vary from state to state, and unless and until . . . Plaintiff clarifies under what state law it is moving, neither Defendants nor the Court can address whether the claim or claims have been adequately plead"); *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-cv-1819, 2008 WL 426522 (N.D. Cal. Feb. 14, 2008).  Here, the complaint premises liability for alleged real property injuries in Alaska based on the release of carbon dioxide incident to defendants' operation of power electric generation facilities in many other States.  This case thus gives rise to difficult choice-of-law issues.  Indeed, although atmospheric carbon dioxide is not a noxious compound traceable to these defendants, the Court could have to grapple with the laws of at least 33 different States, depending on how those choice-of-law issues are resolved.  *Cf. Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 487 (1987) (holding that state-law claim concerning interstate water pollution subject to the federal Clean Water Act and originating from a single, identifiable point source is governed by the law of the State in which the source is located); *North Carolina ex rel. Cooper v. TVA*, --- F. Supp. 2d ---, 2008 WL 553240, at *3 (W.D.N.C. Feb. 27, 2008) (similar under Clean Air Act).  The potential for these claims to become an intractable morass under the laws of so many different States reflects the overarching difficulty discussed above—that the national and international issues of high policy at the heart of this suit are not well-suited to judicial, as opposed to legislative, resolution.  In any event, defendants reserve the right to raise choice-of-law issues at a later stage but, for purposes of this motion, limit their arguments to certain core legal requirements identified by the Restatement and followed in most States, including California and Alaska.  Should any part of this action continue past this initial motion to dismiss, the complex choice-of-law issues inherent in plaintiffs' claims will have to be addressed.

---

1   *Martinez v. Pac. Bell*, 225 Cal. App. 3d 1557, 1565-66 (1990) (nuisance liability extends only to

2   damage proximately caused by defendant's conduct); 58 Am. Jur. 2d *Nuisance* § 9 (2002). Plaintiffs

3   cannot establish either of these essential elements.[21]  Their complaint also fails to establish the basic

4   elements of nuisance as set forth in the Restatement, such as the requirement of a unique injury.

### 1.   Plaintiffs cannot establish a duty.

6   There is no cognizable duty, under any State's law, to limit the emission of carbon dioxide

7   during the legal production of electricity so as to avoid contributing to the phenomenon of global

8   warming and the alleged melting of the Arctic sea ice abutting the shores of Alaskan coastal villages.

9   Plaintiffs in other global warming cases have invoked the principle that a party can be liable for

10  contributing to a nuisance even where the contribution is "relatively slight" and "by itself would not

11  be . . . unreasonable."  Restatement (Second) of Torts § 840E cmt. b.  *See* note 5, *supra*.  But, as

12  discussed above, *see* § I.A., *supra*, this standard cannot apply in the case of global warming.

13  The reasons are straightforward.  In determining whether a defendant owes a duty of care to a

14  plaintiff, courts assess the following factors:  (1) foreseeability of harm to the plaintiff; (2) degree of

15  certainty that the plaintiff suffered injury; (3) closeness of the connection between the defendant's

16  conduct and the injury suffered; (4) moral blame attached to the defendant's conduct; (5) policy of

17  preventing future harm; (6) extent of the burden to the defendant and consequences to the

18  community of imposing a duty to exercise care with resulting liability for breach; and (7)

19  availability, cost, and prevalence of insurance for the risk involved.  *See e.g., Rowland v. Christian*,

20  69 Cal. 2d 108, 112-13 (1968); *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555

21  (Alaska 1981).  Many of the same factors that preclude adjudication of this lawsuit under the

22  political question and standing doctrines likewise prevent this Court from resolving the subsidiary

23  issues necessary to find that defendants owed plaintiffs any duty to limit their carbon dioxide

24  emissions.

---

26  [21] Questions of duty and proximate cause are both questions of law for a court to decide.  *See*
    *DeNardo*, 163 P.3d at 961 (whether there is a duty of care is a question of law); *Weirum v. RKO*
27  *Gen., Inc.*, 15 Cal. 3d 40, 46 (1975) (same); *Benefiel v. Exxon Corp.*, 959 F.2d 805, 808 (9th Cir.
    1992) ("where causation cannot reasonably be established under the facts alleged by a plaintiff, the
28  question of proximate cause is one for the court" under both federal and California law).

1   At the threshold, the remoteness of plaintiffs' alleged harm in northwest Alaska from

2   defendants' conduct in other States, and the many intervening forces that coalesced to cause their

3   alleged injuries—including the myriad other emissions of greenhouse gases, the timing and extent of

4   ice barrier formations, the frequency and extent of winter storms, and the erosion of plaintiffs'

5   coastal property—foreclose any findings that plaintiffs' alleged injuries were a foreseeable result or

6   sufficiently connected to defendants' lawful generation of electricity.  Nor can the Court assign

7   "moral blame" to these defendants without making the numerous and fundamental policy judgments

8   that necessarily underlie any determination that certain levels of carbon dioxide emissions by

9   electricity providers are unreasonable.  These are the very policy judgments that render plaintiffs'

10  claims nonjusticiable.

11  Finally, questions inherent in articulating and implementing the duty that plaintiffs ask this

12  Court to create demonstrate that any such duty is unworkable.  Not only would the Court have to

13  determine permissible levels emissions of carbon dioxide to define the duty, but it would also have

14  to determine who is subject to the duty and to whom the duty is owed.  Because of the very nature of

15  global warming as set forth in the complaint, *everyone* in the world contributes to it and *everyone* in

16  the world is affected by it.  Imposing tort duties in a case such as this either would mean everyone is

17  liable to everyone else, or would require drawing lines limiting which contributors should be liable

18  and which affected parties can recover, once again immersing the Court in the very policy judgments

19  that are exclusively the province of the political branches.  *See* § I.C *supra*.  Thus, in addition to

20  demonstrating that this case raises nonjusticiable political questions, these realities also establish that

21  plaintiffs cannot show a breach of any legally cognizable duty.[22]

22  ### 2.    Plaintiffs cannot establish proximate causation.

23  Where injuries are too remote from the alleged wrongful conduct, a plaintiff cannot establish

24  proximate causation.  *See In re Exxon Valdez,* 270 F.3d 1215, 1253 (9th Cir. 2001) ("the requirement

---

[22] This is particularly true given that District Courts have been directed to reject unprecedented and novel legal theories when applying state law.  *See Young v. Aeroil Prods. Co.*, 248 F.2d 185, 188 (9th Cir. 1957) (when interpreting California law, "Our task is not to innovate, but to imitate"); *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1484 (9th Cir. 1984) (same); *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 363 (S.D.N.Y. 2005) (federal courts should not adopt novel legal theories when applying state law).

1   of proximate cause bars remote and speculative claims."); *Benefiel v. Exxon Corp.*, 959 F.2d 805,

2   807 (9th Cir. 1992) (affirming dismissal where alleged injuries were "remote and derivative" and

3   defendants' conduct "did not directly cause any injury"); *see also Ass'n of Wash. Pub. Hosp. Dists.*,

4   241 F.3d at 706.  Proximate cause refers generally to "'the judicial tools used to limit a person's

5   responsibility for the consequences of that person's own acts.'"  *Or. Laborers-Employers Health &*

6   *Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999).  Among those tools is

7   the requirement that there be some "direct relationship between the injury and the alleged

8   wrongdoing." *Id.* (citing *Holmes,* 503 U.S. 258, 269 (1992)).  The requirements of proximate cause

9   and direct injury clearly apply to nuisance claims.  *See Ass'n of Wash. Pub. Hosp. Dists.*, 241 F.3d at

10  706 (affirming dismissal of common law claims including nuisance for lack of proximate cause);

11  Restatement (Second) Torts § 834 cmt. d ("When a person is only one of several persons

12  participating in carrying on an activity, his participation must be substantial before he can be held

13  liable for the harm resulting from it.  This is true because to be a legal cause of harm a person's

14  conduct must be a substantial factor in bringing it about."); *id.* § 431.  Thus, if a plaintiffs' injuries

15  are too remote from the alleged wrongful conduct, courts will not find nuisance liability.

16          Injuries are too remote if they can be connected to the alleged wrongful conduct only by

17  multiple links in an attenuated chain of causation.  *Benefiel*, 959 F.2d at 807 (referring to "uniformly

18  accepted principles of tort law which require a plaintiff to prove more than that the defendant's

19  action triggered a series of other events that led to the alleged injury").  As Prosser & Keeton

20  explain:

21              [T]he consequences of an act go forward to eternity, and the causes of
             an event go back to the dawn of human events, and beyond.  But any
22           attempt to impose responsibility upon such a basis would result in
             infinite liability for all wrongful acts, and would set society on edge
23           and fill the courts with endless litigation.

24  W. Page Keeton, *Prosser & Keeton on Torts*, § 41, at 264 (5th ed. 1984) (quotation marks omitted).

25  Consequently, plaintiffs cannot recover if there are simply too many links in the causal chain

26  between the alleged wrongdoing and injury; if the chain of causation is too attenuated, courts will

27  hold that the alleged injuries are, as a matter of law, too indirect to permit recovery.  Just as the

28  highly attenuated causal chain necessary to link plaintiffs' alleged injuries to defendants' conduct

1   precludes a finding of Article III standing, *see* § II.B, that same causal chain is too lengthy to permit

2   a finding of proximate cause.

3          The Restatement confirms that plaintiffs' alleged injuries are too remote here.  The

4   Restatement recognizes that proximate cause requires a showing that a defendant's conduct was a

5   "substantial" factor in bringing about the alleged harm.  Restatement (Second) of Torts § 431.

6   "Whether conduct is a 'substantial factor in bringing about harm' depends in part on whether 'the

7   actor's conduct . . . has created a situation harmless unless acted upon by other forces for which the

8   actor is not responsible.'"  *Benefiel*, 959 F.2d at 807 (omission in original) (quoting Restatement

9   (Second) of Torts § 433(b)).  Here, defendants' emissions are harmless in and of themselves, and

10  plaintiffs' injuries allegedly arose only because of the aggregated effects of innumerable emissions

11  from around the world and over the course of centuries—an aggregation for which defendants are

12  not responsible.  Because plaintiffs cannot establish proximate causation, their state nuisance claim

13  should be dismissed.

14                **3.**       **Plaintiffs do not allege a unique injury.**

15         Plaintiffs' nuisance claim also fails because they have not alleged that they suffered a unique

16  injury—a requirement for a private plaintiff bringing a public nuisance claim.  To recover damages

17  in an individual action for public nuisance, plaintiffs must have suffered harm of a different kind

18  from that suffered by other persons exercising "the right common to the general public that was the

19  subject of interference."  Restatement (Second) of Torts § 821C(1); *see also In re Burbank Envtl.*

20  *Litig.*, 42 F. Supp. 2d 976, 984 (C.D. Cal. 1998) ("To state a claim for public nuisance, a private

21  citizen must allege injuries different in kind than injuries to the general public.").

22         The injuries plaintiffs allege (erosion, flooding, etc.) are not unique to Kivalina, but,

23  according to plaintiffs, are common to native Alaskan coastal villages.[23]  *See* GAO Report at 2-3

24

---

25  [23] Numerous cases addressing the special injury issue demonstrate that it is appropriate to consider a specific community, such as similarly-situated Alaskan villages, rather than a larger population, such

26  as all of Alaska or even all of the United States, as the "public" at issue.  *See, e.g., Koll-Irvine Ctr. Prop. Owners Assoc. v. County of Orange*, 24 Cal. App. 4th 1036, 1041 (1994) (affirming dismissal

27  of nuisance claims where, plaintiffs, property owners near an airport with allegedly hazardous fuel tanks, did not allege a unique injury because their injuries were the same as those suffered by "all the

28  homes and businesses in the area of the airport."); *532 Madison Ave. Gourmet Foods, Inc. v.*

*(Footnote continued)*

("184 of 213 or 86.4 percent of Alaska Native villages experience some level of flooding and

erosion"), *cited in* Compl. ¶¶ 185, 186.  An argument that erosion or flooding at Kivalina is more

extreme or is occurring at a faster rate than in other Alaskan villages will not save plaintiffs' claim:

they must show a harm different in *kind*.  Differences in *degree* are not sufficient to establish special

injury.  Restatement (Second) Torts § 821C cmt. b; *see also In re Exxon Valdez*, No. A89-0095-CV

(HRH), 1994 WL 182856, at *2 (D. Alaska Mar. 23, 1994) ("The Alaska Natives do not have a

viable, maritime, public nuisance claim, as their claim is only different in degree, but not in kind,

from that suffered by the general population of Alaska").  Because plaintiffs have not alleged a

special injury that is different in both kind and degree from that suffered by others exercising the

same public right, they cannot make out a claim for public nuisance.[24]

### B.    Plaintiffs' Concert-of-Action Claim Fails As A Matter Of Law.

Plaintiffs' concert-of-action claim also must be dismissed.  That claim is dependent on the

underlying substantive tort and thus must be dismissed once the nuisance claim is dismissed.  The

complaint in any event falls well short of alleging a viable concert-of-action theory.

---

*Finlandia Ctr., Inc.*, 750 N.E.2d 1097, 1105 (N.Y. 2001) (affirming dismissal of nuisance claim due to lack of unique injury by plaintiffs whose businesses lost money during street closures caused by a construction accident because "every person who maintained a business, profession or residence in the heavily populated areas of Times Square and Madison Avenue was exposed to similar economic loss during the closure periods").

[24] If this case were to proceed to a point where the Court must engage in a choice-of-law analysis, *see*, n.20, *supra*, there will likely be other nuisance-specific arguments that bar plaintiffs' claims. For example, many jurisdictions, including Alaska, require that a plaintiff allege that the defendants controlled the nuisance.  *See, e.g., Parks Hiway*, 995 P.2d at 666 ("'liability for damage caused by a nuisance turns on whether the defendants were in control over the instrumentality alleged to constitute the nuisance'").  In this case, defendants control, at most, the source of their own emissions.  But emissions alone are not the nuisance plaintiffs allege.  Instead, the alleged nuisance is the global warming allegedly caused by the *accumulation* of countless emissions from around the world over the course of decades and even centuries, and the loss of Arctic sea ice allegedly caused by global warming.  *See* Compl. ¶ 185 ("[r]ising temperatures caused by global warming have affected the thickness, extent and duration of sea ice that forms along Kivalina's coast.  Loss of sea ice . . . leaves Kivalina's coast more vulnerable to waves, storm surges and erosion.  Storms now routinely batter Kivalina and are destroying its property to the point that Kivalina must relocate or face extermination.").  But neither loss of Arctic Sea ice, nor the climate change that allegedly leads to such loss, is within defendants' control.

1

### 1.    Concert of action is not an independent tort.

2          Properly understood, concert of action merely describes two theories of secondary liability—

3    conspiracy and aiding and abetting.  *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

4    Concert of action thus is not an independent tort.  It is, at most, a basis for imposing liability on

5    someone other than the primary tortfeasor.  *See E. Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623 (7th

6    Cir. 2000) ("there is no tort of aiding and abetting"; rather, it is "a basis for imposing [tort]

7    liability"); *Halberstam*, 705 F.2d at 479 ("Since liability for civil conspiracy depends on

8    performance of some underlying tortious act, the conspiracy is not independently actionable; rather,

9    it is a means for establishing vicarious liability for the underlying tort."); *Cadlo v. Owens-Illinois,

10   Inc.*, 125 Cal. App. 4th 513, 521 (2004) ("Concert of action is a theory of group liability.").

11         Because plaintiffs cannot assert an actionable, underlying tort, their concert-of-action claim

12   cannot survive.  *See, e.g., Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1114 (C.D. Cal. 2002)

13   (dismissing aiding-and-abetting claim where complaint failed to establish an underlying tort); *In re

14   Lupron Mktg. & Sales Practices Litig.*, No. 01-cv-10861, 2004 WL 2070883, at *5 (D. Mass. Sept.

15   16, 2004) (same result following dismissal or waiver of underlying tort claims); *FDIC v. S. Prawer

16   & Co.*, 829 F. Supp. 453, 457 (D. Me. 1993) (same result because plaintiff had "not alleged an

17   independent tort to which aiding and abetting liability c[ould] attach").  "The unifying principle

18   under either . . . civil conspiracy or aiding and abetting[] is that . . . liability depends upon the actual

19   commission of a tort."  *Richard B. LeVine, Inc. v. Higashi*, 131 Cal. App. 4th 566, 574 ( 2005).

20   ### 2.    The complaint does not properly plead concert of action.

21         In any event, plaintiffs have failed to plead a proper concert-of-action claim.  Section 876 of

22   the Restatement divides concert of action into three clauses.  Restatement (Second) of Torts § 876, at

23   315.  Clause (a) addresses actions undertaken "pursuant to a common design," which most courts

24   treat as equivalent to civil conspiracy.  *See, e.g., Halberstam*, 705 F.2d at 477.  Clauses (b) and (c)

25   address actions that, among other requirements, provide "substantial assistance" to otherwise

26   tortious activities, which courts treat as equivalent to civil aiding and abetting.  *See, e.g., Wynn*, 234

27

28

1    F. Supp. 2d at 1114.  Even if one assumes that those theories could be asserted under relevant law,[25]

2    the complaint falls short of establishing either one.

3          A boilerplate recitation of the elements identified by the Restatement is not sufficient.  Rule 8

4    of the Federal Rules of Civil Procedure requires "more than labels and conclusions, and a formulaic

5    recitation of the elements of a cause of action." *Twombly*, 127 S. Ct. at 1964-65.  To avoid

6    dismissal, the complaint must allege facts sufficient "to raise a right to relief above the speculative

7    level." *Id.* at 1965; *see id.* at 1966 (holding that "an allegation of parallel conduct and a bare

8    assertion of conspiracy will not suffice" to allege a § 1 claim under the Sherman Act); *see also*

9    *Impac Warehouse Lending Group v. Credit Suisse First Boston, LLC*, No. 06-56024, 2008 WL

10   731050, at *1 (9th Cir. Mar. 17, 2008) (in light of *Twombly*, allegations that defendants

11   "'knowingly, and willfully agreed and conspired'" to engage in fraud, without any "facts supporting

12   the existence of an agreement," were insufficient to state a claim for conspiracy under Rule 8(a)

13   notice pleading standards).

14         Plaintiffs offer precisely the sort of "formulaic recitation" that *Twombly* forbids.  Their

15   concert-of-action allegations simply parrot, nearly verbatim, § 876 of the Restatement without any

16   supporting factual allegations.  *Compare* Compl. ¶¶ 279-282, *with* Restatement (Second) of Torts

17   § 876.  The complaint thus offers *no facts* to suggest that defendants had a "tacit understanding" or a

18   "common plan" to accomplish a tortious result—as § 876(a) requires.  *See, e.g.*, *Sindell v. Abbott*

19   *Labs.*, 607 P.2d 924, 932 (Cal. 1980); *Pittman by Pittman v. Grayson*, 149 F.3d 111, 122-23 (2d Cir.

20   1998).[26]   Nor does it identify how any defendant "'substantially assisted'" any other defendant's

21   ────────────────

22   [25] With respect to the federal claims, there is some doubt that a "substantial assistance" concert-of-
23   action claim—*i.e.*, aiding and abetting—can be asserted at all.  The Supreme Court has described
that doctrine as "at best uncertain in application . . . . [T]he leading cases applying this doctrine are
24   statutory securities cases, with the common-law precedents 'largely confined to isolated acts of
adolescents in rural society.'"  *Cent. Bank of Denver*, 511 U.S. at 181 (citing *Halberstam*, 705 F.2d
25   at 489).  The actions of defendants here fall into neither category.  With respect to the state-law
claims, plaintiffs have not identified which State's law would apply, but their concert-of-action
26   allegations do not meet the minimal requirements that would be applied by any State.

27   [26] Plaintiffs do allege in their Third Claim for Relief that *certain* defendants engaged in a civil
conspiracy "to mislead the public with respect to the science of global warming and to delay public
28   awareness of the issue," Compl. ¶ 269, by, for example, "funding and use of 'global warming

                                                                  *(Footnote continued)*

1   tortious conduct as required by § 876(b) and (c).  *See, e.g., Chance World Trading, E.C. v. Heritage*

2   *Bank of Commerce*, 438 F. Supp. 2d 1081, 1084 (N.D. Cal. 2005), *aff'd*, 263 F. App'x 630 (9th Cir.

3   2008).  The complaint is bereft of any allegation of even a *single active step* by any one defendant to

4   facilitate another defendant's emissions.  Mere knowledge of another's conduct (and failure to

5   prevent it) cannot establish concert of action.  *See, e.g., Davidson v. City of Westminster*, 649 P.2d

6   894, 897 (Cal. 1982); *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1326 (1996); *Ellison v. Plumbers &*

7   *Steamfitters Union Local 325*, 118 P.3d 1070, 1077-78 (Alaska 2005).  And "'parallel or imitative'"

8   conduct is likewise insufficient.  *See In re Related Asbestos Cases*, 543 F. Supp. 1152, 1159 (N.D.

9   Cal. 1982).

10      Even before *Twombly*, courts regularly dismissed concert-of-action claims where the

11   complaint, like the one here, merely transcribed the Restatement but alleged no facts supporting the

12   elements.  In *Wynn*, 234 F. Supp. 2d at 1115, for example, the plaintiff had failed to allege that a

13   particular defendant had "acted in any specific way to aid" any other identified person in

14   perpetrating the tort.  Because of that omission, the concert-of-action claim "fail[ed] to provide" the

15   defendants with "adequate notice of the alleged wrongdoing" that Rule 8 requires.  *Id.*; *see In re*

16   *Textainer P'ship Sec. Litig.*, No. C-05-0969, 2005 WL 3801596, at *16 (N.D. Cal. Dec. 12, 2005)

17   (dismissing for failure to allege "facts to support an inference" of "knowledge" or substantial

18   assistance); *Scognamillo v. Credit Suisse First Boston LLC*, No. C03-2061, 2005 WL 2045807, at *5

19   (N.D. Cal. Aug. 25, 2005) (similar), *aff'd*, 254 F. App'x 669 (9th Cir. 2007); *Shulz v. Neovi Data*

20   *Corp.*, 152 Cal. App. 4th 86, 97 (2007) (failure to allege "facts showing 'substantial assistance or

21   encouragement'"); *Cadlo*, 125 Cal. App. 4th at 522 (similar).  For the same reasons, the concert-of-

22   allegations are inadequate and dismissal is likewise required here.

### CONCLUSION

24      For all of the foregoing reasons, plaintiffs' federal claim and their state-law nuisance and

25   concert-of-action claims should be dismissed with prejudice.

---

28   skeptics." *Id.* ¶ 191.  But, based on the language in the complaint itself, we presume that the Fourth
Claim for relief, which implicates *all* defendants, is not an expansion of that earlier claim.

1    Dated:  June 30, 2008                    Respectfully submitted,

2                                             SIDLEY AUSTIN LLP

3

4                                             By:  /s/Samuel R. Miller
5                                                      Samuel R. Miller

6                                             Attorneys for Defendants
                                              AMERICAN ELECTRIC POWER
7                                             COMPANY AND DUKE ENERGY
                                              CORPORATION
8

9
     JONES DAY                                GREENBERG TRAURIG LLP
10

11
        By:  _____/s/_____                     By:  _____/s/_____
12              Kevin P. Holewinski                      Richard K. Welsh

13   Attorneys for Defendant                  Attorneys for Defendant
     XCEL ENERGY INC.                         THE AES CORPORATION
14

15

16   HUNTON & WILLIAMS LLP                    BAKER BOTTS LLP

17

18
        By:  _____/s/_____                     By:  _____/s/_____
19              Belynda B. Reck                          Jeffrey A. Lamken

20   Attorneys for Defendants                 Attorneys for Defendants
     DTE ENERGY COMPANY, EDISON               DYNEGY HOLDINGS INC. AND RELIANT
21   INTERNATIONAL, MIDAMERICAN               ENERGY, INC.
     ENERGY HOLDINGS COMPANY,
22   PINNACLE WEST CAPITAL CORP., AND
     THE SOUTHERN COMPANY
23

24

25

26

27

28

                                        44

1

## ATTESTATION OF SIGNATURE
### (N.D. Cal. General Order 45)

2

3    I, Samuel R. Miller, hereby attest that concurrence in the filing of **UTILITY**

4 **DEFENDANTS' MOTION TO DISMISS** has been obtained from all of the signatories.

5

6 Dated: June 30, 2008                                  SIDLEY AUSTIN LLP

7

8                                                        By: /s/ Samuel R. Miller

9

10                                                       Attorneys for Defendants
                                                         AMERICAN ELECTRIC POWER
11                                                       COMPANY AND DUKE ENERGY
                                                         CORPORATION
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

1            UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF MISSISSIPPI
2                  SOUTHERN DIVISION

3

4   NED COMER, ET AL                          PLAINTIFFS

5   V.                    CIVIL ACTION NO: 1:05CV436-LG-RHW

6   MURPHY OIL, U.S.A., ET AL                 DEFENDANTS

7

8   **TRANSCRIPT OF HEARING ON DEFENDANTS' MOTIONS TO DISMISS**

9

10         BEFORE HONORABLE LOUIS GUIROLA, JR.
              UNITED STATES DISTRICT JUDGE

11

12

13                  AUGUST 30, 2007
               GULFPORT, MISSISSIPPI

14

15

16

17  COURT REPORTER:

18  TERI B. NORTON, RMR, FCRR
    2012 15TH STREET, SUITE 814
19  GULFPORT, MISSISSIPPI  39501
    (228) 563-1740
20

21

22

23

24

25

```
1     APPEARANCES:

2     REPRESENTING THE PLAINTIFFS:

3              F. GERALD MAPLES, ESQUIRE
               ALEXANDER J. WILLIAMSON, ESQUIRE
4              CARLOS A. ZELAYA, ESQUIRE
               STEPHEN M. WILES, ESQUIRE
5              F. GERALD MAPLES, PA
               902 JULIA STREET
6              NEW ORLEANS, LOUISIANA  70113

7
      REPRESENTING THE DEFENDANTS:
8
               SCOTT L. WINKELMAN, ESQUIRE
9              KATHLEEN TAYLOR SOOY, ESQUIRE
               TRACY A. ROMAN, ESQUIRE
10             CROWELL & MORING
               1001 PENNSYLVANIA AVENUE, N.W.
11             WASHINGTON, DC  20004-2595

12             ROBERT D. GHOLSON, ESQUIRE
               BURR & FORMAN
13             THE HERITAGE BUILDING
               401 EAST CAPITOL STREET, SUITE 100
14             JACKSON, MISSISSIPPI  39201

15

16

17

18

19

20

21

22

23

24

25
```

1          **THE COURT:**  The matter scheduled this morning is in

2     cause number 1:05cv436.  The case is styled Ned Comer, et al

3     versus Murphy Oil U.S.A., et al.  This matter is scheduled for

4     an oral argument hearing on a series of motions to dismiss upon

5     which the Court today will concentrate or will hear argument

6     regarding one issue and one issue only, and that is the

7     question of whether or not this Court has the jurisdiction over

8     the claims made by the plaintiffs.  In particular I have asked

9     the attorneys to focus on the issue of standing and political

10    question.  I am given to understand that on behalf of the

11    plaintiffs that Mr. Maples, Gerald Maples, you will be speaking

12    on behalf of the plaintiffs?  Is that correct?

13         **MR. MAPLES:**  Yes, sir.

14         **THE COURT:**  And Mr. Winkelman, you will be speaking

15    on behalf of the defendants?

16         **MR. WINKELMAN:**  Yes, Your Honor.

17         **THE COURT:**  I think it would be helpful to the court

18    reporter, and it would be helpful to me as well, if we went

19    around the room, starting with you, Mr. Maples, and if we went

20    around and you would all identify yourselves and identify who

21    you represent.

22         **MR. MAPLES:**  Gerald Maples for the plaintiffs.

23         **MR. WILLIAMSON:**  Alex Williamson on behalf of the

24    plaintiffs.

25         **MR. WILES:**  Stephen Wiles representing the

1    into and entered his house.  So if all we did is look at those

2    labels, what the Supreme Court would have found in 1849 was no

3    political question.  It found the opposite because it turned

4    out that the breakers and enterers said they were authorized to

5    do so because they were the lawful agents of the properly

6    constituted government of Rhode Island at a time of martial

7    law, a fairly important detail.  And what the Supreme Court

8    decided was that to resolve this seemingly simple trespass case

9    about only damages, it would have to decide issues that only

10   the Congress can decide.  So there is plenty of precedent, Your

11   Honor, for my earlier point that, unfortunately, semantic

12   cataloguing, the quote from the Supreme Court, doesn't work.

13   It doesn't much matter what the labels are in the complaint.

14   What matters is, what are the issues that have to be

15   adjudicated.  Thank you, Judge.

16        **THE COURT:**  Thank you, Mr. Winkelman.  I will take a

17   short recess, and when I return, I will tell you where we are

18   going to go.  Thank you.

19        (RECESS TAKEN AT 10:06 A.M. UNTIL 10:32 A.M.)

20        **THE COURT:**  Thank you.  Please be seated.  One of the

21   questions that I pondered with some of the staff attorneys

22   during the recess was just why weren't the plaintiffs able to

23   find a nondiverse party.  Having failed in that responsibility,

24   the Court will here give it its best shot.

25        I have struggled because it is very easy to be inclined to

1    want to, quote-unquote, do the right thing at all times.  And

2    you have got to weigh that, balance that, with the authority

3    that you have under Article III and the responsibility you have

4    to follow the law, or in this case the absence of law.

5        While the plaintiffs argue that this is not a case about

6    global warming, it really is.  It is a case wherein the

7    plaintiffs have rung a bell that should not come as a surprise

8    to many of us, anyone who reads the newspaper or watches the

9    television, anyone who is aware of the science and has taken

10   any time at all to do some independent research.

11       Let me point out that it is very apparent, Mr. Maples,

12   while you make your arguments that you and in all likelihood

13   those that sit with you on that side of the courtroom are

14   passionate about this issue, and you have a right to be

15   passionate about it.  I think it would be unwise for any of us

16   as citizens of this planet to ignore the science and to ignore

17   the signs, if you will, of what we are doing to our planet and

18   what we are doing to our environment, what we are doing to our

19   atmosphere, and what legacy we will hand down to our children

20   and grandchildren.  As an individual, I am concerned about

21   that, but as a judge of this court, I don't have the luxury of

22   being an individual.  I have the responsibility to administer

23   the law.

24       In this case it seems apparent to the Court, based upon

25   the arguments of counsel and based upon the very

1   well-articulated arguments that you have made in your brief,

2   that this Court does not have standing to adjudicate these

3   issues.  These are not injuries which are fairly attributable

4   to these individual defendants.  And while plaintiffs have

5   argued that we are not -- I am gratified to know I am not a

6   co-defendant, but I am a responsible person, as all of us are

7   responsible for the emission of $CO_2$ and ultimately greenhouse

8   gases which cause global warming.  We are all responsible for

9   that.  But I do not think that under our system of

10  jurisprudence that is attributable or traceable to these

11  individual defendants but is instead or are instead injuries

12  which are attributable to a larger group that are not before

13  this Court, not only within this nation but outside of our

14  jurisdictional boundaries as well.  In the opinion of the

15  Court, these plaintiffs do not have standing and this Court

16  does not have justiciable issues before it.

17      Alternatively, and I think I am going to speak briefly

18  about the political question issue because it is somewhat

19  intertwined with the standing question, that question of

20  whether or not this is a political question.  I have done some

21  independent research that you may not find in the law books

22  that tends to underscore, if you will, the realization that the

23  problem is one in which this Court is simply ill-equipped or

24  unequipped with the power that it has to address these issues.

25  For example, I am sure that many of you here know that

1   effective as of January of 2007 that the State of California

2   has enacted its own Global Warming Solutions Act of 2006.  This

3   particular act in California requires the State Air Resources

4   Board there to adopt regulations that require reporting and

5   verification of statewide greenhouse gas emissions and to

6   monitor and to enforce compliance with these programs.  The act

7   also requires the board to determine what the statewide

8   greenhouse gas emissions levels were in 1990, and to establish

9   emissions limits that are equivalent to the 1990 levels by the

10  year 2020.  These are, of course, efforts taken on by the

11  California legislature.  Connecticut, Washington, Maine,

12  Vermont, New York, Pennsylvania, Rhode Island, Maryland, New

13  Jersey, Oregon, and Massachusetts have all enacted plans that

14  are similar to the California act.  I cite as an example, the

15  California and Maine acts have enacted what they call the

16  Climate Change Action Plan that establishes the goal of

17  reducing emissions to the 1990 levels by the year 2020.

18  Maryland has set limits on the amount of greenhouse gases that

19  can be emitted from facilities utilizing coal burning or fired

20  heat exchangers.  New Jersey has required enactment of

21  regulations requiring monitoring and reporting of greenhouse

22  gas emissions.  Georgia, Alaska, Colorado, Idaho, South

23  Carolina, and Florida have established advisory committees that

24  study the effect of global warming and determine measures that

25  can be taken to mitigate the problem.  Nebraska has established

1    a carbon sequestration advisory committee to conduct research

2    concerning agricultural advances that would reduce greenhouse

3    emissions.  The state of Iowa has enacted statutes that require

4    the Department of Natural Resources to establish voluntary

5    greenhouse gas inventory and registry, an energy independence

6    plan that would decrease reliance on foreign oil, and a climate

7    change advisory council.  New Hampshire has developed a

8    voluntary greenhouse gas emissions reduction registry as well.

9    And Virginia has adopted a Commonwealth Energy Policy that will

10   promote the generation of electricity through technologies that

11   do not contribute to greenhouse gases and global warming.  The

12   legislatures in Alabama, Illinois, Kentucky, Georgia, Oklahoma,

13   Wyoming, and West Virginia have all adopted statutes providing

14   the development of new regulatory programs intended to reduce

15   greenhouse gases and their emissions are premature absent some

16   Senate ratification of the Kyoto Protocol.  Of course, these

17   states fear that piecemeal uncoordinated regulations may be

18   inconsistent with subsequent determinations that are made by

19   our Congress, and the premature enactment of such regulations

20   would hurt the economy.  Georgia and Oklahoma have, of course,

21   developed voluntary reduction programs, and Illinois has

22   enacted the Clean Coal FutureGen Project for Illinois Act which

23   would develop carbon storage and capture plans for fossil fuel

24   energy and hydrogen-generating units.  The State of Illinois

25   has a goal of at least five percent of the state's energy

1    production -- use derived from renewable sources or forms of

2    energy by 2010, and at least 15 percent by 2020.

3         I bring this to your attention, and I think many of you

4    may already know some of these things, because I think, again,

5    that underscores the arena in which this debate needs to be

6    discussed.  It is a legitimate debate.  It is an important

7    debate, but it is a debate which simply has no place in the

8    court, until such time as Congress enacts legislation which

9    sets appropriate standards by which this Court can measure

10   conduct, whether it be reasonable or unreasonable, and, more

11   important, develops standards by which a group of people, we

12   call them juries, can adjudicate facts and apply the law, these

13   standards, and judge whether conduct crosses the line between

14   reasonable and legal conduct and unreasonable or tortious

15   conduct.  Under the circumstances, I think that the plaintiffs

16   are asking the Court to develop those standards, and it is

17   something that this Court simply is not empowered to do.

18        This is not a case such as *Massachusetts versus EPA* where

19   the State of Massachusetts simply wanted to require the

20   Environmental Protection Agency to, in essence, do its job.

21   This is not a case in which these defendants, for example, have

22   done some damage, some attributable damage to the wetlands or

23   to the floor of the wetlands, which, in essence, has made

24   damage as a result of hurricanes more likely.  Instead, this is

25   a case in which the plaintiffs directly ask this Court to

1    attribute fault to these defendants under standards that as of

2    yet do not exist.

3         It is clear from the complaint and clear from the

4    arguments here today that what you are asking this Court to do

5    is what *Baker versus Carr* told me not to do, and that is to

6    balance economic, environmental, foreign policy, and national

7    security interest and make an initial policy determination of a

8    kind which is clearly nonjudicial.  Adjudication of the

9    plaintiffs' claims in this case would necessitate the

10   formulation of standards dictating, for example, the amount of

11   greenhouse gas emissions that would be excessive and the

12   scientific and policy reasons behind those standards.  These

13   policy decisions are best left to the executive and to the

14   legislative branches of the government, who are not only in the

15   best position to make those decisions but are constitutionally

16   empowered to do so.

17        Finally, one practical note, and it became very apparent,

18   Mr. Maples, during your argument, that the preparation and the

19   discovery involved in a case of this magnitude will take a long

20   time and will cost both sides millions of dollars.  It seems to

21   me that it would be a much better course of action to take.

22   And, of course, I am convinced that I am right, but I could be

23   wrong, but if I am wrong, I can be corrected, and the Court of

24   Appeals will have no hesitation to correct me and send this

25   case back, at which time we will conduct the discovery

1    necessary to prepare it for trial.  If, on the other hand, I

2    were to take the other course, which I think would be

3    incorrect, and that is to permit the case to go forward and

4    rule against the defendants on the standing issue, I would be

5    inviting the prospect or the proposition that after spending

6    millions of dollars and countless hours, man-hours, in

7    preparation of the case, that it would be reviewed by an

8    appellate court that would conclude that it was not an issue

9    that was justiciable by the Court, and ultimately all our work

10   would be in vain.

11       The defendant's motion to dismiss is granted.  In addition

12   to that, the Court is sua sponte dismissing all of the

13   remaining defendants.  This will place this case in a

14   procedural posture in which all of the parties, plaintiffs and

15   defendants, can have this matter reviewed in the event that I

16   am in error.  I will enter that order today.  Anything else on

17   behalf of the movants or the defendants?  Any questions?

18           MR. WINKELMAN:  No, Your Honor.  Thank you.

19           THE COURT:  Mr. Maples, anything else on behalf of

20   the plaintiffs?  I guess, in essence, what I am saying, if I

21   have no standing as to these defendants, there is no standing

22   as to any of the defendants.

23           MR. MAPLES:  Your Honor, may I make one request?

24           THE COURT:  Yes.

25           MR. MAPLES:  Would you make clear which version of

1   the complaint is at issue?

2          **THE COURT:**  The fourth amended complaint.  The fourth

3   amended complaint is what is on file.

4          **UNKNOWN SPEAKER FROM AUDIENCE:**  The fourth amended

5   complaint is on file or the third amended complaint is on file?

6          **THE COURT:**  I'm sorry.  The third amended complaint

7   is on file.  There is leave to file a fourth amended complaint,

8   which, of course, is moot at this point.  The third amended

9   complaint is the one that is before this Court.

10         **MR. MAPLES:**  And there is no ruling on the fourth

11  amended complaint?

12         **THE COURT:**  In the event that I am in error and there

13  is standing, then I will consider whether or not an additional

14  amended complaint will be allowed.

15         **MR. MAPLES:**  Thank you, Your Honor.

16         **THE COURT:**  I'm sorry.  I took one step.  Of course,

17  all additional motions are rendered moot.  I will enter an

18  order accordingly.  If there is nothing else, we are adjourned.

19                    (HEARING CONCLUDED.)

20

21

22

23

24

25

1

2                       CERTIFICATE OF COURT REPORTER

3

4               I, Teri B. Norton, RMR, FCRR, Official Court

5      Reporter for the United States District Court for the Southern

6      District of Mississippi, appointed pursuant to the provisions

7      of Title 28, United States Code, Section 753, do hereby certify

8      that the foregoing is a correct transcript of the proceedings

9      reported by me using the stenotype reporting method in

10     conjunction with computer-aided transcription, and that same is

11     a true and correct transcript to the best of my ability and

12     understanding.

13              I further certify that the transcript fees and format

14     comply with those prescribed by the Court and the Judicial

15     Conference of the United States.

16

17

18

19                          _____
                            TERI B. NORTON, RMR, FCRR
20                          OFFICIAL COURT REPORTER

21

22

23

24

25

1  Samuel R. Miller (SBN 66871)
   srmiller@sidley.com
2  Paul L. Yanosy (SBN 233014)
   pyanosy@sidley.com
3  SIDLEY AUSTIN LLP
   555 California Street
4  San Francisco, California  94104
   Telephone:        (415) 772-1200
5  Facsimile:        (415) 772-7400

6  David T. Buente, Jr. (admitted *pro hac vice*)
   dbuente@sidley.com
7  Joseph R. Guerra (admitted *pro hac vice*)
   jguerra@sidley.com
8  SIDLEY AUSTIN LLP
   1501 K Street, N.W.
9  Washington, D.C. 20005
   Telephone:        (202) 736-8000
10 Facsimile:        (202) 736-8711

11

12 **Attorneys For Defendants**
   **AMERICAN ELECTRIC POWER COMPANY AND**
   **DUKE ENERGY CORP.**
13
   **[Counsel Listing Continued on Next Page]**
14
                    UNITED STATES DISTRICT COURT
15
                  NORTHERN DISTRICT OF CALIFORNIA
16
                         OAKLAND DIVISION
17

18 NATIVE VILLAGE OF KIVALINA and       )  Case No. 08-cv-1138-SBA
   CITY OF KIVALINA,                    )
19                                       )  Assigned to: Hon. Saundra B. Armstrong
                   Plaintiffs            )
20                                       )  **[PROPOSED] ORDER GRANTING**
                                         )  **UTILITY DEFENDANTS' MOTION TO**
21          vs.                          )  **DISMISS**
                                         )
22 EXXONMOBIL, CORPORATION,              )
                                         )  Date:     December 9, 2008
23                                       )  Time:     1:00 p.m.
                   Defendants            )  Place:    Courtroom 3, 3rd Floor
24 _____

25

26

27

28

---

[PROPOSED] ORDER GRANTING UTILITY DEFENDANTS' MOTION TO DISMISS
CASE NO. 08-cv-1138 SBA

THOMAS A. RECTOR (SBN 199173)
tarector@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: 415-626-3939
Facsimile: 415-875-5700

THOMAS E. FENNELL (*Pro hac vice*)
tefennell@jonesday.com
MICHAEL L. RICE (*Pro hac vice*))
mlrice@jonesday.com
JONES DAY
2727 N. Harwood Street
Dallas, TX 75201
Telephone: 214-220-3939
Facsimile: 214-969-5100

KEVIN P. HOLEWINSKI (*Pro hac vice*)
kpholewinski@jonesday.com
JONES DAY
41 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: 202-879-3939
Facsimile: 202-626-1700

**Attorneys for Defendant
XCEL ENERGY INC.**

JEFFREY A. LAMKEN (SBN 154217)
jeffrey.lamken@bakerbotts.com
JEREMY LEVIN (SBN 210577)
jeremy.levin@bakerbotts.com
BAKER BOTTS LLP
The Warner
1299 Pennsylvania Ave., N.W.
Washington D.C. 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

**Attorneys for Defendants
DYNEGY HOLDINGS INC. AND RELIANT
ENERGY, INC.**

F. WILLIAM BROWNELL (*Pro hac vice*)
bbrownell@hunton.com
NORMAN W. FICHTHORN (*Pro hac vice*)
nfichthorn@hunton.com
ALLISON D. WOOD (*Pro hac vice*)
awood@hunton.com
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
Telephone: (202) 955-1500
Facsimile: (202) 778-2201

SHAWN PATRICK REGAN (*Pro hac vice*)
sregan@hunton.com
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, NY 10166-0136
Telephone: (212) 309-1000
Facsimile: (212) 309-1100

BELYNDA B. RECK (SBN 163561)
breck@hunton.com
HUNTON & WILLIAMS LLP
550 South Hope Street, Suite 2000
Los Angeles, CA 90071-2627
Telephone: (213) 532-2000
Facsimile: (213) 532-2020

**Attorneys for Defendants
DTE ENERGY COMPANY, EDISON
INTERNATIONAL, MIDAMERICAN
ENERGY HOLDINGS COMPANY,
PINNACLE WEST CAPITAL CORP.,
AND THE SOUTHERN COMPANY**

RICHARD K. WELSH (SBN 208825)
welshr@gtlaw.com
SCOTT BERTZYK (SBN 116449)
bertzyks@gtlaw.com
FELIX LEBRON (SBN 232984)
lebronf@gtlaw.com
KAMRAN SALOUR (SBN 247983)
salourk@gtlaw.com
GREENBERG TRAURIG LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

**Attorneys for Defendant
The AES CORPORATION**

1       The Motion of the Utility Defendants[1] to Dismiss plaintiffs' claims, under Rules 12(b)(1) and

2   12(b)(6) of the Federal Rules of Civil Procedure, came on for hearing before this Court on December

3   9, 2008.  All parties were represented by counsel.

4       Having considered the moving and opposition papers and heard the oral arguments of

5   counsel, the Court HEREBY ORDERS that the Utility Defendants' Motion to Dismiss under Rules

6   12(b)(1) and 12(b)(6) is GRANTED; and Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

7       In considering a motion to dismiss under Rule 12(b)(1), this Court must determine whether it

8   has subject matter jurisdiction, and "may look beyond the complaint to matters of public record"

9   when making that determination.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  Under Rule

10   12(b)(6), this Court must dismiss "where there is no cognizable legal theory or an absence of

11   sufficient facts alleged to support a cognizable theory."  *Navarro v. Block*, 250 F.3d 729, 732 (9th

12   Cir. 2001).  While all allegations of fact must be taken as true and all reasonable inferences drawn in

13   favor of plaintiffs, the Court need not accept legal conclusions cast as factual allegations.  *Clegg v.*

14   *Cult Awareness Network,* 18 F.3d 752, 754-55 (9th Cir.1994).  And, while the Court generally may

15   not look beyond the complaint when ruling on a Rule 12(b)(6) motion, it may consider matters of

16   public record, such as formal pronouncements by agencies and officials.  *Barron v. Reich*, 13 F.3d

17   1370, 1377 (9th Cir. 1994).  These standards mandate dismissal of plaintiffs' claims.

18       This is the fourth lawsuit in which a group of plaintiffs has sued seeking judicial redress for

19   injuries allegedly caused by greenhouse gas emissions and global warming.  The three earlier

20   lawsuits were all dismissed on the pleadings because they inescapably required federal courts to

21   usurp the responsibilities of the political branches to decide fundamental questions concerning the

22   nation's economy, security, and foreign relations.[2]  This lawsuit is materially no different.

---

23   [1] For purposes of this order, the phrase "utility defendants" refers to American Electric Power

24   Company, DTE Energy Corporation, Duke Energy Corporation, Dynergy Holdings, Inc., Edison
    International, MidAmerican Energy Holdings Company, Pinnacle West Capital Corporation, Reliant

25   Energy, Inc., The AES Corporation, The Southern Company and Xcel Energy, Inc.

26   [2] *See California v. Gen. Motors Corp.*, No. 06-5755, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007),

27   *appeal pending*, No. 07-16908; *Comer Oil v. Murphy Oil USA*, No. 1:05-cv-00436-LG-RHW (S.D.
    Miss. Aug. 30, 2007), *appeal pending*, No. 07-60756 (5th Cir.) "*Comer Order*"); *Connecticut v.*

28   *(Footnote continued)*

1

[PROPOSED] ORDER GRANTING UTILITY DEFENDANTS' MOTION TO DISMISS
CASE NO. 08-cv-1138 SBA

1

2   **Rule 12(b)(1):** First, plaintiffs' claims raise non-justiciable political questions. "[T]he

3   presence of a political question precludes a federal court, under Article III of the Constitution, from

4   hearing or deciding the case." *No GWEN Alliance of Lane County, Inc. v. Aldridge*, 855 F.2d 1380,

5   1382 (9th Cir. 1988); *see also Baker v. Carr*, 369 U.S. 186, 217 (1962). Because everyone on the

6   planet emits carbon dioxide, this suit requires the Court to determine that greenhouse gas emissions

7   beyond a certain level and by certain sources should be actionable. As the three other courts that

8   have confronted global warming tort suits have recognized, courts have no "discoverable and

9   manageable standards" for making such initial policy determinations. *Id.*, 217; *see Gen. Motors*,

10  2007 WL 2726871, at *6-*16; *Connecticut*, 406 F. Supp. 2d at 274; *Comer Order* at 39. To hold

11  that defendants' past emissions were unreasonable, and thus tortious, this Court (or a jury) would

12  have to determine (a) the costs defendants would have incurred if they had fundamentally altered

13  energy production in order to achieve significant greenhouse gas reductions, (b) the economic and

14  other societal consequences that would have resulted from such costs, and (c) the risk that such

15  reductions would have been offset by increased emissions elsewhere. The Court (or jury) would

16  then have to determine that these societal costs and risks were outweighed by the risk of plaintiffs'

17  alleged global warming-related injuries. The "correct" balance of such broad-gauged and

18  multifaceted societal interests, however, is not a question of fact for this Court or a jury to decide.

19  Rather, such issues of "high policy" must be resolved "within the legislative process after the kind of

20  investigation, examination, and study that legislative bodies can provide and courts cannot. That

21  process involves the balancing of competing values and interests, which in our democratic system is

22  the business of elected representatives." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630,

23  647 (1981) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 317 (1980)). *See Gen. Motors*, 2007

24  WL 2726871 at *14 (finding "Plaintiff's federal common law global warming nuisance tort would

25

26  _____

27  *American Elec. Power Co., Inc.*, 406 F. Supp. 2d 265 (S.D.N.Y. 2005), *appeal pending*, Nos. 05-5104-cv & 05-5119-cv (2nd Cir.).

28

[PROPOSED] ORDER GRANTING UTILITY DEFENDANTS' MOTION TO DISMISS
CASE NO. 08-cv-1138 SBA

1    have an inextricable effect on interstate commerce and foreign policy – issues constitutionally

2    committed to the political branches of government.")

3         Second, plaintiffs lack standing.  To have Article III standing, plaintiffs must have suffered

4    an injury-in-fact that was caused by defendants and is redressable by this Court.  *Lujan v. Defenders*

5    *of Wildlife,* 504 U.S. 555, 560 (1992).  Because this Court is presumed to lack Article III

6    jurisdiction, plaintiffs had to plead facts sufficient to establish each of these indispensable elements.

7    *Kokonnen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  "It is not . . . proper to

8    assume that [plaintiffs] can prove facts that [they] ha[ve] not alleged," and mere "labels and

9    conclusions, [or] a formulaic recitation of the elements of a cause of action will not do." *Bell*

10   *Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65, 1969 n.8 (citation and internal quotation marks

11   omitted) (2007).

12        Here, plaintiffs do not and cannot allege that their claimed injuries—*i.e.*, storm damage and

13   erosion from a loss of Arctic sea ice that formerly protected their island—are fairly traceable to these

14   particular defendants.  In fact, plaintiffs' allegations contradict such a claim.  According to the

15   complaint, plaintiffs' injuries are not attributable to the select group of companies they have sued,

16   but to a homogeneous aggregation of countless worldwide emissions dating back decades and

17   possibly centuries.  For these very reasons, the *Comer* court dismissed a similar complaint for lack of

18   standing, ruling that the plaintiffs' injuries were not "fairly attributable" to many of the same

19   defendants that plaintiffs have sued here.  *Comer Order* at 36.  The court noted that everyone on the

20   planet was responsible to some degree "for the emission of [carbon dioxide] and ultimately

21   greenhouse gases which cause global warming." *Id.*  The injuries asserted by plaintiffs in that case,

22   therefore, were not "traceable to these individual defendants but . . . instead . . . are attributable to a

23   larger group that [is] not before this Court, not only within this nation but outside of our

24   jurisdictional boundaries as well." *Id.*  Here, too, plaintiffs' own allegations make clear that their

25   alleged injuries are not fairly traceable to these defendants, but to countless entities around the globe.

26   *See also Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 974 (7th Cir. 2005)

27   (failure to account for pollution attributable to others precluded traceability to one industry's

28

[PROPOSED] ORDER GRANTING UTILITY DEFENDANTS' MOTION TO DISMISS
CASE NO. 08-cv-1138 SBA

1    discharges).  Boilerplate recitations that defendants' emissions "are a direct and proximate

2    contributing cause of" plaintiffs' injuries, Compl. ¶ 251, cannot mask this fatal defect.

3           Additionally, plaintiffs' injuries are simply too remote from the conduct of these defendants

4    to be fairly traceable.  *See In re African-American Slave Descendants Litig.*, 471 F.3d 754, 761 (7th

5    Cir. 2006), *cert. denied*, 128 S. Ct. 92 (2007) (remoteness is "a limitation on Article III standing").

6    Injuries are too remote to establish Article III causation when they can be connected to the alleged

7    wrongful conduct only by multiple links in an attenuated chain of causation.  *See, e.g., Camden*

8    *County Bd. of Chosen Freeholders v. Baretta U.S.A. Corp.*, 123 F. Supp. 2d 245, 257 (D.N.J. 2000),

9    *aff'd*, 273 F.3d 536 (3d Cir. 2001).  Here, the asserted causal chain between the carbon dioxide

10   emissions from defendants' operations and plaintiffs' alleged injuries involves far too many

11   attenuated links to establish Article III causation.  *See In re African-Am. Slave Descendants Litig.*,

12   471 F.3d at 759 (affirming dismisal where causal chain was "too long and ha[d] too many weak links

13   for a court to be able to find that the defendants' conduct harmed the plaintiffs at all"); *Camden*

14   *County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 273 F.3d 536, 541 (3d Cir. 2001) (causal

15   chain with seven links was "too attenuated to attribute sufficient control to the manufacturers to

16   make out a public nuisance claim").

17           **Rule 12(b)(6):**  Although the complaint is properly dismissed for lack of jurisdiction under

18   Rule 12(b)(6), the Court deems it appropriate to dismiss the claims provisionally under Rule

19   12(b)(6) as well.

20           ***Federal Claims:***  Plaintiffs' federal claim also fails as a matter of law.  First, plaintiffs lack a

21   federal cause of action.  The federal common law cause of action the Supreme Court created a

22   century ago for transborder pollution permitted *States* to seek *injunctive relief* for nuisances of

23   "*simple type*"— *i.e.*, those where immediately harmful or noxious substances cause severe localized

24   harms directly traceable to an identifiable out-of-state source.  *North Dakota v. Minnesota*, 263 U.S.

25   365, 374 (1923) (it was only "a public nuisance of *simple type* for which a *state* may properly ask an

26   injunction")(emphasis added); *Illinois v. Milwaukee*, 406 U.S. 91, 106 n.8 (1972) ("*Milwaukee I*")

27   (same).  Plaintiffs cannot wedge their claims into this mold.  They are not States and they do seek

28

[PROPOSED] ORDER GRANTING UTILITY DEFENDANTS' MOTION TO DISMISS
CASE NO. 08-cv-1138 SBA

1 damages, not injunctive relief. *Middlesex County Sewerage Authority v. National Sea Clammers*

2 *Ass'n*, 453 U.S. 1, 10 (1983) (a federal nuisance claim for damages by a private party would go

3 "considerably beyond [*Milwaukee I*], which involved purely *prospective relief* by a *state*")(emphasis

4 added); *see also Gen. Motors*, 2007 WL 2726871 at *15 (noting that the Court's cases all involved

5 claims for equitable relief). Moreover, the novel and complex nuisance they allege differs in every

6 material respect from those of "simple type." The emissions at issue are not immediately harmful or

7 noxious, and global warming is alleged to cause planet-wide harms, none of which is directly

8 traceable to any source.

9        Nor can this Court expand the previously recognized cause of action to encompass plaintiffs'

10 extraordinary claim. Doing so would contravene the Supreme Court's repeated admonitions that

11 courts cannot use their limited federal common lawmaking powers to create private damages actions

12 or to resolve issues of high policy. *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001); *Stoneridge*

13 *Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) (refusing to expand right of

14 action implied from federal securities laws); *Central Bank of Denver, N.A. v. First Interstate Bank of*

15 *Denver, N.A.*, 511 U.S. 164 (1994) (same); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004) ("a

16 decision to create a private right of action . . . is one better left to legislative judgment in the great

17 majority of cases.").

18        Furthermore, any expanded version of the federal common law cause of action that could

19 encompass plaintiffs' claim has been displaced. "[I]t is for Congress, not federal courts to articulate

20 the appropriate standards to be applied as a matter of federal law," and courts should adopt a

21 "*willingness* to find congressional displacement of federal common law" whenever "Congress

22 addresses [a] problem formerly governed by federal common law." *City of Milwaukee v. Illinois*,

23 451 U.S. 304, 317 & n.9, 315 n.8 (1981) ("*Milwaukee II*") (emphasis added and deleted); *see also*

24 *Nat'l Audubon Soc. v. Dep't of Water*, 869 F.2d 1196, 1201 (9th Cir. 1988); *United States v. Oswego*

25 *Barge Corp.*, 664 F.2d 327, 335 (2d Cir. 1981) ("separation of powers concerns create a presumption

26 *in favor of [displacement] of federal common law* whenever . . . Congress has legislated on the

27 subject") (emphasis added). Under *Milwaukee II*, "once Congress has addressed a national concern,

28

[PROPOSED] ORDER GRANTING UTILITY DEFENDANTS' MOTION TO DISMISS
CASE NO. 08-cv-1138 SBA

our fundamental commitment to the separation of powers precludes the courts from scrutinizing the sufficiency of the congressional solution" or "holding that the solution Congress chose is not adequate." *Illinois v. Outboard Marine Corp.*, 680 F.2d 473, 478 (7th Cir. 1982). Congress has spoken directly to the subject of global warming through a series of laws that adopt a carefully calibrated mix of regulation, research, technology development incentives and multilateral negotiations.

In addition, a recognition of the damages action plaintiffs seek would effectively create *de facto* emissions limits and would thus interfere with the President's implementation of U.S. foreign policy, which seeks to use the prospect of mandatory U.S. emissions limits as a means of obtaining comparable commitments from developing countries, such as China. Accordingly, the federal common law cause of action cannot be expanded to encompass plaintiffs' novel claims, because a "global warming nuisance tort would have an inextricable effect on . . . foreign policy." *Gen. Motors*, 2007 WL 2726871 at *13, *14; *see also Connecticut*, 406 F. Supp. 2d at 272-73 (federal common law nuisance claim to address global warming would require court to "determine and balance the implications of such relief on the United States' ongoing negotiations with other nations").

Finally, even if a federal claim did exist, it would be time-barred. Where the "untimeliness is apparent on the face of the liberally construed complaint," the suit must be dismissed. *Soliman v. Philip Morris Inc.*, 311 F.3d 966, 971 (9th Cir. 2002). Plaintiffs' allegations and the documents they incorporate in their complaint show that they were aware of the factual basis of their claims no later than December 2003. Because they waited until February 2008 to bring this suit, their claims are barred by California's three-year statute of limitations, under the "borrowing" rule that applies when Congress fails to provide a limitations period for a statutory cause of action. *Barajas v. Bermudez*, 43 F.3d 1251, 1255 (9th Cir. 1994); *see also N. Star Steel Co. v. Thomas*, 515 U.S. 29, 35 (1995).

[PROPOSED] ORDER GRANTING UTILITY DEFENDANTS' MOTION TO DISMISS
CASE NO. 08-cv-1138 SBA

1    California requires an "action for trespass upon or injury to real property" to be brought within

2    "three years." CAL. CIV. PROC. CODE § 338(b).[3]

3        ***State Law Claims:*** Insofar as this order provisionally disposes of the federal claims on non-

4    jurisdictional grounds, the Court chooses to retain its "discretion to adjudicate the remaining [state-

5    law] claims." *Herman Family Revocable Trust v. Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001),

6    because the defects that doom plaintiffs' state-law claims are so closely related to the issues that

7    mandate dismissal off their federal claim. Accordingly, having invested significant resources in

8    evaluating and addressing the federal claim, this Court will exercise its discretion in the interests of

9    convenience, fairness and judicial economy to address and dispose of the related state-law counts as

10    well.

11        Plaintiffs' state law claims must be dismissed because they are preempted by the same

12    federal laws and foreign policy efforts that displace plaintiffs' purported federal common law claim.

13    Massive state-law damage awards would frustrate and conflict with Congress's method of

14    addressing climate change. Congress has ordered a careful phasing-in of one type of emissions cap

15    (for automobiles), conferred authority on an expert and politically accountable agency to determine

16    whether to regulate greenhouse gas emissions, and has repeatedly confirmed that climate change

17    must be addressed on a comprehensive, national basis, that includes negotiations with other nations.

18    *See Public Utility District No. 1 of Gray's Harbor County Washington v. Idacorp Inc.*, 379 F.3d 641,

19    649-50 (9th Cir. 2004) (quoting *Gadda v. Ashcroft,* 363 F.3d 861, 871 (9th Cir. 2004) ("'conflict

20    preemption' exists 'if there is an actual conflict between federal and state law or where compliance

22    [3] Nor is either plaintiff exempt from statutes of limitations by virtue of its status. The City of
23    Kivalina is a municipality, not a State, and thus is subject to statutes of limitations to the same extent
      as a private party. *See Guar. Trust Co. of N.Y. v. United States*, 304 U.S. 126, 135 n.3 (1938); *San*
24    *Marcos Water Dist. v. San Marcos Unified Sch. Dist.*, 190 Cal. App. 3d 1083, 1087 (Ct. App. 1987).
      Finally, although California Civil Code § 3490 provides that "[n]o lapse of time can legalize a public
25    nuisance," that provision applies only to "action[s] brought by a public entity to *abate* a public
      nuisance," not to damages suits like this one. *Mangini v. Aerojet-Gen. Corp.*, 230 Cal. App. 3d
26    1125, 1142-43 (Ct. App. 1991) (emphasis added); *Beck Dev. Co. v. S. Pac. Transp. Co.*, 44 Cal.
      App. 4th 1160, 1216 (Ct. App. 1996); *see also* Donald G. Gifford, *Public Nuisance as a Mass*
27    *Products Liability Tort*, 71 U. Cin. L. Rev. 741, 781-82 (2003).

28

1    with both is impossible'"); *see also BMW, Inc. v. Gore*, 517 U.S. 559, 585 (1996) (no state may use

2    tort system "as a means of imposing its regulatory policies on the entire Nation").  Global climate

3    change is predominantly a matter of federal concern and cannot be addressed in any meaningful

4    manner by varied state law mandates.  In addition, state-law damage awards conflict with the

5    President's implementation of U.S. foreign policy.

6         Further, plaintiffs have not and cannot allege key elements to make out a cognizable nuisance

7    claim.  For the same reasons that plaintiffs' allegations fail to establish standing, those allegations do

8    not and cannot establish proximate causation, *see Assoc. of Washington Public Hosp. Districts v.*

9    *Philip Morris Inc.*, 241 F.3d 696, 706 (9th Cir. 2001) (dismissing common law claims, including

10   nuisance, for lack of proximate cause); *Martinez v. Pac. Bell*, 225 Cal. App. 3d 1557, 1565-1566

11   (Cal. Ct App. 1990) (nuisance liability extends only to damage proximately caused by defendant's

12   conduct).  For the same reasons that their purported federal common law claim is nonjusticiable,

13   plaintiffs cannot show a breach of any legally cognizable duty.  And plaintiffs have failed to allege a

14   unique injury.  *See In re Exxon Valdez*, No. A89-0095-CV (HRH), 1994 WL 182856 at *2 (D.

15   Alaska March 23, 1994) ("[t]he Alaska Natives do not have a viable, maritime, public nuisance

16   claim, as their claim is only different in degree, but not in kind, from that suffered by the general

17   population of Alaska").

18        They likewise cannot state an independent concert-of-action claim.  Properly understood,

19   concert of action merely describes two theories of secondary liability—conspiracy and aiding and

20   abetting.  *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).  Concert of action thus is

21   not an independent tort.  It is, at most, a basis for imposing liability on someone other than the

22   primary tortfeasor.  *See Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617 (7th Cir. 2000) ("there is

23   no tort of aiding and abetting"; rather, it is "a basis for imposing tort liability"); *Halberstam*, 705

24   F.2d at 479 ("[s]ince liability for civil conspiracy depends on performance of some underlying

25   tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing

26   vicarious liability for the underlying tort."); *Cadlo v. Owens-Illinois, Inc.*, 23 Cal. Rptr. 3d 1, 6 (Cal.

27   Ct. App. 2004) ("[c]oncert of action is a theory of group liability.").  Because plaintiffs cannot assert

28

8

[PROPOSED] ORDER GRANTING UTILITY DEFENDANTS' MOTION TO DISMISS
CASE NO. 08-cv-1138 SBA

an actionable, underlying tort, their concert-of-action claim cannot survive.  *See, e.g., Wynn v. Nat'l Broad. Co., Inc.*, 234 F. Supp. 2d 1067, 1114 (C.D. Cal. 2002) (dismissing aiding-and-abetting claim where complaint failed to establish an underlying tort).  Furthermore, in light of *Twombly*, allegations that defendants "knowingly, and willfully agreed and conspired" to engage in fraud, without any "facts supporting the existence of an agreement," are insufficient to state a claim for conspiracy under Rule 8(a) notice pleading standards.  *Impac Warehouse Lending Group v. Credit Suisse First Boston, LLC*, No. 06-56024, 2008 WL 731050, at *1 (9th Cir. 2008).  A boilerplate recitation of the elements identified by the Restatement is not sufficient.

Finally, and for the same reasons discussed with respect to the federal claims, plaintiff's state law claims are time-barred by California's three year statute of limitations.

For all of the foregoing reasons, the Utility Defendants' Motion to Dismiss is GRANTED.  Because leave to amend would here be futile, *Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.*, 806 F. 2d 1393, 1401 (9th Cir. 1986), *Albrecht v. Lund*, 845 F. 2d 193, 195-96 (9th Cir. 1988), Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

DATED:   December __, 2008

_____
Honorable Saundra B. Armstrong
United States District Judge

[PROPOSED] ORDER GRANTING UTILITY DEFENDANTS' MOTION TO DISMISS
CASE NO. 08-cv-1138 SBA