Samuel R. Miller (SBN 66871)
srmiller@sidley.com
Paul L. Yanosy (SBN 233014)
pyanosy@sidley.com
SIDLEY AUSTIN LLP
555 California Street
San Francisco, California  94104
Telephone:        (415) 772-1200
Facsimile:        (415) 772-7400

David T. Buente, Jr. (admitted *pro hac vice*)
dbuente@sidley.com
Joseph R. Guerra (admitted *pro hac vice*)
jguerra@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone:        (202) 736-8000
Facsimile:        (202) 736-8711

**Attorneys For Defendants
AMERICAN ELECTRIC POWER COMPANY AND
DUKE ENERGY CORP.**

**[Counsel Listing Continued on Next Page]**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| NATIVE VILLAGE OF KIVALINA and CITY OF KIVALINA,<br><br>        Plaintiffs<br><br>    vs.<br><br>EXXONMOBIL, CORPORATION,<br><br>        Defendants | Case No. 08-cv-1138-SBA<br><br>Assigned to: Hon. Saundra B. Armstrong<br><br>**MOTION OF CERTAIN UTILITY DEFENDANTS TO DISMISS PLAINTIFFS' CIVIL CONSPIRACY CLAIM**<br><br>[Proposed] Order filed concurrently herewith<br><br>Date:      December 9, 2008<br>Time:      1:00 p.m.<br>Place:     Courtroom 3, 3rd Floor |

1

Karl R. Moor, Esq. (*pro hac vice* pending)
krmoor@southernco.com
THE SOUTHERN COMPANY
601 Pennsylvania Avenue N.W.
Washington D.C. 20004
Tel:  (202) 261-5001
Fax:  (202) 296-7937

**Attorney for Defendant**
**THE SOUTHERN COMPANY**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................1

BACKGROUND ........................................................................................................2

ARGUMENT ..............................................................................................................4

I.  PLAINTIFFS LACK STANDING TO PURSUE THEIR CONSPIRACY
    CLAIM ..............................................................................................................4

  A.  Plaintiffs' Alleged Injuries Are Too Remote To Satisfy Article III Causation. ..................5

  B.  Plaintiffs' Theory Of Causation Relies On Impermissible Speculation. ............................6

    1.  Plaintiffs' speculation concerning the public's reaction. .................................7

    2.  Plaintiffs' speculation about the actions of the political branches. ................................9

    3.  Plaintiffs' speculation about the efficacy of a boycott and/or additional regulation. ....12

II.  PLAINTIFFS' CONSPIRACY CLAIM IS LEGALLY BARRED. .......................................15

  A.  Plaintiffs' Civil Conspiracy Claim Is Constitutionally Barred. ........................................15

    1.  The *Noerr-Pennington Doctrine* Bars Plaintiffs' Claim That The Alleged
       Conspiracy Prevented Federal Regulatory Measures. ......................................................16

    2.  The First Amendment Bars Plaintiffs' Claim That The Alleged Conspiracy
       Prevented A Public Boycott. .......................................................................................20

  B.  Plaintiffs Have Failed To State A Claim For Civil Conspiracy. .......................................23

    1.  Plaintiffs cannot state an independent claim for civil conspiracy. ...............................23

    2.  Plaintiffs cannot establish proximate causation. ..........................................................24

CONCLUSION ...........................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*In re African-American Slave Descendants Litig.*,
471 F.3d 754 (7th Cir. 2006), *cert. denied*, 128 S. Ct. 92 (2007)....................................................6

*Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*,
834 F. Supp. 1216 (D. Alaska 1991) ..................................................................................16, 20

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)............................................................................................................16, 18

*Assoc. of Washington Public Hosp. Districts v. Philip Morris Inc.*,
241 F.3d 696 (9th Cir. 2001) ....................................................................................................25

*BE & K Constr. Co. v. NLRB*,
536 U.S. 516 (2002)..................................................................................................................17

*Barnstead Broad. Corp. v. Offshore Broad. Corp.*,
886 F. Supp. 874 (D.D.C. 1995)...............................................................................................24

*Barron v. Reich*,
13 F.3d 1370 (9th Cir. 1994) ......................................................................................................4

*Beck v. Prupis*,
529 U.S. 494 (2000)............................................................................................................15, 24

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007)............................................................................................................5, 7

*Benefiel v. Exxon Corp.*,
959 F.2d 805 (9th Cir. 1992) ....................................................................................................25

*Bill Johnson's Restaurants, Inc. v. NLRB*,
461 U.S. 731 (same)..................................................................................................................17

*Boone v. Redevelopment Agency*,
841 F.2d 886 (9th Cir. 1988) ....................................................................................................20

*Boyanowski v. Capital Area Intermediate Unit*,
215 F.3d 396 (3d Cir. 2000)......................................................................................................24

*California v. Gen. Motors Corp.*,
No. 06-5755, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007), *appeal pending*, No. 07- 16908
(9th Cir.)......................................................................................................................................8

ii

*Camden County Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.,*
273 F.3d 536 (3d Cir. 2001)................................................................6

*Campbell v. PMI Food Equip. Group, Inc.,*
509 F.3d 776 (6th Cir. 2007) ............................................................17

*City of Columbia v. Omni Outdoor Advertising, Inc.,*
499 U.S. 365 (1991)..........................................................................20

*Clegg v. Cult Awareness Network,*
18 F.3d 752 (9th Cir. 1994) .............................................................4, 5

*Consolidated Edison of N.Y. v. Public Svc. Comm'n,*
447 U.S. 530 (1980)..........................................................................21

*Demuth Dev. Corp. v. Merck & Co.,*
432 F. Supp. 990 (E.D.N.Y. 1977) ...................................................21

*In re Ditropan XL Antitrust Litig.,*
529 F. Supp. 2d 1098 (N.D. Cal. 2007) ...........................................23

*Duquesne Light Co. v. EPA,*
166 F.3d 609 (3d Cir. 1999).................................................................7

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961)......................................................16, 17, 18, 19, 20

*Estate of Heiser v. Islamic Republic of Iran,*
466 F.Supp.2d 229 (D.D.C. 2006) ....................................................25

*In re Exxon Valdez,* 270 F.3d
1215 (9th Cir. 2001)..........................................................................25

*Gen-Probe, Inc. v. Amoco Corp.,*
926 F. Supp. 948 (S.D. Cal. 1996)....................................................15

*Hopkins v. Keefe Commissary Network  Sales,*
No. 07-745, 2007 WL. 2080480 (W.D. Pa. July 12, 2007) .............24

*Kirch v. Liberty Media Corp.,*
449 F.3d 388 (2d Cir. 2006)..............................................................24

*Knievel v. ESPN,*
393 F.3d 1068 (9th Cir. 2005) ..........................................................19

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
511 U.S. 375 (1994)............................................................................4

iii

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)...............................................................................................4, 10

*Manistee Town Center v. City of Glendale,*
227 F.3d 1090 (9th Cir. 2000) ...........................................................................16, 20

*Massachusetts v. EPA,*
127 S. Ct. 1438 (2007)............................................................................................9, 11

*McMillan v. Togus Reg'l Office,*
294 F. Supp. 2d 305 (E.D.N.Y. 2003), *aff'd,* 120 F. App'x 849 (2d Cir. 2005) ..........................22

*NAACP  v. Claiborne Hardware Co.,*
458 U.S. 886 (1982).......................................................................................................16

*Navarro v. Block,*
250 F.3d 729 (9th Cir. 2001) .........................................................................................4

*New York Times Co. v. Sullivan,*
376 U.S. 254 (1964)...............................................................................................21, 22

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.,*
185 F.3d 957 (9th Cir. 1999) .......................................................................................25

*Oregon Natural Res. Council v. Mohla,*
944 F.2d 531 (9th Cir. 1991) .......................................................................................17

*Org. for  a Better Austin v. Keefe,*
402 U.S. 415 (1971).......................................................................................................22

*Oxycal Labs., Inc. v. Jeffers,*
909 F. Supp. 719 (S.D. Cal. 1995).............................................................................22

*Police Dep't v. Mosley,*
408 U.S. 92 (1972)..........................................................................................................21

*Pritikin v. Dep't of Energy,*
254 F.3d 791 (9th Cir. 2001) .........................................................................................7

*Simon v. E. Ky. Welfare Rights Org.,*
426 U.S. 26 (1976)...........................................................................................................7

*Sosa v. DIRECTV,*
437 F.3d 923 (9th Cir. 2006) .................................................................................16, 17

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
2008 WL 426522 (N.D. Cal. Feb. 14, 2008) ..............................................................23

iv

*Stevens v. Tillman*,
855 F.2d 394 (7th Cir. 1988) ........................................................................15

*Time, Inc. v. Hill*,
385 U.S. 374 (1967)........................................................................................21

*United Mine Workers of Am. v. Pennington*,
381 U.S. 657 (1965)........................................................................................17

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) ........................................................................14

*Universal City Studios, Inc. v. Corley*,
273 F.3d 429 (2d Cir. 2001)...........................................................................21

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)........................................................................................21

*Valore v. Islamic Republic of Iran*,
478 F. Supp. 2d 101 (D.D.C. 2007) ..............................................................24

*Video Int'l Prod., Inc. v. Warner-Amex Cable Communications, Inc.*,
858 F.2d 1075 (5th Cir. 1988) ......................................................................17

*Warth v. Seldin*,
422 U.S. 490 (1975)..........................................................................................7

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) ..................................................................4, 17

## STATUTES AND REGULATIONS

Pub. L. No. 100-204, 101 Stat. 1331 (1987)..................................................10

Pub. L. No. 105-276, 112 Stat. 2461 (1998)..................................................12

Pub. L. No. 106-74, 113 Stat. 1047 (1999)....................................................12

Pub. L. No. 106-377, 114 Stat. 1441 (2000)..................................................12

Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 ...............11

*Average Fuel Economy Standards for Light Trucks Model Years 2008-2011*, 71 Fed. Reg.
17,566 (April 6, 2006) ....................................................................................11

*Control of Emissions from New Highway Vehicles and Engines,* 68 Fed. Reg. 52,922 (Sept.
8, 2003) ............................................................................................................9

15 U.S.C. § 2901 note ........................................................................................................11
15 U.S.C. § 2902 ...............................................................................................................10
15 U.S.C. § 2904 ...............................................................................................................10
15 U.S.C. § 2938(b)(1) ......................................................................................................10

42 U.S.C. § 13381 .............................................................................................................11
42 U.S.C. § 13382(a) .........................................................................................................10
42 U.S.C. § 13384 .......................................................................................................10, 11
42 U.S.C. § 13389 .............................................................................................................11

## LEGISLATIVE HISTORY

S. Res. 98, 105th Cong. (1997) ........................................................................................12

H.R. Rep. No. 102-474, pt. I (1992), *reprinted in* 1992 U.S.C.C.A.N. 1953 ...............11

S. Rep. No. 95-740 (1978), *reprinted in* 1978 U.S.C.C.A.N. 1386 ..............................10

## OTHER AUTHORITIES

Am. Jur. 2d *Conspiracy* (2008)........................................................................................24

Restatement (Second) of Torts (1979) ............................................................................25

Gov't Accountability Office, *Alaska Native Villages* (Dec. 2003), *available at*
http://www.gao.gov/new.items/d04142.pdf......................................................................13

IPCC Working Group I, Intergovernmental Panel on Climate Change, *Climate Change 1995:
The Science of Climate Change, Summary for Policy Makers* (1995) *available at*
http://www.ipcc.ch/pdf/climate-changes-1995/spm-science-of-climate-changes.pdf...................14

IPCC Working Group II, Intergovernmental Panel on Climate Change, *Climate Change
1995: Impacts, Adaptations and Mitigation of Climate Change: Scientific-Technical
Analyses, Summary for Policy Makers* (1995) *available at* http://www.ipcc.ch/pdf/climate-
changes-1995/spm-science-of-climate-changes.pdf ........................................................14

IPCC Working Group III, Intergovernmental Panel on Climate Change, *Climate Change
2001: Mitigation, Summary for Policy Makers* (1995) *available at*
http://www.ipcc.ch/pdf/climate-changes-2001/mitigation/mitigation-spm-en.pdf ......................14

Transcript, *President Bush Discusses Global Climate Change* (Jun. 11, 2001),
http://www.whitehouse.gov/news/releases/2001/06/20010611-2.html ........................................12

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE that, on December 9, 2008 at 1:00 p.m. or as soon thereafter as it

3    may be heard, in the above-entitled Court located at 1301 Clay Street, Oakland, California, before

4    the Honorable Saundra B. Armstrong, Courtroom 3, third floor, defendants will and hereby do move

5    this Court, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss with

6    prejudice plaintiffs' civil conspiracy claim. The grounds for this motion are that plaintiffs lack

7    Article III standing to pursue their civil conspiracy claim, and that their conspiracy claim fails as a

8    matter of law as defendant's alleged conduct is protected by the First Amendment and *Noerr-*

9    *Pennington* doctrine and plaintiffs do not and cannot allege essential elements of any such claim.

10   This motion is based on this notice of motion, the accompanying memorandum of points and

11   authorities, the pleadings and other papers on file in this action, and such other argument as may be

12   presented to the court on reply and at the time of hearing.

13                        **INTRODUCTION AND SUMMARY OF ARGUMENT**

14   As the utility defendants explain in their Omnibus Motion to Dismiss, plaintiffs cannot use a

15   putative federal common law nuisance claim or state nuisance law to hold defendants liable for

16   global warming-related injuries that plaintiffs have allegedly sustained. This Court lacks jurisdiction

17   over plaintiffs' nuisance claims, because those claims raise nonjusticiable political questions and

18   plaintiffs lack standing to assert them. Util. Omnibus Mot. §§ I., II. In addition, no federal common

19   law cause of action encompasses, or could encompass, plaintiffs' extraordinary nuisance claim. *Id.*

20   § III. Plaintiffs' federal and state nuisance claims are time-barred. *Id.* § IV. Finally, plaintiffs'

21   state-law claims are preempted, and fail on their own terms for various reasons. *Id.* §§ V, VI.

22   Evidently recognizing that the political question doctrine bars courts from resolving their

23   purported nuisance claims, plaintiffs seek to evade dismissal of their suit in its entirety by including

24   a conspiracy claim. They allege that certain defendants conspired "to mislead the public with

25   respect to the science of global warming and to delay awareness of the issue—so that they could

26   continue contributing to, maintaining and/or creating the nuisance without demands from the public

27   that they change their behavior as a condition of further buying their products." Compl. ¶ 269. This

28   effort to salvage their lawsuit, however, fails as a matter of law on multiple independent grounds.

1   Plaintiffs' conspiracy claim rests on the theory that, if defendants had not conspired to

2   allegedly "mislead the public about the science of global warming," the public would have forced

3   defendants to reduce their greenhouse gas emissions, and that this reduction would have saved

4   Kivalina from the threat of flooding.  But plaintiffs do not plead any facts from which a factfinder

5   could plausibly conclude that the alleged conspiracy caused the public to refrain from engaging in a

6   massive and unprecedented consumer boycott to force significant emissions reductions.  And, even

7   if the Court accepted this implausible speculation, plaintiffs' own allegations and the documents they

8   incorporate in their complaint make clear that no boycott commencing in the 1990s (when the

9   alleged conspiracy took place) could have saved Kivalina from the threat of flooding it allegedly

10  now faces.  For these and other reasons, plaintiffs' alleged injuries are not "fairly traceable" to the

11  conduct they challenge in their conspiracy claim.  Accordingly, the Court should dismiss the

12  conspiracy claim for lack of Article III standing.

13  In addition, the conspiracy claim runs headlong into the First Amendment.  To the extent

14  plaintiffs allege that defendants conspired to persuade the government not to increase regulation of

15  greenhouse gas emissions, the petitioning clause of the First Amendment and the *Noerr-Pennington*

16  doctrine preclude imposition of liability.  To the extent that plaintiffs allege only that defendants

17  sought to influence public opinion, the First Amendment's free speech clause protects defendants'

18  actions.  Either way, plaintiffs' conspiracy claim is barred.

19  Finally, even if plaintiffs could overcome these insuperable barriers, their civil conspiracy

20  claim still fails.  Civil conspiracy is not an independent tort, but merely a basis for imposing liability

21  arising out of a separate tort.  Because plaintiffs' federal common law and state-law nuisance claims

22  fail, their civil conspiracy claim fails as well.  In all events, plaintiffs do not and cannot plead facts

23  establishing that the alleged conspiracy was the proximate cause of their asserted injuries.

## BACKGROUND

25  Plaintiffs are a municipality and an Alaskan Native Village that seek damages for injuries

26  allegedly sustained as a result of global warming.  Plaintiffs allege that, over an extended and

27  indeterminate period, carbon dioxide and other greenhouse gases have raised the temperature of the

28  atmosphere, which has melted glaciers and ice caps and raised ocean temperatures, causing sea

2

1   levels to rise.  Compl. ¶¶ 123, 125, 127, 130-32.  Plaintiffs allege that increased global temperature

2   has caused a loss of sea ice, which has left their island, Kivalina, more vulnerable to flooding from

3   waves, storm surges and erosion.  *Id.* ¶ 185.  Plaintiffs allege that the threat of flooding renders

4   Kivalina uninhabitable and requires plaintiffs to relocate at substantial cost.  *Id.* ¶¶ 185-86.

5        In their civil conspiracy claim, plaintiffs allege that their injuries resulted from a conspiracy

6   by certain defendants "to mislead the public with respect to the science of global warming," *id.*

7   ¶¶ 269, 276-77.  Plaintiffs allege that these defendants feared "that the public would become

8   concerned by global warming and that the growing concern would force a change in the Conspiracy

9   Defendants' behavior which would be costly."  *Id.* ¶ 269.  These defendants therefore allegedly

10  conspired to mislead the public in order "to delay public awareness of the issue—so that they could

11  continue contributing to, maintaining and/or creating the nuisance" of global warming.  *Id.*

12       In particular, plaintiffs allege that the conspiracy defendants supported scientists who were

13  so-called "global warming skeptics."  *Id.* ¶ 191.  Defendants allegedly supported these scientists

14  directly and indirectly, through trade associations and "front groups, fake citizens organizations, and

15  bogus scientific bodies, such as the Global Climate Coalition ('GCC'), the Greening Earth Society,

16  the George C. Marshall Institute, and the Cooler Heads Coalition."  *Id*. ¶ 190.  Plaintiffs allege that

17  these scientists held "marginal" or "fringe" views regarding climate change science, *id.* ¶¶ 191, 230;

18  *see also id.* ¶ 210, and published their views in "numerous mainstream, unsuspecting, news outlets

19  . . . in order to sow doubt among the public about global warming," *id.* ¶ 191; *see also id.* ¶ 248.

20  Plaintiffs further allege that the conspiracy included not only disseminating "contrarian theories

21  about global warming," *id.* ¶ 206, but also "questioning the prevailing views" concerning climate

22  change, by "attack[ing] credible and preeminent expert scientists."  *Id.* ¶¶ 215, 224.

23       Within their complaint, however, plaintiffs concede that the "prevailing view" of climate

24  change has evolved over decades of scientific research and debate.  The complaint refers to a "global

25  warming debate," *id.* ¶¶ 193, 197, to the "*mounting* scientific evidence of the changing climate," *id.*

26  ¶ 223 (emphasis added), and to a "*growing* scientific and public consensus regarding global

27  warming," *id.* ¶ 209 (emphasis added).  Plaintiffs nevertheless contend that it was wrong for the

28

1   conspiracy defendants to "claim[] that there was an issue as to whether man-made greenhouse gases

2   caused global warming." *Id.* ¶ 222.

3       Plaintiffs further assert, without any factual elaboration, that this alleged conspiracy caused

4   their alleged injuries because, if the public had not been misled about the science of global warming,

5   it would have engaged in an unprecedented consumer boycott, defendants would have been forced to

6   reduce emissions, the atmosphere would not have warmed as much, the sea ice around Kivalina

7   would have stayed frozen, and Kivalina would have been protected against storms. *Id.* ¶ 273.

8                                         **ARGUMENT**

9       The utility defendants named in the conspiracy claim[1] move to dismiss that claim pursuant to

10  Rules 12(b)(1) and 12(b)(6). Under Rule 12(b)(1), this Court must determine whether it has subject

11  matter jurisdiction, and "may look beyond the complaint to matters of public record" when making

12  that determination. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). Under Rule 12(b)(6), this

13  Court must dismiss "where there is no cognizable legal theory or an absence of sufficient facts

14  alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

15  While all well-pleaded allegations of fact must be taken as true and all reasonable inferences drawn

16  in favor of plaintiffs, the Court need not accept legal conclusions cast as factual allegations. *Clegg v.*

17  *Cult Awareness Network,* 18 F.3d 752, 754-55 (9th Cir. 1994). And, while the Court generally may

18  not look beyond the complaint when ruling on a Rule 12(b)(6) motion, it may consider matters of

19  public record, such as formal pronouncements by agencies and officials. *Barron v. Reich*, 13 F.3d

20  1370, 1377 (9th Cir. 1994). These standards mandate dismissal of the civil conspiracy claim.

21  **I.     PLAINTIFFS LACK STANDING TO PURSUE THEIR CONSPIRACY CLAIM.**

22      A district court is presumed to lack Article III jurisdiction. *Kokkonen v. Guardian Life Ins.*

23  *Co. of Am.*, 511 U.S. 375, 377 (1994). To overcome this presumption, plaintiffs must allege facts

24  that, if true, establish that their injuries are "fairly trace[able]" to the conspiracy they allege. *Lujan*

25  *v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (internal quotation marks omitted). "It is not . . .

26  proper to assume that [plaintiffs] can prove facts that [they] ha[ve] not alleged," and mere "labels

27

28  _____

[1] American Electric Power Company, Duke Energy Corporation, and The Southern Company.

1   and conclusions, [or] a formulaic recitation of the [necessary] elements . . . will not do." *Bell*

2   *Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 1969 n.8 (2007) (citation and internal quotation

3   marks omitted); *see also Clegg,* 18 F.3d at 754-55 (court need not "accept legal conclusions cast in

4   the form of factual allegations if those conclusions cannot reasonably be drawn from the facts

5   alleged"). Instead, the "[f]actual allegations must be enough to raise a right to relief"—or the

6   existence of standing—"above the speculative level." *Twombly*, 127 S. Ct. at 1965.

7   With respect to their conspiracy claim, plaintiffs allege that the supposed "campaign to

8   deceive the public about the science of global warming has caused Plaintiffs' injuries and/or is a

9   substantial contributing factor." Compl. ¶ 273. This is precisely the type of "formulaic recitation"

10  and bare "legal conclusion" that the Supreme Court and Ninth Circuit have condemned as

11  inadequate to satisfy Rule 8's pleading requirements. Instead, to establish Article III causation,

12  plaintiffs must allege facts that provide a non-speculative basis for finding that the alleged risk of

13  flooding in Kivalina, and plaintiffs' alleged need to relocate, is "fairly traceable" to the alleged

14  campaign to support "contrarian theories" that contradict "prevailing views" about the science of

15  global warming. Plaintiffs have not met—and cannot possibly meet—this standard.

16  **A.    Plaintiffs' Alleged Injuries Are Too Remote To Satisfy Article III Causation.**

17  As the utility defendants demonstrate in their Omnibus Motion to Dismiss, plaintiffs cannot

18  establish Article III causation with respect to their alleged federal and state nuisance claims because,

19  among other things, their injuries are simply too remote from defendants' emissions. Util. Omnibus

20  Mot. § II.B. Here, the causal chain necessary to link the alleged conspiracy to plaintiffs' alleged

21  injuries is even more attenuated and remote. It consists of at least the following links:

22      (1) sometime in the 1990s, Compl. ¶ 192, the conspiracy defendants began a campaign to
23      mislead the public about the science of global warming, *id.* ¶¶ 189-91;

    (2) this campaign "create[d] doubt in the minds of the public," "subvert[ed]" and
24      "defuse[d]" the "debate on global warming," and "delay[ed] public awareness of the issue,"
25      *id.* ¶¶ 193, 197, 227, 242, 269;

    (3) as a result, the public refrained from boycotting defendants' products, *id.* ¶ 269, and/or
26      demanding "meaningful action," *id.* ¶ 247, presumably by the federal government, *see id.*
27      ¶ 242 (referring to efforts to "thwart any corrective action" by Congress);

28

5

(4)  had the public boycotted defendants' products and/or the federal government adopted more aggressive emissions restrictions, defendants and others would have emitted smaller amounts of carbon dioxide, *id.* ¶¶ 3, 269;

(5)  fewer emissions would have "mix[ed] in the atmosphere" and "merge[d] with the accumulation of emissions in California and in the world," *id.* ¶¶ 254, 10;

(6)  as a result, the accumulation of worldwide emissions would not have been as large, and would have trapped less heat, *id.* ¶ 123;

(7)  the reduced pool of trapped heat would have led to a smaller increase in the temperature of the atmosphere, *id.* ¶¶ 123, 127;

(8)  this smaller increase in atmospheric temperature would have caused less melting of glaciers and ice caps, and a smaller increase in ocean temperatures, and thus a smaller rise in sea levels, *id.* ¶¶ 130-31;

(9)  as a result, there would have been no loss (or a significantly smaller loss) of the sea ice around Kivalina, *id.* ¶ 185;

(10)  Kivalina's coast would have been less vulnerable to waves, storm surges and erosion, *id.*; and

(11)  Kivalina would not have sustained the damage that has created an unacceptable risk of flooding, rendering the island unsafe, *id.*

Merely reciting this causal chain demonstrates that plaintiffs' injuries are too remote from the alleged conspiracy to satisfy Article III's causation requirement.  Remoteness is "a limitation on Article III standing."  *In re African-American Slave Descendants Litigation*, 471 F.3d 754, 761 (7th Cir. 2006), *cert. denied*, 128 S. Ct. 92 (2007).  Here, the extraordinary length of the causal chain necessary to link plaintiffs' alleged injuries to the alleged conspiracy precludes any finding that those injuries are "fairly traceable" to the conspiracy defendants.  *See id.* at 759 (affirming dismissal where causal chain was "too long and ha[d] too many weak links for a court to be able to find that the defendants' conduct harmed the plaintiffs at all"); *Camden County Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 541 (3d Cir. 2001) (causal chain with seven links "too attenuated to attribute sufficient control to the manufacturers to make out a public nuisance claim").  Plaintiffs' causal chain—as set forth in their own complaint—confirms that their alleged injuries are far too remote from the alleged conspiracy to demonstrate Article III standing.

**B.    Plaintiffs' Theory Of Causation Relies On Impermissible Speculation.**

Plaintiffs have failed to allege facts establishing causation not only because the causal chain necessary to link the threat of flooding in Kivalina to the alleged conspiracy is too long and

1   attenuated, but because that chain rests on impermissible speculation.  The Supreme Court and

2   courts of appeals have held time and again that traceability cannot be established when the plaintiffs'

3   theory of causation rests on *suppositions* about decisions and actions by "independent actors."  *See,*

4   *e.g., Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976) (plaintiffs lacked standing to

5   challenge a revenue ruling that permitted hospitals to retain their nonprofit status despite refusal to

6   serve indigents, because it was mere guesswork whether plaintiffs were denied service because of

7   the revenue ruling or unrelated decisions by the hospitals); *Warth v. Seldin*, 422 U.S. 490, 507

8   (1975) (no standing where plaintiffs failed to allege facts from which it reasonably could be inferred

9   that, absent restrictive zoning practices, independent third parties would build affordable housing);

10  *Pritikin v. Dep't of Energy*, 254 F.3d 791, 793 (9th Cir. 2001) (no standing where plaintiffs' causal

11  chain presupposed the outcome of a decision by an independent party not before the court);

12  *Duquesne Light Co. v. EPA*, 166 F.3d 609, 613 (3d Cir. 1999) (plaintiff lacked standing where

13  alleged injury was "the product of the independent action of a third party").

14          As in these cases, plaintiffs rest their theory of causation on suppositions about the decisions

15  that would have been taken by independent actors in the absence of the alleged conspiracy.  Thus,

16  plaintiffs allege that, but for the alleged campaign, the public at large would have "demand[ed] . . .

17  that [the conspiracy defendants] change their behavior as a condition of further buying their

18  products."  Compl. ¶ 269.  Their complaint also asserts that the supposed conspiracy prevented the

19  political branches from mandating significant emissions reductions.  Yet plaintiffs allege no *facts*

20  that, if true, would render either of these speculative assumptions plausible.  *See Twombly*, 127 S. Ct.

21  at 1974 (plaintiffs must allege "enough facts to state a claim to relief that is *plausible*") (emphasis

22  added).  Moreover, the complaint itself and the materials it incorporates make clear that any such

23  choices or actions could not have prevented plaintiffs' injuries.

### 1.      Plaintiffs' speculation concerning the public's reaction.

25          Plaintiffs' primary theory of causation relies on the wholly unsupported, and utterly

26  implausible, claim that, if the public had had a better understanding of the science of global

27  warming, it would have engaged in an unprecedented consumer boycott of electricity and oil-based

28  products that would have compelled defendants to undertake massive and costly emissions

7

1   reductions.  Compl. ¶ 269.  At the outset, it is worth noting that plaintiffs' own allegations

2   undermine a central premise of this theory—*i.e.*, that the alleged conspiracy misled the public into

3   thinking that global warming "is not man-made."  *Id.* ¶ 189.  Plaintiffs allege that there was a

4   "*growing . . . public consensus regarding global warming*," and that, by 1997, this consensus forced

5   a number of supporters of one of the alleged "front groups," GCC, "to reconsider the *negative public*

6   *relations implications* of their involvement in a group that was *increasingly recognized* as a self-

7   serving anti-environmental front group."  *Id.* ¶ 209 (emphases added); *see also id.* ¶ 243 ("the GCC's

8   role caused [ExxonMobil] and other members *so much embarrassment* that a large scale defection

9   occurred at the end of 1999 and the beginning of 2000") (emphasis added); *id.* ¶ 201 (GCC became

10  so "controversial" that it changed its membership to trade associations "in order to distance the

11  individual companies from its work").  These allegations that the public consensus about global

12  warming had grown so strong that companies feared public embarrassment, controversy and

13  backlash if they supported scientists who questioned global warming are completely at odds with

14  plaintiffs' conclusory assertion that the alleged campaign prevented the public from viewing global

15  warming as a man-made phenomenon.

16          But even if the Court were to ignore plaintiffs' self-contradicting allegations and accept their

17  premise of an uninformed public, the complaint is devoid of any factual support for plaintiffs'

18  completely fanciful "boycott" theory.  Beyond the ever-growing number of modern conveniences it

19  powers, electricity is a primary input to virtually all economic activity.  It powers innumerable safety

20  devices and systems, prevents deaths from heat in summer and from cold in winter, and powers our

21  military and homeland security.  The scope and range of the utility defendants' customers is so

22  broad—and electricity is so indispensable to those customers—that it is utterly implausible to

23  believe that a better understanding of the "prevailing views" on the science of global warming would

24  have led to a public boycott so widespread and significant that defendants would have implemented

25  extraordinarily costly and unprecedented measures to restructure how they generate electricity.

26          The absurdity of this claim is underscored by Judge Jenkins' recent observation that the

27  problems believed to be associated with global warming can be addressed only through "a broad

28  array of domestic and international measures that are yet undefined."  *California v. Gen. Motors*

1   *Corp.*, No. 06-5755, 2007 WL 2726871, at *10 (N.D. Cal. Sept. 17, 2007), *appeal pending*, No. 07-

2   16908 (9th Cir.).  Global warming "is not a problem . . . that has escaped the attention of

3   policymakers in the Executive and Legislative Branches of our Government."  *Massachusetts v.*

4   *EPA*, 127 S. Ct. 1438, 1463-64 (2007) (Roberts, C.J., dissenting).  It "has been discussed extensively

5   during the last three Presidential campaigns; it is the subject of debate and negotiation in several

6   international bodies; and numerous bills have been introduced in Congress over the last 15 years to

7   address the issue."  *Control of Emissions from New Highway Vehicles and Engines*, 68 Fed. Reg.

8   52,922, 52,928 (Sept. 8, 2003).  Indeed, Congress has already enacted more than a half-dozen laws

9   that seek—through a mix of regulatory authority, fuel efficiency standards, technology incentives

10  and research mandates—to craft a comprehensive national response to the issue while the executive

11  branch negotiates with other countries over a coordinated international response.  *See* Util. Omnibus

12  Mot. § I.C.  Yet plaintiffs claim that the alleged conspiracy caused the "public at large" to refrain

13  from engaging in a massive, unprecedented consumer boycott of electricity and oil-based products,

14  that such a boycott would have resulted in reduced emissions, and that these reductions would have

15  prevented alleged injuries that a series of federal laws and international negotiations failed to

16  prevent.  If this wholly unsupported "allegation" suffices to establish Article III standing, then

17  *Twombly*'s "plausibility" standard has no meaning.

18          **2.**        **Plaintiffs' speculation about the actions of the political branches.**

19          Plaintiffs also allege that the purported conspiracy on global climate science misled Congress

20  and the Executive Branch, or, alternatively, that it effectively prevented the public from demanding

21  more aggressive regulatory measures from the political branches.  *See* Compl. ¶ 242 (referring to

22  alleged lobbying efforts to "thwart any corrective action" by Congress); *id.* ¶ 212 (referring to

23  alleged study that "claimed that *policy makers needed to know* that the 'growing body of scientific

24  evidence shows global warming is not a serious threat'") (emphasis added).[2]  This theory of

25  _____

26  [2] The various reports and other documents incorporated by reference in their complaint make even
    clearer that plaintiffs are necessarily relying on the theory that the alleged campaign "caused" their
    injuries by inducing the political branches to refrain from adopting more aggressive measures.  *See*

27  *infra*, § II.A.1.  Plaintiffs' apparent unwillingness to state this theory as directly as their "boycott"

28  theory of causation presumably reflects their recognition that the *Noerr-Pennington* doctrine bars

    *(Footnote continued)*

causation, however, rests on equally impermissible and unfounded speculation, rather than pleaded facts.

Plaintiffs ask this Court to accept the speculation that the alleged conspiracy caused Congress and/or the Clinton and George W. Bush administrations to refrain from taking some actions; but plaintiffs fail to allege in even a conclusory fashion, let alone with any factual support, *what* the government would have done.  Nor do they allege that any additional governmental actions would have been sufficient to prevent the confluence of climate changes and other effects that they claim has created the alleged threat of flooding in Kivalina.  But standing requires more than naked supposition.  Plaintiffs must allege "facts showing that . . . choices [by the political branches] have been or [would have been] made in such manner as to produce causation."  *Lujan*, 504 U.S. at 562 (quotation marks and citations omitted).  They have completely failed to discharge this burden.

Moreover, any claim that the alleged conspiracy actually convinced the political branches that global warming does not exist or "is not man-made," Compl. ¶¶ 189-91, 269, is refuted by the public record.  A host of laws show that, both before and since the alleged campaign began, Congress has not acted in accordance with either of these premises.

- In 1978, Congress directed the President to establish a national climate program that includes "appropriate . . . recommendations for action," 15 U.S.C. §§ 2902, 2904(a), (b)(1), (d)(1), (9), so the nation can "respond more effectively to climate-induced problems," S. Rep. No. 95-740, at 13, 14 (1978), *reprinted in* 1978 U.S.C.C.A.N. 1386, 1399.

- The 1987 Global Climate Protection Act declared that U.S. policy is to "identify technologies and activities to limit mankind's adverse effect on the global climate."  Pub. L. No. 100-204, tit. XI, §§ 1102(3), 1103(a), 101 Stat. 1331, 1408 (1987) (codified at 15 U.S.C. § 2901, Note).

- The Global Change Research Act directed EPA to formulate "a coordinated national policy on global climate change," 15 U.S.C. § 2938(b)(1).

- The Energy Policy Act of 1992 directs the Secretary of Energy to assess various options for reducing greenhouse gas emissions, and requires the Executive Branch to develop a plan for "stabilization and eventual reduction in the generation of greenhouse gases."  42 U.S.C. §§ 13382(a), (g), 13384.

---

any claim that defendants should be held liable for the alleged effects of a public relations campaign designed to forestall actions by the political branches.  *See id.*

- The Energy Policy Act of 2005 called for a "national strategy to promote the deployment and commercialization" of technologies to reduce greenhouse gas intensity. *See id.* § 13389.

- The Energy Independence and Security Act of 2007 addresses greenhouse gas emissions by, among other things, imposing motor vehicle fuel economy requirements and requirements for renewable and alternative fuels, creating a number of vehicle-emissions reduction planning and incentive programs, requiring an assessment of carbon sequestration methods, and creating grant programs to accelerate research and development of non-carbon emitting technologies such as solar, geothermal, marine and hydrokinetic energy. *See* Pub. L. No. 110-140, tit. I, VII, VI, §§ 101-36, 711-714, 601-36, 121 Stat. 1492 *et seq.* (2007).

These laws are fundamentally inconsistent with any claim that Congress does not believe that human activities contribute to global warming. Indeed, Congress has authorized EPA to determine whether to regulate greenhouse gas emissions. *See Massachusetts v. EPA*, 127 S. Ct. 1438, 1459-60 (2007) (construing 42 U.S.C. § 7521(a)(1)). It has ordered more stringent fuel efficiency standards, Pub. L. No. 110-140, tit. I, § 102(a), 121 Stat. 1492 *et seq.* (2007), which are the equivalent of emissions standards for automobiles.[3] It has created incentives for emissions-reducing technologies. *Id.*, tit. I, VII, VI §§ 101-36, 711-714, 601-36. And it has directed the President to "work toward [international] agreements" on issues of climate change. 15 U.S.C. § 2901 note.

To the extent the political branches have declined to adopt even more aggressive measures, it is because of their longstanding concern that such measures could inflict severe harm on the U.S. economy, particularly in the absence of comparable measures by other nations (including developing countries such as China and India). Thus, for example, the Energy Policy Act of 1992 directed the Secretary of Energy to report on the "economic, energy, social, environmental, and competitive implications, including implications for jobs," of various options for reducing greenhouse gas emissions, 42 U.S.C. §§ 13384, 13381, and adopted a strategy of requiring "dramatic and possibly higher cost [responses to global warming] . . . *only in the conte[x]t of concerted international*

---

[3] *See Average Fuel Economy Standards for Light Trucks Model Years 2008-2011*, 71 Fed. Reg. 17,566, 17,659 (Apr. 6, 2006) (codified at 44 C.F.R. Pts 523, 533 & 537 (National Highway Transportation Safety Administration) (explaining that "fuel economy is directly related to emissions of greenhouse gases").

1    *action*," H.R. Rep. No. 102-474, pt. I, at 152 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1953, 1975

2    (emphasis added).  Five years later, the Senate unanimously urged President Clinton not to sign the

3    Kyoto Protocol to the United Nations Framework Convention on Climate Change because it

4    imposed emissions caps on developed nations, but not developing nations like China and India.  *See*

5    S. Res. 98, 105th Cong. (1997).  President Bush opposes the Protocol because this asymmetry would

6    have "a negative economic impact, with layoffs of workers and price increases for consumers."[4]

7    And, before his election, Congress used appropriations legislation to bar any attempt to implement

8    the Protocol.[5]  Plaintiffs do not, and cannot, allege that the conspiracy defendants manufactured the

9    asymmetrical burdens of the Kyoto Protocol or somehow misled the political branches into believing

10   that asymmetrical regulatory burdens could adversely affect the U.S. economy.

11        In short, any claim that the alleged conspiracy caused the alleged undue risk of flooding in

12   Kivalina by inducing the political branches to refrain from adopting even more aggressive regulatory

13   measures also rests on speculation that cannot form the basis for Article III causation.

14            **3.    Plaintiffs' speculation about the efficacy of a boycott and/or additional
                      regulation.**

15

16        Even if plaintiffs had alleged facts that, contrary to commonsense and historical fact,

17   rendered either their "public boycott" or "additional governmental action" theories remotely

18   plausible, their theory of causation relies on yet another impermissible speculative leap:  that

19   boycotts and/or additional regulatory actions undertaken or adopted in the 1990s could have

20   prevented the threat of flooding in Kivalina that allegedly materialized no later than 2003.  Once

21   again, plaintiffs allege no facts from which the Court could make such a finding.  Instead, their

22   complaint and the materials it incorporates refute this unfounded speculation.

23        Plaintiffs' problem is one of timing.  Although they allege that the first of the so-called "front

24

25   [4] *See* Transcript, *President Bush Discusses Global Climate Change* (Jun. 11, 2001),
     http://www.whitehouse.gov/news/releases/2001/06/20010611-2.html.

26

27   [5] *See* Pub. L. No. 105-276, tit. III, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, tit. III, 113 Stat.
     1047, 1080 (1999); Pub. L. No. 106-377, app. A, 114 Stat. 1441, 1441A-41 (2000).

28

1    groups" was founded in 1989, Compl. ¶ 196, they allege no public statements, advertisements or

2    campaigns by any conspiracy defendant, "front group" or scientist associated with or funded by

3    these entities prior to the mid-1990s.[6]  Accordingly, the fact that a consumer boycott and/or more

4    aggressive regulatory measures did not occur prior to the mid-1990s cannot be ascribed to the

5    alleged campaign, since, according to plaintiffs' own allegations, that campaign had not yet begun.

6         The only way the alleged campaign could have "caused" plaintiffs' injuries, therefore, is if

7    emissions reductions that would have first been compelled in the mid-1990s would have prevented

8    an unacceptable risk of flooding in Kivalina that allegedly materialized just a few years later, in

9    2003.[7]  But the complaint alleges no facts that would permit the Court to make such a finding.

10   Nowhere do plaintiffs allege that, if U.S. domestic emissions had been reduced beginning in the mid-

11   1990s, the accumulation of worldwide emissions would in a short space of time have trapped less

12   heat; that this reduced pool of trapped heat would have led within a few years to a smaller increase

13   in the temperature of the atmosphere; that this smaller increase in atmospheric temperature would

14   have caused less melting of the glaciers and ice caps and a smaller increase in ocean temperatures;

15   and that, as a result, Kivalina would have lost less sea ice and would have been less vulnerable to the

16   waves, storm surges and erosion that created the allegedly unacceptable risk of flooding.  In the

17   absence of such allegations, there is absolutely no basis for concluding that the conspiracy

18

19   [6] *See* Compl. ¶¶ 192-93 ("[o]ne of the earliest" alleged front groups, TASSC, "was originally formed
20   in 1993," and, "[a]t some point in the 1990s," began working on behalf of the alleged conspiracy
     defendants); *id.* ¶¶ 205-08 (describing activities of the GCC in 1995 and 1996); *id.* ¶¶ 211-14 (citing
21   press releases and reports by the George C. Marshall Institute in 1995 and 1996 and activities since
     ExxonMobil allegedly began financing it in 1998); *id.* ¶¶ 215-22 (statements and activities in 1996
22   and 1997 by various groups); *id.* ¶ 223 (1998 strategy memo by industry task force formed "in the
     1990s"); *id.* ¶¶ 225-30 (founding of Greening Earth Society in 1998 and activities thereafter); *id.*
23   ¶ 231-48 (ExxonMobil activities from 1998 to present).

24   [7] Plaintiffs' allegations concerning the risks of flooding on Kivalina are drawn from a 2003 report by
25   the Government Accountability Office.  *See* Compl. ¶ 185 (citing Gov't Accountability Office,
     *Alaska Native Villages* (Dec. 2003), *available at* http://www.gao.gov/new.items/d04142.pdf ("GAO
26   Report")).  That report states that, by 2003, rising temperatures had already "affected the thickness,
     extent, and duration of sea ice that forms along [Alaska's] western and northern coasts," leaving
27   those coasts "more vulnerable to waves, storm surges, and erosion," and leaving Kivalina "in
28   imminent danger from flooding and erosion."  GAO Report at 4, 8; *cf.* Compl. ¶ 185.

1    defendants forestalled any actions that could have prevented plaintiffs' alleged injuries.

2        In fact, plaintiffs' allegations, and information they incorporate in their complaint, make

3    clear that no steps taken in the 1990s could have possibly prevented their alleged injuries.  Plaintiffs

4    allege that "[a] large fraction of carbon dioxide emissions persist in the atmosphere *for several*

5    *centuries*, and thus have a *lasting effect on the climate*."  Compl. ¶ 125 (emphases added).  The

6    Second Assessment Report of the Intergovernmental Panel on Climate Change ("IPCC"), which was

7    published in 1995 and is cited in the complaint, *see id.* ¶ 155,[8] explicitly states that "climate-induced

8    environmental change cannot be reversed quickly, if at all, due to the long time-scales associated

9    with the climate system."[9]  That report predicted that, under the best-case scenario—which assumed

10   the lowest level of future emissions as well as several other favorable factors—the atmospheric

11   temperature would still rise 1 degree Celsius over the next century.[10]  The IPCC's Third Assessment

12   Report, which was published in 2001 and is cited in the complaint, *see id.* ¶ 156, likewise described

13   the centuries-long nature of global climate change, and predicted that, even with a concerted,

14   worldwide effort, it would take 10 to 20 years before future emissions simply returned to 2000

15   levels, levels that the report indicates would be insufficient to reverse the reported warming trend.[11]

16       These facts preclude any finding that measures compelled by a public boycott or the federal

17   government in the mid-1990s could have halted, and then reversed, a centuries-long ecological

---

[8] This Court may consider documents cited in the complaint in ruling on a motion to dismiss.  *See United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).

[9] IPCC Working Group II, Intergovernmental Panel on Climate Change, *Climate Change 1995: Impacts, Adaptations and Mitigation of Climate Change:  Scientific-Technical Analyses, Summary for Policy Makers* (1995) at 2, *available at* http://www.ipcc.ch/pdf/climate-changes-2001/mitigation/mitigation-spm-en.pdf.

[10] IPCC Working Group I, Intergovernmental Panel on Climate Change, *Climate Change 1995:  The Science of Climate Change, Summary for Policy Makers* (1995) at 3-4, *available at* http://www.ipcc.ch/pdf/climate-changes-1995/spm-science-of-climate-changes.pdf.

[11] IPCC Working Group III, Intergovernmental Panel on Climate Change, *Climate Change 2001: Mitigation, Summary for Policy Makers* (1995) at 3, 6, *available at* http://www.ipcc.ch/pdf/climate-changes-2001/mitigation/mitigation-spm-en.pdf.

1   process that, by 2003, had, according to plaintiffs, resulted in an unacceptable risk of flooding in

2   Kivalina.  It necessarily follows that, even if the alleged conspiracy forestalled such measures, it

3   could not have caused the alleged injuries for which plaintiffs seek damages.

4   **II.     PLAINTIFFS' CONSPIRACY CLAIM IS LEGALLY BARRED.**

5          Not only do plaintiffs lack standing, their civil conspiracy claim fails as a matter of law.

6   Holding defendants[12] liable for seeking to shape public policy is constitutionally impermissible.  The

7   First Amendment and *Noerr-Pennington* doctrine "bar[ ] any claim, federal or state, common law or

8   statutory, that has as its gravamen constitutionally-protected petitioning activity."  *Gen-Probe, Inc.*

9   *v. Amoco Corp.*, 926 F. Supp. 948, 956 (S.D. Cal. 1996).  Thus, defendants cannot be liable for

10  attempting to shape public policy.  And, insofar as plaintiffs claim that the alleged conspiracy was

11  designed to stave off an unprecedented consumer boycott, the First Amendment's free speech clause

12  prohibits imposing liability on the basis of whose scientific view was more valid and whose public

13  policies more sound.  "The first amendment prohibits efforts to ensure 'laboratory conditions' in

14  politics; speech rather than damages is the right response to distorted presentations and overblown

15  rhetoric."  *Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir. 1988).

16         In all events, civil conspiracy is not an independent claim for relief; such a claim must allege

17  a separate, underlying tortious act.  *Beck v. Prupis*, 529 U.S. 494, 501 (2000) (collecting cases).

18  Here, the complaint alleges that defendants conspired to mislead the public in furtherance of the

19  "public nuisance [of] global warming."  Compl. ¶¶ 271, 272.  Accordingly, because plaintiffs'

20  nuisance claims are barred, their civil conspiracy claim necessarily fails as well.

21         **A.     Plaintiffs' Civil Conspiracy Claim Is Constitutionally Barred.**

22         Plaintiffs claim that the alleged campaign to deceive the public caused their alleged injuries

23

---

24  [12] The complaint refers to a large number of so-called "front organizations" and industry groups,
    without identifying which "Conspiracy Defendants" are alleged to have been members of which

25  organizations or groups.  It is impossible to know, then, what statements or actions plaintiffs would
    impute to which defendants, and which defendants are alleged to be liable for making or conspiring

26  to make any particular statement.  As a shorthand, defendants refer to all the actions and statements
    on which plaintiffs premise their conspiracy claim as "defendants' statements," "defendants'

27  actions," "defendants' publicity campaigns," etc., but they do not thereby concede that all (or any)

28  defendants made or agreed to the making of any particular alleged statement.

by forestalling the adoption of additional federal regulatory measures and/or by preventing a consumer boycott that would have forced expensive emissions reductions.  Both of these theories are foreclosed by the First Amendment.

> **1.    The *Noerr-Pennington Doctrine* Bars Plaintiffs' Claim That The Alleged Conspiracy Prevented Federal Regulatory Measures.**

Seeking favorable government policies through a public relations campaign, even a campaign alleged to be deceptive or misleading, is constitutionally protected activity, and under the *Noerr-Pennington* doctrine, no liability may attach to such conduct.  *See, e.g., Sosa v. DIRECTV*, 437 F.3d 923, 929-32 (9th Cir. 2006); *Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 834 F. Supp. 1216, 1226-28 (D. Alaska 1991).

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), trucking companies sued certain railroads, claiming the latter had violated the antitrust laws by conducting a misleading campaign designed to publicize the supposed harms caused by trucks. *Id.* at 129.  Accepting that such conduct was anti-competitive, and thus unlawful, the Supreme Court held that the Sherman Act had to yield to the railroads' constitutional right to petition the government.  *Id.*  Although the railroads were not alleged to have lobbied government officials directly, their publicity campaign was nevertheless immune from liability because it sought, albeit indirectly, to shape public policy regarding trucking.  *Id.*; *see also Manistee Town Center v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000) ("A publicity campaign directed at the general public and seeking government action is covered by *Noerr-Pennington* immunity").[13]  The Court held that "the Sherman Act does not prohibit . . . persons from associating . . . in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a

---

[13] *See also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907-10 (1982) (*Noerr-Pennington* protected a boycott of white merchants through a publicity campaign that included church speeches, personal solicitations, and publishing the names of boycott violators in a newspaper); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 511 (1988) (*Noerr* "involved a public relations campaign rather than direct lobbying of the lawmakers and [the defendants] were held not subject to antitrust challenge because of the fundamental importance of maintaining the free flow of information to the government and the right of the people to seek legislative relief, *directly or indirectly*."  (emphasis added)) (White, J., dissenting).

1    restraint or a monopoly."  *Noerr*, 365 U.S. at 136 (attaching liability to such a publicity campaign

2    "would raise important constitutional questions" respecting the right to petition) *id.* at 138; *see also*

3    *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) ("Joint efforts to influence

4    public officials do not violate the antitrust laws even though intended to eliminate competition").

5        The Supreme Court has reaffirmed *Noerr-Pennington* immunity on numerous occasions,

6    both in the antitrust setting and with respect to other causes of action.  *See, e.g., BE & K Constr. Co.*

7    *v. NLRB*, 536 U.S. 516, 525 (2002) (applying *Noerr-Pennington* to labor dispute); *Bill Johnson's*

8    *Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741-43 (1983) (same).  Because *Noerr-Pennington* "is

9    based on and implements the First Amendment right to petition," the immunity "'is no longer limited

10   to the antitrust context'"; it protects all genuine petitioning conduct—no matter the alleged basis for

11   liability.  *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) (quoting *Manistee Town Center*, 227

12   F.3d at 1092).[14]

13       Nor does the availability of the immunity turn on the accuracy of the alleged statements.  It

14   made no difference in *Noerr* that the trucking companies had alleged—just as plaintiffs allege here,

15   Compl. ¶ 273—that the defendants' publicity campaign was "fraudulent" and "malicious."  *Noerr*,

16   365 U.S. at 133.  The truckers further claimed—again, precisely as plaintiffs have here—that the

17   defendants had deceptively employed "front" organizations to make statements appear to be the

18   "spontaneously expressed views of independent persons and civic groups."  *Id.* at 129-30.  And, as

19   here, the *Noerr* plaintiffs argued that the defendants had deceived the public through the

20

21   [14] *See also DIRECTV*, 437 F.3d at 937 (although *Noerr* and its progeny involved the antitrust laws,
Supreme Court precedent "compels a similar construction of other laws to the extent they impinge
22   on the right of petition"); *Oregon Natural Res. Council v. Avison Timer Co.*,  944 F.2d 531, 533 (9th
Cir. 1991) (*Noerr-Pennington* "protection has been expanded to apply to petitions to courts and
23   administrative agencies, as well as to preclude claims other than those brought under the antitrust
laws") (citation omitted); *Campbell v. PMI Food Equip. Group, Inc*., 509 F.3d 776, 790 (6th Cir.
24   2007) ("Although the *Noerr -Pennington* doctrine was initially recognized in the antitrust field, the
federal courts have by analogy applied it to claims brought under both state and federal laws,
25   including common law claims"); *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858
F.2d 1075, 1084 (5th Cir. 1988) ("There is simply no reason that a common-law tort doctrine can
26   any more permissibly abridge or chill the constitutional right of petition than can a statutory claim
such as antitrust").

27

28

17

1    "manufacture of bogus sources of reference, (and) distortion of public sources of information."  *Id.*

2    at 140.  The Court held that such allegations are "legally irrelevant" to the analysis.  *Id.* at 142, 145

3    ("[d]eception, reprehensible as it is, can be of no consequence so far as the Sherman Act is

4    concerned"); *see also Allied Tube*, 486 U.S. at 499-500 ("A publicity campaign directed at the

5    general public, seeking legislation or executive action, enjoys antitrust immunity even when the

6    campaign employs unethical and deceptive methods").[15]

7          These settled principles apply directly here.  Plaintiffs' civil conspiracy claim is based on

8    statements alleged to have been made by defendants themselves or alleged front groups that,

9    according to plaintiffs' own averments, were intended to influence governmental policy with respect

10   to climate change.  For example, plaintiffs allege:

12   - "GCC activities have included publication of glossy reports raising concern about
13     unemployment that it claims would result *from emissions regulations*,"  Compl. ¶ 204
        (emphasis added);

14   - "The GCC claimed that 'a bedrock principle addressing global climate change issues is
        that science—not emotional or political reactions—must serve as the foundation for
15       global climate *policy decisions*,'" *id.* ¶ 210 (emphasis added);

16   - "In April, 1995, the George C. Marshall Institute issued a press release touting a study
17     that claimed . . . that *policy makers needed to know* that the 'growing body of scientific
        evidence shows global warming is not a serious threat,'" *id.* ¶ 212 (emphasis added);

18
19   - In a June 19, 1996 Wall Street Journal op-ed piece, "Dr. Frederick Seitz . . . stated that
        Dr. Santer and his co-authors 'deliberately *deceived policymakers* and the public,'" *id.*
20       ¶¶ 218-19 (emphasis added);

21   - "The July 19, 1999 issue of *World Climate Report*, the [Greening Earth] Society's
        newsletter . . . [contains an article that] laments the economic ruin *restrictions on coal-
22       burning* would bring to rural America," *id.* ¶ 229 (emphasis added);

23   - "*The New Jersey Star-Ledger* observed on August 1, 1999, that 'over the past decade, the
24     Global Climate Coalition has spent millions of dollars to defuse the global warming
        issue, *lobbying members of Congress to thwart any corrective action*,'" *id.* ¶ 242
25       (emphasis added);

26   ───────────────

27   [15] Of course, defendants deny that they engaged in any deception.  Although the Court must accept
     plaintiffs' factual allegations as true under Rule 12(b)(6), even plaintiffs' allegations recognize that
28   the allegedly "prevailing view" on climate change has evolved over time.  *See supra* at 3, 7-8.

─────────────────

18

- The alleged conspiracy "attempts to demonstrate that . . . there is not enough scientific certainty *to warrant action*," *id.* ¶ 189 (emphasis added).

Additionally, numerous documents and reports quoted and relied upon in the complaint further underscore that the plaintiffs impermissibly seek to hold defendants liable for a publicity campaign designed to shape public policy concerning global warming.[16]  Thus, for example:

- ¶ 194 cites an article that states that industry groups "have poured millions of dollars into a bewildering array of green-sounding front groups" to defeat recommendations from the Intergovernmental Panel on Climate Change "for *policy measures* to reduce emissions of greenhouse gases by 20% below 1990 levels."  "Thinking Globally, Acting Vocally: The International Conspiracy to Overheat the Earth," at 1 (emphasis added);

- ¶ 195 cites an *Air Daily* article concerning a report by the Edison Electric Institute ("EEI"), asserting that "EEI had hoped to use the study *to bolster its stand against binding targets to reduce worldwide GHG* [greenhouse gas] *emissions*."  "Is EEI Keeping ICF Study Results Quiet?" *Air Daily*, Dec. 3, 1997 (emphasis added);

- ¶ 223 cites a document that lists various defendants as alleged members of an alleged entity called the Global Climate Science Communication Team ("GCSCT"), and asserts that GCSCT "developed an action plan to inform the American public that science does not support the precipitous *actions [that the] Kyoto [Protocol] would dictate*, *thereby providing a climate for the right policy decisions to be made*."  The document also asserts that the GCSCT lists as a goal ensuring that "[a] majority of the American public, including industry leadership, recognizes that significant uncertainties exist in climate science, *and therefore raises questions among those (e.g. Congress) who chart the future U.S. course on global climate change*." http://euronet.nl/users/e_wesker/ew@shell/API-prop.html at 2, 3 (emphasis added);

- ¶ 223 also cites a New York Times article about the GCSCT.  The article states that among the GCSCT's ideas is a campaign to "convince journalists, politicians and the public that the risk of global warming is too uncertain *to justify controls on greenhouse gases* like carbon dioxide that trap the sun's heat near Earth."  John H. Cushman Jr., "Industrial Group Plans to Battle Climate Treaty," *The New York Times*, April 26, 1998 (emphasis added).

Thus, just as the trucking companies did in *Noerr*, plaintiffs allege that they were harmed by an alleged publicity campaign that used newspaper editorials, advertisements, and "front" organizations to make allegedly false statements to the public.  *See Noerr*, 365 U.S. at 142-43

---

[16] Although these documents are not attached to the complaint, this Court can consider them on a motion to dismiss because of plaintiffs' reliance on them.  *E.g.*, *Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005).

1    (noting allegations of misleading "[c]irculars, speeches, newspaper articles, editorials, magazine

2    articles, [other] memoranda"); *id.* at 140 (noting allegations that defendants used "third-party"

3    entities to give "propaganda actually circulated by a party in interest the appearance of being

4    spontaneous declarations of independent groups").  Under well-settled law, such a campaign to

5    shape public policy is shielded from liability under the *Noerr-Pennington* doctrine.  It is immaterial

6    that the alleged publicity campaign was motivated by a desire to avoid costly regulations.  Compl.

7    ¶ 269 (delaying "costly" changes in defendants' behavior "was the major objective of the

8    conspiracies described herein").  As the Supreme Court has observed, "[t]hat a private party's

9    political motives are selfish is irrelevant:  *Noerr* shields . . . a concerted effort to influence public

10   officials regardless of intent or purpose."  *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S.

11   365, 380 (1991) (internal quotation marks ommitted); *see also Manistee*, 227 F.3d at 1093 (to

12   qualify for *Noerr-Pennington* immunity, "it does not matter whether [defendants] intend to bring

13   about an advantage to themselves or a disadvantage to their competitors").  Irrespective of a

14   complaint's "specific allegations" of intent, the Ninth Circuit has held that the dispositive inquiry is

15   whether "the behavior [plaintiffs] ostensibly describe falls squarely within the *Noerr-Pennington*

16   doctrine."  *Boone v. Redevelopment Agency*, 841 F.2d 886, 894 (9th Cir. 1988).  Given the striking

17   similarities between the conduct alleged in *Noerr* and the allegations here, the answer to this inquiry

18   is resoundingly clear.

          Because plaintiffs' civil conspiracy claim targets protected petitioning activity, this Court

19   must dismiss the civil conspiracy count for failure to state a claim upon which relief can be granted.

20   *See, e.g., Manistee*, 227 F.3d at 1091 (affirming Rule 12(b)(6) dismissal on *Noerr-Pennington*

21   grounds); *Boone*, 841 F.2d at 888-89 (same); *see also Alaska Cargo Transport*, 834 F. Supp. at

22   1226-28 (dismissing claim on *Noerr-Pennington* grounds).

23

24          **2.    The First Amendment Bars Plaintiffs' Claim That The Alleged
                    Conspiracy Prevented A Public Boycott.**

25

26          Even assuming—contrary to the complaint itself and to common sense—that the alleged

27   "campaign" was not intended to influence government policy, the conspiracy claim would still be

28   barred by the First Amendment.  The First Amendment makes clear that the government "has no

                                                    20

1   power to restrict expression because of its message, its ideas, its subject matter, or its content."

2   *Police Dep't v. Mosley*, 408 U.S. 92, 95 (1972).  This command applies to the scientific debate

3   surrounding climate change.  Indeed, "[i]t is . . . well settled . . . that the First Amendment protects

4   scientific expression and debate just as it protects political and artistic expression."  *Universal City*

5   *Studios, Inc. v. Corley*, 273 F.3d 429, 446-47 (2d Cir. 2001) (internal quotation marks and citation

6   omitted).  Plaintiffs allege that the defendants' alleged speech related to global warming was based

7   on shoddy science and was misleading.  *See, e.g.,* Compl. ¶ 191.  Even if that were true, which this

8   Court must assume for purposes of this motion, such assertions do not deprive defendants of their

9   First Amendment protections.[17]

10      The First Amendment does not permit courts to referee disputes over the truth or falsity of

11  statements made in a scientific debate, for "constitutional protection does not turn upon . . . truth,

12  popularity, or social utility."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964) (internal

13  quotation marks omitted); *accord Org. for a Better Austin v. Keefe*, 402 U.S. 415, 418 (1971) ("It is

14  elementary, of course, that . . . the courts do not concern themselves with the truth or validity of the

15  publication").  Because a vigorous debate must be tolerated to ensure that freedom of expression

16  maintains the "breathing space" necessary to survive, courts have "consistently refused to recognize

17  an exception for any test of truth—whether administered by judges, juries, or administrative

18  officials."  *New York Times*, 376 U.S. at 271; *see also Oxycal Labs., Inc. v. Jeffers*, 909 F. Supp.

19  719, 724 (S.D. Cal. 1995) ("The Court cannot inquir[e] into the validity of . . . scientific theories, nor

20  should it"); *Demuth Dev. Corp. v. Merck & Co.*, 432 F. Supp. 990, 993-94 (E.D.N.Y. 1977)

---

[17] Corporations—even those subject to detailed government regulations—enjoy the same protections from undue infringement on their right to free speech as individuals.  *See Consolidated Edison Co. of N.Y. v. Pub. Serv. Comm'n*, 447 U.S. 530, 534 n.1 (1980) ("[T]he speech of heavily regulated businesses may enjoy constitutional protection.  [Such regulation] does not decrease the informative value of [corporations'] opinions on critical public matters.") (citations omitted).  It is of no moment that the defendants' speech is alleged to have been informed by a commercial motive, Compl. ¶ 269.  *See, e.g., Time, Inc. v. Hill*, 385 U.S. 374, 397 (1967) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment") (internal quotation marks omitted); *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) (Speech is entitled to full First Amendment protection "even though it is carried in a form that is 'sold' for profit" and "even though it may involve a solicitation to purchase or otherwise pay or contribute money").

1    ("Merck's right to publish free of fear of liability is guaranteed by the First Amendment"; a holding

2    of liability "would serve neither justice nor the public interest because of its manifestly chilling

3    effect upon the right to disseminate knowledge"); *McMillan v. Togus Reg'l Office*, 294 F. Supp. 2d

4    305, 322 (E.D.N.Y. 2003) (finding First Amendment protects public debate on scientific matters and

5    that expression of views on scientific matters "should be given wide leeway" and "spared the

6    interference of courts"), *aff'd*, 120 F. App'x 849 (2d Cir. 2005).

7          Thus, even "utterance[s that] contain[] 'half-truths' and 'misinformation'" cannot form the

8    basis of liability.  *New York Times*, 376 U.S. at 273; *id.* at 722 n.13 (noting that "'to argue

9    sophistically, to suppress the facts or arguments, to misstate the elements of the case, or misrepresent

10   the opposite opinion" is not necessarily "morally culpable" and "still less could law presume to

11   interfere with this kind of controversial misconduct.'" (quoting Mill, *On Liberty*, at 47) (Oxford:

12   Blackwell, 1947).  Accordingly, claims that defendants disseminated unsound and misleading

13   science furnish no basis for liability.  Indeed, this conclusion is reinforced here by plaintiffs'

14   representations in the complaint that the "prevailing view" of climate change evolved over time.

15   The complaint refers to a "'growing realization'" in 1980 "'that the earth's atmosphere could be

16   permanently'" altered by human activities, Compl. ¶ 146, and to the "*mounting* scientific evidence,"

17   *id.* ¶ 223 (emphasis added), and "*growing* scientific and public consensus regarding global warming"

18   in the late 1990s, *id.* ¶ 209 (emphasis added).  Plaintiffs further aver that a number of the conspiracy

19   defendants publicly withdrew from the GCC at this same time.  *See id.*  The First Amendment does

20   not permit courts to impose retrospective liability on those who (according to the allegations of the

21   complaint) hold what turn out to be a dissenting view in a complex and evolving scientific debate.

22         The Supreme Court's decision in *Consolidated Edison* is particularly instructive because the

23   statements held to be protected by the First Amendment there are strikingly similar to the statements

24   on which plaintiffs base their civil conspiracy claim in this case.  In *Consolidated Edison*, the

25   defendant utility told its customers that nuclear power plants were "safe, economical and clean," and

26   that the benefits of nuclear power "far outweigh any potential risk."  447 U.S. at 532.  The complaint

27   here similarly identifies statements attributed to the conspiracy defendants (or their alleged front

28   groups) concerning safety, economy, and pollution, and the balance of risks and benefits.  Plaintiffs

1  attribute to the conspiracy defendants statements that:  the causes and effects of global warming are

2  not as certain as others believe (Compl. ¶¶ 189, 212, 213, 222, 246, 272); curbing greenhouse gas

3  emissions will injure the economy (*id.* ¶¶ 204, 229, 242); and the balance of risks and benefits does

4  not favor controls on emissions (*id.* ¶¶ 204, 225, 228).  As in *Consolidated Edison*, the statements

5  upon which plaintiffs' challenge relies interpret information on scientific and technical matters in the

6  context of a spirited public policy discussion, and express conclusions on those matters that some

7  perceive as controversial.  But, just as the Supreme Court held that the utility's "controversial" views

8  about nuclear power went to "the heart" of the First Amendment, so this Court should conclude that

9  the views plaintiffs ascribe to the conspiracy defendants are constitutionally protected.

10        It follows, then, that plaintiffs' allegations that defendants conspired to "mislead the public

11  about the science of global warming," Compl. ¶ 189, in order to allay the public's "concern" about

12  the issue, *id.* ¶ 269, fail to state a claim, even if this Court accepts that the conspiracy defendants did

13  not intend to influence government policy.

14        **B.      Plaintiffs Have Failed To State A Claim For Civil Conspiracy.**

15        Finally, even if plaintiffs' civil conspiracy claim were not barred as a matter of law—and it

16  clearly is—it still fails to state any claim for relief.  Neither federal nor state common law recognizes

17  a stand-alone claim for civil conspiracy.[18]  And even if they did, plaintiffs have not pled facts that, if

18  true, establish that the alleged conspiracy was the proximate cause of their alleged injuries.

19        **1.      Plaintiffs cannot state an independent claim for civil conspiracy.**

20        As the Supreme Court has explained, it is "widely accepted" and "well established" that "a

21  plaintiff could bring suit for civil conspiracy only if he had been injured by an act that was itself

22  ────────────────────
   [18]  Plaintiffs purport to plead a claim for civil conspiracy under federal common law or, alternatively,
23  under unspecified state law.  Compl. ¶ 276.  The First Amendment compels dismissal of this claim
   no matter the source of law.  But if this Court's determination does turn on state law, the complaint
24  must be dismissed as inadequate.  Defendants have no obligation to guess which state law applies or
   to seek dismissal under the laws of each of the fifty states.  *See, e.g., In re Static Random Access*
25  *Memory (SRAM) Antitrust Litig.*, 2008 WL 426522 (N.D. Cal. Feb. 14, 2008); *In re Ditropan XL*
   *Antitrust Litig.*, 529 F. Supp. 2d 1098, 1101 (N.D. Cal. 2007) (dismissing complaint because "ability
26  to plead a claim for unjust enrichment may vary from state to state, and unless and until Direct
   Purchaser Plaintiff clarifies under what state law it is moving, neither Defendants nor the Court can
27  address whether the claim or claims have been adequately plead[ed]").

28

1   tortious." *Beck*, 529 U.S. at 504; *see also id.* at 501 ("There is no tort of civil conspiracy in and of

2   itself"); *Barnstead Broad. Corp. v. Offshore Broad. Corp.*, 886 F. Supp. 874, 883 (D.D.C. 1995)

3   ("Under both federal and District of Columbia law, civil conspiracy is not actionable in and of itself.

4   It is not a separate tort"); *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 108 n.9 (D.D.C.

5   2007)  ("[C]ivil conspiracy is not recognized as an independent tort, but rather as a basis for liability

6   arising out of a separate tort").  Under the common law, the Court observed, "a conspiracy claim was

7   not an independent cause of action, but was only the mechanism for subjecting co-conspirators to

8   liability when one of their members committed a tortious act." *Beck*, 529 U.S. at 503 ("[I]t is a

9   means for establishing vicarious liability for the underlying tort") (internal quotation marks omitted);

10  *see also Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000) (holding

11  that "the cause of action [for a civil conspiracy] is wholly subordinate to the underlying tort's

12  existence").  Accordingly, a civil conspiracy claim serves only to render conspiracy defendants

13  jointly and severally liable for an independent tortious act, here the alleged "maintain[ance of] a

14  public nuisance, global warming."  Compl. ¶ 269.

15          Because plaintiffs' nuisance claims must be dismissed, *see* Util. Omnibus Mot., their civil

16  conspiracy claim necessarily fails along with them.  *See, e.g., Hopkins v. Keefe Commissary Network

17  Sales*, No. 07-745, 2007 WL 2080480, at *5 (W.D. Pa. July 12, 2007) (dismissing underlying federal

18  constitutional tort under Rule 12(b)(6), and holding that "alleged [civil] conspiracy to do that which

19  is not a . . . tort fails to state a federal claim"); *Barnstead Broadcasting*, 886 F. Supp. at 883 (because

20  "underlying torts upon which the civil conspiracy claim is based . . . are not stated with particularity,

21  and having dismissed those claims, it necessarily follows that the civil conspiracy count falls as

22  well"); *cf. Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (holding, under New

23  York law, that "since [plaintiff] fails to state causes of action for either of the torts underlying the

24  alleged conspiracy, . . . it necessarily fails to state an actionable claim for civil conspiracy").

### 2.  Plaintiffs cannot establish proximate causation.

26          Plaintiffs' purported civil conspiracy claim fails for yet another reason—*i.e.*, plaintiffs cannot

27  establish proximate causation.  *See* Am. Jur. 2d *Conspiracy* § 51 (updated 2008) ("civil conspiracy

28  requires an object to be accomplished, a meeting of minds on the object or course of action, one or

1   more overt acts, and damages as the proximate result thereof"); Restatement (Second) of Torts,

2   § 876 cmt. d ("[i]n determining liability [for acting in concert], the factors are the same as those used

3   in determining the existence of legal causation when there has been negligence or recklessness");

4   *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229, 266-67 (D.D.C. 2006) (under

5   California law, civil conspiracy requires a showing that "damages were incurred by the plaintiff as a

6   proximate result of the actions taken pursuant to the conspiracy" (citing *Rusheen v. Cohen*, 128 P.3d

7   713, 722 (Cal. 2006)); *Assoc. of Washington Public Hosp. Districts v. Philip Morris Inc.*, 241 F.3d

8   696, 706 (9th Cir. 2001) (affirming dismissal of common law claims for lack of proximate cause).

9       "[T]he requirement of proximate cause bars remote and speculative claims."  *In re Exxon*

10  *Valdez,* 270 F.3d 1215, 1253 (9th Cir. 2001); *see also Benefiel v. Exxon Corp.*, 959 F.2d 805, 808

11  (9th Cir. 1992) (affirming dismissal where alleged injuries were "remote and derivative" and

12  defendants' conduct "did not directly cause any injury"); *Oregon Laborers-Employers Health &*

13  *Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999) (there must be some

14  "direct relationship between the injury and the alleged wrongdoing").  For all the same reasons that

15  plaintiffs' allegations fail to establish Article III causation, those allegations likewise fail to establish

16  proximate causation.  Plaintiffs' alleged injuries are far too remote from the alleged conspiracy, and

17  the causal chain necessary to link the alleged injuries and conspiracy rests on impermissible

18  speculation.  *See* §§ I.A.-B., *supra*.  Moreover, the materials and facts they have incorporated into

19  their complaint preclude a finding that the alleged conspiracy forestalled any public or governmental

20  actions that could have possibly prevented their alleged injuries.  *Id.* § I.B.3.  Accordingly, their

21  conspiracy claim should be dismissed for failure to plead facts establishing proximate causation.

**CONCLUSION**

23      For all of the foregoing reasons, the conspiracy claim should be dismissed with prejudice.

Dated:  June 30, 2008                          Respectfully Submitted,

                                               SIDLEY AUSTIN LLP


                                               By:  /s/Samuel R. Miller
                                                          Samuel R. Miller

                                               Attorneys for Defendants
                                               AMERICAN ELECTRIC POWER
                                               COMPANY AND DUKE ENERGY
                                               CORPORATION


                                               By:   /s/Karl R. Moor
                                                          Karl R. Moor, Esq.
                                                          (*pro hac vice* pending)

                                               Attorney for Defendant
                                               THE SOUTHERN COMPANY



                          **ATTESTATION OF SIGNATURE**
                          **(N.D. Cal. General Order 45)**

       I, Samuel R. Miller, hereby attest that concurrence in the filing of defendants **MOTION OF
CERTAIN UTILITY DEFENDANTS TO DISMISS PLAINTIFFS' CIVIL CONSPIRACY
CLAIM** has been obtained from all of the signatories.


Dated:  June 30, 2008                          SIDLEY AUSTIN LLP


                                               By:  /s/ Samuel R. Miller

                                               Attorneys for Defendants
                                               AMERICAN ELECTRIC POWER
                                               COMPANY AND DUKE ENERGY
                                               CORPORATION

1  Samuel R. Miller (SBN 66871)
   srmiller@sidley.com
2  Paul L. Yanosy (SBN 233014)
   pyanosy@sidley.com
3  SIDLEY AUSTIN LLP
   555 California Street
4  San Francisco, California  94104
   Telephone:       (415) 772-1200
5  Facsimile:       (415) 772-7400

6  David T. Buente, Jr. (admitted *pro hac vice*)
   dbuente@sidley.com
7  Joseph R. Guerra (admitted *pro hac vice*)
   jguerra@sidley.com
8  SIDLEY AUSTIN LLP
   1501 K Street, N.W.
9  Washington, D.C. 20005
   Telephone:       (202) 736-8000
10 Facsimile:       (202) 736-8711

11 **Attorneys For Defendants**
   **AMERICAN ELECTRIC POWER COMPANY AND**
12 **DUKE ENERGY CORP.**

13 **[Counsel Listing Continued on Next Page]**

14                  UNITED STATES DISTRICT COURT

15               NORTHERN DISTRICT OF CALIFORNIA

16                       OAKLAND DIVISION

17
   NATIVE VILLAGE OF KIVALINA and       )  Case No. 08-cv-1138-SBA
18 CITY OF KIVALINA,                     )
                                         )  Assigned to: Hon. Saundra B. Armstrong
19          Plaintiffs                   )
                                         )  **[PROPOSED] ORDER DISMISSING**
20      vs.                              )  **PLAINTIFFS' CIVIL CONSPIRACY**
                                         )  **CLAIM**
21                                       )
                                         )
22 EXXONMOBIL, CORPORATION,              )
                                         )  Date:      December 9, 2008
23          Defendants                   )  Time:      1:00 p.m.
                                         )  Place:     Courtroom 3, 3rd Floor
24                                       )
                                         )
25 _____

26

27

28

Karl R. Moor, Esq. (*pro hac vice* pending)
krmoor@southernco.com
THE SOUTHERN COMPANY
601 Pennsylvania Avenue N.W.
Washington D.C. 20004
Tel:  (202) 261-5001
Fax:  (202) 296-7937

**Attorney for Defendant
THE SOUTHERN COMPANY**

1    The motion of defendants American Electric Power Company, Duke Energy Corp. and The

2    Southern Company to Dismiss Plaintiffs' Civil Conspiracy Claim under Rules 12(b)(1) and 12(b)(6)

3    of the Federal Rules of Civil Procedure ("Motion to Dismiss the Civil Conspiracy Claim") came on

4    for hearing before this Court on December 9, 2008.  All parties were represented by counsel.

5    Having considered the moving and opposition papers and heard the oral arguments of

6    counsel, the Court HEREBY ORDERS that defendants' Motion to Dismiss the Civil Conspiracy

7    Claim is GRANTED; and Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

8    In considering a motion to dismiss under Rule 12(b)(1), this Court must determine whether it

9    has subject matter jurisdiction, and "may look beyond the complaint to matters of public record"

10   when making that determination.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  Under Rule

11   12(b)(6), this Court must dismiss "where there is no cognizable legal theory or an absence of

12   sufficient facts alleged to support a cognizable theory."  *Navarro v. Block*, 250 F.3d 729, 732 (9th

13   Cir. 2001).  While all allegations of fact must be taken as true and all reasonable inferences drawn in

14   favor of plaintiffs, the Court need not accept legal conclusions cast as factual allegations.  *Clegg v.*

15   *Cult Awareness Network,* 18 F.3d 752, 754-55 (9th Cir.1994).  And, while the Court generally may

16   not look beyond the complaint when ruling on a Rule 12(b)(6) motion, it may consider matters of

17   public record, such as formal pronouncements by agencies and officials.  *Barron v. Reich*, 13 F.3d

18   1370, 1377 (9th Cir. 1994).  These standards mandate dismissal of the civil conspiracy claim.

19   **Rule 12(b)(1):**  First, plaintiffs lack Article III standing to pursue their conspiracy claim.

20   Plaintiffs must allege facts which, if true, establish that their injuries are "fairly traceable" to the

21   conspiracy they allege.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  With respect to

22   their conspiracy claim, plaintiffs allege merely that the supposed "campaign to deceive the public

23   about the science of global warming has caused Plaintiffs' injuries and/or is a substantial

24   contributing factor."  Compl. ¶ 273.  This is precisely the type of "formulaic recitation" and bare

25   "legal conclusion" that the Supreme Court and Ninth Circuit have condemned as inadequate to

26   satisfy Rule 8's pleading requirements.  Instead, to establish Article III causation, plaintiffs must

27   allege facts that provide a non-speculative basis for finding that the alleged unreasonable risk of

28

1

1  flooding in Kivalina is "fairly traceable" to the alleged campaign to support "contrarian theories"

2  that contradict "prevailing views" about the science of global warming.  It is clear as a matter of law

3  that plaintiffs have not met—and cannot possibly meet—this standard.

4          Remoteness is "a limitation on Article III standing."  *In re African-American Slave*

5  *Descendants Litig.*, 471 F.3d 754, 761 (7th Cir. 2006), *cert. denied*, 128 S. Ct. 92 (2007).  Here, the

6  extraordinary length of the causal chain necessary to link plaintiffs' alleged injuries to the alleged

7  conspiracy precludes any finding that those injuries are "fairly traceable" to the conspiracy

8  defendants.  *See id.* at 759 (affirming dismissal where causal chain was "too long and ha[d] too

9  many weak links for a court to be able to find that the defendants' conduct harmed the plaintiffs at

10  all").

11         In addition, the chain of causation necessary to link plaintiffs' alleged injuries to the alleged

12  conspiracy rests on impermissible speculation concerning the actions that the public and/or the

13  political branch would have taken in the absence of the alleged conspiracy.  *See, e.g., Simon v.*

14  *Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 42-43 (1976) (plaintiffs lacked

15  standing to challenge a revenue ruling that permitted hospitals to retain their nonprofit status despite

16  refusal to serve indigents, because it was mere guesswork whether plaintiffs were denied service

17  because of the revenue ruling or unrelated decisions by the hospitals); *Warth v. Seldin*, 422 U.S. 490,

18  507 (1975) (no standing where plaintiffs failed to allege facts from which it reasonably could be

19  inferred that, absent restrictive zoning practices, independent third parties would build affordable

20  housing); *Pritikin v. Department of Energy*, 254 F.3d 791, 791 (9th Cir. 2001) (no standing where

21  plaintiffs' causal chain presupposed the outcome of a decision from an independent party not before

22  the court).  Moreover, the materials and facts plaintiffs have incorporated into their complaint

23  preclude a finding that the alleged conspiracy forestalled any public or governmental actions that

24  could have possibly prevented their alleged injuries, because any actions commencing in the 1990s

25  (when the alleged conspiracy took place) could not have saved Kivalina from the threat of flooding it

26  allegedly now faces.

27         **Rule 12(b)(6):**  Even if plaintiffs had Article III standing, their conspiracy claims fail

28

[PROPOSED] ORDER DISMISSING PLAINTIFFS' CIVIL CONSPIRACY CLAIM
CASE NO. 08-1138 SBA

as a matter of law.  First, insofar as plaintiffs seek to hold defendants liable for allegedly engaging in a publicity campaign designed to dissuade the government from increasing regulation of greenhouse gas emissions, the petitioning clause of the First Amendment and the *Noerr-Pennington* doctrine preclude imposition of liability.  The First Amendment and the *Noerr-Pennington* doctrine "bar any claim, federal or state, common law or statutory, that has as its gravamen constitutionally-protected petitioning activity."  *Gen-Probe, Inc. v. Amoco Corp., Inc.*, 926 F. Supp. 948, 956 (S.D. Cal. 1996).  Seeking favorable government policies through a public relations campaign, even a campaign alleged to be deceptive or misleading, is constitutionally protected activity, and under the *Noerr-Pennington* doctrine, no liability may attach to such conduct. "That a private party's political motives are selfish is irrelevant: *Noerr* shields . . . a concerted effort to influence public officials regardless of intent or purpose."  *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991) (citation and quotation committed); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *Manistee Town Center v. City of Glendale*, 227 F.3d 1090, 1093 (9th Cir. 2000) (affirming Rule 12(b)(6) dismissal as "[a] publicity campaign directed at the general public and seeking government action is covered by *Noerr-Pennington* immunity"); *Alaska Cargo Transport, Inc. v. Alaska R.R. Corp.*, 834 F. Supp. 1216, 1226-28 (D. Alaska 1991) (dismissing claim on *Noerr-Pennington* grounds).

　　　　Similarly, to the extent plaintiffs allege that defendants sought to influence public opinion, the First Amendment's free speech clause protects defendants' actions.  "It is . . . well settled . . . that the First Amendment protects scientific expression and debate just as it protects political and artistic expression.'"  *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446-47 (2d Cir. 2001); *see also Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir. 1988) ("[t]he first amendment prohibits efforts to ensure 'laboratory conditions' in politics; speech rather than damages is the right response to distorted presentations and overblown rhetoric").  "[C]onstitutional protection does not turn upon . . . truth, popularity, or social utility."  *New York Times v. Sullivan*, 376 U.S. 254, 271 (1964); *accord Org. for a Better Austin v. Keefe*, 402 U.S. 415, 418 (1971) ("It is elementary, of course, that . . . the courts do not concern themselves with the truth or falsity of the publication"); *Consolidated Edison*

1    *Co. of New York, Inc. v. Public Service Commission of New York*, 447 U.S. 530, 532 (1980).

2    Defendants cannot be liable for attempting to shape public policy or engaging in public debate.

3         Second, even if plaintiffs' civil conspiracy claim were not constitutionally barred, the

4    common law does not recognize civil conspiracy as an independent claim for relief; rather, such a

5    claim must allege a separate, underlying tortious act. *Beck v. Prupis*, 529 U.S. 491, 501 (2000)

6    (collecting cases). Here, the complaint alleges that defendants conspired to mislead the public in

7    furtherance of the "public nuisance [of] global warming." Compl.¶¶ 271, 272. Accordingly,

8    because plaintiffs' nuisance claims fail, their civil conspiracy claim necessary fails as well. *See, e.g.,*

9    *Hopkins v. Keefe Commissary Network Sales*, No. 07-745, 2007 WL 2080480, at *5 (W.D. Pa. July

10   12, 2007) (after dismissing the underlying federal constitutional tort under Rule 12(b)(6), holding

11   that "alleged [civil] conspiracy to do that which is not a . . . tort fails to state a federal claim").

12   Finally, for all the same reasons plaintiffs' allegations fail to establish Article III causation, those

13   allegations likewise fail to establish proximate causation, which is an essential element to any civil

14   conspiracy claim.

15        For all of the foregoing reasons, defendants' Motion to Dismiss the Civil Conspiracy Claim

16   is GRANTED. Because leave to amend would here be futile, *Schreiber Distributing Co. v. Serv-*

17   *Well Furniture Co., Inc.*, 806 F. 2d 1393, 1401 (9th Cir. 1986), *Albrecht v. Lund*, 845 F. 2d 193,

18   195-96 (9th Cir. 1988), plaintiff's civil conspiracy claim is DISMISSED WITH PREJUDICE.

19

20        IT IS SO ORDERED.

21

22   DATED:   December __, 2008                   _____

23                                               Honorable Saundra B. Armstrong
                                                 United States District Judge
24

25

26

27

28

4

SF1 1503794v.1