

1  Belynda B. Reck (State Bar No. 163561)
   HUNTON & WILLIAMS LLP
2  550 South Hope Street, Suite 2000
   Los Angeles, California 90071-2627
3  Tel: (213) 532-2000/Fax: (213) 532-2020
4  E-mail: breck@hunton.com

5  Counsel for Defendants DTE Energy Company,
   MidAmerican Energy Holdings Company,
6  Pinnacle West Capital Corporation,
   and Southern Company
7
8  [Counsel Listing Continued on Next Four Pages]

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                   OAKLAND DIVISION

12

13  NATIVE VILLAGE OF KIVALINA and          CASE NO.:  CV-08-1138 SBA
    CITY OF KIVALINA
14                                          JUDGE:  Saundra B. Armstrong
              Plaintiffs,
15
16        v.                                **NOTICE OF MOTION AND MOTION TO
                                            DISMISS THE COMPLAINT FOR LACK
17  EXXON MOBIL CORPORATION, et al.,        OF PERSONAL JURISDICTION
                                            PURSUANT TO FED. R. CIV. P. 12(b)(2)
18            Defendants.                   ON BEHALF OF AMERICAN ELECTRIC
                                            POWER COMPANY, INC., AMERICAN
19                                          ELECTRIC POWER SERVICE
                                            CORPORATION, DTE ENERGY
20                                          COMPANY, DUKE ENERGY
                                            CORPORATION, DYNEGY HOLDINGS
21                                          INC., MIDAMERICAN ENERGY
                                            HOLDINGS COMPANY, PINNACLE
22                                          WEST CAPITAL CORPORATION,
                                            RELIANT ENERGY, INC., SOUTHERN
23                                          COMPANY, THE AES CORPORATION,
                                            AND XCEL ENERGY INC.**
24
25                                          DATE:    TBD (per Order, entered June 4,
                                                     2008; Dkt. No. 126, ¶10)
26                                          TIME:    1:00 p.m.
27                                          PLACE:   Courtroom 3
28

Hunton & Williams LLP

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

1  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2          Please take notice that, pursuant to the Order entered on June 4, 2008, Dkt. No. 126, on a

3  date to be determined by the Court, Defendants American Electric Power Company, Inc.,

4  American Electric Power Service Corporation, DTE Energy Company, Duke Energy Corporation,

5  Dynegy Holdings Inc., MidAmerican Energy Holdings Company, Pinnacle West Capital

6  Corporation, Reliant Energy, Inc., Southern Company, The AES Corporation, and Xcel Energy

7  Inc. (collectively, the "Non-resident Utility Defendants" or "Defendants") will and hereby do

8  move to dismiss Plaintiffs' Complaint as against them for lack of personal jurisdiction, pursuant

9  to Fed. R. Civ. P. 12(b)(2), on the ground that Plaintiffs have failed to allege facts sufficient to

10  warrant the exercise of general or specific jurisdiction over Defendants and on the ground that the

11  exercise of jurisdiction over Defendants would offend due process.[1]

12          This Motion is based upon the Notice of Motion, the accompanying Memorandum of

13  Points and Authorities, the Declarations in Support Thereof, the pleadings, records and papers

14  regarding this action on file with the Court, any Reply Memorandum filed in support of the

15  Motion and on any such further evidence or other matters that the Court deems proper at the

16  hearing of this Motion or otherwise.  Defendants certify that they have met and conferred with

17  Plaintiffs prior to filing this Motion, pursuant to ¶5 of the Standing Orders of this Court.

18

19  DATED:  June 30, 2008               By: _Belynda Reck_

20                                          Belynda B. Reck (SBN 163561)
                                            Hunton & Williams LLP
21                                          550 South Hope Street, Suite 2000
                                            Los Angeles, CA  90071-2627
22                                          Tel: 213-532-2000
                                            Fax: 213-532-2020
23                                          Email:  breck@hunton.com

24

25

26  _____
   [1] Pursuant to General Order No. 45, Section X, filer attests that the moving Defendants have
27  consented to their signatures on this document and the accompanying Memorandum of Points and
   Authorities and concur with the electronic filing of this document and the accompanying
28  Memorandum of Points and Authorities.

*Hunton & Williams LLP* (left margin)



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hunton & Williams LLP

F. William Brownell (*Admitted Pro Hac Vice*)
Norman W. Fichthorn (*Admitted Pro Hac Vice*)
Allison D. Wood (*Admitted Pro Hac Vice*)
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
Tel: 202-955-1500
Fax: 202-778-2201
Email: bbrownell@hunton.com
        nfichthorn@hunton.com
        awood@hunton.com

Shawn Patrick Regan (*Admitted Pro Hac Vice*)
Hunton & Williams LLP
200 Park Avenue
New York, NY 10166-1036
Tel: 212-309-1000
Fax: 212-309-1100
Email: sregan@hunton.com

Counsel for Defendants DTE Energy Company,
MidAmerican Energy Holdings Company, Pinnacle
West Capital Corporation, and Southern Company

DATED: June 30, 2008        By : /s/ Samuel R. Miller
                                 Samuel R. Miller (SBN 66871)
                                 Paul L. Yanosy (SBN 233014)
                                 Sidley Austin LLP
                                 555 California Street
                                 San Francisco, CA 94104
                                 Tel:415-772-1200
                                 Fax: 415-772-7400
                                 Email: srmiller@sidley.com
                                         pyanosy@sidley.com

1

David T. Buente, Jr. (*Admitted Pro Hac Vice*)

2

Joseph R. Guerra  (*Admitted Pro Hac Vice*)
Sidley Austin LLP

3

1501 K Street, N.W.
Washington, D.C.  20005

4

Tel:202-736-8000
Fax:  202-736-8711

5

Email:  dbuente@sidley.com

6

          jguerra@sidley.com

7

Counsel for Defendants American Electric Power
Company, Inc., American Electric Power Service

8

Corporation, and Duke Energy Corporation

9

DATED:  June 30, 2008

By: /s/ Jeffrey A. Lamken

10

Jeffrey A. Lamken (SBN 154217)
Jeremy Levin (SBN 210577)

11

Baker Botts LLP
The Warner

12

1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400

13

Tel:  202-639-7700
Fax:  202-639-7890

14

Email:  jeffrey.lamken@bakerbotts.com

15

          jeremy.levin@bakerbotts.com

16

Counsel for Defendants Dynegy Holdings Inc., and
Reliant Energy, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

Hunton & Williams LLP



DATED:  June 30, 2008    By:  /s/ Richard K. Welsh

Richard K. Welsh  (SBN 208825)
Scott Bertzyk (SBN 116449)
Felix Lebron (SBN 232984)
Kamran Salour (SBN 247983)
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA  90404
Tel:  310-586-7700
Fax:  310-586-7800
Email:  welshr@gtlaw.com
        bertzyks@gtlaw.com
        lebronf@gtlaw.com
        salourk@gtlaw.com

Counsel for Defendant The AES Corporation

DATED:  June 30, 2008    By:  /s/ Kevin P. Holewinski

Thomas A. Rector (SBN 199173)
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104
Tel: 415-626-3939
Fax: 415-875-5700
Email:  tarector@jonesday.com

Thomas E. Fennell (*Admitted Pro Hac Vice*)
Michael L. Rice (*Admitted Pro Hac Vice*)
Jones Day
2727 N. Harwood Street
Dallas, TX 75201
Tel: 214-220-3939
Fax: 214-969-5100
Email:  tefennell@jonesday.com
        mlrice@jonesday.com

Kevin P. Holewinski (*Admitted Pro Hac Vice*)
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Tel: 202-879-3939
Email:  kpholewinski@jonesday.com
Counsel for Defendant Xcel Energy Inc.

Hunton & Williams LLP

Hunton & Williams LLP

**TABLE OF CONTENTS**

I.    INTRODUCTION ...........................................................................................1

II.   PLAINTIFFS' ALLEGATIONS OF FACT ................................................3

III.  LEGAL STANDARD .....................................................................................7

IV.   ARGUMENT ..................................................................................................9

    A.    Plaintiffs have not made a prima facie showing that Defendants are subject to general jurisdiction in California. ....................................................10

        1.    Plaintiffs' allegations concerning certain of the Defendants' alleged direct contacts with California are insufficient to confer general jurisdiction. ........................................................................................10

            a.    Plaintiffs' allegations concerning Defendants' direct contacts with California are directly controverted by the Complaint, by affidavits or by judicially noticeable materials. ....................................................................................11

                i.    Plaintiffs' allegations that AES, DTE, Duke, and Dynegy own electric generating facilities in California are demonstrably false and must be rejected. ........................................................................11

                ii.   Allegations that Reliant has operations in California are refuted by the very documents on which Plaintiffs base their allegations. ............................12

            b.    Plaintiffs' remaining allegations do not establish "substantial, continuous, and systematic" contacts by Defendants with California, and thus fail to establish general jurisdiction. ....................................................................13

                i.    Allegations that shares of certain Defendants' stock are held by California residents, and that those residents receive mailings and dividend checks related to such stock ownership, are insufficient to establish general jurisdiction................................14

                ii.   Pleading that certain Defendants have registered to do business in California or have appointed an agent to receive service of process there is insufficient to make a prima facie showing of general jurisdiction over those Defendants. ...............................................15

                iii.  Allegations that AEP Service and Duke engaged in price manipulation in California for 18 months almost seven years ago do not confer general jurisdiction. ........................................................................16

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

Hunton & Williams LLP

iv.    Plaintiffs' claims regarding AEP Service's alleged performance of contracts in California are insufficient to establish general jurisdiction. ......................17

2.    Plaintiffs' allegations concerning the forum contacts of subsidiaries do not provide a basis for establishing jurisdiction over Defendants. ........18

a.    Plaintiffs have not pled facts sufficient to establish personal jurisdiction over Defendants based on an alter ego theory. ...........20

i.    Statements in annual reports about emissions....................22

ii.    Unsupported allegations that Defendants agreed to control emissions by their subsidiaries. ..............................22

iii.    Performing cost analyses regarding emissions reductions by subsidiaries. ...................................................23

iv.    Defendants' statements in annual reports and other environmental statements....................................................23

b.    Plaintiffs have not pled facts sufficient to establish personal jurisdiction over Defendants based on an agency theory...............24

B.    Plaintiffs have not made a prima facie showing that Defendants are subject to specific jurisdiction in California..........................................................................27

1.    Because Defendants have not purposefully directed their activities at California, the exercise of specific jurisdiction over them is not warranted....................................................................................................28

2.    Because Plaintiffs also have not alleged facts that, if accepted as true, would show that forum-related activities by Defendants were the but-for cause of their alleged harm, they have failed to establish a prima facie case for specific jurisdiction.................................................30

3.    Plaintiffs' remaining allegations regarding contacts with the forum are too vague and attenuated to serve as a basis for specific jurisdiction. ...............................................................................................31

4.    Exercise of jurisdiction over Defendants would be unreasonable. ............32

a.    Plaintiffs have not pled facts sufficient to show purposeful interjection into the forum state by Defendants. .............................32

b.    Plaintiffs' choice of jurisdiction imposes a significant and unnecessary burden on Defendants................................................32

c.    Exercise of jurisdiction over Defendants conflicts with the law and sovereignty of several states and encroaches on federal powers. ...............................................................................33

d.    California has no interest in adjudicating a dispute regarding property in Alaska. .......................................................................33

e.    Exercise of jurisdiction over Defendants by California would not effect an efficient resolution of the controversy. ...........33

f.    Plaintiffs have no articulable interest in bringing the suit in California........................................................................................34

g.    The most appropriate fora are the political branches. ......................34

C.    Allegations of foreseeability of harm are insufficient to meet the requirements of due process.................................................................34

V.    DEFENDANT-SPECIFIC ANALYSIS ...........................................................37

VI.   CONCLUSION ................................................................................................44

Hunton & Williams LLP

1

# TABLE OF AUTHORITIES

2

**CASES**

3

*Amba Mktg. Sys. v. Jobar Int'l, Inc.*,
    551 F.2d 784 (9th Cir. 1977)................................................................ passim

4

*Ameritec Corp. v. Ameritech Corp.*,
    1986 WL 10702 (C.D. Cal. Apr. 29, 1986) ...................................... 29

5

6

*Arikat v. JP Morgan Chase & Co.*,
    430 F. Supp. 2d 1013 (N.D. Cal. 2006) ............................................ 31

7

*Asahi Metal Indus. Co. v. Superior Court*,
    480 U.S. 102 (1987)..................................................... 28, 34-35, 36

8

9

*AT&T v. Compagnie Bruxelles Lambert*,
    94 F.3d 586 (9th Cir. 1996)............................................................ 7-8

10

11

*Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*,
    223 F.3d 1082 (9th Cir. 2000)..................................................... passim

12

*Birzer v. Jockey's Guild, Inc.*,
    444 F. Supp. 2d 1005 (C.D. Cal. 2006) ............................................ 17

13

14

*Britesmile, Inc. v. Discus Dental, Inc.*,
    2005 WL 1048701 (N.D. Cal. May 5, 2005) .................................... 38

15

16

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)............................................................ 9, 32, 35, 36

17

*Butcher's Union Local No. 498 v. SDC Inv., Inc.*,
    788 F.2d 535 (9th Cir. 1986)............................................................ 7

18

19

*Calder v. Jones*,
    465 U.S. 783 (1984)............................................................ 28, 29, 30

20

21

*California v. General Motors Corp.*,
    No. C06-05755-MJJ, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007),
    *appeal docketed*, No. 07-16908 (9th Cir. Oct. 24, 2007)..................... 3, 34

22

23

*Calvert v. Huckins*,
    875 F. Supp. 674 (E.D. Cal. 1995).................................................... 22

24

25

*Carretti v. Italpast*,
    101 Cal. App. 4th 1236 (2002) ....................................................... 8, 35

26

*Church of Scientology v. Adams*,
    584 F.2d 893 (9th Cir. 1978).............................................. 18, 38, 40, 41

27

28

-iv-

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

Hunton & Williams LLP

Hunton & Williams LLP

*Comer v. Murphy Oil,*
   No. 05-cv-00436-RSW, Oral Opinion (S.D. Miss. Aug. 30, 2007),
   *appeal docketed*, No. 07-60756 (5th Cir. Sept. 17, 2007) ...................................................... 3, 34

*Connecticut v. Am. Elec. Power Co.,*
   406 F. Supp. 2d 265 (S.D.N.Y. 2005),
   *appeals pending*, Nos. 05-5104, 05-5119 *(appeal argued June 7, 2006)*............................... 3, 34

*Coremetrics, Inc. v. Atomic Park.com, LLC,*
   370 F. Supp. 2d 1013 (N.D. Cal. 2005) .............................................................................. 8, 9

*Core-Vent Corp. v. Nobel Indus. AB,*
   11 F.3d 1482 (9th Cir. 1993)............................................................................................ passim

*Cybersell, Inc. v. Cybersell, Inc.,*
   130 F.3d 414 (9th Cir. 1997)................................................................................................ 28

*Data Disc, Inc. v. Systems Tech. Assocs., Inc.,*
   557 F.2d 1280 (9th Cir. 1977)..................................................................................... 7, 8, 9, 12

*Doe v. American Nat'l Red Cross,*
   112 F.3d 1048 (9th Cir. 1997).............................................................................................. 30

*Doe v. Unocal,*
   248 F.3d 915 (9th Cir. 2001)........................................................................................... passim

*Dreiling v. Am. Express Co.,*
   458 F.3d 942 (9th Cir. 2006)................................................................................................ 13

*DVI Inc. v. Superior Court,*
   104 Cal. App. 4th 1080 (2002) .......................................................................................... passim

*Fru-Con Constr. Corp. v. Sacramento Mun. Util. Dist.,*
   2007 WL 2384841 (E.D. Cal. Aug. 17, 2007) ...................................................................... 25

*Funk v. Limelight Media Group, Inc.,*
   2006 WL 2983058 (W.D. Ky. Oct. 16, 2006) .................................................. 14, 37, 42, 43, 44

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,*
   284 F.3d 1114 (9th Cir. 2002)............................................................................................ 9, 10

*Gray Line Tours v. Reynolds Elec. and Eng'g Co.,*
   193 Cal. App. 3d 190 (Cal. App. 2 Dist. 1987) ..................................................................... 15

*Gulf Oil Corp. v. Gilbert,*
   330 U.S. 501 (1947)........................................................................................................ 32, 33

*Harris Rutsky & Co. Ins. Svcs. v. Bell & Clements Ltd.,*
   328 F.3d 1122 (9th Cir. 2003).............................................................................................. 12

*Helicopteros Nacionales de Columbia v. Hall, S.A.,*
466 U.S. 408 (1984) ......................................................................................................... 8

*Hilsenrath v. Equity Trust (Jersey) Ltd.,*
2008 WL 728902 (N.D. Cal. Mar. 17, 2008) ......................................................... 9, 27

*In re Automobile Antitrust Cases I and II,*
135 Cal. App. 4th 100 (2005) ........................................................................... 25, 26

*In re Dynamic Random Access Memory Antitrust Litigation,*
2005 WL 2988715 (N.D. Cal. Nov. 7, 2005) ........................................................ 8, 28

*In re MDC Holdings Sec. Litig.,*
754 F. Supp. 793 (S.D. Cal. 1990) ...................................................................... 19

*Insurance Co. of N. Am. v. Marina Salina Cruz,*
649 F.2d 1266 (9th Cir. 1981) ........................................................................... 32

*International Shoe v. Washington,*
326 U.S. 310 (1945) .......................................................................................... 9

*Italian Colors Restaurant v. American Express Co.,*
2003 WL 22682482 (N.D. Cal. Nov. 10, 2003) .................................................. 34

*Jewish Defense Org., Inc. v. Superior Court,*
72 Cal. App. 4th 1045 (1999) ............................................................................ 29

*Katzir's Floor & Home Design, Inc. v. M-MLS.com,*
394 F.3d 1143 (9th Cir. 2004) ........................................................................... 20

*Keeton v. Hustler,*
465 U.S. 770 (1984) .................................................................................... 35, 36

*Kipperman v. McCone,*
422 F. Supp. 860 (N.D. Cal. 1976) .................................................................... 28

*Love v. The Mail on Sunday,*
2006 WL 4046170 (C.D. Cal. July 14, 2006) .................................................. 30-31

*Menken v. Emm,*
503 F.3d 1050 (9th Cir. 2007) ........................................................................... 28

*Missud v. D.R. Horton,*
2007 WL 3231733 (N.D. Cal. Oct. 30, 2007) ............................................... passim

*MMCA Group, Ltd. v. Hewlett-Packard Co.,*
2007 WL 1342586 (N.D. Cal. May 8, 2007) ................................... 28, 38, 39, 43

*North American Catholic Educational Programming Foundation, Inc. v. Cardinale,*
536 F. Supp. 2d 181 (D R.I. 2008) .................................................................... 14

Hunton & Williams LLP

-vi-

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

*Omeluk v. Langsten Slip & Batbyggeri A/S*,
   52 F.3d 267 (9th Cir. 1995)..................................................................................... 35

*Panavision Int'l, L.P. v. Toeppen*,
   141 F.3d 1316 (9th Cir. 1998)................................................................................. 33

*Panda Brandywine Corp. v. Potomac Elec. Power Co.*,
   253 F.3d 865 (5th Cir. 2001)................................................................................... 14

*Parrino v. FHP Inc.*,
   146 F.3d 699 (9th Cir. 1998)................................................................................... 13

*Pavlovich v. Superior Court*,
   29 Cal. 4th 262 (2002) ............................................................................................. 9

*Peacock v. Willis*,
   2006 WL 3060134 (E.D. Cal. Oct. 27, 2006) .................................................. 29, 33

*Perfect 10, Inc. v. Visa Int'l Svc. Ass'n*,
   494 F.3d 788 (9th Cir. 2007)..................................................................................... 9

*Schwarzenegger v. Fred Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004)..................................................................................... 8

*Serafini v. Superior Court*,
   68 Cal. App. 4th 70 (1998) ............................................................................... 12, 24

*Shisler v. Sanfer Sports Cars, Inc.*,
   146 Cal. App. 4th 1254 (2006) ............................................................................... 10

*Sonora Diamond Corp. v. Superior Court*,
   83 Cal. App. 4th 523 (2000) ............................................................................. passim

*Teledyne, Inc. v. Kone Corp.*,
   892 F.2d 1404 (9th Cir. 1989)................................................................................. 28

*Tercica, Inc. v. Insmed Inc.*,
   2006 WL 1626930 (N.D. Cal. June 9, 2006) .................................................... passim

*Tuazon v. R.J. Reynolds Tobacco Co.*,
   433 F.3d 1163 (9th Cir.), cert. denied, 127 S. Ct. 723 (2006) ............................... 10

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980)................................................................................ 9, 35, 36, 37

*Yahoo! Inc. v. La Ligue Contre le Racisme et L'Antisemitisme*,
   433 F.3d 1199 (9th Cir. 2006).................................................................................. 28

*Young v. Colgate-Palmolive Co.*,
   790 F.2d 567 (7th Cir. 1986)................................................................................... 14

Hunton & Williams LLP

**STATUTES**

Cal. Code. Civ. Proc. §410.10 (2008) ............................................................................. 8

**OTHER AUTHORITIES**

Restatement (Second) Conflict of Laws § 35 cmt. d ............................................. 12, 24

Hunton & Williams LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendants American Electric Power Company, Inc. ("AEP"), American Electric Power Service Corporation ("AEP Service"), DTE Energy Company ("DTE"), Duke Energy Corporation ("Duke"), Dynegy Holdings Inc. ("Dynegy"), MidAmerican Energy Holdings Company ("MidAmerican"), Pinnacle West Capital Corporation ("Pinnacle West"), Reliant Energy, Inc. ("Reliant"), Southern Company ("Southern"), The AES Corporation ("AES"), and Xcel Energy Inc. ("Xcel Energy") (collectively, the "Non-resident Utility Defendants" or "Defendants"), by and through their undersigned counsel, respectfully submit this consolidated memorandum of law in support of their Motion to Dismiss the Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).

Plaintiffs are Alaska entities that claim to have suffered injury in Alaska caused by global warming and greenhouse gas emissions. Nonetheless, they chose to bring this suit in California – more than 2,600 miles from their residence and the site of their alleged injuries. But they did not do so because they wished to sue a large group of California residents or businesses operating in California. Nor did Plaintiffs bring this suit in California to establish liability for activities taking place in California. Non-resident Utility Defendants are not California residents and do not emit greenhouse gases in California.

It therefore should come as no surprise that Plaintiffs do not and cannot plead sufficient facts to establish personal jurisdiction for this lawsuit against these Defendants in California. Plaintiffs rely on allegations that either: (1) are indisputably false regarding "ownership" or "operation" of facilities supposedly generating power in California (as demonstrated by the incontrovertible evidence submitted by Defendants herewith); or (2) would be insufficient, even if true, to establish the requisite nexus between Defendants and California such that this Court could exercise general or specific long-arm jurisdiction. For example, the Complaint is rife with allegations about the California activities of Defendants' respective subsidiaries. But Plaintiffs did not sue those subsidiaries. Instead, Plaintiffs sued parent corporations that have few or no contacts with this forum and thus, as a matter of law, cannot be haled into Court here.

Hunton & Williams LLP

1

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

1    With respect to general jurisdiction, other than a few demonstrably false allegations, the

2    Complaint includes no allegations of facts that, if true, would be sufficient to constitute

3    "substantial, continuous, and systematic" contacts with California such that Defendants could be

4    deemed to be "doing business" in this forum.  For example, Plaintiffs' allegations concerning

5    activities in California by Defendants' current or former subsidiaries; allegations regarding the

6    California Public Employees' Retirement System's ("CalPERS") ownership of AES, AEP,

7    Southern, or Xcel Energy stock; and allegations that MidAmerican, Pinnacle West, and Reliant

8    have designated agents for service of process and are registered to do business in California fall

9    short, as a matter of law, of satisfying Plaintiffs' heavy burden.

10    Plaintiffs' allegations concerning specific jurisdiction suffer similar flaws.  First,

11    Plaintiffs fail to allege facts sufficient to establish that their alleged injury arose out of or relates

12    to Defendants' conduct in the forum.  Plaintiffs' allegations that certain Defendants own and/or

13    operate facilities in California that emit greenhouse gases are demonstrably false.  Second,

14    Plaintiffs' claim that this Court has specific jurisdiction based on Defendants' out-of-state

15    emissions must fail as a matter of law, because Defendants' conduct was not purposefully

16    directed at California and because Plaintiffs' injury does not arise out of Defendants' conduct.

17    *Indeed, Plaintiffs' Complaint is barren of any allegations that they personally suffered any harm*

18    *or damages in California, let alone jurisdictionally sufficient harm related to any of Defendants'*

19    *activities.*  This alone forecloses specific jurisdiction.  Moreover, a review of the relevant factors

20    establishes that the Court's exercise of jurisdiction over Defendants would offend due process.

21    Finally, Plaintiffs cannot invoke this Court's jurisdiction over Defendants based on

22    allegations that it was foreseeable that Defendants' alleged actions would cause harm in

23    California.  The United States Supreme Court, the Ninth Circuit, and California appellate courts

24    all have rejected this theory of personal jurisdiction because it violates the due process

25    requirements of fair play and substantial justice.[2]

26    ---

[2] Plaintiffs' inability to allege facts sufficient to warrant the exercise of jurisdiction over
Defendants is unsurprising.  Plaintiffs' suit is a brazen attempt to have the judiciary intervene in
27    federal policy-making that is the province of the political branches of government – which, as
three other district courts have held, are the only branches that are constitutionally empowered
28

Hunton & Williams LLP

## II.    PLAINTIFFS' ALLEGATIONS OF FACT

Plaintiffs, the Native Village of Kivalina and the City of Kivalina, are the governing bodies of an Alaskan village of approximately 400 people. Plaintiffs claim as follows:

- that Defendants "are electric power corporations that emit millions of tons of carbon dioxide each year from the combustion of fossil fuels" (Compl. ¶ 170);

- that "the combustion of fossil fuels adds large quantities of carbon (in the form of carbon dioxide) to the atmosphere that otherwise would have remained sequestered deep in the Earth" (*id.* ¶ 126);

- that "a large fraction of carbon dioxide emissions persists in the atmosphere for several centuries" (*id.* ¶ 125);

- that, as "[e]nergy from the sun heats the Earth, which re-radiates the energy to space, [c]arbon dioxide and other greenhouse gases absorb some of the outgoing infrared energy, raising the temperature of the Earth's atmosphere" (*id.* ¶ 123);

- that "[r]ising temperatures . . . have affected the thickness, extent, and duration of sea ice that forms along Kivalina's coast, . . . particularly land-fast sea ice" (*id.* ¶ 185);

- that "the period of open water is increasing and the Chukchi Sea is less likely to be frozen when damaging winter storms occur" (*id.* ¶ 185);

- that this "leaves Kivalina's coast more vulnerable to waves [and] storm surges" (id.); and

- that "[t]he result of the increased storm damage is a massive erosion problem" that will require the Village of Kivalina to be abandoned or relocated (*id.* ¶¶ 4, 185-86).

AEP is a New York corporation with a principal place of business in Columbus, Ohio. Compl. ¶ 62. It is alleged to be a holding company that owns all outstanding common stock of its domestic electric utility subsidiaries, as well as all outstanding common stock of Defendant

---

and equipped to resolve the national and international economic, energy, and environmental issues associated with global climate change. *See California v. General Motors Corp.*, No. C06-05755-MJJ, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007), *appeal docketed*, No. 07-16908 (9th Cir. Oct. 24, 2007) (dismissing State of California's global warming nuisance claim as presenting a "non-justiciable political question"); *Comer v. Murphy Oil*, No. 05-cv-00436-RSW, Oral Opinion (S.D. Miss. Aug. 30, 2007), *appeal docketed*, No. 07-60756 (5th Cir. Sept. 17, 2007); *Connecticut v. Am. Elec. Power Co.*, 406 F. Supp. 2d 265, 274 (S.D.N.Y. 2005), *appeals pending*, Nos. 05-5104, 05-5119 (appeals argued June 7, 2006).

3

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

*Hunton & Williams LLP*

1  American Electric Power Service Corporation ("AEP Service"). *Id.* Plaintiffs further allege that

2  California residents, including CalPERS, own shares of AEP stock and that those shareholders

3  receive communications attendant to their ownership of those shares and deposit dividend checks

4  into California banks on a regular basis. *Id.* ¶ 63.

5      According to the Complaint, <u>AEP Service</u> is a wholly-owned New York corporation and

6  subsidiary of AEP, with its principal place of business in Columbus, Ohio. *Id.* ¶ 64. Plaintiffs

7  claim that AEP Service, as an "agent" for AEP, participated in the California energy market

8  during at least the period from January 1, 2000 to June 20, 2001, and has contracted to buy power

9  from and/or sell power into California. *Id.* ¶ 65.

10      Plaintiffs allege that <u>DTE</u> is a Michigan corporation, headquartered in Detroit, Michigan.

11  *Id.* ¶ 69. Plaintiffs further allege that: (1) "DTE is a 99% owner of a biomass-fired electric

12  generating plant in Woodland, California" and (2) "DTE *subsidiaries* DTE Biomass Energy, Inc.,

13  DTE Energy Technologies, Inc., DTE Solar Company of California, DTE ES Operations, LLC

14  and DTE Woodlands, LLC are all registered to do business in California and have designated a

15  registered agent for service of process in California." *Id.* (emphasis added).

16      Plaintiffs allege that <u>Duke</u> is a North Carolina corporation with its principal place of

17  business in Charlotte. *Id.* ¶ 73. Plaintiffs allege that "Duke *subsidiary*, Duke Energy Fossil-

18  Hydro California Inc., has its principal place of business in California[,] . . . is registered to do

19  business in California and has designated a registered agent for service of process in California"

20  (*id.* ¶ 76, emphasis added), and that other Duke *subsidiaries* – Duke Solar Energy, LLC, Duke

21  Energy Merchants, LLC and Duke Energy Carolinas Plant Operations, LLC – are "registered to

22  do business in California and have a registered agent for service of process in California" (*id.* ¶ 77

23  (emphasis added)). The Complaint alleges that Duke "has a 50% ownership interest in Southwest

24  Power Partners, LLC," an entity that previously "provided power to California." *Id.* The

25  Complaint similarly alleges that "Duke has a 60% ownership interest in Duke Energy Trading

26  and Marketing, LLC ("DETM"),"[3] which allegedly "participated in the California energy market

27  ───────────────
[3] With respect to DETM, Plaintiffs further allege that "FERC accused DETM of engaging in
28  manipulation of the California energy market during the [June 1, 2000 to June 20, 2001] time

Hunton & Williams LLP

4

1    during at least the period January 1, 2000 to June 20, 2001." *Id.* ¶ 75. Finally, Plaintiffs'

2    Complaint alleges that "[u]ntil they were sold in 2006, Duke owned power generation facilities in

3    Monterey County, Morro Bay, Chula Vista and Oakland, CA." *Id.*

4        Plaintiffs allege that <u>Dynegy</u> is a Delaware corporation, headquartered in Houston, Texas.

5    They allege that Dynegy "owns and operates generation facilities in Monterey County, Morro

6    Bay, Chula Vista and Oakland, CA." *Id.* ¶ 81. Plaintiffs further allege that Dynegy subsidiaries

7    "Dynegy Operating Company Corp.,"[4] Dynegy Falcon Holdings Inc., Dynegy Power Marketing,

8    Inc. ("DPM"), and Dynegy Power Corp. ("DPC") are registered to do business in California and

9    have designated agents for service of process in California; that DPM and DPC, as agents for

10   Dynegy, participated in the California energy market in 2000 and 2001; that DPM and DPC were

11   accused by the Federal Energy Regulatory Commission ("FERC") of engaging in manipulation of

12   the California energy market during that period; and that DPM, as agent for Dynegy, contracted

13   to "sell power into California." *Id.* ¶¶ 82-83.

14       According to Plaintiffs, <u>MidAmerican</u> is registered to do business in California, has a

15   designated registered agent for service of process in California (*id.* ¶ 91), and does business in

16   California though its subsidiaries MidAmerican Energy Company and PacifiCorp by generating,

17   distributing, and supplying energy (*id.*).

18       Plaintiffs allege that <u>Pinnacle West</u> is an Arizona corporation based in Phoenix, Arizona,

19   and that it is registered to do business in California and has a designated registered agent for

20   service of process in California. *Id.* ¶ 104. According to Plaintiffs, Pinnacle West is engaged in

21   the generation, transmission, and distribution of electricity and the sale of energy services

22   "*through its subsidiaries.*" *Id.* (emphasis added).

23

24   period" and Plaintiffs point to a 2004 press release by the California Attorney General as support
     for their allegation that "[i]n 2004, the California Attorney General reached a proposed settlement
25   with 'Duke Energy and several affiliates' . . ." concerning alleged manipulation of the California
     electricity market. Compl. ¶ 75.

26   [4] There is no such entity as "Dynegy Operating Company Corp." Declaration of Amy E. Jolley,
     Vice President - Tax, of Dynegy Holdings Inc. ¶ 6. Defendants presume the Plaintiffs intend to
27   refer to Dynegy Operating Company, which is an indirect subsidiary of Dynegy.

28

5

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

Hunton & Williams LLP

1    Reliant is alleged to be a Delaware corporation based in Houston, Texas, that is registered

2    to do business in California with a designated registered agent for service of process in California.

3    *Id.* ¶ 108.  Plaintiffs claim that Reliant has identified "California, Nevada, Illinois, New Jersey,

4    Pennsylvania, Ohio, Florida, Mississippi and Texas as the principal markets in which it owns,

5    leases or has under contract wholesale generation assets." *Id.*  They further allege that, "through

6    its subsidiaries, Reliant owns and operates power stations in California, including stations at

7    Daggett; Goleta; Oxnard; and Rancho Cucamonga." *Id.*  Finally, the Complaint asserts that

8    "Reliant's subsidiaries settled civil antitrust claims arising from Reliant's decision to shut down

9    four of its five power stations in 2000." *Id.*

10    Southern is alleged to be a Delaware corporation with its principal place of business in

11    Atlanta, Georgia. *Id.* ¶ 112.  According to Plaintiffs, Southern is a holding company that owns all

12    outstanding common stock of its domestic electric utility subsidiaries, Alabama Power Company,

13    Georgia Power Company, Gulf Power Company, Mississippi Power Company, and Savannah

14    Electric and Power Company, with fossil fuel-fired electric generating facilities located in

15    Alabama, Florida, Georgia, and Mississippi. *Id.*  The Complaint alleges that Southern is the

16    *former* owner of Southern Energy, the company now known as Mirant Corporation.  Plaintiffs

17    claim that "through Southern Energy, Southern owned fossil-fuel fired electric generating

18    facilities in California from 1999 until April 2001, when Southern sold Mirant." *Id.* ¶ 113.

19    Plaintiffs further allege that California residents, including CalPERS, own shares of Southern

20    stock and that those shareholders receive communications attendant to their ownership of those

21    shares and deposit dividend checks into California banks on a regular basis. *Id.* ¶ 114.

22    According to the Complaint, The AES Corporation is a Delaware corporation with its

23    principal place of business in Arlington, Virginia. *Id.* ¶ 57.  Plaintiffs allege that "AES owns and

24    operates power plants at the following locations in California:  Long Beach, Huntington Beach,

25    Redondo Beach and north of Los Angeles." *Id.*  Plaintiffs also allege that California residents,

26    including CalPERS, own shares of AES stock and that those shareholders receive

27    communications attendant to their ownership of those shares and deposit dividend checks into

28    California banks on a regular basis. *Id.* ¶ 58.  Plaintiffs further allege that AES has made "various

Hunton & Williams LLP

6

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

1  agreements and pledges to exercise control over the carbon dioxide emissions from facilities

2  owned and/or operated by its subsidiaries," that its 2002 Annual Report states that as "one of the

3  largest emitters of CO2 in the world, AES must continue to strive to economically stabilize

4  greenhouse gas concentrations" and that AES admits the need to mitigate some of the risk to AES

5  associated with global warming. *Id.* ¶ 60.

6         Finally, <u>Xcel Energy</u> is alleged to be a Minnesota corporation with its principal place of

7  business in Minneapolis. *Id.* ¶ 118. According to Plaintiffs, Xcel Energy is a holding company

8  that owns all of the outstanding common stock of four power generation subsidiaries, none of

9  which are located in California. *Id.* Plaintiffs also claim that Xcel Energy was registered to do

10  business in California through its subsidiary Xcel Energy Products and Services, Inc., but

11  surrendered its business registration in June 2006. *Id.* Plaintiffs further allege that California

12  residents, including CalPERS, own shares of Xcel Energy stock and that those shareholders

13  receive communications attendant to their ownership of those shares and deposit dividend checks

14  into California banks on a regular basis. *Id.* ¶ 119.

15  **III.   LEGAL STANDARD**

16

17         Plaintiffs bear the burden of pleading facts that, if true, would be sufficient to establish

18  that the Court has personal jurisdiction over Defendants. *Data Disc, Inc. v. Systems Tech.*

19  *Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). Absent such a showing, the Complaint must

20  be dismissed. *Id.; Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538 (9th Cir.

21  1986) (court must dismiss any defendant as to which jurisdiction is not established). Where a

22  motion challenges the facts alleged, "a court may consider evidence outside of the pleadings,

23  including affidavits." *Tercica, Inc. v. Insmed Inc.*, 2006 WL 1626930, at *8 (N.D. Cal. June 9,

24  2006) (Armstrong, J.). If Plaintiffs do not meet their burden of pleading facts sufficient to

25  establish a prima facie case that this Court has personal jurisdiction over Defendants, their

26  Complaint must be dismissed. *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th

27

28

*Hunton & Williams LLP*

7

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

1  Cir. 1996) (where a district court decides a motion to dismiss for lack of personal jurisdiction

2  based on materials submitted by the parties, court must apply a *prima facie* standard).[5]

3  Exercise of personal jurisdiction over a non-resident defendant must also comport with

4  fundamental requirements of due process. Under California's long-arm statute, a "court's

5  assertion of personal jurisdiction over a non-resident defendant who has not been served with

6  process within the state comports with the requirements of the due process clause of the federal

7  Constitution if the defendant has such minimum contacts with the state that the assertion of

8  jurisdiction does not violate 'traditional notions of fair play and substantial justice.'" *Carretti v.*

9  *Italpast*, 101 Cal. App. 4th 1236, 1242 (2002); Cal. Code Civ. Proc. §410.10 (2008).

10  Personal jurisdiction may exist based on one of two theories: general jurisdiction or

11  specific jurisdiction. Plaintiffs' Complaint supports neither. Nor does it allege facts establishing

12  that the Non-resident Utility Defendants have sufficient minimum contacts with the state to make

13  the exercise of jurisdiction reasonable.

14  General jurisdiction requires a showing that the defendants' contacts are substantial,

15  continuous, and systematic and fairly can be described as extensive or wide-ranging.

16  *Helicopteros Nacionales de Columbia v. Hall*, S.A., 466 U.S. 408, 416-17 (1984); *Bancroft &*

17  *Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). The pleading standard

18  for general jurisdiction "is 'fairly high,' and requires that the defendant's contacts be of the sort

19  that approximate physical presence." *Bancroft & Masters*, 223 F.3d at 1086; *Schwarzenegger v.*

20  *Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004); *Coremetrics, Inc. v. Atomic Park.com,*

21  *LLC*, 370 F. Supp. 2d 1013, 1016 (N.D. Cal. 2005) ("This is an exacting standard, as it should be,

22  
---

[5] *See also Data Disc,* 557 F.2d at 1285. Conclusory allegations are insufficient to establish
23  personal jurisdiction and withstand a motion to dismiss. *Missud v. D.R. Horton*, 2007 WL
3231733, *3-4 (N.D. Cal. Oct. 30, 2007) (rejecting plaintiff's personal jurisdiction arguments on
24  grounds that bald conclusory assertions without more are insufficient to establish jurisdiction);
*Amba Mktg. Sys. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977) (holding that, once the
25  defendant challenged personal jurisdiction, "[plaintiff] could not simply rest on the bare
allegations of its complaint . . . . In this case, [plaintiff] failed to meet [defendant's] jurisdictional
26  challenge with sufficient facts to sustain its burden of showing that an 'event' in Arizona had
been caused by [defendant]") (internal citations omitted); *In re Dynamic Random Access Memory*
27  *Antitrust Litigation*, 2005 WL 2988715, *1 (N.D. Cal. Nov. 7, 2005) ("The court need not,
however, assume the truth of allegations in a pleading that is contradicted by sworn affidavit.").

28  

Hunton & Williams LLP

1    because a finding of general jurisdiction permits a defendant to be haled into court in the forum

2    state to answer for any of its activities anywhere in the world.") (citation references omitted);

3    *Tercica*, 2006 WL 1626930, at *12.

4         If the defendant does not have substantial and systematic contacts with the forum

5    sufficient to establish general jurisdiction, a court must then determine whether specific

6    jurisdiction exists over the defendant.  Specific jurisdiction exists where the defendant has

7    purposefully availed itself of forum benefits, the controversy is related to or arises out of the

8    defendant's contacts with the forum, and the exercise of jurisdiction is reasonable.  *Glencore*

9    *Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002);

10   *Hilsenrath v. Equity Trust (Jersey) Ltd.*, 2008 WL 728902, at *2 (N.D. Cal. Mar. 17, 2008);

11   *Pavlovich v. Superior Court*, 29 Cal. 4th 262, 269 (2002).

12        Under either jurisdictional theory, a defendant must be shown to have sufficient minimum

13   contacts with the forum state "such that the maintenance of the suit does not offend traditional

14   notions of fair play and substantial justice" under the due process clause of the Fourteenth

15   Amendment.  *International Shoe v. Washington*, 326 U.S. 310, 316 (1945); *Data Disc*, 557 F.2d

16   at 1287.  Such minimum contacts do not exist where the defendant's activities were such that it

17   could not reasonably anticipate being haled into court there.  *Burger King Corp. v. Rudzewicz*,

18   471 U.S. 462, 474 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

19   **IV.    ARGUMENT**

20        In deciding this motion, the Court must accept as true the Complaint's uncontradicted

21   factual allegations relevant to personal jurisdiction.  *Perfect 10, Inc. v. Visa Int'l Svc. Ass'n*, 494

22   F.3d 788, 794 (9th Cir. 2007).  This assumption does not apply, however, to those factual

23   allegations related to personal jurisdiction that Defendants have challenged as demonstrably and

24   indisputably false. [6]  *See* §§ IV(A)(1)(a) and IV(A)(1)(b)(ii) below.

25

26

---

27   [6] *Data Disc*, 557 F.2d at 1284 (court "may not assume the truth of allegations in a pleading which are contradicted by affidavit").

28

9

**A.    Plaintiffs have not made a prima facie showing that Defendants are subject to general jurisdiction in California.**

In determining whether a plaintiff has made a showing of general jurisdiction, a court looks at factors such as whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, has designated an agent for service of process in the forum, holds a license in the forum, and is incorporated in the forum. *See Bancroft & Masters*, 223 F.3d at 1086. But there is no "precise checklist" or "definitive litany of factors" for determining whether a defendant is subject to general jurisdiction, and no single factor is determinative. *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1172 (9th Cir.), *cert. denied*, 127 S. Ct. 723 (2006). A non-resident defendant must be found to conduct business in California not occasionally or casually, but with a measure of permanence or continuity, and a defendant "cannot be haled into a jurisdiction as a result of random, fortuitous, or attenuated contacts." *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1490 (9th Cir. 1993) (citations omitted); *Glencore Grain Rotterdam*, 284 F.3d at 1123; *Shisler v. Sanfer Sports Cars, Inc.*, 146 Cal. App. 4th 1254, 1259 (2006).

Here, with the limited exception of demonstrably false allegations, Plaintiffs attempt to establish jurisdiction over the Non-resident Utility Defendants by stringing together a hodge-podge of allegations that, even if true, are insufficient to constitute, for any single defendant, the substantial, continuous, and systematic contacts with California necessary for the assertion of general jurisdiction.

**1.    Plaintiffs' allegations concerning certain of the Defendants' alleged direct contacts with California are insufficient to confer general jurisdiction.**

The Non-resident Utility Defendants lack direct contacts with California sufficient to support the exercise of personal jurisdiction. Most of Plaintiffs' allegations of contacts with California by Defendants themselves are demonstrably false, and those that remain are insufficient, as a matter of law, to establish the substantial, continuous, and systematic contacts required to justify the exercise of general jurisdiction.

Hunton & Williams LLP

Hunton & Williams LLP

1

         **a.**   **Plaintiffs' allegations concerning Defendants' direct contacts with California are directly controverted by the Complaint, by affidavits or by judicially noticeable materials.**

2

3           Plaintiffs allege that several Defendants have direct contacts with California, either

4 through ownership and/or operation of power generation facilities there or because they allegedly

5 derive substantial revenues from the state. The Court need not consider these allegations,

6 however, as they are disproved by the incontrovertible evidence discussed below.

7

            i.     **Plaintiffs' allegations that AES, DTE, Duke, and Dynegy own electric generating facilities in California are demonstrably false and must be rejected.**

8

9           Plaintiffs allege that AES, DTE, Duke, and Dynegy each either currently *directly* own

10 and/or operate, or previously have *directly* owned and/or operated power generation facilities in

11 California. *See* Compl. ¶ 57 ("AES owns and operates power plants at the following locations in

12 California: Long Beach, Huntington Beach, Redondo Beach and north of Los Angeles."); *id.* ¶

13 69 ("DTE is a 99% owner of a biomass-fired electric generating plant in Woodland, CA."); *id.* ¶

14 75 ("Until they were sold in 2006, Duke owned power generation facilities in Monterey County,

15 Morro Bay, Chula Vista and Oakland, California."); *id.* ¶ 81 ("Dynegy Holdings owns and

16 operates generation facilities in Monterey County, Morro Bay, Chula Vista and Oakland, CA.").

17           Each of these allegations is demonstrably and indisputably false based on incontrovertible

18 evidence: None of the named facilities are "owned or operated" by Defendants. First, the power

19 plants in "Long Beach, Huntington Beach, Redondo Beach and north of Los Angeles" that

20 Plaintiffs allege are owned and operated by AES are, in fact, owned and operated by various AES

21 subsidiaries. *See* Declaration of Leith Mann, Assistant Secretary of The AES Corporation ¶¶ 3-8.

22 Second, DTE does not own or operate, and has never owned or operated, the biomass-fired

23 electric generating plant in Woodland, California, as Plaintiffs allege. *See* Declaration of Sandra

24 K. Ennis, Corporate Secretary of DTE Energy Company ¶ 5. Third, Duke does not own or

25 operate, and has never owned or operated, power generation facilities in "Monterey County,

26 Morro Bay, Chula Vista and Oakland, California," as Plaintiffs allege in the Complaint. *See*

27 Declaration of Richard G. Beach, Assistant Secretary of Duke Energy Corporation ¶ 5. Fourth,

28 Dynegy does not own or operate, and has never owned or operated power generation facilities in

11

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

1  "Monterey County, Morro Bay, Chula Vista and Oakland, CA," as Plaintiffs allege in the

2  Complaint; the alleged facilities are owned and operated by separate corporations that are indirect

3  Dynegy subsidiaries. *See* Jolley Decl. ¶ 4.

4      Where the alleged facts purporting to establish a jurisdictional basis are demonstrably and

5  incontrovertibly false, the law is clear that the exercise of jurisdiction is not appropriate. *See*

6  *Data Disc*, 557 F.2d at 1284 (court "may not assume the truth of allegations in a pleading which

7  are contradicted by affidavit"); *Harris Rutsky & Co. Ins. Svcs. v. Bell & Clements Ltd.*, 328 F.3d

8  1122, 1129 (9th Cir. 2003) (noting that plaintiffs' version of the facts is taken as true "unless

9  directly contravened").[7]

        ii.     **Allegations that Reliant has operations in California are**
10                 **refuted by the very documents on which Plaintiffs base**
               **their allegations.**

11

12      Plaintiffs also rely on statements taken from Reliant's securities filings as "evidence" that

13  the company has direct contacts with California. Specifically, Plaintiffs allege that "Reliant

14  identifies California, Nevada, Illinois, New Jersey, Pennsylvania, Ohio, Florida, Mississippi and

Texas as the principal markets in which it owns, leases or has under contract wholesale
15
generation assets." Compl. ¶ 108. Plaintiffs have lifted that statement, almost verbatim, from the
16
company's Annual Report. *See* Reliant Energy, Inc., 2006 Annual Report (Form 10-K) at 3 (Feb.
17
28, 2007) ("The following table identifies the principal markets where we own, lease or have
18
under contract wholesale generation assets"; listing the same nine states in a nearby table).
19
    Plaintiffs overlook, however, qualifying language elsewhere in that report, which
20
explicitly states that the terms "'we,' 'us' and 'our' refer to Reliant Energy, Inc. *and its*
21
*consolidated subsidiaries*," including its California subsidiaries. *See id.* at F-14 (emphasis

22

23    [7] Plaintiffs' allegations also are flawed insofar as they purport to base jurisdiction on Duke's
24  (Compl. ¶ 75) putative *prior* ownership of plants in California. *See DVI Inc. v. Superior Court*,
104 Cal. App. 4th 1080, 1101 (2002) (holding that the exercise of general jurisdiction is
25  reasonable only "when the defendant has substantial, continuous and systematic contacts with the
forum *at the time the complaint is served on that defendant*") (emphasis added); *see also Serafini*
26  *v. Superior Court*, 68 Cal. App. 4th 70, 80 (1998) ("When the corporation ceases to do business
in the state, there is no longer any general jurisdiction, i.e., jurisdiction as to causes of action
27  independent of that business.") (citing Restatement (Second) Conflict of Laws § 35 cmt. d, p.
144)).

28

Hunton & Williams LLP

12

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

1  added).[8]  Given that clarifying language, the statement cited by Plaintiffs does not establish that

2  Reliant itself "owns, leases, or has under contract wholesale generation assets" in California.[9]  To

3  the contrary, the very next sentence of the Complaint acknowledges that Reliant's *subsidiaries*

4  own the power stations at Daggett, Goleta, Oxnard, and Rancho Cucamonga, California.  Compl.

5  ¶ 108.  The fact that Reliant *subsidiaries* own or operate generation facilities in California is no

6  basis for asserting jurisdiction over Reliant, which does not.

7                                   **b.    Plaintiffs' remaining allegations do not establish "substantial,**
                                             **continuous, and systematic" contacts by Defendants with**
8                                            **California, and thus fail to establish general jurisdiction.**

9           In addition to the factually inaccurate allegations refuted above, Plaintiffs also allege that

10  certain Defendants had other specific direct contacts with California.  However, these alleged

11  contacts – alone or in combination with one another – are insufficient to meet the exacting

12  standard of substantial, continuous and systematic contacts "of the sort that approximates physical

13  presence" in the forum.  *Bancroft & Masters*, 223 F.3d at 1086.

14

15

16  ────────────────────────

[8] Because the Complaint relies on the annual report, the Court may consider its entire contents.
17  When ruling on a motion to dismiss, a Court "may consider a document the authenticity of which
is not contested and upon which the plaintiff's complaint necessarily relies," even if the complaint
18  does not specifically cite to the document. *Parrino v. FHP Inc.*, 146 F.3d 699, 706 (9th Cir.
1998) (explaining the policy behind the rule as "preventing plaintiffs from surviving a
19  [dispositive] motion by deliberately omitting references to documents upon which their claims are
based"), *abrogated by statute in part not relevant*.  Here, Plaintiffs have "necessarily relied" on
20  Reliant's Annual Report as a basis for their Complaint, so the Court may properly consider the
entirety of that document on Defendants' motions to dismiss.  Furthermore, consideration of this
21  document does not require the Court to convert the current motion into one for summary
judgment. *Id.* at 706 n.4 (explaining that, because the plaintiff relied on a certain document, the
22  plaintiff is "obviously on notice of the contents of the document and the need for a chance to
refute evidence is greatly diminished").  Indeed, documents of this nature are commonly
23  judicially noticed. *See Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n. 2 (9th Cir. 2006)
(finding that SEC filings are subject to judicial notice).  And the attached Declaration of Michael
24  L. Jines refutes the allegations in any event. *See* Declaration of Michael L. Jines, Senior Vice
President, General Counsel and Corporate Secretary of Reliant Energy, Inc. ¶ 4.

25  [9] Furthermore, Reliant's alleged reporting of financial results on behalf of its California
26  subsidiaries and alleged use of a single term to refer jointly to itself and its subsidiaries in its
Annual Report are not evidence of an alter ego relationship. *Doe v. Unocal*, 248 F.3d 915, 928
27  (9th Cir. 2001) ("references in the parent's annual report to subsidiaries or chains of subsidiaries
as divisions of the parent company do not establish the existence of an alter ego relationship").

28

Hunton & Williams LLP

1
2
3

          i.     **Allegations that shares of certain Defendants' stock are held by California residents, and that those residents receive mailings and dividend checks related to such stock ownership, are insufficient to establish general jurisdiction.**

4      Plaintiffs allege that residents of California, including CalPERS, own shares of the

5    publicly-traded stock of certain Defendants – AES, AEP, Southern, and Xcel Energy[10] – and that

6    those shareholders: (i) receive communications attendant to their ownership of such shares, and

7    (ii) deposit dividend checks into California banks on a regular basis.[11]  Compl. ¶¶ 58, 63, 114,

8    119.  That a company is publicly traded and that shares of its stock are owned by shareholders

9    nationwide, including within the forum jurisdiction, does not establish general jurisdiction within

10   the forum. *See Funk v. Limelight Media Group, Inc.*, 2006 WL 2983058, at *5 n.4 (W.D. Ky.

11   Oct. 16, 2006) (rejecting plaintiff's argument that a corporation is subject to personal jurisdiction

12   in every state in which the corporation's shareholders reside).[12]  Indeed, if the law of general

13   jurisdiction were otherwise, virtually every publicly-traded company would be subject to

14   nationwide general jurisdiction.  This clearly is not the case.

15
16
17
18

---

19   [10] Plaintiffs do not allege that the remaining Defendants have outstanding shares of stock owned

20   by California residents, or that California residents receive mailings related to such stock or deposit dividend checks from those Defendants into California banks.

21   [11] These allegations are made "upon information and belief" (Compl. ¶¶ 58, 63, 114, 119), which is insufficient as a matter of law. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253

22   F.3d 865, 867 (5th Cir. 2001) (affirming district court's rejection of "information and belief"

23   allegations as a basis for personal jurisdiction).

24   [12] *See also Young v. Colgate-Palmolive Co.*, 790 F.2d 567, 570 (7th Cir. 1986) (rejecting plaintiff's argument that shareholder mailings were the types of contacts that established the

25   transaction of business).  Likewise, issuing communications attendant to share ownership is insufficient. *See North Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 536 F. Supp.

26   2d 181, 195 (D. R.I. 2008) (citing *Young* and noting that "[i]f the Court was to adopt Plaintiff's reasoning, any corporation that ever sent a letter to Rhode Island updating or making investment

27   offers to its shareholders could be dragged into the Rhode Island forum every time a shareholder had an occasion to sue the corporation").

28

Hunton & Williams LLP

           ii.    **Pleading that certain Defendants have registered to do business in California or have appointed an agent to receive service of process there is insufficient to make a prima facie showing of general jurisdiction over those Defendants.**

Plaintiffs also allege that Defendants MidAmerican (Compl. ¶ 91), Reliant (*id.* ¶ 108), and Pinnacle West (*id.* ¶ 104) are registered to do business in California and that each has designated an agent for service of process in California.[13] But these actions cannot establish general jurisdiction, because the limited acts of registering to do business and appointing an agent for service of process do not themselves constitute a presence that is so substantial, continuous, and systematic that it takes the place of physical presence in the jurisdiction. *Gray Line Tours v. Reynolds Elec. and Eng'g Co.*, 193 Cal. App. 3d 190 (1987) (no general jurisdiction over defendant, even though defendant had been qualified to do intrastate business in California since 1951). As one California Court explained:

> [D]esignation of an agent for service of process and qualification to do business in California alone are insufficient to permit general jurisdiction except for lawsuits arising out of the foreign corporation's business conducted in the state. Here, DVI conducts no business in California: DVI's business is to own the stock of [its subsidiary, a corporation that did do business in California].

*DVI*, 104 Cal. App. 4th at 1095. Because Plaintiffs do not allege other facts that would constitute contacts akin to physical presence in the jurisdiction, these allegations regarding registration and designation of an agent for service of process are facially insufficient to establish general jurisdiction over these Defendants.[14]

---

[13] Plaintiffs do not allege that the remaining Defendants are registered to do business in California or have designated registered agents for service of process there.

[14] With respect to Pinnacle West, these allegations are not only legally insufficient, but demonstrably false. *See* Declaration of Shirley A. Baum, Associate Secretary, Pinnacle West Capital Corporation ¶¶ 4-5.

Hunton & Williams LLP

Hunton & Williams LLP

1
2

               iii.     **Allegations that AEP Service and Duke engaged in price manipulation in California for 18 months almost seven years ago do not confer general jurisdiction.**

3        Plaintiffs also attempt to base jurisdiction on allegations that FERC accused AEP Service

4 and Duke of price manipulation in the California energy market during a brief period more than

5 seven years ago. Compl. ¶ 65 ("The Federal Energy Regulatory Commission ('FERC') accused

6 AEP Service of engaging in manipulation of the California energy market during that time

7 period."); *id.* ¶ 75 ("In 2004, the California Attorney General reached a proposed settlement with

8 'Duke Energy and several affiliates' for $207.5 million for its manipulation of the electricity

9 market in the state."). Even if those allegations were true, contacts with California that ended

10 nearly seven years before the current action was filed are plainly insufficient to confer general

11 jurisdiction over AEP Service or Duke. *See DVI*, 104 Cal. App. 4th at 1100-01 (holding that the

12 exercise of general jurisdiction is reasonable only "when the defendant has substantial,

13 continuous and systematic contacts with the forum at the time the complaint is served on that

14 defendant").

15        And Plaintiffs' reliance on Duke's participation in a proposed settlement agreement also

16 fails. A defendant's participation in litigation unrelated to the current suit is irrelevant to the

17 question of general jurisdiction.[15] *Tercica*, 2006 WL 1626930, at *12 (holding that "it is clear . . .

18 that unrelated litigation in a forum state is a not [sic] controlling factor in, or even relevant to, the

19 general jurisdiction analysis") (*quoting Core-Vent*, 11 F.3d at 1490)).

20
21
22
23

---

24 [15]   Plaintiffs' reliance on the proposed settlement as a basis for specific jurisdiction over Duke also is misplaced. As Plaintiffs' Complaint makes clear, the proposed settlement concerned allegations of manipulation of electricity rates. Here, Plaintiffs assert claims for damages that allegedly arose out of Defendants' emission of greenhouse gases, not the alleged manipulation of electricity rates. Thus, the suit here cannot be said to "arise out of, or relate to" the settlement or the energy pricing activities that underlaid the settlement. As such, the proposed settlement cannot confer specific jurisdiction over Duke in this action. *See infra* pp. 30-31 (discussing specific jurisdiction).

28

1

iv.   **Plaintiffs' claims regarding AEP Service's alleged performance of contracts in California are insufficient to establish general jurisdiction.**

2

3       With regard to AEP Service, Plaintiffs allege that it "has contracted to buy power from

4   and/or sell power into California." Compl. ¶ 65. Such conclusory allegations, unsupported by

5   facts, are insufficient to withstand a motion to dismiss. *Amba Mktg. Sys.*, 551 F.2d at 787 (once

6   the defendant challenged personal jurisdiction, "plaintiff could not simply rest on the bare

7   allegations of its complaints . . . ."). Additionally, assuming *arguendo* that AEP Service

8   contracted to buy energy from and sell energy into California for approximately 18 months more

9   than seven years ago, these allegations are also insufficient to establish general jurisdiction. *See*

10   *Bancroft & Masters*, 223 F.3d at 1086 (license agreements with television networks and "handful

11   of California vendors" not sufficient to establish general jurisdiction; court found that the

12   contracts "constitute[d] doing business *with* California, but [did] not constitute doing business *in*

13   California"; "engaging in commerce with residents of the forum state is not in and of itself the

14   kind of activity that approximates physical presence within the state's borders") (emphasis

15   added); *Birzer v. Jockey's Guild, Inc.*, 444 F. Supp. 2d 1005, 1010 (C.D. Cal. 2006) ("The Ninth

16   Circuit recognizes that merely contracting with a California resident or one licensed to do

17   business in California is not sufficient to support the exercise of general jurisdiction.").

                              *        *        *

18

19       Thus, Plaintiffs have failed to meet their heavy burden for establishing general

20   jurisdiction over the Non-resident Utility Defendants, which are neither located in nor doing

21   business in California. Plaintiffs' allegations that certain Defendants own and/or operate facilities

22   in California are false, as demonstrated by the affidavits submitted by those Defendants.

23   Plaintiffs' remaining allegations regarding Defendants' allegedly direct contacts with California

24   are not, as a matter of law, substantial, continuous and systematic contacts, as required to

25   establish general jurisdiction.

26

27

28

**Hunton & Williams LLP**

**2.    Plaintiffs' allegations concerning the forum contacts of subsidiaries do not provide a basis for establishing jurisdiction over Defendants.**

Perhaps recognizing that the allegedly direct contacts discussed above cannot establish jurisdiction, Plaintiffs rely heavily on jurisdictional allegations regarding purported actions by Defendants' *subsidiaries*, not Defendants themselves. But allegations concerning a subsidiary's contacts with the jurisdiction are irrelevant to the establishment of jurisdiction over the parent, absent allegation of *facts*[16] sufficient to establish that a defendant has ignored the corporate separateness between itself and its subsidiary and that the subsidiary is either an alter ego of the parent or its mere agent. *Church of Scientology v. Adams*, 584 F.2d 893, 897 (9th Cir. 1978) ("Even in cases where the contacts of a parent or subsidiary corporation are sufficient to subject it to personal jurisdiction, we recognize that the activities of one related corporation are irrelevant to the issue of jurisdiction over the other, so long as a separation between the corporations has been maintained."); *Doe v. Unocal*, 248 F.3d 915, 925 (9th Cir. 2001) ("The existence of a relationship between a parent company and its subsidiaries is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum."); *see also Tercica*, 2006 WL 1626930, at *13 n.12 ("whether [the subsidiary] is, in fact, the alter ego of [the parent] is another element that must be established by plaintiff before this Court can assume general jurisdiction over [the parent]").

For that reason, Plaintiffs' persistent focus on the alleged activities of Defendants' subsidiaries is entirely irrelevant. As a matter of law, it matters not, even if taken as true, that:

- "DTE subsidiaries DTE Biomass Energy, Inc., DTE Energy Technologies, Inc., DTE Solar Company of California, DTE ES Operations, LLC and DTE Woodlands, LLC are all registered to do business in California and have designated a registered agent for service of process in California." Compl. ¶ 69;

- "Duke Energy Fossil-Hydro California Inc. . . . is registered to do business in California and has designated a registered agent for service of process in California." *Id.* ¶ 76;

---

[16] Unable to plead specific facts evidencing an alter ego or agency relationship, Plaintiffs resort to bare legal conclusions, pleading, for example, that Defendants "through [their] subsidiaries" engaged in various activities in California. As discussed herein, these allegations, even if true, fail to establish that Defendants are liable for the forum-related acts of their subsidiaries.

18

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

- "The following Duke subsidiaries are also registered to do business in California and have a registered agent for service of process in California:  Duke Solar Energy, LLC; Duke Energy Merchants, LLC; and Duke Energy Carolinas Plant Operations, LLC." *Id.* ¶ 77;

- Dynegy Power Marketing, Inc. ("DPM"), Dynegy Power Corp. ("DPC"), Dynegy Operating Company, and Dynegy Falcon Holdings Inc. are "registered to do business in California and have designated registered agents for service of process in California." *Id.* ¶¶ 82-83;

- "MEHC does business in California through its subsidiaries...." *Id.* ¶ 91;

- "Through its subsidiaries, including APS Energy Services Company, Inc., PWC is engaged in the generation, transmission, and distribution of electricity...." *Id.* ¶ 104;

- Pinnacle West's subsidiary "APS Energy Services Company, Inc. ("APS") is an Arizona corporation...with offices in...California,...provides service throughout...California,...is registered to do business in California and has designated a registered agent for service of process in California." *Id.* ¶ 105;

- "Through its subsidiaries, Reliant owns and operates power stations in California ... Reliant's subsidiaries settled civil antitrust claims arising from Reliant's decision to shut down four of its five power stations in 2000 to create an energy shortage and drive up the prices for electricity in California."[17] *Id.* ¶ 108;

- "Through [its subsidiary] Southern Energy, Southern owned fossil fuel-fired electric generating facilities in California from 1999 until Southern sold Mirant Corporation in April, 2001." *Id.* ¶ 113; and

- "Prior to surrendering its business registration in June 2006, Xcel was registered to do business in California through its subsidiary Xcel Energy Products and Services, Inc." *Id.* ¶ 118.

None of those allegations about Defendants' *subsidiaries* can establish jurisdiction over

*Defendants* themselves.  Plaintiffs' jurisdictional allegations about the activities of entities in

which Defendants merely hold some ownership interest are more attenuated still.[18]

---

[17] To the extent that Plaintiffs allege that Reliant participated in the conduct that led to the settlement by its subsidiaries, such an allegation is plainly inapposite.  Plaintiffs' vague assertions concerning a single act eight years prior to filing of the Complaint are insufficient to establish general jurisdiction over Reliant. *See DVI*, 104 Cal. App. 4th at 1100-01 (holding that the exercise of general jurisdiction is reasonable only "when the defendant has substantial, continuous and systematic contacts with the forum at the time the complaint is served on that defendant").  Moreover, any claim that Reliant participated in the alleged decisions to shut down the power stations is false. *See* Jines Decl. ¶ 5.

[18] *See* Compl. ¶ 75 (alleging that Duke "has a 60% ownership interest in Duke Energy Trading and Marketing, LLC ('DETM')", which "participated in the California energy market during at least the period January 1, 2000 to June 20, 2001"); *id.* ¶ 77 (alleging that "Duke owns a 50% interest in Southwest Power Partners, LLC, which provided power in California"). *See, e.g., In re MDC Holdings Sec. Litig.*, 754 F. Supp. 793-94 (S.D. Cal. 1990) (holding that "stock ownership

Hunton & Williams LLP

1

           **a.    Plaintiffs have not pled facts sufficient to establish personal
jurisdiction over Defendants based on an alter ego theory.**

2

3           To the extent Plaintiffs seek to establish personal jurisdiction over the Non-resident

4  Utility Defendants based on an "alter ego" theory, the Complaint and the facts do not support it.

5  A parent company is subject to personal jurisdiction under an alter ego theory based on the acts of

6  a subsidiary only where (1) there is "such a unity of interest and ownership . . . that the separate

7  personalities of the corporation and the shareholder do not in reality exist"; and (2) there would

8  be "an inequitable result if the acts in question are treated as those of the [subsidiary] corporation

9  alone." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000). "Alter ego

10  is a limited doctrine, invoked only where recognition of the corporate form would work an

11  *injustice* to a third person. *The injustice that allows a corporate veil to be pierced is not a*

12  *general notion of injustice; rather, it is the injustice that results only when corporate*

13  *separateness is illusory.*" *Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143,

14  1149 (9th Cir. 2004) (emphasis added). Accordingly, to withstand a motion to dismiss, Plaintiffs

15  must have pled facts – not bare legal conclusions – that, if true, would show that the parent

16  "controls the subsidiary to such a degree as to render the latter a mere instrumentality of the

17  former." *Doe*, 248 F.3d at 926 (establishing an "alter ego" relationship requires showing that "the

18  parent dictates every facet of the subsidiary's business – from broad policy to day-to-day

19  operation"). In determining whether a subsidiary is an alter ego of its parent, courts take into

20  account whether the plaintiff has pled facts showing the commingling of assets; that one entity

21  holds itself out as responsible for the debts of the other; identical ownership; the use of one entity

22  as "a mere shell or conduit for the affairs of the other"; disregard for corporate formalities; and

23  the existence of identical officers and directors. *Sonora Diamond*, 83 Cal. App. 4th at 538-39

24

25

_____

26  and board representation do not provide a basis for exercising personal jurisdiction" over a
foreign defendant corporation; "[e]ven where a parent owns 100% of a subsidiary and their

27  boards of directors overlap, the foreign parent is not subject to jurisdiction absent a showing that
the parent controls the internal affairs of the subsidiary and determines how the company will be

28  operated on a day-to-day basis") (citations omitted)).

20

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

Hunton & Williams LLP

1  (citations omitted).  Here, Plaintiffs have not alleged facts sufficient to establish personal

2  jurisdiction under an "alter ego" theory.

3         The bulk of Plaintiffs' parent-subsidiary jurisdictional allegations are embodied in

4  boilerplate language that Plaintiffs plead, verbatim, with respect to each Defendant:

> **[Insert Defendant Name]**, through its employees and/or agents,
> manages, directs, conducts and/or controls operations relating to
> emissions of carbon dioxide from fossil fuel-fired electric
> generating facilities owned and/or operated by **[Insert Defendant
> Name]**'s subsidiaries.  Such management, direction, conduct and/or
> control is exercised through a variety of means, including through
> implementation by **[Insert Defendant Name]**'s employees and/or
> agents of policies, procedures, and programs relating to global
> warming generally, to carbon dioxide emissions specifically, to
> dispatch of plants with varying carbon dioxide emissions per unit of
> energy, and/or to fuels utilized at each plant.

11  *See* Compl. ¶ 59 (AES); *id.* ¶ 66 (AEP and AEP Service); *id.* ¶ 70 (DTE); *id.* ¶ 78 (Duke); *id.* ¶ 84

12  (Dynegy); *id.* ¶ 92 (MidAmerican); *id.* ¶ 106 (Pinnacle West); *id.* ¶ 109 (Reliant); *id.* ¶ 115

13  (Southern); *id.* ¶ 120 (Xcel Energy).[19]

14

15         But these allegations amount to nothing more than a description of the standard, and

16  appropriate, oversight inherent in any parent-subsidiary relationship.  The Ninth Circuit has

17  expressly recognized that a parent's control over a subsidiary's general policies and procedures is

18  insufficient to demonstrate an alter ego relationship.  *Doe*, 248 F.3d at 926 ("Appropriate parental

19  _____

20  [19] Plaintiffs similarly allege with respect to each Defendant that:

21  [a]s a result of such management, direction, conduct and/or control of operations relating to
emissions of carbon dioxide from facilities owned and/or operated by its subsidiaries, **[Insert
22  Defendant Name]** is responsible for the past carbon dioxide emissions of its subsidiaries and the
emission of approximately [] million tons of carbon dioxide annually.

23  *See* Compl. ¶ 61 (AES); *id.* ¶ 68 (AEP and AEP Service); *id.* ¶ 72 (DTE); *id.* ¶ 80 (Duke); *id.* ¶ 86
(Dynegy); *id.* ¶ 93 (MidAmerican); *id.* ¶ 107 (Pinnacle West); *id.* ¶ 111 (Reliant); *id.* ¶ 117
24  (Southern); *id.* ¶ 122 (Xcel Energy).  But, again, these are not allegations of *facts* but merely
assertions of a legal conclusion (*i.e.*, that each specified company "is responsible" for the past
25  carbon dioxide emissions of its subsidiaries).  As such, although Defendants clearly dispute and
deny these conclusions, they have no bearing on whether Plaintiffs have asserted *facts* sufficient
26  to establish personal jurisdiction.  Thus, Defendants need not respond to them for the purposes of
this motion.
27

28

21

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

Hunton & Williams LLP

1    involvement includes:  monitoring of the subsidiary's performance, supervision of the

2    subsidiary's finance and capital budget decisions, and articulation of general policies and

3    procedures.").  Plaintiffs do not allege that any of the Defendants exercised the degree of day-to-

4    day control over their subsidiaries necessary for finding an alter ego relationship.

5

6    Beyond the conclusory boilerplate allegations addressed above, Plaintiffs also allege that

7    certain Defendants engaged in four other types of activity that purportedly demonstrate some

8    level of parental control over their subsidiaries.  Defendants address each type of activity in turn.

9    i.    **Statements in annual reports about emissions.**

10   Plaintiffs allege that AEP (Compl. ¶ 67), Dynegy (*id.* ¶ 85), Southern (*id.* ¶ 116), and

11   Xcel Energy (*id.* ¶ 121) each submitted "annual reports to the DOE reporting the amount of

12   carbon dioxide emissions avoided or sequestered from facilities owned and/or operated by its

13   subsidiaries."  However, any consolidated reporting of information on behalf of a subsidiary is a

14   routine and proper function of a parent company; it does not evidence the requisite pervasive day-

15   to-day control and, therefore, is irrelevant to establishing an alter ego relationship.  *Doe*, 248 F.3d

16   at 929 (declining to exercise jurisdiction over parent and noting that "consolidating the activities

17   of a subsidiary into the parent's reports is a common business practice") (quoting *Calvert v.*

18   *Huckins*, 875 F. Supp. 674, 678-79 (E.D. Cal. 1995)).

19   ii.    **Unsupported allegations that Defendants agreed to**
        **control emissions by their subsidiaries.**

20   Plaintiffs allege that AES (Compl. ¶ 59), AEP (*id.* ¶ 67), Dynegy (*id.* ¶ 85), and Xcel

21   Energy (*id.* ¶ 121) each entered into "various agreements and pledges to exercise control over the

22   carbon dioxide emissions from facilities owned and/or operated by its subsidiaries."  Plaintiffs

23   fail to support these vague allegations with any facts, and this alone is fatal to their claim.  *See*

24   *Amba Mktg. Sys.*, 551 F.2d at 787 (holding that, once the defendant challenged personal

25   jurisdiction "[plaintiff] could not simply rest on the bare allegations of its complaint, but rather

26   was obligated to come forward with facts, by affidavit or otherwise, supporting personal

27   jurisdiction").  Moreover, even if accepted as true, these allegations do not establish that

28

Hunton & Williams LLP

Defendants actually exercised day-to-day control over their subsidiaries. Conclusory allegations regarding "agreements and pledges to control carbon dioxide emissions" do not, as a matter of law, constitute the day-to-day control necessary for a finding of "unity of interest and ownership" necessary to establish an alter ego relationship.

            iii.     **Performing cost analyses regarding emissions reductions by subsidiaries.**

Plaintiffs also point to alleged representations by AEP (Compl. ¶ 67), Dynegy (*id.* ¶ 85), and Southern (*id.* ¶ 116) that they conducted cost analyses of each company's respective ability to comply with proposed emissions reduction scenarios. Even assuming the allegations to be true, a parent company's conduct of a cost analysis to determine how proposed regulation could affect its subsidiaries is a typical – often necessary – step to inform the parent's decisions in setting overall policy. Once again, this would be typical parent-subsidiary conduct, and not evidence of an alter ego relationship. *See Doe*, 248 F.3d at 926 (approving a parent company's articulation of general policies and procedures for its subsidiaries).

            iv.     **Defendants' statements in annual reports and other environmental statements.**

With regard to AES (Compl. ¶ 60), Reliant (*id.* ¶ 110), and Southern (*id.* ¶ 116), Plaintiffs cite various statements in each company's annual reports and other environmental statements as "evidence" that those Defendants control the emissions of their subsidiaries. These are merely statements of the parent companies' general environmental policies with regard to greenhouse gas emissions and say nothing about whether AES, Reliant, or Southern exercises the type of day-to-day control over its subsidiaries necessary to be an "alter ego."[20] To the extent that Plaintiffs are

---

[20] As to AES, Plaintiffs cite its 2002 Annual Report, which states that, as "one of the largest emitters of CO2 in the world, AES must continue to strive to economically stabilize greenhouse gas concentrations" and AES's "admission of the need to mitigate some of the risk to AES associated with global warming." Compl. ¶ 60.

As to Reliant, Plaintiffs cite "Reliant's statement in its Environmental/Safety Statement of Principles that 'We acknowledge our responsibility to design, build and operate our facilities in compliance with applicable environmental and safety requirements and to provide a safe workplace' and its statement that 'Reliant Energy is committed to operate our plants in a fashion that is protective of the environment.'" Compl. ¶ 110.

Hunton & Williams LLP

23

1    alleging that AES, Reliant, and Southern acknowledge that their subsidiaries emit greenhouse

2    gases, the case law is clear that discussion of a subsidiary's activities in a parent's reports does

3    not support a finding of alter ego. *Doe*, 248 F.3d at 928.

                            *        *        *

5        In sum, Plaintiffs fail to allege facts showing that Defendants exercised a degree of day-

6    to-day control over the operations of their subsidiaries such that the parent and its subsidiary

7    lacked separate corporate personalities, *Sonora Diamond*, 83 Cal. App. 4th at 538, or that the

8    subsidiary was a "mere instrumentality" of its parent. *Doe*, 248 F.3d at 926. Critically, Plaintiffs

9    have not even attempted to plead facts sufficient to meet the second prong of the alter ego test:

10   that failure to disregard separate identities "would result in fraud or injustice." *Id.* Consequently,

11   Defendants cannot be subjected to personal jurisdiction under an alter ego theory.[21]

                    **b.    Plaintiffs have not pled facts sufficient to establish personal
                            jurisdiction over Defendants based on an agency theory.**

13       Nor does the Complaint provide any basis for attributing the conduct of subsidiaries to

14   their parent corporations under an agency theory. To impute jurisdiction from a subsidiary to a

15   parent under an agency theory, a plaintiff must show that "in the truest sense, the subsidiaries'

16   presence substitutes for the presence of the parent" in the forum state. *Doe*, 248 F.3d at 929.

17   Plaintiffs must plead facts showing that the subsidiary performs services "sufficiently important

---

19   As to Southern, Plaintiffs cite "Southern's admission in its 2003 Environmental Progress Report
20   that it emits large amounts of carbon dioxide, which it recognized as 'a greenhouse gas'; and
     Southern's statement in the same report that 'there are concerns' about its emissions of carbon
     dioxide because of the impact those emissions may be having on global climate." Compl. ¶ 116.

21   [21] Insofar as Plaintiffs also seek to base jurisdiction over Southern on acts of its *former* subsidiary
22   Southern Energy, now known as Mirant (Compl. ¶ 113 (discussing Southern Energy's ownership
     of generation facilities in California from 1999 to 2001)), or Xcel Energy, via its former
23   subsidiary (*id.* ¶ 118), their theory suffers from an additional flaw. Under California law, the
     activities of a former subsidiary are insufficient to establish a basis for the exercise of general
24   jurisdiction where the parent's alleged contacts had already ceased when the Complaint was
     served. *See DVI*, 104 Cal. App. 4th at 1101 (holding that the exercise of general jurisdiction is
25   reasonable only "when the defendant has substantial, continuous and systematic contacts with the
     forum *at the time the complaint is served on that defendant*") (emphasis added); *see also Serafini
26   v. Superior Court*, 68 Cal. App. 4th 70, 80 (1998) ("When the corporation ceases to do business
     in the state, there is no longer any general jurisdiction, *i.e.*, jurisdiction as to causes of action
27   independent of that business.") (citing Restatement (Second) Conflict of Laws § 35 cmt. d, p.
     144)).

Hunton & Williams LLP

1  to the foreign corporation that if it did not have a representative to perform them, the

2  corporation's own officials would undertake to perform substantially similar services." *Doe*, 248

3  F.3d at 928. In the context of corporate parent-subsidiary relationships, courts have used the term

4  "representative services" in their analysis of agency. *See, e.g., Fru-Con Constr. Corp. v.*

5  *Sacramento Mun. Util. Dist.*, 2007 WL 2384841, at *3 n.2 (E.D. Cal. Aug. 17, 2007) (calling the

6  representatives services doctrine a "variant of the agency theory"); *Sonora Diamond*, 83 Cal.

7  App. 4th at 542 (applying the label "representative services doctrine" to the Ninth Circuit's

8  agency test).

9       Like alter ego status, an "agency relationship is typified by parental control of the

10  subsidiary's internal affairs or daily operations." *Doe*, 248 F.3d at 926. As the court emphasized

11  in *Sonora Diamond*:

> The parent's general executive control over the subsidiary is not
> enough; rather there must be a strong showing beyond simply facts
> evidencing "the broad oversight typically indicated by the common
> ownership and common directorship" present in a normal parent-
> subsidiary relationship. As a practical matter, the parent must be
> shown to have moved beyond the establishment of general policy
> and direction for the subsidiary and in effect taken over
> performance of the subsidiary's day-to-day operations in carrying
> out that policy.

18  *Sonora Diamond*, 83 Cal. App. 4th at 542; *see also In re Automobile Antitrust Cases I and*

19  *II*, 135 Cal. App. 4th 100, 120 (2005) ("The foreign company must exercise a highly pervasive

20  degree of control over . . . day-to-day operations of the local subsidiary in order to apply the

21  representative services doctrine.").

22       To the extent that Plaintiffs argue that the allegations discussed above (in § IV(A)(2))

23  alternatively suffice to confer jurisdiction over Defendants under an agency theory, that argument

24  too fails as a matter of law. First, while Plaintiffs allege actions by the parent outside of

25  California in an effort to show parental control over the subsidiary, none of those allegations

26  plead specific facts to establish that the parent undertakes *its own business in California* through

27  its subsidiary. As a result, the Plaintiffs have failed to plead facts sufficient to show that the

28  subsidiary serves as the *parent's substitute in the forum*. Second, as discussed above, Plaintiffs'

Hunton & Williams LLP

25

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

Hunton & Williams LLP

1    allegations also fail to demonstrate that Defendants exercised the "highly pervasive degree of

2    control" that is necessary to establish jurisdiction. *In re Automobile Antitrust Cases I and II*, 135

3    Cal. App. 4th at 120. For this reason as well, the Complaint on its face fails to plead facts

4    sufficient to establish that the named subsidiaries were mere "agents" of Defendants.

5         For most of the Defendants, Plaintiffs rely solely on the generic allegations discussed in §

6    IV(A)(2)(a) above. With respect to AEP, Duke and Dynegy, however, Plaintiffs appear to

7    attempt to invoke an agency theory based on the following additional allegations about their

8    respective subsidiaries:

9    • AEP subsidiary "AEP Service, as agent for AEP, participated in the
      California energy market from January 1, 2000 to June 20, 2001. The
10     Federal Energy Regulatory Commission ("FERC") accused AEP Service
      of engaging in manipulation of the California energy market during that
11     time period. AEP Service, as agent for AEP, has contracted to buy power
      from and/or sell power into California." Compl. ¶ 65.
12

13   • Duke subsidiary "DETM, as agent for Duke, participated in the California
      energy market during at least the period January 1, 2000 to June 20, 2001.
14     FERC accused DETM of engaging in manipulation of the California
      energy market during that time period.... DETM, as agent for Duke, has
15     contracted to sell power into California." *id.* ¶ 75; *see also id.* ¶ 76 ("Duke
      Energy Fossil-Hydro California Inc...acts as Duke's agent there.");
16

17   • Dynegy Holdings subsidiaries "Dynegy Power Marketing ("DPM") and
      Dynegy Power Corp. ("DPC"), as agents for Dynegy, participated in the
18     California energy market during at least the period January 1, 2000 to June
      20, 2001. FERC accused DPM and DPC of engaging in manipulation of
19     the California energy market during that time period. DPM, as agent for
      Dynegy, has contracted to sell power into California." *id.* ¶ 82.[22]
20

21        Although these allegations use the word "agent," they fail to plead any facts

22   demonstrating that any of the named subsidiaries functioned as an *agent* under any recognized

23   legal theory. For example, Plaintiffs do not allege any facts that establish an absence of separate

24   corporate personalities, or that these subsidiaries' operations in the California energy market were

25   "sufficiently important to the foreign corporation that if it did not have a representative to perform

26   _____

27   [22] The vague and conclusory allegation of agency is not only legally insufficient, but also
     incorrect. *See* Jolley Decl. ¶ 5.

28

1  them, the corporation's own officials would undertake to perform substantially similar services."

2  *Doe*, 248 F.3d at 928.  Indeed, they do not show that the actions were undertaken on behalf of the

3  parent's business, as opposed to the subsidiary's.  Thus, AEP, Duke and Dynegy are not subject

4  to California jurisdiction under an agency theory due to their subsidiaries' alleged activities in

5  California.

6  Finally, the agency theory is particularly inapplicable to those Defendants that are holding

7  companies – i.e., AES (Compl. ¶ 57), AEP (*id.* ¶ 62), DTE (Ennis Decl. ¶ 4), Dynegy (Jolley

8  Decl. ¶ 3), MidAmerican (Compl. ¶ 91), Pinnacle West (Baum Decl. ¶ 6), Reliant (Jines Decl. ¶

9  3), Southern (Compl. ¶ 112), and Xcel Energy (*id.* ¶ 118).  As the court explained in *Sonora*

10  *Diamond*, an agency theory supports personal jurisdiction only where a subsidiary assists the

11  parent in the operation of the parent's *own* business in the forum.  That theory cannot be used to

12  confer jurisdiction over a parent holding company "whose only business pursuit is the investment

13  in the subsidiary."  83 Cal. App. 4th at 543; *see also Doe*, 248 F.3d at 930 (refusing to find

14  jurisdiction over holding company parents because "they merely hold assets, nothing more").

15  Thus, Plaintiffs do not allege facts sufficient to establish jurisdiction over Defendants

16  based on alleged contacts with California by their subsidiaries, based on either an alter ego or

17  agency/representative services theory of personal jurisdiction.  Therefore, the exercise of general

18  jurisdiction over Defendants would be improper.

**B.  Plaintiffs have not made a prima facie showing that Defendants are subject to specific jurisdiction in California.**

Plaintiffs also fail to allege facts sufficient to establish a *prima facie* case for asserting

specific jurisdiction.  To withstand a motion to dismiss, a plaintiff seeking to invoke specific

jurisdiction must plead facts sufficient to establish that (1) the defendant purposefully availed

itself of the benefits of the forum or purposefully directed its activities at the forum; (2) the

plaintiff's claims arise from the defendant's alleged forum-related activities; <u>and</u> (3) the court's

exercise of jurisdiction over the defendant is reasonable. *Bancroft & Masters*, 223 F.3d at 1086; *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 416 (9th Cir. 1997).[23]  Plaintiffs fail this test.

> **1.    Because Defendants have not purposefully directed their activities at California, the exercise of specific jurisdiction over them is not warranted.**

In tort cases, a court will not exercise long-arm jurisdiction over a non-resident unless the defendant has "purposefully directed"[24] its activities at the forum. *See, e.g., Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112-13 (1987) (plurality opinion); *Yahoo!*, 433 F. 3d at 1206.  To determine whether a defendant has purposefully directed its activities at the forum, courts apply the "effects" test set forth in *Calder v. Jones*, 465 U.S. 783, 789-90 (1984).  Under this test, the defendant must have committed an intentional act that was expressly aimed at the forum state and caused harm the defendant knew was likely to be suffered in the forum state. *Yahoo!*, 433 F.3d at 1207 (requiring a jurisdictionally sufficient amount of harm to be suffered in the forum state).  To satisfy this "express aiming" requirement, plaintiffs must allege that a defendant's acts were targeted at a plaintiff that the defendant knew to be a resident of the forum state. *Bancroft & Masters*, 223 F.3d at 1087.  Plaintiffs have not met this burden.

Plaintiffs here are not California residents (Compl. ¶ 1) and have not alleged that they suffered any injury in California.  As the Complaint makes clear, Plaintiffs are suing for harm alleged to have occurred to their real property in Alaska.  Indeed, the Complaint does not allege

---

[23] To the extent that Plaintiffs attempt to assert jurisdiction over Defendants AEP, Duke, and Southern under a "conspiracy theory of jurisdiction," their attempt fails.  California courts have repeatedly recognized that personal jurisdiction must be predicated on the forum-related activities of the individual defendant, not on allegations regarding its participation in a "conspiracy." *Hilsenrath v. Equity Trust (Jersey) Limited*, 2008 WL 728902 (N.D. Cal. Mar. 17, 2008) (citing *Kipperman v. McCone*, 422 F. Supp. 860, 873, n.14 (N.D. Cal. 1976)) ("personal jurisdiction over any non-resident individual must be premised upon forum-related acts personally committed by the individual"); *In re Dynamic Random Access Memory Antitrust Litigation*, 2005 WL 2988715, *8 (N.D. Cal. Nov. 7, 2005) (noting that "[t]he conspiracy theory doctrine is not a generally accepted theory" and that "Ninth Circuit district court case law argues in favor of rejecting this theory of jurisdiction"); *see also MMCA Group, Ltd. v. Hewlett-Packard Co.*, 2007 WL 1342586, *7-8 (N.D. Cal. May 8, 2007) (collecting cases).

[24] This part of the analysis is known as the "purposeful availment and direction" prong, which "may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof." *Menken v. Emm*, 503 F.3d 1050, 1057 (9th Cir. 2007) (quoting *Yahoo! Inc. v. La Ligue Contre le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006)).

Hunton & Williams LLP

1    that Plaintiffs suffered *any* harm in California. In the absence of some injury suffered in the

2    forum, Plaintiffs have not shown "express aiming" by Defendants. *See Teledyne, Inc. v. Kone*

3    *Corp.*, 892 F.2d 1404, 1411 (9th Cir. 1989) (finding no express aiming where "[a]ll that [plaintiff]

4    has shown is that defendants, while in Finland, performed acts detrimental to a corporation in

5    Canada, and that this conduct may have had foreseeable effects in the United States").[25]

6        Moreover, the Complaint does not allege that Defendants committed a single act targeted

7    anywhere in particular, let alone one targeted at California.[26] The Complaint plainly alleges that

8    Defendants emit greenhouse gases into the *atmosphere* – not California's atmosphere, or even the

9    United States' atmosphere, but the *global atmosphere* – where these emissions "inevitably

10   merge[] with the accumulation of emissions in California and in the world," thereby "increas[ing]

11   the *global atmospheric* concentration of greenhouse gases and . . . contribut[ing] to *global*

12   *warming.*" Compl. ¶ 10 (emphasis added). Thus, the Complaint establishes on its face that the

13   alleged emissions at issue were subject to atmospheric forces beyond Defendants' control and not

14   "expressly aimed" by Defendants at California (or any other forum). *See Calder*, 465 U.S. at 789

15   (distinguishing "mere untargeted" acts from conduct expressly aimed at the forum state); *see also*

16   *Core-Vent*, 11 F.3d at 1485-86.

---

17   [25] *See also Jewish Defense Org., Inc. v. Superior Court*, 72 Cal. App. 4th 1045, 1059, n.3 (1999)
18   ("[Plaintiff] has not even established that his residence or principal place of business is in
     California, so the purposeful availment prong of the [specific] jurisdiction issue is not satisfied on
19   that ground."); *Peacock v. Willis*, 2006 WL 3060134, *12 (E.D. Cal. Oct. 27, 2006) (California
     has weaker interests when nonresidents sue in California courts).

20   [26] Regarding the conspiracy allegations, Plaintiffs allege that Defendant Southern formed a "front
     group" that "undertook radio advertising blitzes and mass mailings" and that Defendants AEP,
21   Duke, and Southern, directly and through groups such as the Global Climate Coalition, "launched
     a national television, print and radio advertising campaign," disseminated "glossy reports,"
22   distributed "a video to hundreds of journalists," and employed scientific experts to publish in
     "places like the *Wall Street Journal*" and the *Washington Times.* Compl. ¶¶ 191, 194, 204, 222.
23   Plaintiffs do not claim that any of the alleged publications, advertisements, mailings, or videos
     reached *California*. However, even if they had, such allegations would not suffice to establish
24   that AEP, Duke and Southern purposely availed themselves of this forum. *See Ameritec Corp. v.*
     *Ameritech Corp.*, 1986 WL 10702, *6 (C.D. Cal. Apr. 29, 1986) ("Plaintiffs assert that by placing
25   advertisements in national publications which circulate in California, *e.g.*, Wall Street Journal and
     The New York Times, moving defendants have interjected its product [*sic*], the trademark itself,
26   into the 'stream of commerce' in California. . . . [A]dvertisement in national publications does
     not establish, without more, that the moving defendants have purposefully availed itself [*sic*] of
27   the privilege of conducting activities within the forum or invoked the benefits and protections of
     its laws.").
28

Hunton & Williams LLP

1   For all of these reasons, Plaintiffs cannot demonstrate that Defendants purposefully

2   availed themselves of the benefits of this forum or purposefully directed their activities at

3   California.

4        **2.    Because Plaintiffs also have not alleged facts that, if accepted as true,
            would show that forum-related activities by Defendants were the but-
5            for cause of their alleged harm, they have failed to establish a prima
            facie case for specific jurisdiction.**

6   "The second requirement for specific jurisdiction is that the contacts constituting

7   purposeful availment must be the ones that give rise to the current suit." *Bancroft & Masters*, 223

8   F.3d at 1088. Courts must "measure this requirement in terms of 'but for' causation." *Id.* That is,

9   a plaintiff must show that it would not have suffered an injury "but for" the defendant's forum-

10  related activities. *Id.* Plaintiffs fail to plead facts sufficient to make that showing.

11  First, the Complaint does not allege that the Non-resident Utility Defendants emit

12  greenhouse gases *in California.* [27]  As a result, Defendants' *forum-related activities* could not

13  have been the "but for" cause of Plaintiffs' alleged injuries. Second, Plaintiffs' Complaint

14  alleges, at most, that Defendants' emissions outside of California "rapidly mix[ed] in the

15  atmosphere" and "merged with" other emissions from billions of sources around the world; that

16  total mixture is alleged to have caused Plaintiffs' injury in Alaska. Compl. ¶¶ 254, 10. Even

17  assuming that Plaintiffs can somehow link their injury to global climate change induced by

18  human activity, Plaintiffs' vague and cursory allegations regarding Defendants' emissions outside

19  of California – a small fraction of overall human conduct allegedly responsible for climate change

20  – are insufficient as a matter of law to satisfy the "but for" causation test for forum-related

21  activity. *See Doe v. American Nat'l Red Cross*, 112 F.3d 1048, 1051-52 (9th Cir. 1997)

22  (declining to exercise specific jurisdiction over non-resident FDA director, finding that his

23  alleged negligence in regulating blood supply was too attenuated from the actual injury to be

24  considered "but for" cause of death resulting from transfusion of tainted blood); *Love v. The Mail*

25

26  _____

27  [27] We exclude for present purposes those allegations shown above to be false. *See supra* §
    IV(A)(1)(a), pp. 10-13.

28

Hunton & Williams LLP

1    *on Sunday*, 2006 WL 4046170, at *7 (C.D. Cal. July 14, 2006) (finding no "but for" causation if

2    cause of action would exist even in the absence of defendant's alleged forum-related activities).

3              **3.    Plaintiffs' remaining allegations regarding contacts with the forum are**
              **too vague and attenuated to serve as a basis for specific jurisdiction.**

4

5         The heart of Plaintiffs' allegations in support of specific jurisdiction is contained in the

6    following paragraph:

7              As set forth below, each of the defendants intentionally emits
              millions of tons of carbon dioxide and other greenhouse gases into

8              the atmosphere annually, knowing that their emissions increase the
              global atmospheric concentration of greenhouse gases and thereby

9              contribute to global warming. Much of the misconduct occurs in
              California, where *many* of the defendants conduct operations that

10             cause greenhouse gas emissions. *In other instances, defendants*
              *emit gases at other locations,* knowing that the harm from their

11             emissions does not remain localized and inevitably merges with the
              accumulation of emissions in California and in the world.

12

13   Compl. ¶ 10 (emphasis added).

14        Plaintiffs' vague and cursory allegation that "[m]uch of the misconduct occurs in

15   California, where many of the defendants conduct operations that cause greenhouse gas

16   emissions" is inadequate on its face. Neither the Court nor the Defendants should be forced to

17   speculate as to which of the 24 named Defendants allegedly conduct such operations in

18   California. As a matter of law, such general and conclusory allegations regarding unspecified

19   "defendants" are insufficient to meet Plaintiffs' "high" burden of establishing personal

20   jurisdiction through non-conclusory, factual allegations. *Missud v. D.R. Horton*, 2007 WL

21   3231733, at *3-4 (N.D. Cal. Oct. 30, 2007); *Amba Mktg. Sys.*, 551 F.2d at 787; *Arikat v. JP*

22   *Morgan Chase & Co.*, 430 F. Supp. 2d 1013, 1020 (N.D. Cal. 2006) (on motion to dismiss for

23   failure to state a claim, "plaintiffs' allegations are insufficient in that they are ascribed to

24   defendants collectively rather than to individual defendants").

25             **4.    Exercise of jurisdiction over Defendants would be unreasonable.**

26        Before a court can exercise specific jurisdiction over a defendant, the court must find that

27   doing so would be reasonable and would not offend traditional notions of due process. In making

28   this determination, California courts traditionally balance seven factors:

Hunton & Williams LLP

31

1.  The extent of the defendant's purposeful interjection into the forum state;

2.  The burden on the defendant in defending in the forum;

3.  The extent of the conflict with the sovereignty of the defendant's state;

4.  The forum state's interest in adjudicating the dispute;

5.  The most efficient judicial resolution of the controversy;

6.  The importance of the forum to the plaintiff's interest in convenient and effective relief; and

7.  The existence of an alternative forum.

*Bancroft & Masters*, 223 F.3d at 1088 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985)).  Application of those factors here demonstrates that exercising specific jurisdiction over the Non-resident Utility Defendants would be manifestly unreasonable here.

**a.    Plaintiffs have not pled facts sufficient to show purposeful interjection into the forum state by Defendants.**

As addressed in the "purposeful availment" discussion in § IV(B)(1) above, Defendants have not purposefully interjected themselves into the forum state. *Insurance Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1271 (9th Cir. 1981) (noting that it may be unreasonable to subject an out-of-state defendant to jurisdiction where the allegedly tortious act is committed outside of the forum state, having only an effect within the state, if the act is not purposeful; "[t]he degree to which a defendant interjects himself into the state affects the fairness of subjecting him to jurisdiction").

**b.    Plaintiffs' choice of jurisdiction imposes a significant and unnecessary burden on Defendants.**

A significant burden will be imposed on Defendants if they are forced to defend this suit in California.  Fact witnesses necessary to defend these cases are largely outside of Defendants' control and cannot be compelled to appear in this Court.  "[T]o fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 511 (1947).  Moreover, because there is no adequate substitute for

Hunton & Williams LLP

32

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

1    live testimony from disinterested, non-party witnesses, even the potential availability of video

2    depositions is unsatisfactory.

      c.    **Exercise of jurisdiction over Defendants conflicts with the law and sovereignty of several states and encroaches on federal powers.**

5         In this case, the exercise of jurisdiction in California would conflict with the sovereignty

6    of each of the Defendants' states of incorporation. All of these states have a significant interest in

7    adjudicating disputes regarding their resident corporations. The exercise of jurisdiction in

8    California also would conflict with the sovereignty of the state of Alaska, where Plaintiff City of

9    Kivalina is incorporated and all Plaintiffs reside. Compl. ¶ 14. Finally, and perhaps most

10   significantly, this Court's exercise of jurisdiction over Defendants would conflict with the powers

11   of the political branches of the federal government, as discussed in the Non-resident Utility

12   Defendants' Omnibus Motion to Dismiss.

      d.    **California has no interest in adjudicating a dispute regarding property in Alaska.**

         While California does have an interest in providing effective judicial redress for its

citizens, the injury alleged in this case is not to California citizens, but to citizens of Alaska and

their property located there. *See Peacock*, 2006 WL 3060134, at *12 ("California . . . has weaker

interests when non-residents sue in California courts").

      e.    **Exercise of jurisdiction over Defendants by California would not effect an efficient resolution of the controversy.**

20        Litigation in district court in California is not the most efficient means of resolving this

21   controversy. Plaintiffs allege that the situs of their injury is Alaska, not California. *Panavision*

22   *Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323-24 (9th Cir. 1998) (when determining the efficiency

23   of the forum, a court should look at the location of evidence and witnesses). Defendants are not

24   residents of California. *See* pp. 3-7 *supra*. There simply is no nexus between California and this

25   suit.

Hunton & Williams LLP

Hunton & Williams LLP

**f.    Plaintiffs have no articulable interest in bringing the suit in California.**

Plaintiffs are Alaska residents who have no articulable interest in litigating this case in California. Indeed, their failure to state any reason for bringing this case in California hints strongly at forum-shopping. *See Italian Colors Rest. v. American Express Co.*, 2003 WL 22682482, at *4 (N.D. Cal. Nov. 10, 2003) (on motion to transfer venue; "the Ninth Circuit has established that courts should disregard a plaintiff's forum choice where the suit is a result of forum-shopping").

**g.    The most appropriate fora are the political branches.**

As noted above, the appropriate forum for resolving these issues is not a judicial forum at all, but a political forum. There will never be a judicial forum available that has jurisdiction over all greenhouse gas emitters. The issue raised here can be resolved only by the politically elected branches. *See California v. General Motors Corp.*, No. C06-05755-MJJ, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007), *appeal docketed*, No. 07-16908 (9th Cir. Oct. 24, 2007) (dismissing State of California's global warming nuisance claim as presenting a "non-justiciable political question"); *Comer v. Murphy Oil*, No. 05-cv-00436-RSW, Oral Opinion (S.D. Miss. Aug. 30, 2007), *appeal docketed*, No. 07-60756 (5th Cir. Sept. 17, 2007); *Connecticut v. Am. Elec. Power Co.*, 406 F. Supp. 2d 265, 274 (S.D.N.Y. 2005), *appeals pending*, Nos. 05-5104, 05-5119 (appeals argued June 7, 2006).

*        *        *

In sum, application of the seven factors examined by courts to determine the reasonableness of exercising specific jurisdiction demonstrates that it would be unreasonable to exercise jurisdiction over Defendants.

**C.    Allegations of foreseeability of harm are insufficient to meet the requirements of due process.**

Plaintiffs allege that the exercise of specific jurisdiction is warranted because "defendants emit gases at other locations, knowing that the harm from their emissions does not remain localized and inevitably merges with the accumulation of emissions in California and in the world." Compl. ¶ 10. Any argument that personal jurisdiction exists because it was somehow

34

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

1  *foreseeable* that Defendants' actions could cause harm in California would be unavailing:  this

2  notion of jurisdiction has been universally rejected by the United States Supreme Court, the Ninth

3  Circuit and California appellate courts, and should be rejected here.  *Asahi Metal Indus. Co. v.*

4  *Superior Court*, 480 U.S. 102 , 111-113 (1987) (plurality opinion) ; *Burger King Corp. v.*

5  *Rudzewicz*, 471 U.S. 462 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286

6  (1980); *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 271 (9th Cir. 1995); *Carretti v.*

7  *Italpast*, 101 Cal. App.4th 1236 (2002).

8       Indeed, a review of the three seminal decisions in which the Supreme Court rejected this

9  concept of jurisdiction (*i.e., World-Wide Volkswagen, Burger King*, and *Asahi Metal*) illustrates

10  how far off the mark Plaintiffs' theory is.

11       In *World-Wide Volkswagen*, an individual injured in an automobile accident in Oklahoma

12  brought a products liability suit against, among others, the New York wholesaler and New York

13  retailer from which he bought the vehicle.  The plaintiff argued that, because an automobile is

14  mobile by design and purpose, it was foreseeable that it would cause injury in a state other than

15  where the defendant distributor had sold it.  According to the plaintiff, this satisfied due process.

16  444 U.S. at 290, 295.  The Court rejected the plaintiff's theory, holding that "foreseeability alone

17  has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause,"

18  *id.* at 295, and emphasized that "if foreseeability were the criterion . . . [e]very seller of chattels

19  would in effect appoint the chattel his agent for service of process [and its] amenability to suit

20  would travel with the chattel."  *Id.* at 296.

21       Five years later, in *Burger King*, the Supreme Court reinforced the point and rejected the

22  kind of theory now advanced by Plaintiffs, writing that:

23       Although it has been argued that foreseeability of causing injury in
         another state should be sufficient to establish [minimum] contacts .
24       . . the Court has consistently held that this kind of foreseeability is
         not a sufficient benchmark for exercising personal jurisdiction.
25

26  471 U.S. at 474.[28]

27  ──────────────
    [28] In finding that jurisdiction was satisfied there, however, the Supreme Court noted that, in
28  contrast to *World-Wide Volkswagen* and *Keeton v. Hustler*, 465 U.S. 770 (1984), the defendant's

35

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

Hunton & Williams LLP

1    Finally, in *Asahi Metal*, the Supreme Court addressed whether the defendant's awareness

2  that its product would reach the forum state in the stream of commerce constituted minimum

3  contacts such that the exercise of jurisdiction would comport with due process. 480 U.S. at 105.

4  A plurality of the Court held that "placement of a product into the stream of commerce" was *not*

5  enough to establish personal jurisdiction over a non-resident defendant because it "is not an act …

6  purposefully directed toward the forum state." *Id.* at 112 (plurality op.) ("a defendant's

7  awareness that the stream of commerce may or will sweep the product into the forum State does

8  not convert the mere act of placing the product into the stream into an act purposefully directed

9  toward the forum State"). The Court distinguished it from a situation where the defendant may

10 have "create[d], control[led] or employ[ed] the distribution system that brought [the product] to

11 [the forum]." *Id.*

12    These cases make clear that foreseeability-plus-injury is not enough to allow the exercise

13 of jurisdiction over Defendants. Indeed, in each of these cases, the Court explained that requiring

14 purposeful direction implements the core objective of the Due Process Clause – to "give[] a

15 degree of predictability to the legal system that allows potential defendants to structure their

16 primary conduct with some minimum assurance as to where that conduct will and will not render

17 them liable to suit." *World-Wide Volkswagen*, 444 U.S. at 297; *Burger King*, 471 U.S. at 472;

18 *Asahi*, 480 U.S. at 110. As all three opinions explained, the *sine qua non* of due process is

19 allowing actors "to alleviate the risk of burdensome litigation by procuring insurance, passing the

20 expected costs on to customers or, if the risks are too great, severing [their] connection with the

21 State." *World-Wide Volkswagen*, 444 U.S. at 297; *Burger King*, 471 U.S. at 475 n.17; *Asahi*, 480

22 U.S. at 110.

23    The incurable defect in any attempt to base personal jurisdiction upon the theory that it

24 was foreseeable that out-of-state greenhouse gas emissions could cause injury in California is that

25 Plaintiffs cannot explain how Defendants would be able "to structure their . . . conduct" so as to

26 ──────────────────────────────────────────────
   contact with the Florida forum in *Burger King* constituted purposeful direction because he had
27 entered into a highly regimented franchise relationship with the Miami-based franchisor Burger
   King; it was not the result of "random, fortuitous, or attenuated" contacts. 471 U.S. at 475.

28

1    sever their connection with California and avoid being subjected to suit there – short of ceasing

2    such lawful emissions entirely (and the Supreme Court rejected that approach in *World-Wide*

3    *Volkswagen*).

4    Indeed, the allegation that Defendants emit greenhouse gases into the "global commons

5    of the atmosphere" and that those emissions were streamed around the globe by atmospheric

6    forces beyond Defendants' control is the opposite of an allegation of "purposeful direction."

7    Rather, it is an allegation about the nature of greenhouse gases and Earth's atmospheric forces, an

8    argument that is, for all relevant purposes, indistinguishable from the argument made

9    unsuccessfully by the plaintiff in *World-Wide Volkswagen* concerning the mobile nature of

10   automobiles.  Under Plaintiffs' apparent theory, short of ceasing all emissions-producing

11   operations, Defendants would, by virtue of atmospheric phenomena, be subject to nationwide –

12   indeed, worldwide – jurisdiction.  In sum, Plaintiffs' theory of specific jurisdiction in this case

13   runs contrary to fundamental notions of due process as set forth by the Supreme Court and,

14   therefore, fails as a matter of law.

15   **V.    DEFENDANT-SPECIFIC ANALYSIS**

16   For the reasons discussed above, Plaintiffs' allegations regarding each of the Defendants

17   do not justify the exercise of either general or specific jurisdiction.

18   AEP is not a California corporation, and is alleged neither to be registered to do business

19   nor to have an agent for service of process in California.  Compl. ¶¶ 62-68.  Plaintiffs also do not

20   allege that AEP owns or operates generating facilities in California.  *Id.*  The *only* jurisdictional

21   allegations of (arguably) "direct" contact with California are Plaintiffs' allegations relating to

22   ownership by CalPERS's and other California residents of AEP stock (*id.* ¶ 63), which, as a

23   matter of law, does not justify the exercise of personal jurisdiction over AEP.  *Funk*, 2006 WL

24   2983058, at *5 n.4.  Plaintiffs' impermissibly conclusory allegations relating to AEP's

25   subsidiaries also do not confer jurisdiction over AEP, especially where, as here, the defendant is a

26   holding company.  Compl. ¶ 62.  *Sonora Diamond*, 83 Cal. App. 4th at 543; *see also Doe*, 248

27   F.3d at 930; *Missud*, 2007 WL 3231733, at *3-4.  Plaintiffs' allegations that AEP has articulated a

28   general policy of reducing emissions of its subsidiaries (Compl. ¶ 60) and has agreed to analyze

Hunton & Williams LLP

1  their ability to comply with proposed national regulation similarly do not confer jurisdiction over

2  AEP, but merely reflect the normal corporate relationship between parent and subsidiary. *Doe*,

3  248 F.3d at 928. Finally, Plaintiffs' allegation that AEP participated in an "agreement . . . to

4  mislead the public with respect to the science of global warming" (Compl. ¶ 269) does not justify

5  the exercise of personal jurisdiction. *See MMCA Group, Ltd. v. Hewlett-Packard Co.*, 2007 WL

6  1342586, at *7-8 (N.D. Cal. May 8, 2007) (collecting cases rejecting conspiracy theory of

7  personal jurisdiction).

8  <u>AEP Service</u> is not a California corporation and is alleged neither to be registered to do

9  business in California nor to have a registered agent for service of process there. Compl. ¶ 64.

10  Nor is AEP Service alleged to own or operate any generating facilities in California. *Id.* ¶¶ 64-68.

11  Rather, alleging it to be a wholly-owned subsidiary of AEP, Plaintiffs rely on conclusory

12  allegations regarding AEP Service's pre-Complaint conduct and other conduct wholly unrelated

13  to this litigation. Plaintiffs' allegations regarding prior unrelated acts cannot and do not rise to the

14  level of allegations of "substantial, continuous and systematic contacts" sufficient to confer

15  jurisdiction. *See DVI*, 104 Cal. App. 4th at 1100-01 (holding that the exercise of general

16  jurisdiction is reasonable only "when the defendant has substantial, continuous and systematic

17  contacts with the forum at the time the complaint is served on that defendant"); *Britesmile, Inc. v.*

18  *Discus Dental, Inc.*, 2005 WL 1048701, at *2 (N.D. Cal. May 5, 2005) (filing of an unrelated

19  lawsuit ten years prior to present lawsuit was insufficient to establish jurisdiction). Plaintiffs'

20  allegations are thus insufficient to confer jurisdiction over AEP Service.

21  <u>DTE</u> is not a California corporation and is not alleged either to have a registered agent for

22  service of process or to be registered to do business in this forum. Compl. ¶ 69. Plaintiffs' only

23  jurisdictional allegation of "direct" contact by DTE with California is that "DTE is 99% owner"

24  of a biomass-fired electric generating plant in Woodland, California," an allegation that is

25  indisputably false. *See Ennis Decl.* ¶ 5. That DTE's distant *subsidiaries* are alleged to be

26  registered to do business in California and to have designated agents for service of process there

27  is insufficient to establish jurisdiction absent Plaintiffs pleading facts showing that those

28  subsidiaries are either alter egos or agents of DTE, *Church of Scientology*, 584 F.2d at 897; and

Hunton & Williams LLP

38

1    Plaintiffs plead no such facts. Certainly, conclusory allegations relating to DTE's subsidiaries,

2    and Plaintiffs' allegation that DTE has articulated a general policy of reducing emissions (Compl.

3    ¶ 71), do not confer jurisdiction over DTE, especially where, as here, the defendant is a holding

4    company. *See* Ennis Decl. ¶ 4; *Sonora Diamond*, 83 Cal. App. 4th at 543; *see also Doe*, 248 F.3d

5    at 930; *Missud*, 2007 WL 3231733, at *3-4. Thus, personal jurisdiction does not exist over DTE.

6    *Amba Mktg. Sys.*, 551 F.2d at 787.

7            Duke is not alleged to be a California corporation, to have a registered agent for service

8    of process, or to be registered to do business here. Compl. ¶ 73. Plaintiffs' allegations that Duke

9    owned power generation facilities in California prior to the filing of the Complaint are

10   demonstrably untrue and insufficient to confer jurisdiction in any event. *See* Beach Decl. ¶ 5;

11   *DVI*, 104 Cal. App. 4th at 1100-01. Plaintiffs' allegations that DETM and Duke Energy Fossil-

12   Hydro California Inc. are Duke's agents in California (Compl. ¶¶ 75, 76) are mere legal

13   conclusions, unsupported by any facts that would justify the exercise of jurisdiction over Duke

14   pursuant to either agency or alter ego theories. Thus, such allegations cannot confer jurisdiction

15   over Duke. *Amba Mktg. Sys.*, 551 F.2d at 787 (once the defendant challenged personal

16   jurisdiction, "[plaintiff] could not simply rest on bare allegations of its complaints…").

17   Moreover, Plaintiffs' allegations regarding Duke's role in a "proposed settlement" in 2004

18   (Compl. ¶ 75) are irrelevant to the question of whether it is subject to jurisdiction in California in

19   this action. *Tercica*, 2006 WL 1626930, at *12 (holding that "it is clear…that unrelated litigation

20   in a forum state is a not [sic] controlling factor in, or even relevant to, the general jurisdiction

21   analysis"). Even assuming *arguendo* that Duke *had* participated in the California energy market

22   during 2000-01, that conduct would be insufficient to confer jurisdiction in this action. *See DVI*,

23   104 Cal. App. 4th at 1100-01 (exercise of general jurisdiction is reasonable only "when the

24   defendant has substantial, continuous and systematic contacts with the forum at the time the

25   complaint is served on that defendant"). Finally, Plaintiffs' allegation that Duke participated in

26   an "agreement…to mislead the public with respect to the science of global warming" (Compl. ¶

27   269) does not support the exercise of personal jurisdiction. *See MMCA Group*, 2007 WL

28   1342586, at *7-8 (collecting cases rejecting conspiracy theory of personal jurisdiction).

Hunton & Williams LLP

39

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

1    Dynegy is not a California corporation, is not registered to do business in California, and

2  has not appointed an agent for service of process here. *See* Compl. ¶ 81. Plaintiffs' allegation

3  that Dynegy directly owns and operates power plants in California (*id.*) is indisputably false. *See*

4  Jolley Decl. ¶ 4. Moreover, Plaintiffs' allegation that subsidiaries DPM and DPC, "as agents for

5  Dynegy, participated in the California energy market" more than seven years ago is an

6  unsupported legal conclusion, false, and in any event an insufficient basis for the exercise of

7  jurisdiction. *See DVI*, 104 Cal. App. 4th at 1100-01; *Missud*, 2007 WL 3231733, at *3-4 (bald

8  conclusory assertions, without more, are insufficient to establish personal jurisdiction); Jolley

9  Decl. ¶ 5. That Dynegy subsidiaries are alleged to be registered to do business in California and

10  to have designated agents for service of process here (Compl. ¶¶ 82-83) is insufficient to establish

11  jurisdiction absent well-pleaded facts showing that those subsidiaries were either alter egos or

12  agents of Dynegy, *Church of Scientology*, 584 F.2d at 897. Plaintiffs plead no such facts.

13  Certainly, conclusory allegations relating to Dynegy's subsidiaries, and Plaintiffs' allegation that

14  Dynegy reported or agreed to assess the emissions of its subsidiaries (Compl. ¶¶ 84-86) do not

15  confer jurisdiction over Dynegy. *Missud*, 2007 WL 3231733, at *3-4; *Doe*, 248 F.3d at 928.

16  Thus, Plaintiff's claims against Dynegy must be dismissed for lack of personal jurisdiction.

17    Plaintiffs admit that MidAmerican is not a California corporation (Compl. ¶ 91). The

18  only allegations of direct contact by MidAmerican with California are that it is registered to do

19  business in California and has a designated registered agent in California for service of process.

20  *Id.* However, it is clear that these allegations are insufficient bases for jurisdiction under

21  California law, especially where, as here, the defendant is alleged to be merely a holding

22  company. *See DVI*, 104 Cal. App. 4th at 1095 ("designation of an agent for service of process

23  and qualification to do business in California alone are insufficient to permit general

24  jurisdiction...."); *Sonora Diamond*, 83 Cal. App. 4th at 543 (no "jurisdiction where the parent is

25  merely a holding company whose only business pursuit is the investment in the subsidiary").

26  That MidAmerican's *subsidiaries* are alleged to do business in California is insufficient to

27  establish jurisdiction absent Plaintiffs pleading facts showing that those subsidiaries were either

28  alter egos or agents of MidAmerican, *Church of Scientology*, 584 F.2d at 897; and Plaintiffs plead

Hunton & Williams LLP

Hunton & Williams LLP

1   no such facts. Conclusory allegations relating to MidAmerican's subsidiaries do not confer

2   jurisdiction over MidAmerican. *Missud*, 2007 WL 3231733, at *3-4; *Doe*, 248 F.3d at 928.

3   Thus, MidAmerican should be dismissed for lack of personal jurisdiction.

4          Pinnacle West is not a California corporation. Compl. ¶ 104. The only allegations of

5   direct contact by Pinnacle West with California are allegations that it is registered to do business

6   in California and that it has a designated registered agent in California for service of process, both

7   of which are indisputably false. *See* Baum Decl. ¶¶ 4-5. Moreover, even if true, these allegations

8   would be insufficient bases for jurisdiction under California law. *See DVI*, 104 Cal. App. 4th at

9   1095 ("designation of an agent for service of process and qualification to do business in

10  California alone are insufficient to permit general jurisdiction...."). That Pinnacle West's

11  *subsidiary* is allegedly registered to do business in California, allegedly has a registered agent for

12  service of process in California and allegedly has an office in California is insufficient to establish

13  jurisdiction absent Plaintiffs pleading *facts* showing that the subsidiary is either the alter ego or

14  agent of Pinnacle West, *Church of Scientology*, 584 F.2d at 897; and Plaintiffs plead no such

15  facts. Conclusory allegations relating to Pinnacle West's subsidiaries do not confer jurisdiction

16  over Pinnacle West, especially where, as here, the defendant is a holding company. *See* Baum

17  Decl. ¶ 6; *Sonora Diamond*, 83 Cal. App. 4th at 543; *see also Doe*, 248 F.3d at 930; *Missud*, 2007

18  WL 3231733, at *3-4. Thus, Pinnacle West should be dismissed for lack of personal jurisdiction.

19         Plaintiffs admit that Reliant is not a California corporation. Compl. ¶ 108. According to

20  Plaintiffs, it is registered to do business in California and has designated a registered agent for

21  service of process. *Id.* However, these allegations do not suffice to confer jurisdiction over

22  Reliant. *See DVI*, 104 Cal. App. 4th at 1095. The only other allegations of direct contact by

23  Reliant with California are contradicted by the very documents on which Plaintiffs rely:  Reliant

24  does not own, lease or have "under contract" wholesale generation assets in California; nor does

25  it own and operate power stations in California. *See* Reliant Energy, Inc., 2006 Annual Report

26  (Form 10-K), at 3, F-14 (Feb. 28, 2007); Jines Decl. at ¶ 4. Moreover, allegations that Reliant

27  subsidiaries operate power stations in California or settled civil antitrust claims (Compl. ¶ 108) do

28  not justify the exercise of jurisdiction over Reliant absent well-pleaded *facts* establishing that the

41

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

1  subsidiaries are either the alter egos or the agents of Reliant. *DVI*, 104 Cal. App. 4th at 1095;

2  *Doe*, 248 F.3d at 926. Those facts simply are not pled here. Moreover, even if Reliant had itself

3  settled civil antitrust claims eight years ago, such action would be irrelevant to the question of

4  whether it is subject to jurisdiction in California in this action now. *Tercica*, 2006 WL 1626930,

5  at *12 (holding that "it is clear…that unrelated litigation in a forum state is a not [sic] controlling

6  factor in, or even relevant to, the general jurisdiction analysis"). Finally, impermissibly

7  conclusory allegations relating to Reliant's relationship with its subsidiaries do not confer

8  jurisdiction over Reliant, nor do allegations about Reliant's statements of general policy. *Missud*,

9  2007 WL 3231733, at *3-4; *Doe*, 248 F.3d at 928. Thus, Reliant too should be dismissed for lack

10  of personal jurisdiction.

11      Southern is not alleged to be a California corporation, to be registered to do business in

12  California or to have a registered agent for service of process in California. Compl. ¶ 112.

13  Moreover, Southern is merely a holding company that owns subsidiaries – none of which are

14  located in California – and, therefore, it is not subject to personal jurisdiction for the acts of its

15  subsidiaries under an agency or representative services theory. *Sonora Diamond*, 83 Cal. App.

16  4th at 543; *see also Doe*, 248 F.3d at 930 (refusing to find jurisdiction over holding company

17  parents because "they merely hold assets, nothing more"). The *only* (arguably) direct contact that

18  Southern is currently alleged to have with California relates to CalPERS's and other California

19  residents' ownership of Southern stock (Compl. ¶ 114), which, as a matter of law, does not justify

20  the exercise of personal jurisdiction over Southern. *Funk*, 2006 WL 2983058, at *5 n.4.

21  Plaintiffs' allegation that Southern's former subsidiary – a subsidiary that Plaintiffs allege

22  Southern sold in 2001 (Compl. ¶113) – once did business in California does not confer

23  jurisdiction. *See DVI*, 104 Cal. App. 4th at 1100-01 (holding that the exercise of general

24  jurisdiction is reasonable only "when the defendant has substantial, continuous and systematic

25  contacts with the forum at the time the complaint is served on that defendant"). Moreover,

26  neither impermissibly conclusory allegations relating to Southern's subsidiaries, past or present,

27  nor Southern's reports concerning emissions confer jurisdiction over Southern. *Missud*, 2007

28  WL 3231733, at *3-4; *Doe*, 248 F.3d at 928. Finally, allegations that Southern has participated in

Hunton & Williams LLP

1    a "campaign . . . to mislead the public about the science of global warming" (Compl. ¶ 189) do

2    not establish contacts with the forum sufficient to justify the exercise of personal jurisdiction.

3    *MMCA Group*, 2007 WL 1342586, at \*7-8 (collecting cases rejecting conspiracy theory of

4    personal jurisdiction).

5         The AES Corporation is not a California corporation, nor is it alleged to have a registered

6    agent for service of process in this forum. Compl. ¶ 57. Plaintiffs' allegation that AES directly

7    owns and operates power plants in California (*id.*) is indisputably false. *See* Mann Decl. ¶¶ 3-8.

8    The only other jurisdictional allegations of (arguably) "direct" contact with California are

9    Plaintiffs' allegations relating to CalPERS's and other California residents' ownership of AES

10   stock (Compl. ¶ 58), which, as a matter of law, does not justify the exercise of personal

11   jurisdiction over AES. *Funk*, 2006 WL 2983058, at \*5 n.4 (rejecting plaintiff's argument that a

12   corporation is subject to personal jurisdiction in every state in which the corporation's

13   shareholders reside). Plaintiffs' impermissibly conclusory allegations relating to AES's

14   subsidiaries are similarly insufficient to confer jurisdiction over AES, especially where, as here,

15   the defendant is admitted by Plaintiffs to be a holding company. Compl. ¶ 57. *Sonora Diamond*,

16   83 Cal. App. 4th at 543; *see also Doe*, 248 F.3d at 930 (refusing to find jurisdiction over holding

17   company parents because "they merely hold assets, nothing more"); *Missud*, 2007 WL 3231733,

18   at \*3-4 (bald conclusory assertions, without more, are insufficient to establish personal

19   jurisdiction). Finally, Plaintiffs' allegations that AES has articulated a general policy of reducing

20   emissions of its subsidiaries (Compl. ¶ 60) merely reflect the normal corporate relationship

21   between a parent and subsidiary and do not confer jurisdiction over AES. *Doe*, 248 F.3d at 928

22   (parent's discussion of subsidiary's activities in its annual reports does not support finding of alter

23   ego or agency relationship). In sum, AES should be dismissed for lack of personal jurisdiction.

24   *Amba Mktg. Sys.*, 551 F.2d at 787 (holding that, once the defendant challenged personal

25   jurisdiction, "[plaintiff] could not simply rest on the bare allegations of its complaint, but rather

26   was obligated to come forward with facts, by affidavit or otherwise, supporting personal

27   jurisdiction").

28

Hunton & Williams LLP

1    Xcel Energy is not a California corporation. Compl. ¶ 118. It is not registered to do

2  business and does not have a registered agent for service of process here. *Id.* Moreover, it is

3  merely a holding company that owns subsidiaries – none of which are located in California – and

4  therefore is not subject to personal jurisdiction for the acts of its subsidiaries under an agency or

5  representative services theory. *Sonora Diamond*, 83 Cal. App. 4th at 543; *see also Doe*, 248 F.3d

6  at 930. The only (arguably) direct contact that Xcel Energy is alleged to have with California

7  relates to CalPERS's and other California residents' ownership of Xcel Energy's stock (Compl. ¶

8  119), which, as a matter of law, does not justify the exercise of personal jurisdiction over Xcel

9  Energy. *Funk*, 2006 WL 2983058, at *5 n.4. To the extent the Complaint alleges that one of

10  Xcel Energy's former subsidiaries was previously registered to do business in California, as

11  discussed *supra*, that allegation is plainly not enough. *See DVI*, 104 Cal. App. 4th at 1100-01.

12  Finally, impermissibly conclusory allegations relating to Xcel Energy's subsidiaries, and the

13  allegation that Xcel Energy reported or agreed to assess the emissions of its subsidiaries (Compl.

14  ¶¶ 120-122) do not confer jurisdiction over Xcel Energy. *Missud*, 2007 WL 3231733, at *3-4;

15  *Doe*, 248 F.3d at 928. Thus, Xcel Energy should be dismissed for lack of personal jurisdiction.

16  **VI.    CONCLUSION**

17    For the foregoing reasons, the Complaint must be dismissed as to Defendants American

18  Electric Power Company, Inc., American Electric Power Service Corporation, DTE Energy

19  Company, Duke Energy Corporation, Dynegy Holdings Inc., MidAmerican Energy Holdings

20  Company, Pinnacle West Capital Corporation, Reliant Energy, Inc., Southern Company, The

21  AES Corporation and Xcel Energy Inc. for lack of personal jurisdiction.

22

23  DATED: June 30, 2008          By

                                      Belynda B. Reck (SBN 163561)
24                                    Hunton & Williams LLP
                                      550 South Hope Street, Suite 2000
25                                    Los Angeles, CA  90071-2627
                                      Tel: 213-532-2000
26                                    Fax: 213-532-2020
                                      Email:  breck@hunton.com
27

28

Hunton & Williams LLP

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

Hunton & Williams LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F. William Brownell (*Admitted Pro Hac Vice*)
Norman W. Fichthorn (*Admitted Pro Hac Vice*)
Allison D. Wood (*Admitted Pro Hac Vice*)
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
Tel: 202-955-1500
Fax: 202-778-2201
Email: bbrownell@hunton.com
       nfichthorn@hunton.com
       awood@hunton.com

Shawn Patrick Regan (*Admitted Pro Hac Vice*)
Hunton & Williams LLP
200 Park Avenue
New York, NY 10166-1036
Tel: 212-309-1000
Fax: 212-309-1100
Email: sregan@hunton.com

Counsel for Defendants DTE Energy Company,
MidAmerican Energy Holdings Company, Pinnacle
West Capital Corporation, and Southern Company

DATED: June 30, 2008          By : /s/ Samuel R. Miller
                                  Samuel R. Miller (SBN 66871)
                                  Paul L. Yanosy (SBN 233014)
                                  Sidley Austin LLP
                                  555 California Street
                                  San Francisco, CA 94104
                                  Tel:415-772-1200
                                  Fax: 415-772-7400
                                  Email: srmiller@sidley.com
                                         pyanosy@sidley.com

                                  David T. Buente, Jr. (*Admitted Pro Hac Vice*)
                                  Joseph R. Guerra (*Admitted Pro Hac Vice*)
                                  Sidley Austin LLP
                                  1501 K Street, N.W.
                                  Washington, D.C. 20005
                                  Tel:202-736-8000
                                  Fax: 202-736-8711
                                  Email: dbuente@sidley.com
                                         jguerra@sidley.com

                                  Counsel for Defendants American Electric Power
                                  Company, Inc., American Electric Power Service

Corporation, and Duke Energy Corporation

DATED:  June 30, 2008

By: /s/ Jeffrey A. Lamken
    Jeffrey A. Lamken (SBN 154217)
    Jeremy Levin (SBN 210577)
    Baker Botts LLP
    The Warner
    1299 Pennsylvania Ave., N.W.
    Washington, D.C.  20004-2400
    Tel:  202-639-7700
    Fax: 202-639-7890
    Email: jeffrey.lamken@bakerbotts.com
        jeremy.levin@bakerbotts.com
    Counsel for Defendants Dynegy Holdings Inc., and
    Reliant Energy, Inc.

DATED:  June 30, 2008

By: /s/ Richard K. Welsh
    Richard K. Welsh  (SBN 208825)
    Scott Bertzyk (SBN 116449)
    Felix Lebron (SBN 232984)
    Kamran Salour (SBN 247983)
    Greenberg Traurig LLP
    2450 Colorado Avenue, Suite 400E
    Santa Monica, CA  90404
    Tel:  310-586-7700
    Fax:  310-586-7800
    Email:  welshr@gtlaw.com
        bertzyks@gtlaw.com
        lebronf@gtlaw.com
        salourk@gtlaw.com

    Counsel for Defendant The AES Corporation

Hunton & Williams LLP

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

1    DATED:  June 30, 2008                    By:  /s/ Kevin P. Holewinski
                                                   Thomas A. Rector  (SBN 199173)
2                                                  Jones Day
                                                   555 California Street, 26th Floor
3                                                  San Francisco, CA 94104
                                                   Tel:  415-626-3939
4                                                  Fax:  415-875-5700
                                                   Email:  tarector@jonesday.com
5

6                                                  Thomas E. Fennell (*Admitted Pro Hac Vice*)
                                                   Michael L. Rice (*Admitted Pro Hac Vice*)
7                                                  Jones Day
                                                   2727 N. Harwood Street
8                                                  Dallas, TX 75201
                                                   Tel:  214-220-3939
9                                                  Fax:  214-969-5100
                                                   Email:  tefennell@jonesday.com
10                                                            mlrice@jonesday.com
11

12                                                 Kevin P. Holewinski (*Admitted Pro Hac Vice*)
                                                   Jones Day
13                                                 51 Louisiana Avenue, N.W.
                                                   Washington, D.C. 20001
14                                                 Tel:  202-879-3939
                                                   Email:  kpholewinski@jonesday.com
15

16                                                 Counsel for Defendant Xcel Energy Inc.

17

18

19

20

21

22

23

24

25

26

27

28

**Hunton & Williams LLP**

Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) – **Case No.: CV-08-1138 SBA**

1  Samuel R. Miller (SBN 66871)
   srmiller@sidley.com
2  SIDLEY AUSTIN LLP
   555 California Street
3  San Francisco, California 94104
   Telephone:     (415) 772-1200
4  Facsimile:     (415) 772-7400

5  David T. Buente, Jr. (admitted *pro hac vice*)
   dbuente@sidley.com
6  Joseph R. Guerra (admitted *pro hac vice*)
   jguerra@sidley.com
7  SIDLEY AUSTIN LLP
   1501 K Street, N.W.
8  Washington, D.C. 20005
   Telephone:     (202) 736-8000
9  Facsimile:     (202) 736-8711

10

   Attorneys for Defendant,
11 Duke Energy Corporation

12                UNITED STATES DISTRICT COURT

13               NORTHERN DISTRICT OF CALIFORNIA

14                      OAKLAND DIVISION

15 NATIVE VILLAGE OF KIVALINA and CITY       CASE NO.: CV-08-1138 SBA
   OF KIVALINA,
16                                           Judge: Honorable Saundra Armstrong
               Plaintiffs,
17                                           DECLARATION OF RICHARD G. BEACH
           v.                                ON BEHALF OF DUKE ENERGY
18                                           CORPORATION IN SUPPORT OF NON-
   EXXON MOBIL CORPORATION, et al.,          RESIDENT UTILITY DEFENDANTS'
19                                           MOTION TO DISMISS THE COMPLAINT
               Defendants.                   FOR LACK OF PERSONAL
20                                           JURISDICTION PURSUANT TO FED. R.
                                             CIV. P. 12(b)(2) AND ACCOMPANYING
21                                           MEMORANDUM OF POINTS AND
                                             AUTHORITIES
22
                                             DATE:  TBD (per Order, entered June 4,
23                                                   2008; Dkt. No. 126, ¶ 10)
                                             TIME:  1:00 p.m.
24                                           PLACE: Courtroom 3

25

26

27

28
   ─────────────────────────────────────────────────────────────
   DECLARATION OF RICHARD J. BEACH ON BEHALF OF DUKE ENERGY CORPORATION IN SUPPORT OF
   NON-RESIDENT UTILITY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK OF
   PERSONAL JURISDICTION
                                                    Case No.:  CV-08-1138 SBA

I, Richard G. Beach, declare as follows:

1.      I am the Assistant Secretary of Duke Energy Corporation.  This declaration is based upon my personal knowledge, or upon information and belief after a reasonably diligent inquiry of personnel within Duke Energy Corporation, and as to those matters, I believe them to be true.  If called as a witness, I could testify competently to the matters stated herein.

2.      I am submitting this declaration on behalf of Duke Energy Corporation in support of the Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(2) jointly submitted by the AES Corporation, American Electric Power Company, Inc., American Electric Power Service Corporation, DTE Energy Company, Duke Energy Corporation, Dynegy Holdings, Inc., MidAmerican Energy Holdings Company, Mirant Corporation, NRG Energy, Pinnacle West Capital Corporation, Reliant Energy, Inc., Southern Company, and Xcel Energy Inc. (collectively, the "Non-resident Utility Defendants") and the accompanying Memorandum of Points and Authorities.

3.      Duke Energy Corporation is incorporated in the State of Delaware, and its principal place of business is located at 526 South Church Street, Charlotte, North Carolina, 28202.  Duke Energy Corporation's sole business is holding stock in its subsidiaries.

4.      Duke Energy Corporation came into existence through the following series of events. A new parent company, Duke Energy Corporation, a Delaware corporation, was formed upon the merger between Duke Energy Corporation, a North Carolina corporation, and Cinergy Corp., a Delaware Corporation, on April 3, 2006.  As part of that merger, what was Duke Energy Corporation, a North Carolina corporation, became Duke Power Company LLC, also a North Carolina entity.  Duke Power Company LLC has since been renamed Duke Energy Carolinas, LLC, also a North Carolina entity.

5.      Duke Energy Corporation (the Delaware corporation) does not own, and at no time has ever owned, any power generation facilities in California, including without limitation any facilities in Monterey County, Morro Bay, Chula Vista, or Oakland, California.  The former Duke

2

**DECLARATION OF RICHARD G. BEACH ON BEHALF OF DUKE ENERGY CORPORATION IN SUPPORT OF NON-RESIDENT UTILITY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION (CASE NO. CV-08-1138 SBA)**

1    Energy Corporation (now called Duke Energy Carolinas, LLC) also never owned any power

2    generation facilities in California.

3              I declare under penalty of perjury that the foregoing is true and correct to the best of my

4    knowledge and belief.

5

6    Executed on June _23_, 2008.

7

8                                                          *Richard G. Beach* (signature)

9                                                          RICHARD G. BEACH

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                      3
     **DECLARATION OF RICHARD G. BEACH ON BEHALF OF DUKE ENERGY CORPORATION IN SUPPORT
     OF NON-RESIDENT UTILITY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK OF
     PERSONAL JURISDICTION (CASE NO. CV-08-1138 SBA)**

1  JEFFREY A. LAMKEN (SBN 154217)
   jeffrey.lamken@bakerbotts.com
2  JEREMY LEVIN (SBN 210577)
   jeremy.levin@bakerbotts.com
3  BAKER BOTTS, L.L.P.
   The Warner
4  1299 Pennsylvania Avenue, NW
   Washington, D.C. 20004
5  Telephone:  (202) 639-7978
   Facsimile:  (202) 585-4060
6

7  Counsel for Defendant,
   DYNEGY HOLDINGS INC.
8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                         OAKLAND DIVISION
11

12 | NATIVE VILLAGE OF KIVALINA and CITY | CASE NO.:  CV-08-1138 SBA
   | OF KIVALINA,

13 |                                     | Judge: Honorable Saundra Armstrong
                Plaintiffs,

14 |         v.                          | **DECLARATION OF AMY E. JOLLEY ON**
                                          **BEHALF OF DYNEGY HOLDINGS INC.**
15 | EXXON MOBIL CORPORATION, et al.,    | **IN SUPPORT OF NON-RESIDENT**
                                          **UTILITY DEFENDANTS' MOTION TO**
16 |            Defendants.              | **DISMISS THE COMPLAINT FOR LACK**
                                          **OF PERSONAL JURISDICTION**
17                                         **PURSUANT TO FED. R. CIV. P. 12(b)(2)**
                                           **AND ACCOMPANYING MEMORANDUM**
18                                         **OF POINTS AND AUTHORITIES**

19                                         DATE:  TBD (per Order, entered June 4,
                                                  2008; Dkt. No. 126, ¶ 10)
20                                         TIME:  1:00 p.m.
                                           PLACE:  Courtroom 3
21

22

23

24

25

26

27

28
   _____
   DECLARATION OF AMY E. JOLLEY ON BEHALF OF DYNEGY HOLDINGS INC. IN SUPPORT OF NON-
   RESIDENT UTILITY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL
                                      JURISDICTION
   73687.000003 EMF_US 25959345v1                          **Case No.:  CV-08-1138 SBA**

I, Amy E. Jolley, hereby declare as follows:

1.    I am the Vice President—Tax of Defendant Dynegy Holdings Inc. ("Dynegy Holdings"). As Vice President—Tax, I am responsible for, among other things, all tax matters of Dynegy Holdings Inc., including management and oversight of property tax, sales and use tax, and federal, state, and international income tax compliance, tax accounting and associated external reporting, tax planning, and tax audits. I am familiar with the organizational structure, governance, and operating practices of Dynegy Holdings. I have personal knowledge of the facts set forth in this declaration, and if called upon to do so, could and would competently testify thereto.

2.    I am submitting this declaration on behalf of Dynegy Holdings in support of the Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(2) jointly submitted by the AES Corporation, American Electric Power Company, Inc., American Electric Power Service Corporation, DTE Energy Company, Duke Energy Corporation, Dynegy Holdings Inc., MidAmerican Energy Holdings Company, Mirant Corporation, NRG Energy, Pinnacle West Capital Corporation, Reliant Energy, Inc., Southern Company, and Xcel Energy Inc. (collectively, the "Non-resident Utility Defendants") and the accompanying Memorandum of Points and Authorities.

3.    Dynegy Holdings is a corporation organized under the laws of Delaware with its principal place of business in Houston, Texas. Dynegy Holdings is an indirect subsidiary of Dynegy Inc. Dynegy Holdings' sole business is holding stock in its subsidiaries.

4.    Dynegy Holdings does not own or operate, and has never owned or operated, any power generating facilities in California, including without limitation any facilities in Monterey County, California; Morro Bay, California; Chula Vista, California; or Oakland, California.

5.    Dynegy Holdings has never employed either Dynegy Power Marketing, Inc. or Dynegy Power Corp. as its agent for any activities in California.

6.    There is no such entity as "Dynegy Operating Company Corp." in the Dynegy Inc. corporate structure. There is, however, a Dynegy Operating Company, and it is an indirect subsidiary of Dynegy Holdings.

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

7.    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief and that I executed this declaration in Houston, Texas on June __24__ , 2008.

_____
AMY E. JOLLEY

3

1  HUNTON & WILLIAMS LLP
   BELYNDA B. RECK (State Bar No. 163561)
2  550 South Hope Street, Suite 2000
   Los Angeles, California 90071-2627
3  Tel: (213) 532-2000/Fax: (213) 532-2020
   E-mail: breck@hunton.com
4
   HUNTON & WILLIAMS LLP
5  F. WILLIAM BROWNELL (Admitted *Pro Hac Vice*)
   NORMAN W. FICHTHORN (Admitted *Pro Hac Vice*)
6  ALLISON D. WOOD (Admitted *Pro Hac Vice*)
   1900 K Street, N.W.
7  Washington, D.C. 20006-1109
   Tel: (202) 955-1500/Fax: (202) 778-2201
8  E-mail:  bbrownell@hunton.com
   E-mail:  nfichthorn@hunton.com
9  E-mail:  awood@hunton.com

10 HUNTON & WILLIAMS LLP
   SHAWN REGAN (Admitted *Pro Hac Vice*)
11 200 Park Avenue, 52nd Floor
   New York, New York 10166
12 Tel: (212) 309-1000/Fax: (212) 309-1100
   E-mail: sregan@hunton.com
13
   Attorneys for Defendant,
14 PINNACLE WEST CAPITAL CORPORATION

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17                    OAKLAND DIVISION

18 NATIVE VILLAGE OF KIVALINA and CITY     CASE NO.:  CV-08-1138 SBA
   OF KIVALINA,
19                                         Judge: Honorable Saundra Armstrong
              Plaintiff,
20                                         **DECLARATION OF SHIRLEY A. BAUM**
        v.                                 **ON BEHALF OF PINNACLE WEST**
21                                         **CAPITAL CORPORATION IN SUPPORT**
   EXXON MOBIL CORPORATION, et al.,        **OF NON-RESIDENT UTILITY**
22                                         **DEFENDANTS' MOTION TO DISMISS**
              Defendants.                  **THE COMPLAINT FOR LACK OF**
23                                         **PERSONAL JURISDICTION PURSUANT**
                                           **TO FED. R. CIV. P. 12(b)(2) AND**
24                                         **ACCOMPANYING MEMORANDUM OF**
                                           **POINTS AND AUTHORITIES**
25
                                           DATE:  TBD (per Order, entered June 4,
26                                                 2008; Dkt. No. 126, ¶ 10)
                                           TIME:  1:00 p.m.
27                                         PLACE:  Courtroom 3

28
   DECLARATION OF SHIRLEY A. BAUM ON BEHALF OF PINNACLE WEST CAPITAL CORPORATION IN
   SUPPORT OF NON-RESIDENT UTILITY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK
                             OF PERSONAL JURISDICTION
                                                        **Case No.:  CV-08-1138 SBA**

1    I, Shirley A. Baum, declare and state as follows:

2    1.    I am an Associate Secretary at Pinnacle West Capital Corp. ("Pinnacle West"). This

3    declaration is based upon my personal knowledge, or upon information and belief after a reasonably

4    diligent inquiry of personnel within Pinnacle West, and as to those matters, I believe them to be true.

5    If called as a witness, I could testify to the matters stated therein.

6    2.    I am submitting this declaration on behalf of Pinnacle West in support of the Motion

7    to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction Pursuant to Fed. R. Civ. P.

8    12(b)(2) jointly submitted by the AES Corporation, American Electric Power Company, Inc.,

9    American Electric Power Service Corporation, DTE Energy Company, Duke Energy Corporation,

10    Dynegy Holdings, Inc., MidAmerican Energy Holdings Company, Pinnacle West Capital

11    Corporation, Reliant Energy, Inc., Southern Company, and Xcel Energy Inc. (collectively, the "Non-

12    resident Utility Defendants") and the accompanying Memorandum of Points and Authorities.

13    3.    Pinnacle West is incorporated in the state of Arizona, and its principal place of

14    business is located at 400 N. 5th Street, Phoenix, Arizona, 85004.

15    4.    Pinnacle West is not registered to do business in California.

16    5.    Pinnacle West does not have a registered agent for service of process in California.

17    6.    Pinnacle West is structured as a holding company.

18    I declare under penalty of perjury under the laws of the United States of America that the

19    foregoing is true and correct.

20

21    Executed on June 25th, 2008 in Phoenix, Arizona

22

23    Shirley A. Baum

24

25

26

27

28                                          1

DECLARATION OF SHIRLEY A. BAUM ON BEHALF OF PINNACLE WEST CAPITAL CORPORATION IN
SUPPORT OF NON-RESIDENT UTILITY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK
OF PERSONAL JURISDICTION

Case No.:  CV-08-1138 SBA

1    JEFFREY A. LAMKEN (SBN 154217)
     jeffrey.lamken@bakerbotts.com
2    JEREMY LEVIN (SBN 210577)
     jeremy.levin@bakerbotts.com
3    BAKER BOTTS, L.L.P.
     The Warner
4    1299 Pennsylvania Avenue, NW
     Washington, D.C. 20004
5    Telephone:  (202) 639-7978
     Facsimile:  (202) 585-4060
6

7    Counsel for Defendant,
     RELIANT ENERGY, INC.
8
                    UNITED STATES DISTRICT COURT
9
                   NORTHERN DISTRICT OF CALIFORNIA
10
                           OAKLAND DIVISION
11

12   NATIVE VILLAGE OF KIVALINA and CITY        CASE NO.:  CV-08-1138 SBA
     OF KIVALINA,
13                                              Judge: Honorable Saundra Armstrong
             Plaintiffs,
14                                              DECLARATION OF MICHAEL L. JINES
         v.                                     ON BEHALF OF RELIANT ENERGY, INC.
15                                              IN SUPPORT OF NON-RESIDENT
     EXXON MOBIL CORPORATION, et al.,           UTILITY DEFENDANTS' MOTION TO
16                                              DISMISS THE COMPLAINT FOR LACK
             Defendants.                        OF PERSONAL JURISDICTION
17                                              PURSUANT TO FED. R. CIV. P. 12(b)(2)
                                                AND ACCOMPANYING MEMORANDUM
18                                              OF POINTS AND AUTHORITIES

19                                              DATE:   TBD (per Order, entered June 4,
                                                        2008; Dkt. No. 126, ¶ 10)
20                                              TIME:   1:00 p.m.
                                                PLACE:  Courtroom 3
21

22

23

24

25

26

27

28
     DECLARATION OF MICHAEL L. JINES ON BEHALF OF RELIANT ENERGY, INC. IN SUPPORT OF NON-
     RESIDENT UTILITY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL
                                         JURISDICTION
                                                              Case No.:  CV-08-1138 SBA

1    I, Michael L. Jines, hereby declare as follows:

2    1.    I am the Senior Vice President, General Counsel and Corporate Secretary of

3    Defendant Reliant Energy, Inc. ("REI"). This declaration is based upon my personal knowledge, or

4    upon information and belief after a reasonably diligent inquiry of personnel within REI, and as to

5    those matters, I believe them to be true. If called as a witness, I could testify competently to the

6    matters contained herein.

7    2.    I am submitting this declaration on behalf of Reliant Energy, Inc. in support of the

8    Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction Pursuant to Fed. R. Civ. P.

9    12(b)(2) jointly submitted by the AES Corporation, American Electric Power Company, Inc.,

10    American Electric Power Service Corporation, DTE Energy Company, Duke Energy Corporation,

11    Dynegy Holdings Inc., MidAmerican Energy Holdings Company, Mirant Corporation, NRG Energy,

12    Pinnacle West Capital Corporation, Reliant Energy, Inc., Southern Company, and Xcel Energy Inc.

13    (collectively, the "Non-resident Utility Defendants") and the accompanying Memorandum of Points

14    and Authorities.

15    3.    REI is a corporation organized under the laws of Delaware with its principal place of

16    business in Houston, Texas. REI's sole business is holding stock in its subsidiaries.

17    4.    REI does not own, lease, or have under contract any wholesale generation assets in

18    California. REI does not own or operate, and has never owned or operated, any power generation

19    facilities in California, including without limitation any facilities in Daggett, California; Goleta,

20    California; Oxnard, California; or Rancho Cucamonga, California. Any such facilities are owned

21    by, leased to, or under contract to separate subsidiaries of REI, not REI itself.

22    5.    All decisions to dispatch, operate or shut down any power stations in California were

23    made by subsidiaries of REI and not by REI.

24

25

26

27

28

2

**DECLARATION OF MICHAEL L. JINES ON BEHALF OF RELIANT ENERGY, INC. IN SUPPORT OF NON-RESIDENT UTILITY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION (CASE NO. CV-08-1138 SBA)**

6.     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief and that I executed this declaration in Houston, Texas on June 26, 2008.

Michael L. Jines

---

3

**DECLARATION OF MICHAEL L. JINES ON BEHALF OF RELIANT ENERGY, INC. IN SUPPORT OF NON-RESIDENT UTILITY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION (CASE NO. CV-08-1138 SBA)**

1   HUNTON & WILLIAMS LLP
    BELYNDA B. RECK (State Bar No. 163561)
2   550 South Hope Street, Suite 2000
    Los Angeles, California 90071-2627
3   Tel: (213) 532-2000/Fax: (213) 532-2020
    E-mail: breck@hunton.com
4
    HUNTON & WILLIAMS LLP
5   F. WILLIAM BROWNELL (Admitted *Pro Hac Vice*)
    NORMAN W. FICHTHORN (Admitted *Pro Hac Vice*)
6   ALLISON D. WOOD (Admitted *Pro Hac Vice*)
    1900 K Street, N.W.
7   Washington, D.C. 20006-1109
    Tel: (202) 955-1500/Fax: (202) 778-2201
8   E-mail:  bbrownell@hunton.com
    E-mail:  nfichthorn@hunton.com
9   E-mail:  awood@hunton.com

10  HUNTON & WILLIAMS LLP
    SHAWN REGAN (Admitted *Pro Hac Vice*)
11  200 Park Avenue, 52nd Floor
    New York, New York 10166
12  Tel: (212) 309-1000/Fax: (212) 309-1100
    E-mail: sregan@hunton.com
13
    Attorneys for Defendant,
14  DTE Energy Company

15               UNITED STATES DISTRICT COURT

16             NORTHERN DISTRICT OF CALIFORNIA

17                    OAKLAND DIVISION

18  NATIVE VILLAGE OF KIVALINA and CITY   | CASE NO.:  CV-08-1138 SBA
    OF KIVALINA,
19                                        | Judge: Honorable Saundra Armstrong
             Plaintiff,
20                                        | **DECLARATION OF SANDRA K. ENNIS**
          v.                              | **ON BEHALF OF DTE ENERGY**
21                                        | **COMPANY IN SUPPORT OF NON-**
    EXXON MOBIL CORPORATION, et al.,      | **RESIDENT UTILITY DEFENDANTS'**
22                                        | **MOTION TO DISMISS THE COMPLAINT**
             Defendants.                  | **FOR LACK OF PERSONAL**
23                                        | **JURISDICTION PURSUANT TO FED. R.**
                                          | **CIV. P. 12(b)(2) AND ACCOMPANYING**
24                                        | **MEMORANDUM OF POINTS AND**
                                          | **AUTHORITIES**
25
                                          | DATE:  TBD (per Order, entered June 4,
26                                        |        2008; Dkt. No. 126, ¶ 10)
                                          | TIME:  1:00 p.m.
27                                        | PLACE:  Courtroom 3

28  _____
    DECLARATION OF SANDRA K. ENNIS ON BEHALF OF DTE ENERGY COMPANY IN SUPPORT OF NON-
    RESIDENT UTILITY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL
                                      JURISDICTION
                                              **Case No.:  CV-08-1138 SBA**

1    I, Sandra K. Ennis, declare and state as follows:

2    1.    I am the Corporate Secretary of DTE Energy Company ("DTE Energy").  In my role

3    as Corporate Secretary, I am familiar with DTE Energy's business operations.  I make this

4    declaration based on my personal knowledge of all of the facts stated herein, and, if called upon as a

5    witness, I could competently testify thereto.

6    2.    I am submitting this declaration on behalf of DTE Energy in support of the Motion to

7    Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(2)

8    jointly submitted by the AES Corporation, American Electric Power Company, Inc., American

9    Electric Power Service Corporation, DTE Energy Company, Duke Energy Corporation, Dynegy

10    Holdings, Inc., MidAmerican Energy Holdings Company, Pinnacle West Capital Corporation,

11    Reliant Energy, Inc., Southern Company, and Xcel Energy Inc. (collectively, the "Non-resident

12    Utility Defendants") and the accompanying Memorandum of Points and Authorities.

13    3.    DTE Energy is incorporated in the state of Michigan, and its principal place of

14    business is located at 2000 Second Ave., Detroit, Michigan, 48226-1279.

15    4.    DTE Energy's sole business is holding stock in its subsidiaries.

16    5.    DTE Energy does not own, and at no time has ever owned, any power generation

17    facilities in California, including without limitation any biomass-fired electric generating plant in

18    Woodland, California.

19    I declare under penalty of perjury under the laws of the United States of America that the

20    foregoing is true and correct.

21

22    Executed on June 25, 2008 in Detroit, Michigan.

23    *Sandra Kay Ennis*

24    Sandra K. Ennis

25

26

27

28

1

1   HUNTON & WILLIAMS LLP
    BELYNDA B. RECK (State Bar No. 163561)
2   550 South Hope Street, Suite 2000
    Los Angeles, California 90071-2627
3   Tel: (213) 532-2000/Fax: (213) 532-2020
    E-mail: breck@hunton.com
4
    Attorneys for Defendants,
5   DTE Energy Company,
    MidAmerican Energy Holdings Company,
6   Pinnacle West Capital Corporation, and
    Southern Company
7
    [*Counsel Listing Continued on Signature Page*]
8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                        OAKLAND DIVISION

12

13  NATIVE VILLAGE OF KIVALINA and          CASE NO.: CV-08-1138 SBA
    CITY OF KIVALINA
14                                          Judge: Honorable Saundra Armstrong
15              Plaintiffs,
                                            **APPENDIX OF UNPUBLISHED**
16         v.                               **AUTHORITIES IN SUPPORT OF THE**
                                            **NON-RESIDENT UTILITY**
17  EXXON MOBIL CORPORATION, et. al,        **DEFENDANTS' MOTION TO DISMISS**
                                            **THE COMPLAINT FOR LACK OF**
18              Defendants.                 **PERSONAL JURISDICTION PURSUANT**
                                            **TO FED. R. CIV. P. 12(b)(2)**
19
                                            DATE:   TBD (per Order, entered June 4,
20                                                   2008; Dkt. No. 126, ¶ 10)
                                            TIME:   1:00 p.m.
21                                          PLACE:  Courtroom 3
22

23

24

25

26

27

28

*Hunton & Williams LLP* (vertical left margin)

1    Attached hereto as Exhibits A through N are true and correct copies of the following

2    unpublished authorities cited in support of the Non-resident Utility Defendants' Motion to Dismiss

3    for Lack of Personal Jurisdiction[1]:

4       a.  **Exhibit A**: *Ameritec Corp. v. Ameritech Corp.*, 1986 WL 10702 (C.D. Cal. April 29,

5           1986)

6

7       b.  **Exhibit B**: *Britesmile, Inc. v. Discus Dental, Inc.*, 2005 WL 1048701 (N.D. Cal. May

8           5, 2005)

9       c.  **Exhibit C**: *California v. General Motors Corp.*, 2007 WL 2726871 (N.D. Cal. Sept.

10          17, 2007)

11      d.  **Exhibit D**: *Comer v. Murphy Oil*, No. 05-cv-00436-RSW, Oral Opinion (S.D. Miss.

12          Aug. 30, 2007)

13

14      e.  **Exhibit E**: *Fru-Con Constr. Corp. v. Sacramento Mun. Util. Dist.*, 2007 WL

15          2384841 (E.D. Cal. Aug. 17, 2007)

16      f.  **Exhibit F**: *Funk v. Limelight Media Group, Inc.*, 2006 WL 2983058 (W.D. Ky. Oct.

17          16, 2006)

18      g.  **Exhibit G**: *Hilsenrath v. Equity Trust (Jersey) Ltd.*, 2008 WL 728902 (N.D. Cal.

19          March 17, 2008)

20

21      h.  **Exhibit H**: *In re Dynamic Random Access Memory Antitrust Litigation*, 2005 WL

22          2988715 (N.D. Cal. Nov. 7, 2005)

23      i.  **Exhibit I**: *Italian Colors Restaurant v. American Express Co.*, 2003 WL 22682482

24          (N.D. Cal. Nov. 10, 2003)

25

26   [1] For purposes of this Motion to Dismiss the Complaint for Lack of Personal Jurisdiction, the Non-resident Utility Defendants consist of The AES Corporation, American Electric Power Company,
Inc., American Electric Power Service Corporation, DTE Energy Company, Duke Energy

27   Corporation, Dynegy Holdings, Inc., MidAmerican Energy Holdings Company, Pinnacle West

28   Capital Corporation, Reliant Energy, Inc., Southern Company and Xcel Energy Inc.. Pursuant to

1    j.   **Exhibit J:** *Love v. The Mail on Sunday*, 2006 WL 4046170 (C.D. Cal. July 14, 2006)

2    k.   **Exhibit K:** *Missud v. D.R. Horton*, 2007 WL 3231733 (N.D. Cal. Oct. 30, 2007)

3    l.   **Exhibit L:** *MMCA Group, Ltd. v. Hewlett-Packard Co.*, 2007 WL 1342586 (N.D.

4    Cal. May 8, 2007)

5

6    m.  **Exhibit M:** *Peacock v. Willis*, 2006 WL 3060134 (E.D. Cal. Oct. 27, 2006)

7    n.   **Exhibit N:** *Tercica, Inc. v. Insmed Inc.*, 2006 WL 1626930 (N.D. Cal. June 9, 2006).

8

9    DATED:  June 30, 2008        By  *Belynda Reck*

10                 Belynda Reck (SBN 163561)
Hunton & Williams LLP
550 South Hope Street, Suite 2000
Los Angeles, CA  90071-2627
Tel: 213-532-2000
Fax: 213-532-2020
Email:  breck@hunton.com

F. William Brownell (*Admitted Pro Hac Vice*)
Norman W. Fichthorn (*Admitted Pro Hac Vice*)
Allison D. Wood (*Admitted Pro Hac Vice*)
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C.  20006-1109
Tel: 202-955-1500
Fax: 202-778-2201
Email:  bbrownell@hunton.com
         nfichthorn@hunton.com
         awood@hunton.com

Shawn Patrick Regan (*Admitted Pro Hac Vice*)
Hunton & Williams LLP
200 Park Avenue
New York, NY  10166-1036
Tel: 212-309-1000
Fax: 212-309-1100
Email:  sregan@hunton.com

Counsel for Defendants DTE Energy Company,
MidAmerican Energy Holdings Company, Pinnacle
West Capital Corporation, and Southern Company

General Order No. 45, Section X, filer attests that the parties have consented to their signature on this document and concur with the electronic filing of this document.

Hunton & Williams LLP

1

2   DATED:  June 30, 2008          By:  /s/ Richard K. Welsh

3                                       Richard K. Welsh   (SBN 208825)

Scott Bertzyk (SBN 116449)
Felix Lebron (SBN 232984)
Kamran Salour (SBN 247983)
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA  90404
Tel:  310-586-7700
Fax:  310-586-7800
Email:  welshr@gtlaw.com
        bertzyks@gtlaw.com
        lebronf@gtlaw.com
        salourk@gtlaw.com

Counsel for Defendant The AES Corporation

DATED:  June 30, 2008          By:   /s/ Samuel R. Miller

Samuel R. Miller (SBN 66871)
Paul L. Yanosy (SBN 233014)
Sidley Austin LLP
555 California Street
San Francisco, CA  94104
Tel:  415-772-1200
Fax:  415-772-7400
Email:  srmiller@sidley.com
        pyanosy@sidley.com

David T. Buente, Jr. (*Admitted Pro Hac Vice*)
Joseph R. Guerra    (*Admitted Pro Hac Vice*)
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C.  20005
Tel:202-736-8000
Fax:  202-736-8711
Email:  dbuente@sidley.com
        jguerra@sidley.com

Counsel for Defendants American Electric Power
Company, Inc., American Electric Power Service
Corporation, and Duke Energy Corporation

Hunton & Williams LLP

1

DATED:  June 30, 2008

By:  /s/ Jeffrey A. Lamken

2

Jeffrey A. Lamken (SBN 154217)
Jeremy Levin (SBN 210577)

3

Baker Botts LLP
The Warner

4

1299 Pennsylvania Ave., N.W.

5

Washington, D.C.  20004-2400
Tel:  202-639-7700

6

Fax: 202-639-7890
Email:  jeffrey.lamken@bakerbotts.com

7

jeremy.levin@bakerbotts.com

8

9

Counsel for Defendants Dynegy Holdings Inc., and

10

Reliant Energy, Inc.

11

12

DATED:  June 30, 2008

By:  /s/ Kevin P. Holewinski

Thomas A. Rector  (SBN 199173)

13

Jones Day
555 California Street, 26th Floor

14

San Francisco, CA 94104

15

Tel:  415-626-3939
Fax:  415-875-5700

16

Email:  tarector@jonesday.com
Thomas E. Fennell (*Admitted Pro Hac Vice*)

17

Michael L. Rice (*Admitted Pro Hac Vice*)
Jones Day

18

2727 N. Harwood Street

19

Dallas, TX 75201
Tel:  214-220-3939

20

Fax:  214-969-5100
Email:  tefennell@jonesday.com

21

mlrice@jonesday.com

22

Kevin P. Holewinski (*Admitted Pro Hac Vice*)

23

Jones Day
51 Louisiana Avenue, N.W.

24

Washington, D.C. 20001
Tel:  202-879-3939

25

Email:  kpholewinski@jonesday.com

26

Counsel for Defendant Xcel Energy Inc.

27

28

*(left margin, vertical)* Hunton & Williams LLP

# EXHIBIT A

*Westlaw.*

Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.), 230 U.S.P.Q. 225
**(Cite as: Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.))**

C

Ameritec Corp. v. Ameritech Corp.
C.D.Cal.,1986.

United States District Court, C.D. California.
AMERITEC CORPORATION, a California corporation, Plaintiff,
v.
AMERITECH CORPORATION, a Delaware corporation; *et al.,* Defendants.
**No. CV 86-0951 CBM.**

April 29, 1986.

Mark E. Warren, Tim C. Riedler, Frederick A. Meyerson, Gibson, Dunn & Crutcher, Los Angeles, Cal., for plaintiff Ameritec Corporation.
Patrick Lynch, David A. Pash, O'Melveny & Myers, Los Angeles, Cal., and Robert G. Krupka, Stanley L. Ferguson, Helen E. Witt, Sheri J. Engleken, Alan R. Loudermilk, for defendants Ameritech Communications.

MEMORANDUM ORDER.

MARSHALL, District Judge.
*1 This matter is before the Court on the motion of defendants Ameritech Corporation, Ameritech Information Technologies Corporation and Illinois Bell Telephone Company to dismiss for lack of personal jurisdiction pursuant to F.R.Civ.P. 12(b)(2). A hearing was held on April 14, 1986 before the Honorable Consuelo B. Marshall, United States District Court Judge, presiding. The issues presented in this motion are: 1) whether moving defendants have an agency or alter ego relationship with nonmoving defendant American Communications, Inc. such that this Court has general jurisdiction over the moving nonresident corporate defendants, who were not served in California; and 2) whether the moving defendants have the requisite minimum contacts in California sufficient to subject them to limited jurisdiction in this forum?

*FACTS*

On February 12, 1986, plaintiff Ameritec Corporation filed a complaint for injunctive relief, constructive trust, accounting and damages for violation of the Lanham Act, infringement of trademark, service mark and trade name, unfair competition, and interference with prospective economic advantage against defendants Ameritech Communications, Inc., American Information Technologies Corporation, Illinois Bell Telephone Company, and Ameritech Corporation for defendants' use of the name "Ameritech" in connection with telecommunications products and service. Plaintiff is a corporation duly organized and existing under the laws of the State of California, and has its principal place of business in Covina, California. Plaintiff filed its Articles of Incorporation under the trade name "Ameritech Corporation" on or about July 21, 1980, approximately three years prior to the defendants' adoption of their names.

On February 26, 1986, defendant Ameritech Communications, Inc. ("ACI") filed its answer and affirmative defenses to the complaint, and currently does not contest this Court's exercise of personal jurisdiction. However, the three other defendants-American Information Technologies Corporation ("AITC"), Illinois Bell Corporation ("Illinois Bell"), and Ameritech Corporation ("AC")-all contest the Court's personal jurisdiction on the grounds that they have insufficient contacts with California.

Defendant AITC is a Delaware corporation with its principal place of business in Chicago, Illinois. AITC is one of the seven regional holding companies created by the consent decree in *United States v. American Telephone & Telegraph Co.,* 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom., Maryland v. United States,* 460 U.S. 1001 (1983), and is the parent corporation of a number of wholly-owned subsidiaries, including among others defendants ACI, AC and Illinois Bell. AITC is the Midwest regional holding company that serves the states of Illinois,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.), 230 U.S.P.Q. 225
(Cite as: Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.))

Indiana, Michigan, Ohio and Wisconsin.

Defendant Illinois Bell is an Illinois corporation with its principal place of business in Chicago, Illinois. It is a subsidiary of AITC and currently provides local telephone services to customers in the State of Illinois.

*2 Defendant AC is a Delaware Corporation with its principal place of business in Chicago, Illinois. It was created prior to the AT & T divestiture and is presently an inactive subsidiary of AITC.

## DISCUSSION

It is well established that the party seeking to invoke either general or limited jurisdiction of the federal court has the burden of establishing that jurisdiction exists. *Kransco Mfg., Inc. v. Markwitz,* 656 F.2d 1376, 1377 (9th Cir.1981); *Data Disk, Inc. v. Systems Tech. Assoc. Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977). When the court receives only affidavits and discovery materials, plaintiff has the burden to make a prima facie showing of jurisdictional facts through the submitted materials in order to avoid a defendant's motion to dismiss. *Data Disk,* 557 F.2d at 1285. It is said that "[a]ny greater burden-such as proof by a preponderance of the evidence-would permit a defendant to obtain a dismissal simply by controverting the facts established by a plaintiff through his own affidavits and supporting materials." *Id.* Whenever plaintiff's proof is limited to written materials, as is here, "it is necessary only for these materials to demonstrate facts with support a finding of jurisdiction in order to avoid a motion to dismiss." *Id.*

The power of the federal court to exercise personal jurisdiction over nonresident defendants turns on two independent considerations: "[first,] whether [F.R.Civ.P. 4(e) requires] an applicable state rule or statute potentially confers personal jurisdiction over the [out-of-state] defendant, and [second,] whether assertion of such jurisdiction accords with constitutional principles of due process." *Kransco Mfg.,*

*Inc. v. Markwitz,* 656 F.2d at 1377,*citing, Data Disk, Inc. v. Systems Tech. Assoc. Inc.,* 557 F.2d at 1286. With respect to the first prong, the applicable state statute is Cal.Code of Civ.Pro. § 410.10 [FN1], or otherwise known as California's long-arm statute. The Ninth Circuit has long held that § 410.10 imposes limits on the power of California courts to exercise personal jurisdiction that are "coextensive with the outer limits of due process under the state and federal constitutions, as those limits have been defined by the United States Supreme Court." *Data Disk,* 557 F.2d at 1287,*citing, Republic Int'l Corp. v. Amco Engineers, Inc.,* 516 F.2d 161, 167 (9th Cir.1975); *see also, Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* No. 85-1876 (attached to opposition as Exh. A.)

The limitations of federal due process on the court's exercise of personal jurisdiction over nonresident defendants have been delineated by the Supreme Court. *See International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). In *World-wide Volkswagon Corp. v. Woodson,* 444 U.S. 286 (1980), *quoting, International Shoe,* 326 U.S. at 316, the Supreme Court reaffirmed that "a state court may exercise personal jurisdiction over a nonresident defendant only so long as there exists 'minimum contacts' between the defendant and the forum State."

*3 1. *General Jurisdiction.*

The court has general jurisdiction or "jurisdiction over causes of action unrelated to a defendant's forum activities, [and] over such a nonresident defendant only if his or her forum contacts are sufficiently pervasive." *Kransco,* 656 at 1378. When the non-resident defendant's activities are "substantial" or "continuous and systematic," there is a sufficient relationship between the defendant and the forum state to support jurisdiction consistent with due process even if the cause of action is unrelated to the defendant's forum activities. *Data Disk,* 557 F.2d at 1287. Under the theory of general jurisdiction, a nonresident's agency or alter ego relationship with resident corporation would give rise to the court's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.), 230 U.S.P.Q. 225
(Cite as: Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.))

general jurisdiction over the nonresident defendant.

a. Agency Theory.

In order to establish the agency for purposes of jurisdiction, the court must determine that the agent carries on substantial activities for the benefit of the principal, performs duties which are sufficiently necessary to the principal's operations, and assumes charge for a substantial phase of the principal's activity. *See Wells Fargo & Co. v. Wells Fargo Exp. Co.,* 556 F.2d 406 (9th Cir.1977). The relationship is described as follows: "an agent will have broad executive responsibilities and ... his relationship [to the principal] will reflect a degree of continuity ... [a]uthority to act as agent sporadically or in a single transaction ordinarily does not satisfy this provision of this Rule." *Id.* at 423,*citing, Gotlieb v. Sandia American Corp.,* 452 F.2d 510 (3d Cir.), *cert. denied sub nom., Wechsler v. Gottlieb,* 404 U.S. 938 (1971).

In *Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175, 1177 (9th Cir.), *cert. denied,*449 U.S. 1062 (1980), the Ninth Circuit rejected both an agency and alter ego theory in a factual situation similar to the present case. The Court examined two factors: whether nonresident foreign corporate defendants controlled or formed a majority on the board of directors of the alleged agent and alter ego corporation; and whether the foreign corporate defendants controlled the internal affairs of the subsidiary and determined how it operated on a daily basis. Since both factors were absent, the court held that the facts were insufficient to make the defendants subject to jurisdiction through the presence of the subsidiary.

In the present case, plaintiff relies heavily on the fact that the defendants refer to themselves in certain advertisements and publications as the "Ameritech Family of Companies" and that ACI's advertisements use the pronoun "we" in reference to the Midwest regional branches. Plaintiff repeatedly asserts that since ACI's business inures to the benefit of the Ameritech companies as a whole,

that the business is but a part of the integrated service and equipment business "Ameritech Family of Companies," and thus ACI's presence in California should be imputed to the moving defendants in order to subject them to the general jurisdiction of the Court.

*4 One of the main fallacies of plaintiff's contention is that it clumps together all of the moving defendants and characterizes them all as one giant corporate entity with numerous subsidiaries with complete disregard for the separate corporate character of each of the individual branches. As the moving defendants point out, this argument may have had some merit prior to the court ordered divestiture of AT & T, but since the break-up of AT & T, they are required by the Federal Communications Commission to conduct its business operations separately. For instance, Illinois Bell is structurally incapable of and legally prohibited from conducting business through ACI, and thus ACI is not a conduit for the sale of goods for defendant Illinois Bell in California.

In compliance with the FCC requirements, moving defendants allege that ACI operates independently and makes independent decisions in its efforts to achieve its business objectives. For instance, ACI's boards of directors and officers are different from those of the moving defendants; ACI maintains its own accounting books; ACI hires separate operating, marketing, installation and maintenance personnel and maintains its own payroll; ACI prepares its own annual budget; ACI independently sets the prices and other sale terms for its products and services; and lastly, negotiates its own contracts. By the above activities, ACI maintains control over its daily and long-term decision-making processes, and in addition, maintains independent and different board of directors and officers.

Although there is a parent-subsidiary relationship between AITC and ACI, the existence of such a relationship, without more, is insufficient to establish personal jurisdiction over the nonresident parent. *Transure, Inc. v. Marsh & McLennan, Inc.,* 766

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.), 230 U.S.P.Q. 225
(Cite as: Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.))

F.2d 1297, 1299 (9th Cir.1985); *see also, Mizokami Brothers of Arizona, Inc. v. Baychem Corp.,* 556 F.2d 975, 977 (9th Cir.)*cert. denied,*434 U.S. 1035 (1978). Absent circumstances justifying disregard of a corporate entity, a holding or parent company is a separate corporate entity and is treated separately from the subsidiary. *Quarles v. Fuqua Industries, Inc.,* 504 F.2d 1358, 1362 (10th Cir.1974). The circumstances sufficient to justify disregard of the corporate entity exists if separation of the two entities has not been maintained and injustice would occur to third parties if the separate entity is not recognized. *Id.* The records presented illustrate that ACI, and the moving defendants, have continuously maintained themselves as separate corporate entities, and thus under the facts presented plaintiff has not met its burden of establishing that the Court should disregard these separate corporate entities.

Plaintiff submits numerous advertisements which it alleges illustrates ACI is the supporting arm for the Ameritech companies in that ACI provides marketing support and products which are sold by the "Ameritech" corporate family. (Exh. 3 & 9.) Despite suggestive advertisements which could be inferred to imply that the moving defendants are a unitary business, if the operations of the corporations are kept distinct and separate, the court may decline jurisdiction over the matter. *See Manville Boiler Co. v. Columbia Boiler Co. of Pottstown,* 269 F.2d 600, 606 (4th Cir.), *cert. denied,*361 U.S. 901 (1959).

**\*5** Plaintiffs also allege that ACI solicits business for moving defendants in answering telephone inquiries from customers on their behalf, providing products and systems complementing the services provided by moving defendants, and generally representing moving defendants and their customers outside the midwest. This referral system, however, is insufficient to provide the Court with general jurisdiction over the moving defendants.

b. Alter Ego Theory.

In order to apply the alter ego doctrine, the court

must determine: "(1) that there is such unity of interest and ownership that the separate personalities of the corporation and the individuals no longer exist and (2) that failure to disregard the corporation would result in fraud of injustice." *Flynt Distributing Co., Inc. v. Harvey,* 734 F.2d 1389, 1393 (9th Cir.1984). In making this determination, courts have examined the following factors: a) whether the officers and directors of the companies are the same; b) whether one company pays cash for products sold or services rendered to it by another company; c) whether separate books, bank accounts, tax returns, financial statements and the like are kept; and d) whether one company holds the other company out as the agent, either expressly or impliedly, as by representing it is doing business or has a office in California when only the other company is present there.

As many of these factors have been discussed above, the Court will not reiterate its previous discussion, but will address only the new matters raised by plaintiff. Plaintiff asserts AITC's Annual Report illustrates that all moving defendants prepare a consolidated financial statement and federal income tax returns. This consolidation is relied upon by plaintiff as evidence of the defendants' comingled character. In response, moving defendants defend their practice by asserting that the filing of consolidated financial statements and tax returns are common corporate practices.

Plaintiff also asserts that because affiant Bruce B. Howat is a common officer of AC and AITC, the court should pierce the corporate veil and find that ACI is an agent or alter ego of AITC. However, as plaintiff has not demonstrated that there are common directors or officers between ACI and AITC which is necessary in order for the Court to disregard the separate corporate entities between a parent and its subsidiary and pierce the corporate veil, this argument must fail. The mere showing that one individual is an officer of two of the moving defendants is insufficient for the Court to disregard the separate corporate entities of the moving defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                  Page 5
Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.), 230 U.S.P.Q. 225
(Cite as: Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.))

ants.

In addition to showing of control, one of the requirements of finding an "alter ego" status requires that the corporate entities be set up with fraudulent intent or in bad faith. *See Seymour v. Hull & Moreland Engineering,* 605 F.2d 1105, 1111 (9th Cir.1979). This requirement is inapplicable to the present case because the corporate entities were organized in order to be in compliance with the requirements of the FCC.

**\*6** In the present case, the Court finds that plaintiff has not established that there is such unity of interest and ownership that the separate personalities of the corporation and the individuals no longer exist despite the consolidation of the financial statements and tax returns. The moving defendants have maintained their own separate books, officers and directors, and separate corporate personalities such that it would be improper for the Court to exercise general jurisdiction over these defendants.

## 2. *LIMITED JURISDICTION.*

When the nonresident defendant's forum contacts are not "substantial" or "continuous and systematic," the facts must be analyzed to determine whether the defendant has engaged in sufficient forum-related activity to subject defendant to the court's limited jurisdiction. *Id.* at 1287. This form of jurisdiction is specifically limited to "jurisdiction only over causes of action related to the defendant's forum activities." *Kransco,* 656 at 1378. This inquiry requires "an evaluation of the nature and quality of the defendant's contacts in relation to the cause of action." *Data Disk,* 557 F.2d at 1285.

The Ninth Circuit utilizes a three-step approach in evaluating an out-of-state defendant's forum contacts for purposes of establishing limited jurisdiction: 1) the nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and pro-

tections of its laws, 2) the claim must be one which arises out of or results from the defendant's forum-related activities; and 3) exercise of jurisdiction must be reasonable. *Kransco* 656 at 1378.

Plaintiffs assert that by placing advertisements in national publications which circulate in California, e.g., *Wall Street Journal* and *The New York Times,* moving defendants have interjected its product, the trademark itself, into the "stream of commerce" in California. The advertisements also are interpreted to solicit business from California citizens to their companies in the Midwest, and such activities should be deemed "purposefully availing" themselves of the benefits of this state.

A similar argument was explicitly rejected in *Williams v. Canon,* 432 F.Supp. 376, 380 (C.D.Cal.1977) (Takasugi, J). "[N]ational advertising which happens to appear in a particular jurisdiction does not constitute transacting of business in that jurisdiction. The same rationale would apply, *a fortiori,* to the use of a trademark, the most passive form of advertising." *Id.* at 380. Thus, the Court concludes that even though Ameritech's trademark is a property right and Ameritec could enforce this right in this forum, advertisement in national publications does not establish, without more, that the moving defendants have purposefully availed itself of the privilege of conducting activities within the forum or invoked the benefits and protections of its laws. *See Williams,* 432 F.Supp. at 380.

**\*7** Plaintiff alleges that moving defendants purchased goods from plaintiff and another California supplier, and sent employees to California for one week in connection with the production investigation prior to the formation of the contract. However, plaintiff fails to point out that the purchases from the California suppliers are unrelated to the subject matter of the litigation. Moreover, the cases cited by plaintiff are inapposite because they deal with situations in which the contract relied upon was at issue in the lawsuit. Since the issue of limited jurisdiction "turns on the nature and quality

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 6
Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.), 230 U.S.P.Q. 225
(Cite as: Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.))

of the defendant's contacts relating specifically to the cause of action,"*Olsen By Sheldon v. Government of Mexico,* 729 F.2d 641, 648 (9th Cir.1984), the fact that moving defendants purchased goods unrelated to the subject matter of the suit does not affirmatively demonstrate that the moving defendants have sufficient contacts in this state for the court to impose personal jurisdiction.

Plaintiff also asserts that the moving defendants' list its stock on the Pacific Stock Exchange, and solicits stockholders in California. Defendants refute the allegation that Illinois Bell or AC has stock listed on the Pacific Stock Exchange or that these corporations send annual reports to stockholders in California.

Plaintiff also asserts that the moving defendants are investing in a corporation (Speech Plus) located in California and relies on *United States v. Toyota Motor Corp.,* 561 F.Supp. 354 (C.D.Cal.1983) in support of jurisdiction on this basis. However, unlike *Toyota,* the facts in this case not present a situation where there is "purposeful exploitation" of the forum's market.

Personal jurisdiction is, in this case, limited only to claims that arise out of or result from the defendant's forum-related activities. *Data Disk,* 557 F.2d at 1287. Although a "single infringing or unfair act is sufficient to state a trademark or unfair competition cause of action,"*Wells Fargo,* 556 F.2d at 416, plaintiff fails to establish that the infringing act gives rise to the cause of action.

Finally, plaintiff alleges that the exercise of jurisdiction would be reasonable since defendants could "reasonably anticipate being called upon to present a defense in a distant forum." *Olsen,* 729 F.2d at 649. Plaintiff relies heavily on the fact that the claims, defenses, witnesses, evidence and counsel with respect to both ACI and moving defendants are identical, and asserts that it is in the interest of justice for this Court to adjudicate this trademark infringement case. However, these factors go more to whether venue is proper, rather than whether this

court's exercise of personal jurisdiction is reasonable. Based on the moving defendants' tenuous connections with this forum, the Court finds that they could not have reasonably anticipated litigating in this forum. Therefore, for the reasons discussed above, plaintiff has not met its burden of establishing the requisite "minimum contacts" sufficient to confer this court with personal jurisdiction over nonresident corporate defendants.

**\*8 3. REQUEST TO CONDUCT FURTHER DISCOVERY.**

In the alternative, plaintiff requests additional time to conduct further discovery on the jurisdictional issue. *See Wells Fargo,* 556 F.2d at 430, n. 24. In contrast, defendant argues that plaintiff should be estopped from seeking further discovery after completion of briefing the opposition, and after plaintiff agreed to a stay of discovery as to the moving defendants. Defendants point out that plaintiff has obtained over 500 pages of documents, including AT & T's complete plan of reorganization, and thus has had ample opportunity to seek discovery and has had an opportunity to brief this issue fully. At the hearing, defense counsel indicated that additional time would assist the Court in digesting the voluminous exhibits contained in their respective pleadings.

*CONCLUSION*

The Court having reviewed all of the extensive pleadings, and attached exhibits presented on this matter, and all of the pertinent authority, hereby orders the following:

IT IS HEREBY ORDERED THAT moving defendants' motion to dismiss for lack of personal jurisdiction pursuant to F.R.Civ.P. 12(b)(2) is GRANTED. Plaintiff has failed to make a prima facie showing establishing that the Court has general jurisdiction over the moving defendants in that plaintiff has not shown that the nonresident moving defendants activities are "substantial" or "continuous or systematic," so that there is a sufficient relationship

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 7
Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.), 230 U.S.P.Q. 225
**(Cite as: Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.))**

between the moving defendants and the State of California to support jurisdiction consistent with due process. Furthermore, plaintiff has also failed to establish that moving defendants have engaged in sufficient forum-related activity or "minimum contacts" to subject moving defendants to the Court's limited jurisdiction.

IT IS ALSO HEREBY ORDERED THAT plaintiff's request for additional time to conduct further discovery is DENIED. Plaintiff has already received voluminous documentation through discovery, including AT & T's complete plan of reorganization, and has not persuaded the Court that additional time could provide evidence not already presented.

IT IS SO ORDERED.

> FN1. Cal.Code Civ.Pro. § 410.10 provides that "[a] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."

C.D.Cal.,1986.
Ameritec Corp. v. Ameritech Corp.
Not Reported in F.Supp., 1986 WL 10702 (C.D.Cal.), 230 U.S.P.Q. 225

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

**Westlaw.**

Not Reported in F.Supp.2d                                                                                         Page 1
Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.))**

**H**

BriteSmile, Inc. v. Discus Dental, Inc.
N.D.Cal.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
BRITESMILE, INC. and BriteSmile Development,
Inc., Plaintiffs,
v.
DISCUS DENTAL, INC.; Salim Nathoo Defend-
ants.
**No. C 02-03220 JSW.**

May 5, 2005.

David A. Kalow, Milton Springut, Kalow & Sprin-
gut, New York, NY, David M. Madrid, James R.
Batchelder, Day Casebeer Madrid & Batchelder,
Cupertino, CA, Donald M. Falk, Mayer, Brown &
Platt, Shirish Gupta, Mayer Brown Rowe & Maw,
Palo Alto, CA, Douglas L. Sawyer, L., Christine M.
Rebman, Esq., Joseph A. Mahoney, Richard T. Ru-
zich, Mayer, Brown, Rowe & Maw, Chicago, IL,
for Plaintiffs.
Brian K. Brookey, Ksenya Medvedev, David A.
Dillard, Christie, Parker & Hale LLP, Pasadena,
CA, Darin Jeffrey Glasser, O'Melveny & Myers
LLP, Newport Beach, CA, George A. Riley,
O'Melveny & Myers, Jason M. Julian, Foley &
Lardner LLP, Rodney Michael Hudson, Esq.,
Drinker Biddle & Reath LLP, Steven Michael
Selna, Esq., Drinker Biddle & Reath LLP, Martin
C. Fliesler, Melissa L. Basch, Fliesler Dubb Meyer
& Lovejoy, LLP, San Francisco, CA, John Chris-
topher Kappos, O'Melveny & Myers, Irvine, CA,
Robert N. Treiman, Akin Gump Strauss Hauer &
Feld LLP, Los Angeles, CA, Kimberly K. Dodd,
David B. Moyer, Foley & Lardner LLP, Michael A.
Molano, Mayer, Brown, Rowe & Maw LLP, Palo
Alto, CA, Aravind Aithal, Bob Smith & Associates,
Piscataway, NJ, Peter D. McDermott, Banner and
Witcoff, LTD, Boston, MA, for Defendants.

ORDER GRANTING CAP ADVISORS LIM-
ITED'S MOTION TO DISMISS DR. NATHOO'S

SIXTEENTH COUNTERCLAIM

WHITE, J.
**\*1 AND RELATED COUNTERCLAIMS**

Now before the Court is the motion of Third Party
Counter-Defendant CAP Advisors Limited ("CAP
Advisors") to dismiss Dr. Salim Nathoo's sixteen
counterclaim for lack of personal jurisdiction. Hav-
ing carefully considered the parties' arguments and
the relevant legal authority, the Court hereby
GRANTS CAP Advisors' motion to dismiss. The
Court finds the present motion appropriate for de-
cision without oral argument. *See*Fed.R.Civ.P. 78;
Civil L.R. 7-1(b). Therefore, the hearing date of
May 6, 2005 at 9:00 a.m. is HEREBY VACATED.

BACKGROUND

In this patent infringement action, Dr. Nathoo is as-
serting a counterclaim against CAP Advisors for
breach of contract. CAP Advisors is moving to dis-
miss Dr. Nathoo's contract claim against it for lack
of personal jurisdiction pursuant to Federal Rule of
Civil Procedure 12(b)(2). Dr. Nathoo contends that
this Court may exercise jurisdiction over CAP Ad-
visors on the basis of either general or specific jur-
isdiction, and that this Court may consider both
CAP Advisors' own contacts as well as the contacts
of BriteSmile, Inc. ("BriteSmile") pursuant to the
alter ego doctrine to establish jurisdiction over CAP
Advisors. The Court will address the specific facts
relevant to this motion as they are pertinent to the
analysis.

ANALYSIS

I. Choice of Law.

Dr. Nathoo contends that New York law governs
his sixteenth counterclaim for breach of contract.
Pursuant to this counterclaim, Dr. Nathoo alleges

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.))

that he had an agreement with Pilaro and CAP Advisers to purchase $200,000 worth of BriteSmile stock. Dr. Nathoo gave Pilaro a $200,000 note for the stock, which was became due in June 2004. (Dr. Nathoo's Amended Countercomplaint, ¶ 169.) Although Dr. Nathoo paid the $200,000 before the note was due, Pilaro never conveyed the stock. (*Id.* at ¶¶ 170-71.)As a result, Dr. Nathoo is suing Brite-Smile, CAP Advisors, and Pilaro for breach of contract based on their alleged failure to convey such stock. (*Id.* at ¶ 260.)To argue that New York law applies, Dr. Nathoo points to the choice of law provision in the agreement regarding the promissory note, which provides that the promissory note shall be construed and enforced in accordance with New York law. (Supplemental Declaration of Michael Yong, Ex. A, ¶ 11.) The choice of law provision does not address the alleged agreement to convey stock. Because Dr, Nathoo is not suing to enforce the note, the Court concludes that the choice of law provision is inapplicable. Accordingly, the Court will apply California law to Dr. Nathoo's claim for breach of contract.

II. Standards Applicable to Motions to Dismiss for Lack of Personal Jurisdiction.

Pursuant to Rule 12(b)(2), a defendant may move to dismiss a complaint on the ground that the Court does not have jurisdiction over his, her or, in this case, its person. "Personal jurisdiction over an out-of-state defendant is appropriate if the relevant state's long arm-statute permits the assertion of jurisdiction without violating federal due process."*Schwarzenegger v. Fred Martin Motor Company,* 374 F.3d 797, 800-801 (9th Cir.2004). Because California's long arm statute is co-extensive with federal due process requirements, the jurisdictional analyses under California law and federal due process are the same. *Id.* at 801.

*2 As the party bringing this action, Dr. Nathoo "bears the burden of demonstrating that jurisdiction is appropriate."*Id.* at 800.The parties have not requested and the Court has not deemed it necessary to conduct an evidentiary hearing on the motion. The Court is therefore basing its decision on the written materials and declarations submitted by the parties, and thus, the Court considers whether those materials make a prima facie showing of personal jurisdiction. *Id.* at 800.In making that determination, the Court must accept those allegations in Dr. Nathoo's Countercomplaint that are not controverted to be true. *See id.*Any conflicts between the parties over statements contained in affidavits must be resolved in Dr. Nathoo's favor. *See id.*

B. Dr. Nathoo Has Not Made a Prima Facie Showing of General Jurisdiction.

Dr. Nathoo claims that CAP Advisors is subject to general jurisdiction. To demonstrate general jurisdiction is proper, Dr. Nathoo must show that CAP Advisors has "continuous and systematic" contacts with California. Those contacts, however, need not be related to the specific cause of action asserted for breach of contract. *See Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Bancroft & Masters, Inc. v. Augusta National Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000).

The standard for establishing general jurisdiction is fairly high and requires that the CAP Advisors' contacts be of the sort that approximate physical presence. *See Bancroft & Masters,* 223 F.3d at 1086. Factors the Court must take into consideration are "whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there."*Id.* (citing *Hirsch v. Blue Cross of Kansas City,* 800 F.2d 1474, 1478 (9th Cir.1986)). Dr. Nathoo argues both that CAP Advisors' contacts with California are sufficiently "continuous and systematic" to support general jurisdiction, and that under the doctrine of alter ego, BriteSmile's contacts may be attributed to CAP Advisors for purposes of establishing jurisdiction.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.))**

1. CAP Advisors' Contacts with California

CAP Advisors submits evidence demonstrating that it is not incorporated in California, does not have any offices in California or anywhere else in the United States, does not make sales, solicit, or engage in business in California, does not have a designated agent for service of process in California, does not hold any license in California, does not have any employees that reside in California, and does not hold any bank accounts or real property in California. (Supplemental Declaration of Michael Yong ("Suppl. Yong Decl."), ¶¶ 2-5.) Except for the allegations regarding management and control of companies doing business in California which will be addressed in the context of determining whether the alter doctrine applies,[FN1] the only evidence Dr. Nathoo submits to contradict CAP Advisors' and to show "continuous and systematic" contacts in California relates to a lawsuit filed by CAP Advisors and loans it made.[FN2] In 1994, CAP Advisors was a plaintiff in a shareholder derivative suit against Visx filed in the Superior Court of California for the County of Santa Clara. (Declaration of David B. Moyer in support of Dr. Nathoo's opposition to CAP's Advisors' motion ("Moyer Decl."), Ex. J.) Filing an unrelated lawsuit over ten years ago is insufficient to establish general jurisdiction. *See Bhandari v. Mehta,* 2003 WL 22846224, *2 (N.D.Cal. Nov.25, 2003) ("filing of one action in a particular forum does not constitute minimum contacts with the forum sufficient to establish general personal jurisdiction"). Next, Dr. Nathoo asserts that CAP Advisors provided loans to several of BriteSmile's officers and directors who "resided in or were otherwise connected with California."(Opp. at 3, 5.) Even if the evidence submitted by Dr. Nathoo did demonstrate that the individuals to whom CAP Advisors provided loans were California residents, engaging in limited transactions with a few California residents is not "the kind of activity that approximates physical presence within the state's borders."*Bancroft & Masters,* 223 F.3d at 1086 (holding that entering into license agreements with several television net-

works and vendors in California constituted doing business *with* California but not *in* California, and that engaging in commerce with state's residents did not approximate physical presence within the forum state). The Court therefore concludes that Dr. Nathoo has not demonstrated a prima facie showing of general jurisdiction based on CAP Advisors' contacts in California.

> FN1. In essence, Dr. Nathoo contends that through managing and controlling other companies, BriteSmile, Inc. and Visx, Inc., which transact business in California, CAP Advisors itself is "doing business" in the forum. For example, he argues that CAP Advisors managed BriteSmile's teeth whitening business in California. (Opp. to CAP Motion at 12.) Because Dr. Nathoo does not argue that CAP Advisors opened up its own offices or is conducting its own business in California, it is appropriate to evaluate CAP Advisors' conduct in allegedly managing and controlling Brite-Smile and Visx in the context of determining whether the alter ego doctrine applies, and not as direct support for *CAP Advisors'* contacts in California.

> FN2. Dr. Nathoo also relies on credit agreements: (1) between CAP Advisors and BriteSmile International Limited, (2) between CAP America Trust and Brite-Smile, and (3) between Excimer Vision Leasing L.P. and BriteSmile. However, Dr. Nathoo has not demonstrated any theory that applies under which the contacts of BriteSmile International Limited may be attributed to BriteSmile, or that the contacts of CAP America Trust and Excimer Vision Leasing L.P. may be attributed to CAP Advisors. Therefore, the Court has not considered these agreements in determining whether CAP Advisors has sufficient contacts in California for jurisdictional purposes.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 4
Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.))

2. Alter Ego Doctrine

**\*3** To show that BriteSmile is the alter ego of CAP Advisors, and thus that BriteSmile's contacts may be attributed to CAP Advisors for jurisdictional purposes, Dr. Nathoo asserts an assortment of transactions between a variety of individuals and companies, namely Anthony Pilaro, BriteSmile Development, Inc., BriteSmile International Limited, Ion Laser Technology, LCO Investments, Inc., ERSE Trust, CAP America Trust, and CAP America Limited, in addition to BriteSmile and CAP Advisors. Before the Court may consider such transactions, Dr. Nathoo would have to demonstrate it would be proper to ignore the distinctions between Mr. Pilaro and all these different companies. Even assuming *arguendo* that the Court could treat all the transactions asserted by Dr. Nathoo as though they were conducted between BriteSmile and CAP Advisors, Dr. Nathoo still fails to demonstrate that the alter ego doctrine applies.

"If a corporation is an alter ego of an individual or another corporation, then the district court may disregard the corporate form and exercise personal jurisdiction over the other individual or entity."*ADO Finance, AG v. McDonnell Douglas Corp.,* 931 F.Supp. 711, 715-716 (C.D.Cal.1996) (citations omitted); *see also Flynt Distributing Company, Inc. v. Harvey,* 734 F.2d 1389, 1393 (9th Cir.1984) ("[W]here a corporation is the *alter ego* of the stockholders so as to justify disregard of the corporate entity[,] jurisdiction over the corporation will support jurisdiction over the stockholders.") (emphasis in original) (quoting *Sheard v. Superior Court,* 40 Cal.App.3d 207, 210, 114 Cal.Rptr. 743 (1974))."Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations."*Sonora Diamond Corp. v. Superior Court,* 83 Cal.App.4th 523, 538, 99 Cal.Rptr.2d 824 (2000). Under California law, a corporate identity may be disregarded "where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for

the actions of the corporation.... Under the alter ego doctrine, then, when the corporate form is used to penetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation...."*Id.*(citations omitted). As explained by the court in *Sonora Diamond,*"[t]he alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds."*Id.*

To demonstrate that the alter ego doctrine applies, Dr. Nathoo "must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate entities] would result in fraud or injustice."*Doe v. Unocal Corp.,* 248 F.3d 915, 926 (9th Cir.2001) (internal quotes and citation omitted); *see also Sonora Diamond,* 83 Cal.App.4th at 538, 99 Cal.Rptr.2d 824 ("In California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone.").

**\*4** In *Sonora Diamond,* there was no evidence of any wrongdoing by either entity or of any injustice flowing from the recognition of the company's separate corporate identity. The court explained that "[t]he alter ego doctrine ... affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form."*Sonora Diamond,* 83 Cal.App.4th at 539, 99 Cal.Rptr.2d 824. One company's financial advances to another did not prove the requisite misconduct or injustice because there was no evidence that such advances were made with a fraudu-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.))

Page 5

lent or deceptive intent. Due to the absence of this "essential element," the court held that the alter ego doctrine could not be invoked. *Id.* at 539, 99 Cal.Rptr.2d 824.

Similarly here, Dr. Nathoo has not introduced *any* evidence demonstrating any wrongdoing by either BriteSmile or CAP Advisors related to BriteSmile's corporate form or that any injustice would flow from recognizing BriteSmile's corporate identity separate from CAP Advisors. At most, Dr. Nathoo submits evidence demonstrating Anthony Pilaro's and CAP Advisors' made some efforts to control and manage BriteSmile and/or Visx, but not that such efforts were made with any fraudulent or deceptive intent. Accordingly, Dr. Nathoo may not invoke the alter ego doctrine to support exercising jurisdiction over CAP Advisors, and thus Brite-Smile's conduct may not be imputed to CAP Advisors for purposes of establishing general jurisdiction.

C. Dr. Nathoo Has Not Made a Prima Facie Showing of Specific Jurisdiction.

Dr. Nathoo also maintains that this Court can exercise specific jurisdiction over CAP Advisors. To evaluate the nature and quality of a defendant's contacts for the purposes of specific jurisdiction, courts use a three-part test: (1) some action must be taken whereby the defendant purposefully avails itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of the forum's laws; (2) the claim must arise out of or result from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *see also Cubbage v. Merchent,* 744 F.2d 665, 668 (9th Cir.1984). In order to establish purposeful availment, the defendant must have committed an intentional act which was both expressly aimed at and which caused harm in the forum state. *Panavision International v. Toeppen,* 141 F.3d 1316, 1321 (9th Cir.1998).

Dr. Nathoo is suing CAP Advisors for breach of contract. (Dr. Nathoo's Amended Countercomplaint, ¶¶ 260-61.) Dr. Nathoo alleges that he agreed to purchase $200,000 worth of BriteSmile stock and that Dr. Nathoo gave Mr. Pilaro a note in the amount of $200,000 for the stock. (*Id.* at ¶ 169). This was an agreement that was allegedly between Dr. Nathoo, CAP Advisors and Mr. Pilaro and was memorialized in a letter dated June 14, 1999. (*Id.*) The June 14, 1999 letter from CAP Advisors to Dr. Nathoo states: "This will confirm that our nominee ... holds for the account of CAP Advisors Limited the following shares purchased by you as of June 3, 1999 and pledged to us on that date: 18,264.84 shares of common stock, par value of $.001 per share of BriteSmile, Inc., a Utah Corporation."(*Id.* at Ex. P.) Dr. Nathoo further alleges that although he paid the $200,000 before the note became due, Mr. Pilaro failed to convey the stocks. (Dr. Nathoo's Amended Counterclaim, ¶¶ 170-71.) As evidence of CAP Advisors' contacts in California related to the breach of contract claim, Dr. Nathoo also points to BriteSmile's 10KSB form filed on July 2, 1999, which indicates that CAP Advisors provided financing to BriteSmile's senior management, directors and key consultants to purchase BriteSmile stock. (Moyer Decl., Ex. D at 5.)

*5 Dr. Nathoo has not met his burden to demonstrate that CAP Advisors' conduct related to Dr. Nathoo's purchase of BriteSmile stock constitutes intentional acts which were both expressly aimed at and which caused harm in California. Neither Dr. Nathoo nor CAP Advisors are California residents. Dr. Nathoo has not proffered any facts demonstrating he incurred any harm from the alleged agreement in California, nor that CAP Advisors performed any portion of the contract with Dr. Nathoo in this forum state. Therefore, Dr. Nathoo has not met his burden of demonstrating a prima facie case for specific jurisdiction. *See Panavision International,* 141 F.3d at 1321;*see also McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 816 (9th Cir.1988) (no specific jurisdiction based on contract executed in California but negotiated in Eng-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 6
Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.))

land where plaintiff did not allege defendant performed any portion of contract in California).

Because Dr. Nathoo had not demonstrated it would be proper for this Court to exercise jurisdiction over CAP Advisors, either based on general or specific jurisdiction, the Court finds that it lacks jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court GRANTS CAP Advisors' motion to dismiss Dr. Nathoo's sixteen counterclaim against it.

IT IS SO ORDERED.

N.D.Cal.,2005.
BriteSmile, Inc. v. Discus Dental, Inc.
Not Reported in F.Supp.2d, 2005 WL 1048701 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Slip Copy                                                      Page 1
Slip Copy, 2007 WL 2726871 (N.D.Cal.)
(Cite as: 2007 WL 2726871 (N.D.Cal.))

**C**

People of State of **California** v. **GeneralMotors** Corp.
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
PEOPLE of the STATE of **CALIFORNIA**,
Plaintiff,
v.
**GENERALMOTORS** CORPORATION, et al.,
Defendants.
No. C06-05755 MJJ.

Sept. 17, 2007.

Kenneth P. Alex, California Department of Justice, Harrison Martin Pollak, Janill L. Richards, California Attorney General's Office, Oakland, CA, for Plaintiff.
Theodore J. Boutrous, Jr., Gibson, Dunn & Crutcher LLP, Los Angeles, CA, Raymond B. Ludwiszewski, Gibson Dunn & Crutcher LLP, Washington, DC, Neil D. Gordon, Michigan Department of Attorney General, Lansing, MI, for Defendants.

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

MARTIN J. JENKINS, United States District Judge.

**INTRODUCTION**

*1 Before the Court is Defendants General Motors Corp.; Toyota Motor North America, Inc.; Ford Motor Co., American; Honda Motor Co., Inc; Daimler Chrysler Corp.; and Nissan North America, Inc.'s (collectively, "Defendants" or "Automakers") Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim Upon Which Relief May be Granted.[FN1] Plaintiffs, the People of the State of California, *ex rel.* Edmund G. Brown Jr., Attorney General ("Plaintiff" or "the State of California" or "Attorney General") oppose the motion. For the following reasons, the

Court GRANTS Defendants' motion.

FN1.Docket No. 33.

**FACTUAL BACKGROUND**

In this action, the State of California seeks damages against various automakers for creating, and contributing to, an alleged public nuisance-global warming. The material allegations as taken from the operative complaint are as follows.

"Global warming is a 'change of climate which is attributed directly or indirectly to human activity that alters the composition of the global atmosphere and which is in addition to natural climate variability observed over comparable time periods.' " (Second Am. Compl. ("SAC") ¶ 22.) (citation omitted.) According to Plaintiff, the "[s]cientific debate is over" and "there is a clear scientific consensus that global warming has begun and that most of the current global warming is caused by emissions of greenhouse gasses, primarily carbon dioxide from fossil fuel combustion." (*Id.* at ¶ 23.)Global warming occurs when energy from the sun heats the Earth, which radiates the energy into the Earth's atmosphere. (*Id.* at ¶ 28.)Carbon dioxide traps the heat in the Earth's atmosphere that would otherwise escape into space. (*Id.*)

Carbon dioxide is the most significant greenhouse gas emitted by human activity. (*Id.* at ¶ 27.)The six Defendant automakers produce vehicles that emit over 289 million metric tons of carbon dioxide. (*Id.* at ¶ 40.)These emissions constitute over twenty percent of human-generated carbon dioxide emission in the United States. (*Id.*) Defendants' carbon dioxide emissions account for over thirty percent of such emissions in California. (*Id.*) Human-induced emissions of carbon dioxide, such as those from motor vehicles, are causing global warming. (*Id.* at ¶ 19 .)

Plaintiff has expended millions of dollars to study, plan for, monitor, and respond to impacts already

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 2
Slip Copy, 2007 WL 2726871 (N.D.Cal.)
**(Cite as: 2007 WL 2726871 (N.D.Cal.))**

caused, and likely to occur, as a result of global warming. (*Id.* at ¶ 44.)The impacts of global warming have resulted in an increase in the winter average temperatures in the Sierra Nevada region, causing a reduction in the snow pack which serves as thirty-five percent of the State's water. (*Id.* at ¶¶ 47-48.)Additionally, as a result of the increased temperatures, the snow pack melts earlier in the Spring resulting in increased risk of flooding within the State. (*Id.* at ¶ 51.)Global warming has also resulted in rising sea levels that have increased erosion along California's 1,075 miles of coastline. (*Id.* at ¶ 52.)Other impacts of global warming include increases in the frequency and duration of extreme heat events, and increases in the risk and intensity of wildfires, among others. (*Id.* at 55-56.)

*2 Plaintiff asserts two causes of action in the operative complaint: (1) public nuisance under federal common law; and, alternatively, (2) public nuisance under California Law, California Civil Code § 3479, *et seq.* and California Civil Code § 731. Plaintiff seeks to hold each Defendant jointly and severally liable for creating, contributing to, and maintaining a public nuisance. Plaintiff requests monetary damages, attorneys' fees, and declaratory judgment for future monetary expenses and damages incurred by the State of California in connection with the nuisance of global warming.

Defendants now move this Court for order dismissing both causes of action, arguing that Plaintiff is improperly attempting to create a new global warming tort that has no legitimate origins in federal or state law. More specifically, Defendants move to dismiss Plaintiff's claims on four grounds: (1) the entire case raises nonjusticiable issues properly reserved for resolution by the political branches of government; (2) the complaint fails to state a valid nuisance claim under federal common law; (3) the complaint fails to state a valid nuisance claim under California law; and (4) the nuisance claim under California law is preempted by federal law.

**LEGAL STANDARD**

## I. Lack of Subject Matter Jurisdiction-Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes a party to move to dismiss a claim for lack of subject matter jurisdiction. Federal courts are courts of limited jurisdiction; thus, the Court presumes lack of jurisdiction, and the party seeks to invoke the court's jurisdiction bears the burden of proving that subject matter jurisdiction exists. *See Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). A party challenging the court's jurisdiction under Rule 12(b)(1) may do so by raising either a facial attack or a factual attack. *See White v. Lee,* 227 F.3d 1214, 1242 (9th Cir.2000).

A facial attack is one where "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."*Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir.2004). In evaluating a facial attack to jurisdiction, the Court must accept the factual allegations in plaintiff's complaint as true. *See Miranda v. Reno,* 238 F.3d 1156, 1157 n. 1 (9th Cir.2001). For a factual attack, in contrast, the Court may consider extrinsic evidence. *See Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir.1987). Further, the court does not have to assume the truthfulness of the allegations, and may resolve any factual disputes. *See White,* 227 F.3d at 1242. Thus, "[o]nce the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or evidence properly before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."*Savage v. Glendale Union High Sch.,* 343 F.3d 1036, 1039 n. 2 (9th Cir.2003).

*3 In the Ninth Circuit, "[j]urisdictional dismissals in cases premised on federal-question jurisdiction are exceptional, and must satisfy the requirements specific in *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946)."*Sun Valley Gas., Inc. v. Ernst Enters.,* 711 F.2d 138, 140 (9th Cir.1983); *see*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2726871 (N.D.Cal.)
**(Cite as: 2007 WL 2726871 (N.D.Cal.))**

*Safe Air for Everyone,* 373 F.3d at 1039. The *Bell* standard provides that jurisdictional dismissals are warranted "where the alleged claim under the [C]onstitution or federal statute clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such a claim is wholly insubstantial and frivolous."327 U.S. at 682-83. Additionally, the Ninth Circuit has admonished that a "[j]urisdictional finding of genuinely disputed facts is inappropriate when 'the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits' of an action."*Sun Valley,* 711 F.2d at 139. The jurisdictional issue and the substantive issues are intertwined where "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief."*Safe Air for Everyone,* 373 F.3d at 1039 (quoting Sun Valley, 711 F.2d at 139).

**II. Motion to Dismiss-Rule 12(b)(6)**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a claim. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Because the focus of a Rule 12(b)(6) motion is on the legal sufficiency, rather than the substantive merits of a claim, the Court ordinarily limits its review to the face of the complaint. *See Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir.2002). In considering a Rule 12(b)(6) motion, the Court accepts the plaintiff's material allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Shwarz v. United States,* 234 F.3d 428, 435 (9th Cir.2000). Generally, dismissal is proper only when the plaintiff has failed to assert a cognizable legal theory or failed to allege sufficient facts under a cognizable legal theory. *See SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.,* 88 F.3d 780, 782 (9th Cir.1996); *Balisteri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir.1984). In pleading suffi-

cient facts, however, a plaintiff must suggest his or her right to relief is more than merely conceivable, but plausible on its face. *See Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).

**ANALYSIS**

**I. Chronology of Relevant Environmental Policy**

A chronology of the relevant environmental policy on global warming is helpful in setting the stage for the issues now before the Court. Congress and the Executive Branch have taken several actions to understand and address the complex issue of global warming. *Connecticut v. American Elec. Power Co.,* 406 F.Supp.2d 265, 269 (S.D.N.Y.2005) ("AEP").

*\*4 In 1978, Congress established a "national climate program" to improve understanding of global climate change through research, data collection, assessments, information dissemination, and international cooperation. *See* National Climate Program Act of 1978, 15 U.S.C. §§ 2901, *et seq.* Two years later, Congress directed the Office of Science and Technology Policy to engage the National Academy of Sciences in a study of the "projected impact, on the level of carbon dioxide in the atmosphere, of fossil fuel combustion, coal-conversion and related synthetic fuels activities" authorized by the Energy Security Act. *See* Energy Security Act, Pub.L. No. 96-294, tit. VII, § 711, 94 Stat. 611, 774-75 (1980).

Congress next addressed the issue in 1987, when it enacted the Global Climate Protection Act, Title XI of Pub.L. 100-204, 101 Stat. 1407, note following 15 U.S.C. § 2901. Finding that "manmade pollution-the release of carbon dioxide, chlorofluorocarbons, methane, and other trace gases into the atmosphere-may be producing a long-term and substantial increase in the average temperature on Earth," § 1102(1), 101 Stat. 1408, Congress directed EPA to propose to Congress a "coordinated national policy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4
Slip Copy, 2007 WL 2726871 (N.D.Cal.)
(Cite as: 2007 WL 2726871 (N.D.Cal.))

on global climate change," § 1103(b), and ordered the Secretary of State to work "through the channels of multilateral diplomacy" and coordinate diplomatic efforts to combat global warming, § 1103(c). Congress emphasized that "ongoing pollution and deforestation may be contributing now to an irreversible process" and that "[n]ecessary actions must be identified and implemented in time to protect the climate." § 1102(4).

Meanwhile, the scientific community's understanding of climate change and its causes continued to progress. In 1990, the Intergovernmental Panel on Climate Change ("IPCC"), a multinational scientific body organized under the auspices of the United Nations, published its first comprehensive report on the topic. Drawing on expert opinions from across the globe, the IPCC concluded that "emissions resulting from human activities are substantially increasing the atmospheric concentrations of ... greenhouse gases [which] will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface ."IPCC, Climate Change: The IPCC Scientific Assessment, p. xi (J. Houghton, G. Jenkins, & J. Ephraums eds.1991).

Also in 1990, Congress enacted the Global Change Research Act. 15 U.S.C. §§ 2931-2938. This Act established a ten-year research program for global climate issues. § 2932. One of the Act's provisions directed the President to establish a research program to "improve understanding of global change," § 2933, and provided for scientific assessments every four years that "analyze [ ] current trends in global change," § 2936(3). Congress also established a program to research agricultural issues related to global climate change.Pub.L. No. 101-624, tit. XXIV, § 2402, 104 Stat. 4058, 4058-59 (1990). Two years later, the Secretary of Energy was directed to conduct several assessments related to greenhouse gases and report to Congress. *See* Energy Policy Act of 1992, Pub.L. No. 102-486, § 1604, 106 Stat. 2776, 3002.

*5 In 1992, President George H.W. Bush signed, and the Senate ratified, the United Nations Framework Convention on Climate Change ("UNFCCC").[FN2] The UNFCCC was a nonbinding agreement among 154 nations to reduce atmospheric concentrations of carbon dioxide and other greenhouse gases for the purpose of "prevent[ing] dangerous anthropogenic [i.e., human-induced] interference with the [Earth's] climate system."S. Treaty Doc. No. 102-38, Art. 2, p. 5 (1992). The UNFCCC brought together a coalition of countries to work toward a coordinated approach to address the international issue of global warming. This ratification was the result of the negotiations authorized by the Global Climate Protection Act of 1987. Following ratification of the UNFCCC, member nations negotiated the Kyoto Protocol, which called for mandatory reductions in the greenhouse gas emissions of developed nations. *See* UNFCCC, Kyoto Protocol (Dec. 11, 1997).

> FN2. Responding to the IPCC report, the United Nations convened the "Earth Summit" in 1992 in Rio de Janeiro. The industrialized countries listed in Annex I to the UNFCCC undertook to reduce their emissions of greenhouse gases to 1990 levels by the year 2000. No immediate restrictions were imposed on developing countries, including China and India. They could choose to become Annex I countries when sufficiently developed.

Although President William Jefferson Clinton signed the Kyoto Protocol ("Protocol"), it was not presented to the Senate, which formally expressed misgivings over the prospect that the potential economic burdens of carbon dioxide reductions would be shouldered exclusively by developed nations. *See, e.g.* United States. S. Res. 98, 105th Cong. (1997) (resolving by vote of 95-0 to urge the President not to sign any agreement that would result in serious harm to the economy or that did not include provisions regarding the emissions of developing nations). Thereafter, Congress passed a series of bills that barred the EPA from implementing the Protocol. *See*Pub.L. No. 105-276, 112 Stat. 2461,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2726871 (N.D.Cal.)
(Cite as: 2007 WL 2726871 (N.D.Cal.))

Page 5

2496 (1998); Pub.L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub.L. No. 106-377, 114 Stat. 1141, 1441A-41 (2000).

Currently, President George W. Bush opposes the Protocol because it exempts developing nations who are major emitters, fails to address two major pollutants, and would have a negative economic impact on the United States.[FN3] Instead, the Bush Administration's policy "emphasizes international cooperation and promotes working with other nations to develop an efficient and coordinated response to global climate change" that the EPA describes as a "prudent," "realistic and effective long-term approach to the global climate change issue."68 Fed.Reg. at 52933.

> FN3.*See* Transcript, President Bush Discusses Global Climate Change (Jun. 11, 2001); *see also* Letter from President George W. Bush to Senators Hagel, Helms, Craig, & Roberts (March 13, 2001) *available at* http:www.wh itehouse.gov/news/releases/2001/03/2001031 4.html (stating the administration "oppose[s] the Kyoto Protocol because it exempts 80 percent of the world, including major population centers such as China and India, from compliance.").

By way of this lawsuit, Plaintiff asserts claims for nuisance and seeks damages for loss or harm resulting from Defendants' manufacture of automobiles that emit carbon dioxide. Against this backdrop, the Court now turns to examine the question of whether Plaintiff's claims present non-justiciable political questions.

## II. Political Question-Justiciability

The threshold issue in this case is whether the complaint raises non-justiciable political questions that are beyond the limits of this Court's jurisdiction. Defendants argue that Plaintiff's nuisance claims present nonjusticiable political questions. According to Defendants, global warming and its causes are issues of public and foreign policy fraught with scientific complexity, as well as political, social, and economic consequences. Defendants contend that the political branches of the federal government, and not the courts, must address and resolve these issues. Plaintiff maintains that its federal common law nuisance claim, although complex, is the type of case that courts routinely resolve. Plaintiff does not directly address the justiciability of its state law nuisance claim in its papers.

**\*6** Because these claims touch on public policy, foreign policy, and political issues, it is "tempting to jump to the conclusion that such claims are barred by the political question doctrine."*Alperin v. Vatican Bank,* 410 F.3d 532, 537 (9th Cir.2005). However, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."*Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The justiciability inquiry is limited to " 'political questions,' not ... 'political cases,' " *id.* at 217, and should be made on a "case-by-case" basis, *id.* at 211.

To determine if a case is justiciable in light of the separation of powers ordained by the Constitution, a court must decide "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded."*Id.* at 198.Six "formulations" indicate the existence of a non-justiciable political question: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of em-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2726871 (N.D.Cal.)
**(Cite as: 2007 WL 2726871 (N.D.Cal.))**

barrassment from multifarious pronouncements by various departments on one question. *Vieth v. Jubelirer,* 541 U.S. 267, 277-78, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (quoting *Baker,* 369 U.S. at 217). Dismissal on the basis of the political question doctrine is appropriate only if one of these formulations ^FN4 is "inextricable" from the case. *Baker,* 369 U.S. at 217. However, these tests are more discrete in theory than in practice, with the analyses often collapsing into one another. *See Nixon v. United States,* 506 U.S. 224, 228-29, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (describing interplay between the first and second *Baker* tests). This overlap is not surprising given the common underlying inquiry of whether the very nature of the question is one that can properly be decided by the judiciary. *Alperin,* 410 F.3d at 544. Although several of the *Baker* indicators support the Court's conclusion that Plaintiff's current claims raise nonjusticiable political questions, the third indicator is most relevant on the current record. *See Connecticut v. American Electric Company, Inc. (AEP),* 406 F.Supp.2d 265, 272 (S.D.N.Y.2005) (stating that third *Baker* factor is most relevant)..

> FN4. Although termed as "formulations" in *Baker,* the plurality in *Vieth v. Jubelirer,* 541 U.S. 267, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004), recently described these criteria as "six independent tests." *Alperin,* 410 F.3d at 544.

**A. Indicia of Non-Justiciability**

**1. Resolution Of Plaintiff's Federal Common Law Nuisance Claim Would Require This Court To Make An Initial Policy Decision**

The third *Baker* indicator asks whether the Court can decide the case "without [making] an initial policy determination of a kind clearly for nonjudicial discretion."*Baker,* 369 U.S. at 217. This factor largely controls the analysis in the current case due to the complexity of the initial global warming policy determinations that must be made by the elected branches prior to the proper adjudication of

Plaintiff's federal common law nuisance claim. *AEP,* 406 F.Supp.2d at 273. Defendants argue that it is impossible for this Court to decide this case without making an initial policy decision of the kind reserved for the political branches of government. Relying on the chronology of legislative and executive efforts in the field of global warming, Defendants argue that any meaningful reduction in carbon dioxide emissions can be achieved only if a broad array of domestic and international activities are regulated in coordination. According to Defendants, this is a policy determination of the highest order more properly reserved for the political branches of government. In opposition, Plaintiff proffers that resolution of this case does not require the Court to make an initial policy determination, but instead requires the Court to do nothing more than apply facts to well-established law. Plaintiff contends that Defendants are contributing to an interstate nuisance that is causing concrete damage to the State of California, which is properly compensable in damages. Plaintiff asserts that it should not have to await a comprehensive political solution to global warming.

*7 As the Supreme Court has recognized, to resolve typical air pollution cases, courts must strike a balance "between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes [will] retard industrial development with attendant social costs."*AEP,* 406 F.Supp.2d at 272 (citing *Chevron U .S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 847, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Balancing those interests, together with the other interests involved, is impossible without an "initial policy determination" first having been made by the elected branches to which our system commits such policy decisions, namely, Congress and the President.*Id.* Courts have recognized the complexity of the "initial policy determinations" that must be made by the elected branches before a non-elected court can properly adjudicate a global warming nuisance claim. *Id.* at 273.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In *AEP,* the court rejected a similar global warming nuisance claim finding that resolution of the issues required "an initial policy determination of a kind clearly for non-judicial discretion."*AEP,* 406 F.Supp.2d at 274.There, the Attorneys General of California and other States brought a global warming public nuisance claim against certain electric utilities seeking abatement.*Id.* at 267, 270.In particular, the plaintiffs sought an order: (1) holding each of the defendants jointly and severally liable for contributing to an ongoing public nuisance, global warming; and (2) enjoining each of the defendants to abate its contribution to the nuisance by capping its emission of carbon dioxide and then reducing those emissions by a specified percentage each year for at least a decade. *Id.* at 270.After outlining the historical legislative and executive efforts to address global warming, the court stated, "[t]he explicit statements of Congress and the Executive on the issue of global climate change in general and their specific refusal to impose the limits on carbon dioxide emissions Plaintiffs now seek to impose by judicial fiat confirm that making the 'initial policy determination[s]' addressing global climate change is an undertaking for the political branches."*Id.* at 274.

Also in *AEP,* the court noted that the EPA's commentary on global warming was compelling support for the notion that the elected branches must make an initial policy determination on global warming before the courts can properly adjudicate such a claim. *See id.* at 273.The EPA, the agency in which "Congress has vested administrative authority" over the "technically complex area of environmental law," has been grappling with the proper approach to the issue of global climate change for a number of years. *Id.* (citation omitted). As the EPA has stated:

It is hard to imagine any issue in the environmental area having greater "economic and political significance" than regulation of activities that might lead to global climate change. 68 Fed.Reg. at 52928. The issue of global climate change ... has been dis-

cussed extensively during the[past] Presidential campaigns; it is the subject of debate and negotiation in several international bodies; and numerous bills have been introduced in Congress over the last 15 years to address the issue." 68 Fed.Reg. at 52928. Unilateral [regulation of carbon dioxide emissions in the United States] could also weaken U.S. efforts to persuade key developing countries to reduce the [greenhouse gas]intensity of their economies. 68 Fed.Reg. at 52931. Unavoidably, climate change raises important foreign policy issues, and it is the President's prerogative to address them. 68 Fed.Reg. at 52931. Virtually every sector of the U.S. economy is either directly or indirectly a source of [greenhouse gas] emissions, and the countries of the world are involved in scientific, technical, and political-level discussions about climate change. 68 Fed.Reg. at 52928.

**8* *Id.*

This Court is mindful that the federal common law nuisance claim in *AEP* sought only equitable relief, whereas Plaintiff's current federal common law nuisance claim seeks damages. However, despite this difference, the Court finds that the same justiciability concerns predominate and significantly constrain this Court's ability to properly adjudicate the current claim. Regardless of the type of relief sought, the Court must still make an initial policy decision in deciding whether there has been an "unreasonable interference with a right common to the general public."*In re Oswego Barge Corp.,* 664 F.2d 327, 332 n. 5 (2d Cir.1981) (describing public nuisance). Plaintiff insists that in order to adjudicate its claim, "[t]he Court will not be required to determine whether [D]efendants' actions have been unreasonable, but [instead] whether the interference suffered by California is unreasonable."(Pl's. Opp. at 21:4-5.) This distinction is unconvincing because regardless of the relief sought, the Court is left to make an initial decision as to what is unreasonable in the context of carbon dioxide emissions. Such an exercise would require the Court to create a quotient or standard in order to quantify any potential

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 8
Slip Copy, 2007 WL 2726871 (N.D.Cal.)
**(Cite as: 2007 WL 2726871 (N.D.Cal.))**

damages that flow from Defendants' alleged act of contributing thirty percent of California's carbon dioxide emissions. Just as in *AEP,* the adjudication of Plaintiff's claim would require the Court to balance the competing interests of reducing global warming emissions and the interests of advancing and preserving economic and industrial development. *AEP,* 406 F.Supp.2d at 272. The balancing of those competing interests is the type of initial policy determination to be made by the political branches, and not this Court.

The political branches' actions and deliberate inactions in the area of global warming further highlight this case as one for nonjudicial discretion. An examination of the political branches' consideration of the issues surrounding global climate change counsels against an initial policy determination to be made by the courts. As early as 1978, and as recent as the current administration, the elected branches of government have addressed the issues of climate change and global warming. As the above-referenced chronological policy summary demonstrates, reductions in carbon dioxide emissions is an issue still under active consideration by those branches of government.

Turning to the current legislative landscape, it is evident that Congress established a comprehensive state and federal scheme to control air pollution in the United States in the Clean Air Act, 42 U.S.C. § 7401 *et seq.* ("CAA"). *National Audubon Society v. Dept. of Water,* 869 F.2d 1196, 1201 (9th Cir.1988). The central elements of this comprehensive scheme are the Act's provisions for uniform national standards of performance for new stationary sources of air pollution. 42 U.S.C. § 7411. The Act's provisions provide for uniform national emission standards for hazardous air pollutants likely to cause an increase in mortality or serious illness, § 7412, for promulgation of primary and secondary national ambient air quality standards (NAAQS), §§ 7408-09, and for the development of national ambient air quality standards for motor vehicle emissions. § 7521; *National Audubon Society,* 869

F.2d at 1202. [FN5]

> FN5. Two sections of the CAA govern the establishment and revision of the national ambient air quality standards. Section 108 directs the Administrator of the EPA to identify pollutants which may reasonably be anticipated to endanger public health or welfare and to issue air quality criteria for them. 42 U.S.C. § 7408. Section 109 directs the Administrators to propose and promulgate "primary" and "secondary" NAAQS for pollutants identified under Section 108. 42 U.S.C. § 7409. The Act defines a primary standard as one the attainment and maintenance of which, in the judgment of the Administrator, based on specific criteria and allowing for an adequate margin of safety, is requisite to protect the public health. 42 U.S.C. § 7409. A secondary standard must specify a level of air quality, the attainment of which, in the judgment of the Administrator, based on specific criteria and allowing for an adequate margin of safety, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of the pollutant in the ambient air. *Id.*

**\*9** Once the EPA determines that a particular pollutant has an adverse effect on public health or welfare and originates from one or more numerous or diverse mobile or stationary sources, the EPA must develop national air quality standards and the states must implement them within a limited time period.*National Audubon Society,* 869 F.2d at 1202(citing *Natural Resources Defense Council, Inc. v. Train,* 545 F.2d 320, 322-24 (3d Cir.1976)). The CAA provides that "[e]ach state shall have the primary responsibility for assuring air quality within the entire geographic area comprising such state,"42 U.S.C. § 7407(a), and "[t]hat the prevention and control of air pollution at its source is the primary responsibility of states and local govern-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ments."42 U.S.C. § 7401(a)(3). However, section 209(a) of the CAA expressly precludes state regulation of emissions from new automobiles, with certain exceptions. 42 U.S.C. § 7543.

Next, turning to the Energy Policy and Conservation Act, 49 U.S.C. § 32901 *et seq.* ("EPCA"), Congress established a comprehensive response to the energy crisis of the 1970s. Pub.L. No. 94-163, 89 Stats 871 (1975). The EPCA imposes fleet-wide fuel economy requirements on the automobile industry in the form of mandatory corporate average fuel economy ("CAFE") standards. Under CAFE standards, an automobile manufacturer may sell any combination of its vehicles consumers choose to buy, as long as the average fuel economy levels of its nationwide vehicle fleet does not exceed the applicable CAFE standard. 49 U.S.C. § 32902. At the conclusion of each model year, EPA calculates the fuel economy of each model and the number of vehicles manufactured in each model line within a manufacturer's fleet. 42 U.S.C. § 32904. A manufacturer may be liable for civil penalties if it fails to meet the CAFE standard for a model year. 42 U.S.C. § 32912. The EPCA provides for a congressionally-established average fuel economy standard for passenger automobiles of 27.5 miles per gallon, and expressly preempts any state law relating to fuel economy standards. 49 U.S.C. §§ 32902(b), 32919. The EPCA also provides that "the Secretary of Transportation may prescribe regulations amending the standard ... for a model year to a level the Secretary decides is the maximum feasible average fuel economy level for that model year."49 U.S.C. § 32902(c).

In determining the "maximum feasible average fuel economy level," the Department of Transportation ("DOT")-which has delegated this responsibility to the National Highway Traffic Safety Administration ("NHTSA")-is required to consider and balance a number of specified statutory factors raising competing public policy concerns. These factors include technological feasibility, economic practicability, the effect of other motor vehicle standards of

the Government on fuel economy, and the need of the United States to conserve energy. 49 U.S.C. § 32902(f). After considering and balancing the statutory factors, NHTSA determines the "maximum feasible" level of fuel economy that can be imposed through regulation without suffering the attendant consequences Congress sought to avoid. 49 U.S.C. § 32902(f).

**\*10** By themselves, the CAA and EPCA do not directly address the issue of global warming and carbon dioxide emission standards. However, when read in conjunction with the prevalence of international and national debate, and the resulting policy actions and inactions, the Court finds that injecting itself into the global warming thicket at this juncture would require an initial policy determination of the type reserved for the political branches of government. A judicial determination of monetary damages for Plaintiff's global warming nuisance tort would improperly place this Court into precisely the geopolitical debate more properly assigned to the coordinate branches and would potentially undermine the political branches' strategic choices by "weaken[ing] U.S. efforts to persuade key developing countries to reduce the [greenhouse gas] intensity of their economies."68 Fed.Reg. at 52927, 52931. Plaintiff has failed to provide the Court with sufficient explanation or legal support as to how this Court could impose damages against the Defendant automakers without unreasonably encroaching into the global warming issues currently under consideration by the political branches. Because a comprehensive global warming solution must be achieved by a broad array of domestic and international measures that are yet undefined, it would be premature and inappropriate for this Court to wade into this type of policy-making determination before the elected branches have done so.

A recent Supreme Court opinion further underscores the conclusion that policy decisions concerning the authority and standards for carbon dioxide emissions lie with the political branches of govern-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ment, and not with the courts. *See Massachusetts v. Environmental Protection Agency,* --- U.S. ----, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). In *Massachusetts,* a group of private environmental organizations filed a rulemaking petition requesting the EPA to regulate carbon dioxide emissions from new motor vehicles. *Id.* at 1446.The EPA denied the petition, explaining: (1) that it lacked authority under the CAA to regulate such emissions [FN6]; and (2) that even if it possessed the necessary statutory authority it would decline to exercise it. *Id.* at 1450.A group of States, local governments, and private organizations thereafter sought judicial review of the EPA's denial. *Id.* The D.C. Circuit rejected the plaintiffs' challenge, finding that the EPA had properly denied the rulemaking petition. *Id.* at 1451-52.In reversing the circuit court's decision, the Supreme Court held: (1) that the plaintiffs had standing under Article III to challenge the EPA's denial of rulemaking petition, *id.* at 1452-58; (2) that the EPA possesses authority under the CAA to regulate new motor vehicle carbon dioxide emissions, *id.* at 1459-62; and (3) that the EPA failed to provide a "reasoned explanation" for its conclusion that it would not regulate such emissions even if it possessed the authority to do so. The Supreme Court's holdings with respect to standing and the reach of the EPA's regulatory authority are particularly relevant to this Court's finding that Plaintiff's claims are non-justiciable.

> FN6. The EPA had previously ruled that the Clean Air Act does not authorize carbon dioxide regulation. *Control of Emissions from New Highway Vehicles and Engines,* 68 Fed.Reg. 52922-02 (Sept. 8, 2003); 68 Fed.Reg. at 52928.

**\*11** First, in finding that the plaintiffs had standing, the Supreme Court relied upon the notion that certain constitutional principles of sovereignty afford the States "special solitude" to seek judicial review of decisions by federal regulatory agencies because the States have "surrendered" to the federal government their right to engage in certain forms of regu-

lations.*Id.* at 1454-55.To that end, the Supreme Court stated,

> When a State enters the Union, it surrenders certain sovereign prerogatives. Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions, it cannot negotiate an emissions treaty with China or India, and in some circumstances the exercise of its police powers to reduce in-state motor-vehicle emissions might well be pre-empted. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) ("One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers").

> *These sovereign prerogatives are now lodged in the Federal Government,* and Congress has ordered EPA to protect Massachusetts (among others) by prescribing standards applicable to the "emission of any air pollutant from any class or classes of new motor vehicle engines, which in [the Administrator's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."42 U.S.C. § 7521(a)(1). Congress has moreover recognized a concomitant procedural right to challenge the rejection of its rulemaking petition as arbitrary and capricious. § 7607(b)(1). Given that procedural right and Massachusetts' stake in protecting its quasi-sovereign interests, the Commonwealth is entitled to special solicitude in our standing analysis.

*Id.* (emphasis added). Underpinning the Supreme Court's standing analysis is the concept that the authority to regulate carbon dioxide lies with the federal government, and more specifically with the EPA as set forth in the CAA. Also inherent in the Supreme Court's reasoning is the principle that any State that is dissatisfied with the federal government's global warming policy determinations may exercise its "procedural right" to advance its in-

terests through administrative channels and, if necessary, to "challenge the rejection of its rulemaking petition as arbitrary and capricious."42 U.S.C. § 7607. Thus, such an approach emphasizes that initial policy determinations are made by the political branches while preserving a framework for judicial review of those determinations.

Second, in holding that the EPA possessed authority under the CAA to regulate new motor vehicle carbon dioxide emissions, the Supreme Court emphasized that Section 202(a)(1) of the CAA provides that the EPA " 'shall by regulation prescribe ... standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [the Administrator's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.' " Massachusetts, 127 S.Ct. at 1459-60 (quoting 42 U.S.C. § 7521(a)(1)). Relying on the CAA's broad sweeping definition of "air pollutant" as "any air pollution agent or combination of such agents, including any physical, chemical ... substance or matter which is emitted into or otherwise enters the ambient air ...", the Supreme Court found that such definition embraced "all airborne compounds of whatever stripe, and underscores that intent through the repeated use of the word 'any.' " Id. at 1460 (citing 42 U.S.C. § 7602(g).)

*12 The underpinnings of the Supreme Court's rationale in Massachusetts only reinforce this Court's conclusion that Plaintiff's current tort claim would require this Court to make the precise initial carbon dioxide policy determinations that should be made by the political branches, and to the extent that such determination falls under the CAA, by the EPA. Because the States have "surrendered" to the federal government their right to engage in certain forms of regulations and therefore may have standing in certain circumstances to challenge those regulations, and because new automobile carbon dioxide emissions are such a regulation expressly left to the federal government, a resolution of this case would

thrust this Court beyond the bounds of justiciability. Plaintiff has failed to offer an adequate explanation of how this Court would possibly endeavor to make the initial policy determinations that would be both necessary and antecedent to a resolution of this case.

Plaintiff attempts to accord a different significance to the Massachusetts decision. Plaintiff accuses Defendants of putting a "positive spin on a case they lost," (Pl.'s Supp. Br. at 1:2-3), and argues that the claims at issue in Massachusetts did not implicate the pending questions of justiciability now before this Court. According to Plaintiff, Massachusetts allows a State-like California-to pursue its claim in federal court for injuries related to a global warming interstate tort. Finally, Plaintiff argues that for the same reasons the EPA may not refuse to regulate carbon dioxide, this Court may not refuse to address the issue. The Court finds Plaintiff's arguments unconvincing.

While the Supreme Court did not expressly address the issue of justiciability, it certainly did not sanction the justiciability of the interstate global warming damages tort claim now before this Court. Rather, the Supreme Court's analysis on the issue of standing counsels with convincing force to the contrary. As noted above, a State has standing to pursue its "procedural right" through administrative channels, and if necessary, to "challenge the rejection of its rulemaking petition as arbitrary and capricious" as did the plaintiffs in Massachusetts.[FN7] 42 U.S.C. § 7607(b)(1). Unlike the procedural posture of Massachusetts, the current case is not before the Court by way an administrative challenge to an EPA's decision, but rather as an interstate global warming damages tort claim. Plaintiff's argument essentially ignores this procedural distinction. Similarly, the Court finds Plaintiff's attempt to equate this Court's decision on justiciability with the EPA's decision on whether to regulate carbon dioxide emissions to be problematic. The EPA's global warming carbon dioxide policymaking determinations are statutorily governed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2726871 (N.D.Cal.)
(Cite as: 2007 WL 2726871 (N.D.Cal.))

by the CAA, and are therefore not analogous the justiciability principles which govern the issues now before the Court. Accordingly, this Court is not persuaded to adopt Plaintiff's reading of *Massachusetts.*

> FN7. As discussed more fully below, California may seek a waiver from the EPA under section 209(b) of the CAA, *see*42 U.S.C. § 7543(b), for permission to promulgate and enforce its own emissions standards and regulations.

**\*13** For these reasons, the Court find that it cannot adjudicate Plaintiff's federal common law global warming nuisance tort claim without making an initial policy determination of a kind clearly for nonjudicial discretion.

### 2. Plaintiff's Claim Implicates A Textually Demonstrable ConstitutionalCommitment To The Political Branches

Several other factors outlined by the Supreme Court in *Baker* weigh in favor of the Court's finding that Plaintiff's claim presents a non-justiciable political question. The first Baker test requires a court to determine whether the issues before the court implicate a textually demonstrable constitutional commitment to the political branches of government. *Baker,* 369 U.S. at 217. In support of their argument that the Constitution reserves the issues in this case for the political branches of government, Defendants rely on Congress's enumerated power over interstate commerce and the political branches' enumerated power over foreign policy. *See*U .S. Const. art. I, § 8, cl. 3; art. II, § 2, cl. 2. Plaintiff disagrees and maintains its environmental nuisance claim is committed to the federal judiciary and has no import on interstate commerce or foreign policy.

"In order to determine whether there has been a textual commitment to a coordinate department of the Government, [a court] must interpret the Constitution."*Powell v. McCormack,* 395 U.S. 486, 519, 89

S.Ct. 1944, 23 L.Ed.2d 491 (1969). The test for a "textual commitment to a coordinate political department" is not completely separate from the test for "a lack of judicially discoverable and manageable standards" for resolving it. *Nixon,* 506 U.S. at 228. The lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch. *Id.* at 228-29.At issue here are the textual commitment of *interstate commerce and foreign policy* to the political branches of government.

As to issues of commerce, the Commerce Clause, Article I, Section 8, Clause 3 of the United States Constitution, empowers the United States Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."U.S. Const. art. I, § 8, cl. 3. A State's power to impose burdens on the interstate market for automobiles is not only subordinate to the federal power over interstate commerce, *Gibbons v. Ogden,* 9 Wheat. 1, 194-96, 6 L.Ed. 23 (1824), but is also constrained by the need to respect the interests of other States. *See, e.g., Healy v. Beer Institute,* 491 U.S. 324, 335-36, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (the Constitution has a "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres") (footnote omitted); *Edgar v. MITE Corp.,* 457 U.S. 624, 643, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); *BMW of N. Am. v. Gore,* 517 U.S. 559, 571-72, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

As to issues of foreign policy, the power to regulate foreign affairs is vested exclusively in the political branches of government. *See e.g., Deutsche v. Turner Corp.,* 324 F.3d 692, 709 (9th Cir.2003)."It is axiomatic that 'the conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government; [and] that the propriety of the exercise of that power is not open to judicial review.' " *Mingtai Fire & Marine Ins. Co. v. United Parcel Service,* 177 F.3d 1142,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 13
Slip Copy, 2007 WL 2726871 (N.D.Cal.)
(Cite as: 2007 WL 2726871 (N.D.Cal.))

1144-45 (9th Cir.1999) (citations omitted). "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative-'the political'-Departments of Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Baker,* 369 U.S. at 211 n. 31. As the Ninth Circuit has stated, "we are mindful of the Supreme Court's admonition that it is up to the political branches to come to terms with these 'delicate [and] complex' foreign policy decisions 'for which the Judiciary has neither aptitude, facilities nor responsibility'...." *Alperin,* 410 F.3d at 560.

**\*14** In this case, by seeking to impose damages for the Defendant automakers' lawful worldwide sale of automobiles, Plaintiff's nuisance claims sufficiently implicate the political branches' powers over interstate commerce and foreign policy, thereby raising compelling concerns that warn against the exercise of subject matter jurisdiction on this record.

In addressing Congress's power over national and foreign commerce, the Court notes that recognizing such a new and unprecedented federal common law nuisance claim for damages would likely have commerce implications in other States by potentially exposing automakers, utility companies, and other industries to damages flowing from a new judicially-created tort for doing nothing more than lawfully engaging in their respective spheres of commerce within those States. *See Gore,* 517 U.S. at 571-72 (discussing Commerce Clause in tort context and declaring that "a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States."). The Court finds that the concerns raised by the potential ramifications of a judicial decision on global warming in this case would sufficiently encroach upon interstate commerce, to cause the Court to pause before delving into such areas so constitutionally committed to Congress.

In the area of foreign policy, the Court finds that the political branches have weighed in on the issue, and have made foreign policy determinations regarding the United States' role in the international concern about global warming. The political branches have deliberately elected to refrain from any unilateral commitment to reducing such emissions domestically unless developing nations make a reciprocal commitment. The EPA has recognized that imposing mandatory unilateral restrictions on domestic manufacturers would impede that diplomatic objective. 68 Fed.Reg. at 52931. Furthermore, the fact that an award of damages would punish Defendants for lawfully selling their automobiles both within California, and outside of California in the global market, buttresses Defendants' position that a judicial determination of damages for carbon dioxide emissions would run headlong into nonjusticiable foreign policy issues.

For these reasons, the Court finds that Plaintiff's federal common law global warming nuisance tort would have an inextricable effect on interstate commerce and foreign policy-issues constitutionally committed to the political branches of government.

**3. There Is A Lack of Judicially Discoverable Or Manageable Standards ByWhich To Resolve Plaintiff's Claim**

The second *Baker* indicator requires a court to determine whether there are judicially discoverable or manageable standards available to resolve the question before it. *Baker,* 369 U.S. at 217. Defendants accord special significance to this indicator of justiciability. Defendants assert that it will be impossible for the Court to determine what constitutes an unreasonable level of carbon dioxide produced by Defendants' vehicles, without making an initial policy determination of national scope. Defendants also point to the difficulty associated in evaluating the essential elements of causation and injury, given the myriad sources of global greenhouse gas emissions and the "[s]ubstantial scientific uncertainties [that] limit [the] ability to ... separate out those changes resulting from natural variability

Slip Copy                                                    Page 14
Slip Copy, 2007 WL 2726871 (N.D.Cal.)
(Cite as: 2007 WL 2726871 (N.D.Cal.))

from those that are directly the result of increases in anthropogenic [greenhouse gases] ."68 Fed.Reg. at 52930. Plaintiff avers that because this action seeks damages only, the legal framework for adjudicating this case is already established.

**\*15** The crux of this inquiry is not whether the case is unmanageable in the sense of being large, complicated, or otherwise difficult to tackle from a logistical standpoint. *Alperin,* 410 F.3d at 552. Rather, courts must ask whether they have the legal tools to reach a ruling that is "principled, rational, and based upon reasoned distinctions."*Vieth,* 541 U.S. at 278.

In support of its argument that the legal framework is well-established, Plaintiff cites a number of trans-boundary nuisance cases. *See, e.g., Illinois v. City of Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (*"Milwaukee I"* ) (seeking abatement of discharge of raw sewage into Lake Michigan), *vacated on other grounds, Milwaukee v. Illinois and Michigan,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (*"Milwaukee II"* ); *New Jersey v. City of New York,* 283 U.S. 473, 51 S.Ct. 519, 75 L.Ed. 1176 (1931) (originally seeking injunctive relief against diversion of waters from rivers); *New York v. New Jersey,* 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937 (1921) (seeking injunction against discharge of sewage into New York Bay); *North Dakota v. Minnesota,* 263 U.S. 365, 44 S.Ct. 138, 68 L.Ed. 342 (1923) (seeking injunction for actions causing flooding); *Georgia v. Tennessee Copper,* 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) (seeking injunction from discharge of noxious gasses); *Missouri v. Illinois,* 200 U.S. 496, 26 S.Ct. 268, 50 L.Ed. 572 (1906) (seeking injunction to restrain the discharge of the sewage of Chicago through an artificial drainage canal into the Mississippi river); *Missouri v. Illinois,* 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901) (seeking injunction to restrain discharge of raw sewage into the Mississippi river); *Wisconsin v. City of Duluth,* 96 U.S. 379, 24 L.Ed. 668 (1877) (seeking injunction to restrain the diversion of the St. Louis river);

*Pennsylvania v. The Wheeling & Belmont Bridge Co.,* 54 U.S. 518, 13 How. 518, 14 L.Ed. 249 (1851) (seeking injunction to restrain interference with Ohio river navigation); *Mayor, etc. of City of Georgetown v. Alexandria Canal Co.,* 37 U.S. 91, 12 Pet. 91, 9 L.Ed. 1012 (1838) (seeking injunction to restrain river siltation). However, a review of these decisions reveals that the cases are legally, and factually, distinguishable in important respects.

Legally, these cases are distinguishable because the remedies sought therein were equitable remedies to enjoin or abate the nuisance, rather than the legal remedy of monetary damages sought in the current case. Additionally, the cases cited by Plaintiff do not provide the Court with legal framework or applicable standards upon which to allocate fault or damages, if any, in this case. The Court is left without guidance in determining what is an unreasonable contribution to the sum of carbon dioxide in the Earth's atmosphere, or in determining who should bear the costs associated with the global climate change that admittedly result from multiple sources around the globe. Plaintiff has failed to provide convincing legal authority to support its proposition that the legal framework for assessing global warming nuisance damages is well-established.

Factually, Plaintiff's cases are distinguishable because none of the pollution-as-public-nuisance cases implicates a comparable number of national and international policy issues. *See AEP,* 406 F.Supp.2d at 272 (noting that the plaintiffs' reliance on the same decisions was unavailing due to the wide array of policy considerations not suitable for judicial determination). To the contrary, Plaintiff's cited decisions involve primarily issues of local concern involving a state or public entity seeking equitable relief from a source-certain nuisance originating in a neighboring state. Plaintiff's cited decisions are also factually distinguishable because the cases involved trans-boundary nuisances from identifiable external sources. As more fully discussed below, this is a critical distinction because

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2726871 (N.D.Cal.)
(Cite as: 2007 WL 2726871 (N.D.Cal.))

the limited application of federal common law nuisance claims has been recognized as a means for a State to seek abatement of pollution originating within the borders of another state. In this case, Plaintiff's global warning nuisance tort claim seeks to impose damages on a much larger and unprecedented scale by grounding the claim in pollution originating both within, and well beyond, the borders of the State of California. Unlike the equitable standards available in Plaintiff's cited cases, here the Court is left without a manageable method of discerning the entities that are creating and contributing to the alleged nuisance. In this case, there are multiple worldwide sources of atmospheric warming across myriad industries and multiple countries.

**\*16** "Were judges to resolve political questions, there would be no check on their resolutions because the Judiciary is not accountable to any other branch or to the People. Thus, when cases present political questions, 'judicial review would be inconsistent with the Framers' insistence that our system be one of checks and balances.' " *AEP*, 406 F. Supp 2d at 267. For these reasons, the Court finds that this *Baker* indicator is inextricable from the current case and that there is a lack of judicially discoverable or manageable standards by which to properly adjudicate Plaintiff's federal common law global warning nuisance claim.

Because each of the identified *Baker* indicators is inextricable from Plaintiff's federal common law global warning nuisance claim, the Court finds that the claim presents a non-justiciable political question, and therefore **GRANTS** Defendants' motion to dismiss this claim.

### III. Federal Common Law Claim for Nuisance

Defendants alternatively argue that even if the case were justiciable, it must be dismissed for lack of subject matter jurisdiction because there exists no "federal common law" nuisance claim for global warming. Defendants also state that fundamental separation-of-powers principles preclude the judi-

ciary from recognizing such a claim that would interfere with and undermine the policy judgments of the political branches on matters of global warming. More specifically, Defendants argue that the statutory landscape effectively displaces any common law global warming nuisance claim that might have existed. Plaintiff counters that sufficient federal precedent exists recognizing federal common law claims for public nuisance. Plaintiff further maintains that there exists no congressional action to displace their federal common law claim. Plaintiff insists that the available statutory backdrop is void of a comprehensive scheme that speaks directly to their claims in this case.

Accordingly, the next issue before the Court is whether there exists a federal common law claim for nuisance that would authorize Plaintiff's action for damages against the Defendant automakers for creating and contributing to global warming. If the Court were to find that such a common law claim exists, the next step in the inquiry would be to determine whether the available statutory guidelines speak sufficiently to the issue so as to displace the common law claim. However, because the Court has already determined that the complaint raises non-justiciable political questions, it need not and does not reach the issue of whether the federal common law recognizes Plaintiff's global warming nuisance claim or whether congressional action has otherwise displaced Plaintiff's claim.

### IV. California State Law Claim for Nuisance

The parties agree that if Plaintiff's federal common law nuisance claim fails, the Court would be precluded from exercising supplemental jurisdiction over Plaintiff's state law nuisance claim. The absence of a "sufficiently substantial federal claim" precludes a court from exercising supplemental jurisdiction over pendent state-law claims. *See, e.g., Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 421 (9th Cir.1991). The Ninth Circuit has held that district courts should decline to exercise supplemental over pendent claims when all federal claims are dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2726871 (N.D.Cal.)
**(Cite as: 2007 WL 2726871 (N.D.Cal.))**

missed before trial. *See e.g., Acri v. Varian Associates, Inc.,* 114 F.3d 999, 1000 (9th Cir.1997) (en banc). Accordingly, the Court **GRANTS** Defendants' motion as to Plaintiff's public nuisance cause of action under California Civil Code § 3479, et seq. and California Civil Code § 731, and **DISMISSES** Plaintiff's state-law claim **WITHOUT PREJUDICE** to refiling in state court.

CONCLUSION

**\*17** For the foregoing reasons, the Court **GRANTS** Defendants' motion.

**IT IS SO ORDERED.**

N.D.Cal.,2007.
People of State of California v. General Motors Corp.
Slip Copy, 2007 WL 2726871 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF MISSISSIPPI
2                  SOUTHERN DIVISION

3

4    NED COMER, ET AL                          PLAINTIFFS

5    V.                    CIVIL ACTION NO: 1:05CV436-LG-RHW

6    MURPHY OIL, U.S.A., ET AL                 DEFENDANTS

7

8        **TRANSCRIPT OF HEARING ON DEFENDANTS' MOTIONS TO DISMISS**

9

10          BEFORE HONORABLE LOUIS GUIROLA, JR.
              UNITED STATES DISTRICT JUDGE

11

12

13                    AUGUST 30, 2007
                    GULFPORT, MISSISSIPPI

14

15

16

17   COURT REPORTER:

18   TERI B. NORTON, RMR, FCRR
     2012 15TH STREET, SUITE 814
19   GULFPORT, MISSISSIPPI  39501
     (228) 563-1740
20

21

22

23

24

25

```
 1   APPEARANCES:

 2   REPRESENTING THE PLAINTIFFS:

 3           F. GERALD MAPLES, ESQUIRE
             ALEXANDER J. WILLIAMSON, ESQUIRE
 4           CARLOS A. ZELAYA, ESQUIRE
             STEPHEN M. WILES, ESQUIRE
 5           F. GERALD MAPLES, PA
             902 JULIA STREET
 6           NEW ORLEANS, LOUISIANA   70113

 7

     REPRESENTING THE DEFENDANTS:
 8
             SCOTT L. WINKELMAN, ESQUIRE
 9           KATHLEEN TAYLOR SOOY, ESQUIRE
             TRACY A. ROMAN, ESQUIRE
10           CROWELL & MORING
             1001 PENNSYLVANIA AVENUE, N.W.
11           WASHINGTON, DC  20004-2595

12           ROBERT D. GHOLSON, ESQUIRE
             BURR & FORMAN
13           THE HERITAGE BUILDING
             401 EAST CAPITOL STREET, SUITE 100
14           JACKSON, MISSISSIPPI  39201

15

16

17

18

19

20

21

22

23

24

25
```

 1          **THE COURT:**  The matter scheduled this morning is in

 2     cause number 1:05cv436.  The case is styled Ned Comer, et al

 3     versus Murphy Oil U.S.A., et al.  This matter is scheduled for

 4     an oral argument hearing on a series of motions to dismiss upon

 5     which the Court today will concentrate or will hear argument

 6     regarding one issue and one issue only, and that is the

 7     question of whether or not this Court has the jurisdiction over

 8     the claims made by the plaintiffs.  In particular I have asked

 9     the attorneys to focus on the issue of standing and political

10     question.  I am given to understand that on behalf of the

11     plaintiffs that Mr. Maples, Gerald Maples, you will be speaking

12     on behalf of the plaintiffs?  Is that correct?

13          **MR. MAPLES:**  Yes, sir.

14          **THE COURT:**  And Mr. Winkelman, you will be speaking

15     on behalf of the defendants?

16          **MR. WINKELMAN:**  Yes, Your Honor.

17          **THE COURT:**  I think it would be helpful to the court

18     reporter, and it would be helpful to me as well, if we went

19     around the room, starting with you, Mr. Maples, and if we went

20     around and you would all identify yourselves and identify who

21     you represent.

22          **MR. MAPLES:**  Gerald Maples for the plaintiffs.

23          **MR. WILLIAMSON:**  Alex Williamson on behalf of the

24     plaintiffs.

25          **MR. WILES:**  Stephen Wiles representing the

1  plaintiffs.

2          MR. ZELAYA:  Carlos Zelaya on behalf of the

3  plaintiffs.

4          MR. WINKELMAN:  Scott Winkelman, Judge, for the Coal

5  Company defendants.

6          MR. GHOLSON:  Bob Gholson, Coal Company defendants.

7          MS. SOOY:  Kathleen Sooy for the Coal Company

8  defendants.

9          MS. ROMAN:  Tracy Roman for the Coal Company

10  defendants.

11          THE COURT:  Very well.  Thank you.  I have chosen as

12  a format, and I think that since we are concentrating on

13  jurisdictional issues, I have chosen as a format approximately

14  20 minutes argument per side, and since the defendants bring

15  the motion, they will speak first.  I would think that the best

16  approach would be to allow you approximately 15 minutes within

17  which to begin.  Mr. Maples, I will hear from you afterward,

18  and then I will give you about five minutes for rebuttal.

19      I take this matter very seriously.  I have read many, many

20  motions, many, many briefs, and what little case authority

21  there is available for the Court on these issues.  So while

22  that may not seem like a lot of time to argue a very important

23  matter, the Court is somewhat educated on the issues.  And in

24  any event, these arguments will, in all likelihood, be good

25  practice because I have no doubt that whatever ruling the Court

1    issues here will have to be the subject of review by an

2    appellate court.  Mr. Winkelman, I will hear you on your

3    motions.  And if I interrupt with a question, it will not be

4    counted against you.

5            **MR. WINKELMAN:**  Well, good morning, Judge, and thank

6    you so much for hearing us on these two issues.  I do think we

7    can get the job done in the time that you have suggested.  One

8    reason I say that, Judge, is because, as Your Honor is aware,

9    what the Supreme Court has told us is that the doctrines you

10   have asked about today are practical.  We apply straightforward

11   tests, in one case under *Baker v. Carr*, in one case under *Allen*

12   *v. Wright* and *Lujan*, to complaints.  It is rather as simple as

13   that.

14        I will start, Judge, by suggesting the interplay and

15   fundamental relationship between the two doctrines, Judge, that

16   you have asked us to talk about today because they are so, not

17   just fundamental to our system of justice but so fundamentally

18   interrelated.  Both, Judge, as you know, go to power of a

19   Court, both moreover are about the separation of powers in our

20   system of government.  As I said, both doctrines are very

21   practical, straightforward tests, not always easy to apply but

22   at least the tests themselves are straightforward.  Both

23   doctrines, Your Honor, impose each and every burden upon the

24   plaintiff and upon the complaint that the plaintiff has given

25   the Court.  Both are questions of law to be decided at the

1    threshold because, after all, they do go to the power's
2    authority to adjudicate, as Your Honor mentioned at the outset.
3    Both, I would say, and the Courts do, are, in a sense, about
4    humility.  It is one of the wonderful things of our system,
5    aspects of our system of government that what you have
6    withstanding in political question are Courts recognizing what
7    they can do, and times when they can't solve problems.  Both in
8    this case are important because what they seek from the Court I
9    would say is a ruling that never before has happened, an
10   unprecedented ruling.  No Court has found itself able to
11   adjudicate the issues underlying the Comer complaint, that is,
12   the policy issues about global warming, and no Court ever, to
13   my knowledge, has found a private party in our system to have
14   Article III standing in the context of a global warming
15   scenario.  So that is how, in my humble opinion, the two
16   interrelate.

17        Let me turn directly to standing itself, and then I will
18   move along, Judge, to political question.  In terms of
19   standing, as I said, we are talking about limits fundamental
20   from the beginning of our experience, fundamental to the
21   separation of powers, what courts can and cannot do, and the
22   task for a judge when faced with a standing issue,
23   constitutional standing, that is, is to simply look at the
24   complaint, in this case the third amended Comer complaint, and
25   apply to it a three-part test that has been given us by the

1    Supreme Court in *Allen v. Wright*, and in the *Lujan* case, those
2    three prongs being, is there injury in fact adequately alleged
3    in the complaint, is there traceability that is a credible,
4    plausible link between the conducts alleged, in this case I
5    would say lawful conduct of the Coal Company defendants, a link
6    between conduct and between the injury, the harm, at issue,
7    and, finally, redressability, which is another kind of a link.
8    There you are focusing on the link between the injury alleged,
9    again in this case, property damage, and the relief being
10   sought in this case, mostly monetary damages.

11       As you know, Judge, we have placed all three at issue on
12   behalf of our clients.  You also know that we have focused most
13   of our energy on the final two prongs, which in many cases
14   overlap.   In this case we would say they overlap, and
15   fundamentally they are about causation, about conjecture, and
16   about remoteness.

17       The reason we focus there, Judge, is the reason Judge
18   Senter seemed to focus on that when this case was before him in
19   February of 2006, and forgive me for telling you things you
20   know, but what the Court hinted at at that early stage was a
21   fear about the daunting, he called it, causation dilemma faced
22   by this case involving global warming.  We think Judge Senter
23   foreshadowed something exactly right, looking at a complaint
24   that materially hasn't improved on that issue.  The fact
25   remains, in terms of traceability, that when you ask yourself

1   what is the link, what is the link between an emission in the

2   complaint, a link between an emission of a greenhouse gas and

3   an injury, a property damage to a specific parcel in the State

4   of Mississippi, you don't know where to go.  The complaint

5   tells us not how to get from that one dot to the other.

6   Indeed, what the complaint tells us, and we have emphasized

7   this in our papers, taking the plaintiffs' own word for it, are

8   eight or nine links in that chain, getting from this emission

9   of a gas by some or one of the billions and billions of

10  emitters of carbon dioxide gases, including everybody in this

11  court, by the way, and 123 Johnson Street in Mississippi.  That

12  is a specifically harmed piece of property.  That is the

13  fundamental traceability problem, we think, in this case.  And

14  we don't need to speculate about that at this stage because the

15  complaint, by very fine lawyers, has done a good job of

16  fleshing out exactly that causal chain, and what we know for

17  certain is that there is no way to shorten that chain or to

18  strengthen the links.  Why do we know that?  Because global

19  warming is what it is.  It is a global phenomenon, as its name

20  suggests.  There is no shortcut to get from this emission, a

21  particular harm -- misconduct, that is, alleged misconducts, in

22  a particular piece of property, and never could be.

23       That, in essence, Judge, is our position on the

24  traceability requirement from the Supreme Court on standing,

25  and as you know, we then turn to redressability, which in many

1 cases like this is interwoven with the traceability problem in

2 order to redress a property damage as alleged in the third

3 amended complaint.  What would a Court have to do to get from

4 here to there?  What would the actual adjudication look like?

5 Well, once again, what it would look like is all of the same

6 causation problems.

7   What we have here are tort claims.  In a sense, this is

8 Tort Law 101.  Duty, just as an example, is at the center as an

9 element of every claim in this case.  For Your Honor and a jury

10 to determine duty more so, Your Honor, that being a question of

11 law, we would have to decide what is the right level, what is

12 an acceptable level of emissions in a world in which, after

13 all, again, my clients have engaged in nothing but lawful

14 activity.  About that there is no dispute.  So to litigate the

15 duty question, we would have to find, the judge would have to

16 find that some emissions are acceptable and some are tortious.

17 Well, here we go again.  We have the same causal link problems,

18 and compounding that problem you have political question

19 problems.  And while I will get to political question next,

20 this is the place, redressability is the place where the two

21 doctrines intersect, because to decide duty, to decide that

22 certain emitters should shoulder burdens related to global

23 warming, to decide who does and who doesn't pay, we are

24 deciding, a judge would be deciding precisely the issues that

25 the elected branches of our government are deciding as we

1    speak, and to some extent already have decided.

2        So, again, I will get back to political question, but

3    redressability here folds in quite neatly with the political

4    question issues that underlie the tort claims in this case, and

5    the Supreme Court law sees that interrelationship, and when the

6    chain went to redress a harm, you have to stretch through a

7    causation quagmire, the Courts find no redressability.

8        Judge, finally, on standing, what I would say is, another

9    thing that we know for sure, which is that no amount of

10   repleading, modifying of the complaint, can fix this problem.

11   We know that, for starters, because the Supreme Court does not

12   allow that.  The Supreme Court, as you know, says this is about

13   power, it is about a, quote-unquote, discriminating analysis of

14   the complaint itself and whether on that complaint, the third

15   amended complaint, the plaintiffs have established standing.

16       The fourth amended complaint, the one that has not been

17   accepted, doesn't modify the causal chain allegations, and this

18   case does not modify the theories of redressability, and nor

19   could it, because, again, this case is about what is

20   fundamental, what is inherent about a global phenomenon, that

21   is, global warming.

22       So, Judge, we think if we simply apply the practical test

23   directly laid out by the Supreme Court, the right conclusion is

24   that this case cannot be in this court because there is no

25   Constitutional standing.

1        Let me turn, if I can, Judge --

2            **THE COURT:**  Before we move away -- you are moving

3    into the political question arena.  Before we move away from

4    the standing question, so I can trim the bush, if you will, if

5    you will allow me, although you have placed in issue all three

6    elements, all three of the standing elements, do you concede

7    the first of those elements, and that is that the plaintiff, or

8    plaintiffs, have suffered an injury in fact?

9            **MR. WINKELMAN:**  Thank you, Judge.  We do not concede

10   that.  You are exactly right that our papers have focused on

11   traceability and redressability.  We do not believe that the

12   complaint meets Supreme Court obligations to allege a concrete

13   injury.  Having said that, we have turned our focus on the

14   fundamental causation and remoteness problem.

15           **THE COURT:**  Thank you.  Go ahead.

16           **MR. WINKELMAN:**  Thank you.  Let's turn to, then, if I

17   might, to political question, which again is a limit on

18   judicial power.  It once again is a doctrine about prudence,

19   about humility, and about when Courts ought not take on cases

20   because our elected officials, Congress and the President, are

21   and have.  And, again, here we are blessed by a very

22   straightforward test.  *Baker v. Carr*, in 1962, identified the

23   six prongs that, if any is met, finds the case to be a

24   political question.  And what in a sense I would say, Judge, is

25   most important about teachings on political question, and again

1    I am quoting from the Supreme Court, is that there can be no

2    semantic cataloguing.  You can't look at the name of the cause

3    of action and decide yea or nay.  What the Supreme Court

4    teaches us is that you have to dig lower.  The question is

5    whether to resolve the trespass claim in this case, the

6    nuisance claim in this case.  Would you have to wind up getting

7    bound up in questions that are meant for our political

8    branches?

9        So, Your Honor, in our briefs we have focused specifically

10   on the *Baker v. Carr* prongs that render this case

11   nonjusticiable political questions, and in a sense I would say,

12   Judge -- and I have never seen a case in this jurisprudence

13   like this.  What makes this easy is the plaintiffs' own

14   complaint.  The plaintiffs' complaint, the third amended

15   complaint and all of its predecessors, say, the Article I and

16   Article II components of our national government are dealing,

17   are taking action on global warming, the issues underlying the

18   claims here.  Their complaint in their complaint is that that

19   action is not the action that some might want, so they are

20   coming to a Court as a refuge, as a different way of achieving

21   the relief and answering the political questions, the policy --

22   making the policy choices that Congress and the President

23   already have made and are continuing to make every day.

24       So taking the plaintiffs at their own word, this is the

25   quintessential political question case.  Specifically, Judge, I

1    would refer you to footnote 13 and 14 in the complaint.  It has

2    nothing but illustrations of where the plaintiffs emphasize the

3    political nature and the political activity of our elected

4    branches of the government.

5        Judge, the core reasons why we think this case could only

6    be a political question case are two.  First is the nature of

7    global warming itself.  It surprises nobody in this room, and

8    the title suggests global warming is a global problem.  It

9    knows no borders.  It is not local, like, for instance, cases

10   dealing with floods, dealing with erosion.  On flood and

11   erosion cases, of course sometimes the Federal Government gets

12   involved, and yet usually political question doctrines don't

13   apply, but it is the nature of global warming, as Judge

14   Sentelle once said, affecting humanity at large, that calls out

15   for comprehensive decisions by our political branches.  That is

16   the reason one.  The reason two, Judge, is what I just alluded

17   to.  It is the very nature and degree of political action.  It

18   is not as if we just have a big issue named global warming.  We

19   have a big issue being dealt with comprehensively by our

20   political branches, and that is not just a today phenomenon, as

21   you know.  For at least three decades each President of the

22   United States, his delegation in the Secretary of State's

23   office and elsewhere, and Congress, have been constantly at

24   work deciding what is the right level of emissions, what is the

25   right way to tackle global warming, should we have

1    multi-lateral treaties to get at this issue, should our energy

2    policy change?  After all, again, I represent companies, coal

3    companies, who do nothing but engage in lawful activities, and

4    there is no allegation otherwise in this case.  And those

5    activities are at the center of this nation's energy policy

6    under the commerce clause, as the Judge knows.  That is what

7    Congress does.  It sets forth our country's energy policy.  So

8    when you have the combination of a global issue and global

9    action by our nation's political branches, you have,

10   inescapably, I would say, a political question.

11       As I have suggested, and the briefing spells this out,

12   therefore, the Supreme Court isn't interested so much in the

13   labels of causes of action, and there are very important and

14   consistent Supreme Court cases where if all the Court did was

15   said, this is a trespass claim, this case seeks only damages,

16   and therefore acts, we have a very different doctrine.  The

17   Court doesn't do that.  No Court does that.  The Courts look

18   beyond the labels, and they ask, as I said, what has to really

19   be resolved to get from a complaint to a verdict?  And here, as

20   I have said, that path is fraught with nothing but political

21   questions.  And that, I think, Judge, is why no Court yet has

22   seen fit to adjudicate claims like this.  There just hasn't

23   been a Court put in the position that the Comer complaint is

24   putting Your Honor in.

25       Judge, that is what I had to say on the issues.  Of

1    course, I am thrilled to answer your questions.

2            **THE COURT:**  If you know, recently the United States

3    Supreme Court addressed a somewhat similar question in

4    *Massachusetts versus Environmental Protection Agency,* and I

5    probably am oversimplifying the decision, which was, the

6    Environmental Protection Agency must act.  Has the

7    Environmental Protection Agency taken any action as a result of

8    the mandate from the Supreme Court?

9            **MR. WINKELMAN:**  That is something I should know,

10   Judge.  I do not.  I suspect there are people in this courtroom

11   who do.  What we do know is that the Supreme Court has said

12   that the EPA has to now take steps, but I am afraid I can't

13   answer your question.

14           **THE COURT:**  Thank you, Mr. Winkelman.

15           **MR. WINKELMAN:**  Would you like me to address Mass. v.

16   EPA, or is that sufficient for your purposes?

17           **THE COURT:**  That is sufficient for my purposes.

18           **MR. WINKELMAN:**  Thank you, Judge.

19           **THE COURT:**  Thank you.  Mr. Maples?

20           **MR. MAPLES:**  I will apologize at the outset.  I will

21   be reading a great deal of my presentation.  The constraints of

22   time do not allow me that cherished luxury of rambling, so my

23   apologies for this particular format.

24       In responding to a couple of the points made by opposing

25   counsel, regarding the three tests under *Lujan*, it seems to me

1    that we really are focused on the second test, that number

2    three, redressability, is taken care of, and the jurisprudence

3    is very clear on this by the fact that this is a case

4    requesting monetary damages, not injunctive relief or anything

5    that would invade the Article I and II branches' authority or

6    the fields they have occupied.

7        The traceability requirement, number two, I think it is

8    fairly obvious in defendants' briefing in this case that the

9    absence of a serious foreseeability analysis in that briefing

10   indicates that really what they are trying to do is confuse the

11   traceability issue by failing to address it as a foreseeability

12   issue, and, in fact, what they are talking about is some sort

13   of confusion in arriving at apportionment of liability and

14   damages.  I think that is what they are talking about, in fact,

15   and I do not believe that that is an appropriate matter for

16   inquiry on a 12(b)(6) motion such as this, even though we are

17   dealing with an in depth look at political question and

18   standing.

19       With regard to foreseeability, it really does not matter

20   how many links there are in the chain.  What we are really

21   talking about are issues that arose, for instance, in a couple

22   of Mississippi cases that are important proximate cause cases,

23   *Ogburn versus City of Wiggins,* as well as *Owens Corning versus*

24   *R. J. Reynolds.*  Is there an intervening cause, or in fact are

25   we trying to mask what should be a subrogation claim as

1   something else because contractual subrogation is not

2   available?  We don't have those problems here, and we do know

3   how much $CO_2$ these defendants have put into the atmosphere,

4   both by virtue of their operations in the United States and

5   their worldwide operations.  We can get there.  As the Court

6   recognized in *Massachusetts versus EPA*, we don't have to have

7   every defendant before the Court in order to satisfy the

8   redressability requirement.

9       With that said, I also would like to point the Court, with

10  regard to opposing counsel's statements on political question,

11  to page 12 of the complaint, the two footnotes, where we make

12  it clear that the Article I and II branches have done nothing

13  with regard to addressing the problems that ultimately led to

14  the damages complained of in this case.  They have done nothing

15  to redress the problems, and I will not stand here and read

16  that language to the Court verbatim, but we strongly disagree

17  with counsel that there is anything in our complaint that would

18  say otherwise.

19      We are dealing with a hearing here today that uses Rule

20  12(b)(6) as a vehicle for analysis of the political question

21  and standing issues.  It has to be done by the Court looking at

22  the face of the complaint and looking only within the four

23  corners of the complaint.  That is clear.  The Court certainly

24  should apply the Baker decision and look at the six criteria,

25  or the three criteria in *Lujan*, but the analysis, according to

1    the case law, the Court is required to conduct a careful and

2    delicate analysis when applying Baker criteria.

3        This case is about a nuisance claim based upon federal

4    common law, as well as the nuisance law of the State of

5    Mississippi.  It is based on a negligence claim, and we have an

6    unjust enrichment count.  That is what it is.  It is a lawsuit,

7    lawsuits just like we see all the time, just like the Court has

8    seen on many occasions.  The judge and jury will decide

9    foreseeability, duty, breach of duty, reasonableness of

10   conduct, and redressability, or, in the language used by the

11   Mississippi Supreme Court for the Mississippi causes of action,

12   duty and law, which is more often than not decided by the

13   Court, and cause in fact, which is decided primarily by the

14   trier of fact.

15       In the Fifth Circuit case of *Cox versus City of Dallas*,

16   with regard to nuisance claims, the Fifth Circuit has

17   recognized that "strict liability is often applied in nuisance

18   cases.  The reasonableness of the injury and risk imposed on

19   the property owner who is complaining of damage is the more

20   important inquiry in a nuisance case, not necessarily just the

21   reasonableness of conduct.  An activity can be perfectly legal

22   and still be a nuisance if the injury to one's fellow property

23   owner is unreasonable under the circumstances."  Unjust

24   enrichment, as we all know, requires certain, the application

25   of certain equitable principles, which this Court certainly has

1    the authority to do.

2        This is a case that asks the Court to perform its

3    traditional Article III role to identify the controversy

4    between the parties, apply federal law and Mississippi law, and

5    apply an appropriate remedy.  Here is what this case is not and

6    what it does not do:  It is not a case that requires the

7    determination of what would be an appropriate level of $CO_2$

8    emissions.  It is a case that requires the Court and the jury

9    to address what constitutes unreasonable conduct pursuant to

10   Mississippi law and Federal Common Law on the part of a

11   defendant or defendants.  It is not a case that asks this Court

12   to make policy.  It does not request injunctive relief.  It

13   does not affect Presidential power.  It has no precedential

14   effect outside of this state except perhaps decisions

15   concerning Federal Common Law.

16       In prosecuting this case, it does not matter and should be

17   of no concern in the prosecution of this case if this case were

18   to cause the filing of a thousand similar cases in a thousand

19   different courtrooms, nor is it of any concern in the

20   prosecution of this case by the parties or the Court if as a

21   result of this case there is a change in corporate behavior.

22   Oftentimes Court decisions and results effect a change in

23   behavior in society.  It does not affect, limit, or invade

24   Congressional power.  It does not require the Court to make any

25   impossible predeterminations.  It is not a case against a

1    foreign sovereignty, such as the Nazi reparations case that has

2    been cited by the defendants.  It is not a case involving the

3    Civil War or 600 years of reparations where Congress and the

4    White House long ago completely occupied the field.

5        These defendants, often in concert, have fought regulation

6    and sought a system of voluntary self-regulation.  In the

7    process they have discredited honest, sincere science and

8    honest, sincere scientists and waged a fierce disinformation

9    campaign.  They have succeeded in avoiding regulation and have

10   gambled away the opportunity to seek preemption.  Now they want

11   other people to pay that gambling debt.  Congress and the White

12   House have done nothing to occupy this field.  Using the

13   defendants' reasoning we can infer that Congress has refused to

14   preempt this case and refused to enjoin this and the other

15   Courts from hearing a case such as this.

16       In the MTBE case that was cited, a United States District

17   Court case out of the Second Circuit that so clearly delineates

18   the difference between a case such as Comer and the *Connecticut*

19   *versus AEP* case.  The Court said, "The defendants have blurred

20   the line between a case for compensation and the national

21   policy interest and the composition of the nation's fuel

22   supply."  We believe that that same attempt is being made here

23   in the Comer case, to blur that line.

24       And, in fact, regulation, were there some regulation in

25   place, does not always preempt tort litigation.  There are many

1    examples of that, and that is covered in the *Spreitzma versus*

2    *Mercury Marine* case, and we can point to such federal

3    regulatory laws as the Vaccine Act as other examples.

4        12(b)(6) does not allow the Court to determine the weight

5    of the evidence today, a determination of fact reserved for the

6    jury, Rule 56 determinations, matters related to class

7    certification, or factual issues related to reasonableness of

8    conduct, foreseeability, or cause in fact.  It also does not

9    allow the Court to determine the appropriate measure of damages

10   or the appropriate damage model.

11       On April 2, 2007, the United States Supreme Court handed

12   down the case of *Massachusetts versus EPA*, and here is what we

13   learned:  The EPA did not contest causation; Massachusetts has

14   standing to represent its citizens; the size of the problem

15   does not minimize that standing; and the numerosity of injured

16   parties or potential injured parties does not defeat standing

17   or create a political question; in order for standing to exist,

18   the particularization doctrine does not require proof of the

19   precise degree of anticipated damages, only reasonable

20   certainty that damage will occur; all responsible parties do

21   not have to be before the Court, nor is it required that the

22   Court address all of the plaintiffs' damages in order to meet

23   the recompensability requirement.  I will further read from the

24   Massachusetts decision.  One reason the Court found that

25   jurisdiction did in fact exist was, quote-unquote, the unusual

1    importance of the underlying issue persuaded us to grant the

2    writ.

3        The MTBE case states that cases are nonjusticiable only to

4    the extent that they are beyond the competence and proper role

5    of the courts.    In *Gordon versus Texas* the Court recognized

6    that monetary compensation is the manifest object of the

7    savings clause.    The Courts almost never find Baker-based

8    nonjusticiability in monetary compensation cases.

9        I note something very interesting from the *Baker versus*

10   *Carr* case on page 15.    The moving parties, parties moving in

11   favor of nonjusticiability, had quoted extensively from a prior

12   opinion by Justice Frankfurter, and in *Baker versus Carr* they

13   note this:    "Commentators have suggested that the following

14   statement in Mr. Justice Frankfurter's opinion might imply a

15   view that appellants there had no standing."    And they quote

16   Justice Frankfurter.    "This is not an action to recover for

17   damage because of the discriminatory exclusion of a plaintiff

18   from rights enjoyed by other citizens.    The basis for this suit

19   is not a private wrong, but a wrong suffered by Illinois as a

20   polity."    In making the distinction that that was not a case

21   for monetary damages, we believe what Justice Frankfurter was

22   saying is that had it been, then in fact it would be -- it

23   clearly would be a case over which an Article III Court had

24   jurisdiction.

25       This Court has the ability to identify the parties at

1    interest and to identify the appropriate laws, evidence, and

2    remedies.  There may come a time when this Court decides that

3    this case cannot go forward, but this is not the time or

4    vehicle for doing so.  The plaintiffs are entitled to move

5    forward, conduct discovery, and explore the factual issues

6    related to the elements of their causes of action.  They are

7    entitled to move toward and learn about what the defendants

8    actually knew, compared to what they publicly said.  They are

9    entitled to learn about the defendants' joint enterprises,

10   efforts, and how it may create joint and several liability

11   under the Mississippi tort statutes.  In short, in the absence

12   of any specific and clear showing that meets one or more of the

13   Baker criteria, they are entitled to the full protection of the

14   savings clause, the Fifth and the Seventh Amendments.

15       In closing I would like to direct this Court and this

16   courtroom's attention to footnote 18 of *Massachusetts versus*

17   *EPA.*  "We note with sadness and with graditude and hope the

18   U.S. Supreme Court's reference to Hurricane Katrina, sadness

19   because it represents a recognition of the magnitude of what

20   happened here on the Mississippi Coast, gratitude because it

21   represents a recognition of the significance of what happened

22   here on the Mississippi Coast, and hope that at least five of

23   the nine justices would approve of and respect what the

24   plaintiffs are trying to accomplish here in this courtroom on

25   the Mississippi Coast.  Thank you, Your Honor.

| 1 | **THE COURT:**  Mr. Maples, if I could address a couple |
|---|---|
| 2 | of questions before we move on to Mr. Winkelman's rebuttal.  I |
| 3 | will ask you the same question I asked Mr. Winkelman.  Are you |
| 4 | aware of what steps the Environmental Protection Agency has |
| 5 | taken as a result of the mandate of the Supreme Court? |
| 6 | **MR. MAPLES:**  The EPA? |
| 7 | **THE COURT:**  Yes. |
| 8 | **MR. MAPLES:**  I am not.  I have actually considered |
| 9 | that issue, but we don't have any information as of yet. |
| 10 | **THE COURT:**  But we agree that they were mandated to |
| 11 | at least take a look at the effects of greenhouse gases on the |
| 12 | environment and to take some action and in fact regulate them? |
| 13 | **MR. MAPLES:**  Only with regard to automobile |
| 14 | emissions. |
| 15 | **THE COURT:**  Now, I think -- I would like to try to |
| 16 | understand a little better the plaintiffs' causes of action.  I |
| 17 | think you have characterized them as nuisance and negligence, |
| 18 | and I think you also mentioned unjust enrichment.  I will |
| 19 | concentrate on the nuisance and negligence aspect of it so we |
| 20 | can eliminate some causes of action.  There is no cause of |
| 21 | action here that is based upon a federal statute or federal |
| 22 | regulation? |
| 23 | **MR. MAPLES:**  No. |
| 24 | **THE COURT:**  Likewise, there is no cause of action |
| 25 | here that is based upon a Mississippi statute or a Mississippi |

1    regulation?

2         **MR. MAPLES:**  No, Your Honor.

3         **THE COURT:**  There is no cause of action,

4    quote-unquote, global warming style cause of action based on

5    any decision by the Mississippi Supreme Court?

6         **MR. MAPLES:**  This has nothing to do with global

7    issues, Your Honor.

8         **THE COURT:**  You made the statement earlier, and it

9    caught my attention because you said that what this case is

10   about is that a Court, I think you said a Court, or the judge

11   and the jury must determine what constitutes unreasonable

12   conduct.  What measuring rod would the Court and the jury be

13   armed with?  What would an instruction look like, an

14   instruction to the jury that they are to consider the conduct

15   of the defendants under XXX standard?  How would they do that?

16        **MR. MAPLES:**  One thing that comes to mind is what is

17   often referred to in jurisprudence as the reasonable man

18   standard.  What would a reasonable man do under the

19   circumstances given the level of knowledge that that person had

20   concerning the potential risk, the foreseeability of that risk,

21   and the impact that that risk might have on fellow citizens?

22        **THE COURT:**  Wouldn't you agree that any emission or

23   any contribution to greenhouse gases, that cannot be a good

24   thing, and, consequently, there must be some standard by which

25   a jury could conclude that at some point so much has been

1    contributed to the -- so much greenhouse gas has been

2    contributed to the atmosphere that it reaches a point of

3    negligence or unreasonable conduct.  Where is that -- where is

4    that point?  When do we reach that point?  How do we know, for

5    example, when a particular coal mining or coal producing

6    defendant has crossed the line between acceptable legal conduct

7    and negligent or unreasonable conduct?

8              MR. MAPLES:  As an example of crossing the line, I

9    think we have to look at the conduct of the parties, their

10   actions in concert, whether or not they were making a good

11   faith effort to learn the effects of their products, to promote

12   science, or were they in fact doing something else and visiting

13   a giant fraud on the public at large.  They cannot say that the

14   public at large are contributors to this cause if it was their

15   conduct that caused a confusion in the eyes of the public at

16   large as far as what the scientific truth was.  Not only is

17   that evidence against these corporate defendants and their

18   industry organizations that engaged in these kinds of

19   activities, but it is also evidence in favor of the plaintiffs'

20   position that the average person didn't have the foreseeability

21   to be a joint tortfeasor or a contributor and didn't have any

22   good options.

23             THE COURT:  Are you telling me that ultimately the

24   standard that the jury would apply would be what would a

25   reasonable emitter of greenhouse gases do?

1          **MR. MAPLES:**  Based upon the law and the evidence, and

2     that was the reason --

3          **THE COURT:**  Who would set that standard of what a

4     reasonable emitter is permitted to --

5          **MR. MAPLES:**  It doesn't have to be a scientific

6     standard.  This Court doesn't have to make a predetermination

7     about what would be a good policy or bad policy decision

8     concerning levels of emissions into the atmosphere.  The

9     defendants would have you, Your Honor, think that, and

10    therefore say that it is nonjusticiable.  That is not the case.

11    If these defendants knew full well what they were doing, if

12    they knew that this problem was getting worse and worse and

13    worse, if they hid the truth, if they were deceitful about the

14    science, then I think this Court can formulate jury

15    instructions that submit that question to the jury based upon

16    the evidence, but we have to go through the whole discovery

17    process to see what all of the evidence is.

18          **THE COURT:**  I am also -- I suppose that the

19    plaintiffs do not take the position that all of us here are

20    co-defendants or producers ourselves every morning when we get

21    into our automobiles of emissions that ultimately contribute to

22    the gases?

23          **MR. MAPLES:**  No, Your Honor.  Part of the

24    consideration is who was in a position to prevent this harm,

25    who was not just best in position but who was in a position at

1   all?  Who was in a position to know what the truth is regarding

2   the foreseeability issue?  And I don't think most people, in

3   this country anyway, in this state, have until perhaps just

4   recently recognized what a problem, what kind of problem

5   exists, and I believe they were deliberately confused or

6   misled, and I think that will be a very significant part of the

7   evidence.

8       We also have a distribution system in this country that

9   doesn't allow us any alternatives.  I have tried to find an

10  alternative personally.  I can't do it.  I can't buy a plug-in

11  hybrid vehicle.  I can't buy one -- I have tried to get in

12  touch with people in California that sell these things to

13  owners of fleets of vehicles.  I can't do it.

14          THE COURT:  That would probably be well beyond the

15  means of the average person anyway.

16          MR. MAPLES:  It would indeed.  Where are the bio-fuel

17  distribution points?  I can't buy bio-diesel.  You would have

18  to ride a thousand miles to buy a tank of bio-diesel.

19          THE COURT:  Well, and I don't -- I am glad that you

20  concede that we are not all co-defendants, but do you concede

21  that we are all at fault?

22          MR. MAPLES:  No, sir.

23          THE COURT:  You do not?

24          MR. MAPLES:  I do not.  I do not think there is fault

25  on the part of the average user.

1          **THE COURT:**  Well, is there fault elsewhere?  And I

2     don't refer to -- is there fault perhaps not just by the

3     producers here in our nation but producers elsewhere in other

4     countries?

5          **MR. MAPLES:**  Not fault under our law in Mississippi

6     or Federal Common Law.

7          **THE COURT:**  Well, I am not sure.  How would you

8     administer the Mississippi apportionment of fault statute in a

9     situation like this?  Assuming that the defendants raised

10    apportionment of fault and I had to instruct the jury on

11    apportionment of fault, how would I instruct the jury?

12         **MR. MAPLES:**  There are two options here, one to find

13    that other manmade contributions to the $CO_2$ problem did not

14    have any duty under the laws of the State of Mississippi or

15    Federal Common Law.  The other option would be for the Court to

16    find out that they were in fact contributors in fact and that

17    these defendants that are before the Court and over which we do

18    have in personam jurisdiction should not be held accountable

19    for that part of the damages.  It is a distinguishment between

20    liability and apportionment of damages, apportionment of fault

21    based on liability and damages.

22         But there is also another issue that I alluded to in my

23    presentation, and that is the Mississippi tort liability

24    statutes have a provision when there is a concerted -- when

25    there is concerted activity, those participants in that

1    concerted activity can be held jointly and severally liable.

2         I make one other point as well.  The United States

3    contributes to 25 percent of the global $CO_2$ emissions,

4    activities in the United States, but that doesn't mean that

5    that is all that these defendants are responsible for.  That is

6    just activities of the United States.  Some of these defendants

7    are some of the biggest corporations in the world, and their

8    contribution is much more than just their portion of what

9    happens in the United States.  But ultimately, if the Court

10   decided that these defendants in toto contribute X percentage

11   to the worldwide, and they should only be held liable for that

12   part of the damages, *Massachusetts versus EPA* makes it very

13   clear we don't have to have all the responsible parties before

14   the Court, and the Court, in order to satisfy redressability,

15   is not required to be able to compensate plaintiffs for all of

16   their injuries.

17        My young learned colleague has suggested that we look to

18   Learned Hand to analyze the risk, the extent of the harm, and

19   the cost of change.  The jury's job is not to set the standard

20   but to evaluate the conduct under specific facts and

21   circumstances.

22             **THE COURT:**  Thank you, Mr. Maples.

23             **MR. MAPLES:**  Thank you, Your Honor.

24             **THE COURT:**  Mr. Winkelman?

25             **MR. WINKELMAN:**  Briefly, Judge.  Thank you.  My

1   distinguished colleague began by saying that we have
2   misunderstood the causation piece of standing, and that really
3   it is about, and I quote, "foreseeability and about intervening
4   events," and I would suggest respectfully that there is not a
5   single Supreme Court case that suggests that.  Every time the
6   Supreme Court has spoken to traceability and whether the link
7   is fairly traceable.  It talks about exactly, Judge, what we
8   have been talking about.  It talks about the links that are
9   necessary to get from this emission to 123 Jackson Street,
10  Mississippi.  That is precisely what we are talking about.
11  That concept is familiar in tort law, as Your Honor is aware,
12  and it is at the center of constitutional standing.

13      Number two, my colleague suggests that they haven't really
14  in their complaint suggested that there has been action by our
15  political branches.  And if you don't mind, Judge, if I can
16  briefly approach the bench?

17          **THE COURT:**  Sure.  These are portions of the
18  complaint?

19          **MR. WINKELMAN:**  Exactly, Judge.  Judge, you are
20  exactly right.  I mentioned earlier on the footnotes in the
21  complaint, and that is what I have handed you, and as you will
22  see, what the plaintiffs have told you in their third amended
23  complaint is that the Article I and the Article II components
24  of our Federal Government, that is, Congress and the President,
25  have refused to act, but then later you will see they say, "and

1   have taken the wrong actions."  And that is not the only time,

2   Judge, they say that.  On that very same page in that complaint

3   they criticize the dearth of meaningful political action.

4       So I would say, Judge, as I said earlier, we have the

5   unusual case where the plaintiffs themselves concede, because

6   they have to, they are honest people, concede that our

7   political branches have been active, not just debating, by the

8   way, not just researching, active in deciding political

9   questions about global warming.

10      The next thing my able colleague says is that regulation

11  doesn't always mean political question.  And they are exactly

12  right about that.  The curious thing, though, that they say is

13  look at the MTBE case.  The reason I say that is curious is,

14  what did Judge Scheindlin do in the Southern District of New

15  York in that case?  She said, and now I paraphrase, I have to

16  distinguish MBTE(sic) from global warming.  Why?  And I quote,

17  Judge, "because the claims regarding global warming were unique

18  in the context of pollution as public nuisance cases, as they

19  'touched on so many areas of national and international

20  policy.'"  Judge Scheindlin says exactly what our clients have

21  said about why this case, perhaps unlike many, like MTBE, for

22  instance, is bound up in political questions.

23      Plaintiffs make much of Massachusetts v. EPA, and we

24  talked about that briefly, and I only want to make sure we

25  understand what that case was.  Of course, it was not a tort

1   case.   It was a case of statutory construction.   You are right

2   in your characterization, Judge, of it.   And what the Court

3   found is that Congress had already granted the State of

4   Massachusetts a procedural right.   It had already decided that

5   that state, among many others, can ask for EPA activity, and

6   what the majority thought it was doing, whether we agree or

7   not, was simply enforcing bad acts and deciding that states get

8   special solicitude and don't need to honor the usual standards

9   of traceability and redressability.   So if there is anything we

10  know, Judge, about *Mass. v. EPA*, is that not a single justice

11  would think that *Mass. v. EPA* standing analysis would find

12  standing here.   We know the four member dissent wouldn't, and

13  the majority itself, by applying special solicitude and relaxed

14  standards, is functionally telling us the same thing.   So I

15  walked in, Judge, thinking actually that the most analogous

16  case, the most obvious reason not to find standing here, in

17  fact, is *Mass. v. EPA*.

18       Finally, Judge, and I will stop, my worthy adversary said,

19  what courts don't do in the political question world is find

20  political questions when there is a claim for damages.   Judge,

21  we cited you cases precisely the opposite, and I will end by

22  simply discussing a single case, because it goes all the way

23  back to 1849.   It is called *Luther v. Borden*, and it was as

24  simple and practical as this case.   It was a trespass case.   It

25  was only about damages.   Mr. Luther said that Mr. Borden broke

1    into and entered his house.  So if all we did is look at those

2    labels, what the Supreme Court would have found in 1849 was no

3    political question.  It found the opposite because it turned

4    out that the breakers and enterers said they were authorized to

5    do so because they were the lawful agents of the properly

6    constituted government of Rhode Island at a time of martial

7    law, a fairly important detail.  And what the Supreme Court

8    decided was that to resolve this seemingly simple trespass case

9    about only damages, it would have to decide issues that only

10   the Congress can decide.  So there is plenty of precedent, Your

11   Honor, for my earlier point that, unfortunately, semantic

12   cataloguing, the quote from the Supreme Court, doesn't work.

13   It doesn't much matter what the labels are in the complaint.

14   What matters is, what are the issues that have to be

15   adjudicated.  Thank you, Judge.

16          **THE COURT:**  Thank you, Mr. Winkelman.  I will take a

17   short recess, and when I return, I will tell you where we are

18   going to go.  Thank you.

19          (RECESS TAKEN AT 10:06 A.M. UNTIL 10:32 A.M.)

20          **THE COURT:**  Thank you.  Please be seated.  One of the

21   questions that I pondered with some of the staff attorneys

22   during the recess was just why weren't the plaintiffs able to

23   find a nondiverse party.  Having failed in that responsibility,

24   the Court will here give it its best shot.

25          I have struggled because it is very easy to be inclined to

1    want to, quote-unquote, do the right thing at all times.  And

2    you have got to weigh that, balance that, with the authority

3    that you have under Article III and the responsibility you have

4    to follow the law, or in this case the absence of law.

5        While the plaintiffs argue that this is not a case about

6    global warming, it really is.  It is a case wherein the

7    plaintiffs have rung a bell that should not come as a surprise

8    to many of us, anyone who reads the newspaper or watches the

9    television, anyone who is aware of the science and has taken

10   any time at all to do some independent research.

11       Let me point out that it is very apparent, Mr. Maples,

12   while you make your arguments that you and in all likelihood

13   those that sit with you on that side of the courtroom are

14   passionate about this issue, and you have a right to be

15   passionate about it.  I think it would be unwise for any of us

16   as citizens of this planet to ignore the science and to ignore

17   the signs, if you will, of what we are doing to our planet and

18   what we are doing to our environment, what we are doing to our

19   atmosphere, and what legacy we will hand down to our children

20   and grandchildren.  As an individual, I am concerned about

21   that, but as a judge of this court, I don't have the luxury of

22   being an individual.  I have the responsibility to administer

23   the law.

24       In this case it seems apparent to the Court, based upon

25   the arguments of counsel and based upon the very

1    well-articulated arguments that you have made in your brief,

2    that this Court does not have standing to adjudicate these

3    issues.  These are not injuries which are fairly attributable

4    to these individual defendants.  And while plaintiffs have

5    argued that we are not -- I am gratified to know I am not a

6    co-defendant, but I am a responsible person, as all of us are

7    responsible for the emission of $CO_2$ and ultimately greenhouse

8    gases which cause global warming.  We are all responsible for

9    that.  But I do not think that under our system of

10   jurisprudence that is attributable or traceable to these

11   individual defendants but is instead or are instead injuries

12   which are attributable to a larger group that are not before

13   this Court, not only within this nation but outside of our

14   jurisdictional boundaries as well.  In the opinion of the

15   Court, these plaintiffs do not have standing and this Court

16   does not have justiciable issues before it.

17       Alternatively, and I think I am going to speak briefly

18   about the political question issue because it is somewhat

19   intertwined with the standing question, that question of

20   whether or not this is a political question.  I have done some

21   independent research that you may not find in the law books

22   that tends to underscore, if you will, the realization that the

23   problem is one in which this Court is simply ill-equipped or

24   unequipped with the power that it has to address these issues.

25   For example, I am sure that many of you here know that

1    effective as of January of 2007 that the State of California

2    has enacted its own Global Warming Solutions Act of 2006.  This

3    particular act in California requires the State Air Resources

4    Board there to adopt regulations that require reporting and

5    verification of statewide greenhouse gas emissions and to

6    monitor and to enforce compliance with these programs.  The act

7    also requires the board to determine what the statewide

8    greenhouse gas emissions levels were in 1990, and to establish

9    emissions limits that are equivalent to the 1990 levels by the

10   year 2020.  These are, of course, efforts taken on by the

11   California legislature.  Connecticut, Washington, Maine,

12   Vermont, New York, Pennsylvania, Rhode Island, Maryland, New

13   Jersey, Oregon, and Massachusetts have all enacted plans that

14   are similar to the California act.  I cite as an example, the

15   California and Maine acts have enacted what they call the

16   Climate Change Action Plan that establishes the goal of

17   reducing emissions to the 1990 levels by the year 2020.

18   Maryland has set limits on the amount of greenhouse gases that

19   can be emitted from facilities utilizing coal burning or fired

20   heat exchangers.  New Jersey has required enactment of

21   regulations requiring monitoring and reporting of greenhouse

22   gas emissions.  Georgia, Alaska, Colorado, Idaho, South

23   Carolina, and Florida have established advisory committees that

24   study the effect of global warming and determine measures that

25   can be taken to mitigate the problem.  Nebraska has established

 1    a carbon sequestration advisory committee to conduct research

 2    concerning agricultural advances that would reduce greenhouse

 3    emissions.  The state of Iowa has enacted statutes that require

 4    the Department of Natural Resources to establish voluntary

 5    greenhouse gas inventory and registry, an energy independence

 6    plan that would decrease reliance on foreign oil, and a climate

 7    change advisory council.  New Hampshire has developed a

 8    voluntary greenhouse gas emissions reduction registry as well.

 9    And Virginia has adopted a Commonwealth Energy Policy that will

10    promote the generation of electricity through technologies that

11    do not contribute to greenhouse gases and global warming.  The

12    legislatures in Alabama, Illinois, Kentucky, Georgia, Oklahoma,

13    Wyoming, and West Virginia have all adopted statutes providing

14    the development of new regulatory programs intended to reduce

15    greenhouse gases and their emissions are premature absent some

16    Senate ratification of the Kyoto Protocol.  Of course, these

17    states fear that piecemeal uncoordinated regulations may be

18    inconsistent with subsequent determinations that are made by

19    our Congress, and the premature enactment of such regulations

20    would hurt the economy.  Georgia and Oklahoma have, of course,

21    developed voluntary reduction programs, and Illinois has

22    enacted the Clean Coal FutureGen Project for Illinois Act which

23    would develop carbon storage and capture plans for fossil fuel

24    energy and hydrogen-generating units.  The State of Illinois

25    has a goal of at least five percent of the state's energy

1    production -- use derived from renewable sources or forms of

2    energy by 2010, and at least 15 percent by 2020.

3        I bring this to your attention, and I think many of you

4    may already know some of these things, because I think, again,

5    that underscores the arena in which this debate needs to be

6    discussed.   It is a legitimate debate.   It is an important

7    debate, but it is a debate which simply has no place in the

8    court, until such time as Congress enacts legislation which

9    sets appropriate standards by which this Court can measure

10   conduct, whether it be reasonable or unreasonable, and, more

11   important, develops standards by which a group of people, we

12   call them juries, can adjudicate facts and apply the law, these

13   standards, and judge whether conduct crosses the line between

14   reasonable and legal conduct and unreasonable or tortious

15   conduct.   Under the circumstances, I think that the plaintiffs

16   are asking the Court to develop those standards, and it is

17   something that this Court simply is not empowered to do.

18       This is not a case such as *Massachusetts versus EPA* where

19   the State of Massachusetts simply wanted to require the

20   Environmental Protection Agency to, in essence, do its job.

21   This is not a case in which these defendants, for example, have

22   done some damage, some attributable damage to the wetlands or

23   to the floor of the wetlands, which, in essence, has made

24   damage as a result of hurricanes more likely.   Instead, this is

25   a case in which the plaintiffs directly ask this Court to

1    attribute fault to these defendants under standards that as of
2    yet do not exist.

3        It is clear from the complaint and clear from the
4    arguments here today that what you are asking this Court to do
5    is what *Baker versus Carr* told me not to do, and that is to
6    balance economic, environmental, foreign policy, and national
7    security interest and make an initial policy determination of a
8    kind which is clearly nonjudicial.  Adjudication of the
9    plaintiffs' claims in this case would necessitate the
10   formulation of standards dictating, for example, the amount of
11   greenhouse gas emissions that would be excessive and the
12   scientific and policy reasons behind those standards.  These
13   policy decisions are best left to the executive and to the
14   legislative branches of the government, who are not only in the
15   best position to make those decisions but are constitutionally
16   empowered to do so.

17       Finally, one practical note, and it became very apparent,
18   Mr. Maples, during your argument, that the preparation and the
19   discovery involved in a case of this magnitude will take a long
20   time and will cost both sides millions of dollars.  It seems to
21   me that it would be a much better course of action to take.
22   And, of course, I am convinced that I am right, but I could be
23   wrong, but if I am wrong, I can be corrected, and the Court of
24   Appeals will have no hesitation to correct me and send this
25   case back, at which time we will conduct the discovery

1    necessary to prepare it for trial.  If, on the other hand, I

2    were to take the other course, which I think would be

3    incorrect, and that is to permit the case to go forward and

4    rule against the defendants on the standing issue, I would be

5    inviting the prospect or the proposition that after spending

6    millions of dollars and countless hours, man-hours, in

7    preparation of the case, that it would be reviewed by an

8    appellate court that would conclude that it was not an issue

9    that was justiciable by the Court, and ultimately all our work

10    would be in vain.

11        The defendant's motion to dismiss is granted.  In addition

12    to that, the Court is sua sponte dismissing all of the

13    remaining defendants.  This will place this case in a

14    procedural posture in which all of the parties, plaintiffs and

15    defendants, can have this matter reviewed in the event that I

16    am in error.  I will enter that order today.  Anything else on

17    behalf of the movants or the defendants?  Any questions?

18               **MR. WINKELMAN:**  No, Your Honor.  Thank you.

19               **THE COURT:**  Mr. Maples, anything else on behalf of

20    the plaintiffs?  I guess, in essence, what I am saying, if I

21    have no standing as to these defendants, there is no standing

22    as to any of the defendants.

23               **MR. MAPLES:**  Your Honor, may I make one request?

24               **THE COURT:**  Yes.

25               **MR. MAPLES:**  Would you make clear which version of

1   the complaint is at issue?

2           **THE COURT:**  The fourth amended complaint.  The fourth

3   amended complaint is what is on file.

4           **UNKNOWN SPEAKER FROM AUDIENCE:**  The fourth amended

5   complaint is on file or the third amended complaint is on file?

6           **THE COURT:**  I'm sorry.  The third amended complaint

7   is on file.  There is leave to file a fourth amended complaint,

8   which, of course, is moot at this point.  The third amended

9   complaint is the one that is before this Court.

10          **MR. MAPLES:**  And there is no ruling on the fourth

11  amended complaint?

12          **THE COURT:**  In the event that I am in error and there

13  is standing, then I will consider whether or not an additional

14  amended complaint will be allowed.

15          **MR. MAPLES:**  Thank you, Your Honor.

16          **THE COURT:**  I'm sorry.  I took one step.  Of course,

17  all additional motions are rendered moot.  I will enter an

18  order accordingly.  If there is nothing else, we are adjourned.

19                      (HEARING CONCLUDED.)

20

21

22

23

24

25

1

2                           CERTIFICATE OF COURT REPORTER

3

4           I, Teri B. Norton, RMR, FCRR, Official Court

5    Reporter for the United States District Court for the Southern

6    District of Mississippi, appointed pursuant to the provisions

7    of Title 28, United States Code, Section 753, do hereby certify

8    that the foregoing is a correct transcript of the proceedings

9    reported by me using the stenotype reporting method in

10   conjunction with computer-aided transcription, and that same is

11   a true and correct transcript to the best of my ability and

12   understanding.

13          I further certify that the transcript fees and format

14   comply with those prescribed by the Court and the Judicial

15   Conference of the United States.

16

17

18

19                              _____

20                              TERI B. NORTON, RMR, FCRR
                                OFFICIAL COURT REPORTER

21

22

23

24

25

# EXHIBIT E

**Westlaw.**

Slip Copy                                                                    Page 1
Slip Copy, 2007 WL 2384841 (E.D.Cal.)
(Cite as: 2007 WL 2384841 (E.D.Cal.))

**H**

Fru-Con Const. Corp. v. Sacramento Municipal
Utility Dist.
E.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. California.
FRU-CON CONSTRUCTION CORPORATION, a
Missouri corporation, Plaintiff,
v.
SACRAMENTO MUNICIPAL UTILITY DIS-
TRICT, a municipal utility district; Utility Engin-
eering Corporation, a Texas corporation, Defend-
ants.
No. CIV. S-05-583 LKK/GGH.

Aug. 17, 2007.

Charlie C.H. Lee, pro hac vice, Heidi Brown, pro
hac vice, Jonathan A. Beldon, pro hac vice, Nicole
Neuman, pro hac vice, Robert M. Moore, Robert D.
Windus, Shoshana Rothman, pro hac vice, Moore
and Lee, LLP, McLean, VA, Eileen M. Diepen-
brock, The Diepenbrock Law Firm, Gene K.
Cheever, Jennifer L. Dauer, Diepenbrock Harrison,
Sacramento, CA, John Benjamin Patrick, Bennett
Jinchul Lee, Watt Tieder Hoffar and Fitzgerald, San
Francisco, CA, Robert C. Niesley, Michael R.
Gandee, Watt, Tieder, Hoffar & Fitzgerald, LLP,
Irvine, CA, for Plaintiff.
Brian L. Becker, James S. Bright, Kristin G.
Taylor, Maureen J. Bright, Sharon M. Apodaca,
Bright and Brown, Glendale, CA, John Stuart
Poulos, Pillsbury Winthrop Shaw Pittman LLP,
Sacramento, CA, for Defendants.
Jeffrey A. Barker, Sarah E. Kline, O'Melveny &
Myers LLP, Los Angeles, CA, for Bilfinger Berger
AG.
Kenneth C. Mennemeier, Andrew W. Stroud, Men-
nemeier, Glassman & Stroud, LLP, Sacramento,
CA, for Fru-Con Holding Corp.

*ORDER*

LAWRENCE K. KARLTON, Senior Judge.

*1 Pending before the court in this matter are three
motions. The first two are motions to dismiss for
lack of personal jurisdiction filed by counter-de-
fendants Bilfinger Berger AG ("Bilfinger") and
Fru-Con Holding Corporation ("FCHC"). The third
motion, filed by the Sacramento Municipal Utility
District ("SMUD"), seeks jurisdictional discovery
and a stay of the pending motions to dismiss. The
crux of the present dispute is whether the court may
exert personal jurisdiction over these counter-
defendants based on an alter ego theory. The court
resolves the matter on the parties' papers and after
oral argument. For the reasons set forth below, the
court grants the motions to dismiss and denies the
motion seeking jurisdictional discovery.

**I. Background**[FN1]

> FN1. The court dispenses with any recita-
> tion of the general background of this case,
> as it has been discussed in previous orders.

On December 15, 2006, the court granted Fru-Con's
motion to file an amended counterclaim adding Bil-
finger and FCHC as counter-defendants in this ac-
tion. Fru-Con is owned by FCHC, which in turn is
owned by Bilfinger. The first amended counter-
claim alleges that Bilfinger and FCHC are directly
liable to SMUD "because there exists a unity and
identity of interest between Bilfinger Berger, Fru-
Con Holding and Fru-Con such that adherence to
the fiction of separate existences of these entities
would     sanction     fraud     and     promote     in-
justice."Counterclaim ¶ 6. The counterclaim further
alleges that Bilfinger and/or FCHC completely con-
trolled Fru-Con, that Fru-Con was inadequately
capitalized, that Bilfinger and/or FCHC made loans
to Fru-Con and guaranteed certain aspects of Fru-
Con's business obligations, and that employees of
the corporations were freely interchanged. *Id.*

In support of these allegations and in response to
the pending motions to dismiss, Fru-Con has set

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 2
Slip Copy, 2007 WL 2384841 (E.D.Cal.)
(Cite as: 2007 WL 2384841 (E.D.Cal.))

forth two sets of facts (detailed in the analysis section of this order) that fall under the two prongs of the alter ego test. *See Sonora Diamond Corp. v.Super. Ct.,* 83 Cal.App.4th 523, 538, 99 Cal.Rptr.2d 824 (2000). One pertains to the alleged unity and identity of interest shared by Bilfinger, FCHC, and Fru-Con (collectively, "the parties"). The other pertains to the alleged injustice that would result if Bilfinger and FCHC were not made parties to this action. With regard to the first set of facts, SMUD maintains it can prove that (1) Bilfinger and FCHC exerted control over Fru-Con's day-to-day activities (2) the parties shared employees, (3) the parties shared legal services, (4) Fru-Con relied upon Bilfinger's experience and financial wherewithal, and (5) Fru-Con was inadequately capitalized.

## II. Standard

**Motion to Dismiss for Lack of Personal Jurisdiction**

When a defendant challenges the sufficiency of personal jurisdiction, the plaintiff bears the burden of establishing that the exercise of jurisdiction is proper. *Sinatra v. National Enquirer, Inc.,* 854 F.2d 1191, 1194 (9th Cir.1988).

Analysis of the appropriateness of the court's personal jurisdiction over a defendant in a case in which the court exercises diversity jurisdiction begins with California's long arm statute. *Aanestad v. Beech Aircraft Corp.,* 521 F.2d 1298, 1300 (9th Cir.1974). California's long arm statute authorizes the court to exercise personal jurisdiction on any basis consistent with the due process clause of the United States Constitution. Cal.Code Civ. Proc. § 410.10; *Rocke v. Canadian Auto. Sport Club,* 660 F.2d 395, 398 (9th Cir.1981).

**\*2** Consistent with the due process clause, the court may exercise personal jurisdiction over a defendant when the defendant has certain minimum contacts with the forum state such that the maintenance of

the suit does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). If the defendant is domiciled in the forum state, or if the defendant's activities there are "substantial, continuous and systematic," a federal court can exercise general personal jurisdiction as to any cause of action involving the defendant, even if unrelated to the defendant's activities within the state.*Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952); *Data Disc, Inc. v. Systems Technology Assoc., Inc.,* 557 F.2d 1280, 1287 (9th Cir.1977).

If a non-resident defendant's contacts with California are not sufficiently continuous or systematic to give rise to general personal jurisdiction, the defendant may still be subject to specific personal jurisdiction on claims arising out of defendant's contacts with the forum state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477-78, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1397 (9th Cir.1986).

The court employs a three-part test to determine whether the exercise of specific jurisdiction comports with constitutional principles of due process. *See Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir.2004). First, specific jurisdiction requires a showing that the out-of-state defendant purposefully directed its activities toward residents of the forum state or purposefully availed itself of the privilege of conducting activities in the forum state, thus invoking the benefits and protections of its laws. *Burger King,* 471 U.S. at 474-75. Second, the controversy must be related to or arise out of defendant's contact with the forum. *Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995). Third, the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable. *Haisten,* 784 F.2d at 1397.

## III. Analysis

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2384841 (E.D.Cal.)
(Cite as: 2007 WL 2384841 (E.D.Cal.))

Here, SMUD argues that the court may exercise personal jurisdiction under an alter ego or agency theory, or directly. As explained below, none of these avenues is availing, and the motions to dismiss must be granted.

## A. Alter Ego & Agency Theory

First, SMUD asserts that the court may exercise personal jurisdiction over Bilfinger and FCHC because they are alter egos of Fru-Con. Under California law, two conditions must both be met in order to invoke the alter ego theory: (1) a unity of interest and ownership must exist between two corporate entities such that there does not exist a separateness between them; and (2) injustice would result if the acts in question were treated as those of only one of the corporate entities. *Sonora Diamond,* 83 Cal.App.4th at 538, 99 Cal.Rptr.2d 824. "[B]oth of these requirements must be found to exist before the corporate existence will be disregarded."*Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal.App.2d 825, 837, 26 Cal.Rptr. 806 (1962). SMUD bears the burden in presenting evidence that satisfies both prongs of the test. *Mid-Century Ins. Co. v. Gardener,* 9 Cal.App.4th 1205, 1212, 11 Cal.Rptr.2d 918 (1992).

**\*3** The agency theory of jurisdiction is closely related but distinct. In the case of agency, "the question is not whether there exists justification to disregard the subsidiary's corporate identity, the point of the alter ego analysis, but instead whether the degree of control exerted over the subsidiary by the parent is enough to reasonably deem the subsidiary an agent of the parent under traditional agency principles."[FN2]*Sonora Diamond,* 83 Cal.App.4th 523, 541, 99 Cal.Rptr.2d 824. Nevertheless, in the case at bar, one of the principal arguments marshaled by SMUD in support of its claim that a unity of interest exists (under the first prong of the alter ego test) is that FCHC and Bilfinger exerted day-to-day control over Fru-Con. Accordingly, the court addresses both the alter ego and agency theories simultaneously, because they both rely on a similar

body of evidence.

> FN2. A "variant" of the agency theory is the "representatives services" doctrine, which permits jurisdiction where the subsidiary "performs a function that is compatible with, and assists the parent in the pursuit of, the parents' *own business."Sonora Diamond,* 83 Cal.App.4th at 543, 99 Cal.Rptr.2d 824. This doctrine is inapplicable to the facts here, because Fru-Con operated its business for over 100 years prior to its relationship with Bilfinger, just as Bilfinger has likewise conducted its business operations for a century prior to affiliating with Fru-Con.

## 1. Injustice

Here, in reverse order, the motions can be resolved on the second prong of the test, because SMUD has not put forward (and cannot put forward) enough evidence to prove that injustice would result if Bilfinger and FCHC were not made parties to this action.

SMUD initially maintains that "inequity would result because ... Bilfinger, FCHC, and Fru-Con failed in key instances to draw any division between themselves as allegedly separate entities."Opp. at 28. If this were sufficient, however, the injustice prong of the test would collapse into the unity prong and become superfluous. Acknowledging as much, SMUD then goes on to argue that Fru-Con would not be able to pay a judgment if one is obtained in the District's favor, or that there is at least a risk of such a result. In the vast majority of cases, courts have only pierced a corporation that was bankrupt, insolvent, or otherwise incapable of paying judgment.[FN3]

> FN3.*See, e.g., Norins Realty Co. v. Consol. Abstract & Title Guar. Co.,* 80 Cal.App.2d 879, 883, 182 P.2d 593 (1947); *M.O.D. of the Islamic Republic of Iran v. Gould, Inc.,* 969 F.2d 764, 770 (9th Cir.1992); *Wady v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 4
Slip Copy, 2007 WL 2384841 (E.D.Cal.)
**(Cite as: 2007 WL 2384841 (E.D.Cal.))**

*Provident Life & Accident Ins. Co. of Am.,* 216 F.Supp.2d 1060, 1070 (C.D.Cal.2002); *Haskell v. Time, Inc.,* 857 F.Supp. 1392, 1403 (E.D.Cal.1994). Nevertheless, there have also been cases in which the courts were silent on the ability of a defendant to satisfy a judgment. *See, e.g., Elliott v. Occidental Life Ins. Co. of Cal.,* 272 Cal.App.2d 373, 377, 77 Cal.Rptr. 453 (1969); *Mathes v. Nat'l Utility Helicopters Ltd.,* 68 Cal.App.3d 182, 190, 137 Cal.Rptr. 104 (1977).

There appears to be no dispute that at all times relevant to this matter, that Fru-Con was covered by a bond that had a minimum capacity of $750 million dollars, and its present uncommitted capacity is in excess of $500 million dollars-which would almost certainly cover any judgment that SMUD might obtain in this action. Decl. of James Scott, ¶ 8. This fact alone is sufficient to negate the imposition of alter ego liability.[FN4] In addition, Fru-Con has provided evidence that it is presently involved in ongoing projects throughout the United States totaling approximately $600 million. Scott Decl., ¶ 8. Of course, this figure represents the gross total value of its current construction contracts-not necessarily its ability to pay a judgment of a particular size-but it is at least suggestive of Fru-Con's current financial health.

> FN4. The fact that the bonding company, Travelers, has filed its own suit and disputes its obligation to pay does not change this conclusion. SMUD has the burden of showing that injustice would result, and the chance that Travelers might be able to avoid liability is not enough to satisfy SMUD's burden under the alter ego test. Furthermore, this is an obstacle that no amount of discovery pertaining to the unity of interest prong can cure.

SMUD makes several arguments, none of which are responsive to the fact that a bond covers the project. For example, SMUD asserts that Fru-Con may be unable to pay because it was allegedly undercapitalized for the project. The alleged undercapitalization stems from the fact that the project's performance bond, which SMUD required, was obtained by Bilfinger, rather than independently by Fru-Con. Nevertheless, the counterclaim states that "[a]s part of the Contract, Fru-Con was obligated to obtain and provide to the District a performance bond in a form acceptable to the District, which Fru-Con did"-suggesting that SMUD found the bond itself to be acceptable, even if it was unhappy to discover the ultimate source supporting the bond. Counterclaim ¶ 2.

**\*4** SMUD also points out that there have been frequent infusions of money into Fru-Con by Bilfinger. Decl. of John Poolos, Ex. P (discussing cash infusions from Bilfinger). There is also evidence, however, indicating that Fru-Con has never failed to have cash available to meet its obligations as they became due. Poolos Decl., Ex. P. *See Platt v. Billingsley,* 234 Cal.App.2d 577, 583, 44 Cal.Rptr. 476 (1965) (focusing on whether company had assets to meet its debts "as they came due"). To the extent that this cash was infused by Bilfinger, there is no guarantee that such an infusion would be forthcoming in the event of a judgment against Fru-Con, but Fru-Con's historical payment history is nevertheless probative of its future payment ability.[FN5]

> FN5. Although SMUD has presented (hearsay) evidence that Bilfinger is contemplating getting out of the U.S. construction business, this does not prove that Fru-Con or Bilfinger is in financial trouble. Poolos Decl., Ex. YY (news article reporting Bilfinger is considering pulling out of the U.S. construction business). It is also worth noting that Fru-Con has been in existence for over 130 years and is the 10th oldest contracting firm in the U.S.

Furthermore, while it is unclear if the presence of bad faith is a requirement for alter ego liability or merely a factor, *compare Sonora Diamond,* 83

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                      Page 5
Slip Copy, 2007 WL 2384841 (E.D.Cal.)
(Cite as: 2007 WL 2384841 (E.D.Cal.))

Cal.App.4th at 539, 99 Cal.Rptr.2d 824 *with Elliott*, 272 Cal.App.2d at 377, 77 Cal.Rptr. 453, there is also insufficient evidence from which to conclude that Fru-Con acted in bad faith. SMUD claims that it was misled because Fru-Con described itself in its Statement of Qualifications as "a major international constructor" and that it had a $750 million bonding capacity-which SMUD maintains would be true only if the statements encompassed both Fru-Con and Bilfinger, rather than only Fru-Con. This is far from clear, however, and SMUD has not discharged its heavy burden in piercing the corporate veil.[FN6]

> FN6. With regard to the quibble over whether Fru-Con was an "international" constructor, there is evidence that the company had, at the time of its application, conducted "start-up work" in non-U.S. countries such as Mexico and Indonesia, Poulos Decl., ¶ 17, Ex. M, but it is unclear if this could reasonably refer to "construction" work, and if not, whether this would rise to the level of bad faith conduct.

> With regard to the bonding issue, there is simply no dispute that Fru-Con was in fact covered by a $750 million bond. The only point of contention is that SMUD was unaware of the parental guarantee that supported the bond. The ability to secure a bond may have been valuable to SMUD for, primarily, its existence and, incidentally, what it signaled (i.e., Fru-Con's wherewithal to secure a bond), but it is doubtful that the non-disclosure of Bilfinger's role rose to the level of bad faith.

In any event, because the bond is sufficient to cover any judgment, the court finds that it is not apparent that injustice would result if Bilfinger and FCHC were not party to this action.

**2. Unity and Identity of Interest**

Even if Fru-Con could meet the hurdle presented by the injustice prong of the alter ego analysis, it would nevertheless falter under the unity prong. The factors relevant to whether there is a unity and identity of interest between corporations were set forth in *Associated Vendors*. 210 Cal.App.2d at 837-40, 26 Cal.Rptr. 806. They include, as SMUD maintains is present here, the control of the subsidiary's day-to-day operations, commingling of funds, shared employees, shared legal services, disregard of corporate formalities, and inadequate capitalization. *Id.* There is no required magic number of factors that must be met in order for alter ego liability to be imposed. *See Mesler v. Bragg Mgmt. Co.*, 39 Cal.3d 290, 300, 216 Cal.Rptr. 443, 702 P.2d 601 (1985) ("There is no litmus test to determine when the corporate veil is pierced"). A corporate veil, however, ought to be pierced only in "rare" and "exceptional" circumstances. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003).

Some of the factors alleged in the counterclaim, such as commingling of funds and the diversion of assets, lack any evidentiary support whatsoever. *See* Decl. of Joerg Mrosek ¶ 11-12 (adherence to corporate formalities and no shared bank accounts); Scott Decl. ¶ 5-6 (same). Accordingly, the court only focuses on the factors supported by evidence.

**a. Day-to-Day Control**

*5 Where a parent dictates every facet of a subsidiary's business from policy to day-to-day operations, courts have found the alter ego test satisfied. *See Rollins Burdick Hunter of S. Cal., Inc. v. Alexander & Alexander Servs., Inc.*, 206 Cal.App.3d 1, 11, 253 Cal.Rptr. 338 (1988) (finding alter ego where "every facet" of the subsidiary's business seemed to be dictated by the parent, including budget approval, hiring, compensation, and certain real estate purchases and leases); *Mathes v. Nat'l Utility Helicopters Ltd.*, 68 Cal.App.3d 182, 190-91, 137 Cal.Rptr. 104 (1977) (finding alter ego where parent exercised control over subsidiary's budget, re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

placed the subsidiary's general manager, and sent employees to subsidiary to investigate problems and report back).

Nevertheless, a "parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is 'consistent with the parent's investor status.' Appropriate parental involvement includes: 'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures.' " *AT & T v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir.1996); *see also Calvert v. Huckins,* 875 F.Supp. 674, 679 (E.D.Cal.1995) (holding that plaintiffs "must present evidence showing that [the parent companies] do more than exercise the broad oversight indicated by common ownership and common directorship").

Here, SMUD identifies two examples of Bilfinger's and (to a lesser extent) FCHC's alleged day-to-day control over Fru-Con. First, SMUD points to a "Letter of Direction" issued by Bilfinger to Fru-Con setting forth the overall limits of Fru-Con's management authority. Poulos Decl., ¶¶ 7, Ex. C. The Letter required Fru-Con to seek the written approval of the FCHC Board for what SMUD terms "routine" activities, such as "buying or selling real estate; leasing real estate for more than five years; opening or closing branch offices; entering into contracts outside of Fru-Con's traditional business activities; initiating litigation estimated to cost more than $200,000; setting an annual salary budget for employees; and appointing officers."Opp. at 11-12.

These activities may reasonably be characterized, as counter-defendants term them, "macro-management" decisions. They show that only FCHC was entitled to make decisions regarding significant contracts and major personnel decisions. They do not evidence day-to-day control over Fru-Con. *See Wady,* 216 F.Supp.2d at 1068-69 (finding appropriate parental involvement where

parent monitored subsidiary's performance, supervised the subsidiary's finance and capital budget decisions, and articulated general policies and procedures); *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1459-60 (2d Cir.1995) (no alter ego liability where parental approval was required for leases, major capital expenditures, and the sale of its subsidiary's assets). The fact that some of the required approvals were obtained via telephone with a group of three board members, Poulos Decl. ¶ 8, Ex. D, rather than through the formality of a full board meeting, gives the court pause, but this does not justify alter ego liability.

**\*6** The second example cited by SMUD of alleged day-to-day control stems from the involvement of Peter Ophoven, a Bilfinger executive, at the project site. Ophoven testified that he was present at the site for a maximum of approximately 36 days spread out over the course of several months. Poulos Decl., Ex. T (4 days in March; 5 days in September; 2 days in December; 18 days in January; 7 days in February); *Id.*(stating that "[m]ost of the guys knew me."). He was at the site long enough that he was listed as a "monthly employee" (at least for accounting purposes). Poulos Decl. ¶ 21, Ex. Q. He also had his own telephone extension at the site. Poulos Decl. ¶ 22, Ex. R. During his visits, Ophoven discussed the project schedule, cost forecasts, possible improvements regarding cost and time, and interviewed various project executives. Poulos Decl. ¶ 25, Ex. U.

Again, these activities are not enough to show that Bilfinger overstepped its bounds. Permissible parental conduct includes monitoring and oversight of the subsidiary. *See Wady,* 216 F.Supp.2d at 1068-69;*AT & T,* 94 F.3d 586 at 591. Interviewing project executives, keeping abreast of project developments, and discussing potential improvements do not rise to the level of day-to-day control. Unlike the cases in which courts pierced the corporate veil, *see, e.g., Rollins,* 206 Cal.App.3d at 11, 253 Cal.Rptr. 338;*Mathes,* 68 Cal.App.3d at 182, 137 Cal.Rptr. 104, Fru-Con and Bilfinger each adhered

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to their own set of corporate formalities from ac-
counting and tax standpoints through annual meet-
ings, had separate bank accounts and payrolls, and
separately maintained corporate minutes. Jrosek
Decl. ¶ 11; Scott Decl. ¶ 5.

**b. Shared Employees**

Next, SMUD points out that Bilfinger, FCHC, and
Fru-Con have shared some of the same
employees.FN7Courts have noted the existence of
shared employees in imposing alter ego liability.
*See, e.g., Rollins,* 206 Cal.App.3d at 11, 253
Cal.Rptr. 338;*Mathes,* 68 Cal.App.3d at 191, 137
Cal.Rptr. 104. At the same time, however, other
courts have observed that "[i]t is considered a nor-
mal attribute of ownership that officers and direct-
ors of the parent serve as officers and directors of
the subsidiary."*Sonora Diamond,* 83 Cal.App.4th at
548-49, 99 Cal.Rptr.2d 824;*see also Doe v. Unocal,*
248 F.3d 915, 925-26 (9th Cir.2001) (noting that it
is appropriate for directors of a parent to serve as
directors of the subsidiary without exposing the
parent to liability for the subsidiary's act). Accord-
ingly, while this factor carries some weight, the
court will not impose alter ego liability without a
more substantial showing.

> FN7. For example, Fru-Con Vice President
> and General Counsel Len Ruzicka testified
> that he was an officer of Fru-Con, FCHC,
> and other Fru-Con related entities. Poulos
> Decl. ¶ 38, Ex. HH. Fru-Con controller
> Martin Schaper and Vice President of
> Audit Tanya Gale testified about various
> positions that they alternately filled for
> Bilfinger and Fru-Con over the years.
> Poulos Decl. ¶ 12, Ex. H; ¶ 59, Ex. CCC.
> Fru-Con Operations Manager Earle Hard-
> grave also came from Bilfinger and went
> back to Bilfinger. Poulos Decl. ¶ 35, Ex.
> EE.

**c. Legal Services**

SMUD also argues that Len Ruzicka, Fru-Con's
general counsel, provided legal services for both
Fru-Con and FCHC, and was an officer of both.
Poulos Decl. ¶ 38, Ex. HH. The use of the same
lawyers is another relevant factor in the alter ego
analysis. *See Slottow v. Am. Cas. Co.,* 10 F.3d
1355, 1360 (9th Cir.1993) (use of same lawyer a
"relevant factor[ ]"); *Marr v. Postal Union Life Ins.
Co.,* 40 Cal.App.2d 673, 683, 105 P.2d 649 (1940)
(use of same lawyer "a fact entitled to considera-
tion"); *Calvert,* 875 F.Supp. at 679 (use of same
lawyer "carries plaintiffs' [alter ego] argument the
furthest" but nevertheless finding no alter ego liab-
ility). At the same time, "common characteristics
[such] as ... shared professional services" may be
normal and appropriate. *See Sonora Diamond,* 83
Cal.App.4th at 540-41, 99 Cal.Rptr.2d 824.

*7 Here, Ruzicka did not testify that he provided
legal advice to both Fru-Con and FCHC in his ca-
pacity as an officer of each corporation; rather, he
stated that it was his role in such capacities to com-
plete the meeting minutes and oversee certain activ-
ities from a corporate legal standpoint. Poulos Decl.
¶ 38, Ex. HH ("My primary function as a secretary
of each of those corporations is to do the corporate
minutes, [ ] be involved in overseeing what was
done from a legal corporate point of view. So it
would have been more of ... corporate legal ser-
vices."). That Ruzicka "change[d] hats," *Sonora
Diamond,* 83 Cal.App.4th at 548-49, 99 Cal.Rptr.2d
824, like the other employees who have worked for
Fru-Con in addition to FCHC and/or Bilfinger, is
still not enough to establish alter ego liability.

Ruzicka's contact with Bilfinger was even less dir-
ect than the contact with FCHC. He testified that he
would call Bilfinger's general counsel and "keep
him informed." Poulos Decl. ¶ 38, Ex. HH. As a
subsidiary, Fru-Con had a duty to report significant
legal issues to its parent. *Sonora Diamond,* 83
Cal.App.4th at 548-89, 99 Cal.Rptr.2d 859. There is
no indication that Bilfinger or its general counsel
directed Fru-Con's day-to-day litigation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**d. Experience and Financial Wherewithal**

SMUD also maintains that Fru-Con misrepresented its experience, relying on Bilfinger's track record for its representation that it was a "major international constructor," (a point addressed above) and also misrepresented its financial wherewithal by not disclosing Bilfinger's backing in obtaining the bond. "[T] he concealment and misrepresentation of the identity of responsible ownership, management and financial interest, or concealment of personal business activities" is a factor in the alter ego analysis.*Associated Vendors,* 210 Cal.App.2d at 840-41, 26 Cal.Rptr. 806;*Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, LLP,* 69 Cal.App.4th 223, 251, 81 Cal.Rptr.2d 425 (1999) (describing "financial misrepresentation" as an "important" factor).

Fru-Con's conduct, however, does not rise to the level of a "financial misrepresentation." The fact that Bilfinger used its financial weight to secure Fru-Con's bond is insufficient to establish alter ego liability. *See Akzona, Inc. v. E.I. Du Pont De Nemours and Co.,* 607 F.Supp. 227, 238 (D.Del.1984) (parental guaranty of third party loans insufficient); *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil,* 456 F.Supp. 831, 841-43 (D.Del.1978) (surety on bank loans insufficient); *Calvert,* 875 F.Supp. at 679 (parental guarantees appropriate feature of parent-subsidiary relationship). As noted above, from all that appears, what was most valuable to SMUD (and what SMUD inquired about) was the existence of the bond, not its source.

**e. Undercapitalization**

SMUD argues that Fru-Con was undercapitalized, another factor in the alter ego analysis. *See Associated Vendors,* 210 Cal.App.2d at 839, 26 Cal.Rptr. 806. To be adequately capitalized, a subsidiary must have "capital reasonably regarded as adequate to enable the corporation to operate its business and pay its debts as they mature."*Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up*

*Serv., Inc.,* 736 F.2d 516, 524 (9th Cir.1984).

**\*8** SMUD bases its argument on Bilfinger's role in securing the bond (addressed above) and on the cash infusions that Fru-Con received from Bilfinger. Poulos Decl. ¶ 20, Ex. P (testimony of Fru-Con's cash manager, who stated that "if there was ever a need for cash that Bilfinger would-there would be a cash infusion."). This latter practice, however, is a common feature of parent-subsidiary relationships, and the fact that a subsidiary receives cash infusions from time to time does not necessarily mean that it has been inadequately capitalized. *See Sonora Diamond,* 83 Cal.App.4th at 546, 99 Cal.Rptr.2d 824 (finding corporation "was adequately capitalized at the outset and regularly funded, by intercompany loans, when operational losses made cash infusions necessary"); Poulos Decl. ¶ 20, Ex. H (Fru-Con controller testifying that when Fru-Con "had some longer-term cash flow problems" in the 1980s, Bilfinger would send cash).

In sum, SMUD has not tendered sufficient evidence to show that there was a unity of interest and identity between Fru-Con, on the one hand, and Bilfinger or FCHC, on the other. With regard to FCHC, the only evidence presented in support of an alter ego theory is that (1) Fru-Con was required to obtain FCHC board approval with respect to certain "macro-management" decisions contained in the Letter of Direction, (2) Fru-Con and FCHC shared certain employees, and (3) Fru-Con's general counsel also performed certain tasks as an officer of FCHC from a legal standpoint. This falls far short of the required showing for alter ego liability.

With regard to Bilfinger, the evidence at issue consists of (1) Ophoven' s periodic visits to the site over a span of several months, (2) shared employees, (3) the description of Fru-Con as a major international constructor and the alleged reliance on Bilfinger's experience in making that statement, (4) Bilfinger's role in obtaining the bond, and (5) Bilfinger's cash infusions to Fru-Con. While perhaps a closer issue than that presented by FCHC, SMUD has also not introduced sufficient evidence to prove

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2384841 (E.D.Cal.)
**(Cite as: 2007 WL 2384841 (E.D.Cal.))**

that alter ego liability is warranted.

**B. Direct Contacts**

Alternately, SMUD asserts that the court may exert jurisdiction over Bilfinger and FCHC based on their direct contacts with California. As detailed below, this argument is even less availing than jurisdiction under an alter ego or agency theory.

**1. General Jurisdiction**

General jurisdiction can exist where a foreign corporation's contacts with the forum are "continuous and systematic general business contacts."*Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414-16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The standard for establishing general jurisdiction is "fairly high and requires that the defendant's contact be of the sort that approximate physical presence."*Bancroft & Masters, Inc. v. Augusta Nat'l Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000) (internal citations and quotations omitted).

With regard to Bilfinger, the only alleged direct contact with California consists of two general engineering licenses, the most recent of which expired in 1992, a decade before Fru-Con's contract with SMUD was negotiated. Poulos Decl. ¶¶ 17, 19, Ex. O. These licenses are simply too stale to permit the exercise of general jurisdiction. Courts reach back no more than five to seven years in examining jurisdictional facts. *See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 569 (2d Cir.1996) (noting that other courts have found three to seven years to be reasonable); *Slurry Sys. v. Berminghammer Found. Equip.,* 2006 U.S. Dist. LEXIS 20238, *12-13 (N.D.Ind.2005) (declining to examine contacts beyond seven years).

**\*9** With regard to FCHC, there are two alleged contacts: (1) a lease for three cars associated with the project and (2) an insurance policy endorsement that covered some project-related equipment. Poulos Decl. ¶ 27, Ex. W (lease agreements); ¶ 28,

Ex. X (insurance policy). These two contacts are not the sort that "approximate physical presence." *Bancroft & Masters,* 223 F.3d at 1086.

**2. Specific Jurisdiction**

Alternately, a court may exert specific jurisdiction where (1) the defendant has purposefully availed itself of a forum benefit, (2) the controversy is related to or arises out of the defendant's contacts, and (3) the exercise of jurisdiction would comport with fair play and substantial justice. *Burger King,* 471 U.S. at 475-78.

With regard to Bilfinger, all of SMUD's jurisdictional claims are derivative. Accordingly, because SMUD cannot establish jurisdiction under an alter ego or agency theory, there is no specific jurisdiction over Bilfinger. With regard to FCHC, the evidence shows that FCHC received the lease agreements, but there is no indication that FCHC was the contracting party or in control of the cars in question. Moreover, although there is evidence that an insurance policy obtained by FCHC was amended to include certain Fru-Con equipment used on the project, this contact, like the lease agreement, is simply too peripheral to be said to give rise to the present controversy. Relatedly, it would not comport with fair play and substantial justice to hail international defendants into California on such an attenuated basis.

**C. Discovery**

The final matter before the court is SMUD's motion, which seeks jurisdictional discovery and requests that the court stay any decision on the pending motions to dismiss.

There is no definitive standard for whether to permit jurisdictional discovery. Some courts have held that before allowing such discovery, the plaintiff must first make a "colorable or prima facie showing of personal jurisdiction."*See Central States v. Reimer Express World Corp.,* 230 F.3d 934, 946 (7th

Slip Copy                                                                    Page 10
Slip Copy, 2007 WL 2384841 (E.D.Cal.)
**(Cite as: 2007 WL 2384841 (E.D.Cal.))**

Cir.2000); *see also United States v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, 625 (1st Cir.2001) ("[A] diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of in personam jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense."); *Jazini v. Nissan Motor Co.,* 148 F.3d 181, 186 (2d Cir.1998) (denying discovery where plaintiffs "did not establish a prima facie case that the district court had jurisdiction").

Other courts, however, have rejected the requirement of a prima facie case. *See Orchid Biosciences Inc. v. St. Louis Univ.,* 198 F.R.D. 678, 673 (S.D.Cal.2001) ("It would [ ] be counterintuitive to require a plaintiff, prior to conducting discovery, to meet the same burden that would be required in order to defeat a motion to dismiss. Moreover, the authorities from our circuit ... indicate that our Federal Rules envision a broader scope of even preliminary discovery."). The Ninth Circuit has also held that while "[a]n appellate court will not interfere with the trial court's refusal to grant discovery except upon the clearest showing that the dismissal resulted in actual and substantial prejudice to the litigant," discovery "should be granted where pertinent facts bearing on the question are controverted ... or where a more satisfactory showing of the facts is necessary."*Wells Fargo & Co. v. Wells Fargo Exp. Co.,* 556 F.2d 406, 430 n. 24 (internal quotation marks omitted).

**\*10** Here, most of the facts themselves are not seriously in dispute; the issue is whether they rise to a level warranting application of the alter ego theory. Furthermore, there is no reasonable likelihood that additional discovery would help SMUD to prove that injustice would result if Bilfinger and FCHC were not made party to this action.[FN8] Without proof of this necessary element, any other discovery would be futile. The simple fact remains that a bond exists (with an uncommited capacity almost assuredly large enough to satisfy any judgment). In addition, Fru-Con has ongoing projects worth hun-

dreds of millions of dollars and has a track record of timely payment of debts. Against this background, it would be unfair to permit SMUD to conduct jurisdictional discovery.

> FN8. As noted earlier, although SMUD maintains that Travelers' legal obligation to pay is in doubt, this doubt is not enough to satisfy its burden of showing that injustice will result. Furthermore, additional discovery would not help SMUD with regard to this issue.

### IV. Conclusion

For the reasons set forth above, the court GRANTS Bilfinger and Fru-Con Holding Corporation's motions to dismiss for lack of personal jurisdiction (Doc. Nos. 410 & 412) and DENIES SMUD's motion for jurisdictional discovery (Doc. No. 419).

IT IS SO ORDERED.

E.D.Cal.,2007.
Fru-Con Const. Corp. v. Sacramento Municipal Utility Dist.
Slip Copy, 2007 WL 2384841 (E.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.))**

**C**

Funk v. Limelight Media Group, Inc.
W.D.Ky.,2006.
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Bowling Green Division.
William H. FUNK II and All American Investors
Group, Inc., Plaintiffs
v.
LIMELIGHT MEDIA GROUP, INC., et al., De-
fendants.
**Civil Action No. 1:06CV-72-M.**

Oct. 16, 2006.

David F. Broderick, Broderick & Associates, Bowl-
ing Green, KY, Hunter Durham, Durham & Zornes,
Columbia, KY, for Plaintiffs.
Brigid O. Gies, Ann Toni Kereiakes, Elisabeth S.
Gray, Greenebaum Doll & McDonald PLLC,
Louisville, KY, Deborah J. Newman, Jamie M.
Brickell, Pryor Cashman Sherman & Flynn LLP,
New York, NY, for Defendants.

*MEMORANDUM OPINION AND ORDER*

JOSEPH H. McKINLEY, JR., District Judge.
**\*1** This matter is before the Court on a motion by
Defendants, Limelight Media Group, Inc., Impart
Mobile Media Division, David Lott, and Stewart
Layton, to dismiss the complaint for lack of person-
al jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2)
and for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6) [DN 9]. Fully briefed, this
matter is ripe for decision.

**I. BACKGROUND**

On February 2, 2005, Defendant, Limelight Media
Group, Inc. (hereinafter "Limelight") [FN1], an-
nounced that it had signed a letter of intent to ac-
quire a majority interest in OTR Media, Inc.
(hereinafter "OTR"), a privately-held company in-
corporated under the laws of Nevada and with its

principal place of business in Bowling Green, Ken-
tucky. OTR provides outdoor advertising services
primarily through the placement of mobile bill-
boards on tractor trailers. In addition to the place-
ment of advertisements, OTR developed a propriet-
ary system of tracking the mobile billboards in
commercial markets.

> FN1. Defendant, Limelight Media Group,
> Inc., is incorporated under the laws of
> Nevada and currently has its principal
> place of business in Seattle, Washington.
> In December of 2005, Limelight Media
> Group changed its name to Impart Media
> Group, Inc. Prior to moving its principal
> place of business to Seattle, Washington,
> Limelight maintained its principal place of
> business in Tennessee.

The letter of intent provided that OTR would dis-
tribute 51 percent of OTR's outstanding capital
stock in exchange for Limelight assuming "full op-
erational and financial functions of the com-
pany."(Complaint, Exhibit A, February 2, 2005,
Form 8-K.) Further, the letter of intent indicated
that certain OTR shareholders, including Plaintiff
All American Investment Group, Inc. (hereinafter
"All American"), would "return to OTR Media is-
sued shares which [would] be redistributed to exist-
ing shareholders of OTR Media."(*Id.*) Upon conclu-
sion of the share distribution, Limelight was to own
a majority interest in OTR, and OTR's operations
and assets were to be posted on Limelight's books
as a partially-owned subsidiary. (*Id.*)

On March 11, 2005, Limelight entered into a Stock
Purchase Agreement with OTR under which Lime-
light acquired approximately 51 percent of OTR's
outstanding capital stock. In consideration for the
shares, Limelight agreed "to assume financial and
operational control and responsibility of OTR from
and after April 15, 2005."(Complaint, Exhibit B,
March 11, 2005, Form 8-K.) Defendant, Stewart
Layton, was appointed president of OTR. Defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 2
Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.))

ant, David V. Lott, Chief Executive Officer and President of Limelight, was elected to serve on the board of directors of OTR. (*Id.*) Both Layton and Lott are residents of Tennessee. Plaintiffs allege that following the acquisition of OTR Media, Inc., by Limelight, OTR's proprietary information, including trade secrets, were turned over to the Defendants pursuant to the Stock Purchase Agreement.

On August 28, 2005, Limelight filed a Form 8-K with the SEC indicating that as a result of several material breaches of the Stock Purchase Agreement by OTR, including OTR's failure to deliver to Limelight the OTR shares and to provide Limelight with access to the books and records, Limelight relinquished its right to receive the OTR shares, as well as financial and operational control it had assumed. (Complaint, Exhibit E, August 28, 2005 Form 8-K.) Lott resigned from the Board of Directors of OTR on that date as well.

*2 On December 14, 2005, Defendant Limelight announced a new division, Impart Mobile Media. The Impart Mobile Media Division is led by former OTR President, Stewart Layton. According to the press release, the Impart Mobile Media Division "is tasked with establishing the necessary infrastructure to capitalize on three primary business venues in the Fleet Marketing industry: (1) Truck-side Advertising; (2) Fleet Marketing; and (3) Fleet Asset and Retail Media Management."(Complaint, Exhibit F.)

As of a result of these actions, on April 21, 2006, Plaintiffs, William Funk and All American, filed suit in Warren Circuit Court, Bowling Green, Kentucky. Plaintiffs are shareholders of stock issued by OTR. (Complaint at ¶¶ 1, 2.) Plaintiffs allege a violation of the Kentucky Uniform Trade Secrets Act (KRS § 365.880), loss of pecuniary interest as a result of the Defendants' failure to honor the Stock Purchase Agreement and breach of that agreement, and loss of value of the stock relinquished by All American in consideration of Defendants' acquisition of OTR. Plaintiffs seek a temporary restraining

order and preliminary and permanent injunctions against the Defendants prohibiting them from continuing to use trade secrets of OTR and ordering them to abide by and to enforce the acquisition of OTR. (Complaint at p. 8.) Additionally, Plaintiffs seek compensatory and punitive damages.

Defendants removed this action to this Court in May of 2006 and have now filed a motion to dismiss the complaint. Defendants argue that the complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(2) because they do not have sufficient contacts with Kentucky to warrant the exercise of personal jurisdiction. Defendants further argue that the complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because (1) Plaintiffs do not have standing to bring claims for unfair competition and misappropriation of trade secrets; (2) the unfair competition claims are preempted by the Kentucky Uniform Trade Secrets Act; (3) Count III fails to state a claim for which relief can be granted; and (4) Impart Mobile Media Division does not have the capacity to be sued. These arguments will be addressed in turn.

## II. PERSONAL JURISDICTION

### A. Standard of Review

When a motion to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) is made, the plaintiff has the burden of proving that jurisdiction exists. *Youn v. Track, Inc.,* 324 F.3d 409, 417 (6th Cir.2003). As a part of the burden of proof, a plaintiff's burden of persuasion depends upon whether the court conducts an evidentiary hearing on the motion to dismiss. When an evidentiary hearing is held, the plaintiff must establish jurisdiction by a preponderance of the evidence. *Id.* at 417.When there is no evidentiary hearing, the plaintiff must make only a prima facie showing and the pleading and affidavits are viewed in a light most favorable to the plaintiff. *Dean v. Motel 6 Operating L.P.,* 134 F.3d 1269, 1272 (6th Cir.1998)).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.))**

Federal courts apply the law of the forum state when determining whether personal jurisdiction exists. *Youn,* 324 F.3d at 417;*Bird v. Parsons,* 289 F.3d 865, 871 (6th Cir.2002). If personal jurisdiction exists under the forum state's long arm statute, the court then must determine whether personal jurisdiction would comport with the Due Process Clause of the U.S. Constitution. *Id.*

### B. Discussion

**\*3** Both parties acknowledge that the issue of personal jurisdiction involves an inquiry into the reach of the forum's state long-arm statute and considerations of due process. The dispute concerns whether the Defendants' activities place them within the reach of Kentucky's long-arm statute.

"Whether or not personal jurisdiction is established in any instance depends upon the facts and circumstances of each particular case."*Info-Med Inc. v. National Healthcare, Inc.,* 669 F.Supp. 793, 796 (W.D.Ky.1987). In determining whether the exercise of personal jurisdiction over a nonresident defendant is authorized, a federal district court must first apply the law of the forum state. *Clay v. Hopperton Nursery, Inc.,* 533 F.Supp. 476, 478 (E.D.Ky.1982). If the state long-arm statute would permit the exercise of personal jurisdiction over the nonresident defendant, the court must examine whether the exercise of jurisdiction is consistent with the Due Process Clause of the United States Constitution. *Id.* Where the state legislature has authorized state courts to reach the full constitutional limits in pursuing a nonresident defendant, these two inquiries become one. *Id.*

In Kentucky, the reach of the long-arm statute and considerations of due process are conflated as " 'the long-arm statute within this jurisdiction allows Kentucky courts to reach to the full constitutional limits of due process in entertaining jurisdiction over non-resident defendants.' " *Wilson v. Case,* 85 S.W.3d 589, 592 (Ky.2002) (citation omitted). Thus, the Court need only consider whether juris-

diction is proper under the Fourteenth Amendment.*National Grange Mut. Ins. Co. v. White,* 83 S.W.3d 530, 533-34 (Ky.2002); *see also Tobin v. Astra Pharmaceutical Products, Inc.,* 993 F.2d 528, 541 (6th Cir.), *cert. denied,*510 U.S. 914 (1993) (recognizing that the Kentucky long-arm statute has been understood to reach the full constitutional limits in entertaining jurisdiction over non-resident defendants).

"The relevant inquiry is whether the facts of the case demonstrate that the nonresident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.' " *Theunissen v. Matthews,* 935 F.2d 1454, 1459 (6th Cir.1991) (quoting *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316 (1945)). Depending on the type of contacts with the forum, personal jurisdiction may be either general or specific. General jurisdiction exists upon a showing that the defendant has "continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims the plaintiff may have against the defendant." *Kerry Steel, Inc. v. Paragon Industries, Inc.,* 106 F.3d 147, 149 (6th Cir.1997). Specific jurisdiction is exercised over a defendant in a suit arising out of or related to the defendant's contacts with the forum. *Id.;Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414-415 & nn. 8-10 (1984). Plaintiffs do not contend that the Court has general jurisdiction over Defendants. Thus, only specific jurisdiction will be considered in this case.

**\*4** The Sixth Circuit has identified three criteria for determining whether specific in personam jurisdiction may be exercised.

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.))

substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Mach. Co. v. Mohasco Indus., Inc.,* 401 F.2d 374, 381 (6th Cir.1968).*See also Theunissen,* 935 F.2d at 1460;*Franklin Roofing, Inc. v. Eagle Roofing and Sheet Metal, Inc.,* 61 S.W.3d 239, 240 (Ky.App.2001).

In order to determine whether personal jurisdiction over the Defendants would be appropriate in this forum, the Court must examine their contacts in terms of the three criteria outlined in *Mohasco.*"The three-prong test is intended to be a framework for analysis and is not susceptible to mechanical application."*Info-Med,* 669 F.Supp. at 796 (citing *Welsh v. Gibbs,* 631 F .2d 436, 440 (6th Cir.1980))."Furthermore, the first and second prongs may be considered as one due to their interrelatedness."*Id.*

First, Defendants must have purposefully availed themselves of the privilege of acting in the forum state or causing consequences in the forum state. Jurisdiction is proper under the purposeful availment requirement "where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State."*Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985). Moreover, the defendant's conduct and connection with the forum must be of a character that he or she should reasonably anticipate being haled into court there. *Id.* at 474."This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts."*Id.* at 475.

"[P]arties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities."' *LAK, Inc. v. Deer Creek Enterprises,* 885 F.2d 1293, 1300 (6th Cir.1989) (quoting *Burger King,* 471 U.S. at

"[J]urisdiction may not be avoided merely because the defendant did not *physically* enter the forum state, so long as a commercial actor's efforts are purposefully directed toward residents of another state."*Info-Med,* 669 F.Supp. at 796.

Defendants assert that the Stock Purchase Agreement was a "one-shot transaction" that did not create "continuing relationships and obligations" between Defendants and Kentucky. In support of this argument, Defendants maintain that the Agreement contemplated that Limelight would purchase a majority interest in OTR and "assume financial and operational control of the company from [Limelight's] out-of-state headquarters."(Defendants' Reply at 7.) Furthermore, the Agreement provided that any disputes arising from the Agreement were to be adjudicated in Tennessee in accordance with the laws of that State.[FN2] As a result, Defendants contend that the fact that a portion of the Stock Purchase Agreement's negotiations are alleged to have taken place in Kentucky does not constitute purposeful availment of the benefits and protections of Kentucky's laws.

> FN2. The existence of a forum selection clause within the Stock Purchase Agreement does not deprive this Court of personal jurisdiction over the Plaintiffs' claims. The enforcement of the forum selection clause against the Plaintiffs is not permitted given that they are not parties to the Stock Purchase Agreement.

**\*5** Considering the facts alleged in the complaint in the light most favorable to the Plaintiff, the Court finds that Plaintiffs have made a prima facie showing that the Defendants [FN3] purposefully availed themselves of the benefits and protections of Kentucky law. The record reflects that pursuant to the March 11, 2005, Stock Purchase Agreement, Limelight acquired 10.2 million shares of common stock of OTR, representing 51 percent of the outstanding capital stock of OTR. Negotiations related to the Stock Purchase Agreement occurred in both Kentucky and Tennessee. The documents filed with the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                            Page 5
Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.))

SEC specifically describe OTR as "a privately held company based in Bowling Green, Kentucky that provides outdoor advertising services primarily through the placement of mobile billboards on tractor trailers."(Complaint, Exhibit B, March 11, 2005 Form 8-K.) The Stock Purchase Agreement provides that in consideration for the shares of OTR, Limelight agreed to "assume financial and operational responsibility" of OTR from and after April 15, 2005. (Complaint, Exhibit B, Stock Purchase Agreement and March 11, 2005 Form 8-K.)

> FN3. The Court has not specifically considered the contacts of Impart Mobile Media Division which is a division of Limelight. An unincorporated division lacks the legal capacity to be sued. *Bingham v. Inland Division of General Motors,* 1991 WL 224092, * 1 (6th Cir. October 31, 1991), *cert. denied,* 504 U.S. 965 (1992). As such, all claims against it are claims against Limelight.

While the Defendants contend that Limelight intended to assume all financial and operational control of OTR from Limelight's out-of-state headquarters, neither the Stock Purchase Agreement nor the SEC Forms support this assertion. It appears from the pleadings that Limelight along with the other Defendants reached out beyond Tennessee and created continuing obligations with "citizens of another state." The exhibits attached to Plaintiffs' complaint reflect that Limelight entered into negotiations in Kentucky, purchased controlling interest in a Kentucky-based company, and agreed to assume financial and operational control of a Kentucky-based company. Likewise, the individual Defendants became officers in a Kentucky-based company. Finally, Plaintiffs allege that these Defendants then misappropriated trade secrets obtained through the acquisition of this Kentucky-based company. These contacts were in no way "random," "fortuitous," or "attenuated." These facts satisfy the first prong of *Mohasco.*[FN4]

> FN4. In support of their argument that per-

sonal jurisdiction over the Defendants exists, Plaintiffs state that the majority of the shareholders of OTR reside in Kentucky. The Plaintiff has not cited any case law that establishes where a defendant intends to acquire a majority interest in a corporation it subjects itself to personal jurisdiction in every state in which the corporation's shareholders reside.

Second, the Plaintiffs must show that their cause of action "arose out of" the Defendants' activities in the forum state. " 'An action will be deemed not to have arisen from the defendant's contacts with the forum state only when they are unrelated to the operative facts of the controversy.' " *General Motors Corp. v. Ignacio Lopez de Arriortua,* 948 F.Supp. 656, 663 (E.D.Mich.1996)(quoting *Creech v. Roberts,* 908 F.2d 75, 80 (6th Cir.1990), *cert. denied,* 499 U.S. 975 (1991)). The Sixth Circuit has noted that the first and second prongs can be considered as one due to their interrelatedness. Here, the Court has no trouble concluding that the Plaintiffs' cause of action arose from the Defendants' forum state activities. Plaintiffs have alleged that by virtue of Limelight's purchase of the controlling interest of OTR, acquisition of OTR's trade secrets, and subsequent breach of the Stock Purchase Agreement, the Defendants were able to misappropriate OTR's proprietary information including trade secrets. Clearly, Plaintiffs' cause of action is related to Defendants' solicitation and purchase of the majority interest of stock of OTR. Thus, the facts of this case also satisfy the second prong of *Mohasco.*

*6 Finally, the remaining inquiry is whether the acts of the Defendants or consequences caused by the Defendants have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. If the first two factors have been met, then an inference arises that the third factor is also present. See *CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1268 (6th Cir.1996). Defendant Limelight engaged in a busi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.))

ness transaction with OTR that occurred over a significant period of time. Limelight, along with the individual Defendants, established a relationship with OTR from which they hoped to profit financially. *See Neal v. Janssen,* 270 F.3d 328, 333 (6th Cir.2001). Then Limelight allegedly breached the Stock Purchase Agreement and, along with the individual Defendants, stole OTR's trade secrets. These facts are sufficient to make it reasonable for Kentucky to exercise personal jurisdiction. *Id.* Thus, the Court finds that all three prongs of *Mohasco* are satisfied, and Defendants' motion to dismiss for lack of personal jurisdiction is denied.

### III. MOTION TO DISMISS

#### A. Standard of Review

Upon a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), the Court must construe the complaint in a light most favorable to the plaintiffs, accept all the factual allegations as true, and determine whether the plaintiffs undoubtedly can prove no set of facts in support of their claim that would entitle them to relief. *Sistrunk v. City of Strongsville,* 99 F.3d 194, 197 (6th Cir.1996), *cert. denied,* 520 U.S. 1251 (1997). A judge may not grant a Fed.R.Civ.P. 12(b)(6) motion based on a disbelief of a complaint's factual allegations. *Wright v. MetroHealth Medical Center,* 58 F.3d 1130, 1138 (6th Cir.1995), *cert. denied,* 516 U.S. 1158 (1996). A Fed.R.Civ.P. 12(b)(6) motion tests whether the plaintiffs have stated a claim for which the law provides relief. *Gazette v. City of Pontiac,* 41 F.3d 1061, 1064 (6th Cir.1994). It is against this standard that the Court reviews the facts set forth above.

#### B. Discussion

#### 1. Standing

Defendants assert that Plaintiffs lack standing to pursue a direct claim for unfair competition and misappropriation of trade secrets alleged in Count I and for "loss of pecuniary interest in OTR" alleged in Count II. Defendants argue that OTR, not Plaintiffs, is the proper party to bring these claims. The Court agrees.

"[A] shareholder of a corporation does not have a personal or individual right of action for damages based solely on an injury to the corporation."*Gaff v. Federal Deposit Insurance Corp.,* 814 F.2d 311, 315 (6th Cir.1987). The general rule is even applicable in cases where the individual is the sole shareholder.*Trebilcock v. Elinsky,* 2006 WL 414064, *3 (N.D.Ohio Feb. 21, 2006)(citing *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 603 (6th Cir.1988))."A suit for damages arising from an injury to the corporation can only be brought by the corporation itself or by a shareholder derivatively if the corporation fails to act, ... since only the corporation has an action for wrongs committed against it."*Gaff,* 814 F.2d at 315. However, an exception to this rule exists if the shareholder can show " 'an injury separate and distinct from the damage or injury suffered by other shareholders or the corporation as an entity.' " *Trebilcock,* 2006 WL 414064, *3 (citation omitted); *Gaff,* 814 F.2d at 315.

*7 It is clear from the face of the Complaint that the trade secrets Plaintiffs allege were misappropriated belong to OTR, rather than to the Plaintiffs. *See* Complaint at ¶ 17 ("The Defendants ... misappropriated by improper means trade secrets of OTR.") Therefore, any injury caused by Defendants' alleged unfair competition or misappropriation of trade secrets as alleged in Count I is a direct injury only to OTR, not the Plaintiffs. Similarly, with respect to Count II, Plaintiffs' "loss of pecuniary interest in OTR" as a result of the alleged breach of the Stock Purchase Agreement by Limelight is insufficient to provide Plaintiffs standing to sue. "A depreciation or diminution in the value of a shareholder's corporate stock is generally not recognized ... as the type of direct, personal injury which is necessary to sus-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 7
Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.))

tain a direct cause of action."*Gaff,* 814 F.2d at 315. As recognized by the Sixth Circuit, diminution in the value of corporate stock "resulting from depletion of or injury to corporate assets is a direct injury only to the corporation; it is merely an indirect or incidental injury to an individual shareholder."*Id.*

Plaintiffs respond that as a result of Defendants' raid upon OTR, there is essentially no corporation that can act to redress the wrongs of the Defendants, and that the OTR shareholders are all that are left to prosecute any claims for damages. However, the Plaintiffs fail to plead facts indicating that OTR Media, Inc., is no longer a corporation that can redress harms allegedly committed against it. From the facts set forth in the complaint, the Court finds that a shareholder derivative action is the proper method to redress the injuries set forth in Counts I and II.

For the reasons discussed above, the Court finds that the Plaintiffs have not alleged any injury in Counts I and II separate and apart from that suffered by OTR or its shareholders as a result of the alleged actions of the Defendants. As such, Plaintiffs lack standing to obtain relief on their own behalf; and Defendants' motion to dismiss Counts I and II for lack of standing is granted.

**2. Count III**

In Count III, Plaintiff, All American, alleges that in consideration of the Defendants' acquisition of the majority interest in OTR, Plaintiff "gave up 2,500,000 shares of 3,000,000 shares of stock it owned in OTR Media Group, Inc., prior to said acquisition."(Complaint at ¶ 27.) All American alleges that as a direct and proximate result of the Defendants' actions, All American "has lost the value of stock it relinquished in consideration of the Defendants' acquisition of the controlling interest in OTR Media, Inc., all to the detriment and financial loss of All American...."(*Id.* at ¶ 28.)The Defendants argue that accepting the allegations in Plaintiffs' complaint as true, All American has

failed to explain any legal theory under which Defendants would be liable to All American for loss it allegedly incurred as a result of relinquishing its OTR shares. As a result, Defendants argue that Count III fails to state a claim upon which relief can be granted.

**\*8** In as much as All American is alleging a breach of contract claim, such a claim fails because All American is not a party to the Stock Purchase Agreement and as a result, it does not have standing to sue for any alleged breach. " '[A]s a general rule, whenever a wrong is founded upon a breach of contract, the plaintiff suing in respect thereof must be a party or privy to the contract, and none but a party to a contract has the right to recover damages for its breach against any of the parties thereto.'" *Presnell Const. Managers, Inc. v. EH Const., LLC,* 134 S.W.3d 575, 579 (Ky.2004) (citation omitted). Furthermore, while the Stock Purchase Agreement specifically references the fact that All American, along with another shareholder, would relinquish a majority of its stock, there is no indication in the Agreement that these shareholders constitute third-party beneficiaries who have standing to sue under the Agreement. In fact, the Stock Purchase Agreement specifically provides: "*No Third Party Beneficiaries:* This Agreement is intended for the benefit of the parties hereto ... and is not for the benefit of, nor may any provision hereof be enforced by, any other person."(Complaint, Exhibit B, § 6.8.) Therefore, Plaintiffs fail to state a claim for breach of contract.

Additionally, in response to the motion to dismiss, Plaintiffs argue that OTR Media is still in the eyes of the Plaintiffs controlled by Defendants and therefore, Defendants are the proper party against which All American should look for redress. This argument is contrary to the exhibits attached to Plaintiffs' complaint. The August 28, 2005, SEC Form 8-K filed by Limelight specifically states that Limelight terminated the Stock Purchase Agreement as a result of OTR's breach of the Stock Purchase Agreement and relinquished its right to re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.))

ceive OTR shares, as well as any financial and operational control it had assumed. (Complaint, Exhibit E; *see also* Complaint, Exhibit F.) Therefore, pursuant to the exhibits attached to Plaintiffs' complaint, it would appear that the shares of stock in question are under the control of OTR and All American should seek return of the 2.5 million shares of stock from OTR.

" 'In practice, a ... complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory.' " *Lillard v. Shelby County Board of Education,* 76 F.3d 716, 726 (6th Cir.1996)(emphasis in original) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988)). Considering both the Plaintiffs' complaint and response to the motion to dismiss, the Court finds that the Plaintiff has failed to identify some viable legal theory for recovery by All American from the Defendants for the shares of OTR stock All American relinquished. For these reasons, the motion to dismiss Count III of Plaintiffs' complaint for failure to state a claim is granted.

### IV. CONCLUSION

**\*9** For the reasons set forth above, the motion by Defendants to dismiss the complaint for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) is **DENIED** and the motion by Defendants to dismiss the complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) [DN 9] is **GRANTED.**

W.D.Ky.,2006.
Funk v. Limelight Media Group, Inc.
Not Reported in F.Supp.2d, 2006 WL 2983058 (W.D.Ky.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2008 WL 728902 (N.D.Cal.)
(Cite as: 2008 WL 728902 (N.D.Cal.))

**H**

Hilsenrath v. Equity Trust (Jersey) Ltd.
N.D.Cal.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Hana HILSENRATH and Oliver Hilsenrath,
Plaintiffs,
v.
EQUITY TRUST (JERSEY) LIMITED, Candover
Investments PLC, Insinger De Beaufort Holdings
SA, Jardine Matheson Holdings Limited, Philip
Joseph Austin, Grant Brown, Melvyn Kalman, John
Perkins and Caroline Bougeard, Defendants.
No. C 07-3312 CW.

March 17, 2008.

Hana Hilsenrath, Hilsenrath Cases, Danville, CA,
pro se.
Oliver Hilsenrath, Hilsenrath et al, Danville, CA,
pro se.
Sarah Meyers Ray, Darius C. Ogloza, Katie Ya-Yee
Chang, Peter Allen Wald, Latham & Watkins LLP
Andrew James Cho, Maria Ellinikos, Reginald
David Steer, Akin Gump Strauss Hauer & Feld
LLP, San Francisco, CA, Rachel M. Herrick, Quinn
Emanuel Urquhart Oliver & Hedges LLP, Redwood
Shores, CA, Patrick Martin Ryan, Thelen Reid
Brown Raysman & Steiner LLP, Daven Gerald
Lowhurst, Thelen Reid & Priest LLP, Stacy Marie
Monahan, Quinn Emanuel Urquhart Oliver &
Hedges, San Francisco, CA, Sarah Leslie Knapp,
Baach Robinson & Lewis, Washington, DC, for
Defendants.

ORDER GRANTING DEFENDANTS' MOTIONS
TO DISMISS WITHOUT LEAVE TO AMEND
AND WITHOUT PREJUDICE

CLAUDIA WILKEN, District Judge.
*1 Defendants Equity Trust (Jersey) Limited, Can-
dover Investments PLC, Insinger de Beaufort Hold-
ings SA (IBH), Jardine Matheson Holdings Lim-
ited, Phillip Austin, Grant Brown, Melvyn Kalman,

John Perkins and Caroline Bougeard move to dis-
miss the complaint.[FN1] Plaintiffs Hana and Oliver
Hilsenrath oppose the motions. The motions were
submitted on the papers. Having considered the
parties' papers, the Court grants Defendants' mo-
tions to dismiss without leave to amend and without
prejudice to refiling the appropriate jurisdiction or
jurisdictions.

> FN1. Each Defendant moved separately
> except for Brown and Bougeard and Kal-
> man and Perkins who filed joint motions.

BACKGROUND

Plaintiffs filed this case on June 25, 2007, alleging
various claims based on a lawsuit entitled *Janvrin
Holdings Limited et al v. Hilsenrath et al,* No. C
02-1068 (2002 suit), brought against them in 2002
by entities not party to this case. At issue in that
suit was the propriety of the settlement agreement
reached in an earlier suit between the same
parties.[FN2]The Hilsenraths had filed counterclaims
against the plaintiffs in that suit, claiming that they
improperly accessed the Hilsenraths' confidential
personal information prior to the settlement of the
earlier suit. The Hilsenraths further alleged that
Equity Trust provided the confidential information
to those plaintiffs, but the Hilsenraths did not in-
clude    Equity    Trust    as    a    counter-claim
defendant.[FN3]The Hilsenraths now allege that De-
fendant Equity Trust brought the 2002 suit "by
means of Janvrin et al" and that it breached its fidu-
ciary duty to the Hilsenraths by disclosing their
confidential information. FAC ¶ 68. This fiduciary
duty was allegedly based on company management
agreements (CMAs) Equity Trust entered into with
Plaintiffs. It is undisputed that none of the current
Defendants were party to the 2002 suit or to the
earlier settlement.

> FN2. For a complete history of the prior
> litigation underlying the current case, see
> the Court's concurrently filed order deny-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 2
Slip Copy, 2008 WL 728902 (N.D.Cal.)
**(Cite as: 2008 WL 728902 (N.D.Cal.))**

ing Plaintiffs' motion to disqualify Latham & Watkins from representing Equity Trust.

FN3. A later motion to join Equity Trust as a counter-claim defendant in the 2002 suit was denied.

According to the present complaint, the other Defendants are entities that created Equity Trust or controlled it and individuals who were executives of Equity Trust and Janvrin. FAC ¶¶ 14-23. Each Defendant now moves to dismiss the complaint on various bases, including jurisdictional grounds, improper venue, *forum non conveniens,* failure to state a claim and defective service.

### DISCUSSION

Because Defendants move to dismiss the case on individual jurisdictional bases, each motion is discussed separately below.

### I. Candover Investments

Candover Investments moves to dismiss based on lack of personal jurisdiction. Under Federal Rule of Civil Procedure Rule 12(b)(2), when a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction exists. *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir.2004). The plaintiff "need only demonstrate facts that if true would support jurisdiction over the defendant."*Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir.1995); *Fields v. Sedgwick Assoc. Risks, Ltd.,* 796 F.2d 299, 301 (9th Cir.1986). Uncontroverted allegations in the complaint must be taken as true. *AT & T v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996). However, the court may not assume the truth of all allegations if they are contradicted by affidavit. *Data Disc, Inc. v. Systems Technology Associates, Inc.,* 557 F.2d 1280, 1284 (9th Cir.1977). Conflicts in the evidence must be resolved in the plaintiff's favor. *AT & T,* 94 F.3d at 588.

*2 There are two independent limitations on a court's power to exercise personal jurisdiction over a non-resident defendant: the applicable state personal jurisdiction rule and constitutional principles of due process.*Sher v. Johnson,* 911 F.2d 1357, 1361 (9th Cir.1990); *Data Disc, Inc.,* 557 F.2d at 1286. California's jurisdictional statute is co-extensive with federal due process requirements; therefore, jurisdictional inquiries under state law and federal due process standards merge into one analysis. *Rano v. Sipa Press, Inc.,* 987 F.2d 580, 587 (9th Cir.1993).

The exercise of jurisdiction over a non-resident defendant violates the protections created by the due process clause unless the defendant has "minimum contacts" with the forum State so that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice."*International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Personal jurisdiction may be either general or specific. General jurisdiction exists where the defendant's contacts with the forum State are so substantial or continuous and systematic that jurisdiction exists even if the cause of action is unrelated to those contacts. *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000). The standard for establishing general jurisdiction is "fairly high." *Id.;Brand v. Menlove Dodge,* 796 F.2d 1070, 1073 (9th Cir.1986). The defendant's contacts must approximate physical presence in the forum State. *Schwarzenegger,* 374 F.3d at 801. Factors considered in evaluating the extent of contacts include whether the defendant makes sales, solicits or engages in business, designates an agent for service of process, holds a license, or is incorporated in the forum State.*Bancroft & Masters, Inc.,* 223 F.3d at 1086.

Specific jurisdiction exists where the cause of action arises out of or relates to the defendant's activities within the forum. *Data Disc, Inc.,* 557 F.2d at 1286. Specific jurisdiction is analyzed using a three-prong test: (1) the non-resident defendant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

must purposefully direct its activities or consummate some transaction with the forum or a resident thereof; or perform some act by which it purposefully avails itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) the exercise of jurisdiction must be reasonable. *Lake v. Lake,* 817 F.2d 1416, 1421 (9th Cir.1987). Each of these conditions is required for asserting jurisdiction. *Insurance Co. of N. Am. v. Marina Salina Cruz,* 649 F.2d 1266, 1270 (9th Cir.1981).

A showing that a defendant "purposefully availed" itself of the privilege of doing business in a forum State typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there. *Schwarzenegger,* 374 F.3d at 802. The requirement of purposeful availment ensures that the defendant should reasonably anticipate being haled into the state court of the forum based on its contacts. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The purposeful availment test is met where "the defendant has taken deliberate action within the forum state or if he has created continuing obligations to forum residents."*Ballard,* 65 F.3d at 1498.

**\*3** A showing that a defendant "purposefully directed" its conduct toward a forum State "usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere."*Schwarzenegger,* 374 F.3d at 803. Purposeful direction may be established under the "effects test" where the defendant (1) committed an intentional act, (2) expressly aimed at the forum State, (3) causing harm that the defendant knows is likely to be suffered in the forum State. *Dole Food Co. v. Watts,* 303 F.3d 1104, 1111 (9th Cir.2002).

The second factor requires that the claim arise out of or result from the defendant's forum-related

activities. A claim arises out of a defendant's conduct if the claim would not have arisen "but for" the defendant's forum-related contacts. *Panavision Int'l v. L.P.v. Toeppa,* 141 F.3d 1316, 1322 (9th Cir.1998).

Once the plaintiff has satisfied the first two factors, the defendant bears the burden of overcoming a presumption that jurisdiction is reasonable by presenting a compelling case that specific jurisdiction would be unreasonable.*Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472-73, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Haisten v. Grass Valley Medical Fund, Ltd.,* 784 F.2d 1392, 1397 (9th Cir.1986). Seven factors are considered in assessing whether the exercise of jurisdiction over a nonresident defendant is reasonable: (1) the extent of the defendant's purposeful interjection into the forum State's affairs, (2) the burden on the defendant, (3) conflicts of law between the forum State and the defendant's home jurisdiction, (4) the forum State's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the dispute, (6) the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum. *Caruth v. International Psychoanalytical Ass'n,* 59 F.3d 126, 128 (9th Cir.1995); *Roth v. Garcia Marquez,* 942 F.2d 617, 623 (9th Cir.1991).

## A. General Jurisdiction

According to the declaration of Company Secretary Andrew Moberly, Candover Investments PLC is a British holding company that organizes and invests in large European buyouts. Moberly Decl. ¶ 2. Its principal place of business is in the United Kingdom and it does not maintain an office, mailing address, bank account or employees in California. *Id.* at ¶¶ 2, 6. Candover is not registered or licensed to do business in California; nor does it solicit or conduct business in the State. *Id.* at ¶¶ 4, 5.

Nonetheless, Plaintiffs argue that general jurisdiction exists over Candover because it invests in various American companies, alleging that Candover

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

owns and controls those companies. Only one of those companies, Lombard Investments, Inc., is a California corporation.[FN4] However, as Candover notes, "engaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders."*Bancroft & Masters*, 223 F.3d at 1086. Further, even taking as true Plaintiffs' allegation that Candover owns the American companies in which it invests, "[t]he existence of a relationship between a parent company and its subsidiaries is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum."*Doe v. Unocal Corp.*, 248 F.3d 915, 925 (9th Cir.2001).

> FN4. Plaintiffs also argue that each Defendant should be subject to nation-wide jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2). However, Rule 4(k)(2) only allows nation-wide jurisdiction when "the exercise of jurisdiction is consistent with the Constitution and laws of the United States."Fed.R.Civ.P. 4(k)(2). Plaintiffs have not established that subjecting Defendants to personal jurisdiction in the United States would be consistent with the Constitution.

> Similarly, Plaintiffs' second argument-that Candover and IBH's participation in commercial banking in the United States is sufficient to establish nation-wide federal jurisdiction-misinterprets the case on which it relies. That case holds only that a foreign state can be subject to jurisdiction in U.S. courts under the Foreign Sovereign Immunities Act based on the "commercial activities" exception when it participates in commercial banking. *See First City, Texas-Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 53 (2d. Cir.2001).

**\*4** Candover does not have sufficient contacts with California to establish general jurisdiction over

FN5

> FN5. Plaintiffs also cite *Mackey v. Compass Mktg.*, 391 Md. 117, 892 A.2d 479 (2006), in support of their argument that each of the Defendants is subject to jurisdiction in this Court because they are coconspirators with Janvrin, which committed overt acts in this State during the underlying litigation. However, the Ninth Circuit has not adopted a conspiracy theory of personal jurisdiction, and district courts within the Ninth Circuit have rejected it. *See, e.g., Kipperman v. McCone*, 422 F.Supp. 860, 873 n. 14 (N.D.Cal.1976) ("[P]ersonal jurisdiction over any non-resident individual must be premised upon forum-related acts personally committed by the individual. Imputed conduct is a connection too tenuous to warrant the exercise of personal jurisdiction.").

B. Specific Jurisdiction

In support of their argument that the Court should exercise specific jurisdiction over Candover, the Hilsenraths state only that it "acted as the *de facto* management" of Equity Trust. The Hilsenraths submit a variety of unauthenticated documents to support this allegation. However, even taking those documents as true, and assuming for purpose of argument that the Court has personal jurisdiction over Equity Trust, there is insufficient evidence to establish that Candover operated as the alter ego of Equity Trust. "[A] parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is 'consistent with the parent's investor status.'"*Id.* at 926 (quoting *United States v. Bestfoods*, 524 U.S. 51, 71, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)). Although the documents cited by the Hilsenraths state that Candover and the management of the companies it buys "act as partners to build long-term value for these businesses," Hilsenrath Decl., Ex. 21, this does not establish that Candover maintained "control of the subsidiar[ies'] in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5
Slip Copy, 2008 WL 728902 (N.D.Cal.)
(Cite as: 2008 WL 728902 (N.D.Cal.))

ternal affairs or daily operations" as required for alter ego status. *Doe,* 248 F.3d at 926.

The Court grants Candover's motion to dismiss for lack of personal jurisdiction.

II. Jardine Matheson Holdings Limited

Jardine moves to dismiss the complaint against it for lack of personal jurisdiction and for failure effectively to serve it.

A. General Jurisdiction

According to company secretary Charles Wilken, Jardine is a Bermuda company that has never conducted business or had property, bank accounts, assets, offices, officers, directors, agents or employees in California. Wilken Decl. ¶¶ 3, 4. As with Candover, Plaintiffs allege that the Court has general jurisdiction over Jardine because it is the "owner" of various companies that do business in the United States. However, Wilken declares that Jardine has no involvement in the day-to-day operations of the companies Plaintiffs cite. Wilken Reply Decl, ¶¶ 3-6. Jardine does not have sufficient contacts with California to support general jurisdiction over it.

B. Specific Jurisdiction

Plaintiffs argue that "Janvrin, Crossgar and Ryburn were owned and operated by Jardine Matheson" during 2000. Opposition at 16. However, the unauthenticated document they cite in support of this argument shows only that a company called C N Limited held one share in Ryburn in trust for the Matheson Trust Company (Jersey) Limited. Hilsenrath Decl., Ex. 7. This share was worth $1.00. *Id.* Even assuming that Matheson Trust Company is the same as Jardine Matheson, that Matheson Trust company had one share held in trust for it is insufficient to establish that it owned and operated Ryburn. Further, Wilken declares that "Jardine has never owned

or operated Janvrin, Ryburn, or Crossgar."Wilken Reply Decl. ¶ 2.

*5 Plaintiffs also argue, "Under Jardine Matheson they negotiated the original securities of Janvrin et al. [sic]." Opposition at 16. Neither of the unauthenticated documents cited in support of this argument mentions Janvrin, Ryburn or Crossgar.

The Court grants Jardine's motion to dismiss for lack of personal jurisdiction. Because the Court finds that it does not have jurisdiction over Janvrin, it need not reach the argument that Plaintiffs failed properly to serve Jardine.

III. Insinger de Beaufort Holdings S.A.

IBH moves to dismiss the complaint against it for lack of personal jurisdiction and for failure effectively to serve it.

A. General Jurisdiction

According to Chief Financial Officer Robert Mooij, IBH is a holding company with its principal place of business in Luxembourg. Mooij Decl. ¶ 2. IBH is not licensed or registered to do business in California and has no offices, property, bank accounts, employees or officers in California. *Id.* at ¶ 3-5.IBH does not advertise in California and does not have any contracts with California companies. *Id.* at ¶ 6. Plaintiffs argue that the Court has general jurisdiction over IBH because it is "an intensive player in the U.S. federal legal system."Opposition at 26. However, each of the unauthenticated documents cited in support of this argument concern various IBH subsidiaries' contacts with the State of New York and the United States in general. Mooij declares that IBH "does not manage the affairs of its subsidiaries or investments," Mooij Decl. ¶ 1, and Plaintiffs do not provide any evidence that it does.

B. Specific Jurisdiction

Plaintiffs argue that "in the 2001/2 time frame

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 6
Slip Copy, 2008 WL 728902 (N.D.Cal.)
**(Cite as: 2008 WL 728902 (N.D.Cal.))**

[Janvrin, Crossgar and Ryburn] were operated and owned by Insinger de Beaufort ."Opposition at 16. In support of this argument, the Hilsenraths submit documents indicating that the director of Insinger de Beaufort in Jersey approved the settlement at issue in the 2002 suit and participated in the meeting in London at which Equity Trust allegedly improperly disclosed Plaintiffs' confidential personal information. Hilsenrath Decl., Exs. 41, 44. Even assuming that these documents are sufficient to establish jurisdiction over Insinger de Beaufort in Jersey, Plaintiffs have not established that IBH is involved in the day-to-day operations of Insinger de Beaufort in Jersey. Therefore, there is no basis on which to exercise specific jurisdiction over IBH.

Because the Court grants IBH's motion to dismiss for lack of personal jurisdiction, it need not address the alternate ground for dismissal based on failure properly to serve IBH.

IV. Equity Trust, Kalman, Perkins, Bougeard, Brown and Austin

The remaining Defendants are Equity Trust and former and current Equity Trust employees and officers (collectively, the Equity Trust Defendants). Equity Trust is a Jersey company and the individuals are Jersey residents. The Equity Trust Defendants each move to dismiss the complaint based on improper venue, lack of personal jurisdiction, defective service and the doctrine of *forum non conveniens.*In addition, the individuals argue that Plaintiffs have failed to state a claim against each of them.

**\*6** Although personal jurisdiction is generally a threshold issue to be determined before any other consideration of a case and all of the Equity Trust Defendants have argued that the Court lacks personal jurisdiction over them, the Court dismisses the claims against them on the basis of *forum non conveniens* without first determining questions of personal jurisdiction. The Supreme Court recently held that "where subject-matter or personal juris-

diction is difficult to determine, and *forum non conveniens* considerations weigh heavily in favor of dismissal, the court properly takes the less burdensome course."*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.,* ---U.S. ----, ----, 127 S.Ct. 1184, 1194, 167 L.Ed.2d 15 (2007).

The Court finds that it would not be able to determine whether it has personal jurisdiction over the Equity Trust Defendants without granting the parties additional opportunities to supplement the record.[FN6]Further, the Court finds that the factors it must consider in making a *forum non conveniens* determination weigh heavily toward dismissal.

> FN6. As mentioned above, pro se Plaintiffs have filed extensive documents in support of their opposition to the motions to dismiss. And, as Defendants note in their joint evidentiary objections, the majority of those documents are not properly authenticated. In order to determine personal jurisdiction with respect to the Equity Trust Defendants, the Court likely would have to allow Plaintiffs an opportunity to re-submit and authenticate the evidence filed in support of their opposition to the motions to dismiss. Further, the Court would have to expend considerable effort determining the corporate structure of Equity Trust, a Jersey corporation. As discussed below, the Court finds that the agreements between Equity Trust and the Hilsenraths, and therefore the Hilsenraths' allegations which stem from those agreements, are governed by Jersey law. Therefore, the Court would have to determine Equity Trust's corporate structure based on Jersey law in order to decide whether it has personal jurisdiction over Equity Trust. This weighs toward dismissing this case on the basis of *forum non conveniens* without reaching the question of personal jurisdiction.

Under the doctrine of *forum non conveniens,* the district court has discretion to decline to exercise

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

jurisdiction in a case where litigation in an alternative forum would be more convenient for the parties. Dismissal based on *forum non conveniens* is "an exceptional tool to be employed sparingly."*Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir.2000). The Supreme Court instructs that dismissal is ordinarily appropriate only where "the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice."*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

In deciding whether to dismiss an action due to *forum non conveniens*, the district court must "consider the availability of an adequate alternative forum, and then ... whether several 'private' and 'public' interest factors favor dismissal."*Leetsch v. Freedman*, 260 F.3d 1100, 1103 (9th Cir.2001). There is a strong presumption in favor of a domestic plaintiff's choice of forum, which can be overcome only when the private and public interest factors clearly point towards trial in the alternative forum. *Piper Aircraft*, 454 U.S. at 265-66;*Ravelo Monegro*, 211 F.3d 509 at 514.

The Equity Trust Defendants argue that Jersey is the proper forum for this case and that the Jersey courts provide a sufficient "avenue for redress." *Creative Tech., Ltd. v. Aztech System PTE, Ltd.,* 61 F.3d 696, 702 (9th Cir.1995). Although the Ninth Circuit has never addressed the ability of the Jersey courts to provide plaintiffs with an adequate remedy, other federal courts have. *See, e.g., Kovzac Ltd. v. Westway Trading Corp.,* 2003 U.S. Dist. LEXIS 10767, 2003 WL 21459953 (E.D.La.); *Mayo Assoc. v. Union Bank of Switzerland,* 1998 U.S. Dist. LEXIS 7791, 1998 WL 274283 (S.D.N.Y.).

Further, the Equity Trust Defendants argue that both private and public interest factors weigh in favor of dismissing this case. The Ninth Circuit holds that the private interest factors to be considered include:

**\*7** (1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Lueck v. Sundstrand Corp.,* 236 F.3d 1137, 1145 (9th Cir.2001) (internal quotations omitted). All of the Equity Trust Defendants are Jersey residents. Further, the conspiracy that Plaintiffs allege only includes one California participant, the non-party law firm Nixon Peabody. Therefore the private interest factors related to the accessibility of witnesses and physical evidence weigh in favor of resolving this case in Jersey. As Equity Trust argues, it appears that the vast majority of the witnesses involved in the case would be outside this Court's subpoena power. *See*Fed.R.Civ.P. 45. Plaintiffs counter, "The events, the witnesses, the documentation and the agents of the U.S. government who will be called to testify are all in California."Opposition at 41. However, Plaintiffs do not indicate who these witnesses are or what this evidence is.

The public interest factors to be considered are:

(1) local interest of lawsuit; (2) the court's familiarity with governing law; (3) burden on local courts and juries; (4) congestion in the court; and (5) the costs of resolving a dispute unrelated to this forum.

*Id.* at 1147.Again, these factors weigh heavily in favor of resolution of this case in the Jersey courts. At the core of the case are allegations of a breach of fiduciary duties arising out of the CMAs, which specifically provide that they

shall be governed by[,] construed and interpreted in accordance with the laws of the Island of Jersey, and all parties shall submit to the jurisdiction of the courts of the said Island.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 728902 (N.D.Cal.)
(Cite as: 2008 WL 728902 (N.D.Cal.))

Austin Decl., Ex. F at 4; *Id.,* Ex. G at 5.[FN7] Not only are the Jersey courts better equipped to resolve the questions of Jersey law governing claims arising out of the Equity Trust agreements, but they have a stronger interest than this Court in the resolution of a dispute arising out of a Jersey corporation's agreement with an individual who held himself out to be an Israeli citizen at the time the agreement was made.

> FN7. Equity Trust also argues that this clause requires a finding that venue is only proper in Jersey. However, Ninth Circuit case law clearly holds that such language is permissive rather than mandatory. *See, e.g., Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.2d 75, 76-78 (9th Cir.1987) (interpreting a similar clause indicating that a certain court "shall have jurisdiction" over the parties in any dispute arising out of the contract as permissive); *see also Northern Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.,* 69 F.3d 1034, 1036-37 (9th Cir.1995). Although this provision might prevent Plaintiffs from contesting personal jurisdiction if Equity Trust brought a suit against them in the Jersey court and it requires any interpretation of the agreements to be made under Jersey law, it does not require any case arising out of the contract to be tried in the courts of the Island of Jersey.

Plaintiffs argue that these forum selection clauses should not control because they were contained in adhesion contracts. However, the California courts have held, "A forum selection clause within an adhesion contract will be enforced as long as the clause provided adequate notice to the party that he was agreeing to the jurisdiction cited in the contract."*Intershop Communic. AG v.Super. Ct. of San Francisco,* 104 Cal.App.4th 191, 201, 127 Cal.Rptr.2d 847 (2002) (internal quotations and alterations omitted). Plaintiffs have not provided any evidence that they did not have adequate notice of the import of the forum selection clause.

*8 The Court acknowledges that this case is based in part on facts related to earlier cases decided by this Court. However, the Court finds that the required application of Jersey law, the Jersey court's interest in the resolution of this case and the likely increase in cost associated with litigating in California outweigh this Court's interest in maintaining jurisdiction over any overlapping disputes. Further, neither Equity Trust nor any Individual Defendant was a party to any of those lawsuits.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motions to dismiss (Docket Nos. 4, 21, 40, 41, 45, 70, 83). The dismissal is without leave to amend and without prejudice to refiling in the appropriate jurisdiction or jurisdictions.

The Court DENIES as moot Defendants' objections to the exhibits filed in support of Plaintiffs' oppositions to the motions (Docket No. 84). The Court did not rely on any improper or inadmissible evidence in deciding these motions.

IT IS SO ORDERED.

N.D.Cal.,2008.
Hilsenrath v. Equity Trust (Jersey) Ltd.
Slip Copy, 2008 WL 728902 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT H**

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.), 2005-2 Trade Cases P 75,013
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.))

**H**

In re Dynamic Random Access Memory (Dram)
N.D.Cal.,2005.

United States District Court,N.D. California.
In re DYNAMIC RANDOM ACCESS MEMORY
(DRAM) Antitrust Litigation
No. C 02-1486 PJH, C 05-2013 PJH, C 05-2903
PJH, C 05-475 PJH, C 05-1883 PJH, C 05-2907
PJH, C 05-1227 PJH, C 05-1884 PJH.

Nov. 7, 2005.

Cadio Zirpoli, Geoffrey C. Rushing, Guido Saveri, Richard Alexander Saveri, Saveri & Saveri Inc., Joseph J. Tabacco, Jr., Berman DeValerio Pease Tabacco Burt & Pu, Allan Steyer, D. Scott Macrae, Lisa Marie Williams, Steyer Lowenthal Boodrookas Alvarez & Smith LLP, Susan G. Kupfer, Glancy & Binkow LLP, Laurence D. King, Kaplan Fox & Kilsheimer LLP, Willem F. Jonckheer, Juden Justice Reed, Schubert & Reed LLP, Christine G. Pedigo, Shannon P. Cereghino, Finkelstein Thompson & Loughran, Craig C. Corbitt, Anna C. Conley, Christopher T. Micheletti, Zelle, Hofmann, Voelbel, Mason & Gette LLP, John J. Bogdanor, Josef D. Cooper, Tracy R. Kirkham, Cooper & Kirkham, P.C., Adam C. Belsky, Monique Alonso, Terry Gross, Gross & Belsky LLP, Francis O. Scarpulla, Law Offices of Francis O. Scarpulla, Jenelle Welling, Robert S. Green, Green Welling LLP, Joseph M. Patane, Law Office of Joseph M. Patane, Mario Nunzio Alioto, Trump Alioto Trump & Prescott LLP, Michael P. Lehmann, The Furth Firm LLP, Charlene Haught Johnson, Jeremiah F. Hallisey, John St. John, Hallisey & Johnson, Lingel H. Winters, Lingel H. Winters, Esq., San Francisco, CA, Fred Taylor Isquith, Wolf Haldenstein Adler Freeman & Herz LLP, Christopher Lovell, Lovell Stewart Halebian LLP, Bernard Persky, Goodkind Labaton Rudoff & Sucharow, New York, NY, Merrick Scott Rayle, Lovell Stewart Halebian LLP, Pacific Grove, CA, Anthony D. Shapiro, Steve W. Berman, Craig R. Spiegel, Hagens Berman Sobol Shapiro LLP, Seattle, WA, Eugene A. Spector, Jeffrey J. Corrigan, Spector Roseman & Kodroff PC, Joel Cary Meredith, Steven J. Greenfogel, Meredith Cohen Greenfogel & Skirnick PC, Ira N. Richards, Trujillo Rodriguez & Richards LLC, Philadelphia, PA, Francis A. Bottini, Jr., Francis M. Gregorek, Wolf Haldenstein Adler Freeman & Herz, Bonny E. Sweeney, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Dennis Stewart, Hulett Harper Stewart LLP, Alexander M. Schack, Law Offices of Alexander M. Schack, Chad M. McManamy, Daniel J. Mogin, Lisa J. Frisella, The Mogin Law Firm, PC, Ralph B. Kalfayan, Krause Kalfayan Benink & Slavens, San Diego, CA, Garrett D. Blanchfield, Jr., Mark Reinhardt, Mark A. Wendorf, Reinhardt Wendorf & Blanchfield, St. Paul, MN, John A. Macoretta, Spector Roseman & Kodroff PC, Philadelphia, PA, Steven A. Kanner, Much Shelist Freed Denenberg & Ament PC, Mary Jane Edelstein, Mary Jane Edelstein Fait, Wolf Haldenstein Adler Freeman Herz LLP, Marvin A. Miller, Miller Faucher & Cafferty LLP, Chicago, IL, Philip H. Gordon, Gordon Law Offices, Boise, ID, Alfred Glenn Yates, Jr., Law Office of Alfred G. Yates Jr., P.C, Pittsburgh, PA, Stephen E. Connolly, Schiffrin & Barroway, LLP, Radnor, PA, Roger M. Schrimp, Clinton P. Walker, Gene J. Stonebarger, Damrell, Nelson, Schrimp, Pallios, Pache, Modesto, CA, Bruce Lee Simon, Cotchett Pitre & Simon, Burlingame, CA, Kevin B. Love, Hanzman & Criden P.A., Coral Gables, FL, Michael G. Nast, Dianne M. Nast, Roda & Nast PC, Lancaster, PA, Ryan M. Hagan, Alexander Hawes & Audet, LLP, San Jose, CA, Kenneth George Gilman, Gilman and Pastor, LLP, Boston, MA, Dennis James Johnson, Peter John McDougall, Johnson & Perkinson, South Burlington, VT, Ian Otto, Timothy D. Battin, Matthew Maniscalco, Christopher H. Skinner, David Boies, Straus & Boies LLP, Fairfax, VA, C. Dewey Branstetter, Jr., James G. Stranch, III, James G. Stranch, IV, Branstetter Kilgore Stranch & Jennings, Douglas S. Johnston, Barrett, Johnston & Parsley,

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.), 2005-2 Trade Cases P 75,013
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.))

Hal Hardin, Nashville, TN, Jeffrey A. Bartos, Guerrieri Edmond & Clayman PC, Douglas G. Thompson, Jr., Mila Bartos, Finkelstein Thompson Loughran, Washington, DC, Wyatt B. Durrette, Jr., Durrettebradshaw, Richmond, VA, James F. Wyatt, III, Wyatt & Blake LLP, Charlotte, NC, Michael N. Widener, Van Bunch, Bonnett Fairbourn Friedman & Balint PC, Signal Mountain, TN, Alan R. Plutzik, Daniel Edward Birkhaeuser, Bramson Plutzik Mahler & Birhaeuser LLP, Walnut Creek, CA, Daniel S. Glaser, Peter J. McNulty, McNulty Law Firm, Bel Air, CA, Lynnette D. Chen, W. Timothy Needham, Janssen Malloy Needham Morrison & Reinholsten, LLP, Eureka, CA, Richard M. Hagstrom, Richard L. Voelbel, Zelle Hofmann Voelbel Mason & Gette LLP, Minneapolis, MN, Richard G. Urquhart, Zelle Hofmann Voelbel Mason & Gette LLP, Dallas, TX, Scott Ames, Steven J. Serratore, Serratore & Ames, Henry H. Rossbacher, The Rossbacher Firm, Los Angeles, CA, William F. Patterson, Jr., Forman Rossabi Black P.A., Greensboro, NC, Daniel R. Karon, Goldman Scarlato & Karon PC, Cleveland, OH, Mary Gilmore Kirkpatrick, Lisman Webster Kirkpatrick & Leckerling, P.C., Burlington, VT, Kevin Peter Roddy, Wilentz Goldman & Spitzer, PA, Woodbridge, NJ, Gary Kostow, James C. Shah, Natalie Finkelman Bennett, Scott R. Shepherd, Media, PA, James E. Miller, Shepherd Finkelman Miller & Shah LLC, Chester, CT, Robert J. Bonsignore, Bonsignore & Brewer, Medford, MA, D. Michael Noonan, William Shaheen, Shaheen & Gordon, PA, Dover, NH, Steven M. Gordon, Concord, NH, Adam Stein, Ferguson Stein Wallas Adkins Gresham & Sumter, PA, Chapel Hill, NC, Samuel W. Lanham, Cuddy & Lanham, Bangor, ME, for Plaintiffs.

G. Michael Barnhill, Jim D. Cooley, Womble Carlyle Sandridge & Rice PLLC, Charlotte, NC, Joel S. Sanders, Gibson, Dunn & Crutcher LLP, Albert J. Boro, Jr., Cecil S. Chung, Paul R. Griffin, Peter Manfred Bransten, Terrence A. Callan, Pillsbury Winthrop Shaw Pittman LLP, David Dong-In Sohn, Gary L. Halling, James L. McGinnis, Sheppard Mullin Richter & Hampton LLP, Timothy G.

O'Connor, Epstein Becker & Green, P.C., Howard Mark Ullman, Orrick, Herrington & Sutcliffe LLP, Robert B. Pringle, Jonathan E. Swartz, Peter F. Burns, Paul R. Griffin, Thelen Reid & Priest LLP, William M. Goodman, Raphael M. Goldman, Topel & Goodman, William Silas Farmer, Jr., Collette & Erickson LLP, San Francisco, CA, Debra L. Bouffard, R. Jeffrey Behm, Sheehey Furlong & Behm PC, Burlington, VT, Ronald C. Redcay, Arnold & Porter LLP, Aton Arbisser, Julian Brew, Tanja K. Shipman, Kaye Scholer LLP, Christopher J. Heck, Sarretta McDonough, Alexander F. MacKinnon, Eileen Barish, Jeffrey S. Davidson, Kirkland & Ellis LLP, Daniel Lee Alexander, Kenneth R. O'Rourke, O'Melveny & Myers LLP, Robert B. Humphreys, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, CA, Karen Walker, Tefft W. Smith, Ian T. Simmons, O'Melveny & Myers LLP, Washington, DC, David A. Donohoe, Jonathan M. Jacobson, Steven A. Mansfield, Akin Gump Strauss Hauer & Feld LLP, New York, NY, Robert E. Freitas, Cynthia A. Wickstrom, Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA, Steven H. Morrissett, Palo Alto, CA, R. Dale Grimes, David R. Esquivel, Matthew J. Sinback, Bass Berry & Sims PLC, Nashville, TN, for Defendants.

### ORDER GRANTING MOTIONS TO DISMISS AND DENYING JURISDICTIONAL DISCOVERY

HAMILTON, J.

*1 This document Relates to: Elias v. Micron et al. (C 05-475 PJH) Weisburgh v. Micron et al. (C 05-1227 PJH) Kongkham v. Micron et al. (C 05-2013 PJH) Kinkade v. Micron et al. (C 05-1883 PJH) Greene v. Elpida et al. (C 05-1884 PJH) Microprocessor Designs v. Micron et al. (C 05-2903 PJH) Kaplan v. Micron et al. (C 05-2907 PJH)

Before this court are several defendants' motions to dismiss for lack of personal jurisdiction. The moving defendants include the following: Hynix Semiconductor Inc. ("HSI"); Elpida Memory, Inc. ("Elpida Japan"); Elpida Memory (USA) Inc. ("Elpida USA"); NEC Electronics Corporation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.), 2005-2 Trade Cases P 75,013
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.))**

("NEC Japan"); NEC Electronics America, Inc. ("NECELAM"); Nanya Technology Corporation ("Nanya"); Winbond Electronics Corporation ("Winbond Taiwan"), and Winbond Electronics Corporation America ("WECA") (collectively "defendants"). Defendants' motions, which were individually filed, seek dismissal as to various of the underlying complaints against them.[FN1]

> FN1. HSI, Nanya, and Winbond Taiwan move for dismissal in *Kaplan v. Micron et al.* and *Kongkham v. Micron et al.* (North Carolina actions). HSI, Nanya, Winbond Taiwan, and WECA move for dismissal in *Greene v. Elpida et al.,Kinkade v. Micron et al.,* and *Elias v. Micron et al.* (Tennessee actions). HSI, Elpida Japan, Elpida USA, NECELAM, NEC Japan, Winbond Taiwan, and WECA move for dismissal in *Weisburgh v. Micron et al.* and *Microprocessor Designs v. Micron et al.* (Vermont actions).

Given the common questions of law and fact among defendants, the motions to dismiss were consolidated for briefing and hearing. The motions came on for hearing on October 19, 2005 before this court. Defendants appeared through their respective counsel, Steven H. Morrissett, Ian Simmons, Jonathan E. Swartz, and Howard M. Ullman. Plaintiffs appeared through their respective counsel, Josef Cooper, and Allan Steyer.

Having read the papers and carefully considered the relevant legal authority, the court hereby rules as follows on the motions to dismiss, for the reasons stated below and for the reasons stated at the hearing: Defendants' motions to dismiss are GRANTED, and plaintiffs' request for jurisdictional discovery is DENIED.

## BACKGROUND

Defendants are either foreign corporations, or U.S. subsidiaries of foreign corporations, all of whom engage in the manufacture and sale of dynamic random access memory (i.e., "DRAM"). Plaintiffs are indirect purchasers of DRAM residing in either North Carolina, Tennessee, or Vermont.

Plaintiffs filed the various underlying actions in these three states, alleging that defendants (along with other co-defendants not before the court on these motions) conspired to unlawfully fix prices for DRAM, in violation of state antitrust laws. Subsequently, each of the actions was transferred to this court for consolidated pre-trial proceedings, pursuant to the multidistrict litigation ("MDL") procedures set forth in 28 U.S.C. § 1407.

Defendants now seek an order pursuant to Federal Rule of Civil Procedure 12(b)(2) dismissing the claims asserted against them for lack of personal jurisdiction. Plaintiffs oppose the motion, and assert that they are entitled to jurisdictional discovery in any event, prior to the grant of any of defendants' motions.

## DISCUSSION

### I. Motions to Dismiss

#### A. Legal Standard

On a motion to dismiss the complaint for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2), the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant. *See, e.g.,Harris Rutsky & Co. Ins. Serv., Inc. v. Bell & Clement Ltd.,* 328 F.3d 1122, 1128-29 (9th Cir.2003). Where the court decides the jurisdictional issue on the basis of the pleadings and supporting declarations, without holding an evidentiary hearing on the issue, "the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant."*Doe v. Unocal,* 248 F.3d 915, 922 (9th Cir.2001). The court will resolve all disputed facts in favor of the plaintiff, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.), 2005-2 Trade Cases P 75,013
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.))

plaintiff's version of the facts is accepted as true. *Id.* The court need not, however, assume the truth of allegations in a pleading that is contradicted by sworn affidavit. *See Data Disc, Inc. v. Systems Tech. Assoc., Inc.,* 557 F.2d 1280, 1289 n. 5 (9th Cir.1977).

**\*2** In MDL actions such as this one, the court is entitled to exercise personal jurisdiction over each defendant only to the same degree that the original transferor court could have. *See Maricopa County v. Am. Petrofina, Inc.,* 322 F.Supp. 467, 469 (N.D.Cal.1971). Accordingly, this court must evaluate the nature of defendants' contacts in the relevant forum states with regard to the long-arm statutes of those states. Since North Carolina, Tennessee, and Vermont all have long-arm statutes that authorize the exercise of personal jurisdiction to the fullest extent authorized by constitutional due process, personal jurisdiction is to be assessed with regards to federal due process law. And since federal law accordingly controls, this court will look to its own circuit as the source for federal law. *See, e.g., Menowitz v. Brown,* 991 F.2d 36, 40 (2d Cir.1993)("a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit").

With this in mind, it is well-established that federal due process requires that a non-resident defendant have sufficient minimum contacts with the forum state such that imposition of personal jurisdiction "does not offend traditional notions of fair play and substantial justice."*Int'l Shoe Co. v. Washington,* 326 U.S. 310, 315, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Furthermore, the relationship between the defendant and the forum must be such that it is "reasonable ... to require the [defendant] to defend the particular suit which is brought there."*Id.* at 317.

Due process is traditionally determined under either a general or specific jurisdiction analysis. *Helicopteros Nacionales de Colombia S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Plaintiffs stated at the hearing, and defend-

ants raised no objection, that they are proceeding before the court here only on specific jurisdiction grounds. As such, the only relevant inquiry is whether plaintiffs have made, or can make, a factual showing that warrants the exercise of specific personal jurisdiction under the standards espoused by the Ninth Circuit.

### B. The Parties' Factual Showing

Accordingly, the crux of these motions comes down to the factual showing made by both parties regarding defendants' minimum contacts, and whether that showing is sufficient to confer specific jurisdiction over defendants. Defendants set forth, through numerous affidavits, their showing as to why plaintiffs cannot establish specific personal jurisdiction. Plaintiffs, in their consolidated opposition, offer up additional evidence with the aim of proving the opposite.

Taken as a whole, the factual showing as to each defendant is as follows:

### a. *Hynix Semiconductor Inc. ("HSI").*

HSI is a South Korean corporation with its principal place of business in South Korea. HSI is not registered to do business in, and does not own any property in, the states of North Carolina, Tennessee, or Vermont. It has not manufactured DRAM, or any other product, in any of those states, nor has it operated any offices, plants, or warehouses there. It has not delivered, distributed or sold DRAM to any customers in those states. HSI has not advertised any product or otherwise solicited business there, nor has it employed representatives or sales agents there. HSI does not maintain a shipping address, telephone listing, or bank accounts there, and has not paid income or property taxes in the those states. HSI has no designated agent for service of process there.

**\*3** HSI owns substantially all shares of its subsidiary company, Hynix Semiconductor America

Not Reported in F.Supp.2d                                                                                        Page 5
Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.), 2005-2 Trade Cases P 75,013
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.))**

("HSA"). The two companies have two directors in common who serve on the board. Otherwise, the two companies are separately incorporated and direct their own day to day activities. HSI sells DRAM to HSA, a California corporation, who in turn sells DRAM to manufacturers in the United States. HSA is a registered foreign corporation in North Carolina, and one of HSA's distributors has an office in North Carolina and provides a toll-free number for manufacturers that covers North Carolina, Tennessee, and Vermont.

b. *Nanya Technology Corp. ("Nanya").*

Nanya is a Taiwanese corporation with headquarters in Taiwan. Nanya has not sold or contracted to sell any goods or services (including DRAM) in either North Carolina or Tennessee, nor has it advertised any goods or services there. It does not conduct or transact any business there. Nanya does not own or rent property in those states, and it has no offices, facilities, bank accounts, telephone listings, mailing addresses, or agents or employees in those states. It pays no taxes to either state, and has no designated agent for service of process there.

Nanya owns its subsidiary company, Nanya USA, although the two companies are separately incorporated and direct their own day to day activities. Nanya USA is listed as one of Nanya's worldwide sales offices on Nanya's website. Nanya sells the DRAM that it manufactures in Taiwan through Nanya USA. Nanya USA markets and distributes its DRAM product to a network of manufacturers throughout the United States. One of Nanya USA's distributors has an office in North Carolina and offices throughout the U.S. that serve a "worldwide" region.

c. *Elpida Memory (USA) Inc. ("Elpida USA").*

Elpida USA is a Delaware corporation with its principal place of business in Santa Clara, California. Elpida USA sells DRAM to manufacturers in selected states within the United States. Elpida USA has

never sold DRAM or any other products or services to Vermont residents, nor has it ever regularly transacted or solicited any business in Vermont, or derived substantial revenue from the sale of any goods or services in Vermont. It has never employed anyone in the state. Elpida USA does not maintain telephone listings, mailing addresses, or bank accounts in Vermont, nor does it own, lease, or possess any property there. It is not licensed or authorized to do business in the state, and has no registered agent for service of process there.

Elpida USA is a subsidiary of Elpida Japan. The two are separate and distinct entities, with independent control over their day to day activities.

d. *Elpida Memory Inc. ("Elpida Japan").*

Elpida Japan is a Japanese corporation with its principal place of business in Tokyo. It manufactures DRAM. It has never sold DRAM or any other products or services to Vermont residents, it has never transacted or solicited business in Vermont, and it has never received any revenue from goods used or consumed in Vermont. Elpida Japan has never directed any advertising or marketing efforts to Vermont residents. It does not own, lease, or possess any property in the state of Vermont, nor does it maintain telephone listings, mailing addresses, or bank accounts there. Elpida Japan pays no taxes to the state of Vermont, is not licensed or authorized to do business there, and has no registered agent for service of process.

**\*4** Elpida Japan owns Elpida USA, though the two are separate and distinct entities, with independent control over their day to day activities.

e. *NEC Electronics America, Inc. ("NECELAM").*

NECELAM is a California corporation with its headquarters and principal place of business in California. NECELAM has never sold DRAM to any Vermont residents, nor has it sold any goods or services at all to Vermont residents since 1999. It

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.), 2005-2 Trade Cases P 75,013
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.))

has not transacted or solicited any significant business in Vermont, nor derived substantial revenue from the sale of goods or services in Vermont since 1999. It does not own, lease, or possess any property in the state of Vermont, and has never paid any taxes there. It does not maintain telephone listings, mailing addresses, or bank accounts there. NECELAM has never employed anyone in Vermont, is not licensed or authorized to do business there, and does not maintain any registered agent there for the service of process.

NECELAM is a wholly owned subsidiary of NEC Japan. NECELAM has an extensive sales, representative, and distributor network that serves customers throughout the United States. Any customer from anywhere in the United States can purchase electronic components from NECELAM online, although DRAM itself is not available for sale online, and no online sales of any product have ever been made by NECELAM to Vermont residents.

f. *NEC Electronics Corp. ("NEC Japan").*

NEC Japan is a Japanese corporation with headquarters and principal place of business in Kanagawa, Japan. It was formed on November 1, 2002. It does not own, lease, or possess any property in the state of Vermont, does not regularly transact or solicit substantial business with the state of Vermont, and does not maintain any registered agent for the service of process there.

g. *Winbond Electronics Corp. ("Winbond Taiwan").*

Winbond Taiwan is a Taiwanese corporation with headquarters in Hsinchu, Taiwan. It manufactures and sells DRAM in Taiwan. It conducts no business in North Carolina, Tennessee, or Vermont, and has never received any revenue from any of the three states. It does not make any products using DRAM there nor does it receive any income from sales of DRAM products in North Carolina, Tennessee, or Vermont. Winbond Taiwan has no business license,

employees, sales representatives, or agents in those states, nor does it have any property there. It maintains no addresses, telephone numbers, or physical presence of any sort in those states. It has never contracted for any goods or services there, has never paid taxes there, and conducts no advertising or marketing there.

Winbond Taiwan sells the DRAM it makes in Taiwan to its subsidiary and sole U.S. distributor, Winbond Electronics Corp. America ("WECA"). Both companies share two directors on their respective boards.

WECA, a Delaware corporation, in turn markets and sells Winbond Taiwan's DRAM to others in the United States.

h. *Winbond Electronics Corp. America ("WECA").*

*5 WECA is a Delaware corporation, with its headquarters in San Jose, California. WECA conducts no business at all in the states of Tennessee and Vermont, and has sold no DRAM in those states from 1999 to the present. It does not sell any products or services there or obtain products or services there, and it has no business license or employees in those states. WECA maintains no addresses, telephone numbers, or physical presence of any sort there, and has never paid taxes there. WECA maintains a passive internet site, but conducts no business through the internet with any Tennessee or Vermont residents. WECA does not conduct advertising or marketing for sales of any product in Tennessee and Vermont, and receives no revenue from either state.

WECA is a wholly owned subsidiary of Winbond Taiwan. WECA and Winbond Taiwan share two directors on their respective boards. Otherwise, the two companies are separate entities that maintain their own books and day to day activities.

WECA has distributors that in turn service Vermont and Tennessee.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.), 2005-2 Trade Cases P 75,013
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.))**

C. Legal Analysis

Plaintiffs contend that the above showing sufficiently establishes specific jurisdiction. The Ninth Circuit applies a three-part test to determine whether a defendant's activities are sufficiently related to the forum state to establish specific jurisdiction: (1) whether the defendant purposefully availed itself of the privileges of conducting activities within the forum state; (2) whether the underlying claims arise out of or result from the defendant's forum-related conduct; and (3) whether the exercise of personal jurisdiction would be reasonable. *See Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1123 (9th Cir.2002).

1. Purposeful Availment

Even a cursory review of the facts here demonstrates that insufficient minimum contacts exist to satisfy the "purposeful availment" element of the Ninth Circuit test. This is because, in view of defendants' affidavits and declarations (which plaintiffs fail to controvert), plaintiffs can make no showing that defendants have "performed [any] type of affirmative conduct which allows or promotes the transaction of business within the forum state[s]."*Doe v. Unocal Corp.,* 248 F.3d 915, 924 (9th Cir.2001). Indeed, defendants' affidavits and declarations affirmatively establish the opposite, and prove that defendants have never availed themselves of the privileges of doing business in any of the foreign states.

Despite this, plaintiffs argue that purposeful availment can be shown under (1) the effects test, (2) the stream of commerce theory, (3) the agency test, and (4) the conspiracy theory doctrine. For the reasons explained below, plaintiffs' argument fails as to each.

a. *The Effects Test*

Plaintiffs argue that minimum contacts are satisfied here-even though defendants have no physical contact with the forum states-under the 'effects' test, first enunciated by the U.S. Supreme Court in *Calder v. Jones.See* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). Specifically, plaintiffs argue that under *Calder,* defendants' alleged intentional participation in the underlying price-fixing conspiracy constitutes a foreign act that is both aimed at and has effect in the forum states, such that the purposeful availment prong is satisfied. *See generally id.*

**\*6** Under the Ninth Circuit's interpretation of *Calder,* a defendant meets the 'effects' test if (1) the defendant has committed an intentional act, which is (2) expressly aimed at the forum state, and (3) causes harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state. *See Bancroft & Masters, Inc. v. Augusta Nat. Inc.,* 223 F.3d 1082, 1087 (9th Cir.2000). With respect to the "express aiming" requirement in particular, the Ninth Circuit has held that it is satisfied only when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state. *Id.*

This test is not satisfied here. Although plaintiffs allege that defendants have committed an intentional act by way of their participation in a price-fixing conspiracy, plaintiffs fail to allege that defendants' conspiratorial acts were individually targeted towards any plaintiff *whom defendants knew to be residents of* North Carolina, Tennessee, or Vermont. Nor can plaintiffs do so, given the uncontroverted testimony offered by defendants demonstrating that they have never manufactured nor sold any DRAM in any of the forum states, nor do they maintain any business or corporate formalities in the forum states, nor do they receive any substantial revenue from the sale of DRAM (or any other products) in the forum states. In short, nothing exists here that can establish the wrongful targeting of a known forum resident, as required by Ninth Circuit law. *See also Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414, 419-420 (9th Cir.1997)(describing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 8
Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.), 2005-2 Trade Cases P 75,013
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.))

similar fact pattern and holding no personal juris-diction exists under effects test).

Accordingly, jurisdiction cannot be conferred under the effects test.

### b. *Stream of Commerce*

Plaintiffs next try to prove purposeful availment through the stream of commerce theory. Under this theory, a nonresident defendant's placement of a product into the stream of commerce, with the expectation that the product will end up in the forum state (and the product does injury in the forum state), suffices to establish purposeful availment for purposes of the jurisdictional analysis. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980); *Asahi Metal Indus. Co., Ltd. v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion).

Mere placement into the stream of commerce, however, is not enough. In *Asahi,* the Supreme Court held that additional conduct on the defend-ant's part indicating an intent or purpose to serve the market in the forum state, was required to estab-lish personal jurisdiction. *Asahi,* 480 U.S. at 112-13. While *Asahi* was a plurality opinion, the Ninth Circuit has since adopted similar reasoning, and held that defendant must have actually known that a given product would reach a forum state, be-fore the stream of commerce theory will support an exercise of jurisdiction. *See, e.g., Terracom v. Val-ley Nat'l. Bank,* 49 F.3d 555, 560-61 (9th Cir.1995).

*\*7* Here, plaintiffs' failure to offer any evidence that defendants knew that DRAM products related to them would reach the forum states prohibits applic-ation of the stream of commerce theory. The best plaintiffs offer up in their opposition are several website pages that indicate a general intent to serve the United States market, or at the very most indic-ate the presence of *third party* connections to the forum states. This is plainly insufficient to over-come defendants' sworn testimony, which (1)

demonstrates only the barest of contacts with the forum states at issue, and (2) expressly disclaims any and all attempts to market, advertise, or sell any DRAM product to the forum states.

Accordingly, no purposeful availment can be found based on stream of commerce.

### c. *Agency Test*

Next, plaintiffs argue that purposeful availment, and therefore personal jurisdiction, may be found upon closer look at the parent/subsidiary relation-ships that the defendants have. Specifically, plaintiffs argue that the foreign parent defendants (all except for WECA, NECELAM, and Elpida USA, who are the American subsidiary defendants) use their subsidiaries as agents, such that the subsi-diary agent's minimum contacts may be imputed to the foreign parent defendants, and personal juris-diction may be exercised under the agency theory of jurisdiction.

Preliminarily, the court notes that this argument presupposes that the subsidiary defendants have sufficient minimum contacts with the forum states, such that those contacts may confer jurisdiction. As described here and elsewhere in this order, however, this is simply not the case, particularly in view of defendants' uncontroverted factual show-ing. Nonetheless, even considering the merits of the agency test as plaintiffs purport to apply it here, plaintiffs argument fails as described below.

The Ninth Circuit has held that the agency test is satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are "sufficiently important to the foreign corporation that if it did not have a rep-resentative to perform them, the corporation's own officials would undertake to perform substantially similar services."*Doe v. Unocal Corp.,* 248 F.3d at 928. The essence of this inquiry is whether, "in the truest sense, the subsidiaries' presence substitutes for the presence of the parent" in the forum state.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.), 2005-2 Trade Cases P 75,013
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.))

*Id.* at 929.At an "irreducible minimum," the subsidiary must "perform some service or engage in some meaningful activity in the forum state on behalf of its principal."*Id.* at 930.

That cannot be said here. None of plaintiffs' evidence is sufficient to refute defendants' sworn testimony demonstrating that each foreign parent defendant who maintains an American subsidiary also maintains an independent and separate existence, controls its own day to day activities, controls its own books, and maintains its own revenues.

**\*8** Indeed, the only real evidence plaintiffs point to for support is the fact that both HSI and HSA have two directors that overlap on their boards, as do Winbond Taiwan and WECA. But a mere overlap in directors is insufficient as a matter of law to prove the type of parental control that approximates physical presence in the forum state. *See Doe,* 248 F.3d at 926. As for the rest of plaintiffs' purported proof, it consists only of vague references on the foreign parent corporations' websites, in which they allude to the generalized duties of their American subsidiaries (e.g., WECA is responsible for marketing and selling all Winbond products in the U.S., and Elpida USA is referred to as one of Elpida Japan's "sales and marketing operations"). This generalized proof is not enough to overcome defendants' sworn testimony that none of the parent/subsidiary relationships among the defendants should be viewed through the agency prism.

Accordingly, specific jurisdiction may not be premised on agency.

### d. *Conspiracy Theory Doctrine*

Finally, plaintiffs attempt to establish purposeful availment by way of the conspiracy theory doctrine. Specifically, plaintiffs argue that the allegedly criminal acts of defendants' alleged co-conspirators (co-defendants in the underlying actions) in the forum states are sufficient to impute jurisdiction to defendants in the forum states.

The conspiracy theory doctrine is not a generally accepted theory. There is a split among circuits between those who have adopted it as a valid means of invoking personal jurisdiction, and those who have rejected it. The Ninth Circuit has not directly ruled on the merits of the theory, though it considered it fairly recently, in *Underwager v. Channel 9 Australia,* 69 F.3d 361, 364 (9th Cir.1995).*Underwager,* however, is of limited value, as the Ninth Circuit refused to reach the merits of the conspiracy theory, since no conspiracy allegations had been made. Nonetheless, consideration of Ninth Circuit district court case case law argues in favor of rejecting this theory of jurisdiction. *See, e.g., Kipperman v. McCone,* 422 F.Supp. 860, 873 n. 14 (N.D.Cal.1976) ("[P]ersonal jurisdiction over any non-resident individual must be premised upon forum-related acts personally committed by the individual. Imputed conduct is a connection too tenuous to warrant the exercise of personal jurisdiction."). Moreover, it is at least somewhat persuasive that in *Piedmont Label Co. v. Sun Garden Packing Co.,* 598 F.2d 491, 492 (9th Cir.1979), the Ninth Circuit rejected an analogous conspiracy theory to establish venue.

Accordingly, the court declines plaintiffs' invitation to adopt the conspiracy theory of personal jurisdiction. Furthermore, not only does the court believe that precedent warrants its rejection, but plaintiffs' conspiracy allegations are insufficient in that they are wholly conclusory. As defendants pointed out in their papers and at the hearing, plaintiffs' allegations in the underlying actions are overly generalized and make almost no reference to specific or individualized allegations of participation in the conspiracy on the part of *these* defendants.

**\*9** Accordingly, no personal jurisdiction exists based on plaintiffs' conspiracy allegations.

### 2. Arise out of, Relate to

Given that plaintiffs have failed to make a prima facie showing that any minimum contacts exist-un-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 10
Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.), 2005-2 Trade Cases P 75,013
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.))

der any theory-it is not possible for plaintiffs to satisfy the second requirement for specific jurisdiction; there is no claim that can arise out of, or relate to, non-existent contacts with the forum states at issue. *See, e.g., Glencore Grain,* 284 F.3d at 1123.

### 3. Reasonableness

The court need not consider this final requirement, given plaintiffs' failure to establish the first two requirements for specific jurisdiction. Even if it did, however, the court would find that the exercise of jurisdiction over defendants here would be unreasonable. Given the lack of defendants' minimum contacts with the forum states, the majority of defendants' status as foreign corporations (and the corresponding hardship to defendants in litigating the underlying actions), and the continuation of the underlying suit as to all other defendants in the underlying cases, the balance of factors weighs in favor of a finding that personal jurisdiction is not reasonable in this instance. *See, e.g., CE Distribution, LLC v. New Sensor Corp.,* 380 F.3d 1107, 1112 (9th Cir.2004)(setting forth factors to be considered in assessing reasonableness).

Accordingly, and for all the reasons enumerated above, the court finds that personal jurisdiction cannot be asserted over the moving defendants.

## II. Jurisdictional Discovery

### A. Legal Standard

The court has discretion to order jurisdictional discovery. Jurisdictional discovery "should be granted where pertinent facts bearing on the question of jurisdiction are controverted ... or where a more satisfactory showing of the facts is necessary."*Wells Fargo & Co. 13. v. Wells Fargo Express Co.,* 556 F.2d 406, 430 n. 24 (9th Cir.1977). Where, however, a plaintiff's claim of personal jurisdiction appears to be "attenuated and based on bare allegations in the face of specific denials made by de-

fendants," the court need not permit even limited discovery. *See Terracom v. Valley Nat'l Bank,* 49 F.3d at 562.

### B. Legal Analysis

Plaintiffs argue that they are entitled to jurisdictional discovery as a matter of course prior to the grant of defendants' motions to dismiss. Specifically, plaintiffs argued at the hearing that they are entitled to test the credibility of defendants' declarants and affiants, in order to determine whether jurisdictional facts exist. Defendants, for their part, argue that jurisdictional discovery is not to be had for the taking. Rather, plaintiffs must first make some showing as to the facts that plaintiff expects to uncover through jurisdictional discovery-something that plaintiffs have not done here.

Defendants are correct. Where, as here, plaintiffs have made no showing that any sworn testimony presented by defendants is disputed, and have not pointed out the existence of any facts that, if shown, would warrant the exercise of personal jurisdiction, the court is within its discretion to deny discovery. *See, e.g., Terracom v. Valley Nat'l Bank,* 49 F.3d at 562. This court does so now.

*10 *Rutsky & Co. Insurance Services v. Bell & Clements,* cited by plaintiffs at the hearing on defendants' motions, does not change this result. *See*328 F.3d 1122 (9th Cir.2003). In *Rutsky,* although the appellate court reversed the district court's denial of jurisdictional discovery, it did so because the record was not sufficiently developed to enable the court to determine whether a jurisdictional basis was met. That is not the case here.

## CONCLUSION

For the reasons set forth above, the court hereby GRANTS defendants' motions to dismiss plaintiffs' complaints as follows:

1. HSI, Nanya, and Winbond Taiwan's motions to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.), 2005-2 Trade Cases P 75,013
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.))**

dismiss, as filed in *Kaplan v. Micron et al.,* Case No. C 05-2907 PJH, and *Kongkham v. Micron et al.,* Case No. C 05-2013 PJH, are GRANTED. Plaintiffs' complaints are dismissed with prejudice as to these defendants.

2. HSI, Nanya, Winbond Taiwan, and WECA's motions to dismiss, as filed in *Greene v. Elpida et al.,* Case No. C 05-1884 PJH, *Kinkade v. Micron et al.,* Case No. C 05-1883 PJH, and *Elias v. Micron et al.,* Case No. C 05-475 PJH, are GRANTED. Plaintiffs' complaints are dismissed with prejudice as to these defendants.

3. HSI, Elpida Japan, Elpida USA, NECELAM, NEC Japan, Winbond Taiwan, and WECA's motions to dismiss, as filed in *Weisburgh v. Micron et al.,* Case No. C 05-1227 PJH, and *Microprocessor Designs v. Micron et al.,* Case No. C 05-2903 PJH, are GRANTED. Plaintiffs' complaints are dismissed with prejudice as to these defendants.

Plaintiffs' request for jurisdictional discovery is DENIED.

IT IS SO ORDERED.

N.D.Cal.,2005.
In re Dynamic Random Access Memory (Dram)
Not Reported in F.Supp.2d, 2005 WL 2988715 (N.D.Cal.), 2005-2 Trade Cases P 75,013

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT I**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.))**

**C**
Italian Colors Restaurant v. American Express Co.
N.D.Cal.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
ITALIAN COLORS RESTAURANT, on behalf of
itself and all similarly situated persons, Plaintiffs,
v.
AMERICAN EXPRESS COMPANY and American
Express Travel Related Services Company, Inc.,
Defendants.
**No. C 03-3719 SI.**

Nov. 10, 2003.

Merchants and small business owners brought action on behalf of nationwide class against credit and charge card issuer alleging violations of Clayton Act and Sherman Act. On issuer's motion to transfer venue, the District Court, Illston, J., held that transfer of action from Northern District of California to Southern District of New York was warranted.

Motion granted.

West Headnotes

**[1] Federal Courts 170B ⬅️106.5**

170B Federal Courts
    170BII Venue
        170BII(B) Change of Venue
            170BII(B)1 In General; Venue Laid in
Proper Forum
                170Bk106 Determination in Particular
Transferable Actions
                    170Bk106.5 k. In General. Most
Cited Cases
    (Formerly 170Bk106)
Transfer of potential nationwide class action from Northern District of California to Southern District of New York was warranted, since plaintiffs' choice of forum was disregarded due to forum shopping, plaintiffs' contacts with forum were of minimal

value in context of nationwide class action, neither party had substantial contacts with present forum, litigation costs weighed heavily in favor of transfer to Southern District of New York with regard to both documentary and testamentary evidence, contract at issue had New York choice of law clause, although it did not have forum selection clause, and transfer would not offend California public policy. 28 U.S.C.A. § 1404(a).

**[2] Federal Civil Procedure 170A ⬅️8.1**

170A Federal Civil Procedure
    170AI In General
        170AI(A) In General
            170Ak8 Consolidation of Actions
                170Ak8.1 k. In General. Most Cited
Cases
Consolidation is a device constricted in scope to multiple cases pending in the same district. Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

Blaine H. Bortnick, Liddle & Robinson, L.L.P., Gary B. Friedman, Friedman & Shube, New York, NY, Christopher William Hellmich, Esq., Read K. McCaffrey, Patton Boggs, LLP, Washington, DC, David S. Markun, Edward Zusman, Kevin K. Eng, Markun, Zusman & Compton LLP, San Francisco, CA, for Plaintiffs.
Bruce Schneider, Heidi Balk, Esq., Stroock & Stroock & Lavan LLP, New York, NY, D. Wayne Jeffries, Stephen J. Newman, Strook & Strook & Lavan LLP, Los Angels, CA, for Defendants.

ORDER GRANTING DEFENDANTS' MOTION
TO TRANSFER VENUE TO THE SOUTHERN
DISTRICT OF NEW YORK AND DENYING
PLAINTIFFS' MOTION TO CONSOLIDATE
AND APPOINT LEAD COUNSEL

ILLSTON, J.
*1 On November 7, 2003, this Court heard oral argument on defendants' motion to transfer venue and plaintiffs' motion to consolidate and appoint lead

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                  Page 2
Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.))

counsel. Having considered the arguments of counsel and the papers submitted, the Court hereby TRANSFERS venue to the Southern District of New York, and DENIES plaintiffs' motion as premature.

## BACKGROUND

This action was filed in this Court on August 8, 2003. Months earlier, however, in June, 2003, a virtually identical action, based on a nearly verbatim complaint, was filed in the Eastern District of New York, on behalf of New York-based merchants and small business owners representing a proposed nationwide class ("*Phuong* Complaint"). Mot. to Transfer, Ex. A. The *Phuong* complaint was voluntarily dismissed at plaintiffs' behest on July 16, 2003, after defendants filed notice of their intent to file a motion to dismiss. Decl. of Schneider at 2. One day before the dismissal notice in the *Phuong* action, plaintiffs' counsel filed the same complaint in the Central District of California using a different local business as the named plaintiff ("*Il Forno* Complaint").*Id.* The *Il Forno* complaint was filed but never served on defendants. *Id.* Roughly three weeks later, the instant complaint was filed in the Northern District of California. All three actions, including the complaint currently before this Court, allege violations by defendants American Express Co. and American Express Travel Related Services (hereinafter collectively referred to as "American Express," unless required by context) of Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, and Section 1 of the Sherman Act, 15 U.S.C. § 1. Compl. ¶ 4.

Plaintiffs allege that certain provisions of the standard contract executed by all merchants who agree to accept American Express cards constitute anticompetitive tying arrangements. *Id.* at ¶ 45.The standard contract requires merchants who accept the American Express charge card to accept the American Express credit card. *Id.* Unlike a credit card, a charge card is not a means of financing, but a "method of payment." *Id.* at ¶ 18.Charge card users

must pay their balance in full each month, as opposed to credit card users, who use their cards to access revolving credit based on a predetermined interest rate. *Id.* at ¶¶ 18, 28.Merchants are willing to pay higher fees to access the American Express charge card member base, based on perceptions that charge card users are more affluent. *Id.* at ¶ 23.These perceptions are supported by data indicating that the average purchase on an American Express charge card is 17% higher than the average credit card purchase. *Id.* at ¶ 24.

For every purchase made on a credit or charge card, merchants pay a "discount rate" to the credit or charge card company. The discount rate for competitor credit cards such as Visa and MasterCard is usually between 0.85 and 1.8%.*Id.* at ¶¶ 22, 43.According to plaintiffs, American Express unlawfully leverages its charge card member base to force merchants to accept its credit card at a "grossly supracompetitive" discount rate of 3.0%. *Id.* at ¶¶ 2, 21.Similar tying arrangements formerly employed by Visa and MasterCard were discontinued as part of a settlement agreement in a similar antitrust action.*Id.* at ¶ 43,*citingIn re Visa Check/ Mastermoney Antitrust Litigation,* 2003 WL 1712568 (E.D.N.Y. Apr.1, 2003). Plaintiffs allege that the American Express tying arrangement is an unlawful restraint of trade under federal antitrust laws. Compl. ¶ 3. Now before the Court are defendants' motion to transfer venue to the Southern District of New York, and plaintiffs' motion to consolidate cases and appoint lead counsel.

## LEGAL STANDARD

*2 "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil matter to any other district or division where it might have been brought."28 U.S.C. § 1404(a). The purpose of § 1404(a) is to " 'prevent the waste of time, energy, and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.' " *Van Dusen v. Barrack,* 376 U.S. 612, 616, 84 S.Ct. 805, 809,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.))

11 L.Ed.2d 945 (1964), citing *Continental Grain Co. v. The FBL-585,* 364 U.S. 19, 26-27, 80 S.Ct. 1470, 1474-75, 4 L.Ed.2d 1540 (1960). A motion for transfer lies within the broad discretion of the district court, and must be determined on an individualized basis. See *Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498 (9th Cir.2000), citing *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 2244, 101 L.Ed.2d 22 (1988).

To support a motion for transfer, the moving party must establish: (1) that venue is proper in the transferor district; (2) that the transferee district is one where the action might have been brought; and (3) that the transfer will serve the convenience of the parties and witnesses and will promote the interests of justice. See *Goodyear Tire & Rubber Co. v. McDonnell Douglas Corp.,* 820 F.Supp. 503, 506 (C.D.Cal.1992). In determining the convenience of the parties and witnesses and the interests of justice, the Ninth Circuit considers "multiple factors" including:

(1) location where the relevant agreements were negotiated and executed; (2) the state that is most familiar with the governing law; (3) the plaintiff's choice of forum; (4) the respective parties' contacts with the forum; (5) the contacts relating to the plaintiff's cause of action in the chosen forum; (6) the differences in the costs of litigation in the two forums; (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses; and (8) the ease of access to sources of proof.

*Jones,* 211 F.3d at 498-99. The existence of a forum selection clause, along with the forum state's relevant public policy, may also comprise "significant factor[s] in the court's § 1404(a) analysis." *Id.*

## DISCUSSION

### I. Defendants' motion to transfer venue

[1] On a motion to transfer, the moving party must first demonstrate that venue is proper in both the transferor and transferee courts, as required by the first two components of the *Goodyear* test. Thereafter, the Court uses the multi-factor determination set forth in *Jones* to establish the third element of *Goodyear:* convenience to the parties and witnesses, and the interests of justice. In this case, venue is proper in both the transferor and transferee courts under 15 U.S.C. § 22, which provides for the filing of an antitrust suit against a corporation in any district where it conducts business. Accordingly, the dispute centers on which party is favored by application of the ten *Jones* factors. As explained *infra,* this balance weighs heavily in favor of transferring the action to the Southern District of New York.

### A. Location where the relevant agreements were negotiated and executed

*3 The parties do not dispute that the individual named plaintiff in this action executed the agreement from its place of business in California. Plaintiffs argue that more of the relevant tying agreements were executed by merchants in California than in any other state. Opp'n. at 5. Plaintiffs support this statement with state-by-state analyses of credit card receivables and overall retail sales. Decl. of Zusman, Ex. A, B. Neither of these statistics, however, is broken down by creditor, making it impossible to tell how much of the share belongs to American Express. Moreover, as the most populous state in the country, California has a disproportionate share of many economic activities. By this logic, as defendants illustrate, "virtually every significant class action case would need to be litigated in California," a logic that has been repeatedly rejected. See, *e.g., Ho v. Ikon Office Solutions, Inc.,* 143 F.Supp.2d 1163, 1167-68 (N.D.Cal.2001).

Many merchants throughout every state in the nation negotiated and executed identical agreements. If the named plaintiff purports to act on behalf of a nationwide class of merchants, there is nothing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 4
Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.))**

unique or probative about the location of its place of business. Furthermore, while the agreements with respect to defendant TRS may have been mailed from its offices in Phoenix, Arizona, the New York office, as the principal place of business, is likely to have drafted the original agreement and developed the business policy behind it. Neither party alleges that every agreement was negotiated in person. The very nature of this type of agreement, which is transmitted through the mail and executed by merchants at thousands of individual businesses throughout the country, deprives this factor of any weight in the analysis of proper venue.

**B. Forum state most familiar with the governing law**

Plaintiffs correctly state that where federal law governs all claims raised, "either forum is equally capable of hearing and deciding those questions."*Deal-Time.com Ltd. v. McNulty,* 123 F.Supp.2d. 750, 757 (S.D.N.Y.2000). Although the merchant agreements at issue contain a New York choice of law clause, such a provision alone does not demonstrate that federal courts sitting in New York have a more well-developed body of antitrust law than those in California. Accordingly, this factor, like the last, weighs in favor of neither party.

**C. Plaintiffs' choice of forum**

Generally, courts afford considerable weight to a plaintiff's choice of forum in determining a motion to transfer, subject to various conditions. *SeePiper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981). The plaintiff's choice is given less deference where, as here, the action is brought on behalf of a nationwide class. *SeeLou v. Belzberg,* 834 F.2d 730, 739 (9th Cir.1987); *Koster v. (American) Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 832, 91 L.Ed. 1067 (1947) ( "where there are hundreds of potential plaintiffs ... the claim of any one plaintiff that a forum is appropriate merely because it is his

home is considerably weakened.").

\*4 The complaint admits that all potential class members "have been damaged in precisely the same fashion, by precisely the same conduct."Compl. ¶ 16. Interchangeable plaintiffs could be and have been found in several districts, including the Eastern District of New York, where the first cause of action was filed. Decl. of Schneider, Ex. A. Notably, in that case, the same counsel representing plaintiffs in the present action asserted that venue was proper in the Eastern District of New York because the defendants "may be found or transac[t] business" there, and "have marketed their charge card services ... to thousands of merchants within [the Eastern District]." Mot. to Transfer, Ex. A, *Phuong* Compl. ¶ 5. Here, the only contact between the proposed plaintiff class and this district is the individual named plaintiff's place of business. This contact is no more forceful than the link between the thousands of potential class members and their respective districts, a roster which surely includes every district court in the nation.

Furthermore, the Ninth Circuit has established that courts should disregard a plaintiff's forum choice where the suit is a result of forum-shopping. *SeeAlltrade. Inc., v. Uniweld Products, Inc.,* 946 F.2d 622, 628 (9th Cir.1991). One could rationally infer forum shopping here, based on plaintiffs' repeat filing and plaintiffs' admitted perceptions that California provides a more favorable rule of decision, as discussed below. Plaintiffs voluntarily dismissed the *Phuong* action one day before filing the first California case. Decl. of Schneider at 2. The first California case, in the Central District, was filed but never served on defendants. *Id.* Throughout this "odyssey," as defendants put it, the roster of plaintiffs' counsel has remained substantially the same.[FN1]

> FN1. One member of plaintiffs' local counsel was employed at a different firm in New York when the New York case was filed. *Id.* at Ex. A.

Not Reported in F.Supp.2d                                        Page 5
Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.))

At oral argument, plaintiffs stated that they brought suit in California so as to avail themselves of the Ninth Circuit's disfavor of arbitration clauses within adhesion contracts. According to plaintiffs, the relocation became necessary after it came to their attention during the *Phuong* action that not all potential class members had signed identical merchant agreements. Merchants who signed on after a certain year were bound by a compulsory arbitration clause, while others were not bound. Plaintiffs stated that in order to serve their entire proposed class equitably, they sought a venue where the two groups of merchants would be treated identically as a matter of law, assuming a negation of the arbitration clause.

Pursuit of a venue where a class can be maintained without bifurcation is not a disfavored strategy per se, but this does not explain plaintiffs' forum shopping within California. Plaintiffs secured the perceived tactical gain they purportedly seek when they first filed suit in the Central District. If plaintiffs' sole objective in repeat filing was to accrue perceived benefits for their class as a whole, this does not explain why they filed complaints in both the Central and Northern Districts. The Court's forum shopping concerns persist. Accordingly, plaintiffs' choice of forum is disregarded.

D. Respective parties' contacts with the forum

**\*5** Plaintiffs' contacts with the forum, as previously discussed, are of minimal value in a class action, especially in view of plaintiffs' forum shopping. In addition to their demographic analyses of credit card receivables as described in subsection (A) *supra,* which this Court rejects, plaintiffs also urge the Court to consider other lawsuits as contacts between the defendants and this forum. Opp'n. to Mot. to Transfer at 7. According to plaintiffs, one or more of the defendants is a party in 225 civil cases and more than 25,000 bankruptcy proceedings currently pending in California courts. Decl. of Zusman at 2. However, plaintiffs offer no source of law which instructs the Court to count unrelated

lawsuits as contacts for the purposes of determining venue. Neither party has substantial contacts with the present forum.

E. Contacts relating to the plaintiff's cause of action in the chosen forum

Here, again, plaintiffs argue that this district is the most appropriate forum because Californians have more small businesses and hence have executed more American Express merchant contracts than any other state. Opp'n. to Mot. to Transfer at 7. Plaintiffs offer no evidence to show that per capita, California is significantly more affected by the contracts than other states, including New York. As in subsection (A), this argument finds no place here.

F. Difference in the cost of litigation

Litigation costs weigh heavily in favor of transfer to the Southern District of New York, with regard to both documentary and testamentary evidence. Documents pertaining to defendants' business practices are most likely to be found at their principal place of business. Although developments in electronic conveyance have reduced the cost of document transfer somewhat, the cost of litigation will be substantially lessened if the action is venued in the same district where most of the documentary evidence is found. A reduction in document sharing and litigation costs serves both parties as well as the public interest. Plaintiff Italian Colors, on the other hand, can be expected to contribute comparatively little documentary evidence to the action. As explained above, its interests are entirely fungible with those of a potential class member in the Southern District of New York.

Generally, litigation costs are reduced when venue is located near most of the witnesses expected to testify or give depositions. Beyond merely having a principal place of business in New York, defendants specifically name at least two individual American Express officers based in New York whose expertise and expected testimony is directly relevant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 6
Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.))**

to the claims. Mot. to Transfer at 9, *citing Maxon v. Jefferson Pilot Securities Corp.,* 2002 WL 523575, *4 (N.D.Cal. Apr 2, 2002) (relevant expertise of potential witnesses dispositive when transferring venue based on relative location of witnesses). Since the claims arise solely out of defendants' business practices, the parties would expect that most of the witnesses will be the defendants' employees. Accordingly, this factor weighs heavily in favor of transfer.

### G. Availability of non-party witnesses

**\*6** Plaintiffs predict that the most "important" non-party witnesses are likely to be employees and officers of Visa U.S.A., which plaintiffs characterize as defendants' largest competitor. Opp'n to Mot. to Transfer at 1. Visa maintains offices within this district in San Francisco and Foster City.*Id.* As defendants point out, this approach comprises "an entirely different logic to [plaintiffs'] original choice of venue [New York]," which was premised on defendants' place of business. Reply in Supp. of Mot. to Transfer at 4. Further, plaintiffs appear to understate the value of non-party witnesses from Master-Card, another credit card competitor with its principal place of business in the Southern District of New York. *Id.* at 4; Supp. Schneider Decl. at Ex. 1. Plaintiffs do not attempt to explain how non-party witnesses from Visa would provide more probative information about the relevant market share and competitive business practices than those from MasterCard or any other non-party. This factor does not weigh in plaintiffs' favor.

### H. Ease of access to sources of proof

This factor derives from the same operative facts as subsection (F) *supra,* and weighs heavily in favor of venue transfer.

### I. Forum selection clause

As stated in *Jones,* the presence of a forum selec-

tion clause functions as a ninth factor weighing in favor of venue transfer. *See*211 F.3d at 499. In the instant case, the individual plaintiff signed a merchant agreement in 1993 that had a New York choice of law clause, but did not have a forum selection clause. Decl. of Alterman at 1, Ex. E. The most recent merchant agreement, dated May 2003, does contain a New York forum selection clause. *Id.,* Ex. F. It is unclear what year the forum selection clause first appeared on the merchant agreement. Plaintiffs argue that if the clause first appeared in 2003, the percentage of the potential class bound to it is a relatively small fraction, as most potential class members will have signed an earlier agreement. Even in the light most favorable to the plaintiff, assuming that the clause made its debut in 2003, and thereby applies to only a part of the proposed plaintiff class, this factor still leans in favor of venue transfer, since the clause never mentioned California or any other state.

### J. Public policy

Lastly, plaintiffs urge the Court to consider the forum state's public policy interest in declining to enforce the merchant agreement's collective action waiver and compelled arbitration provisions. Opp'n. to Mot. to Transfer at 2-3. Plaintiffs rely on *Jones,* wherein the Ninth Circuit held that the forum selection clause of a franchise agreement, which would otherwise be honored under federal law, was precluded by California's strong public policy interest against such provisions. *See*211 F.3d at 499. *Jones,* however, is distinguishable from the instant action because the public policy at issue there concerned venue itself, rather than the merits of the claim. *Id.*

**\*7** Plaintiffs cite *Ting v. AT & T,* 319 F.3d 1126 (9th Cir.2003) and *Circuit City Stores. Inc. v. Mantor,* 335 F.3d 1101 (9th Cir.2003) as a source of California's public policy against anti-class action and compelled arbitration clauses. However, this is but one possible interpretation of public policy. As defendants point out, an equally plausible interpretation is that arbitration clauses do not offend the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.))

Page 7

public policy of either New York, California, or federal common law-each of which has its own "well-developed bod[y] of law regarding arbitration."*Id.* More importantly, the question of arbitration is not presently before the court; its invocation as a source of public policy is premature on a motion to transfer. In short, plaintiffs fail to illustrate how transfer will offend the public policy of this Court's forum state.

Plaintiffs' argument concerning California public policy is further weakened by the fact that plaintiffs filed, but did not serve and apparently did not intend to pursue, a claim in the Central District. In sum, all factors not neutral in disposition weigh in favor of venue transfer. Accordingly, defendants' motion to transfer venue is GRANTED and venue is hereby TRANSFERRED to the Southern District of New York.

## II. Consolidation and appointment of lead counsel

[2] Even in the absence of venue transfer, consolidation under Federal Rule of Civil Procedure 42(a) is a device constricted in scope to multiple cases pending in the same district. Plaintiffs cite no authority by which this Court could divest other Article III courts of jurisdiction over matters pending before them. Only the presiding court can order transfer of venue. *See* 15 Fed. Prac. & Proc. Juris.2d § 3844. Moreover, appointment of lead counsel is premature before other counsel file cases on behalf of other clients. No competition exists among counsel that requires refereeing by the Court, and no class has yet been certified, or even proposed. If and when this becomes problematic, the Judicial Panel on MultiDistrict Litigation is the appropriate arbiter.

Having granted defendants' motion to transfer venue, however, plaintiffs' motion to consolidate and appoint lead counsel is DENIED as premature. This motion is not proper before the transferor court, and should be reserved for the transferee court.

CONCLUSION

For the foregoing reasons and for good cause shown:

(1) Defendants' motion to transfer venue is GRANTED and this action is TRANSFERRED to the Southern District of New York; and

(2) Plaintiffs' motion to consolidate and appoint lead counsel is denied.

IT IS SO ORDERED.

N.D.Cal.,2003.
Italian Colors Restaurant v. American Express Co.
Not Reported in F.Supp.2d, 2003 WL 22682482 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT J

Westlaw.

Not Reported in F.Supp.2d                                                                                       Page 1
Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.))**

**H**

Love v. The Mail on Sunday
C.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,C.D. California.
Mike LOVE
v.
THE MAIL ON SUNDAY, et al.
**No. CV05-7798ABCPJWX.**

July 14, 2006.

Alfred G. Rava, The Rava Law Firm, San Diego, CA,
Philip H. Stillman, Flynn & Stillman, for Mike Love.
Andrew J. Thomas, Kelli L. Sager, Robyn Aronson,
Davis Wright and Tremaine, Los Angeles, CA, for The
Mail on Sunday.
Gregory S. Gabriel, Kinsella Weitzman Iser Kump and
Aldisert, Santa Monica, CA, for Sanctuary Records
Group.

Neville L. Johnson, Nicholas A. Kurtz, Johnson & Rish-
wain, Beverly Hills, CA, for Bigtime.TV.
Barry E. Mallen, Joy T. Teitel, Manatt Phelps & Phil-
lips, Edward A. Ruttenberg, Leopold Petrich & Smith,
Los Angeles, CA, for Brian Wilson, Jean Sievers, Lip-
pin Group Inc., Soop LLC, and David Leaf.
Gregory J. Aldisert, Kinsella Weitzman Iser Kump and
Aldisert, Santa Monica, CA, for Sanctuary Records
Group, Brian Wilson, Jean Sievers, Lippin Group Inc.,
Soop LLC, and David Leaf.

CIVIL MINUTES-GENERAL

COLLINS, J.

| | | |
|---|---|---|
| Daphne Alex | None Present | |
| Deputy Clerk | Court Reporter/Recorder | Tape No. |

Attorneys Present for Plaintiff:
None Present

Attorneys Present for Defendant:
None Present

Proceedings:

DEFENDANT ASSOCIATED NEWSPAPERS' MO-
TION TO DISMISS

PLAINTIFF'S FIRST AMENDED COMPLAINT
FOR LACK OF

PERSONAL JURISDICTION (In Chambers)

BACKGROUND

**\*1** Pending before the Court is Associated Newspapers'
Motion to Dismiss Plaintiff's First Amended Complaint
("Motion"). The hearing date regarding this Motion is
currently set for July 17, 2006. The Court, however, has
determined that it does not require oral argument in this
matter. Rather, upon consideration of the parties' sub-
missions and the case file, the Court hereby GRANTS
Associated Newspapers' Motion to Dismiss Plaintiff's
FAC. Accordingly, the Court takes the hearing on the
Motion off calendar for July 17, 2006.

This case is the latest in a long history of litigation in-
volving the principal members of the well-known mu-
sical group the Beach Boys. In this case, Plaintiff Mike
Love alleges that Defendants distributed a promotional
CD of re-recorded Beach Boys songs to millions of
people without obtaining his authorization. Plaintiff
claims that the distribution of this CD has, among other
things, damaged existing and future sales of Beach
Boys albums and tarnished the Beach Boys' trademark.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.))**

The distribution of the promotional CD coincided with the release of Brian Wilson's fabled solo album, "Smile." Bigtime.TV approached Associated Newspapers about a promotion campaign involving the "Smile" release. Bigtime.TV was responsible for licensing the recordings for the promotional CD. It obtained permission from Sanctuary Records, a British record company, to use the recordings that were ultimately included in the promotional CD. The discs were manufactured by ODS Optical Disc Service ("ODS"), a German company with offices in London, England.

Neither Associated Newspapers nor Bigtime.TV ever entered into any contracts with anyone in California. Bigtime.TV did, however, maintain email contact with attorneys for Brian Wilson and others who were in California. These contacts pertained to various aspects of the promotional CD, but did not involve any contractual obligations between the individuals in California and Bigtime.TV.

Once the design and the manufacturing of the promotional CD were complete, Associated Newspapers distributed it in the September 26, 2004 edition of the Mail on Sunday to 2.6 million people in the United Kingdom and Ireland. Although approximately 425 copies of the September 26, 2004 edition of the Mail on Sunday were distributed in the United States, none of those 425 copies included the promotional CD. Of the 425 copies of the September 26, 2004 edition of the Mail on Sunday distributed in the United States, only eighteen were distributed to California, each of which went to a California subscriber to the Mail on Sunday.

On March 22, 2006, the Court granted Associated Newspapers' Motion to Dismiss Plaintiff's original complaint for lack of personal jurisdiction with leave to amend. Plaintiff filed his First Amended Complaint ("FAC") on April 25, 2006. On June 2, 2006, Associated Newspapers filed the instant Motion. Plaintiff filed his Opposition on June 26, 2006 and Associated Newspapers replied on July 10, 2006.

## DISCUSSION

### The Court Has No Personal Jurisdiction Over Defendant.

**\*2** The plaintiff bears the burden of establishing jurisdiction. *Ziegler v. IndianRiverCounty,* 64 F.3d 470, 473 (9th Cir.1995). Even absent formal discovery or an evidentiary hearing, the plaintiff must still establish at least a prima facie showing that personal jurisdiction exists to survive a motion to dismiss for lack of jurisdiction. *Fields v. SedgwickAssociatedRisks,Ltd.,* 796 F.2d 299, 301 (9th Cir.1986); *Ziegler,* 64 F.3d at 473. "Prima facie" showing means that the plaintiff has demonstrated facts that if true would support a finding of jurisdiction. *Data Disc, Inc. v. Systems Technology Associates, Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977); *Ballard v. Savage,* 65 F.2d 1495, 1498 (9th Cir.1995). In determining whether a plaintiff has met this burden, uncontroverted allegations in the complaint "must be taken as true." *AT & T Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996) (citing *WNS, Inc. v. Farrow,* 884 F.2d 200, 203 (5th Cir.1989)). Although the Court may consider affidavits in support of and in opposition to a motion challenging personal jurisdiction, the Court must resolve all factual conflicts between the parties' affidavits in the plaintiff's favor. *Id.*

There is no applicable federal statute governing personal jurisdiction in this case. Accordingly, the Court must apply the law of California, the state in which the Court sits. *Core-Vent Corp. v. Nobel Industries AB,* 11 F.3d 1482, 1484 (9th Cir.1993). California's long-arm statute permits a court to exercise personal jurisdiction over a defendant to the extent permitted by the Due Process Clause of the Constitution. Cal.Code Civ. P. § 410.10; *Gordy v. Daily News, L.P.,* 95 F.3d 829, 831 (9th Cir.1996). Due process requires that the nonresident defendant " 'have certain minimum contacts' " with the forum state such that the maintenance of the suit "does not offend 'traditional notions of fair play and substantial justice.' " *Terracom v. Valley Nat'l Bank,* 49 F.3d 555, 559 (9th Cir.1995) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The defendant's "conduct and connection with the forum state" must be such that the defendant "should reasonably anticipate being haled into court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.))**

there." *World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

Personal jurisdiction may be founded on either general jurisdiction or specific jurisdiction. Below, the Court discusses each jurisdictional basis individually.

1. General Jurisdiction

"General jurisdiction exists when a defendant is domiciled in the forum state or his activities there are 'substantial' or 'continuous and systematic." ' *Panavision International, L.P. v. Toeppen,* 141 F.3d 1316, 1320 (9th Cir.1998) (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414-16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Factors that courts may consider in determining whether general jurisdiction exists include "whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Bancroft & Masters, Inc. v. Augusta National Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000). The standard for establishing general jurisdiction is "fairly high." *Id.* (quoting *Brand v. Menlove Dodge,* 796 F.2d 1070, 1073 (9th Cir.1986)). Indeed, the plaintiff cannot meet his burden to establish general jurisdiction unless he shows that the defendant's contacts are the type that approximate physical presence.*Bancroft,* 223 F.2d at 1086.

**\*3** Here, Associated Newspapers has no contacts with California that could establish general jurisdiction there. It is not a California company and its contacts with California are neither substantial nor continuous and systematic so that they approximate physical presence. Moreover, none of Associated Newspapers' internet activities are sufficient to establish general jurisdiction. Further, Associated Newspapers has taken none of the steps that traditionally give rise to general jurisdiction, such as designating an agent for service of process or incorporating in California. Although the Court finds general jurisdiction over Associated Newspapers to be impossible, the Court discusses each of Plaintiff's arguments below, however meritless.

First, Plaintiff alleges that Associated Newspapers' business entity, known as This Is Travel, maintains "substantial or continuous and systematic" activities in California that justify general jurisdiction there. Specifically, This is Travel operates thisistravel.com, a travel website accessible to Internet users. For purposes of analyzing personal jurisdiction, courts generally categorize websites into three different types: actively commercial, passive, and interactive. Only active and interactive websites may establish personal jurisdiction. *See,e.g.,Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414, 419-20 (9th Cir.1997). When a defendant sells products or conducts business through a website, he has purposefully availed himself to any state in which he offers to sell products or do business. *See,e.g.,Stomp v. Neato, LLC.,* 61 F.Supp.2d 1074, 1078-79 (C.D.Cal.1999); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1124-26 (W.D.Penn.1997). In *Stomp,* for example, the court found purposeful availment where a Connecticut corporation maintained a website through which it marketed and sold its goods to California residents.*Stomp,* 61 F.Supp.2d at 1087.

In contrast, a defendant does not purposefully avail himself to a forum state's protections and benefits by maintaining a passive website that merely informs users about the defendant company's services. *See,e.g.,Cybersell,* 130 F.3d at 419-20;*New Tech Stainless steel Prods. Co., Ltd. v. Sun Mfg. Corp.,* 2004 WL 1773416, at \*4 (C.D.Cal. July 20, 2004) (finding no specific jurisdiction where defendant maintained "purely informative" website and allowed only "minimal" interaction between defendant and users).

Between commercial and passive websites lay interactive websites, which allow Internet users to exchange information with a host computer. *Zippo,* 952 F.Supp. at 1124. To determine whether maintaining an interactive website constitutes purposeful availment, courts look to the nature and quality of the information exchanged over the website. *Id.* (W.D.Penn.1997) ("[T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet."). In *Mink v. AAAA Development*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.))

*LLC,* 190 F.3d 333 (5th Cir.1999), the defendant corporation operated a website that listed several ways, including an e-mail address and toll-free number, through which users could contact the company. *Mink,* 190 F.3d at 337. Noting that the website was neither actively commercial nor strictly passive, the Fifth Circuit concluded that the website's listing of contact information, without more, was insufficient to establish purposeful availment. *Id.*]

**\*4** The Ninth Circuit "regularly [has] declined to find general jurisdiction even where the contacts are quite extensive."*Amoco Egypt Oil Co. v. Leonis Navigtion,* 1 F.3d 848, 851 n. 3 (9th Cir.1993); *Seee.g.Brand v. Menlove,* 796 F.2d 1070 (9th Cir.1986) (listing various Ninth Circuit cases where court did not find general jurisdiction despite significant contacts with the forum state). Moreover, personal jurisdiction should not be based solely on the ability of forum state residents to access an Internet site within the forum state because that "does not by itself show any persistent course of conduct by the defendants."*GTE New Media Services, Inc. v. Bellsouth Corp.,* 199 F.3d 1343, 1349 (D.C.Cir.2000); *SeeSchwarzenegger,* 374 F.3d 801 (finding maintenance of a website accessible to California residents insufficient to allow general jurisdiction over out-of-state defendant).

Here, This Is Travel's website is at most interactive.[FN1]It provides Internet users with advertisements and information about hotels and restaurants worldwide, including California, and allows users to check hotel availability. Although thisistravel.com allows for some interaction, its interactive nature falls far short of "quite extensive." No evidence shows that Associated Newspapers maintains contacts or conducts marketing or sales with California vendors. Nor is thisistravel.com structured to operate as a travel site exclusively for Californians; instead, it provides information about any location in the world to any Internet user. Moreover, Defendant is not selling goods or conducting business via thisistravel.com. Given the Ninth Circuit's high standard for general jurisdiction, Plaintiff's argument that thisistravel.com subjects Defendant Associated Newspapers to general jurisdiction in California is

unfounded. Accordingly, the Court concludes that thisistravel.com does not allow general jurisdiction over Defendant.

> FN1. In its opposition to Defendant's motion to dismiss, Plaintiff asserts that thisistravel.com is an active website, thereby automatically subjecting Defendant to general jurisdiction in California. However, Plaintiff has failed to establish that this website actually conducts business with California residents. *Stomp,* 61 F.Supp.2d 1078-79.Moreover, even if thisistravel.com is classified as an active website, Plaintiff has not established that Associated Newspapers itself conducted business via the website. As discussed below, unilateral activities of third parties cannot satisfy a defendant's purposeful availment requirement. *Regents of the Univ. Of New Mexico v. The Superior Court of Los Angeles County,* 52 Cal.App.3d 964, 971, 125 Cal.Rptr. 413 (1975) (citing Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

Similarly, the Court is not persuaded by Plaintiff's argument that Associated Newspapers' website, known as anm.co.uk, makes Defendant amenable to personal jurisdiction in California. This website simply links users to business entities of Associated Newspapers, such as This is Travel, the Daily News and the Mail on Sunday. But, as discussed above, access to a website alone does not confer jurisdiction over a defendant. *GTE New Media Services,* 199 F.3d at 1349. Plaintiff's argument that this website-a website that merely directs users to other websites-subjects Defendant, a United Kingdom company, to general jurisdiction in California is inconceivable. Defendant does not conduct any business or sell any products via anm.co.uk. At most, the website provides users with Defendant's contact information. However, listing of contact information without more does not allow specific jurisdiction, let alone general jurisdiction. *SeeMink,* 190 F.3d at 337. In short, this website can in no way subject Defendant to general jurisdiction in California.

**\*5** Accordingly, Associated Newspapers is not subject

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 5
Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.))

to general jurisdiction in California.

2. Specific Jurisdiction

Specific jurisdiction is proper when the case arises out of "certain forum-related acts." *Bancroft,* 223 F.3d at 1086. The Ninth Circuit evaluates three factors to determine whether specific jurisdiction exists. First, the defendant "must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws."*Yahoo, Inc. v. La Lique Contre Le Racisme Et L'Antisemitisme,* 433 F.3d 1199, 1205-06 (9th Cir.2006). Second, the plaintiff's cause of action must arise out of or result from the defendant's forum-related activities. Finally, the exercise of jurisdiction must be reasonable under the circumstances of the given case.*Ochoa v. J.B. Martin & Sons Farms,* Inc., 287 F.3d 1182, 1188-89 (9th Cir.2002) (citation omitted). Below, the Court analyzes each of these factors.

a. Defendant's Contacts With California Do Not Constitute Purposeful Availment.

In the past, the Ninth Circuit used the term "purposeful availment" as shorthand for two distinct concepts: purposeful availment and purposeful direction. *Yahoo,* 433 F.3d at 1206;*Schwarzenegger v. Fred Martin Co.,* 374 F.3d 797, 802 (9th Cir.2004) (noting that "availment and direction are, in fact, two distinct concepts")."A purposeful availment analysis is most often used in suits sounding in contract."*Schwarzenegger,* 374 F.3d at 802. In contrast, in tort cases, such as this one, courts inquire whether the defendant "purposefully directed" its activities to the forum state, applying an "effects" test focusing on "the forum in which the defendant's actions were felt," regardless of from where those actions originated. *Yahoo,* 433 F.3d at 1206.

Both parties in this case agree that the "purposeful direction" or "effects" test applies in this case. Under the "effects" test, personal jurisdiction is proper against an out-of-state defendant if three requirements are met: (1)

the defendant committed an intentional act; (2) the act was expressly aimed at the forum state; and (3) the act caused harm that the defendant knew was likely to be suffered in the forum state.

The "expressly aimed" requirement of the "effects" test requires more than foreseeable effects on the forum state; instead, the plaintiff must show that the defendant directed its act at the forum state. *Schwarzenegger,* 374 F.3d at 807. Indeed, even if the Defendant's acts cause harm to the plaintiff in the forum state and the plaintiff resides in the forum state, personal jurisdiction is nevertheless lacking under the "effects" test unless the defendant expressly aims its act at the forum state. *Id.* In *Schwarzenegger,* for example, the defendant circulated an advertisement in Ohio using an unauthorized image of Arnold Schwarzenegger to encourage Ohio residents to buy or lease cars from the defendant. *Id.* at 799.Although the Ninth Circuit acknowledged the defendant's act most likely caused harm in California, where Schwarzenegger resided, the act was nevertheless aimed only at Ohio residents, not at anyone in California. *Id.* at 807.Accordingly, personal jurisdiction was not proper in California under the "effects" test.

**\*6** Here, Associated Newspapers' acts were directed solely at the United Kingdom and Ireland. Indeed, the promotional CDs were distributed only in the United Kingdom and Ireland. And although a handful of copies of the September 26, 2004 edition of the Mail on Sunday made their way into California, none of those copies included the promotional CD. As such, Associated Newspapers could not have aimed its act of distributing the allegedly offending promotional CD at California.

Moreover, the fact that Plaintiff has found one or several copies of the promotional CD on eBay does not alter the Court's conclusion. Plaintiff conveniently fails to allege that either Associated Newspapers or Bigtime.TV offered the CD for sale on eBay. And in any event, to the extent that a third party placed the promotional CD for sale on eBay, that act would not subject Associated Newspapers to personal jurisdiction in California. "Unilateral activity of another party or a third person is not an appropriate consideration when determining

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.))

whether a defendant has sufficient contacts with a forum state to justify an assertion of jurisdiction."*HelicopterosNacionalesdeColumbia v. Hall,* 466 U.S. 408, 417, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Moreover, it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Regents of the Univ. Of N.M. v. The Superior Ct. of Los Angeles County,* 52 Cal.App.3d 964, 971, 125 Cal.Rptr. 413 (1975) (citing *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). Therefore, sale of a promotional CD on eBay by a third party does not subject Associated Newspapers to specific jurisdiction.

Likewise, Bigtime.TV's emails to Brian Wilson's representatives in California do not subject Associated Newspapers to personal jurisdiction in California against Plaintiff's tort claims.[FN2] Even if these contacts might satisfy the "purposeful availment" test in a contractual dispute between Bigtime.TV and the individuals it contacted in California,[FN3] this fact is of little consequence here because this action does not involve a contractual dispute. Rather, it sounds only in tort, which calls for the purposeful direction or "effects" test. And as discussed above, Plaintiff cannot satisfy this test because he cannot show that either Bigtime.TV or Associated Newspapers expressly aimed its intentional act at California. Rather, both entities expressly aimed their acts at the United Kingdom and Ireland. To the extent that Bigtime.TV had any contacts with California, those contacts were tangential to the contracts into which Bigtime.TV entered with exclusively European companies. See *FDIC v. British-American Corp.,* 828 F.2d 1439, 1444 (9th Cir.1987) (no specific jurisdiction in California where all relevant contacts occurred in Fiji and the Bahamas except for trip to California by defendant's employee to finalize deal).

Plaintiff attributes Bigtime.TV's acts to Associated Newspapers because, according to Plaintiff, Bigtime.TV acted as Associated Newspapers' agent.

> FN2. Plaintiff attributes Bigtime.TV's acts to Associated Newspapers because, according to Plaintiff, Bigtime.TV acted as Associated Newspapers' agent.

> FN3. The Court notes that Bigtime.TV did not

enter into a contract with any California citizen regarding the promotional CD.

**\*7** Finally, Defendant's websites, thisistravel.com and anm.co.uk, do not satisfy the "effects" test because Defendant did not specifically direct its websites at California residents. Indeed, these websites can be accessed by anyone, anywhere. Moreover, the default departure location for flights on thisistravel.com is London, which suggests that the website is in fact aimed at residents of the United Kingdom. As such, neither thisistravel.com nor anm.co.uk constitutes purposeful direction according to the "effects" test.

In sum, Plaintiff cannot show that Associated Newspapers expressly aimed its intentional acts at California.[FN4] The Court, therefore, need not reach the third part of the "effects" test.

> FN4. Moreover, to the extent that Plaintiff relies on his "residence" in California to show that personal jurisdiction is proper, this reliance is misplaced. Plaintiff is not a resident of California. Rather, he is a resident of Nevada, as he stated in his Complaint. In any event, regardless of his residency, the acts of which he complains were expressly aimed only at the United Kingdom and Ireland, not California. *SeeSchwarzenegger,* 374 F.3d at 807.

b. Defendant's Contacts With California Do Not Arise From or Relate To Plaintiff's Causes of Action.

As stated above, the plaintiff's cause of action must arise out of or result from the defendant's forum-related activities. "Contacts with a forum state are relevant for purposes of specific jurisdiction only if they are sufficiently related to the cause of action."*Metro-Goldwyn-Mayer,* 243 F.Supp.2d 1073, 1085 (C.D.Cal.2004). The Ninth Circuit applies a "but for" test to determine whether a given cause of action arises out of the defendant's forum-related activities. *Doe v. Unocal Corp.,* 248 F.3d 915, 924 (9th Cir.2001). In essence, the court must ask whether the cause of action would exist but for the defendant's contacts with the forum. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 7
Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.))**

Plaintiff bases the Court's personal jurisdiction over Associated Newspapers on any and all of Defendant's activities that can be tied to California, no matter how far-fetched. These contacts, however, do not arise from or relate to Plaintiff's causes of action and, therefore, cannot establish specific jurisdiction.

First, Plaintiff alleges that Defendant's ownership of fifteen use trademarks subjects Defendant to personal jurisdiction in California. The Court is not persuaded by this argument for two reasons. First, using a trademark cannot establish purposeful availment. *SeeAmeritecCorp. v. Ameritech Corp.,* 1986 WL 10702, at *6 (C.D.Cal. Apr.28, 1986). In *Ameritec Corp.,* for example, the district court reasoned that "[n]ational advertising which happens to appear in a particular jurisdiction does not constitute transacting of business in that jurisdiction. The same rationale would apply, *a fiorari,* to the use of a trademark, the most passive form of advertising."*Id.* (citing *Williams v. Canon,* 432 F.Supp. 376, 380 (D.C.Cal.1977)). Second, even if purposeful availment was established, this action did not arise from or relate to Defendant's trademarks. In other words, this action would exist even if Defendant did not exercise its trademark rights in California.[FN5]

> FN5. To the extent that Plaintiff alleges these trademarks establish general jurisdiction, the court rejects their argument given the high standard for general jurisdiction discussed above.

Plaintiff's alternative argument that thisistravel.com establishes personal jurisdiction is equally unavailing. As discussed above, thisistravel.com does not subject Defendant to general jurisdiction. Likewise, it does not subject Defendant to specific jurisdiction. Even if this website did sustain purposeful availment, Plaintiff's causes of action do not arise from or relate to Defendant's travel website. Specifically, Plaintiff's instant causes of action deal with the alleged unauthorized use of trademarks and the distribution of promotional CDs; they do not involve travel at all. Because these causes of action do not arise from or relate to the maintenance of thisistravel.com, specific jurisdiction does not exist.

*8 Likewise, Defendant's website, anm.co.uk, does not subject Defendant to specific jurisdiction. Although this website is not completely passive, as it links users to other websites and provides them with Defendant's contact information, it cannot establish specific jurisdiction. Again, Plaintiff's causes of action do not arise from or relate to Defendant's maintenance of anm.co.uk.

Lastly, Defendant's single contract with TIMCO Software, Inc. of Palo Alto, California does not constitute sufficient purposeful availment to exercise specific jurisdiction over Defendant in California.[FN6] Plaintiff's causes of action would have occurred regardless of Defendant's contract with TIMCO. Therefore, Plaintiff's assertion of personal jurisdiction based on Defendant's contract with TIMCO fails.

> FN6. The Court also rejects Plaintiff's argument that Associated Newspapers' contract with TIMCO Software, Inc., which is totally unrelated to the instant matter, establishes general jurisdiction.

In sum, Plaintiff cannot establish that any of Defendant's California activities sufficiently relate to the instant causes of action. Therefore, Associated Newspapers is not subject to specific jurisdiction in California. Consequently, the Court need not determine whether the exercise of jurisdiction would be reasonable in this case.

CONCLUSION

As explained above, the Court lacks personal jurisdiction over Defendant Associated Newspapers. Accordingly, the Court GRANTS Associated Newspapers' Motion and DISMISSES Associated Newspapers from this action without leave to amend.

IT IS SO ORDERED.

C.D.Cal.,2006.
Love v. The Mail on Sunday
Not Reported in F.Supp.2d, 2006 WL 4046170 (C.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT K**

**Westlaw.**

Slip Copy                                                                 Page 1
Slip Copy, 2007 WL 3231733 (N.D.Cal.)
**(Cite as: 2007 WL 3231733 (N.D.Cal.))**

Missud v. Horton
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
Oakland Division.
Patrice and Julie MISSUD, Plaintiffs,
v.
D.R. HORTON, et al., Defendants.
No. C 07-2625 SBA.
Docket Nos. 6, 24, 29, 30.

Oct. 30, 2007.

Patrick Alexandre Missud, Attorney at Law, San
Francisco, CA, for Plaintiffs.
Gillian Mailey Ross, Wendel Rosen Black & Dean
LLP, Oakland, CA, for Defendants.

**ORDER**

SAUNDRA BROWN ARMSTRONG, United
States District Judge.
\*1 Before the Court is a motion to dismiss [Docket
No. 6] pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure filed by defendants D.R.
Horton, Inc., DHI Mortgage Company Ltd. and the
six individuals named in the complaint. After read-
ing and considering the arguments presented by the
parties, the Court finds this matter appropriate for
resolution without a hearing. *See* FED. R. CIV . P.
78. For the reasons that follow, the defendants' mo-
tion to dismiss is hereby GRANTED.

**BACKGROUND**

This case arises out of the purchase of a single fam-
ily home in Nevada in November 2003 by the
plaintiffs, Patrice and Julie Missud. The defendants
are D.R. Horton, Inc. (Horton), a large corporate
homebuilder, its mortgage subsidiary DHI Mort-
gage Company, Ltd. (DHI), and six individuals as-
sociated with one or both of these companies.

On November 11, 2003, Patrice and Julie Missud
entered into a written sales contract with Horton for
the purchase of a residence at 1353 Romanesca
Drive in Henderson, Nevada. *See* Docket No. 10,
Ex. A. The agreement required a down payment of
approximately $40,000 and the procurement of a
loan of around $362,000. *Id.* In February 2004,
Patrice Missud received a letter from DHI, Horton's
mortgage subsidiary, stating he was not fulfilling
the loan terms of his purchase agreement. *See* Dock-
et Nos. 9, Ex. A; 7, Ex. JN1. The letter provided
notice that, if Missud could not provide Horton or
DHI with proof they were approved for a mortgage
loan, he might put his deposit money at risk. *See*
Letter from Horton to Patrice Missud (Docket No.
9, Ex. A). Although it is unclear whether Missud
used DHI or an outside lender to secure his loan,
Missud states in his complaint that he "fully per-
formed under the terms of the Contract," and there
is no evidence in the record that Missud in fact lost
any portion of his initial deposit. *See* Docket No. 1
at 22.

On August 22, 2005, Missud filed a complaint in
San Francisco Superior Court alleging intentional
infliction of emotion distress, claiming the defend-
ants' letter caused him "severe abdominal pain and
nausea for which he was intravenously admin-
istered narcotics for approximately 4 hours." Compl.
at 2, *Missud v. Horton, et al.,* No. 05-444247 (filed
Aug. 22, 2005). The defendants responded by filing
a motion to quash service or, in the alternative, a
motion to dismiss on the ground of *forum non con-
veniens,* based on the argument that all the events
giving rise to the claim occurred in Nevada. Ross
Decl., ¶ 3. After Missud failed to respond to the de-
fendants' motion, San Francisco Superior Court
James Warren ordered the entire case dismissed
without prejudice on November 9, 2005. Nov. 9,
2005 Order, *Missud v. Horton, et al.,* No.
05-444247.

On December 9, 2005, Missud refiled his emotional
distress complaint in San Francisco Superior Court.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2007 WL 3231733 (N.D.Cal.)
**(Cite as: 2007 WL 3231733 (N.D.Cal.))**

Compl., *Missud v. Horton, et al.,* No. 05-447499 (filed Dec. 9, 2005). The defendants again filed a motion to quash service that was sustained as to all defendants except Horton, which agreed to waive service to reach the merits of whether the court had personal jurisdiction over Horton. On April 25, 2006, Judge Warren sustained the defendants' motion to quash service and again ordered the case dismissed without prejudice as to Horton, based on lack of personal jurisdiction. April 25, 2006 Order, *Missud v. Horton, et al.,* No. 05-447499.Missud continued filing a variety of motions until the San Francisco Superior Court finally ordered the entire case dismissed on January 11, 2007. Jan. 11, 2007 Order, *Missud v. Horton, et al .,* No. 05-447499.

**\*2** On October 23, 2006, several months before the dismissal of Missud's second emotional distress complaint, Missud and his wife filed a third lawsuit against the same defendants, this time alleging two counts of fraud, intentional misrepresentation, breach of fiduciary duty, declaratory relief and restitution. Compl., *Missud et al. v. Horton, et al.,* No. 06-457207 (filed Oct. 23, 2006). The defendants once again filed a motion to quash, which was granted by Judge Busch on February 15, 2007. On the same day, the court ordered Missud's entire case dismissed, and also ordered the defendants' motion to declare Missud a vexatious litigant to be taken off calender in light of the court's ruling on the motion to quash. Feb. 15, 2007 Order, *Missud et al. v. Horton, et al.,* No. 06-457207.

Missud then filed the present complaint in federal district court on May 17, 2007. *See*Docket No. 1. In addition to the claims alleged in the three state court suits, Missud also alleges retaliation under 18 U.S.C. § 1513 based upon his allegation that the defendants have interfered with his contracting and legal practices by contacting the Nevada agency regulating engineers and the California State Bar. *Id.; See*Docket No. 20 at 8. Missud is licensed to practice law in the state of California. *See*Docket No. 21, ¶ 1.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a complaint for lack of personal jurisdiction. The exercise of personal jurisdiction over a nonresident defendant must be pursuant to constitutional principles of due process and the law of the state where the district court sits. *Sher v. Johnson,* 911 F.2d 1357, 1360-61 (9th Cir.1990).California Code of Civil Procedure section 410.10, governing personal jurisdiction, is coextensive with federal due process requirements, meaning that the Court may exercise personal jurisdiction to the full extent allowed by constitutional due process principles.[FN1] *See Dole Food Co. v. Watts,* 303 F.3d 1104, 1110 (9th Cir.2002); *Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995). Under the Due Process Clause, a nonresident defendant must have sufficient minimum contacts with the forum state such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice. *See Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1155 (9th Cir.2006); *Tuazon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1169 (9th Cir.2006), *cert. denied,*--- U.S. ----, 127 S.Ct. 723, 166 L.Ed.2d 560 (2006). This means that the defendant's conduct and connection with the forum state must be such that the defendant should reasonably anticipate being haled into court there. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).

> FN1. The California statute states that "A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."CAL.CODE CIV. PROC. § 410.10.

The plaintiff has the burden of proving that the Court has personal jurisdiction over the defendant. *Pebble Beach,* 453 F.3d at 1154;*Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir.2004). If the Court rules without holding an evidentiary hearing, dismissal for lack of personal jurisdiction is appropriate only if the plaintiff has not made a prima facie showing of personal juris-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

diction. *Tuazon,* 433 F.3d at 1168;*Myers v. Bennet Law Offices,* 238 F.3d 1068, 1071 (9th Cir.2001). Although the plaintiff cannot simply rest on the bare allegations of his complaint, uncontroverted allegations in the complaint must be taken as true in determining whether the plaintiff has made a prima facie showing of personal jurisdiction. *Schwarzenegger,* 374 F.3d at 800;*American Tel. & Tel.,* 94 F.3d at 588-89. Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor. *Schwarzenegger,* 374 F.3d at 800;*see also Mattel, Inc. v. Greiner & Hausser GmbH,* 354 F.3d 857, 862 (9th Cir.2003) ("Unless directly contravened, [the plaintiff's] version of the facts is taken as true, and conflicts between facts contained in declarations submitted by the two sides must be resolved in [the plaintiff's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists").

## ANALYSIS

### A. Personal jurisdiction

**\*3** There are two types of personal jurisdiction, specific and general, either of which will sustain the exercise of personal jurisdiction over a defendant. *See American Tel. & Tel. Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996); *Rano v. Sipa Press, Inc.,* 987 F.2d 580, 587 (9th Cir.1993). A court may exercise specific jurisdiction where the suit arises out of or is related to the defendant's contacts with the forum and the defendant purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Tuazon,* 433 F.3d at 1169. In a controversy unrelated to a defendant's contacts with the forum, a court may exercise general jurisdiction only where the defendant has substantial or continuous and systematic contact with the state. *See Tuazon,* 433 F.3d at 1169;*Easter v. American West Fin.,* 381 F.3d

948, 960 (9th Cir.2004).

### 1. Horton and DHI

The defendants contend they do not have sufficient contacts with California to support the conclusion they have purposely directed their business to the forum state or purposely availed themselves of California law. Horton is a Delaware corporation with its headquarters in Texas, and conducts business in Nevada but not in California. *See*Docket No. 10 at ¶ 3. Horton's vice president and legal counsel states that Horton has no offices in California. *Id.* Likewise, DHI is a Texas limited partnership that, at the time it worked on procuring Missud's mortgage loan, was operating under the name CH Mortgage Company I, Ltd., which transacted business only in Nevada. *See*Docket No. 10, ¶ 6.

Missud offers two arguments to sustain his burden of showing this Court has personal jurisdiction over Horton and DHI. The first is that both companies "are residents and do business within the Ninth Circuit in Nevada."Docket No. 1 at 2. This argument fails because the territorial region of the Ninth Circuit has no bearing upon the test of whether a non-resident defendant has sufficient minimum contacts *with the forum state* such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice. *See Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1155 (9th Cir.2006); *Tuazon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1169 (9th Cir.2006), *cert. denied,*--- U.S. ----, 127 S.Ct. 723, 166 L.Ed.2d 560 (2006) (emphasis added). It is the state of California that represents the forum in this case-not the territory within the Ninth Circuit.

Missud's second argument supporting personal jurisdiction for Horton and DHI relies on his statement that "the corporate Defendants have contracted with over 40 California consumer residents."Docket No. 20 at 7. Although Missud does not dispute that these transactions have no relation to the incidents giving rise to this claim, the plaintiff can still estab-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3231733 (N.D.Cal.)
(Cite as: 2007 WL 3231733 (N.D.Cal.))

lish general personal jurisdiction by showing the nonresident defendants have substantial or continuous and systematic contact with the state. *See Tuazon,* 433 F.3d at 1169;*Easter v. American West Fin.,* 381 F.3d 948, 960 (9th Cir.2004).

**\*4** Missud's bald assertion, however, lacks any evidentiary support. Nothing in the record, such as a declaration or affidavit, sheds light on whether these "40 California consumer residents" even exist, let alone whether they transacted with the defendants in a substantial or continuous and systematic way. Therefore Missud fails to sustain his burden to show this Court has personal jurisdiction over the two corporate defendants, and the motion to dismiss must be granted in favor of Horton and DHI.

**2. The six individual defendants**

Missud also claims this Court has personal jurisdiction over six individuals associated with either Horton or DHI. *See*Docket No. 1 at 2. Annie Schankin, Michael Mason and Daniel Callihan, three defendants employed by either Horton or DHI, work and reside in Nevada, and have no contacts at all with California. *See*Docket Nos. 12 at 2; 9 at 2; 13 at 2. Missud alleges other California families, the "Yoons" and the "Songs," had direct contacts with Schankin, Mason and Callihan during negotiations for their own home purchases. *See*Docket No. 20 at 9. But Missud offers no proof of these contacts. Since Missud fails to offer any evidence rebutting the lack of minimum contacts between California and Schankin, Mason and Callihan, these three defendants must be dismissed from the complaint for lack of personal jurisdiction.

A similar scenario exists for the three corporate officers named in the complaint: Donald Horton, Donald Tomnitz and James Frasure. Horton is the Chairman of the Board of Directors of Horton, Tomnitz is Horton's Chief Executive Officer and Frasure is the president of Horton's Las Vegas division. *See*Docket Nos. 10, ¶ 9; 11, ¶ 1. Neither Hor-

ton nor Tomnitz had any involvement in Missud's real estate transaction, nor does either man reside or work in California. *See*Docket No. 10, ¶ 9. Likewise, Frasure lives and works in Nevada, and had no involvement in the day-to-day handling of Missud's real estate and mortgage transactions. *See*Docket No. 11, ¶¶ 2-3. As with the other individual defendants, Missud offers no proof that Horton, Tomnitz or Frasure had any contacts with California. Missud's conclusory statements in his opposition papers, such as "[a]ll Board members inclusive of both Tomnitz and Horton are responsible for the contents of their contracts to which they systematically and continuously bind California consumers and other consumers nationwide," fail to establish any facts supporting this Court's personal jurisdiction over these defendants. For these reasons, the motion to dismiss is granted in favor of the six individual defendants.

**B. Forum non conveniens**

The defendants argue that even if personal jurisdiction exists, the complaint should be dismissed on the grounds of forum non conveniens. A district court has discretion to decline to exercise jurisdiction in a case where litigation in a foreign forum would be more convenient for the parties. *Tuazon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1177 (9th Cir.2006) (quoting *Lueck v. Sundstrand Corp.,* 236 F.3d 1137, 1142 (9th Cir.2001); *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 504, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). In dismissing an action on forum non conveniens grounds, a court determines 1) whether an adequate alternative forum exists, and 2) whether the balance of private and public interest factors favors dismissal. *Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1118 (9th Cir.2002); *Lueck,* 236 F.3d at 1142 (citing *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 22, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Gulf Oil,* 330 U.S. at 507-09;*Ceramic Corp. of America v. Inka Maritime Corp.,* 1 F.3d 947, 949 (9th Cir.1993).

**\*5** The private interests considered in determining

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether to dismiss a case on forum non conveniens grounds include 1) the relative ease of access to sources of proof, 2) the availability of compulsory process for attendance of unwilling witnesses and the cost of obtaining attendance of willing ones, 3) the possibility of viewing premises, if appropriate and 4) all other practical problems that make trial of a case easy, expeditious and inexpensive. *Menken v. Emm,* WL 2713139 (9th Cir.2007) (quoting *Gulf Oil,* 330 U.S. at 508);*see Altmann v. Republic of Austria,* 317 F.3d 954, 973 (9th Cir.2002). Public factors include administrative difficulties from court congestion; the local interest in having local controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws; and the unfairness of burdening citizens in an unrelated forum with jury duty.*Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Lueck,* 236 F.3d at 1147.

In this case, an adequate alternative forum exists in Nevada because all corporate and individual defendants are subject to personal jurisdiction in that state. An important private interest to consider in this case-perhaps the most important one-is the "relative ease of access to sources of proof."*Gulf Oil,* 330 U.S. at 508. Nine out of out of ten of Missud's claims involve state causes of action related to fraud, breach of contract, breach of fiduciary duty and personal injury. *See*Docket No. 1. By their nature, these claims place significant focus on the representations of the individual employees of Horton and DHI, and their interactions with Missud. All of these employees or former employees reside in Nevada. As noted above in the discussion of personal jurisdiction, the defendants' residence in the territory of the Ninth Circuit is irrelevant when considering the difficulty in compelling witnesses to appear in a California district court. Missud's assertion to the contrary that "this Court can compel the availability of all witnesses, willing or not" is a misstatement of law. *See*Docket No. 20 at 14.

Additionally, the state of Nevada has a far greater interest than California in suits involving the conveyance of real property located in Nevada. The Nevada brokers, loan agents and real estate agents involved in Missud's transaction are all regulated by Nevada law. In his complaint, Missud himself premises his fourth case of action, for breach of fiduciary duty, on Nevada state law. *See*Docket No. 1 at 21.The purchase contract signed by Missud states that the agreement "shall be construed in accordance with the laws of the State of Nevada."*See*Docket No. 10, Ex. A, Section 19(I).

For the reasons stated above, the district court in Nevada that presides over the region including the real property that is the subject of this transaction is a more proper forum than this Court. The defendants' motion to dismiss is granted on the grounds of forum non conveniens.

## C. Statutes of limitations

*6 A statute of limitations defense may be properly raised in a Rule 12(b)(6) motion. *Hyatt Chalet Motels, Inc. v. Carpenters Local,* 1065 430 F.2d 1119, 1120 (9th Cir.1970); *Suckow Borax Mines Consol. v. Borax Consol.,* 185 F.2d 196, 204 (9th Cir.1951). Where there is no specific federal statute, federal courts will apply the state statute of limitations. *Intl. Union of Operating Engineers v. Fischbach and Moore, Inc.,* 350 F.2d 936, 938-939 (9th Cir.1965).

## 1. The fraud claims

The defendants argue that Missud's first three causes of action-for fraud in the inducement, fraudulent concealment and intentional misrepresentation-should be barred by the applicable state statutes of limitations. In California, a plaintiff must bring an action within three years "for relief on the ground of fraud or mistake."[FN2]Cal.Code Civ. P. 338(d). The statute begins to run when "the plaintiff discovers, or reasonably should discover, the underlying facts to his cause of action."*Solomon v. North American Life and Cas. Ins. Co.,* 151 F.3d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 6
Slip Copy, 2007 WL 3231733 (N.D.Cal.)
(Cite as: 2007 WL 3231733 (N.D.Cal.))

1132, 1138 (9th Cir.1998).

> FN2. Defendants acknowledge they have not done a choice-of-law analysis to determine if the contract is governed by Nevada or California law. The limitations period, however, is the same in both states for claims of fraud. Nev.Rev.Stat. § 11.190(3)(d). The periods are also the same for emotion distress claims. Nev.Rev.Stat. § 11.190(4)(e).

Missud alleges in his complaint that on February 19, 2004, "D.R. Horton Inc. received Plaintiffs' certified, return receipt letters detailing the extensive fraud regarding the transaction of the property."Docket No. 1 at 6. In his opposition to the defendants' motion to dismiss, Missud explains that "since allegations for fraud must be pled with 'particularity' as per FRCP Rule 9, the Plaintiff intentionally did not at that time claim any fraud."Docket No. 20 at 11.Essentially Missud concedes that, while he was aware of facts constituting an action of fraud as early as February 2004, he made a conscious decision not to file a suit at that time based on his interpretation of a procedural court rule. Federal Rule 9, which governs how a fraud claim must be pled, has no relation to the rule governing when the statute of limitations begins running on a state fraud claim. Since Missud has admitted he was aware of facts constituting fraud as far back as February 2004, and he filed the present action on May 17, 2007, California law bars his fraud-based claims in this suit.

**2. Emotional distress claims**

Defendants also argue that Missud's sixth and seventh causes of action, for intentional infliction of emotional distress and negligent infliction of emotional distress, are likewise barred by the applicable statute of limitations. California law sets two years as the period for emotional distress claims. Cal.Code Civ. P. 335(1); *Pugliese v. Superior Court,* 146 Cal.App.4th 1444, 1450, 53 Cal.Rptr.3d 681 (Cal.Ct.App.2007). In emotional distress claims, "the statute of limitations begins to run once the plaintiff suffers severe emotional distress as a result of outrageous conduct on the part of the defendant."*Cantu v. Resolution Trust Corp.,* 4 Cal.App.4th 857, 889, 6 Cal.Rptr.2d 151 (Cal.Ct.App.1992).

In February of 2004, Missud alleges he received a letter from the defendants that caused him "severe emotional distress, aggravating his normally benign congenital condition which required immediate medical intervention within three hours [sic] receipt of letter."Compl. at 24. Thus while Missud concedes that his personal injury occurred in February 2004, he did not file the present complaint until May 2007, long after the applicable statute of limitations had run. Missud offers no legal support for his contention that his ongoing injury, in the form of kidney stones caused by the emotional distress initiated by the defendants, bars application of the statute of limitations. When a plaintiff alleges a continuing violation, "an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act."*Columbia Steel Casting Co., Inc. v. Portland General Elec. Co.,* 111 F.3d 1427, 1444 (9th Cir.1996) (quoting *Pace Industries, Inc. v. Three Phoenix Co.,* 813 F.2d 234, 240 (9th Cir.1987)). Accordingly, Missud's emotional distress claims must be dismissed as barred by California law.

**\*7** Finally, prior judicial actions "do not toll the statute of limitations, no matter how close their relationship to the one at bar."*Pace Industries,* 813 F.2d at 240.

**D. Defendants' objections to plaintiffs' evidence**

The defendants objected to certain parts of Missud's declaration and to two pieces of evidence: 1) a San Francisco police report detailing an act of vandalism to Missud's car, and 2) a declaration by Missud related to a letter he received from Horton stating it would contact the California State Bar Association

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3231733 (N.D.Cal.)
**(Cite as: 2007 WL 3231733 (N.D.Cal.))**

if Missud continued the activities alleged in the let-
ter. *See* Docket Nos. 29, 30. Neither of these pieces
of evidence has any bearing on the narrow question
of whether this Court can exercise personal juris-
diction over the defendants. Horton's letter stating
what it might do in the future fails to shed any light
on whether it has sufficient minimum contacts with
the state of California. Additionally, the parts of
Missud's declaration objected to by the defendants
were not considered in this discussion. For these
reasons, this evidence was not considered and the
defendants' objections are overruled as moot.

### CONCLUSION

Accordingly, defendants' motion to dismiss [Docket
No. 6] pursuant to Rule 12(b)(6) is GRANTED.
Defendants' objections to plaintiffs' evidence
[Docket Nos. 24, 29, 30] are OVERRULED as
moot.

IT IS SO ORDERED.

N.D.Cal.,2007.
Missud v. Horton
Slip Copy, 2007 WL 3231733 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT L

**Westlaw.**

Slip Copy                                                                    Page 1
Slip Copy, 2007 WL 1342586 (N.D.Cal.)
**(Cite as: 2007 WL 1342586 (N.D.Cal.))**

**H**

MMCA Group, Ltd. v. Hewlett-Packard Co.
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
MMCA GROUP, LTD., Plaintiff,
v.
HEWLETT-PACKARD COMPANY, et al., De-
fendants.
No. C-06-7067 MMC (EMC).
Docket No. 63.

May 8, 2007.

Thomas Marc Litton, Frederick J. Geonetta, Litton
& Geonetta, LLP, San Francisco, CA, for Plaintiff.
William F. Abrams, Erin Alysa Smart, Bingham
McCutchen LLP, East Palo Alto, CA, Jennifer Ann
Lynch, Kristen A. Palumbo, Bingham McCutchen
LLP, Allison Lane Cooper, Krieg Keller Sloan Re-
illey & Roman LLP, James A. Hughes, Sullwold &
Hughes, San Francisco, CA, Donald Steven Simon,
Wendel, Rosen, Black & Dean, LLP, Thomas P.
Klein, Tklein Associates, Inc., Oakland, CA, Luis
Manuel Alcalde, Crabbe, Brown & James LLP,
Columbus, OH, David Andrew Schlesinger, Guer-
rero Jacobs & Schlesinger LLP, Michael N. Pancer,
San Diego, CA, for Defendants.

**ORDER DENYING PLAINTIFF'S MOTION
FOR LEAVE TO TAKE JURISDICTIONAL
DISCOVERY**

EDWARD M. CHEN, United States Magistrate
Judge.
**\*1** Plaintiff MMCA Group, Ltd. has filed suit
against Defendants Hewlett-Packard Co. ("HP"),
Pinkerton Consulting & Investigations Europe,
PICA, and various individuals employed or
formerly employed by HP. The majority of the indi-
vidual defendants-more specifically, Warren Roth-
er, Robert Cozzolina, Luis Ortega, and Rodolfo
Diaz-have filed motions to dismiss for lack of per-
sonal jurisdiction. *See*Docket Nos. 38, 42, 46,

50.MMCA now seeks an order permitting it to con-
duct jurisdictional discovery in order to oppose the
individual defendants' motions to dismiss. Judge
Chesney referred MMCA's motion for leave to take
jurisdictional discovery (as well as all future dis-
covery disputes) to the undersigned for resolution.
Having reviewed the parties' briefs and accompany-
ing submissions, as well as all other evidence of re-
cord, the Court hereby **DENIES** MMCA's motion.

**I.** *FACTUAL & PROCEDURAL BACKGROUND*

A. *Allegations in MMCA's Complaint*

In its first amended complaint ("FAC"), which is
the operative complaint in the case, MMCA alleges
as follows.

MMCA is a worldwide investigative firm specializ-
ing in intellectual property matters, including in-
vestigation of copyright and trademark counterfeit-
ing. *See* FAC ¶ 22. In 1991, HP hired MMCA as its
investigative contractor for HP's printer supplies
anti-counterfeiting program. *See id.*

In October 2002, HP changed the structure of its
anti-counterfeiting program from one that was cent-
rally managed to one that was regionally managed.
*See id.* ¶ 27.Four regions were established: North
America ("NA"); Latin America ("LA"); Europe,
Middle East, and Asia ("EMEA"); and Asia Pacific
("AP").*See id.*As part of HP's reorganization of the
IPG anti-counterfeiting program, HP also created a
council to coordinate and manage all IPG anti-
counterfeiting activities. *See id.* ¶ 28.

From October 2002 to July 2004, **Mr. Diaz,** a cit-
izen of Florida, was the LA regional manager for
HP's imaging and printing supplies group ("IPG")
anti-counterfeiting program. *See id.* ¶ 9. In July
2004, Mr. Diaz became worldwide manager for that
program. *See id.*Mr. Diaz left HP in December
2005 and now is the COO of PICA, another invest-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1342586 (N.D.Cal.)
(Cite as: 2007 WL 1342586 (N.D.Cal.))

igation service company. *See id.* ¶¶ 8-9.

From July 2004 to May 2006, **Mr. Ortega**, a citizen of Florida, was the LA regional manager for the IPG anti-counterfeiting program. *See id.* ¶ 10.His employment with HP ended in May 2006. *See id.*

From September 2004 to September 2006, **Mr. Rother**, a citizen of South Africa, was the EMEA regional manager for the IPG anti-counterfeiting program. *See id.* ¶ 11.

During the relevant time period, **Mr. Cozzolina**, a citizen of New Jersey, was the worldwide investigations program manager for HP's IPG. *See id.* ¶ 12.

In March 2003, HP and MMCA entered into a Service Agreement. *See id.* ¶ 35.The Agreement contained a nonsolicitation clause which provided that, during the term of the Agreement and for one year thereafter, " 'neither HP nor MMCA shall solicit to hire the other party's employees without prior written permission.' " *Id.* Apart from the Agreement, "[i]t was established policy that HP would not have access to the contact information of any MMCA employee or associate and that MMCA as an independent contractor to HP would be the sole contact to HP in connection with its investigations of counterfeit product and packaging anywhere in the world." *Id.* ¶ 16."The identity and contact information for MMCA employees and associates was [sic] always regarded by MMCA and HP as proprietary to MMCA." *Id.*

**\*2** Both the Service Agreement and the established policies were allegedly violated by HP and HP's employees, including Mr. Diaz, Mr. Ortega, Mr. Rother, and Mr. Cozzolina. For example:

(1) In January 2004, Mr. Diaz, while the LA regional manager, asked that MMCA investigators put their full names and not their initials on incident reports related to investigations. *See id.* ¶ 49.

(2) In August 2004, shortly after becoming worldwide anti-counterfeiting program manager for HP,

Mr. Diaz demanded the proprietary names and contact information for all MMCA employees and associates nationwide. *See id.* ¶ 55.

(3) In August 2004, Mr. Ortega, as LA regional manager for the IPG anti-counterfeiting program, used his personal relationship with a MMCA secretary to obtain confidential information regarding MMCA relations with its employees and associates in Colombia. *See id.* ¶ 58.

(4) In October 2004, shortly after Mr. Ortega terminated the Service Agreement between HP and MMCA for investigations in the LA region and PICA was hired to replace MMCA, a MMCA employee Gabriela Toranzo was offered a position with and was eventually hired by PICA. *See id.* ¶¶ 62-64.Ms. Toranzo's identity and contact information was provided to PICA by either Mr. Ortega and/or Mr. Diaz. *See id.* ¶ 63.Ms. Toranzo was involved in a personal relationship with Mr. Diaz. *See id.* ¶ 57.

(5) In March 2005, during a meeting in Istanbul, Turkey, Mr. Diaz and Mr. Rother (the regional manager for EMEA) sought identity and contact information from all MMCA individuals they met. *See id.* ¶ 80.

(6) In August 2006, MMCA was informed that Mr. Cozzolina, worldwide investigations program manager for HP's IPG, had directly contacted a MMCA associate in Germany and solicited his services on behalf of HP for the IPG anti-counterfeiting program in the EMEA region. *See id.* ¶ 108.

(7) In August 2006, Mr. Rother, the EMEA regional manager, demanded that he be able to speak directly to MMCA employees and associates in the EMEA region so that they could answer his questions and clarify charges on the MMCA invoices. *See id.* ¶ 112.

(8) In August 2006, MMCA learned that Mr. Cozzolina, worldwide investigations program manager for HP's IPG, had provided the identity and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1342586 (N.D.Cal.)
**(Cite as: 2007 WL 1342586 (N.D.Cal.))**

contact information for a MMCA associate in Argentina to PICA. *See id.* ¶ 114.

Based on, *inter alia,* the above acts, MMCA alleges the following causes of action against the individual defendants:

(1) Interference with prospective economic advantage. This claim is based on the individual defendants' contacting and solicitation of MMCA employees and associates, while they were under contractual employment with MMCA. *See id.* ¶ 122.According to MMCA, the individual defendants "interfered with the MMCA's prospective economic advantage in that MMCA has lost key employees and associates to competitors, lost the advantages it held of having multiple investigators in key geographic regions of the world, and it no longer has the same breadth and depth of investigators available to service its clients throughout the world."*Id.* ¶ 124.

*3 (2) Interference with contractual relations. According to MMCA, the individual defendants engaged in acts and conduct which interfered with MMCA's performance of the Service Agreement with HP and which interfered with the contracts between MMCA and its employees and associates. *See id.* ¶ 132.

(3) Conspiracy.

**B.** *Declarations of Individual Defendants*

As noted above, after MMCA initiated this lawsuit, Mr. Rother, Mr. Cozzolina, Mr. Ortega, and Mr. Diaz all filed motions contesting personal jurisdiction in this forum. Each of the individual defendants submitted declarations in support of his motion to dismiss and/or in conjunction with the currently pending motion.

In his declaration, **Mr. Rother** states that he has been an employee of Hewlett-Packard South Africa (Pty) Limited ("HP South Africa") since June 1, 1999. *See* Rother Decl. ¶ 3. HP South Africa is a wholly owned subsidiary of HP. *See id.*Mr. Rother has never worked directly for HP. *See id.* ¶ 5. Nor has he ever worked in California or been employed by a California company. *See id.*He has visited California only once in his life-more specifically, in December 2004 to attend a meeting of the HP IPG anti-counterfeiting and fraud program worldwide council, of which he was a member. *See id.* ¶ 10.He has only communicated "occasionally" with HP employees based in California. *See id.* ¶ 11 (describing those communications with specificity). Mr. Rother states that he is unaware of any other communications with anyone in California except for those specifically described. *See id.* ¶ 12.

In his declaration, **Mr. Cozzolina** states that he has been employed by HP since May 2004 but that he has never traveled to California on HP business and works out of his home in New Jersey. *See* Cozzolina Decl. ¶¶ 3, 8. In the past ten years, he has only been to California one time-more specifically, in September 2001 while employed as a consultant for the federal government. *See id.* ¶ 6. Mr. Cozzolina communicates only "occasionally" with HP employees based on California. *See id.* ¶ 9. He communicates with HP's California-based outside counsel, Howard Rice, on a regular basis-one or two times each month-but on legal matters unrelated to the instant case. *See id.* ¶ 10.In 2004, Mr. Cozzolina sent an e-mail in which a MMCA associate-who is located in California-was carbon copied. *See id.* ¶ 11.The e-mail concerned in investigation by HP in California. *See id.*This is the only communication that he has had with a MMCA employee or associate based in California. *See id* .At the hearing on MMCA's motion for leave to take jurisdictional discovery, counsel for Mr. Cozzolina provided a supplemental declaration from Mr. Cozzolina. The Court admitted the supplemental declaration because it is responsive to a declaration filed by MMCA with its reply brief.

In his declaration, **Mr. Ortega** states that he was an employee of HP (from July 2004 to May 2006) but that, while employed there, he worked out of Flor-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1342586 (N.D.Cal.)
(Cite as: 2007 WL 1342586 (N.D.Cal.))

ida only. *See* Ortega Decl. ¶ 3. In the past five years, he has visited California only once-more specifically, in December 2004, to attend a business meeting unrelated to MMCA. *See id.* ¶ 4. (It is not clear whether this is the same December 2004 meeting to which Mr. Rother refers in his declaration.) Mr. Ortega does not address what communications, if any, he had with HP employees based in California but states that he "reported exclusively to HP personnel in the Miami Office."*Id.* ¶ 3. Mr. Ortega also states that the communications he has had with MMCA and PICA were not initiated from or received in California, nor did they take place in California. *See id.* ¶¶ 6-7.

*4 Finally, in his declaration, **Mr. Diaz** states that he was an employee of HP but that, while employed there, he worked out of Florida only. *See* Diaz Decl. ¶ 4. In the past five years, he has traveled to California only five times. *See id.* ¶ 8. From 2002 to 2005, he traveled to California one time each year for internal HP business meetings. *See id.* Mr. Diaz does not address what communications, if any, he had with HP employees based in California but states that "none of the MMCA representatives with whom [he] had dealings were California residents or were present in California when I communicated with them."*Id.* ¶ 7.

## II. *DISCUSSION*

### A. *Legal Standard*

"A district court is vested with broad discretion to permit or deny [jurisdictional] discovery."*Laub v. United States DOI,* 342 F.3d 1080, 1093 (9th Cir.2003). Jurisdictional discovery should ordinarily be granted where jurisdictional facts are contested or more facts are needed. *See id.; see also Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 430 n. 24 (9th Cir.1977) (stating that discovery "should be granted where pertinent facts bearing on the question of jurisdiction are controverted ... or where a more satisfactory showing of

the facts is necessary") (internal quotation marks omitted).*See, e.g., In re Dynamic Random Access Memory Antitrust Litig.,* 2005-2 Trade Cases (CCH) 75,013 (N.D.Cal. Nov. 7, 2005) (denying jurisdictional discovery because "plaintiffs have made no showing that any sworn testimony by defendants is disputed, and have not pointed to any facts that, if shown, would warrant the exercise of personal jurisdiction").

However, "[w]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants, [a][c]ourt need not permit even limited discovery .... " *Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1160 (9th Cir.2006) (internal quotation marks omitted). In addition, a court may deny discovery where "it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction." *Laub,* 342 F.3d at 1093 (internal quotation marks omitted).*See, e.g., Pebble Beach,* 453 F.3d at 1160 (concluding that additional discovery would not be helpful because, as a matter of law, "a passive website and domain name are an insufficient basis for asserting personal jurisdiction" and defendant's website was a passive website).

The Ninth Circuit has stated that a decision to deny discovery "will not be disturbed except upon the clearest showing that the denial of discovery results in actual and substantial prejudice to the complaining litigant. Prejudice is established if there is a reasonable probability that the outcome would have been different had discovery been allowed."*Laub,* 342 F.3d at 1093 (internal quotation marks omitted). In *Laub,* the Ninth Circuit indicated that the denial of discovery was prejudicial because the documents offered by the plaintiff suggested that there was "at least an arguable claim" of jurisdiction. *Id.*

### B. *Discovery Regarding Individual Defendants' Contacts with California*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1342586 (N.D.Cal.)
(Cite as: 2007 WL 1342586 (N.D.Cal.))

**\*5** The parties agree that because this case is brought under diversity jurisdiction, California law governs the analysis of personal jurisdiction."Where, as here, there is no applicable federal statute governing personal jurisdiction, the law of the state in which the district court sits applies.... California's long-arm statute allows courts to exercise personal jurisdiction over defendants to the extent permitted by the Due Process Clause of the United States Constitution."*Core-Vent Corp. v. Nobel Indus. AB,* 11 F.3d 1482, 1484 (9th Cir.1993). Accordingly, California and federal law on personal jurisdiction and Due Process coincide. Where there is a material divergence in case law, the Court so notes below.

1. *General Jurisdiction*

Based on the declarations submitted by the individual defendants-the contents of which are largely uncontroverted by MMCA, even taking into account the Byrne declaration submitted by MMCA-MMCA has failed to establish that further discovery is likely to yield facts sufficient to establish general jurisdiction. For a court to have general jurisdiction, there must be something equivalent to the physical presence of the defendant in the forum. *See Tuazon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1169 (9th Cir.2006) (noting that, for general jurisdiction to attach, a defendant's contacts with the forum must approximate physical presence). In *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Supreme Court pointed out that "it is an inescapable fact of modern commercial life that a substantial amount of commercial business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."*Id.* at 476.Even so, contacts must be systematic and continuous in order to give rise to general jurisdiction, *see Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 572 (2d Cir.1996) (indicating that extensive mail order and telephone sales could support general jurisdiction if sufficiently continu-

ous and systematic), and Ninth Circuit case law indicates that communications across state lines rarely rise to that level to support general jurisdiction. *See Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1331 (9th Cir.1984) (concluding that solicitation of business through visits, telephone calls, and telexes to the forum state did not support general jurisdiction); *Thos. P. Gonzalez Corp. v. Consejo Nacional De Produccion De Costa Rica,* 614 F.2d 1247, 1254 (9th Cir.1980) ("[U]se of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the state."); *see also Noonan v. Winston Co.,* 135 F.3d 85, 92-93 (1st Cir.1998) (finding nonresident company's regular and frequent telephone calls, faxes, and letters to resident company to solicit business insufficient to establish general jurisdiction). Nothing in the allegations of the complaint or declarations submitted by MMCA, particularly in the face of the undisputed facts contained in defendants' declarations, even approaches a basis for finding general jurisdiction. The Court therefore turns to the question of whether discovery is warranted with respect to specific jurisdiction.

2. *Specific Jurisdiction*

**\*6** Under Ninth Circuit law,

a court may exercise "specific jurisdiction" when the following requirements are met:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; *or* perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1342586 (N.D.Cal.)
(Cite as: 2007 WL 1342586 (N.D.Cal.))

fair play and substantial justice, i.e. it must be reasonable.

*Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1111 (9th Cir.2002) (emphasis added).

MMCA argues that discovery is warranted with respect to the issue of specific jurisdiction because it is likely that there are discoverable facts which would establish such jurisdiction. In particular, MMCA points to (1) the individual defendants' use of HP's Data Management System ("DMS"), which was created and maintained at HP's headquarters in California and (2) the individual defendants' communications with the California-based HP council which coordinated and managed all IPG anticounterfeiting activities.

The Court rejects MMCA's contention that further discovery is warranted to explore the individual defendants' use of the DMS. There is no evidence that the DMS is maintained at HP's headquarters in California. The FAC does not contain any such allegations, *see* FAC ¶¶ 43-47, and Mr. Cozzolina has now submitted a supplemental declaration which states that the DMS has never been based in California. *See* Supp. Cozzolina Decl. ¶ 2 (stating that the DMS is based in Virginia). The Court does not have any reason to suspect that this statement by Mr. Cozzolina, made under penalty of perjury, is not true, and MMCA conceded as much at the hearing. Moreover, it is doubtful that the mere fact that individual defendants allegedly used a database-even one maintained in California-establishes specific jurisdiction. MMCA does not dispute that the key wrongful acts alleged in the complaint-soliciting MMCA employees-took place outside of California. MMCA has not submitted any case law establishing the principle that acquiring information from the forum state which facilitates the ultimate wrongful conduct occurring entirely elsewhere, establishes specific jurisdiction.

As for MMCA's contention that further discovery is warranted to explore the individual defendants' communications with the HP council, the Court is likewise not persuaded. As a preliminary matter, it is not clear that the HP council is, as MMCA claims, California based. Thomas Byrne, a senior case manager at MMCA who served as the "designated central point of contact for MMCA for the investigative services that were provided" to HP's IPG, Byrne Decl. ¶ 2, suggests that the HP council is California based because the chair of the council, Mee-Leng Wang, has an office at HP in Cupertino. *See id.* ¶ 2. But even if Ms. Wang is the chair of the council, that fact alone does not establish that the council is California based; Ms. Wang is only one member of the council. Furthermore, Ms. Wang's position does not establish that the HP council meetings were "conducted from California." *Id.* ¶ 4. Defendants assert that the council is comprised of a large group of individuals residing throughout the nation and the world. MMCA has not produced any evidence, other than that relating to Ms. Wang, that suggests the council's center of gravity resides in California.

*7 However, even assuming that the HP council was California based, there are other insurmountable problems for MMCA. "When a nonresident defendant commits a tort within the state ... that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state ... to exercise personal adjudicative jurisdiction ..."*Guidry v. United States Tobacco Co., Inc.,* 188 F.3d 619, 628 (5th Cir.1999); *see also*4A Wright & Miller, Fed. Prac. & Proc. § 1069.1 (noting that, "[i]f a foreign corporation commits a tortious act within the forum state, ... a federal court within that state will exercise jurisdiction over the corporation").*See, e.g., In re Automobile Antitrust Cases I & II,* 135 Cal.App.4th 100, 123, 37 Cal.Rptr.3d 258 (2005) ("California courts may properly exercise personal jurisdiction over one who commits a tort or who causes a tort to be committed within this state."). However, there is nothing in the complaint or declarations suggesting the alleged tortious interference were committed within the state. As noted above, MMCA has not alleged that any of the indi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 7
Slip Copy, 2007 WL 1342586 (N.D.Cal.)
(Cite as: 2007 WL 1342586 (N.D.Cal.))

vidual defendants committed the tortious acts of wrongful solicitation in or to California. Defendants' declaration state the contrary.

Therefore, MMCA's only basis for specific jurisdiction would be grounded on a conspiracy theory of jurisdiction-*i.e.,* that the individual defendants are subject to suit in California because they conspire with the HP council, which has committed forum-related acts that are imputable to the individual defendants. But MMCA did not offer a conspiracy theory of jurisdiction in any of its briefing to the Court. Rather, the issue arose only the day before the hearing, when the Court *sua sponte* asked the parties to provide authority on the issue. Although this issue was thus effectively waived by MMCA, the Court addresses the merits.

As pointed out by the individual defendants, the majority of courts in California have held that the forum-related activity of co-conspirators cannot be attributed or imputed to nonresident defendants. *See In re Automobile Antitrust Cases I & II,* 135 Cal.App.4th 100, 118, 37 Cal.Rptr.3d 258 (2005) ( "Jurisdictional facts shown must pertain to each nonresident defendant individually, even in an alleged conspiracy."); *Mansour v. Superior Court of Orange County,* 38 Cal.App.4th 1750, 1754-55, 1760, 46 Cal.Rptr.2d 191 (1995) (stating that "California does not recognize conspiracy as a basis for acquiring personal jurisdiction over a party" and thus rejecting plaintiff's argument that "a party is subject to suit in California because it belongs to a conspiracy and a coconspirator has committed forum-related acts which are alleged to be imputable to it"); *Edmunds v. Superior Court,* 24 Cal.App.4th 221, 233, 29 Cal.Rptr.2d 281 (1994) ("[E]ven though [plaintiff] has made allegations of civil conspiracy against [defendant], for purposes of assuming personal jurisdiction, the purposes of other parties in the particular transaction cannot be imputed to the defendant ...."); *Kaiser Aetna v. Deal,* 86 Cal.App.3d 896, 901, 150 Cal.Rptr. 615 (1978) ("Allegations of conspiracy do not establish as a matter of law that if there is one resident conspirat-

or, jurisdiction may be exercised over nonresident conspirators. '[The] purpose of other parties cannot be imputed ....'"); *Tiffany Records, Inc. v. M.B. Krupp Distributors, Inc.,* 276 Cal.App.2d 610, 621, 81 Cal.Rptr. 320 (1969) ( "[T]he issue here is not simply whether there was a conspiracy. It is whether respondents' acts, if any, done pursuant to the alleged conspiracy were such that they can be said to have been doing business in California so as to be subject to jurisdiction.").*See also McKay v. Hagaseth,* No. C-06-1377 MMC, 2007 WL 1056784, at *2 n. 3 (N.D.Cal. Apr.6, 2007) (stating that "California courts have rejected [a conspiracy] theory [of jurisdiction]").*But see Taylor-Rish v. Multitech Corp.,* 217 Cal.App.3d 103, 114, 265 Cal.Rptr. 672 (1990) (in dictum, stating that "the acts of a coconspirator within California may give rise to jurisdiction over a coconspirator in another state").

**\*8** Similarly, although the Ninth Circuit has not made any definitive ruling, "the validity of conspiracy theory of jurisdiction in [the] circuit is in doubt. In *Piedmont Label Co. v. Sun Garden Packing Co.,* 598 F.2d 491 (9th Cir.1979), the Ninth Circuit expressly rejected 'any implication ... that members of a conspiracy, as agents of one another, 'transact business' for venue purposes in any district where one of them transacts business.' " *General Steel Domestic Sales, LLC v. Suthers,* No. CIV. S-06-411 LKK/KJM, 2007 U.S. Dist. LEXIS 19231, at *15 (E.D.Cal. Mar.2, 2007); *see also Dynamic Random Access Memory,* 2005-2 Trade Cases (CCH) 75,013 ("[T]he court declines plaintiffs' invitation to adopt the conspiracy theory of personal jurisdiction."); *Kipperman v. McCone,* 422 F.Supp. 860, 873 n. 14 (N.D.Cal.1976) (rejecting "plaintiff's assertion that personal jurisdiction over alleged co-conspirators may be acquired vicariously through the forum-related conduct of any single conspirator"; "personal jurisdiction over any non-resident individual must be premised upon forum-related acts personally committed by the individual" and "[i]mputed conduct is a connection too tenuous").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1342586 (N.D.Cal.)
**(Cite as: 2007 WL 1342586 (N.D.Cal.))**

Page 8

As discussed above, MMCA has proffered nothing to suggest that any of the individual defendants had substantial contact with California. Furthermore, there is no evidence, as noted above, that the council was based in California. Thus, "it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for [specific] jurisdiction."*Laub,* 342 F.3d at 1093 (internal quotation marks omitted). MMCA has not pointed to any disputed issues of fact material to establishing jurisdiction under the law discussed above. These are not even "base allegations" that would support personal jurisdiction. *Pebble Beach,* 453 F.3d at 1160.FN1

> FN1. In *Piedmont,* the court addressed briefly the issue of jurisdictional discovery: "Sun Garden argues that even if the co-conspirator theory of venue is no longer accepted in this Circuit, we should remand this case to the district court to permit Sun Garden to complete discovery into Piedmont's relationship with the forum. If the district court had prevented Sun Garden from presenting evidence of Piedmont's independent relationship to the forum, we would be sympathetic to Sun Garden's argument. The record indicates, however, that Sun Garden chose to rely solely on the co-conspirator theory of venue in the face of Piedmont's evidence that it had no contact with the state of California. Plaintiff had the burden of showing that venue was properly laid in the Northern District of California. It utterly failed to do so. Thus, we need not remand this case to the district court to permit further discovery."*Piedmont,* 598 F.2d at 496.

## III. *CONCLUSION*

For the foregoing reasons, the Court denies MMCA's request for leave to take jurisdictional discovery with respect to the individual defendants Mr. Rother, Mr. Cozzolina, Mr. Ortega, and Mr. Diaz.

This order disposes of Docket No. 63.

IT IS SO ORDERED.

N.D.Cal.,2007.
MMCA Group, Ltd. v. Hewlett-Packard Co.
Slip Copy, 2007 WL 1342586 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT M**

**Westlaw.**

Slip Copy                                                                Page 1
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
(Cite as: 2006 WL 3060134 (E.D.Cal.))

**C**

Peacock v. Willis

E.D.Cal.,2006.

Only the Westlaw citation is currently available.

United States District Court,E.D. California.

Alan PEACOCK, Plaintiff,

v.

Frank WILLIS, Ruth Willis, and W.W. Boer Goats,
Inc., Defendants.

No. CV F 06-432 AWI LJO.

Oct. 27, 2006.

Kevin Gerard Little, Law Office of Kevin G. Little,
Fresno, CA, for Plaintiff.

Lenden Franklin Webb, Wild, Carter & Tipton,
Fresno, CA, for Defendants.

**ORDER ON DEFENDANTS' MOTION TO
DISMISS FOR IMPROPER VENUE (Rule
12(b)(3)), OR TRANSFER FOR IMPROPER
VENUE (28 U.S.C. § 1406), OR TRANSFER
FOR CONVENIENCE (28 U.S.C. § 1404), OR
MOTION TO DISMISS FOR LACK OF PER-
SONAL JURISDICTION (Rule 12(b)(2))**

ANTHONY W. ISHII, District Judge.

*1 This is essentially a fraud/breach of contract
case involving the sale of Boer goats between Alan
Peacock ("Peacock"), and an Oklahoma goat ranch,
W.W. Boer Goats ("WW Boer"), run by Frank Wil-
lis ("Frank") and Ruth Willis ("Ruth"),
(collectively "Defendants"). Peacock asserts claims
for breach of contract, intentional misrepresenta-
tion, U.C.C. Article 2 breach of warranty, and viol-
ation of California Business and Professions Code §
17200 for unfair and deceptive business practices.
Peacock seeks over $75,000 in damages. Defend-
ants have filed a Rule 12(b)(3) motion to dismiss
for improper venue, or alternatively transfer under
28 U.S.C. § 1406 to the Northern District of Ok-
lahoma, or alternatively transfer to the Northern
District of Oklahoma under 28 U.S.C. § 1404(a), or
alternatively dismissal for lack of personal jurisdic-

tion. For the reasons that follow, Defendants's mo-
tion will be granted.

**FACTUAL BACKGROUND**

From his complaint, Peacock alleges that on March
30, 2005, he purchased three registered Boer buck
goats from Defendants. Defendants agreed to deliv-
er the bucks along with a doe herd to be purchased
by Peacock in May 2005. Until Plaintiff chose the
doe herd, Defendants agreed to feed and care for
the bucks. Plaintiff was a resident of California at
this time.

On May 2, 2005, Peacock traveled to Defendants's
Oklahoma ranch to select a doe herd. Frank showed
Peacock what appeared to be a "premium" doe herd
and ordered the herd manager to inspect and re-
move any "unsuitable" does. Peacock agreed to
purchase 115 of the does shown by Frank, and
Frank stated that all or most of those does were
pregnant, and that the does would reproduce by Ju-
ly 2005. Peacock tendered a check for over half the
purchase price, the remainder to be paid upon deliv-
ery.

On June 9, 2005, Frank called Peacock to confirm
that the does and bucks would be delivered within
the week, but that two does were too pregnant
heavy to ship. Peacock agreed to let Defendants re-
place the two does.

On June 11, 2005, Peacock received the does, but
the goats failed to comply with the agreement and
representations made by Defendants since the goats
had serious health problems. Further, the three
bucks had not been shipped, several of the does
were delivered without markings that corresponded
to their registration certificates, at least one kid
goat was delivered without its registration certific-
ate, and two weathered buck goats were included
within the doe herd. Peacock promptly notified De-
fendants of the non-conforming delivery. Frank ad-
mitted that the delivery was non-conforming and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
**(Cite as: 2006 WL 3060134 (E.D.Cal.))**

Defendants agreed to sell Peacock additional does and kids, which were to be delivered with the pending bucks.

In July 2005, Peacock informed Defendants that none of the does had given birth. In August 2005, only one doe had given birth and less than 20% of the purchased herd was pregnant. The non-reproductive nature of the does delivered was contrary to the agreement and representations made by Defendants.

**\*2** On August 23, 2005, Defendants notified Peacock that the bucks, replacement does, and other pending goats would be shipped to Peacock's Utah ranch. Frank informed Peacock that one of the bucks and two of the pending kid goats had died, but agreed to replace these goats. The goats were to be marked separately so as to distinguish them from other goats that were being shipped together to a different buyer.

On August 26, 2005, Peacock learned that the pending goat shipment had not been marked so as distinguish the goats meant for Peacock from the goats meant for the other purchaser. Peacock notified Defendants and asked them to indicate which of the goats belonged to Peacock, but Defendants failed to do so. Plaintiff proceeded to pick out the goats that he could identify based on age or ear tags. One of these goats was a young buckling that died of pneumonia the following month. Shortly thereafter, Peacock treated several other goats for diseases and health problems that had progressed over time.

As a result of the above non-conforming goat shipments, Peacock suffered significant damages, including the loss of several generations of goats at a time when demand for goat meat has been high. On April 14, 2006, Peacock brought suit in this Court on the basis of diversity, alleged that venue is proper under 28 U.S.C. § 1391(a)(2), and alleged four causes action for breach of contract, misrepresentation, breach of warranty, and unfair and deceptive business practices. Peacock alleges that misrepres-

entations occurred in California, that Defendants purposefully availed themselves of merchants, consumers and markets in California, that Defendants regularly and systematically engage in business with merchants in California, and have received substantial compensation from goat sales in California. Peacock further alleges that a substantial portion of the events described occurred within Modesto, California, and that Defendants negotiated the subject transaction with Plaintiff by directing their activities to Peacock's then residence of Modesto. Further, WW Boer operates an internet website through which it regularly solicits California residents and advertises the sale of goats. California residents can purchase goats from Defendant's website via the internet.

Defendants now move to dismiss or transfer to the Northern District of Oklahoma, based on improper or inconvenient forum, and or to dismiss for lack of personal jurisdiction.[FN1]

> FN1. Defendants do not list "Rule 12(b)(2)" in their motion, but instead simply refer to personal jurisdiction. However, dismissal for want of personal jurisdiction is a motion under Rule 12(b)(2).*See*Fed. R. Civ. Pro. 12(b)(2).

In support of their motions, Defendants have filed declarations from Frank, Ruth, and their attorney. The declarations are basically identical and read:

2. I hereby declare that I have read the foregoing Motion to Dismiss ..., I know the contents thereof, and declare that the contents are true based on my own knowledge, except for those matters which are therein stated on information and belief, as to those matters I believe them to be true.

3. Defendants, Frank Willis and Ruth Willis, are individuals residing in Oklahoma.

**\*3** 4. Defendant, WW Boer Goats, Inc., is a corporation with its principal place of business in Oklahoma and is in the business of livestock develop-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
**(Cite as: 2006 WL 3060134 (E.D.Cal.))**

ment and resale.

5. Defendant, WW Boer Goats, Inc., is not incorporated in California; nor has it qualified to do business in California. Defendant has no subsidiary incorporated or qualified to do business in California.

6. The interests of justice and the convenience of the parties and witnesses would be served by transferring this action to the Northern District of Oklahoma for the following reasons:

(A) It would be burdensome and inconvenient for [all Defendants] to attend trial in California because of the expense of travel and time away from the business and other pursuits.

(B) All the books and records of WW Boer Goats are located in the district to which transfer is sought.

(C) All the face to face meetings and transactions occurred in the Northern District of Oklahoma. Checks were tendered there and the first contact between Plaintiff and Defendant, WW Boer Goats, was received in Oklahoma.

*See* Declarations of Frank Willis and Ruth Willis at ¶¶ 2-6.

Additionally, there has been no dispute that the goats in question were delivered to Utah, *see* Defendants's Motion at 2:19-20; Declarations of Frank and Ruth Willis at ¶ 2, and that Peacock viewed Defendants's website and sent a March 21, 2005, e-mail to Defendants that read:

My wife and I have chosen to become meat goat farmers. We have the time, land, and background to make this adventure real. We are interested in a starting herd of 100-200 animals (I think 100 is a good starting herd) but the right price is also a consideration. We are looking at Boer/Spanish mix, but would take your advice on our best option, please contact me for a talk. I don't have to be 'sold' on the idea, I just don't have the experience in buying

quality animals (goats), sheep I understand, we just want goats.

Defendants's Motion at 4:1-4 (grammatical errors corrected); Declarations of Frank and Ruth Willis at ¶ 2 (stating that they know the contents of their motion and know them to be true).

Peacock has filed opposition declarations that include electronic transmissions from Defendants. Peacock declares in relevant part:

1.... All of my other potential witness [excluding himself and his wife] are in California, which is where I lived during almost all of the factual occurrences alleged in my lawsuit.

2. Although I now operate a goat farm in Utah, I still work as a licensed private investigator in California. I still have several pending California civil and criminal matters on which I work as an investigator, and, since my move to Utah, I have frequently had to travel back to California in relation to those matters. My wife also travels regularly back to California, and we have a secondary residence in the Modesto ... area, but not in Utah or Oklahoma.

3. The negotiations of the contract occurred between the parties when the plaintiff was a resident of Modesto ... and the goats that are at the heart of this lawsuit were purchased by Plaintiff when he was a California resident. Even further, Plaintiff was enticed to travel from California to Oklahoma on what he contends are false representations as to the animals he would be able to purchase, and those misrepresentations were purposefully directed at him while he was in California..

*4 ...

4. I regularly receive unsolicited e-mails from the Defendants, so their Internet operations are not, as they allege, completely passive. Moreover, some of these e-mails confirm that the Defendants have been to California conducting business, indicating that it should not pose an undue hardship for them

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
(Cite as: 2006 WL 3060134 (E.D.Cal.))

Page 4

to defend a claim related to their business in California.

First Declaration of Alan Peacock at ¶¶ 2-4.

In a "further corrected" declaration, Peacock declares:

2. My wife and I did not move to Utah until late April-early May 2005, but I purchased the goats that are the subject of this action on March 30, 2005.[FN2] All of the preceding negotiations, including the many misrepresentations detailed in my complaint, occurred when I was a California resident, and those negotiations occurred via telephone, e-mail, and facsimile when I was in California. [The attached April 22, 2005, e-mail] shows that I had not yet established residence in Utah and was still in California when a deal was struck for the purchase of the subject goats. The trip to the Oklahoma ranch was only for the purpose of picking our specific goats and does.

> FN2. In a declaration entitled "further declaration of Alan Peacock," Peacock originally declared that he purchased the goats on May 30, 2005. In a declaration entitled "corrected further declaration of Alan Peacock," Peacock declares that he purchased the goats on March 30, 2005. The corrected further declaration was filed after the Court took this matter under submission. However, the corrected declaration contains no other changes and the Court, when reviewing the original "further declaration," noticed that the May 30, 2005, date was inconsistent with both the opposition and the complaint. Accordingly, the Court will consider this "corrected further declaration."

3. Since the beginning of doing business with the defendants, I have been the recipient of many unsolicited e-mails.... One of those e-mails describes deliveries made by the defendants to California. Other

e-mails show that the defendants recruited California customers, by, among other conduct, advising prospective California purchasers of the pertinent legal requirements.
Second Declaration of Alan Peacock at ¶¶ 2-3.

Also, attached as part of the Corrected Further Declaration is an April 22, 2005, e-mail from Peacock to Frank. This e-mail reads in part:

Hi Frank. We will be there on May 1, but won't make it to your location until the AM on May 2. What would I have to do to take advantage of the "sale" you are having? I believe we will be making a purchase of at least 100 does.... You have my bucks, I will look forward to meeting them! I can take delivery anytime mid-May on. (I have to put up some fence) I expect to do that next week.... All of my e-mail addresses will change on Monday to [e-mail address] (I think!) I will have to check that to [sic] mailing address is HC 74 Box 6025, Cove Fort, Utah 84713.

Exhibit 1 to Corrected Further Peacock Declaration.

Finally, Peacock's counsel in part declares:

3. In November of 2005, I caused a pretext call to be made to the office of WW Boer Goats, Inc., for investigation purposes. Specifically, the pretext call was intended to determine the amount of business that the defendants conduct in California.

4. During that call, Frank Willis, the principal of WW Boer Goats, represented that the defendants regularly ship goats to California and indicated that they had a relationship with a trucking company that handled their California deliveries for them. Mr. Willis further indicated that he himself had been to California conducting business on behalf of the defendants.

*5 Declaration of Kevin Little at ¶¶ 3-4.[FN3]

> FN3. Both Mr. Little and Peacock also declare that Mr. Little is Peacock's personal and longtime attorney and that Little would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
**(Cite as: 2006 WL 3060134 (E.D.Cal.))**

effectively be unable to represent Peacock if the Court transferred this case to Utah or Oklahoma. *See* Little Declaration at ¶ 2; First Peacock Declaration at ¶ 1.

### *PERSONAL JURISDICTION OVER DEFEND-ANTS*

#### *Defendants's Argument*

Defendants argue that the standard for establishing general jurisdiction is "fairly high." Here, Peacock is the person who initiated contact with Defendants. It is true that Defendants have a website that Peacock saw, but the website is passive in that it does little more than make information available to people who are interested in goats. The website has no interactive features, does not solicit customers, and does not send proactive e-mails. It was Peacock, not Defendants, who made contact and that contact was directed to Oklahoma.

Additionally, at other points in the motion, Defendants argue that it is unreasonable for them to have to defend this case in California, that they did not purposefully direct their acts to California, and that they have never subjected themselves to California jurisdiction.

#### *Plaintiff's Opposition*

Peacock responds that Defendants's argument that they are subject to general jurisdiction is irrelevant since they are subject to specific jurisdiction in California. Defendants purposefully availed themselves of California by committing intentional, tortious acts against a California resident. Although the mere existence of a contract is insufficient to confer personal jurisdiction, when a non-resident transacts business by negotiating and executing a contract via telephone calls and letters with a resident of the forum state, then the defendant has purposefully availed himself of the forum. Further, because Defendants move for dismissal under Rule 12(b)(2) in the alternative to its Rule 12(b)(3) and

alternative 28 U.S.C. §§ 1404, 1406 requests, had filed a stipulation prior to filing this motion, and have consented to jurisdiction by the magistrate judge, Defendants have arguably waived any complaints regarding personal jurisdiction.

#### *Legal Standard*

Plaintiffs bear the burden of establishing that a court has personal jurisdiction over defendants. *See Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir.2004); *Mattel, Inc. v. Greiner & Hausser, GmbH,* 354 F.3d 857, 862 (9th Cir.2003); *Dole Food Co. v. Watts,* 303 F.3d 1104, 1108 (9th Cir.2002). When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff is "obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction."*Scott v. Breeland,* 792 F.2d 925, 927 (9th Cir.1986); *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.,* 551 F.2d 784, 787 (9th Cir.1977). Where the motion to dismiss is based on written materials rather than an evidentiary hearing, the plaintiff "need only make a prima facie showing of jurisdictional facts."*Schwarzenegger,* 374 F.3d at 800;*Mattel,* 354 F.3d at 862;*Dole Food,* 303 F.3d at 1108. "Although the plaintiff cannot 'simply rest on the bare allegations of its complaint,'... uncontroverted allegations in the complaint must be taken as true."*Schwarzenegger,* 374 F.3d at 800 (quoting *Amba Marketing Systems,* 551 F.2d at 787);*Dole Food,* 303 F.3d at 1108;*AT & T v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996). Any conflicts between facts contained within the declarations or affidavits submitted by the parties are resolved in the plaintiffs' favor for purposes of plaintiffs' prima facie case. *See Schwarzenegger,* 374 F.3d at 800;*Mattel,* 354 F.3d at 862;*Dole Food,* 303 F.3d at 1108;*AT & T,* 94 F.3d at 588.

**\*6** In the absence of a specific statutory provision, federal courts apply the personal jurisdiction laws of the state in which they are situated. *See Schwarzenegger,* 374 F.3d at 800-01. "Because California's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
(Cite as: 2006 WL 3060134 (E.D.Cal.))

long-arm jurisdictional statute [Cal.Civ.Proc.Code § 410.10] is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same."*Id.*

"A state may exercise either general or specific jurisdiction over a defendant."*Lake v. Lake,* 817 F.2d 1416, 1420-21 (9th Cir.1987)."General jurisdiction exists if the nonresident's contacts with the forum are continuous and systematic, and the exercise of jurisdiction satisfies traditional notions of fair play and substantial justice."*Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995). For specific jurisdiction, there is a three part test:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Dole Food Co.,* 303 F.3d at 1111. This test requires more than simple foreseeability of causing injury in another state. *See Terracom v. Valley Nat'l Bank,* 49 F.3d 555, 560 (9th Cir.1995). The foreseeability required by due process analysis is that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."*Id.* It is the purposeful availment prong that prevents defendants from being "haled into a jurisdiction through random, fortuitous, or attenuated contacts."*Id.* The Ninth Circuit distinguishes between tort cases and contract cases for purposes of determining purposeful availment. *See Ziegler,* 64 F.3d at 473;*Roth v. Marquez,* 942 F.2d 617, 621 (9th Cir.1991). Courts generally review contract cases under a purposeful availment analysis, and review tort cases under a purposeful

direction analysis. *See Schwarzenegger,* 374 F.3d at 802. Although courts use the shorthand "purposeful availment" for both availment and direction, they are distinct concepts. *Id.*

For purposeful direction in tort cases, Courts utilize an "effects" test.*Schwarzenegger,* 374 F.3d at 803;*Dole Food,* 303 F.3d at 1111;*Roth,* 942 F.2d at 621. Under the effects test, the plaintiff must show that the defendant: (1) committed an intentional act; (2) that was expressly aimed at the forum state; and (3) that caused harm that the defendant knows is likely to be suffered in the forum state. *See Dole Food,* 303 F.3d at 1111. Conduct is expressly aimed at a forum state when the defendant's conduct is "targeted at a plaintiff whom the defendant knows to be a resident of the forum state."*Id.* Communications with a plaintiff in the forum in the form of letters, faxes, and phone calls which contain fraudulent misrepresentations can constitute "express aiming." *See id.* at 1111-12 (citing with approval *Wien Air Alaska, Inc. v. Brandt,* 195 F.3d 208, 212 (5th Cir.1999)). A line of authority had required that "the brunt of the harm" occur within the forum state. *E.g. Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1087 (9th Cir.2000). However, the Ninth Circuit has recently clarified that the "brunt of the harm" need not be suffered in the forum state. *See Yahoo! Inc. v. La Ligue Contre Le Racisme,* 433 F.3d 1199, 1207 (9th Cir.2006) (citing *Keeton v. Hustler Magazine,* 465 U.S. 770, 772-73 (1984))."If a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state."*Yahoo!,* 433 F.3d at 1207.

**\*7** In contract cases, a "showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there."*Schwarzenegger,* 374 F.3d at 802. However, a "contract alone does not automatically establish the requisite minimum contacts necessary for the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
(Cite as: 2006 WL 3060134 (E.D.Cal.))

exercise of personal jurisdiction."*Gray & Co. v. Firstenberg Machinery Co.,* 913 F.2d 758, 760 (9th Cir.1990)."Prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' are the factors to be considered. The foreseeability of causing injury in another state is not a sufficient basis on which to exercise jurisdiction." *Gray & Co.,* 913 F.2d at 760 (quoting and citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 478-79 (1985)); Roth, 942 F.2d at 621;*Sher v. Johnson,* 911 F.2d 1357, 1364 (9th Cir.1990); *Campbell v. Hubbard,* 2006 U.S. Dist. LEXIS 1045 (D.Ariz.2006).

The second prong of specific jurisdiction, the "arising out of" prong, requires that the contacts relied on for personal jurisdiction actually relate to the cause of action. *See MGM Studios Inc. v. Grokster, Ltd.,* 243 F.Supp.2d 1073, 1085 (C.D.Cal.2003) ("Contacts with a forum state are relevant for purposes of specific jurisdiction only if they are sufficiently related to the cause of action.... Thus, if Plaintiffs' claims would have arisen notwithstanding certain contacts, those contacts are not relevant to the jurisdictional analysis."). "But for" causation is all that is required since a "restrictive reading of the 'arising out of ' requirement is not necessary in order to protect potential defendants from unreasonable assertions of jurisdiction."*Shute v. Carnival Cruise Lines,* 897 F.2d 377, 385 (9th Cir.1990).[FN4]

> FN4. Reversed on other grounds, 499 U.S. 585 (1991).

Once a court has found purposeful availment, the reasonableness of jurisdiction is presumed. *See Ochoa v. J.B. Martin & Sons Farms,* 287 F.3d 1182, 1192 (9th Cir.2002); *Ballard v. Savage,* 65 F.3d 1495, 1500 (9th Cir.1995); *Sher,* 911 F.2d at 1364. The burden is then shifted to the defendant to make "a compelling case that the presence of some other considerations that would render jurisdiction unreasonable."*Burger King,* 471 U.S. at 477;*Schwarzenegger,* 374 F.3d at 802;*Dole Food,*

303 F.3d at 1114;*Ballard,* 65 F.3d at 1500. In determining whether the exercise of jurisdiction comports with "fair play and substantial justice," and is therefore "reasonable," courts are to consider seven factors:

(1) the extent of the defendants' purposeful injection into the forum state's affairs;

(2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

**\*8** *Dole Food,* 303 F.3d at 1114.

"If any of the three requirements [for specific jurisdiction] are not satisfied, jurisdiction in the forum would deprive the defendant of due process of law."*Pebble Beach Co. v. Maddy,* 453 F.3d 1151, 1155 (9th Cir.2006); *see also Schwarzenegger,* 374 F.3d at 802. Recently, the Ninth Circuit has held that, where a plaintiff fails to establish purposeful availment, a court "need not address whether the claim arose out of or resulted from [the defendant's] forum related activities or whether an exercise of jurisdiction is reasonable...."*Pebble Beach,* 453 F.3d at1155. However, the Ninth Circuit has also held, "Jurisdiction may be established with a lesser showing of minimum contacts if considerations of reasonableness dictate. Under this analysis, there will be cases in which the defendant has not purposefully directed its activities at the forum state, but has created sufficient contacts to allow the state to exercise personal jurisdiction if such exercise is sufficiently reasonable."*Ochoa,* 287 F.3d at 1189 n. 2;*see also Gray & Co.,* 913 F.2d at 761.

## Discussion

Initially, the Court does not believe that Defendants's conduct is sufficient to waive their objection

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
(Cite as: 2006 WL 3060134 (E.D.Cal.))

to personal jurisdiction. It is true that personal jurisdiction may be waived, either by failing to timely assert the defense or by the course of conduct pursued by a party during litigation. *See*Fed. R. Civ. Pro. 12(g), (h); *Peterson v. Highland Music, Inc.,* 140 F.3d 1313, 1318 (9th Cir.1998)."Rule 12(g) requires that a party who raises a defense by motion prior to an answer raise all such possible defenses in a single motion...."*Chilicky v. Schweiker,* 796 F.2d 1131, 1136 (9th Cir.1986), rev'd on other grounds, 487 U.S. 412 (1988); Fed. R. Civ. Pro. 12(g). Here, Defendants's first responsive motion contains a Rule 12(b)(3) and a challenge to personal jurisdiction, i .e. a Rule 12(b)(2) motion. *Cf.*Fed. R. Civ. Pro. 12(g); *Peterson,* 140 F.3d at 1319 ("... the minimum requirements of Rule 12 are satisfied when a defendant raises the issue of personal jurisdiction in a timely motion to dismiss."). Prior to filing this motion, Defendants filed a stipulation "to answer or otherwise respond." *See* Court's Docket Document No. 10. Filing the motion at bar is "otherwise responding" to Peacock's complaint, and the Court does not see conduct sufficient to warrant a waiver from this stipulation. *Cf. Benny v. Pipes,* 799 F.2d 489, 493 (9th Cir.1986) ("Generally, a motion to extend time to respond gives no hint that the answer will waive personal jurisdiction defects, and is probably best viewed as a holding maneuver while counsel consider how to proceed."). Further, after filing the motion at bar, Defendants filed a consent under 28 U.S.C. § 636(c)(1) to have the magistrate "conduct any further proceedings ." *See* Court's Docket Document No. 16. The Court does not believe that merely consenting to have the magistrate handle "any further proceedings" constitutes a waiver of Defendant's then pending Rule 12(b)(2) motion. *Cf. Peterson,* 140 F.3d at 1318 (discussing "sandbagging" as conduct sufficient to waive personal jurisdiction). Finally, with respect to the structure of Defendants's motion, the structure is poor. The style of the motion suggests that Defendants's personal jurisdiction challenge is in the alternative to their venue motions, including their 28 U.S.C. §§ 1404, 1406 motions. There is no section that is captioned as relating specifically to

personal jurisdiction. The captions within the motion are in terms of venue issues (such as "substantial portion" and "convenience"), but nevertheless contain argument and authority relating to personal jurisdiction, e.g. Defendants state at several points that there is no personal jurisdiction or that to exercise personal jurisdiction would be unreasonable. *See* Defendant's Motion at pp. 3-5, 6-8.Despite the structure of the motion, because the style of the motion raises personal jurisdiction and because of the references and argumentation relating to jurisdiction contained within the motion, the Court does not believe that there is an intent to appear, defend, and/or waive personal jurisdiction in this case. Defendants's motion could have been more artfully pled and argued, but Peacock has recognized the personal jurisdiction issue and responded thereto. To find a waiver under these circumstances would unnecessarily elevate form over substance. *Cf. Phat Fashions, L.L.C. v. Phat Game Ath. Apparel, Inc.,* 2001 U.S. Dist. LEXIS 13892, *8-*9 (S.D.N.Y.2001); *Boss Prods. Corp. v. Tapco Int'l Corp.,* 2001 U.S. Dist. LEXIS 1509, *4 (W.D.N.Y.2001).

**\*9** As to personal jurisdiction over Defendants, it appears uncontested that a contract was agreed upon on March 30, 2005, for the purchase of 3 buck goats and a doe herd (to be chosen in May 2005).FN5*See* Plaintiff's Complaint at ¶ 13; Corrected Further Peacock Declaration at ¶ 2. According to the complaint, the contract called for Defendants to care for the bucks until Peacock chose a doe herd, and then all goats would be delivered together. *See* Complaint at ¶ 9. Peacock's declarations show that this contract was negotiated over faxes, e-mails and telephone calls (of unknown quantity) while Peacock was in Modesto, and presumably Defendants were in Oklahoma. *See* Corrected Further Peacock Declaration at ¶ 2. Defendants did not deliver conforming goats, and additional shipments to Utah were made, apparently in an effort to cure the breach. *See* Complaint at ¶ 16. Although no party has stated expressly, the submissions to the Court show that all goats were intended to be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
**(Cite as: 2006 WL 3060134 (E.D.Cal.))**

shipped to Peacock's ranch in Utah.[FN6]

FN5. No party has produced a copy of the contract and it is unknown if the agreement is written or oral.

FN6. Peacock declares that he agreed to purchase goats on March 30, 2005, that he currently raises goats in Utah, and that he moved to Utah in late April/early May 2005. *See* Corrected Further Peacock Declaration at ¶ 2. He alleges that the March 30, 2005 agreement encompassed the sale of 3 bucks and a doe herd to be chosen in May 2005, and alleges that goats were not shipped until early June 2005. *See* Complaint at ¶¶ 9, 12. Also, a May 1, 2005, invoice from Defendants to Peacock is attached to Defendants's motion as Exhibit A. The invoice is stamped "PAID," lists under the "Bill To" section "Alan Peacock, HC 75 Box 6025, Cove Fort/Beaver, Utah 84713," and under the "Shipping & Handling" part of the "Description" section states "This invoice is paid by as check deposit of $12,375 now and $12,000 when we are ready to ship the goats. These goats will be shipped with others sometime between June 1 & June 30, 2005."*See* Exhibit A of Defendants's Motion; Declarations of Frank and Ruth Willis at ¶ 2. Also, Defendant's motion states that the shipments of goats were sent to and from Utah and Oklahoma. *See* Defendants's Motion at 2:19-20, 4:7-8; Declarations of Frank and Ruth Willis at ¶ 2. Finally, an April 22, 2005, email from Peacock to Frank states that Peacock can take delivery "anytime mid-May on" because he had to install a fence, and that he would have to check on his specific Utah address. *See* Corrected Further Peacock Declaration Exhibit 1. Peacock has not stated that the goats were not shipped to Utah or that the goats were ever intended to be shipped to some place

other than Utah. In the absence of a physical contract, given the declarations and papers on file and the time frames involved, the Court can only conclude that all goats were to be shipped to Utah as part of the March 30, 2005, purchase agreement.

This does not show sufficient contact with California under a purposeful availment/contracts analysis. There is no evidence that Defendants ever went to California as part of the contract or contract negotiations with Peacock, and the extent of the negotiations are not described. It does not appear that Defendants solicited Peacock, *cf. Shute,* 897 F.2d at 381 ("defendant's act of soliciting business in the forum state will generally be considered purposeful availment if that solicitation results in contract negotiations or the transaction of business."), and there is no evidence regarding where the contract was executed or formalized. The further contact and actual performance of the contract by Defendants had nothing to do with California. The March 30, 2005, contract did contemplate future contact, but as to Peacock, that contact involved traveling to Oklahoma to pick a doe herd at a time when he declares that he had moved, or was in the process of moving, to Utah. *See* Corrected Further Peacock Declaration at ¶ 2; Complaint at ¶ 9. As to Defendants, the further contact entailed showing Peacock a doe herd in Oklahoma and shipping all of the goats to Utah. There is no evidence indicating that Defendants were required to, or actually did, perform any acts within California as part of their performance under the contract. Instead, Defendants were required to care for the buck goats in Oklahoma and then ship all of the goats to Utah. Also, there has been no evidence presented that the March 30, 2005, agreement for the bucks and a doe herd encompassed or was meant to begin a regular or ongoing business relationship between the parties. The only evidence before the Court suggests a single, arms length transaction for the purchase of a goat herd (bucks and does). Peacock has only shown that some relatively vague negotiations oc-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
(Cite as: 2006 WL 3060134 (E.D.Cal.))

Page 11

Since the Court has found that Peacock has failed to adequately establish the first prong of specific jurisdiction, *Pebble Beach* suggests that no further analysis is necessary, but *Ochoa* suggests that the Court should nevertheless examine the reasonableness prong. Given this tension, the Court will examine the reasonableness prong.[FN10] Because Peacock has not adequately shown purposeful availment or purposeful direction, the burden has not shifted to Defendants and there is no presumption of reasonableness. *Cf. Ballard,* 65 F.3d at 1500 (noting that once purposeful availment is found, reasonableness is presumed and the burden shifts to defendant). The Court examines seven factors in determining the reasonableness of exercising specific jurisdiction over Defendants.[FN11] *See Dole Food,* 303 F.3d at 1114.

> FN10. The Court believes that the "arising out of" prong is sufficiently met since "arising out of" simply requires "but for" causation. *See Gray & Co.,* 913 F.2d at 761. Here, but for the representations regarding health and "repro ductivity," it appears that no contract would have been made, no goats would have been purchased, no trip to Oklahoma would have occurred, and lost goat generations and profits would not have occurred.

> FN11. Although located in a section of their motion that is captioned as a change of venue for convenience, Defendants address the reasonableness prong of specific jurisdiction. For a motion to transfer venue under 28 U.S.C. § 1404(a), the proper factors are listed in *Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498-99 (9th Cir.2000). The proper factors for a court to consider in assessing reasonableness for specific jurisdiction can be found in *Dole Food,* 303 F.3d at 1114. Defendants's analysis in their memorandum deals with the "*Dole Food* factors." *See* Defendants's Motion at pp. 6-7.In fact, Defendants cite

*Panavision Int'l v. Toeppen,* 141 F.3d 1316, 1323 (9th Cir.1998), which is a personal jurisdiction case, and not a § 1404 case.

*1. The extent of the Defendants' purposeful injection into the forum state's affairs*

**\*11** In addition to the pertinent facts of this case, Peacock's counsel has declared that he caused a pretext call to be made to Defendants and that Frank said that they regularly ship goats to California, that they have a relationship with a shipping company to ship the goats, and that Frank had recently been to California on business. *See* Little Declaration at ¶ 4. Further, Peacock has submitted e-mails and/or website postings from Defendants that describe a recent delivery to California (a delivery of 215 goats to three customers), and a list of disease-testing requirements for goats as required by approximately 45 states, including California. *See* Exhibit 2 Corrected Further Peacock Declaration. Peacock argues that the e-mails show that Defendants's internet business is not as passive as Defendants argue. Defendants have declared that they reside/have their principal place of business in Oklahoma, that WW Boer is not incorporated in California, has not qualified to do business in California, and has no subsidiary incorporated or qualified to do business in California. *See* Defendants's Declarations at ¶¶ 3-6.

The Court believes that the evidence presented tends to show reasonableness, primarily based on the results of Peacock's pretext call. Identifying another delivery of 215 goats and listing California's health testing requirements[FN12] along with approximately 44 other state's health requirements is not particularly compelling. Nevertheless, given the results of the pretext call, the Court believes that this consideration weighs in favor of reasonableness.

> FN12. The only testing requirement listed for California is "scrapie." *See* Corrected Further Peacock Declaration Exhibit 2.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.


Slip Copy                                                    Page 12
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
(Cite as: 2006 WL 3060134 (E.D.Cal.))

*2. The burden on the defendant of defending in the forum*

Defendants have declared that Frank and Ruth reside in Oklahoma and that WW Boer has no agents or subsidiaries in California and is not qualified to do business in California. *See* Defendants's Declarations at ¶¶ 3-5. Further, Defendants declare that the burden of traveling to California to defend this suit would require time away from conducting their business and would be burdensome and inconvenient. *See id.* at ¶ 6. Peacock's evidence indicates that Frank told Peacock's counsel that he had just returned from a business trip in California and that Defendants have a carrier who ships goats to California. *See* Little Declaration at ¶ 4.

The extent of Defendants's business operations or the nature of the trip is not explained. Also, having another individual or entity actually ship goats to California while Defendants remain in Oklahoma seems qualitatively different from actually traveling to California to defend a lawsuit. Although, given our era of electronic communication and discount travel, the inconvenience of traveling to California from Oklahoma is diminished. *See Panavision Int'l v. Toeppen,* 141 F.3d 1316, 1323 (9th Cir.1998). While close, the Court believes that this factor weighs slightly against a finding of reasonableness.

*3. The extent of conflict with the sovereignty of the defendant's state*

**\*12** This factor generally entails a comparison between the competing sovereign interests in regulating the Defendants's behavior. *See Dole Food,* 303 F.3d at 1115. As between California and Oklahoma, the Court believes that Oklahoma would have a greater interest in this suit. Defendants are based in Oklahoma and appear to have conducted their activities relative to this transaction in Oklahoma. As discussed below, the Court does not see that California has a significant interest in adjudicating this case. However, "The conflict with the sovereignty of the defendant's state is not a very

significant factor in cases involving only U.S. citizens; conflicting policies between states are settled through choice of law analysis, not through loss of jurisdiction." *Brand v. Menlove Dodge,* 796 F.2d 1070, 1076 n. 5 (9th Cir.1984). Given these considerations, this factor is neutral.

*4. The forum state's interest in adjudicating the dispute*

California generally has strong interests in protecting its residents from injury, but has weaker interests when nonresidents sue in California courts. *See Sinatra v. National Enquirer, Inc.,* 854 F.2d 1191, 1200 (9th Cir.1988). California does not have a significant interest in adjudicating this dispute. These goats were purchased shortly before Peacock moved out of California and to Utah, the does were chosen in Oklahoma, all goats were to be shipped to Utah, the goats are in Utah and not in California, Peacock is no longer a citizen or resident of California, and the harm was felt in Utah after Peacock had moved to Utah. In other words, the goats were purchased at a time when Peacock was leaving California in order to raise goats in Utah. Peacock declares that he still does investigatory work in California, but this case has nothing to do with his investigatory work and he is now a citizen and resident of Utah. The Court believes that this factors weighs against a finding of reasonableness. *Cf. Gray & Co.,* 913 F.2d at 761-62;*Brand,* 796 F.2d at 1075-76.

*5. The most efficient judicial resolution of the controversy*

This factor "involves a comparison of alternative forums," and the "site where the injury occurred and where evidence is located usually will be the most efficient forum." *Amoco Egypt Oil Co. v.. Leonis Navigation Co.,* 1 F.3d 848, 852 (9th Cir.1993). Here, Peacock's injury has not occurred in California. Peacock's injury occurred in Utah after he had moved out of California, the goats are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
**(Cite as: 2006 WL 3060134 (E.D.Cal.))**

located in Utah, and Defendants's evidence is located in Oklahoma.[FN13] The Court does not know the location of Defendants's evidence, although Peacock does indicate that he has witnesses (who are not identified) who are located in California.[FN14] On the whole, this factor weighs against a finding of reasonableness.

> FN13. The Court does not know the quantity or quality of Defendants's evidence in Oklahoma, although Defendants's motion indicates that witnesses to the goats's condition reside in Oklahoma.

> FN14. The quantity and quality of Peacock's evidence is unknown. Since Peacock is a citizen and resident of Utah, it is likely that a significant portion of his evidence is located in Utah. However, since Peacock's counsel is in California, at least some of his evidence is likely located in California.

*6. The importance of the forum to the plaintiff's interest in convenient and effective relief*

The importance of California to Peacock seems to be largely that his counsel is located in California. *See* First Peacock Declaration at ¶ 1. Otherwise, Peacock lives in Utah and raises his goats in Utah, although he does travel to California with respect to investigatory work. Peacock has declared that his witnesses reside in California, but he nowhere identifies those witnesses or what their testimony may be. In the context of a 28 U.S.C. § 1404 motion, the location of a party's attorney is generally not considered, *see In re Volkswagen AG,* 371 F.3d 201, 206 (5th Cir.2004); *Langford v. Ameritanz, Inc.,* 2006 U.S. Dist. LEXIS 32823, 28-29 (E.D.Cal.2006), and witnesses generally need to be identified and the substance and importance of their testimony explained. *See Florens Container v. Cho Yang Shipping,* 245 F.Supp.2d 1086, 1092-93 (N.D.Cal.2002); *Williams v. Bowman,* 157 F.Supp.2d 1103, 1108 (N.D.Cal.2001). Since Peacock's witnesses are not identified or described,

consideration of these witnesses is diminished. While the presence of a longtime counsel within the forum has more relevance in this context than in 28 U.S.C. § 1404(a), the Court does not believe that it is a particularly strong consideration. Nevertheless, the Court believes that this factor weighs in favor of finding reasonableness.

*7. The existence of an alternative forum*

**\*13** It appears that there are two alternative forums. Oklahoma is the residence and/or principal place of business of Defendants, so personal jurisdiction could easily be exercised. Also, given the evidence and pleadings before the Court, Utah may well be able to exercise personal jurisdiction over Defendants. This factor weighs against a finding of reasonableness.

*Analysis*

Factors 1 and 6 weigh in favor of a finding of reasonableness, factor 3 is neutral, and factors 2, 4, 5, and 7 weigh against a finding of reasonableness. The Court concludes that the reasonableness factors, "taken together, do not 'dictate' personal jurisdiction over [Defendants] in California in this case."*Brand,* 796 F.2d at 1076;*see also Gray & Co.,* 913 F.2d at 760-62.

### CONCLUSION

It is Peacock's burden to establish personal jurisdiction. Since the Court did not hear testimony, Peacock needed to establish a prima facie showing of jurisdiction. Peacock relied on his pleadings and declarations and argued that this Court could exercise specific jurisdiction over Defendants. However, Peacock has not adequately established either personal availment, purposeful direction, or reasonableness. Since the Court has found that it does not have personal jurisdiction over Defendants, it is unnecessary to decide Defendants's remaining motions.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3060134 (E.D.Cal.)
**(Cite as: 2006 WL 3060134 (E.D.Cal.))**

Page 14

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants's Rule 12(b)(2) motion is GRANTED and this case is DISMISSED;

2. Defendants's Rule 12(b)(3), 28 U.S.C. § 1404(a), and 28 U.S.C. § 1406 motions are DENIED as moot; and

3. The Clerk is directed to close this case.

IT IS SO ORDERED.

E.D.Cal.,2006.
Peacock v. Willis
Slip Copy, 2006 WL 3060134 (E.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT N**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))

▷
Tercica, Inc. v. Insmed Inc.
N.D.Cal.,2006.

United States District Court,N.D. California.
TERCICA, INC., Plaintiff,
v.
INSMED INCORPORATED, Defendant.
No. C 05-5027 SBA.

June 9, 2006.

Peter P. Chen, McDermott, Will & Emery, Palo
Alto, CA, for Plaintiff.
Paul S. Chan, Los Angeles, CA, for Defendant.

ORDER

SAUNDRA BROWN ARMSTRONG, J.

[Docket Nos. 17, 23, 26, 31]

**\*1** This matter comes before the Court on Defendant Insmed Incorporated's ("Defendant") Motion to Dismiss the First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6) and to Strike Portions of the First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(f); Plaintiff Tercica, Inc.'s ("Plaintiff") Request for Judicial Notice; Defendant's Opposition and Objections to Plaintiff's Request for Judicial Notice and Evidentiary Objections; and Defendant's Objections to Plaintiff's Two Supplemental Declarations. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing. The Court hereby GRANTS Defendant's Motion to Dismiss for lack of personal jurisdiction and DISMISSES the First Amended Complaint without leave to amend. The Court also GRANTS IN PART AND DENIES IN PART Plaintiff's Request for Judicial Notice, SUSTAINS IN PART AND OVERRULES IN PART Defendant's Opposition and Objections to Plaintiff's Request for Judi-

cial Notice and Evidentiary Objections, and SUSTAINS IN PART AND OVERRULES IN PART Defendant's Objections to Plaintiff's Two Supplemental Declarations.

*BACKGROUND*

A. Factual Background [FN1]

> FN1. Except as otherwise noted, the following facts are taken from the First Amended Complaint ("FAC").

Plaintiff Tercica, Inc. ("Plaintiff" or "Tercica") and Defendant Insmed Incorporated ("Defendant" or "Insmed") are competitors in the drug market for the treatment of growth failure in children. FAC at ¶ 1.

At some point prior to the commencement of this litigation, Tercica acquired the exclusive rights to develop, commercialize, and manufacture Increlex0 ("Increlex") from Genentech, Inc. FAC at ¶ 11. Increlex is composed of recombinant insulin-like growth factor-1 ("IGF-1") and is sometimes referred to as "free IGF" or "free rhIGF." *Id.* at ¶ 14.On August 30, 2005, Increlex received approval from the Food and Drug Administration ("FDA") as an "orphan-designated drug" for the long-term treatment of growth failure in children with severe Primary insulin-like growth factor-1 deficiency ("Primary IGFD") or children with growth hormone gene deletion who have developed neutralizing antibodies to growth hormone. *Id.*Increlex is the only FDA approved free rhGIF or rhIGF-1 product. *Id.* at ¶ 22.FDA approval was granted despite the fact that Insmed had filed a Citizen's Petition with the FDA requesting that the FDA deny Tercica's new drug application on the grounds that Increlex was unsafe. *Id.* at ¶ 23.The FDA specifically found that Insmed's arguments were unpersuasive and that Tercica had "adequately demonstrated that Increlex

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))

is safe and effective under the conditions of use described in its labeling."*Id.* at ¶ 23.After Tercica received FDA approval, it began commercializing Increlex. *Id.* at ¶ 12.Since that time, at least one physician has prescribed Increlex. *Id.*

On September 27, 2005, the FDA issued Insmed an "Approvable Letter" pursuant to 21 C.F.R. 314.110 with respect to Insmed's drug, iPlex0 ("iPlex").*Id.* at ¶ 15, iPlex is composed of recombinant human IGF-1 and IGF binding protein 3 (rhIGF-I/rhIGFBP-3 complex) and is sometimes referred to as "bound IGF," the "complex," or the "combination." *Id.* at ¶ 14.The FDA set December 12, 2005 as the action date on the iPlex new drug application ("NDA").*Id.* at ¶ 15.

**\*2** On September 28, 2005, during an investor conference call, Insmed stated that "in our matched comparison with that IGF-1 study, we have seen about a two-fold higher incidence of serious adverse events with the free IGF-1 treatment that we have with iPlex...." FAC at ¶ 24(A). This statement was later made available as a "webcast" on Insmed's website. *Id.*

Also on September 28, 2005, Lazard Capital Markets published an article stating that "[d]uring a call th[at] morning, Insmed's chief scientific officer spoke of a twofold increase in serious adverse events with free IGF01 (essentially Increlex) versus iPlex and expects a press release on the iPlex data in the next few days detailing results from an oral presentation given at The Joint Endocrine Society/ Lawson Wilkins Pediatric Endocrinology Society (ESPE/LWPES) meeting last weekend in Lyon, France."*Id.* at Ex. 4.

In a September 29, 2005 press release, Insmed further stated:

A matched safety comparison was performed on this [iPlex] study with a similar, prospectively-designed, published clinical study of free rhIGF-1 (manufactured by Pharmacia Inc.) in children with Severe Primary IGF-1 deficiency. A two-fold high-

er incidence of serious adverse events (SAE's) occurred in the free IGF-1 study as compared with the SomatoKine study over a similar time frame.

*Id.* at ¶ 24(G). Additionally, the company stated that iPlex had "demonstrated a superior safety profile in children with Severe Primary IGF-1 deficiency, especially regarding the number of hypoglycemic events and the severity of those events."*Id.* at ¶ 24(H).

On October 1, 2005, an article was published in the *Richmond Times Dispatch* stating that "Insmed had fought to block approval of Tercica['s] competing drug, Increlex, which is identical to a natural hormone produced by the body that is used in growth and metabolism." *Id.* at Ex. 5. The article further reported that "unlike Tercica, Insmed has bound the hormone to protein, which the company says is safer and will keep the drug in the blood longer."*Id.*

On October 19, 2005, Insmed's Chief Business Officer, Phillip Young ("Young"), attended a BIO InvestorForum in San Francisco, California. *Id.* at ¶ 19; Allan Decl. at ¶ 15. During the conference, Young displayed a table that compared iPlex with free IGF and indicated that free IGF had no "Safety Profile." *Id.* at ¶¶ 18, 19.Insmed also stated that "physiological replacement of IGF-1 requires BP-3 for safe and effective administration" and that "if you are going to replace IGF, it requires [IGF]BP-III for the safe administration of IGF."*Id.* at ¶¶ 24(C), (E). Further, the company stated that "[t]here have been companies over the last 20 years that have worked to develop IGF therapy ... But the problem that all these companies are running into is that there has been a significant negative side effect profile associated with administering free IGF. We believe we can mitigate that and we have shown that we can mitigate that by the complex of IFG-I and [IGF]BP-II together."*Id.* at ¶ 24(D).

**\*3** On November 7, 2005, Young participated in a teleconference at the Rodman & Renshaw 7th Annual Healthcare Conference. *Id.* at ¶ 17.During the conference, Young displayed the same chart com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                            Page 3
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))**

paring iPlex with free IGF.*Id.* at ¶ 18.Additionally, Young stated that Insmed had "discovered" that "physiological replacement of IGF-1 requires BP-3 for safe and effective administration."*Id.* at ¶ 20(A). Young further stated that "there has been some consistently observable side effects associated with IGF as a single protein in administration that had not been commonly seen or seen as frequently with iPlex, the complex."*Id.* at ¶ 20(B). Young also presented a slide, which stated that "[s]everal companies have attempted to develop an IGF-1 Therapy, [including] ... Genentech [and] Tercica ... Previous IGF-1 clinical programs all demonstrate an unacceptable safety profile."*Id.* at ¶ 21.

On November 29, 2005, Young attended the Lazard Capital investor conference and again presented the chart comparing iPlex with free IGF. *Id.* at ¶ 19.During that investor conference, Insmed explained the import of the chart as follows:

This is a graph, which demonstrates the differences when iPlex, IGF/BP3 complex is administered to diabetic patients. Now this is not a head to head study. This is just designed to optically give you an impression of the benefit of delivering IGF therapy via iPlex or the combination of IGF and BP3. As you can see the well-known side effects for [free]-IGF documented in studies from numerous companies, peripheral edema, facial edema, jaw pain and [arthrelgia], are far more prevalent when IGF is delivered as a single protein or [sic ] [than] when IGF is delivered as a complex as we do with iPlex.

*Id.* at ¶ 24(B). Insmed further stated that "previous studies [of] [free]-IGF or IGF by itself the clinical programs have demonstrated severe shortfalls in the safety profile. We believe that contributing BP3 and IGF together allows for better presentation of IGF in a very safe environment for delivering it once a day."*Id.* at ¶ 24(F). Additionally, Insmed stated that "we believe we have a safety profile that is superior to free IGF."*Id.* at ¶ 24(I).

On December 12, 2005, Insmed announced that the

FDA had approved iPLex. *Id.* at ¶ 29.On December 13, 2005, during a call with investors, which was later made available through the company's website, Insmed's officers declared: "[T]he major difference here is th[e] fact that our drug can be given once a day and we don't have to specifically time it around food intake."*Id.* at ¶ 29.The company further stated that "[o]nce a day without meal restrictions in a very important component to this product [iPlex]."*Id.*Despite these representations, the iPlex Patient Information sheet instructs parents to "[s]kip your child's dose of IPLEX0 if your child cannot or will not eat for any reason at the time of the injections ... It is important that your child eat well and not skip meals while taking IPLEX0."*Id.* at ¶ 29, Ex. 1. Similarly, the Package Insert warns that:

*4 Patients and/or other caregivers should be instructed in the safe administration of IPLEX0. Because of the possibility of hypoglycemia, patients using IPLEX0 should be on a regular, balanced diet. IPLEX0 should be administered at the same time every day. IPLEX0 should not be administered if the patient cannot or will not eat or when a meal is omitted.

*Id.* at ¶ 29, Ex. 2.

The Package insert also warns that "[e]fficacy beyond one year of treatment has not been established."*Id.* at ¶ 30, Ex. 2. Nevertheless, Insmed's President and CEO Geoffrey Allan has stated that Increlex "is a *long term* treatment for growth."*Id.* at ¶ 30 (emphasis added).

**B. Jurisdictional Allegations**

Tercica is a Delaware corporation with its principle place of business in Brisbane, California. FAC at ¶ 5. Insmed is a Virginia corporation with its principle place of business in Glen Allen, Virginia. FAC at ¶ 6. Insmed has approximately 80 employees, most of whom are located in Virginia and Colorado.[FN3] Allan Decl.[FN4] at ¶ 13. Insmed does

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 4
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))

not maintain an office in California, does not have a telephone number in California, does not maintain any records or company files in California, does not maintain a bank account in California or accept checks drawn on a California bank, and is not registered to do business here. Allan Decl. at ¶¶ 8, 11. Additionally, Insmed has not paid any income taxes in California, does not own any real property in California, does not have an agent for service of process in California, and does not have any registered agents living in California. *Id.* at ¶¶ 8, 10, 13.At no time relevant to this action has Insmed either sold iPlex or other products or services to California consumers, or even solicited sales of iPlex or other products or services in California. *Id.* at ¶ 9. Further, Insmed has not endorsed or sponsored any print, television, or radio advertisements in California. *Id.* at ¶ 12.In fact, Insmed maintains a single, passive website. Allan Decl. at ¶ 14.

> FN3. Only one employee, Andreas Sommer, Ph.D. ("Sommer"), resides in California. *Id.* at ¶ 13; Supp. Allan Decl. at ¶ 3. Sommer is the former President and Chief Executive Officer of Celtrix Pharmaceuticals, Inc., Insmed's wholly-owned subsidiary. Supp. Allan Decl. at ¶ 3. Sommer joined Insmed as a Principal Scientist in August 2000. *Id.* His personal residence is Danville, California. *Id.*

> FN4. Geoffrey Allan, Ph.D. ("Allan") is the President and Chief Executive Officer of Insmed. Allan Decl. at ¶ 1. The Allan Declaration was submitted in support of Defendant's Motion to Dismiss.

California consumers are unable to purchase products from Insmed, because Insmed does not sell any products anywhere in the United States. *Id.* at ¶ 14.No statement on Insmed's website is directed to, or specifically intended for, California consumers. *Id.* The press releases and investor conference "webcasts" are located in the "Investor Relations" section of Insmed's website, and are directed

to existing and prospective investors. *Id.* at ¶ 14.

Only two Insmed employees attended the BIO InvestorForum 2005 at the Palace Hotel in San Francisco, California on October 19-20, 2005. *Id.* at ¶ 15.Insmed did not offer any products for sale or make any sales at the BIO InvestorForum 2005. *Id.* In addition to attending the conference, Insmed's Chief Business Officer, Young, gave a twenty-minute presentation on the status of Insmed. *Id.* This presentation was one of more than 190 company presentations given at the conference. *Id.*

### C. Procedural History

**\*5** On December 6, 2005, Plaintiff Tercica filed a complaint against Defendant Insmed in this Court for alleged violations of: (1) California Business & Professions Code §§ 17500*et seq.* (False Advertising); (2) California Business & Professions Code §§ 17200*et seq.* (Unfair Competition); and (3) the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (False Advertising).

On December 15, 2006, Plaintiff filed the instant First Amended Complaint. In the First Amended Complaint, Plaintiff asserts the same causes of action against Defendant for: (1) violations of California Business & Professions Code §§ 17500*et seq.* (False Advertising); (2) violations of California Business & Professions Code §§ 17200*et seq.* (Unfair Competition); and (3) violations of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (False Advertising). In the First Amended Complaint, Tercica contends that the statements Insmed has made regarding the safety of Increx are false, misleading, and deceptive because: (1) Insmed has not conducted a controlled, "head-to-head" clinical trial of the safety of iPlex and Increlex and therefore has no basis to make comparative claims regarding the safety of its own product; (2) Tercica's drug was studied in 71 subjects for a mean duration of 3.9 years, whereas Insmed's drug was studied by in only 25 patients for only 9 to 12 months, thus the tests or studies that Insmed has conducted are not

Not Reported in F.Supp.2d                                                Page 5
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))

reliable and do not support Insmed's statements; (3) iPlex is not, itself, "safe," as a number of undisclosed severe asymptomatic episodes of hypoglycemia, as well as hepatomegaly, adenoid hypertrophy, papilledema, and tonsillar hypertrophy, were observed during the clinical trial. FAC at ¶¶ 26-28. Tercica also alleges that Insmed has made false and misleading statements regarding the safety of Increlex because it has represented that Increlex can be taken once a day without food when, in fact, the Package Insert instructs that Increlex "should not be administered if the patient cannot or will not eat or when a meal is omitted."*Id.* at ¶ 29.Further, Tercica alleges that Insmed has mislead the public by stating that Increlex is a "long term treatment for growth" when its clinical trial data is only for a limited period of time and the Package Insert specifically states that "[e]fficacy beyond one year of treatment has not been established."*Id.* at ¶ 30.

The First Amended Complaint states that this Court has personal jurisdiction over Insmed because: (1) "the false and misleading statements made by officers of Insmed in the State of California ... have caused injury and damage to Tercica, which has its principal place of business in California"; (2) the "deceptive statements made by Insmed's officers outside of California ... were deliberately calculated to cause, and ... have caused, injury and damage to Tercica in California" and "were purposefully and voluntarily directed towards California in an effort to entice investors and confuse consumers located in California."FAC at ¶ 9. The First Amended Complaint also states that venue is proper in this District because "the acts complained of occurred and are occurring in this District, and have caused damage to Tercica in this District."*Id.* at ¶ 10.

**\*6** On January 13, 2006, Defendant filed the instant Motion to Dismiss the First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6) and to Strike Portions of the First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(f).

On February 7, 2006, Plaintiff filed its Opposition to Defendant's Motion to Dismiss and a Request for Judicial Notice. On the same day, Plaintiff also filed the Declaration of Jennifer Olson (the "Olson Declaration") and the Declaration of Christine Rivera (the "Rivera Declaration").

On February 14, 2006, Defendant filed its Reply, as well as its Objections to the Olson Declaration, the Rivera Declaration, and the Request for Judicial Notice. Also on February 14, 2006, Plaintiff filed a Supplemental Declaration of Jennifer Olson (the "Supplemental Olson Declaration").

On March 13, 2006, Plaintiff filed the Second Supplemental Declaration of Jennifer Olson (the "Second Supplemental Olson Declaration").

On March 16, 2006, Defendant filed its Objections to Plaintiff's Two Supplemental Declarations.

*LEGAL STANDARD*

A. Personal Jurisdiction

Federal Rule of Civil Procedure 12(b)(2) provides the district court with the authority to dismiss an action for lack of personal jurisdiction. *Data Disc, Inc. v. Systems Tech. Assoc., Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977). In order to withstand a motion to dismiss for lack of personal jurisdiction in the initial stages of litigation, the plaintiff need only "make, through [his] pleadings and affidavits, a prima facie showing of the jurisdictional facts."*Myers v. Bennett Law Offices,* 238 F.3d 1068, 1071 (9th Cir.2001)."That is, the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant."*Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir.1995). In ruling on a Rule 12(b)(2) motion, the pleadings are to be viewed in a light most favorable to plaintiff and all doubts are to be resolved in his favor. *See Caruth v. International Psychoanalytical Ass'n,* 59 F.3d 126, 128 n. 1 (9th Cir.1995).

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))

There are two types of personal jurisdiction: general and specific. *Reebok International, Ltd. v. McLaughlin,* 49 F.3d 1387, 1391 (9th Cir.), *cert. denied,*516 U.S. 908, 116 S.Ct. 276, 133 L.Ed.2d 197 (1995). The presence of either general or specific jurisdiction will sustain the exercise of personal jurisdiction over a defendant. *Rano v. SIPA Press, Inc.,* 987 F.2d 580, 587 (9th Cir.1993). General jurisdiction exists where it is established that the defendant has "continuous and systematic contacts with the forum that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice."*Id.* (citation omitted).

As to specific jurisdiction, there are two components that must be fulfilled.*Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995). First, the exercise of personal jurisdiction must comport with the forum state's long arm statute. *Id.* Second, the exercise of personal jurisdiction must satisfy the constitutional requirement of due process. *Id.* As to the first inquiry, California's long-arm statute, California Code of Civil Procedure § 410.10, provides for personal jurisdiction to the full extent allowed by the requirements of due process. *Id.* As such, "the question is whether exercising jurisdiction over defendants would offend due process."*Id.*

*7 The Ninth Circuit has set forth a three-part test to determine whether a district court's exercise of specific jurisdiction comports with due process:

(1) the nonresident defendant must do some act or consummate some transaction with the forum or perform some transaction with the forum by which he purposely avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections;

(2) the claim must be one which arises out of or results from the defendant's forum-related activities; and

(3) the exercise of jurisdiction must be reasonable.

*Ballard,* 65 F.3d at 1498.

The plaintiff bears the burden of meeting this test. *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1397 (9th Cir.1986). In the event that the plaintiff makes a prima facie showing of purposeful availment and forum related activities, "a presumption of reasonableness" arises, which the defendant bears the burden of overcoming. *Id.*

The purposeful availment test focuses on whether a "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there."*World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). The focus on the defendant's affirmative conduct is designed to ensure that the defendant is not haled into court as a result of "random, fortuitous or attenuated contacts." *Gray & Co. v. Firstenberg Machinery Co.,* 913 F.2d 758, 760 (9th Cir.1990)."Purposeful availment analysis examines whether the defendant's contacts with the forum are attributable to his own actions or are solely the actions of plaintiff."*Sinatra v. National Enquirer,* 854 F.2d 1191, 1195 (9th Cir.1988).

B. Venue

In general, 28 U.S.C. § 1391(b) provides that:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). If an action is filed in the wrong venue, 28 U.S.C. § 1406 provides that the district court may "dismiss, or if it be in the interests of justice, transfer such case to any district

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 7
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))**

or division in which it could have been brought."28 U.S.C. § 1406.

C. Dismissal for Failure to State a Claim

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should be granted if it appears beyond a reasonable doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Everest & Jennings, Inc. v. American Motorists Ins. Co.,* 23 F.3d 226, 228 (9th Cir.1994). All reasonable inferences are to be drawn in favor of the plaintiff. *Jacobson v. Hughes Aircraft,* 105 F.3d 1288, 1296 (9th Cir.1997).

*8 The court does not accept as true unreasonable inferences or conclusory allegations cast in the form of factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981); *See Miranda v. Clark County, Nev.,* 279 F.3d 1102, 1106 (9th Cir.2002) ("[C]onclusory allegations of law and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim."); *Sprewell v. Golden State Warriors,* 266 F.3d 1187 (9th Cir.2001); *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 810 (9th Cir.1988) ( "[C]onclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim.").

When a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."*Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986). The Court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure

deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment."*Moore v. Kayport Package Express,* 885 F.2d 531, 538 (9th Cir.1989). Of these factors, prejudice to the opposing party is the most important. *See Jackson v. Bank of Hawaii,* 902 F.2d 1385, 1387 (9th Cir.1990) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330-31, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)). Leave to amend is properly denied "where the amendment would be futile."*DeSoto v. Yellow Freight Sys., Inc.,* 957 F.2d 655, 658 (9th Cir.1992).

D. Motion to Strike

Under Federal Rule of Civil Procedure 12(f), a court may strike a pleading or any portion of a pleading that is "redundant, impertinent, or scandalous." Fed.R.Civ.P. 12(f). Motions to strike are disfavored, and the remedy of striking a pleading should generally be used only when necessary to discourage parties from raising allegations that are completely unrelated to the relevant claims and when the interests of justice so require. *Augustus v. Board of Pub. Instruction,* 306 F.2d 862, 868 (5th Cir.1962).

*ANALYSIS*

I. Extra-Pleading Materials

As a preliminary matter, before the Court can address the substance of Defendant's Motion to Dismiss and to Strike, the Court must rule on the admissibility of the extra-pleading materials that have been submitted to the Court in support of, and in opposition to, the Motion. When adjudicating a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(2), a court may consider evidence outside of the pleadings, including affidavits submitted by the parties. *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir.2001). When adjudicating a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), however,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))**

the Court's consideration of extra-pleading materials is more limited. Normally, the Court cannot consider matters outside of the pleading without converting the motion into a motion for summary judgment. *See* Fed.R.Civ.P. 12(b)(6). The Ninth Circuit has determined, however, that a district court may consider documents alleged in a complaint and essential to a plaintiff's allegations. *See Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994); *Steckman v. Hart Brewing, Inc.* 143 F.3d 1293, 1295 (9th Cir.1998). Additionally, a court may take judicial notice of documents on which allegations in the complaint *necessarily* rely, even if not expressly referenced in the complaint, provided that the authenticity of those documents is not in dispute. *In re Autodesk, Inc. Sec. Litig.,* 132 F.Supp.2d 833, 837-38 (N.D.Cal.2000).

**\*9** In support of its Motion, Defendant has submitted: (1) the Declaration of Geoffrey Allan, Ph.D. ("Allan Declaration"); (2) a letter from legal counsel for Insmed to legal counsel for Tercica, dated November 9, 2005 (the "November 9, 2005 Letter"); and (3) the Supplemental Declaration of Geoffrey Allan, Ph.D. ("Supplemental Allan Declaration"). Both the Allan Declaration and the Supplemental Allan Declaration are submitted in support of Defendant's 12(b)(2) motion and therefore may be considered by the Court. However, the Court notes that Plaintiff has requested that the Court strike the first two sentences of paragraph 3 and the second and third sentences of paragraph 15 of the Allan Declaration as inadmissible hearsay, and Defendant has not opposed this request. Nevertheless, the Court has not relied on these portions of the Allan Declaration in order to make its jurisdictional determination. Accordingly, the request to strike is DENIED AS MOOT.

The Court has also disregarded the November 9, 2005 Letter attached to the Motion to Dismiss. This letter consists of further attorney argument in support of Defendant's Motion and is not properly considered "evidence." [FN5]

FN5. Defendant contends that the letter is

being submitted to show that Insmed was "warned" that a Lanham Act case would be subject to a motion to dismiss. However, this is irrelevant to the legal issues that are currently before the Court.

In opposition to Defendant's Motion to Dismiss and to Strike, Plaintiff requests that the Court take judicial notice of the following documents pursuant to Federal Rule of Evidence 201: [FN6]

FN6. Defendant objects to Plaintiff's Request for Judicial Notice with respect to Exhibits 4, 6, and 7.

(1) Insmed's Form 10-K for the period ending December 31, 2003, filed with the Securities and Exchange Commission ("SEC") on March 12, 2004 (Exhibit 1);

(2) Civil Docket for *Genentech, Inc. et al. v. Insmed Incorporated, et al.,* Case No C 04-05429 CW, filed in the U.S. District Court, Northern District of California (Exhibit 2);

(3) Insmed's Form S-3, filed with the SEC on February 3, 2006 (Exhibit 3);

(4) Declaration of Kenneth M. Attie M.D. in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, filed in *Genentech, Inc. et al. v. Insmed Incorporated, et al.,* Case No C 04-0549 CW, U.S. District Court, Northern District of California (Exhibit 4);

(5) Celtrix Pharmaceuticals, Inc.'s 1997 Annual Report (Exhibit 5);

(6) Declaration of Kevin Tully in Support of Insmed Incorporated's Motion to Dismiss the First Amended Complaint or, in the alternative, for Summary Judgment, filed in *Genentech, Inc. et al. v. Insmed Incorporated, et al.,* Case No C 04-05429 CW, in the U.S. District Court, Northern District of California (Exhibit 6);

(7) Plaintiff's Opposition to Insmed Incorporated's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))

Motion to Dismiss the First Amended Complaint or, in the alternative, for Summary Judgment, Partial Dismissal or Partial Summary Judgment, filed in *Genentech, Inc. et al. v. Insmed Incorporated, et al.,* Case No C 04-05429 CW, in the U.S. District Court, Northern District of California (Exhibit 7).

Plaintiff seeks to have Exhibits 1 and 5 admitted to show the relationship between Celtrix and Insmed, in support of its jurisdictional allegations. The Court may consider these documents for this limited purpose and therefore the Request for Judicial Notice is GRANTED as to Exhibits 1 and 5. Plaintiff also seeks to have Exhibit 2, which is the docket sheet for *Genentech, Inc. et al. v. Insmed Incorporated, et al.,* Case No C 04-0549 CW, admitted to support its jurisdictional allegations. The Court may take judicial notice of this document for its legal effect, which is the fact that Insmed is currently a defendant in an unrelated lawsuit in the Northern District of California. *See Neilson v. Union Bank of Cal., N.A.,* 290 F.Supp.2d 1101, 1113 (C.D.Cal.2003). Since this is the basis for Plaintiff's Request for Judicial Notice, the Request for Judicial Notice is GRANTED IN PART. However, Plaintiff seeks to have Exhibits 6 and 7 to the Request for Judicial Notice, which are the Declaration of Kevin Tully and Plaintiff's Opposition to Insmed Incorporated's Motion to Dismiss the First Amended Complaint, both filed in *Genentech, Inc. et al. v. Insmed Incorporated, et al.,* considered for the truth of the matters asserted therein. However, Rule 201 does not permit the Court to take judicial notice of these documents for the truth of the matters asserted therein. Accordingly, the Court hereby DENIES Plaintiff's request with respect to Exhibits 6 and 7.

**\*10** Plaintiff also seeks to have the Court consider Exhibit 3, which is Insmed's Form S-3, as part of Tercica's opposition to Defendant's Rule 12(b)(6) motion. Exhibit 3 is not part of the First Amended Complaint and the First Amended Complaint does not necessarily rely on it. As such, the Request for Judicial Notice is DENIED.[FN7] Similarly, the

Court DENIES Plaintiff's Request that the Court take judicial notice of Exhibit 4 in order to prove that Kenneth Attie, Insmed's Chief Medical Officer, was formerly a consultant to Tercica. This evidence is irrelevant to the Court's determination of the instant Motion and is not part of the allegations of the First Amended Complaint. Plaintiff's decision to submit this evidence to the Court was inappropriate and Exhibit 4 has therefore been disregarded.

> FN7. To the extent that Plaintiff seeks also to have the Court consider Exhibit 1 for this purpose, *see* Opp. at 7, the Request is DENIED. Exhibit 1 has only been considered to the extent that it pertains to Plaintiff's jurisdictional allegations.

Plaintiff has also submitted: (1) the Rivera Declaration; (2) the Olson Declaration; (3) the Supplemental Olson Declaration; and (4) the Second Supplemental Olson Declaration. Defendant objects to the Court's consideration of any of these filings in connection with Defendant's Rule 12(b)(6) motion. Turning to the Rivera Declaration first, it is quite apparent that paragraph 5 of the Rivera Declaration should not be considered by the Court. This paragraph of the Rivera Declaration lacks foundation, consists entirely of hearsay information supplied by a representative of Tercica, and is, for the most part, intended to bolster the allegations contained in the First Amended Complaint in order to save it from dismissal under Rule 12(b)(6). However, two paragraphs of the Rivera Declaration, *i.e.* paragraphs 3 and 4, do pertain to Plaintiff's jurisdictional allegations. *See, e.g.,* Opp. at 22. Accordingly, Defendant's objection to the Rivera Declaration is SUSTAINED IN PART and OVERRULED IN PART. The Court has considered paragraphs 3 and 4 of the Rivera Declaration for the limited purpose of determining jurisdiction, but has disregarded the remaining allegations contained therein.

Defendant's objections to the Olson Declaration, the Supplemental Olson Declaration, and the Second Supplemental Declaration are also SUSTAINED IN PART and OVERRULED IN PART.

Not Reported in F.Supp.2d                                                                                      Page 10
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))**

The Court notes that the following documents are attached to the Olson Declaration: (a) a copy of a January 3, 2006 Tercica press release (Exhibit 1); (b) a copy of a December 12, 2005 Insmed press release (Exhibit 2); (c) a copy of the California Secretary of State web page concerning Celtrix (Exhibit 3); (d) a copy of Insmed's March 17, 2005 press release (Exhibit 4); (e) a copy of Insmed's April 20, 2005 press release (Exhibit 5); (f) a copy of a letter dated November 11, 2005 from Kenneth Attie to Sally Radovick, MD (Exhibit 6A); (g) a copy of Insmed slides entitled "rhGF-I/rhGFBP-3" (Exhibit 6B); (h) a copy of Insmed slides entitled "Treatment with rhIGF-I" (Exhibit 6C); (i) a copy of an email dated November 15, 2005 from Sally Radovick to others (Exhibit 6D); (j) a copy of a letter dated January 10, 2006 from Kenneth Attie to Leslie Soyka, MD (Exhibit 7); (k) a copy of an Insmed "Corporate Fact Sheet" (Exhibit 8); (l) a copy of a September 19, 2005 Insmed press release (Exhibit 9); (m) a copy of a Yahoo Finance web page showing the stock price range of Insmed stock from August 30, 2005 to September 1, 2005 (Exhibit 10); (n) a copy of a Yahoo Finance web page showing the stock price range of Tercica stock from December 11, 2005 to December 13, 2005 (Exhibit 11); (o) a copy of a transcript of Insmed's Investor Update Conference Call held on September 28, 2005 (Exhibit 12); (p) a copy of a September 29, 2005 Insmed press release (Exhibit 13); (q) a copy of a transcript from the October 19, 2005 BIO InvestorForum (Exhibit 14); (r) a copry of a June 10, 2005 Insmed press release (Exhibit 15); (s) a copy of a web page from Insmed's website entitled "Product Pipeline" (Exhibit 15); (t) a copy of a September 27, 2005 Insmed press release (Exhibit 16).

*11 Out of all of the documents attached to the Olson Declaration, only Exhibits 3, 4, and 5 pertain to Plaintiff's jurisdictional allegations. Therefore, those documents have been considered by the Court as establishing the following: (1) that Celtrix is a Delaware corporation located in Virginia, registered to do business in California, with an agent for service of process in California; and (2) that Insmed is affiliated with two clinical trials being conducted by the University of California, San Francisco.[FN8] However, Defendant's objection to the submission of Exhibits 3, 4, and 5 in connection with the Rule 12(b)(6) motion is SUSTAINED as these documents cannot be used to supplement the First Amended Complaint.

> FN8. Plaintiff also contends that Exhibits 6A, 6D and 7 may be considered as part of the Court's jurisdictional analysis. However, these letters and emails were not directly sent by Insmed to anyone in California and are therefore irrelevant to the analysis. Since these letters are also not alleged in the First Amended Complaint, they have not been considered by the Court in its determination of the Rule 12(b)(6) motion. Moreover, Plaintiff has not sufficiently authenticated Exhibits 6B and 6C and/or shown that they are the same slides referenced in the First Amended Complaint. As such, the Court SUSTAINS Defendant's objections to Exhibits 6A, 6B, 6C, 6D, and 7.

Plaintiff seeks to submit Exhibits 2, 8, 9, 10, 11, 15, 16, and 17 in order to introduce new facts that are not part of the First Amended Complaint. This is improper and Defendant's objections are therefore SUSTAINED. Further, Exhibits 1, 7 to the Olson Declaration are documents that were generated *after* the First Amended Complaint were filed and are therefore neither documents referenced in the First Amended Complaint nor documents upon which the First Amended Complaint necessarily relies. As such, they have also been disregarded by the Court and Defendant's objections are therefore SUSTAINED. However, Exhibits 12, 13, and 14 are specifically referenced in the First Amended Complaint and therefore may be considered by the Court. Accordingly, the Court hereby OVERRULES Defendant's objections to Exhibits 12, 13, and 14.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　Page 11
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))**

Additionally, the Court finds that the document attached to the Supplemental Olson Declaration, which is a copy of a letter from Kenneth Attie to Pinchas Cohen, MD of UCLA, is of questionable relevance, due to the fact that it is dated January 10, 2006-which, again, post-dates the filing of the First Amended Complaint. Further, Plaintiff submitted this document *after* Insmed filed its Reply brief and without first seeking leave of Court. Since Plaintiff submits this document in connection with its Opposition to the Rule 12(b)(2) motion, however, and explains that it did not have access to the document until after its Opposition was filed, the Court has considered the document for the limited purpose of determining personal jurisdiction. In contrast, the documents attached to the Second Supplemental Olson Declaration are directed toward the merits of Plaintiff's First Amended Complaint and Plaintiff provides *no* valid explanation as to why these documents-which are dated 2003, 2004, and 2005, respectively-were submitted to the Court in such an untimely fashion. The Court therefore SUSTAINS Defendant's objections to the Second Supplemental Olson Declaration and has declined to consider any of the documents attached to it.

II. Motion to Dismiss for Lack of Personal Jurisdiction

With respect to the Motion to Dismiss, the Court shall first address Defendant's request to dismiss for lack of personal jurisdiction, which is brought pursuant to Federal Rule of Civil Procedure 12(b)(2). In the First Amended Complaint, Plaintiff contends that the Court has personal jurisdiction over Insmed because: (1) Insmed made several false and misleading statements at an investor forum located in San Francisco, California on October 19, 2005; and (2) Insmed made several other allegedly false and misleading statements outside of California that were calculated to damage Tercica in California.

A. General Jurisdiction

**\*12** At the outset, the Court notes that Plaintiff has not met its "high" burden of establishing that this Court has general jurisdiction over Insmed.*Brand v. Menlove Dodge,* 796 F.2d 1070, 1073 (9th Cir.1986). First, Plaintiff utterly fails to address the fact that Insmed: (1) is a Virginia corporation; (2) has its principle place of business in Virginia; (3) does not maintain an office in California; (4) does not have a telephone number in California; (5) does not maintain any records or company files in California; (6) does not maintain a bank account in California or accept checks drawn on a California bank; (7) is not registered to do business in California; (8) has not paid any income taxes in California; (9) does not own any real property in California; (10) does not have an agent for service of process in California; (11) does not have any registered agents living in California; (12) has not sold iPlex or any other products or services to California consumers; (13) has not solicited sales of iPlex or other products or services in California; (14) has not endorsed or sponsored any print, television, or radio advertisements in California; and (15) maintains a single, passive [FN9] website. *See Bancroft & Masters, Inc. v. Augusta Nat'l Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000) (noting that factors to be taken into consideration in determining whether general jurisdiction exists are whether the defendant makes sales, solicits or engaged in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there).

> FN9. A "passive" website is one that cannot be used to make purchases. *See Bancroft & Masters, Inc. v. Augusta National Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000).

Instead, Plaintiff contends that general jurisdiction is established because: (1) Insmed "consented" to personal jurisdiction in another lawsuit in California; (2) Insmed purportedly mailed advertisements to some California physicians and attended a conference in California; (3) Insmed is participating in two clinical trials in California; and (4) Insmed has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 12
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))**

a subsidiary registered to do business in California. Plaintiff does not cite any legal authorities in support of its position that these factors are sufficient to establish a prima facie case of general jurisdiction. In fact, the relevant authorities make clear that they are not.

In *Core-Vent Corp. v. Nobel Industries AB,* 11 F.3d 1482 (9th Cir.1993), the Ninth Circuit expressly rejected the argument that personal jurisdiction could be established merely because a defendant had consented to jurisdiction in California in an unrelated case and had filed its own, unrelated lawsuit in California. *Id.* at 1490. Indeed, it is clear from *Core-Vent* that unrelated litigation in a forum state is a not controlling factor in, or even relevant to, the general jurisdictional analysis. *Id.*

Further, the Company's mailings to physicians and the single event of attending a two-day investor conference in San Francisco are not the type of "continuous and systemic" or "substantial" activities that support a finding of general jurisdiction. *See id.* at 1490 (finding that the attendance of five medical conferences in the forum state over the course of four years was insufficient to establish general jurisdiction); *see also Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1331 (9th Cir.1984) (declining to find general jurisdiction even in light of allegations that defendant had solicited a distributorship agreement in the forum state, had visited the forum state a number of times, had purchased spare parts in the forum state, and had sent letters and telexes, and made telephone calls to the forum state). This is true even in light of Plaintiff's belated evidence that Insmed mailed a letter directly to a physician in California.[FN10] *See* Supp. Olson Decl. at Ex. 18.

> FN10. The Court does not find this letter to be *relevant* evidence, as the date of the letter is January 2006, which post-dates the filing of the First Amended Complaint.

**\*13** Additionally, while Plaintiff places great weight on the fact that Insmed "is conducting two

major ongoing clinical trials in this District," Plaintiff does not cite any support for its assertion that this factor supports a finding of general jurisdiction. In fact, the authorities that have addressed this precise issue have held that the mere participation in a clinical trial in the forum state is not a sufficient basis for finding general jurisdiction. *See, e.g., Surgical Laser Tech., Inc. v. C.R. Bard, Inc.,* 921 F.Supp. 281 (E.D.Pa.1996); *Gallant v. Trustees of Columbia University in the City of New York,* 111 F.Supp.2d 638, 642 (E.D.Pa.2000). Further, Insmed has produced evidence that the trials are being conducted by the University of California, San Francisco, not Insmed. Supp. Allan Decl. at ¶¶ 5, 7.

Plaintiff's reliance on the fact that Insmed's subsidiary, Celtrix, is located in California is equally unavailing.[FN11] First and foremost, Plaintiff's statement that Celtrix is a California corporation located in California is flatly contradicted by its *own* evidence showing that Celtrix is a Delaware corporation with its principle place of business in Glen Allen, Virginia. *See* Olson Decl. at Ex. E. In fact, according to the Supplemental Allan Declaration, since a short time after its acquisition by Insmed in 2000, Celtrix has owned no real property in California and has neither sold nor solicited sales of iPlex or other products in California. Supp. Allan Decl. at ¶ 4. Further, Celtrix has paid no income taxes in California since that time, maintains no bank accounts in California, does not conduct any business in California, does not maintain any offices or facilities in California, and does not have any employees located there. *Id.* Additionally, since 2000, Celtrix has not endorsed or sponsored any print, television, or radio advertisements in California. *Id.* Accordingly, even assuming *arguendo* that Plaintiff has established that Celtrix is the alter ego of Insmed, Plaintiff still has not met the heavy burden of establishing general jurisdiction.[FN12]

> FN11. Plaintiff argues that Celtrix is "central to the iPlex0 drug which is the subject of this lawsuit's allegations" because: (1) Celtrix conducted the original

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 13
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))

research and development of iPlex, then known as Somatokine, *over six years ago,* and (2) Insmed used the research and test data generated and compiled by Celtrix in its filings with the FDA seeking approval for iPlex. Plaintiff does not produce any authorities, however, showing that the initial research activities of a wholly-owned subsidiary, which took place over half a decade ago, and which no longer occur in the forum state, constitute *continuous* and systemic contacts with the forum state.

FN12. Whether Celtrix is, in fact, the alter ego of Insmed is another element that must be established by Plaintiff before this Court can assume general jurisdiction over Insmed. The Ninth Circuit and the United States Supreme Court have both acknowledged that the mere "existence of a relationship between a parent company and its subsidiaries is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiary's minimum contacts with the forum."*Doe v. Unocal,* 248 F.3d 915, 925 (9th Cir.2001); *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *Church of Scientology v. Adams,* 584 F.2d 893, 897 (9th Cir.1978) ("Even in cases where the contacts of a parent or subsidiary corporation are sufficient to subject it to personal jurisdiction, we recognize that the activities of one related corporation are irrelevant to the issue of jurisdiction over the other, so long as a separation between the corporations has been maintained.") (citing *Uston v. Grand Resorts, Inc.,* 564 F.2d 1217, 1218 (9th Cir.1977)). Indeed, it is well established that the requirements of *International Shoe* must be met as to each defendant over which the forum state is attempting to exercise personal jurisdiction. *Rush v. Savchuk,* 444 U.S. 320, 332, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980). Here, al-

though Insmed disputes whether Plaintiff can establish that Celtrix is the "alter ego" of Insmed, it appears from Insmed's own evidence that the two corporations are sufficiently merged. For example, Insmed's CEO has stated that Celtrix is a wholly-owned subsidiary of Insmed and is otherwise a "non-functioning corporation." *Id.* at ¶¶ 2, 4. Accordingly, the Court has assumed, for the purposes of this Motion, that Celtrix is the alter ego of Insmed. As such, Plaintiff's request for further discovery on this subject is DENIED AS MOOT.

**B. Specific Jurisdiction**

Plaintiff has also failed to establish specific jurisdiction. As the party bearing the burden of proof on specific jurisdiction, Plaintiff must show that each element of the following three-part test is satisfied:

(1) that Insmed has committed some act or consummated some transaction with the forum or performed some transaction with the forum by which it purposely availed itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections;

(2) that the claim is one that arises out of or results from the Insmed's forum-related activities; and

(3) that the exercise of jurisdiction is reasonable.

*Ballard,* 65 F.3d at 1498. *Haisten,* 784 F.2d at 1397. Only in the event that Plaintiff can make a prima facie showing of purposeful availment and forum related activities does "a presumption of reasonableness" arise. *Id.*[FN13]

FN13. In the event that jurisdiction is not established, Plaintiff has requested that the Court stay this Motion and allow Plaintiff to conduct additional discovery. The decision as to whether to allow further discovery is committed to the sound discretion of the district court.*Data Disc, Inc. v. Systems Techn. Assoc., Inc.,* 557 F.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 14
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))**

1280, 1285 n. 1 (9th Cir.1977). Here, however, the relevant facts are not controverted and Plaintiff has not identified any specific discovery that it believes would aid the Court in its jurisdictional determination. Indeed, as set forth below, the area where Plaintiff is most sorely lacking is any showing that Defendant's activities were purposefully directed toward a Californian entity in a way that was intended to, and did, cause substantial harm to Tercica *in* California. The Court presumes that Plaintiff is the entity with access to the information pertaining to the "brunt of the harm," and therefore DENIES Plaintiff's request for further discovery.

**\*14** As to the first element of purposeful availment, Plaintiff must show that the contacts Insmed made with California created a "substantial connection" with the state. In other words, Plaintiff must show that Insmed deliberately engaged in significant activities within California or created "continuing obligations" between it and residents of California, manifestly availing itself of the privilege of conducting business here. *Sher v. Johnson,* 911 F.2d 1357, 1362 (9th Cir.1990). A limited contact with California-if it did not invoke the benefit of acting on or consummating transactions with California-does not suffice. *Casualty Assur. Risk Ins. Brokerage Co. v. Dillon,* 976 F.2d 596, 600 (9th Cir.1992). As to the second element, the Ninth Circuit typically employs a "but for" test, *i.e.*"a claim arises out of the forum-related activities if it would not have happened but for the forum-related activities."*Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267, 271-72 (9th Cir.1995).

Here, as to Insmed's relevant forum-related activities, Plaintiff has shown only that Insmed attended a two-day investor conference in San Francisco, California.[FN14] However, Plaintiff has not effectively shown that Insmed's twenty minute presentation at the October 19, 2005 BIO InvestorForum was significant or created a "continuing obligation" with

any residents of the state of California, particularly since it is undisputed that Defendant was one of 190 companies attending the conference, did not offer any products for sale, and did not make any sales at the conference. *See* Allan Decl. at ¶ 15.

> FN14. Again, Plaintiff also attempts to rely on the fact that Insmed is affiliated with two clinical trials in California, has an employee who resides in California, is involved in litigation in California, has a subsidiary registered to do business in California, and has purportedly communicated with a physician in California regarding the potential sales of its product. Even construing Plaintiff's evidence in the light most favorable to it, it is clear that these contacts are not related to the instant action. First, Plaintiff's own evidence makes it quite apparent that the clinical trials are not related to this action, which pertains to competition over a drug for the treatment of *growth failure in children. See* Olson Decl. at Ex. 4 (clinical trial of IGF-1 for the treatment of prostate cancer); and Ex. 5 (clinical trial of IGF-1 for the treatment of HIV-associated Lipodystrophy). Second, Plaintiff has not alleged or otherwise shown that the sole employee located in California, Sommer, made, or is responsible for, the allegedly false and misleading statements. Third, Plaintiff has not shown that the *Genentech* litigation is sufficiently related to Insmed's purportedly false and/or misleading statements concerning iPlex or Increlex. Fourth, as already discussed, it is also clear from the uncontroverted evidence that Celtrix is no longer located in California and has not been since 2000, which is *five years prior* to the time the allegedly false and misleading statements were made. Finally, the letter sent by Insmed to a physician at UCLA cannot be considered in establishing personal jurisdiction because it post-dates the allegations

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 15
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))

in the First Amended Complaint. *See Farmers Ins. Exch. v. Portage LaPrarie Mut. Ins. Co.,* 907 F.2d 911, 913 (9th Cir.1990) ("Only contacts occurring prior to the event causing the litigation may be considered"). Moreover, the letter that Plaintiff has produced does not contain any of the allegedly false and misleading statements identified in the First Amended Complaint. *See* Supp. Olson Decl. at Ex. 18. In fact, the letter does not mention free IGF *or* Increlex, does not state that iPlex is for "long term treatment," fully discloses the meal restrictions related to iPlex, and mentions certain side effects identified during the clinical trial of iPlex. *See id.*

Nor does Plaintiff's case fall within the "effects" test established in *Calder v. Jones,* 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1986). In *Calder,* the United States Supreme Court held that personal jurisdiction could be established over a non-resident defendant if: (1) the defendant committed an intentional act; (2) expressly aimed at the forum state; (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Id.;Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 803 (9th Cir.2004). Here, although Plaintiff meets the first element of the three-part "effects" test, in that the alleged conduct is intentional, Plaintiff has not shown that the allegedly false and misleading statements were expressly aimed at California or have caused harm that Insmed knew was likely to be suffered in California. *See, e.g., Pharmastem Therapeutics, Inc. v. Cord Blood Registry, Inc.,* 2005 WL 88998 (N.D.Cal.2005) (Whyte, J.) (declining to find the posting of allegedly false and misleading statements concerning a competitor on a company's website sufficient to satisfy the "express aiming" requirement of *Calder* ). First, unlike *Calder,* the purportedly false and misleading statements do not directly refer to Tercica or Tercica's product, Increlex. *Compare with Calder,* 465 U.S. at 788-89 (noting that the allegedly libelous story concerned

the California activities of a California resident, ... was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California). Here, while Tercica is a Delaware corporation located in California, Plaintiff has not established that the "brunt" of the harm will be suffered in California. *See Core-Vent Corp.,* 11 F.3d at 1486 (noting that a "corporation does not suffer harm in the same sense than an individual does."). Indeed, Plaintiff's own evidence merely establishes that only 90 of the 500 (or roughly 20%) of the pediatric endocrinologists who treat children afflicted with short stature are located in California. Rivera Decl. at ¶ 3. Plaintiff also admits that it estimates that only 15% to 20% of Tercica's expected revenue from Increlex may come from patients and physicians located in California. *Id.* at ¶ 4.

**\*15** Plaintiff's reliance on *Tobin v. Astra Pharm. Prods., Inc.,* 993 F.2d 528 (6th Cir.1993) is also misplaced. Contrary to Plaintiff's assertion, the Sixth Circuit did not find, in *Tobin,* that "the defendant had purposefully availed itself of the privilege of conducting business in *all* states by seeking FDA approval."*See* Opp. at 21 (emphasis in original). Instead, the Sixth Circuit premised its jurisdictional finding on the fact that "during the *same time as* the FDA approval process, [the defendant] *sought out and negotiated* a licensing agreement ... to distribute the drug *throughout...* the United States of America" rather than a distribution agreement related solely to New England or specific states. *Tobin,* 993 F.2d at 543 (emphasis added) (internal quotations omitted). Indeed, the Sixth Circuit repeatedly noted that the defendant "could not deny that by licensing Astra to distribute ritodrine in all fifty states it employed the distribution system that brought ritodrine to [the forum state]."*Id.* at 544.There is no such evidence here. In fact, Defendant's February 3, 2006 S-3 filing, which *Plaintiff* introduced as evidence supporting personal jurisdiction, specifically states that-as of the end of 2005-Insmed had not yet entered into any licensing

Not Reported in F.Supp.2d                                                                    Page 16
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))**

or distribution agreements or begun any efforts to sell or distribute iPlex and had absolutely "no experience" in that area. *See* Pl's RJN at Ex. 3 at p. 11.

Finally, while neither party has squarely addressed the "reasonableness" of asserting personal jurisdiction over Insmed in this forum in great detail, [FN15] it is a factor that the Court must consider. *See Core-Vent Corp.*, 11 F.3d at 1487; *FDIC v. British-American Ins. Co., Ltd.*, 828 F.2d 1439, 1442 (9th Cir.1987) (declining to decide if the defendant had purposefully availed itself of the forum state in light of the conclusion that the exercise of jurisdiction would be unreasonable). At the outset, the Court notes that the presumption of reasonableness arises only if Plaintiff makes a prima facie showing of purposeful availment and forum-related activities, which it has not. Further, as to the factors that directly bear on the reasonableness of this forum, these do not, on balance, favor a California forum. The relevant factors to be considered are: (1) the extent of the defendant's purposeful interjection into the forum state affairs; (2) the burden on the defendant of defending in the forum; (3) the forum state's interest in adjudicating the dispute; (4) the most efficient judicial resolution of the controversy; (5) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (6) the existence of an alternative forum. [FN16] *Core-Vent Corp.*, 11 F.3d at 1487-88.

> FN15. Defendant states only that it need not address the reasonableness factor when a prima facie case of purposeful availment and forum-related activities has not been made. Plaintiff, on the other hand, argues in a very cursory fashion that jurisdiction in California is reasonable because: (1) Insmed is already engaged in litigation in California; (2) California has a significant interest in providing legal redress for its residents when California statutes are at issue; and (3) Tercica has a "strong interest" in litigating here. As set forth above,

Plaintiff omits a great deal of the relevant considerations that do not weigh in its favor.

> FN16. Another factor that is typically considered-the extent of conflict with the sovereignty of the defendant's state-is not relevant here. *Core-Vent Corp.*, 11 F.3d at 1487-88.

Here, the extent of the purposeful interjection into the forum state-*i.e.* the attendance of one investor conference in San Francisco-is extremely attenuated and, as such, does not favor a finding of reasonableness. *See Ins. Co. of North America v. Marina Salina Cruz*, 649 F.2d 1266, 1271 (9th Cir.1981) ("The smaller the element of purposeful interjection, the less is jurisdiction to be anticipated and the less reasonable is its exercise"). The second element also does not support jurisdiction in California. While the Ninth Circuit has noted that "[t]he burden of litigating in a foreign forum has become less significant as a result of advances in communication and transportation," it has also noted that "the law of personal jurisdiction is asymmetrical" and where, as here, "the defendant has done little to reach out to the forum state, the burden of defending itself in a foreign forum militates against exercising jurisdiction." *FDIC*, 828 F.2d at 1443 (internal quotations omitted). [FN17] As to California's interest in adjudicating this lawsuit, this factor neither favors nor weighs against retaining jurisdiction here. Significantly, while Tercica is located in California, it is not a California corporation. *See Core-Vent Corp.*, 11 F.3d at 1489 (finding strong interest due to the fact that plaintiff was a California corporation located in California). Further, while there are California state law claims asserted in this case, both parties concede that they are largely duplicative of the federal Lanham Act claim. As to the efficiency of a California forum, it is not clear that the witnesses and evidence are likely to be located in California. In fact, since the First Amended Complaint focuses solely on the activities of Insmed, it may be presumed that most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 17
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))

of the relevant witnesses and evidence are located in Virginia, where Insmed is located. Further, although Tercica states that it has a "strong" interest in litigating here, it has not provided any specific reasons as to why its interests in a California forum are so strong. Finally, it is beyond dispute that an alternate forum exists in the Eastern District of Virginia. Accordingly, when all of the relevant factors are considered, the Court concludes that asserting personal jurisdiction over Insmed in California is not reasonable.

> FN17. The fact that Defendant is already defending against an unrelated lawsuit filed by Tercica in this state does not make jurisdiction any more reasonable, especially since the instant lawsuit is nearly two years behind the one currently pending before Judge Wilken and Plaintiff has made no showing that the same witnesses or evidence are involved.

**\*16** For all of the aforementioned reasons, the Court finds that Plaintiff has not established that specific jurisdiction is proper and Defendant's Rule 12(b)(2) motion is therefore GRANTED. This case is DISMISSED for lack of jurisdiction.

### III. Motion to Dismiss for Lack of Venue

The Court also alternatively GRANTS Defendant's Rule 12(b)(3) motion. In general, 28 U.S.C. § 1391(b) provides that venue is proper: (1) in the judicial district where any defendant resides, if all defendants reside in the same state, (2) in the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) in the judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought. 28 U.S.C. § 1391(b)(1)-(3). Here, it is clear that Defendant is located in the Eastern District of Virginia, not California. Further, Plaintiff has not shown that a substantial part of the events

giving rise to its claims occurred in California. In fact, a great deal of the purportedly false or misleading statements were issued from the Company's headquarters in Virginia or elsewhere outside of California. *See* FAC at ¶¶ 17, 20, 24. Accordingly, the case is DISMISSED on this basis as well.

### III. Rule 12(b)(6) Motion to Dismiss

Further, even if the Court were not granting Defendant's 12(b)(2) and 12(b)(3) motions, the Court finds that the First Amended Complaint should also be DISMISSED for failure to state a claim. Here, Insmed moves to dismiss Plaintiff's First Amended Complaint on the grounds that it fails to state a claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and therefore also fails to state a claim under California Business & Professions Code §§ 17500*et seq.* or California Business & Professions Code §§ 17200*et seq.*[FN18]

> FN18. Other than the fact that Defendant points out that Plaintiff has not identified any law allegedly violated by Insmed in support of its California Business & Professions Code § 17200 claim other than a violation of the Lanham Act, neither party separately analyzes the California statutory causes of action and it appears that both concede that these cause of action must be dismissed if the Lanham Act claim is dismissed. *See Denbicare USA, Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143, 1152-53 (9th Cir.1996).

### A. Lanham Act

Insmed first contends that the First Amended Complaint is deficient under the Lanham Act because: (1) the investor communications identified in the First Amended Complaint do not constitute "commercial advertising or promotion"; and (2) the investor communications were made at a time when the parties were not in commercial competition with each other. Insmed further contends that

Not Reported in F.Supp.2d                                                Page 18
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))

Plaintiff lacks standing to sue under the Landham Act because Tercica is not Insmed's competitor and because the two companies were not actually engaged in commercial competition at the time the First Amended Complaint was filed. Since standing is a jurisdictional issue, it shall be addressed first.

1. Standing

Section 43(a) of the Lanham Act prohibits the use of false designations of origin, false descriptions, and false representations in the advertising and sale of goods and services. *Jack Russell Terrier Network of Northern California v. AKC,* 407 F.3d 1027, 1036 (9th Cir.2005). The express purpose of the Lanham Act is to protect commercial parties against unfair competition.*Waits v. Frito Lay, Inc.,* 978 F.2d 1093, 1108 (9th Cir.1992). To establish standing pursuant to the "false advertising" prong of Section 43(a) of the Lanham Act, a plaintiff must allege: (1) a commercial injury based upon a misrepresentation about a product, and (2) that the injury is "competitive" or harmful to the plaintiff's ability to compete with that defendant. *Jack Russell Terrier Network,* 407 F.3d at 1036.

*17 In arguing that Plaintiff does not have standing to pursue a cause of action against it pursuant to the Lanham Act, Defendant primarily relies on the holdings of *PDK Labs., Inc. v. Friendlander,* 103 F.3d 1105 (2d Cir.1997) and *AlphaMed Pharm. Corp. v. Arriva Pharm., Inc.,* 391 F.Supp.2d 1148 (S.D.Fla.2005). These cases do not support Defendant's position. For example, while Defendant is correct that *PDK Labs.* and *AlphaMed* are factually analogous to the instant case, in that both cases involve disputes between pharmaceutical companies or individuals over prospective pharmaceutical products, there is a critical difference between the instant case and *PDK Labs.* and *AlphaMed.*Specifically, in *PDK Labs.,* the Second Circuit found that the plaintiff and defendant were not competitors because the defendant's [FN19] "hopes of eventually obtaining FDA approval and selling a retail weight loss product [we]re too remote to confer

standing."*PDK Labs.,* 103 F.3d at 112. Indeed, in *PDK Labs.,* the Second Circuit and the district court both noted that it was "unclear when (if ever) [the defendant would] have an FDA-approved marketable consumer product," given that the defendant, an individual, had admitted that he would need to conduct further studies and product testing that would "cost a minimum of $1,500,000.00." *Id.* Similarly, in *AlphaMed,* the district court declined to find standing because the plaintiff had merely alleged that it held a patent to the relevant technology but had not alleged that it had sought FDA approval for the pharmaceutical product in question or that product distribution was imminent. *AlphaMed,* 391 F.Supp.2d at 1162-63.

> FN19.*PDK* was filed as a declaratory judgment action and thus the relevant inquiry was whether the *defendant* would have standing.

Critically, neither *PDK Labs.* or *AlphaMed*-or any other case cited by Defendant-foreclose the possibility that a pharmaceutical company plaintiff could have standing to sue under the Lanham Act where, as here, FDA approval has been obtained and product distribution is likely imminent.[FN20]In fact, the Second Circuit in *PDK Labs.* expressly acknowledged that standing may be established in such instances. *PDK Labs.,* 103 F.3d at 1112 (noting that a "future 'potential for a commercial or competitive injury' can establish standing"). Accordingly, the Court declines to dismiss the First Amended Complaint for lack of standing.

> FN20. Specifically, Plaintiff has alleged that: (1) Tercica received FDA approval for Increlex on August 30, 2005; (2) after Tercica received FDA approval, it began commercializing Increlex; (3) at least one physician has prescribed Increlex; (4) Insmed received an "Approvable Letter" from the FDA on September 27, 2005, setting December 12, 2005 as the action date for Insmed's new drug application; (5) Insmed made the allegedly false and mis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))**

leading statements after receiving the "Approvable Letter"; and (6) the FDA approved iPlex on or about December 12, 2005. *See* FAC at ¶¶ 11-16, 29.

### 2. Failure to State a Claim

However, the Court GRANTS Defendant's Motion to Dismiss based on Defendant's argument that Plaintiff has failed to state a claim. Defendant moves to dismiss the First Amended Complaint on the grounds that the allegedly false and misleading statements, which consisted solely of communications to existing and potential investors, do not constitute "false advertising" under the Lanham Act. In the Ninth Circuit, a claim under the Lanham Act requires: (1) that the defendant made a false statement of fact in a commercial advertisement about its own or another's product; (2) that the advertisement actually deceived or had the tendency to deceive a substantial segment of its audience; (3) that the deception was material in that it was likely to influence the purchasing decision; (4) that the defendant caused its falsely advertised goods to enter interstate commerce; and (5) that the plaintiff had been or was likely to be injured as a result of the foregoing either by direct diversion or sales from itself to the defendant or by the lessening of the goodwill which its products enjoy. *See Rice v. Fox Broadcasting Company,* 330 F.3d 1170, 1180 (9th Cir.2003). Although the Lanham Act does not itself define the terms "advertising" or "promotion," the Ninth Circuit has held that allegedly false or misleading statements constitute "advertising" or "promotion" when they are: (1) commercial speech, (2) by a defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) sufficiently disseminated to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. *Coastal Abstract Service, Inc. v. First American Title Ins. Co.,* 173 F.3d 725, 735 (9th Cir.1999).

**\*18** Here, Defendant is correct that all of the false and misleading statements identified in the First Amended Complaint are alleged to have been made to existing or potential investors of Insmed, not consumers. For example, the First Amended Complaint alleges that the misrepresentations were communicated between September and December 2005:(1) during "webcast" conferences or teleconferences with potential investors; (2) in "webcast" conference calls with existing Insmed investors; and (3) in a press release posted on the "Investor Relations" section of Insmed's website. There are no allegations, however, that any actual or potential consumer attended any of these conferences or participated in any investor conference calls.[FN21] Plaintiff also fails to allege sufficient facts showing that these communications were made "for the purpose of influencing consumers to buy defendant's goods or services." Additionally, Plaintiff has not alleged any facts showing that any consumers specifically associated Plaintiff's references to "free IGF" with Plaintiff's actual product.[FN22] The absence of these relevant allegations makes the First Amended Complaint subject to dismissal under 12(b)(6). *See, e.g., Sigma Dynamics, Inc. v. E. Piphany, Inc.,* 2004 WL 264 8370 (N.D.Cal.2004) ("Statements made during an earnings conference call primarily to influence investors that may have an incidental effect of promoting goods to customers are not within the reach of the Lanham Act."). Accordingly, Defendant's Rule 12(b)(6) motion is also GRANTED. Due to the Court's rulings on Defendant's Motion to Dismiss, Defendant's Motion to Strike is hereby DENIED AS MOOT.

> FN21. Although Plaintiff attempts to rectify the deficiencies in the First Amended Complaint by inundating the Court with over 330 pages of extra-pleading materials, Plaintiff cannot escape the fact that the First Amended Complaint does not provide any factual basis for the Court's consideration of these materials. Thus, Plaintiff's evidentiary submissions only bear on whether Plaintiff could possibly amend the First Amended Complaint in order to meet

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.))

the required pleading standard; they do not, however, save the First Amended Complaint from dismissal.

FN22. Instead, Plaintiff relies on a September 28, 2005 article by Lazard Capital Markets. Lazard Capital Markets is third party, unrelated to Insmed, and Plaintiff has not presented any authorities showing that Plaintiff can be held liable for such third-party statements.

*CONCLUSION*

IT IS HEREBY ORDERED THAT Plaintiff's Request for Judicial Notice [Docket No. 23] is GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED THAT Defendant's Opposition and Objections to Plaintiff's Request for Judicial Notice and Evidentiary Objections [Docket No. 26] are SUSTAINED IN PART AND OVER-RULED IN PART.

IT IS FURTHER ORDERED THAT Defendant's Objections to Plaintiff's Two Supplemental Declarations [Docket No. 31] are SUSTAINED IN PART AND OVERRULED IN PART.

IT IS FURTHER ORDERED THAT Defendant's Motion to Dismiss the First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6) [Docket No. 17] is GRANTED. The First Amended Complaint is DISMISSED WITHOUT LEAVE TO AMEND. This case is hereby DISMISSED for lack of personal jurisdiction and the clerk is therefore directed to close the file and to terminate any pending matters, including the June 14, 2006 Case Management Conference, which is VACATED. Defendant's Motion to Strike Portions of the First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(f) is DENIED AS MOOT.

IT IS SO ORDERED.

N.D.Cal.,2006.

Tercica, Inc. v. Insmed Inc.
Not Reported in F.Supp.2d, 2006 WL 1626930 (N.D.Cal.), 2006-2 Trade Cases P 75,362

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1  Belynda B. Reck (State Bar No. 163561)
   HUNTON & WILLIAMS LLP
2  550 South Hope Street, Suite 2000
   Los Angeles, California 90071-2627
3  Tel: (213) 532-2000/Fax: (213) 532-2020
4  E-mail: breck@hunton.com

5  *Counsel for Defendants DTE Energy Company,*
   *MidAmerican Energy Holdings Company,*
6  *Pinnacle West Capital Corporation, and*
7  *Southern Company*

8  [*Counsel Listing Continued on Next Three Pages*]

9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                          OAKLAND DIVISION

13

14  NATIVE VILLAGE OF KIVALINA and        CASE NO.:  CV-08-1138 SBA
    CITY OF KIVALINA

15
              Plaintiffs,                 **[PROPOSED] ORDER GRANTING**
16                                        **MOTION TO DISMISS THE COMPLAINT**
                                          **FOR LACK OF PERSONAL**
17        v.                              **JURISDICTION PURSUANT TO FED. R.**
                                          **CIV. P. 12(b)(2) OF DEFENDANTS**
18  EXXON MOBIL CORPORATION, et al.,      **AMERICAN ELECTRIC POWER**
                                          **COMPANY, INC., AMERICAN ELECTRIC**
19            Defendants.                 **POWER SERVICE CORPORATION, DTE**
                                          **ENERGY COMPANY, DUKE ENERGY**
20                                        **CORPORATION, DYNEGY HOLDINGS**
                                          **INC., MIDAMERICAN ENERGY**
21                                        **HOLDINGS COMPANY, PINNACLE**
                                          **WEST CAPITAL CORPORATION,**
22                                        **RELIANT ENERGY, INC., SOUTHERN**
                                          **COMPANY, THE AES CORPORATION,**
23                                        **AND XCEL ENERGY INC.**
24
                                          DATE:   TBD (per Order, entered June 4,
25                                                 2008; Dkt. No. 126, ¶ 10)
26                                        TIME:   1:00 p.m.
                                          PLACE:  Courtroom 3
27

28

Hunton & Williams LLP

Belynda Reck (SBN 163561)
Hunton & Williams LLP
550 South Hope Street, Suite 2000
Los Angeles, CA 90071-2627
Tel: 213-532-2000
Fax: 213-532-2020
Email: breck@hunton.com


F. William Brownell (*Admitted Pro Hac Vice*)
Norman W. Fichthorn (*Admitted Pro Hac Vice*)
Allison D. Wood (*Admitted Pro Hac Vice*)
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
Tel: 202-955-1500
Fax: 202-778-2201
Email: bbrownell@hunton.com
        nfichthorn@hunton.com
        awood@hunton.com


Shawn Patrick Regan (*Admitted Pro Hac Vice*)
Hunton & Williams LLP
200 Park Avenue
New York, NY 10166-1036
Tel: 212-309-1000
Fax: 212-309-1100
Email: sregan@hunton.com

*Counsel for Defendants DTE Energy Company,
MidAmerican Energy Holdings Company, Pinnacle West
Capital Corporation, and Southern Company*

Richard K. Welsh (SBN 208825)
Scott Bertzyk (SBN 116449)
Felix Lebron (SBN 232984)
Kamran Salour (SBN 247983)
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404
Tel: 310-586-7700
Fax: 310-586-7800
Email: welshr@gtlaw.com
        bertzyks@gtlaw.com
        lebronf@gtlaw.com
        salourk@gtlaw.com

*Counsel for Defendant The AES Corporation*

Hunton & Williams LLP

[Proposed] Order Granting Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2)

**Case No.: CV-08-1138 SBA**

1    Samuel R. Miller (SBN 66871)
2    Paul L. Yanosy (SBN 233014)
     Sidley Austin LLP
3    555 California Street
     San Francisco, CA 94104
4    Tel: 415-772-1200
     Fax: 415-772-7400
5    Email: srmiller@sidley.com
                  pyanosy@sidley.com
6
7    David T. Buente, Jr. (*Admitted Pro Hac Vice*)
     Joseph R. Guerra (*Admitted Pro Hac Vice*)
8    Sidley Austin LLP
     1501 K Street, N.W.
9    Washington, D.C. 20005
     Tel: 202-736-8000
10   Fax: 202-736-8711
11   Email: dbuente@sidley.com
                  jguerra@sidley.com
12
     *Counsel for Defendants American Electric Power Company,*
13   *Inc., American Electric Power Service Corporation, and*
     *Duke Energy Corporation*
14

15   Jeffrey A. Lamken (SBN 154217)
16   Jeremy Levin (SBN 210577)
     Baker Botts LLP
17   The Warner
     1299 Pennsylvania Ave., N.W.
18   Washington, D.C. 20004-2400
     Tel: 202-639-7700
19   Fax: 202-639-7890
20   Email: jeffrey.lamken@bakerbotts.com
                  jeremy.levin@bakerbotts.com
21

22   *Counsel for Defendants Dynegy Holdings Inc., and Reliant*
23   *Energy, Inc.*

24

25

26

27

28

[Proposed] Order Granting Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2)
**Case No.: CV-08-1138 SBA**

Hunton & Williams LLP

Thomas A. Rector (SBN 199173)
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104
Tel: 415-626-3939
Fax: 415-875-5700
Email: tarector@jonesday.com

Thomas E. Fennell (*Admitted Pro Hac Vice*)
Michael L. Rice (*Admitted Pro Hac Vice*)
Jones Day
2727 N. Harwood Street
Dallas, TX 75201
Tel: 214-220-3939
Fax: 214-969-5100
Email: tefennell@jonesday.com
         mlrice@jonesday.com

Kevin P. Holewinski (*Admitted Pro Hac Vice*)
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Tel: 202-879-3939
Email: kpholewinski@jonesday.com

*Counsel for Defendant Xcel Energy Inc.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hunton & Williams LLP

1    This matter came before the Court upon the Motion of Defendants American Electric Power

2    Company, Inc., American Electric Power Service Corporation, DTE Energy Company, Duke Energy

3    Corporation, Dynegy Holdings Inc., MidAmerican Energy Holdings Company, Pinnacle West

4    Capital Corporation, Reliant Energy, Inc., Southern Company, The AES Corporation, and Xcel

5    Energy Inc. (collectively "Non-resident Utility Defendants" or "Defendants") to Dismiss Plaintiffs'

6

7    Complaint as against them for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2).

8    **I.    BACKGROUND**

9    Plaintiffs, the City of Kivalina and Native Village of Kivalina, are Alaska entities that claim

10   to have suffered injury to their real property in Alaska because of global warming and greenhouse

11   gas emissions. Plaintiffs allege that defendants' out-of-state greenhouse gas emissions "inevitably

12   merge[] with the accumulation of emissions in California and in the world," thereby "increas[ing]

13   the global atmospheric concentration of greenhouse gases and . . . contribut[ing] to global warming."

14

15   Compl. ¶ 10. Plaintiffs allege that elevated global temperatures have prevented sea ice from forming

16   a protective barrier around Kivalina, thereby leaving the village exposed to powerful coastal storms.

17   *Id.* ¶ 185. Plaintiffs claim those storms, as a result, have caused massive wind and wave erosion,

18   forcing them to relocate the entire village at a cost estimated between $95 million and $400 million.

19   *Id.* ¶¶ 1, 4.

20

21   Plaintiffs filed their Complaint on Feb. 26, 2008, asserting claims for public nuisance under

22   state and federal law, as well as claims for private nuisance, civil conspiracy and concert of action

23   under unspecified state law. The Parties agreed upon a briefing schedule whereby the Non-resident

24   Utility Defendants timely moved to dismiss the Complaint for lack of personal jurisdiction. The

25   Non-resident Utility Defendants established in their moving papers that none of them:

26        •    is incorporated in California;

27

28        •    has a principal place of business in California;

- 1 -

Hunton & Williams LLP

- owns or operates greenhouse gas-emitting facilities in California;

- maintains "substantial, continuous and systematic" contacts with California, such that they could be deemed to be doing business there; or

- exercises a pervasive degree of control over their subsidiaries' day-to-day operations, such that the Court may exercise jurisdiction over Defendants based on the California contacts of their subsidiaries under an agency or alter ego theory.

## II.    LEGAL STANDARD

Plaintiffs bear the burden of pleading facts which, if true, would be sufficient to establish that a court has personal jurisdiction over Defendants. *Data Disc, Inc. v. Systems Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). Where a motion challenges the facts alleged, "a court may consider evidence outside of the pleadings, including affidavits." *Tercica, Inc. v. Insmed Inc.*, 2006 WL 1626930, *8 (N.D. Cal. June 9, 2006) (Armstrong, J.). Unless Plaintiffs meet their burden of pleading facts sufficient to establish a *prima facie* case that this Court has personal jurisdiction over Defendants, their Complaint must be dismissed. *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) (where a district court decides a motion to dismiss for lack of personal jurisdiction based on materials submitted by the parties, court must apply a *prima facie* standard, unless it conducts an evidentiary hearing).

### A.    General Jurisdiction

General jurisdiction requires a showing that the defendants' contacts are substantial, continuous, and systematic and fairly can be described as extensive or wide-ranging. *Helicopteros Nacionales de Columbia v. Hall, S.A.*, 466 U.S. 408, 416-17 (1984); *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). The pleading standard for general jurisdiction "is 'fairly high,' and requires that the defendant's contacts be of the sort that approximate physical presence." *Bancroft & Masters*, 223 F.3d at 1086; *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 801 (9th Cir. 2004); *Coremetrics, Inc. v. Atomic Park.com, LLC*, 370 F.

Hunton & Williams LLP

1    Supp. 2d 1013, 1017 (N.D. Cal. 2005) ("This is an exacting standard, as it should be, because a

2    finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer

3    for any of its activities anywhere in the world.") (citation references omitted).

4        **B.    Specific Jurisdiction.**

5        If the defendant does not have substantial and systematic contacts with the forum sufficient

6    to establish general jurisdiction, a court must then determine whether specific jurisdiction exists over

7    the defendant.  Specific jurisdiction exists where the defendant has purposefully availed itself of

8    forum benefits, the controversy is related to or arises out of the defendant's contacts with the forum,

9    and the exercise of jurisdiction is reasonable.  *Glencore Grain Rotterdam B.V. v. Shivnath Rai*

10   *Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002); *Pavlovich v. Superior Court*, 29 Cal. 4th 262,

11   269 (2002).

12       **C.    Due Process**

13       Under either jurisdictional theory, a defendant must be shown to have sufficient minimum

14

15   contacts with the forum state "such that the maintenance of the suit does not offend traditional

16   notions of fair play and substantial justice" under the due process clause of the Fourteenth

17   Amendment.  *International Shoe v. Washington*, 326 U.S. 310, 316 (1945); *Data Disc*, 557 F.2d at

18   1287.  Such minimum contacts do not exist where the defendant's activities were such that it could

19
20   not reasonably anticipate being haled into court there.  *Burger King Corp. v. Rudzewicz*, 471 U.S.

21   462, 474 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

22

23   **III.    ANALYSIS**

24       **A.    General Jurisdiction**

25       Plaintiffs have failed to show that Defendants are subject to general jurisdiction in California,

26   based on Defendants' own direct contacts with the forum or based on the contacts of their

27   subsidiaries.  First, allegations concerning Defendants direct contacts with California are either false

28

- 3 -

Hunton & Williams LLP

1  — as demonstrated by the declarations submitted by Defendants and a plain, complete reading of

2  documents referred to, incorporated or clearly relied upon in Plaintiffs' Complaint — or are

3  insufficient as a matter of law to be deemed "substantial, continuous and systematic" as necessary to

4  justify the exercise of general jurisdiction.  Second, allegations regarding the California contacts of

5
6  Defendants' *subsidiaries* cannot be used to establish general jurisdiction over Defendants, because

7  Plaintiffs have failed to plead facts showing that Defendants have ignored the corporate separateness

8  between themselves and their subsidiaries such that the subsidiaries can be deemed an alter ego of

9  the parent or its mere agent. *Doe v. Unocal*, 248 F.3d 915, 925-26 (9th Cir. 2001); *Church of*

10  *Scientology v. Adams*, 584 F.2d 893, 897 (9th Cir. 1978).

11       Defendants have shown to be false Plaintiffs' allegations that Defendants either currently

12  own or operate or previously owned or operated greenhouse gas emitting power facilities in
13
14  California. *See* Declaration of Leith Mann, Assistant Secretary of The AES Corporation, at ¶¶ 3-8;

15  Declaration of Sandra K. Ennis, Corporate Secretary of DTE Energy Company, at ¶ 5; Declaration

16  of Richard G. Beach, Assistant Secretary of Duke Energy Corporation, at ¶ 5; Declaration of Amy E.

17  Jolley, Vice President - Tax, of Dynegy Holdings Inc. at ¶ 4.  Similarly, Plaintiffs have not pleaded

18  sufficient facts to show that Reliant does business in California. The Complaint references Reliant's
19
20  2006 Annual Report.  But that filing refers to the activities of the company's subsidiaries. *See*

21  Reliant Energy, Inc., 2006 Annual Report (Form 10-K) at F-14 (Feb. 28, 2007); *Parrino v. FHP Inc.*,

22  146 F.3d 699, 706 (9th Cir. 1998) (holding that a court ruling on a dispositive motion may consider

23  "a document the authenticity of which is not contested and upon which the plaintiff's complaint

24  necessarily relies," even if the complaint does not specifically cite to the document).  Where the

25  alleged facts purporting to establish a jurisdictional basis are demonstrably and incontrovertibly

26  false, the law is clear that the exercise of jurisdiction is not appropriate. *See Data Disc*, 557 F.2d at

27

28

Hunton & Williams LLP

1  1284 (court "may not assume the truth of allegations in a pleading which are contradicted by

2  affidavit").

3      The remainder of Plaintiffs' allegations about Defendants' direct contacts with California,

4  even if true, are insufficient to confer general jurisdiction because they are not  substantial,

5  continuous, and systematic such that they can fairly can be described as extensive or wide-ranging.

6

7  *Helicopteros Nacionales de Columbia v. Hall, S.A.*, 466 U.S. 408, 416-17 (1984); *Bancroft &*

8  *Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).  Plaintiffs plead four

9  separate categories of contacts, each of which is insufficient, alone or in combination with one

10  another:

11
12  (1)  Allegations that shares of certain Defendants' stock are held by California residents, and
     that those residents receive mailings and dividend checks related to such stock ownership, are
13  insufficient to establish general jurisdiction. *See Funk v. Limelight Media Group, Inc.*, 2006
     WL 2983058, *5 n.4 (W.D. Ky. Oct. 16, 2006) (rejecting plaintiff's argument that a
14  corporation is subject to personal jurisdiction in every state in which the corporation's
     shareholders reside);
15
16  (2) Pleading that certain Defendants have registered to do business in California or have
     appointed an agent to receive service of process does not establish general jurisdiction over
     those Defendants. *DVI v. Superior Court*, 104 Cal. App. 4th at 1080, 1095 (2002)
17  ("[D]esignation of an agent for service of process and qualification to do business in
     California alone are insufficient to permit general jurisdiction except for lawsuits arising out
18  of the foreign corporation's business conducted in the state.");

19  (3) Allegations that AEP Service and Duke engaged in price manipulation in California for
20  18 months almost seven years ago do not confer general jurisdiction. *DVI*, 104 Cal. App. 4th
     at 1100-01 (holding that the exercise of general jurisdiction is reasonable only "when the
21  defendant has substantial, continuous and systematic contacts with the forum at the time the
     complaint is served on that defendant");
22
23  (4) Plaintiffs' claims regarding AEP Service's alleged performance of contracts in California
     are insufficient to establish general jurisdiction. *Birzer v. Jockey's Guild, Inc.*, 444 F.
24  Supp.2d 1005, 1010 (C.D. Cal. 2006) ("The Ninth Circuit recognizes that merely contracting
     with a California resident or one licensed to do business in California is not sufficient to
25  support the exercise of general jurisdiction.").

26      Plaintiffs' remaining general jurisdiction allegations are based on the proposition that

27  Defendants should be held liable for their subsidiaries' various contacts with California.  *E.g.*,

28

[Proposed] Order Granting Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2)
**Case No.:  CV-08-1138 SBA**

Hunton & Williams LLP

1   Compl. ¶¶ 69, 76, 77, 83, 91 104, 105, 108, 113, 118.  Those allegations are insufficient to confer

2   general jurisdiction over Defendants, however, because Plaintiffs have not pled any facts showing

3   that Defendants' subsidiaries were agents or alter egos of their parent corporations.  A parent

4   company can be subject to personal jurisdiction under an alter ego theory based on the acts of a

5   subsidiary only where (1) there is "such a unity of interest and ownership . . . that the separate

6   personalities of the corporation and the shareholder do not in reality exist"; and (2) there would be

7

8   "an inequitable result if the acts in question are treated as those of the [subsidiary] corporation

9   alone." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000).  To impute

10  jurisdiction from a subsidiary to a parent under an agency theory, a plaintiff must plead facts

11  showing that the subsidiary performs services "sufficiently important to the foreign corporation that

12  if it did not have a representative to perform them, the corporation's own officials would undertake

13  to perform substantially similar services." *Doe,* 248 F.3d at 928; *see also Sonora Diamond*, 83 Cal.

14  App. 4th at 542 (applying the label "representative services doctrine" to the Ninth Circuit's agency

15  test).

16

17  Plaintiffs point to various alleged statements by Defendants concerning greenhouse gas

18  emissions by their subsidiaries as "evidence" that Defendants exercised undue control over their

19  subsidiaries.  But these allegations amount to nothing more than a description of the standard, and

20  appropriate, oversight inherent in any parent-subsidiary relationship and do not justify a finding of

21  agency or alter ego. *Doe*, 248 F.3d at 926 ("Appropriate parental involvement includes:  monitoring

22  of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions,

23  and articulation of general policies and procedures.").

24

25      **B.    Specific Jurisdiction**

26      Plaintiffs have not established that this Court may exercise specific jurisdiction over

27  Defendants because they have failed show that:  (1) Defendants committed an intentional act that

28

[Proposed] Order Granting Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2)
**Case No.: CV-08-1138 SBA**

Hunton & Williams LLP

1    was expressly aimed at California and that caused harm that Defendants knew was likely to be

2    suffered in California, *Yahoo! Inc. v. La Ligue Contre le Racisme et L'Antisemitisme*, 433 F.3d 1199,

3    1207 (9th Cir. 2006); (2) Defendants' out-of-state emission was the "but-for" cause of the injury to

4
     Plaintiffs' real property in Alaska, *Bancroft & Masters*, 223 F.3d at 1088; and (3) exercise of
5
     jurisdiction would be "reasonable." *Bancroft & Masters*, 223 F.3d at 1088 (listing seven factors
6
7    courts balance in the reasonableness inquiry).

8        On the express aiming point, Plaintiffs here are not California residents (Compl. ¶ 1) and

9    have not alleged that they suffered any injury in California.  Instead, Plaintiffs have sued for harm

10   alleged to have occurred to their real property in Alaska.  In the absence of some injury suffered in

11   the forum, Plaintiffs have not shown "express aiming" by Defendants. *See Teledyne, Inc. v. Kone*

12
     *Corp.*, 892 F.2d 1404, 1411 (9th Cir. 1989) (finding no express aiming where "[a]ll that [plaintiff]
13
14   has shown is that defendants, while in Finland, performed acts detrimental to a corporation in

15   Canada, and that this conduct may have had foreseeable effects in the United States").  Furthermore,

16   Plaintiffs have not alleged that Defendants committed a single act targeted anywhere in particular,

17   let alone one targeted at California. *See* Compl. ¶ 10 (alleging that Defendants' out-of-state

18   emissions "inevitably merge[] with the accumulation of emissions in California and in the world,"

19
     thereby "increas[ing] the *global atmospheric* concentration of greenhouse gases
20
21   and . . . contribut[ing] to *global* warming").  As these emissions were subject to atmospheric forces

22   beyond Defendants control, they were not "expressly aimed" at California (or any other forum). *See*

23   *Calder v. Jones*, 465 U.S. 783, 789 (1984) (distinguishing "mere untargeted" acts from conduct

24   expressly aimed at the forum state).

25       Plaintiffs failed to meet the second prong of the test for establishing specific jurisdiction

26   because they have failed to show they would not have suffered their injury but-for Defendants'

27   forum-related conduct.  The Complaint alleges only that Defendants' emissions outside of California

28

Hunton & Williams LLP

1  "mix[ed] in the atmosphere" and "merged with" other emissions from billions of sources around the

2  world and that the total mixture is alleged to have caused Plaintiffs' injury in Alaska. Compl. ¶¶

3  254, 10. Plaintiffs' vague and cursory allegations regarding Defendants' emissions outside of

4  California, which are a small fraction of overall human conduct allegedly responsible for climate

5
6  change, are insufficient as a matter of law to satisfy the "but for" causation test for forum-related

7  activity. *See Love v. The Mail on Sunday*, 2006 WL 4046170, *7 (C.D. Cal. July 14, 2006) (finding

8  no "but for" causation if cause of action would exist even in the absence of defendant's alleged

9  forum-related activities).

10      Finally, the Court finds that Plaintiffs failed to meet the third prong of the specific

11  jurisdiction test because it would be unreasonable to exercise jurisdiction over the Non-resident

12  Utility Defendants based on a review of the seven factors set out by the Ninth Circuit in *Bancroft*:

13

14          (1) The extent of the defendant's purposeful interjection into the forum
            state; (2) The burden on the defendant in defending in the forum; (3)
15          The extent of the conflict with the sovereignty of the defendant's state;
            (4) The forum state's interest in adjudicating the dispute; (5) The most
16          efficient judicial resolution of the controversy; (6) The importance of
            the forum to the plaintiff's interest in convenient and effective relief;
17          and (7) The existence of an alternative forum.

18  223 F.3d at 1088. Application of each of these factors demonstrates that Plaintiffs have not

19  established that this Court may exercise specific jurisdiction over Defendants in this action.

20
        **C.    Due Process/Stream of Commerce Jurisdiction**
21

22      Finally, Plaintiffs' theories of personal jurisdiction in this case are barred by the Due Process

23  Clause because exercising jurisdiction over the Non-resident Utility Defendants would be

24  unreasonable and violate fundamental notions of fair play and substantial justice. Plaintiffs assert

25  that Defendants are subject to jurisdiction in California; however, this "foreseeability-plus-injury"

26  notion of jurisdiction has been universally rejected by the United States Supreme Court, the Ninth

27  Circuit and California appellate courts. *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102

28

Hunton & Williams LLP

- 8 -

1   (1987); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985); *World-Wide Volkswagen Corp. v.*

2   *Woodson*, 444 U.S. 286 (1980); *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 271 (9th

3   Cir. 1995); *Carretti v. Italpast*, 101 Cal. App.4th 1236 (2002).

4

5          Plaintiffs' allegation that Defendants emit greenhouse gases into the global commons of the

6   atmosphere and that those emissions disperse around the globe by atmospheric forces beyond

7   Defendants' control is *not* an allegation of "purposeful direction." Rather, it is an allegation about

8   the nature of greenhouse gases and Earth's atmospheric forces, an argument that is, for all relevant

9   purposes, indistinguishable from the "stream of commerce" jurisdiction argument made

10  unsuccessfully by the plaintiff in *World-Wide Volkswagen*. As the Supreme Court explained in

11  *World-Wide Volkswagen*, "if foreseeability alone were the criterion . . . [e]very seller of chattels

12  would in effect appoint the chattel his agent for service of process [and its] amenability to suit would

13  travel with the chattel." 444 U.S. at 296. In sum, Plaintiffs' theory of specific jurisdiction in this

14  case runs contrary to fundamental notions of due process as set forth by the Supreme Court and,

15  therefore, fails as a matter of law.

16

17  **IV.    CONCLUSION**

18         For the foregoing reasons, Defendants' Motion to Dismiss for Lack of Personal Jurisdiction

19  pursuant to Fed. R. Civ. P. 12(b)(2) is hereby GRANTED. Plaintiffs' Complaint is dismissed in its

20  entirety as to those Defendants.

21

22

23  IT IS SO ORDERED.

24

25  DATED: _____

26                                              _____
                                                The Hon. Saundra B. Armstrong
27                                              UNITED STATES DISTRICT JUDGE

28

*Hunton & Williams LLP*

[Proposed] Order Granting Non-resident Util. Defts.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2)
**Case No.: CV-08-1138 SBA**

1    Belynda B. Reck (State Bar No. 163561)
     HUNTON & WILLIAMS LLP
2    550 South Hope Street, Suite 2000
     Los Angeles, California 90071-2627
3    Tel: (213) 532-2000
     Fax: (213) 532-2020
4    E-mail: breck@hunton.com
5
     *Counsel for Defendants DTE Energy Company,*
6    *MidAmerican Energy Holdings Company,*
     *Pinnacle West Capital Corporation,*
7    *and Southern Company*
8
9                    UNITED STATES DISTRICT COURT
10                  NORTHERN DISTRICT OF CALIFORNIA
11                         OAKLAND DIVISION
12
13   NATIVE VILLAGE OF KIVALINA and        CASE NO.: CV-08-1138 SBA
14   CITY OF KIVALINA
15          Plaintiffs,
16      v.                                 **CERTIFICATE OF SERVICE**
17   EXXON MOBIL CORPORATION, et al.,
18          Defendants.                    DATE: TBD (per Order, entered June 4,
                                           2008; Dkt. No. 126, ¶10)
19                                         TIME: 1:00 p.m.
                                           JUDGE: Honorable Saundra B. Armstrong
20
21
22
23
24
25
26
27
28

Hunton & Williams LLP

1

## CERTIFICATE OF SERVICE

2

Native Village of Kivalina, et al v. Exxon Mobil Corporation, et al.
U.S.D.C. - Northern District of California
Case No. CV-08-1138-SBA

3

4

5

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

6

    I am employed in the County of Los Angeles, State of California.  I am over the age of 18

7

years and not a party to this action.  My business address is 550 South Hope Street, Suite 2000,

8

Los Angeles, California 90071.

9

10

    On June 30, 2008, I served the foregoing document(s) described as **SEE ATTACHED**

11

**RIDER "A"** on the interested parties in this action:

12

13

                        SEE ATTACHED RIDERS "B AND "C

14

15

16

  ☒  **By MAIL:**  by placing true and correct copy(ies) thereof in an envelope addressed to

17

the attorney(s) of record, addressed as stated above.

18

  ☒  **By ECF:**  by filing said documents with the Clerk of Court using the CM/EMF system,

19

which sent notification of that filing to the persons listed above.

20

21

    I declare that I am employed in the office of a member of the bar of this court at whose

22

23

direction the service was made.

24

    Executed on June 30, 2008, Los Angeles, California.

25

26

27

                                 _____
                            HILDA A. ESCOBAR

28

Hunton & Williams LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

1

# R I D E R "A"

    **(1)**     NOTICE OF MOTION AND MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2) ON BEHALF OF AMERICAN ELECTRIC POWER COMPANY, INC., AMERICAN ELECTRIC POWER SERVICE CORPORATION, DTE ENERGY COMPANY, DUKE ENERGY CORPORATION, DYNEGY HOLDINGS INC., MIDAMERICAN ENERGY HOLDINGS COMPANY, PINNACLE WEST CAPITAL CORPORATION, RELIANT ENERGY, INC., SOUTHERN COMPANY, THE AES CORPORATION, AND XCEL ENERGY INC.

    **(2)**     DECLARATION OF SANDRA K. ENNIS ON BEHALF OF DTE ENERGY COMPANY CORPORATION IN SUPPORT OF NON-RESIDENT UTILITY DEFENDANTS MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2) AND ACCOMPANYING MEMORANDUM OF POINTS AND AUTHORITIES;

    **(3)**     DECLARATION OF SHIRLEY A. BAUM ON BEHALF OF PINNACLE WEST CAPITAL CORPORATION IN SUPPORT OF NON-RESIDENT UTILITY DEFENDANTS MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2) AND ACCOMPANYING MEMORANDUM OF POINTS AND AUTHORITIES;

    **(4)**     DECLARATION OF AMY E. JOLLEY ON BEHALF OF DYNEGY HOLDINGS INC. IN SUPPORT OF NON-RESIDENT UTILITY DEFENDANTS MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2) AND ACCOMPANYING MEMORANDUM OF POINTS AND AUTHORITIES;

    **(5)**     DECLARATION OF MICHAEL L. JINES ON BEHALF OF RELIANT ENERGY , INC. IN SUPPORT OF NON-RESIDENT UTILITY DEFENDANTS MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2) AND ACCOMPANYING MEMORANDUM OF POINTS AND AUTHORITIES;

    **(6)**     DECLARATION OF RICHARD G. BEACH ON BEHALF OF DUKE ENERGY CORPORATION IN SUPPORT OF NON-RESIDENT UTILITY DEFENDANTS MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2) AND ACCOMPANYING MEMORANDUM OF POINTS AND AUTHORITIES;

    **(7)**     DECLARATION OF LEITH MANN ON BEHALF OF AES CORPORATION IN SUPPORT OF NON-RESIDENT UTILITY DEFENDANTS MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2) AND ACCOMPANYING MEMORANDUM OF POINTS AND AUTHORITIES; and

    **(8)**     APPENDIX OF UNPUBLISHED AUTHORITIES IN SUPPORT OF THE NON-RESIDENT UTILITY DEFENDANTS' MOTION TO TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2)

Hunton & Williams LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

Hunton & Williams LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        (9)    (PROPOSED) ORDER GRANTING MOTION DISMISS THE COMPLAINT
FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2) ON
BEHALF OF AMERICAN ELECTRIC POWER COMPANY, INC., AMERICAN ELECTRIC
POWER SERVICE CORPORATION, DTE ENERGY COMPANY, DUKE ENERGY
CORPORATION, DYNEGY HOLDINGS INC., MIDAMERICAN ENERGY HOLDINGS
COMPANY, PINNACLE WEST CAPITAL CORPORATION, RELIANT ENERGY, INC.,
SOUTHERN COMPANY, THE AES CORPORATION, AND XCEL ENERGY INC.

# RIDER "B"
## (MANUAL NOTICE)

| | |
|---|---|
| Jeffrey Bossert Clark<br>**Kirkland & Ellis, LLP**<br>655 Fifteenth Street N.W.<br>Washington, DC 20005-5793 | Philip H. Curtis<br>**Arnold & Porter, LLP.**<br>399 Park Avenue<br>New York, NY 10022 |
| Stuart A.C. Drake<br>**Kirkland & Ellis LLP**<br>655 Fifteenth Street, N.W.<br>Washington, DC 20005-5793 | Susan E. Engel<br>**Kirkland & Ellis LLP**<br>655 Fifteenth Street, N.W.<br>Washington, DC 20005-5793 |
| Susan E. Engel<br>**Kirkland & Ellis LLP**<br>655 Fifteenth Street, N.W.<br>Washington, DC 20005-5793 | Thomas E. Fennell<br>**Jones Day**<br>2727 N. Harwood Street<br>Dallas, TX 75201 |
| Michael B. Gerrard<br>**Arnold & Porter, LLP.**<br>399 Park Avenue<br>New York, NY 10022-4690 | H. Lee Godfrey<br>**Susman Godfrey LLP**<br>1000 Louisiana Street<br>Suite 5100<br>Houston, TX 77002-5096 |
| Drew D. Hansen<br>**Susman Godfrey L.L.P.**<br>1201 Third Avenue<br>Suite 3800<br>Seattle, WA 98101 | Kevin Patrick Holewinski<br>**Jones Day**<br>51 Louisiana Avenue, N.W.<br>Washington, DC 20001 |
| Benjamin S. Lippard<br>**Vinson & Elkins, LLP**<br>1455 Pennsylvania Ave., N.W.<br>Washington, DC 20004 | Eric J. Mayer<br>**Susman Godfrey L.L.P.**<br>1000 Louisiana Street<br>Suite 5100<br>Houston, TX 77002 |
| Robert E. Meadows<br>**King & Spalding LLP**<br>1100 Louisiana Street<br>Suite 4000<br>Houston, TX 77002 | James A. O'Brien<br>**Leeger Weiss LLP**<br>One William Street<br>New York, NY 10004 |

| Ronald L. Olson<br>**Munger Tolles & Olson**<br>355 So Grand Ave Ste 3500<br>Los Angeles, CA 90071-1560 | Dennis J. Reich<br>**Reich & Binstock, LLP**<br>4265 San Felipe Blvd., Suite 1000<br>Houston, TX 77027 |
|---|---|
| Tracie J. Renfroe<br>**King & Spalding LLP**<br>1100 Louisiana Street<br>Suite 4000<br>Houston, TX 77002 | Michael L. Rice<br>**Jones Day**<br>2727 N. Harwood St.<br>Dallas, TX 75201 |
| Kathleen Taylor Sooy<br>**Crowell & Moring, LLP.**<br>1001 Pennsylvania Ave., N.W.<br>Washington, DC 20004 | Scott L. Winkelman<br>**Crowell & Moring, LLP**<br>1001 Pennsylvania Ave., N.W.<br>Washington, DC 20004-2595 |

Hunton & Williams LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

5

# RIDER "C"
## (ELECTRONIC MAIL NOTICE)

Hunton & Williams LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

| | |
|---|---|
| **David T. Buente , Jr**<br>dbuente@sidley.com | **Andrew Brian Clubok**<br>aclubok@kirkland.com |
| **Luke Cole**<br>luke@igc.org,colleenEKC@aol.com | **Daniel Paul Collins**<br>Daniel.Collins@mto.com |
| **John Frederic Daum**<br>jdaum@omm.com | **Elizabeth L. Deeley**<br>edeeley@kirkland.com,<br>sfarley@kirkland.com,<br>alevin@kirkland.com,<br>adelapena@kirkland.com |
| **Norm W. Fichthorn**<br>nfichthorn@hunton.com | **Kevin Allen Gaynor**<br>KGaynor@velaw.com |
| **Joseph R Guerra**<br>jguerra@sidley.com | **Laura Ann Guillen**<br>lguillen@thelen.com |
| **Matthew T. Heartney**<br>matthew_heartney@aporter.com | **Reed R. Kathrein**<br>reed@hbsslaw.com,<br>nancyq@hbsslaw.com,<br>sf_filings@hbsslaw.com |
| **Lisa Kobialka**<br>lkobialka@kslaw.com,<br>mhamilton@kslaw.com,<br> aayala-robles@kslaw.com,<br>Pshults@kslaw.com,<br>Trenfroe@kslaw.com,<br>jlmarsh@kslaw.com,<br>rmeadows@kslaw.com,<br>SD'Amico@kslaw.com | **Benjamin Krass**<br>bkrass@pawalaw.com |
| **Jeffrey Alan Lamken**<br>Jeff.Lamken@bakerbotts.com,<br>robert.kry@bakerbotts.com,<br>alex.walsh@bakerbotts.com | **Jonathan Lawrence Marsh**<br>jlmarsh@kslaw.com |
| **Gary E. Mason**<br>gmason@masonlawdc.com,<br>mdicocco@masonlawdc.com,<br>nmigliaccio@masonlawdc.com | **Heather Kendall Miller**<br>kendall@narf.org,athomas@narf.org |
| **Samuel Ray Miller**<br>srmiller@sidley.com | **Brent Joseph Newell**<br>bjnewell@igc.org |
| **Casey M. Nokes**<br>cnokes@kirkland.com, | **Matthew F. Pawa** |

Hunton & Williams LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

| | |
|---|---|
| sfarley@kirkland.com,<br>mdiaz@kirkland.com,<br>alevin@kirkland.com | mp@pawalaw.com |
| **Robert Benard Pringle**<br>rbpringle@thelen.com | **Thomas Ailbe Rector**<br>tarector@jonesday.com,<br>mlandsborough@jonesday.com,<br>cjacobs@jonesday.com,<br>obrien@jonesday.com |
| **Steven Paul Rice**<br>srice@crowell.com,<br>sfortelny@crowell.com | **Mark Richard Rielly**<br>mrielly@pawalaw.com |
| **Tracy A. Roman**<br>troman@crowell.com | **Jerome Cary Roth**<br>Jerome.Roth@mto.com,<br>susan.ahmadi@mto.com |
| **Christopher A. Seeger**<br>cseeger@seegerweiss.com,<br>Dmora@seegerweiss.com,<br>jgrand@seegerweiss.com | **Stephen D. Susman**<br>ssusman@susmangodfrey.com,<br>ddefranco@susmangodfrey.com |
| **Stephen A. Weiss**<br>sweiss@seegerweiss.com | |

1   GREENBERG TRAURIG, LLP
    Richard K. Welsh (SBN 208825) (welshk@gtlaw.com)
2   Scott D. Bertzyk (SBN 116449) (bertzyks@gtlaw.com)
    Felix Lebron (SBN 232984) (lebronf@gtlaw.com)
3   Kamran Salour (SBN 247983) (salourk@gtlaw.com)
    2540 Colorado Avenue, Suite 400E
4   Santa Monica, California 90404
    Telephone: (310) 586-7700
5   Facsimile: (310) 586-7800

6   Attorneys for Defendant,
    THE AES CORPORATION

7

8

9

10                  UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                         OAKLAND DIVISION

13  NATIVE VILLAGE OF KIVALINA, et al.,        CASE NO.  4:08-cv-01138 SBA

14              Plaintiffs,                     Judge: Hon. Saundra Armstrong

15      v.                                      **DECLARATION OF LEITH MANN ON
                                                BEHALF OF THE AES CORPORATION
16  EXXON MOBIL CORPORATION, et al.,            IN SUPPORT OF NON-RESIDENT
                                                UTILITY DEFENDANTS' MOTION TO
17              Defendants.                      DISMISS THE COMPLAINT FOR LACK
                                                OF PERSONAL JURISDICTION
18                                              PURSUANT TO FED. R. CIV. P. 12(b)(2)
                                                AND ACCOMPANYING MEMORANDUM
19                                              OF POINTS AND AUTHORITIES**

20                                              DATE:   TBD (per Order, entered June 4,
                                                        2008; Dkt. No. 126, ¶ 10)
21                                              TIME:   1:00 p.m.
                                                PLACE:  Courtroom 3
22

23

24

25

26

27

28
    ─────────────────────────────────────────────────────────────────
    DECLARATION OF LEITH MANN ON BEHALF OF THE AES CORPORATION IN SUPPORT OF NON-
    RESIDENT UTILITY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL
    JURISDICTION

I, LEITH MANN, do hereby state and declare as follows:

1.      I am the Assistant Secretary of The AES Corporation ("AES Corp."), a defendant in this lawsuit.   In my role as Assistant Secretary, I am familiar with AES Corp.'s business operations, including the relationship between AES Corp. and AES Corp.'s California subsidiaries.  I make this declaration based on my personal knowledge of the facts herein stated and/or the review of records prepared and maintained by AES Corp. in the ordinary course of business, and, if sworn as a witness, I could and would testify competently thereto.

2.      AES Corp. is a Delaware Corporation with its principal place of business in Arlington, Virginia.

3.      AES Corp. does not own or operate any electricity producing facilities in California.

4.      AES Corp. is a holding company that indirectly holds interests in other companies that own and operate electricity producing facilities, including the following four entities:

5.      AES Alamitos, LLC owns and operates an electricity producing facility in Alamitos, California.

6.      AES Huntington Beach, LLC owns and operates an electricity producing facility in Huntington Beach, California.

7.      AES Redondo Beach, LLC owns and operates an electricity producing facility in Redondo Beach, California.

8.      AES Placerita, Inc. owns an electricity producing facility in Newhall, California, which is located north of Los Angeles (and is no longer in operation).

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was executed this 27th day of June, 2008, in Arlington, Virginia.

_Leith Mann_
_____
LEITH MANN

---

DECL. OF LEITH MANN ON BEHALF OF THE AES CORPORATION IN SUPPORT OF NON-RESIDENT UTILITY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION