1   RONALD L. OLSON (SBN 44597)
    Ronald.Olson@mto.com
2   DANIEL P. COLLINS (SBN 139164)
    Daniel.Collins@mto.com
3   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue, 35th Floor
4   Los Angeles, CA  90071-1560
    Telephone:    (213) 683-9100
5   Facsimile:    (213) 687-3702

6   JEROME C. ROTH (SBN 159483)
    Jerome.Roth@mto.com
7   MUNGER, TOLLES & OLSON LLP
    560 Mission Street
8   San Francisco, CA  94105-2907
    Telephone:    (415) 512-4000
9   Facsimile:    (415) 512-4077

    Attorneys for Defendant
10  SHELL OIL COMPANY

11  [Counsel Listing Continued on Next Page]

12                  UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14                        OAKLAND DIVISION

15  NATIVE VILLAGE OF KIVALINA and CITY        CASE NO.  C 08-01138 SBA
    OF KIVALINA,
16                                              **STATEMENT OF RECENT
                    Plaintiffs,                 DECISIONS**
17
           vs.
18
    EXXON MOBIL CORPORATION; BP P.L.C.;
19  BP AMERICA, INC.; BP PRODUCTS NORTH
    AMERICA, INC.; CHEVRON CORPORATION;
    CHEVRON U.S.A., INC.; CONOCOPHILLIPS
20  COMPANY; ROYAL DUTCH SHELL PLC;
    SHELL OIL COMPANY; PEABODY ENERGY
21  CORPORATION; THE AES CORPORATION;
    AMERICAN ELECTRIC POWER COMPANY,
22  INC.; AMERICAN ELECTRIC POWER
    SERVICES CORPORATION; DTE ENERGY
23  COMPANY; DUKE ENERGY CORPORATION;
    DYNEGY HOLDINGS, INC.; EDISON
24  INTERNATIONAL; MIDAMERICAN ENERGY
    HOLDINGS COMPANY; MIRANT
25  CORPORATION; NRG ENERGY; PINNACLE
    WET CAPITAL CORPORATION; RELIANT
26  ENERGY, INC.; THE SOUTHERN COMPANY;
    AND XCEL ENERGY, INC.,
27                  Defendants.

28

JOHN F. DAUM (SBN 52313)
jdaum@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6111
Facsimile: (213) 430-6407

JONATHAN D. HACKER (*Pro hac vice pending*)
jhacker@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

Attorneys for Defendant
EXXON MOBIL CORPORATION

ROBERT MEADOWS (*Pro hac vice*)
rmeadows@kslaw.com
TRACIE J. RENFROE (*Pro hac vice*)
trenfroe@kslaw.com
JONATHAN L. MARSH (*Pro hac vice*)
jlmarsh@kslaw.com
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, TX 77002-5213
Telephone:    (713) 751-3200
Facsimile:    (713) 751-3290

LISA KOBIALKA (SBN 191404)
lkobialka@kslaw.com
KING & SPALDING LLP
1000 Bridge Parkway, Suite 100
Redwood City, CA 94065
Telephone:    (650) 590-0700
Facsimile:    (650) 590-1900

Attorneys for Defendants
CHEVRON CORPORATION and
CHEVRON U.S.A. INC.

STUART A. C. DRAKE (*Pro hac vice*)
sdrake@kirkland.com
ANDREW B. CLUBOK (*Pro hac vice*)
aclubok@kirkland.com
SUSAN E. ENGEL (*Pro hac vice*)
seengel@kirkland.com
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5173
Facsimile: (202) 879-5200

ELIZABETH DEELEY (SBN 230798)
edeeley@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1861
Facsimile: (415) 439-1500

Attorneys for CONOCOPHILLIPS COMPANY

MATTHEW HEARTNEY (SBN 123516)
Matthew.Heartney@aporter.com
ARNOLD & PORTER LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4150
Facsimile: (213) 243-4199

PHILIP H. CURTIS (*Pro hac vice*)
Philip.Curtis@aporter.com
MICHAEL B. GERRARD (*Pro hac vice*)
Michael.Gerrard@ aporter.com
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
Telephone: (212) 715-1000
Facsimile: (212) 715-1399

Attorneys for BP AMERICA INC., AND
BP PRODUCTS NORTH AMERICA INC.

1    Pursuant to Civil Local Rule 7-3(d), Defendants Shell Oil Company, Exxon Mobil

2  Corporation, Chevron Corporation, Chevron U.S.A. Inc., ConocoPhillips Company, BP America

3  Inc., and BP Products North America Inc. ("Oil Company Defendants" or "Defendants")

4  respectfully submit the attached recent decisions in *Ashcroft v. Iqbal*, 556 U.S. __, 2009 WL

5  1361536 (U.S. May 18, 2009) (copy attached as Exhibit A), and *Center for Biological Diversity*

6  *v. U.S. Dept. of the Interior*, ___ F.3d ___, 2009 WL 1025375 (D.C. Cir. Apr. 17, 2009) (copy

7  attached as Exhibit B).

8    In *Ashcroft v. Iqbal*, 2009 WL 1361536 at *12-*17, the Supreme Court addressed the

9  proper construction of Fed. R. Civ. P. 8's pleading requirements, particularly in light of its prior

10  decision in *Bell Atlantic Co. v. Twombly*, 550 U.S. 544 (2007).  This discussion is pertinent to

11  Defendants' argument that Plaintiffs failed to plead the "fair traceability" required by Article III

12  in conformity with the requirements of Rule 8, as construed in *Twombly*.  This argument, and

13  Plaintiffs' response to it, is addressed at pages 33-34 of Defendants' Motion to Dismiss Plaintiffs'

14  Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) ("12(b)(1) Motion"); pages 96-97 of Plaintiffs'

15  Consolidated Memorandum of Points and Authorities in Opposition to Defendants' Motions to

16  Dismiss ("Consolidated Opposition"); and by Defendants on pages 1-2 of Defendants' Reply

17  Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint Pursuant to

18  Fed. R. Civ. P. 12(b)(1) ("12(b)(1) Reply").

19    *Iqbal* is also relevant to Defendants' additional argument that Plaintiffs failed adequately

20  to allege sufficient facts to state a claim *on the merits* under Rule 8, as construed in *Twombly*.

21  The parties addressed Rule 8's standards, in light of *Twombly*, at pages 3-4 of Defendants'

22  Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(6); pages 16-17 of

23  Plaintiffs' Consolidated Opposition; and page 10 of Defendants' Reply Memorandum in Support

24  of Defendants' Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(6).

25    In *Center for Biological Diversity*, the D.C. Circuit held that the petitioners lacked Article

26  III standing to raise a non-procedural challenge to certain actions of the Interior Department

27  because, *inter alia*, Petitioners "rely on too tenuous a causal link between their allegations of

28  climate change and Interior's action" and because "Petitioners  rely on … speculation" about the

1  actions of third parties not before the Court. *Id*. at *8.  The D.C. Circuit's Article III standing

2  analysis is relevant to the arguments made by Defendants on pages 31-39 of their 12(b)(1)

3  Motion; by Plaintiffs on pages 97-106 of their Consolidated Opposition; and by Defendants on

4  pages 15-22 of their 12(b)(1) Reply.  The D.C. Circuit's opinion also addressed the applicability

5  the "limited holding" of *Massachusetts v. EPA*, 549 U.S. 497 (2007), *see Center for Biological*

6  *Diversity*, 2009 WL 1025375 at *6, and that subject is addressed at page 36 of Defendants'

7  12(b)(1) Motion; pages 106-109 of Plaintiffs' Consolidated Opposition; and pages 16-19 and 22-

8  24 of Defendants' 12(b)(1) Reply.

9       Dated:  May 18, 2009       Respectfully Submitted,

10  MUNGER, TOLLES & OLSON LLP       O'MELVENY & MYERS LLP

11      By:    */s/ Daniel P. Collins*       By:    */s/ John F. Daum*

12             Daniel P. Collins               John F. Daum

Attorneys for Defendant         Attorneys for Defendant

13  SHELL OIL COMPANY          EXXONMOBIL CORPORATION

14

15  KING & SPALDING LLP        KIRKLAND & ELLIS LLP

16      By:    */s/ Tracie J. Renfroe*       By:    */s/ Andrew B. Clubok*

           Tracie J. Renfroe             Andrew B. Clubok

17  Attorneys for Defendants        Attorneys for Defendant

CHEVRON CORPORATION and CHEVRON  CONOCOPHILLIPS COMPANY

18  U.S.A. INC.

19  ARNOLD & PORTER LLP

20      By:    */s/ Matthew Heartney*

           Matthew Heartney

21  Attorneys for Defendants

BP AMERICA, INC., AND BP PRODUCTS

22  NORTH AMERICA, INC.

23

24

25

26

27

28

OIL CO. DEFTS.' STATEMENT OF RECENT DECISIONS—C-08-1138 SBA

1     **<u>DECLARATION PURSUANT TO GENERAL ORDER 45, SECTION X</u>**

2         I, Daniel P. Collins, declare and attest, pursuant to this Court's General Order 45, section

3 X, subparagraph B, that I am an ECF User and the filer of this document and that concurrence in

4 the filing of this document has been obtained from each of the other signatories (in addition to

5 myself) shown on page 2 of this document.  I further declare and attest, pursuant to that same

6 subparagraph of General Order 45, that I will maintain records to support this concurrence for

7 subsequent production for the court if so ordered or for inspection upon request by a party until

8 one year after final resolution of the action (including appeal, if any).

9         I declare, under penalty of perjury under the laws of the United States of America, that the

10 foregoing is true and correct.

11 Dated May 18, 2009

12                              *<u>/s/ Daniel P. Collins</u>*
                              Daniel P. Collins

# EXHIBIT A

--- S.Ct. ----                                                                                              Page 1

--- S.Ct. ----, 2009 WL 1361536 (U.S.)

**(Cite as: 2009 WL 1361536 (U.S.))**

Only the Westlaw citation is currently available.

Supreme Court of the United States
John D. ASHCROFT, Former Attorney General, et
al., Petitioners,
v.
Javaid IQBAL et al.
**No. 07-1015.**

Argued Dec. 10, 2008.
Decided May 18, 2009.

*Syllabus*FN*

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*1** Following the September 11, 2001, terrorist attacks, respondent Iqbal, a Pakistani Muslim, was arrested on criminal charges and detained by federal officials under restrictive conditions. Iqbal filed a *Bivens* action against numerous federal officials, including petitioner Ashcroft, the former Attorney General, and petitioner Mueller, the Director of the Federal Bureau of Investigation (FBI). See *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619. The complaint alleged, *inter alia,* that petitioners designated Iqbal a person "of high interest" on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments; that the FBI, under Mueller's direction, arrested and detained thousands of Arab Muslim men as part of its September-11th investigation; that petitioners knew of, condoned, and willfully and maliciously agreed to subject Iqbal to harsh conditions of confinement as a matter of policy, solely on account of the prohibited factors and for no legitimate penological interest; and that Ashcroft was the policy's "principal architect" and Mueller was "instrumental" in its adop-

tion and execution. After the District Court denied petitioners' motion to dismiss on qualified-immunity grounds, they invoked the collateral order doctrine to file an interlocutory appeal in the Second Circuit. Affirming, that court assumed without discussion that it had jurisdiction and focused on the standard set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, for evaluating whether a complaint is sufficient to survive a motion to dismiss. Concluding that *Twombly*'s "flexible plausibility standard" obliging a pleader to amplify a claim with factual allegations where necessary to render it plausible was inapplicable in the context of petitioners' appeal, the court held that Iqbal's complaint was adequate to allege petitioners' personal involvement in discriminatory decisions which, if true, violated clearly established constitutional law.

*Held:*

1. The Second Circuit had subject-matter jurisdiction to affirm the District Court's order denying petitioners' motion to dismiss. Pp. ---- - ----.

(a) Denial of a qualified-immunity claim can fall within the narrow class of prejudgment orders reviewable under the collateral-order doctrine so long as the order "turns on an issue of law."*Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411. The doctrine's applicability in this context is well established; an order rejecting qualified immunity at the motion-to-dismiss stage is a "final decision" under 28 U.S.C. § 1291, which vests courts of appeals with "jurisdiction of appeals from all final decisions of the district courts."*Behrens v. Pelletier,* 516 U.S. 299, 307, 116 S.Ct. 834, 133 L.Ed.2d 773. Pp. ---- - ----.

(b) Under these principles, the Court of Appeals had, and this Court has, jurisdiction over the District Court's order. Because the order turned on an issue of law and rejected the qualified-immunity defense, it was a final decision "subject to immedi-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ate appeal." *Behrens, supra,* at 307.Pp. ---- - ----.

**\*2** 2. Iqbal's complaint fails to plead sufficient facts to state a claim for purposeful and unlawful discrimination. Pp. ---- - ----.

(a) This Court assumes, without deciding, that Iqbal's First Amendment claim is actionable in a *Bivens* action, see *Hartman v. Moore,* 547 U.S. 250, 254, n. 2, 126 S.Ct. 1695, 164 L.Ed.2d 441. Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, see, *e.g., Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611, the plaintiff in a suit such as the present one must plead that each Government-official defendant, through his own individual actions, has violated the Constitution. Purposeful discrimination requires more than "intent as volition or intent as awareness of consequences"; it involves a decisionmaker's undertaking a course of action " 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group."*Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870. Iqbal must plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason, but for the purpose of discriminating on account of race, religion, or national origin. Pp. ---- - ----.

(b) Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief.""[D]etailed factual allegations" are not required, *Twombly,* 550 U.S., at 555, but the Rule does call for sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face,"*id.,* at 570.A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556.Two working principles underlie *Twombly.*First, the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements. *Id.,* at 555.Second, determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense. *Id.,* at 556.A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Pp. ---- - ----.

(c) Iqbal's pleadings do not comply with Rule 8 under *Twombly.*Several of his allegations-that petitioners agreed to subject him to harsh conditions as a matter of policy, solely on account of discriminatory factors and for no legitimate penological interest; that Ashcroft was that policy's "principal architect"; and that Mueller was "instrumental" in its adoption and execution-are conclusory and not entitled to be assumed true. Moreover, the factual allegations that the FBI, under Mueller, arrested and detained thousands of Arab Muslim men, and that he and Ashcroft approved the detention policy, do not plausibly suggest that petitioners purposefully discriminated on prohibited grounds. Given that the September 11 attacks were perpetrated by Arab Muslims, it is not surprising that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the policy's purpose was to target neither Arabs nor Muslims. Even if the complaint's well-pleaded facts gave rise to a plausible inference that Iqbal's arrest was the result of unconstitutional discrimination, that inference alone would not entitle him to relief: His claims against petitioners rest solely on their ostensible policy of holding detainees categorized as "of high interest," but the complaint does not contain facts plausibly showing that their policy was based on discriminatory factors. Pp. ---- - ----.

**\*3** (d) Three of Iqbal's arguments are rejected. Pp. ---- - ----.

(i) His claim that *Twombly* should be limited to its antitrust context is not supported by that case or the Federal Rules. Because *Twombly* interpreted and applied Rule 8, which in turn governs the pleading standard "in all civil actions," Rule 1, the case applies to antitrust and discrimination suits alike, see 550 U.S., at 555-556, and n. 14. P. ----.

(ii) Rule 8's pleading requirements need not be relaxed based on the Second Circuit's instruction that the District Court cabin discovery to preserve petitioners' qualified-immunity defense in anticipation of a summary judgment motion. The question presented by a motion to dismiss for insufficient pleadings does not turn on the controls placed on the discovery process. *Twombly, supra,* at 559. And because Iqbal's complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise. Pp. ---- - ----.

(iii) Rule 9(b)-which requires particularity when pleading "fraud or mistake" but allows "other conditions of a person's mind [to] be alleged generally"-does not require courts to credit a complaint's conclusory statements without reference to its factual context. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade Rule 8's less rigid, though still operative, strictures. Pp. ---- - ----.

(e) The Second Circuit should decide in the first instance whether to remand to the District Court to allow Iqbal to seek leave to amend his deficient complaint. P. ----.

**\*4** 490 F.3d 143, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, THOMAS, and ALITO, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined. BREYER,

J., filed a dissenting opinion.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Gregory G. Garre, Solicitor General, Washington, DC, for Petitioners.

Alexander A. Reinert, for Respondents.

Lauren J. Resnick, Fernando A. Bohorquez, Jr., Baker & Hostetler LLP, New York, NY, Thomas D. WarrenKarl Fanter, Baker & Hostetler LLP, Cleveland, OH, for Michael Rolince.

Leslie R. Caldwell, Morgan, Lewis & Bockius LLP, New York, NY, Brett M. Schuman, Morgan, Lewis & Bockius LLP, San Francisco, CA, for Kenneth Maxwell.

Michael L. Martinez, David E. Bell, Matthew F. Scarlato, Crowell & Moring LLP, Washington, DC, for Respondent Dennis Hasty.

David J. Ball, Rima J. Oken, Jennifer Brace, Etai Lahav, Well, Gotshal & Manges LLP, New York, New York, Alexander A. Reinert, Joan M. Magoolaghan, Elizabeth L. Koob, Koob & Magoolaghan, Yonkers, New York, for Respondent Javaid Iqbal.

Gregory G. Garre, Acting Solicitor General, Gregory G. Katsas, Assistant Attorney General, Jonathan F. Cohn, Deputy Assistant Attorney General, Curtis E. Gannon, Assistant to the Solicitor General, Barbara L. Herwig, Robert M. Loeb, Sarang Vijay Damle, Washington, D.C., for Petitioners.

For U.S. Supreme Court briefs, see:2008 WL 4063957 (Pet.Brief)2008 WL 4734962 (Resp.Brief)2008 WL 4063958 (Resp.Brief)2008 WL 4063959 (Resp.Brief)2008 WL 5009266 (Reply.Brief)2008 WL 5027911 (Reply.Brief)2008 WL 5027912 (Reply.Brief)

Justice KENNEDY delivered the opinion of the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Court.

Respondent Javaid Iqbal is a citizen of Pakistan and a Muslim. In the wake of the September 11, 2001, terrorist attacks he was arrested in the United States on criminal charges and detained by federal officials. Respondent claims he was deprived of various constitutional protections while in federal custody. To redress the alleged deprivations, respondent filed a complaint against numerous federal officials, including John Ashcroft, the former Attorney General of the United States, and Robert Mueller, the Director of the Federal Bureau of Investigation (FBI). Ashcroft and Mueller are the petitioners in the case now before us. As to these two petitioners, the complaint alleges that they adopted an unconstitutional policy that subjected respondent to harsh conditions of confinement on account of his race, religion, or national origin.

In the District Court petitioners raised the defense of qualified immunity and moved to dismiss the suit, contending the complaint was not sufficient to state a claim against them. The District Court denied the motion to dismiss, concluding the complaint was sufficient to state a claim despite petitioners' official status at the times in question. Petitioners brought an interlocutory appeal in the Court of Appeals for the Second Circuit. The court, without discussion, assumed it had jurisdiction over the order denying the motion to dismiss; and it affirmed the District Court's decision.

Respondent's account of his prison ordeal could, if proved, demonstrate unconstitutional misconduct by some governmental actors. But the allegations and pleadings with respect to these actors are not before us here. This case instead turns on a narrower question: Did respondent, as the plaintiff in the District Court, plead factual matter that, if taken as true, states a claim that petitioners deprived him of his clearly established constitutional rights. We hold respondent's pleadings are insufficient.

I

*5 Following the 2001 attacks, the FBI and other entities within the Department of Justice began an investigation of vast reach to identify the assailants and prevent them from attacking anew. The FBI dedicated more than 4,000 special agents and 3,000 support personnel to the endeavor. By September 18 "the FBI had received more than 96,000 tips or potential leads from the public." Dept. of Justice, Office of Inspector General, The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks 1, 11-12 (Apr.2003) (hereinafter OIG Report), http://www.usdoj.gov/oig/special/ 0306/full.pdf?bcsi_scan_61073EC0F74759AD=0 & bcsi_scan_filename=full.pdf (as visited May 14, 2009, and available in Clerk of Court's case file).

In the ensuing months the FBI questioned more than 1,000 people with suspected links to the attacks in particular or to terrorism in general. *Id.,* at 1. Of those individuals, some 762 were held on immigration charges; and a 184-member subset of that group was deemed to be "of 'high interest' " to the investigation. *Id.,* at 111.The high-interest detainees were held under restrictive conditions designed to prevent them from communicating with the general prison population or the outside world. *Id.,* at 112-113.

Respondent was one of the detainees. According to his complaint, in November 2001 agents of the FBI and Immigration and Naturalization Service arrested him on charges of fraud in relation to identification documents and conspiracy to defraud the United States. *Iqbal v. Hasty,* 490 F.3d 143, 147-148 (C.A.2 2007). Pending trial for those crimes, respondent was housed at the Metropolitan Detention Center (MDC) in Brooklyn, New York. Respondent was designated a person "of high interest" to the September 11 investigation and in January 2002 was placed in a section of the MDC known as the Administrative Maximum Special Housing Unit (ADMAX SHU).*Id.,* at 148.As the facility's name indicates, the ADMAX SHU incorpor-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ates the maximum security conditions allowable under Federal Bureau of Prison regulations. *Ibid.* AD-MAX SHU detainees were kept in lockdown 23 hours a day, spending the remaining hour outside their cells in handcuffs and leg irons accompanied by a four-officer escort. *Ibid.*

Respondent pleaded guilty to the criminal charges, served a term of imprisonment, and was removed to his native Pakistan. *Id.,* at 149.He then filed a *Bivens* action in the United States District Court for the Eastern District of New York against 34 current and former federal officials and 19 "John Doe" federal corrections officers. See *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The defendants range from the correctional officers who had day-to-day contact with respondent during the term of his confinement, to the wardens of the MDC facility, all the way to petitioners-officials who were at the highest level of the federal law enforcement hierarchy. First Amended Complaint in No. 04-CV-1809 (JG)(JA), ¶¶ 10 <undefchar value="45">11, App. to Pet. for Cert. 157a (hereinafter Complaint).

**\*6** The 21-cause-of-action complaint does not challenge respondent's arrest or his confinement in the MDC's general prison population. Rather, it concentrates on his treatment while confined to the ADMAX SHU. The complaint sets forth various claims against defendants who are not before us. For instance, the complaint alleges that respondent's jailors "kicked him in the stomach, punched him in the face, and dragged him across" his cell without justification, *id.,* ¶ 113, App. to Pet. for Cert. 176a; subjected him to serial strip and body-cavity searches when he posed no safety risk to himself or others, *id.,* ¶¶ 143-145, App. to Pet. for Cert. 182a; and refused to let him and other Muslims pray because there would be "[n]o prayers for terrorists," *id.,* ¶ 154, App. to Pet. for Cert. 184a.

The allegations against petitioners are the only ones relevant here. The complaint contends that petition-

ers designated respondent a person of high interest on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments to the Constitution. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men ... as part of its investigation of the events of September 11."*Id.,* ¶ 47, at 164a.It further alleges that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001."*Id.,* ¶ 69, at 168a.Lastly, the complaint posits that petitioners "each knew of, condoned, and willfully and maliciously agreed to subject" respondent to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest."*Id.,* ¶ 96, at 172a-173a.The pleading names Ashcroft as the "principal architect" of the policy, *id.,* ¶ 10, at 157a, and identifies Mueller as "instrumental in [its] adoption, promulgation, and implementation."*Id.,* ¶ 11, at 157a.

Petitioners moved to dismiss the complaint for failure to state sufficient allegations to show their own involvement in clearly established unconstitutional conduct. The District Court denied their motion. Accepting all of the allegations in respondent's complaint as true, the court held that "it cannot be said that there [is] no set of facts on which [respondent] would be entitled to relief as against" petitioners. *Id.,* at 136a-137a (relying on *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Invoking the collateral-order doctrine petitioners filed an interlocutory appeal in the United States Court of Appeals for the Second Circuit. While that appeal was pending, this Court decided *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), which discussed the standard for evaluating whether a complaint is sufficient to survive a motion to dismiss.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*7** The Court of Appeals considered *Twombly'* s applicability to this case. Acknowledging that *Twombly* retired the *Conley* no-set-of-facts test relied upon by the District Court, the Court of Appeals' opinion discussed at length how to apply this Court's "standard for assessing the adequacy of pleadings."490 F.3d, at 155. It concluded that *Twombly* called for a "flexible 'plausibility standard,'" which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Id.,* at 157-158.The court found that petitioners' appeal did not present one of "those contexts" requiring amplification. As a consequence, it held respondent's pleading adequate to allege petitioners' personal involvement in discriminatory decisions which, if true, violated clearly established constitutional law. *Id.,* at 174.

Judge Cabranes concurred. He agreed that the majority's "discussion of the relevant pleading standards reflect[ed] the uneasy compromise ... between a qualified immunity privilege rooted in the need to preserve the effectiveness of government as contemplated by our constitutional structure and the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure."*Id.,* at 178 (internal quotation marks and citations omitted). Judge Cabranes nonetheless expressed concern at the prospect of subjecting high-ranking Government officials-entitled to assert the defense of qualified immunity and charged with responding to "a national and international security emergency unprecedented in the history of the American Republic"-to the burdens of discovery on the basis of a complaint as nonspecific as respondent's. *Id.,* at 179.Reluctant to vindicate that concern as a member of the Court of Appeals, *ibid.,* Judge Cabranes urged this Court to address the appropriate pleading standard "at the earliest opportunity." *Id.,* at 178.We granted certiorari, 554 U.S. ---- (2008), and now reverse.

## II

**\*8** We first address whether the Court of Appeals

had subject-matter jurisdiction to affirm the District Court's order denying petitioners' motion to dismiss. Respondent disputed subject-matter jurisdiction in the Court of Appeals, but the court hardly discussed the issue. We are not free to pretermit the question. Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt. *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (citing *United States v. Cotton,* 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)). According to respondent, the District Court's order denying petitioners' motion to dismiss is not appealable under the collateral-order doctrine. We disagree.

### A

With exceptions inapplicable here, Congress has vested the courts of appeals with "jurisdiction of appeals from all final decisions of the district courts of the United States."28 U.S.C. § 1291. Though the statute's finality requirement ensures that "interlocutory appeals-appeals before the end of district court proceedings-are the exception, not the rule,"*Johnson v. Jones,* 515 U.S. 304, 309, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), it does not prevent "review of all prejudgment orders." *Behrens v. Pelletier,* 516 U.S. 299, 305, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). Under the collateral-order doctrine a limited set of district-court orders are reviewable "though short of final judgment." *Ibid.* The orders within this narrow category "are immediately appealable because they 'finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.' " *Ibid.* (quoting *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)).

A district-court decision denying a Government officer's claim of qualified immunity can fall within the narrow class of appealable orders despite "the

absence of a final judgment."*Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). This is so because qualified immunity-which shields Government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights,"*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)-is both a defense to liability and a limited "entitlement not to stand trial or face the other burdens of litigation."*Mitchell,supra,* 472 U.S., at 526. Provided it "turns on an issue of law,"*id.,* at 530, a district-court order denying qualified immunity " 'conclusively determine[s]' " that the defendant must bear the burdens of discovery; is "conceptually distinct from the merits of the plaintiff's claim"; and would prove "effectively unreviewable on appeal from a final judgment."*Id.,* at 527 < undefchar value="45">528 (citing *Cohen, supra,* at 546). As a general matter, the collateral-order doctrine may have expanded beyond the limits dictated by its internal logic and the strict application of the criteria set out in *Cohen.*But the applicability of the doctrine in the context of qualified-immunity claims is well established; and this Court has been careful to say that a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a "final decision" within the meaning of § 1291. *Behrens,* 516 U.S., at 307.

B

*9 Applying these principles, we conclude that the Court of Appeals had jurisdiction to hear petitioners' appeal. The District Court's order denying petitioners' motion to dismiss turned on an issue of law and rejected the defense of qualified immunity. It was therefore a final decision "subject to immediate appeal." *Ibid.* Respondent says that "a qualified immunity appeal based solely on the complaint's failure to state a claim, and not on the ultimate issues relevant to the qualified immunity defense itself, is not a proper subject of interlocutory jurisdiction."Brief for Respondent Iqbal 15 (hereinafter

Iqbal Brief). In other words, respondent contends the Court of Appeals had jurisdiction to determine whether his complaint avers a clearly established constitutional violation but that it lacked jurisdiction to pass on the sufficiency of his pleadings. Our opinions, however, make clear that appellate jurisdiction is not so strictly confined.

In *Hartman v. Moore,* 547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006), the Court reviewed an interlocutory decision denying qualified immunity. The legal issue decided in *Hartman* concerned the elements a plaintiff "must plead and prove in order to win" a First Amendment retaliation claim. *Id.,* at 257, n. 5. Similarly, two Terms ago in *Wilkie v. Robbins,* 551 U.S. 537, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007), the Court considered another interlocutory order denying qualified immunity. The legal issue there was whether a *Bivens* action can be employed to challenge interference with property rights. 551 U.S., at 549, n. 4. These cases cannot be squared with respondent's argument that the collateral-order doctrine restricts appellate jurisdiction to the "ultimate issu[e]" whether the legal wrong asserted was a violation of clearly established law while excluding the question whether the facts pleaded establish such a violation. Iqbal Brief 15. Indeed, the latter question is even more clearly within the category of appealable decisions than the questions presented in *Hartman* and *Wilkie,* since whether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded. In that sense the sufficiency of respondent's pleadings is both "inextricably intertwined with," *Swint v. Chambers County Comm'n,* 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995), and "directly implicated by," *Hartman, supra,* at 257, n. 5, the qualified immunity defense.

Respondent counters that our holding in *Johnson,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238, confirms the want of subject-matter jurisdiction here. That is incorrect. The allegation in *Johnson* was that five defendants, all of them police officers,

unlawfully beat the plaintiff. *Johnson* considered "the appealability of a portion of" the District Court's summary judgment order that, "though entered in a 'qualified immunity' case, determine[d] only" that there was a genuine issue of material fact that three of the defendants participated in the beating. *Id.,* at 313.

In finding that order not a "final decision" for purposes of § 1291, the *Johnson* Court cited *Mitchell* for the proposition that only decisions turning " '*on an issue of law* ' " are subject to immediate appeal. 515 U.S., at 313. Though determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide. Or as we said in *Johnson,* it is a "fact-related" legal inquiry. *Id.,* at 314.To conduct it, a court of appeals may be required to consult a "vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials." *Id.,* at 316.That process generally involves matters more within a district court's ken and may replicate inefficiently questions that will arise on appeal following final judgment.*Ibid.* Finding those concerns predominant, *Johnson* held that the collateral orders that are "final" under *Mitchell* turn on "abstract," rather than "fact-based," issues of law. 515 U.S., at 317.

**\*10** The concerns that animated the decision in *Johnson* are absent when an appellate court considers the disposition of a motion to dismiss a complaint for insufficient pleadings. True, the categories of "fact-based" and "abstract" legal questions used to guide the Court's decision in *Johnson* are not well defined. Here, however, the order denying petitioners' motion to dismiss falls well within the latter class. Reviewing that order, the Court of Appeals considered only the allegations contained within the four corners of respondent's complaint; resort to a "vast pretrial record" on petitioners' motion to dismiss was unnecessary. *Id.,* at 316.And determining whether respondent's complaint has the "heft" to state a claim is a task well within an appellate court's core competency. *Twombly,* 550

U.S., at 557. Evaluating the sufficiency of a complaint is not a "fact-based" question of law, so the problem the Court sought to avoid in *Johnson* is not implicated here. The District Court's order denying petitioners' motion to dismiss is a final decision under the collateral-order doctrine over which the Court of Appeals had, and this Court has, jurisdiction. We proceed to consider the merits of petitioners' appeal.

### III

In *Twombly, supra,* at 553-554, the Court found it necessary first to discuss the antitrust principles implicated by the complaint. Here too we begin by taking note of the elements a plaintiff must plead to state a claim of unconstitutional discrimination against officials entitled to assert the defense of qualified immunity.

In *Bivens*-proceeding on the theory that a right suggests a remedy-this Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights."*Correctional Services Corp. v. Malesko,* 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability "to any new context or new category of defendants."534 U.S., at 68. See also *Wilkie,* 551 U.S., at 549 -550. That reluctance might well have disposed of respondent's First Amendment claim of religious discrimination. For while we have allowed a *Bivens* action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment, see *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), we have not found an implied damages remedy under the Free Exercise Clause. Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment. *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). Petitioners do not press this argument, however, so we assume, without deciding, that respondent's First Amendment claim is actionable un-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

der *Bivens.*

**\*11** In the limited settings where *Bivens* does apply, the implied cause of action is the "federal analog to suits brought against state officials under Rev. Stat. § 1979, 42 U.S.C. § 1983."*Hartman,* 547 U.S., at 254, n. 2. Cf. *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Based on the rules our precedents establish, respondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*Iqbal Brief 46 ("[I]t is undisputed that supervisory *Bivens* liability cannot be established solely on a theory of *respondeat superior*"). See *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also *Dunlop v. Munroe,* 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); *Robertson v. Sichel,* 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue. Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose. *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 540-541, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (First Amendment); *Washington v. Davis,* 426 U.S. 229, 240, 96

S.Ct. 2040, 48 L.Ed.2d 597 (1976) (Fifth Amendment). Under extant precedent purposeful discrimination requires more than "intent as volition or intent as awareness of consequences."*Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). It instead involves a decisionmaker's undertaking a course of action " 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group."*Ibid.* It follows that, to state a claim based on a violation of a clearly established right, respondent must plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin.

**\*12** Respondent disagrees. He argues that, under a theory of "supervisory liability," petitioners can be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees."Iqbal Brief 45-46. That is to say, respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. In a § 1983 suit or a *Bivens* action-where masters do not answer for the torts of their servants-the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

IV

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

A

We turn to respondent's complaint. Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."As the Court held in *Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."550 U.S., at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.,* at 557.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."*Id.,* at 570.A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556.The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.*Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557 (brackets omitted).

**\*13** Two working principles underlie our decision in *Twombly.*First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.,* at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not

bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)).Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.,* at 556.Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show [n]"-"that the pleader is entitled to relief."Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Our decision in *Twombly* illustrates the two-pronged approach. There, we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, 15 U.S.C. § 1. Recognizing that § 1 enjoins only anticompetitive conduct "effected by a contract, combination, or conspiracy,"*Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the plaintiffs in *Twombly* flatly pleaded that the defendants "ha[d] entered into a contract, combination or conspiracy to prevent competitive entry ... and ha[d] agreed not to compete with one another."550 U.S., at 551 (internal

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

quotation marks omitted). The complaint also alleged that the defendants' "parallel course of conduct ... to prevent competition" and inflate prices was indicative of the unlawful agreement alleged. *Ibid.* (internal quotation marks omitted).

The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a " 'legal conclusion' " and, as such, was not entitled to the assumption of truth. *Id.,* at 555.Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the "nub" of the plaintiffs' complaint-the well-pleaded, nonconclusory factual allegation of parallel behavior-to determine whether it gave rise to a "plausible suggestion of conspiracy." *Id.,* at 565-566.Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. *Id.,* at 567.Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed. *Id.,* at 570.

### B

**\*14** Under *Twombly*'s construction of Rule 8, we conclude that respondent's complaint has not "nudged [his] claims" of invidious discrimination "across the line from conceivable to plausible."*Ibid.*

We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth. Respondent pleads that petitioners "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest."Complaint ¶ 96, App. to Pet. for Cert. 173a-174a. The complaint alleges that Ashcroft was the "principal architect" of this invidious policy, *id.,* ¶ 10, at 157a, and that Mueller was "instrumental" in adopting and executing it, *id.,* ¶ 11, at 157a.These bare assertions, much like the pleading of conspiracy in *Twombly,* amount to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim, 550 U.S., at 555, namely, that petitioners adopted a policy " 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."*Feeney,* 442 U.S., at 279. As such, the allegations are conclusory and not entitled to be assumed true. *Twombly,supra,* 550 U.S.,at 554-555. To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. We do not so characterize them any more than the Court in *Twombly* rejected the plaintiffs' express allegation of a " 'contract, combination or conspiracy to prevent competitive entry,' " *id.,* at 551, because it thought that claim too chimerical to be maintained. It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.

We next consider the factual allegations in respondent's complaint to determine if they plausibly suggest an entitlement to relief. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men ... as part of its investigation of the events of September 11."Complaint ¶ 47, App. to Pet. for Cert. 164a. It further claims that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001."*Id.,* ¶ 69, at 168a.Taken as true, these allegations are consistent with petitioners' purposefully designating detainees "of high interest" because of their race, religion, or national origin. But given more likely explanations, they do not plausibly establish this purpose.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*15** The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group. Al Qaeda was headed by another Arab Muslim-Osama bin Laden-and composed in large part of his Arab Muslim disciples. It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims. On the facts respondent alleges the arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts. As between that "obvious alternative explanation" for the arrests, *Twombly, supra,* at 567, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion.

But even if the complaint's well-pleaded facts give rise to a plausible inference that respondent's arrest was the result of unconstitutional discrimination, that inference alone would not entitle respondent to relief. It is important to recall that respondent's complaint challenges neither the constitutionality of his arrest nor his initial detention in the MDC. Respondent's constitutional claims against petitioners rest solely on their ostensible "policy of holding post-September-11th detainees" in the ADMAX SHU once they were categorized as "of high interest." Complaint ¶ 69, App. to Pet. for Cert. 168a. To prevail on that theory, the complaint must contain facts plausibly showing that petitioners purposefully adopted a policy of classifying post-September-11 detainees as "of high interest" because of their race, religion, or national origin.

This the complaint fails to do. Though respondent alleges that various other defendants, who are not before us, may have labeled him a person of "of high interest" for impermissible reasons, his only

factual allegation against petitioners accuses them of adopting a policy approving "restrictive conditions of confinement" for post-September-11 detainees until they were " 'cleared' by the FBI." *Ibid.* Accepting the truth of that allegation, the complaint does not show, or even intimate, that petitioners purposefully housed detainees in the ADMAX SHU due to their race, religion, or national origin. All it plausibly suggests is that the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity. Respondent does not argue, nor can he, that such a motive would violate petitioners' constitutional obligations. He would need to allege more by way of factual content to "nudg[e]" his claim of purposeful discrimination "across the line from conceivable to plausible." *Twombly,* 550 U.S.,at 570.

To be sure, respondent can attempt to draw certain contrasts between the pleadings the Court considered in *Twombly* and the pleadings at issue here. In *Twombly,* the complaint alleged general wrongdoing that extended over a period of years, *id.,* at 551, whereas here the complaint alleges discrete wrongs-for instance, beatings-by lower level Government actors. The allegations here, if true, and if condoned by petitioners, could be the basis for some inference of wrongful intent on petitioners' part. Despite these distinctions, respondent's pleadings do not suffice to state a claim. Unlike in *Twombly,* where the doctrine of *respondeat superior* could bind the corporate defendant, here, as we have noted, petitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic. Yet respondent's complaint does not contain any factual allegation sufficient to plausibly suggest petitioners' discriminatory state of mind. His pleadings thus do not meet the standard necessary to comply with Rule 8.

**\*16** It is important to note, however, that we express no opinion concerning the sufficiency of re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

spondent's complaint against the defendants who are not before us. Respondent's account of his prison ordeal alleges serious official misconduct that we need not address here. Our decision is limited to the determination that respondent's complaint does not entitle him to relief from petitioners.

### C

Respondent offers three arguments that bear on our disposition of his case, but none is persuasive.

### 1

Respondent first says that our decision in *Twombly* should be limited to pleadings made in the context of an antitrust dispute. Iqbal Brief 37-38. This argument is not supported by *Twombly* and is incompatible with the Federal Rules of Civil Procedure. Though *Twombly* determined the sufficiency of a complaint sounding in antitrust, the decision was based on our interpretation and application of Rule 8. 550 U.S., at 554, 127 S.Ct., at ----. That Rule in turn governs the pleading standard "in all civil actions and proceedings in the United States district courts."Fed. Rule Civ. Proc. 1. Our decision in *Twombly* expounded the pleading standard for "all civil actions," *ibid.,* and it applies to antitrust and discrimination suits alike. See 550 U.S., at 555-556, and n. 3.

### 2

Respondent next implies that our construction of Rule 8 should be tempered where, as here, the Court of Appeals has "instructed the district court to cabin discovery in such a way as to preserve" petitioners' defense of qualified immunity "as much as possible in anticipation of a summary judgment motion."Iqbal Brief 27. We have held, however, that the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls placed upon the discovery process. *Twombly,supra,* at 559 ("It is no answer to say that

a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side" (internal quotation marks and citation omitted)).

Our rejection of the careful-case-management approach is especially important in suits where Government-official defendants are entitled to assert the defense of qualified immunity. The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including "avoidance of disruptive discovery." *Siegert v. Gilley,* 500 U.S. 226, 236, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (KENNEDY, J., concurring in judgment). There are serious and legitimate reasons for this. If a Government official is to devote time to his or her duties, and to the formulation of sound and responsible policies, it is counterproductive to require the substantial diversion that is attendant to participating in litigation and making informed decisions as to how it should proceed. Litigation, though necessary to ensure that officials comply with the law, exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government. The costs of diversion are only magnified when Government officials are charged with responding to, as Judge Cabranes aptly put it, "a national and international security emergency unprecedented in the history of the American Republic."490 F.3d, at 179.

**\*17** It is no answer to these concerns to say that discovery for petitioners can be deferred while pretrial proceedings continue for other defendants. It is quite likely that, when discovery as to the other parties proceeds, it would prove necessary for petitioners and their counsel to participate in the process to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position. Even if petitioners are not yet themselves

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

subject to discovery orders, then, they would not be free from the burdens of discovery.

We decline respondent's invitation to relax the pleading requirements on the ground that the Court of Appeals promises petitioners minimally intrusive discovery. That promise provides especially cold comfort in this pleading context, where we are impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties. Because respondent's complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise.

3

Respondent finally maintains that the Federal Rules expressly allow him to allege petitioners' discriminatory intent "generally," which he equates with a conclusory allegation. Iqbal Brief 32 (citing Fed. Rule Civ. Proc. 9). It follows, respondent says, that his complaint is sufficiently well pleaded because it claims that petitioners discriminated against him "on account of [his] religion, race, and/or national origin and for no legitimate penological interest."Complaint ¶ 96, App. to Pet. for Cert. 172a-173a. Were we required to accept this allegation as true, respondent's complaint would survive petitioners' motion to dismiss. But the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context.

It is true that Rule 9(b) requires particularity when pleading "fraud or mistake," while allowing "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally."But "generally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid-though still operative-strictures of Rule 8. See 5A C. Wright &

A. Miller, Federal Practice and Procedure § 1301, p. 291 (3d ed. 2004) ("[A] rigid rule requiring the detailed pleading of a condition of mind would be undesirable because, absent overriding considerations pressing for a specificity requirement, as in the case of averments of fraud or mistake, the general 'short and plain statement of the claim' mandate in Rule 8(a)... should control the second sentence of Rule 9(b)"). And Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss.

V

**\*18** We hold that respondent's complaint fails to plead sufficient facts to state a claim for purposeful and unlawful discrimination against petitioners. The Court of Appeals should decide in the first instance whether to remand to the District Court so that respondent can seek leave to amend his deficient complaint.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SOUTER, with whom Justice STEVENS, Justice GINSBURG, and Justice BREYER join, dissenting.
This case is here on the uncontested assumption that *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), allows personal liability based on a federal officer's violation of an individual's rights under the First and Fifth Amendments, and it comes to us with the explicit concession of petitioners Ashcroft and Mueller that an officer may be subject to *Bivens* liability as a supervisor on grounds other than *respondeat superior.* The Court apparently rejects this concession and, although it has no bearing on the majority's resolution of this case, does away with supervisory liability under *Bivens.*The major-

ity then misapplies the pleading standard under *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), to conclude that the complaint fails to state a claim. I respectfully dissent from both the rejection of supervisory liability as a cognizable claim in the face of petitioners' concession, and from the holding that the complaint fails to satisfy Rule 8(a)(2) of the Federal Rules of Civil Procedure.

I

A

Respondent Iqbal was arrested in November 2001 on charges of conspiracy to defraud the United States and fraud in relation to identification documents, and was placed in pretrial detention at the Metropolitan Detention Center in Brooklyn, New York. *Iqbal v. Hasty,* 490 F.3d 143, 147-148 (C.A.2 2007). He alleges that FBI officials carried out a discriminatory policy by designating him as a person " 'of high interest' " in the investigation of the September 11 attacks solely because of his race, religion, or national origin. Owing to this designation he was placed in the detention center's Administrative Maximum Special Housing Unit for over six months while awaiting the fraud trial.*Id.,* at 148.As I will mention more fully below, Iqbal contends that Ashcroft and Mueller were at the very least aware of the discriminatory detention policy and condoned it (and perhaps even took part in devising it), thereby violating his First and Fifth Amendment rights.[FN1]

> FN1. Iqbal makes no claim against Ashcroft and Mueller based simply on his right, as a pretrial detainee, to be free from punishment prior to an adjudication of guilt on the fraud charges. See *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

Iqbal claims that on the day he was transferred to the special unit, prison guards, without provocation, "picked him up and threw him against the wall, kicked him in the stomach, punched him in the face, and dragged him across the room."First Amended Complaint in No. 04-CV-1809 (JG)(JA), ¶ 113, App. to Pet. for Cert. 176a (hereinafter Complaint). He says that after being attacked a second time he sought medical attention but was denied care for two weeks.*Id.,* ¶¶ 187-188, at 189a.According to Iqbal's complaint, prison staff in the special unit subjected him to unjustified strip and body cavity searches, *id.,* ¶¶ 136-140, at 181a, verbally berated him as a " 'terrorist' " and " 'Muslim killer,' " *id.,* ¶ 87, at 170a-171a, refused to give him adequate food, *id.,* ¶ 91, at 171a-172a, and intentionally turned on air conditioning during the winter and heating during the summer, *id.,* ¶ 84, at 170a.He claims that prison staff interfered with his attempts to pray and engage in religious study, *id.,* ¶¶ 153-154, at 183a-184a, and with his access to counsel, *id.,* ¶¶ 168, 171, at 186a-187a.

**\*19** The District Court denied Ashcroft and Mueller's motion to dismiss Iqbal's discrimination claim, and the Court of Appeals affirmed. Ashcroft and Mueller then asked this Court to grant certiorari on two questions:

"1. Whether a conclusory allegation that a cabinet-level officer or other high-ranking official knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts purportedly committed by subordinate officials is sufficient to state individual-capacity claims against those officials under *Bivens.*

"2. Whether a cabinet-level officer or other high-ranking official may be held personally liable for the allegedly unconstitutional acts of subordinate officials on the ground that, as high-level supervisors, they had constructive notice of the discrimination allegedly carried out by such subordinate officials."Pet. for Cert. I.

The Court granted certiorari on both questions. The first is about pleading; the second goes to the liabil-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ity standard.

In the first question, Ashcroft and Mueller did not ask whether "a cabinet-level officer or other high-ranking official" who "knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts committed by subordinate officials" was subject to liability under *Bivens.*In fact, they conceded in their petition for certiorari that they would be liable if they had "actual knowledge" of discrimination by their subordinates and exhibited " 'deliberate indifference' " to that discrimination. Pet. for Cert. 29 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Instead, they asked the Court to address whether Iqbal's allegations against them (which they call conclusory) were sufficient to satisfy Rule 8(a)(2), and in particular whether the Court of Appeals misapplied our decision in *Twombly* construing that rule. Pet. for Cert. 11-24.

In the second question, Ashcroft and Mueller asked this Court to say whether they could be held personally liable for the actions of their subordinates based on the theory that they had constructive notice of their subordinates' unconstitutional conduct. *Id.,* at 25-33.This was an odd question to pose, since Iqbal has never claimed that Ashcroft and Mueller are liable on a constructive notice theory. Be that as it may, the second question challenged only one possible ground for imposing supervisory liability under *Bivens.*In sum, both questions assumed that a defendant could raise a *Bivens* claim on theories of supervisory liability other than constructive notice, and neither question asked the parties or the Court to address the elements of such liability.

**\*20** The briefing at the merits stage was no different. Ashcroft and Mueller argued that the factual allegations in Iqbal's complaint were insufficient to overcome their claim of qualified immunity; they also contended that they could not be held liable on a theory of constructive notice. Again they conceded, however, that they would be subject to supervisory liability if they "had actual knowledge of

the assertedly discriminatory nature of the classification of suspects as being 'of high interest' and they were deliberately indifferent to that discrimination."Brief for Petitioners 50; see also Reply Brief for Petitioners 21-22. Iqbal argued that the allegations in his complaint were sufficient under Rule 8(a)(2) and *Twombly,* and conceded that as a matter of law he could not recover under a theory of *respondeat superior.* See Brief for Respondent Iqbal 46. Thus, the parties agreed as to a proper standard of supervisory liability, and the disputed question was whether Iqbal's complaint satisfied Rule 8(a)(2).

Without acknowledging the parties' agreement as to the standard of supervisory liability, the Court asserts that it must *sua sponte* decide the scope of supervisory liability here. *Ante,* at 11-13.I agree that, absent Ashcroft and Mueller's concession, that determination would have to be made; without knowing the elements of a supervisory liability claim, there would be no way to determine whether a plaintiff had made factual allegations amounting to grounds for relief on that claim. See *Twombly,* 550 U.S., at 557-558. But deciding the scope of supervisory *Bivens* liability in this case is uncalled for. There are several reasons, starting with the position Ashcroft and Mueller have taken and following from it.

First, Ashcroft and Mueller have, as noted, made the critical concession that a supervisor's knowledge of a subordinate's unconstitutional conduct and deliberate indifference to that conduct are grounds for *Bivens* liability. Iqbal seeks to recover on a theory that Ashcroft and Mueller at least knowingly acquiesced (and maybe more than acquiesced) in the discriminatory acts of their subordinates; if he can show this, he will satisfy Ashcroft and Mueller's own test for supervisory liability. See *Farmer,supra,* at 842 (explaining that a prison official acts with "deliberate indifference" if "the official acted or failed to act despite his knowledge of a substantial risk of serious harm"). We do not normally override a party's concession, see, *e.g.,United*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*States v. International Business Machines Corp.,* 517 U.S. 843, 855, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996) (holding that "[i]t would be inappropriate for us to [e]xamine in this case, without the benefit of the parties' briefing," an issue the Government had conceded), and doing so is especially inappropriate when, as here, the issue is unnecessary to decide the case, see *infra,* at 8. I would therefore accept Ashcroft and Mueller's concession for purposes of this case and proceed to consider whether the complaint alleges at least knowledge and deliberate indifference.

Second, because of the concession, we have received no briefing or argument on the proper scope of supervisory liability, much less the full-dress argument we normally require. *Mapp v. Ohio,* 367 U.S. 643, 676-677, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (Harlan, J., dissenting). We consequently are in no position to decide the precise contours of supervisory liability here, this issue being a complicated one that has divided the Courts of Appeals. See *infra,* at 7-8.This Court recently remarked on the danger of "bad decisionmaking" when the briefing on a question is "woefully inadequate," *Pearson v. Callahan,* 555 U.S. ----, ---- (2009) (slip op., at 14), yet today the majority answers a question with no briefing at all. The attendant risk of error is palpable.

**\*21** Finally, the Court's approach is most unfair to Iqbal. He was entitled to rely on Ashcroft and Mueller's concession, both in their petition for certiorari and in their merits briefs, that they could be held liable on a theory of knowledge and deliberate indifference. By overriding that concession, the Court denies Iqbal a fair chance to be heard on the question.

### B

The majority, however, does ignore the concession. According to the majority, because Iqbal concededly cannot recover on a theory of *respondeat superior,* it follows that he cannot recover under any theory of supervisory liability.*Ante,* at 13.The majority says that in a *Bivens* action, "where masters do not answer for the torts of their servants,""the term 'supervisory liability' is a misnomer," and that "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."*Ibid.* Lest there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating *Bivens* supervisory liability entirely. The nature of a supervisory liability theory is that the supervisor may be liable, under certain conditions, for the wrongdoing of his subordinates, and it is this very principle that the majority rejects.*Ante,* at 19 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic").

The dangers of the majority's readiness to proceed without briefing and argument are apparent in its cursory analysis, which rests on the assumption that only two outcomes are possible here: *respondeat superior* liability, in which "an employer is subject to liability for torts committed by employees while acting within the scope of their employment,"Restatement (Third) of Agency § 2.04 (2005), or no supervisory liability at all. The dichotomy is false. Even if an employer is not liable for the actions of his employee solely because the employee was acting within the scope of employment, there still might be conditions to render a supervisor liable for the conduct of his subordinate. See, *e.g.,Whitfield v. Melendez-Rivera,* 431 F.3d 1, 14 (C.A.1 2005) (distinguishing between *respondeat superior* liability and supervisory liability); *Bennett v. Eastpointe,* 410 F.3d 810, 818 (C.A.6 2005) (same); *Richardson v. Goord,* 347 F.3d 431, 435 (C.A.2 2003) (same); *Hall v. Lombardi,* 996 F.2d 954, 961 (C.A.8 1993) (same).

In fact, there is quite a spectrum of possible tests for supervisory liability: it could be imposed where a supervisor has actual knowledge of a subordinate's constitutional violation and acquiesces, see,

*e.g.,Baker v. Monroe Twp.,* 50 F.3d 1186, 1994 (C.A.3 1995); *Woodward v. Worland,* 977 F.2d 1392, 1400 (C.A.10 1992); or where supervisors " 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see,' " *International Action Center v. United States,* 365 F.3d 20, 28 (C.A.D.C.2004) (Roberts, J.) (quoting *Jones v. Chicago,* 856 F.2d 985, 992 (C.A.7 1988) (Posner, J.)); or where the supervisor has no actual knowledge of the violation but was reckless in his supervision of the subordinate, see, *e.g.,Hall,supra,* at 961; or where the supervisor was grossly negligent, see, *e.g.,Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (C.A.1 1988). I am unsure what the general test for supervisory liability should be, and in the absence of briefing and argument I am in no position to choose or devise one.

**\*22** Neither is the majority, but what is most remarkable about its foray into supervisory liability is that its conclusion has no bearing on its resolution of the case. The majority says that all of the allegations in the complaint that Ashcroft and Mueller authorized, condoned, or even were aware of their subordinates' discriminatory conduct are "conclusory" and therefore are "not entitled to be assumed true."*Ante,* at 17.As I explain below, this conclusion is unsound, but on the majority's understanding of Rule 8(a)(2) pleading standards, even if the majority accepted Ashcroft and Mueller's concession and asked whether the complaint sufficiently alleges knowledge and deliberate indifference, it presumably would still conclude that the complaint fails to plead sufficient facts and must be dismissed.[FN2]

> FN2. If I am mistaken, and the majority's rejection of the concession is somehow outcome determinative, then its approach is even more unfair to Iqbal than previously explained, see *supra,* at 6, for Iqbal had no reason to argue the (apparently dispositive) supervisory liability standard in light of the concession.

## II

Given petitioners' concession, the complaint satisfies Rule 8(a)(2). Ashcroft and Mueller admit they are liable for their subordinates' conduct if they "had actual knowledge of the assertedly discriminatory nature of the classification of suspects as being 'of high interest' and they were deliberately indifferent to that discrimination."Brief for Petitioners 50. Iqbal alleges that after the September 11 attacks the Federal Bureau of Investigation (FBI) "arrested and detained thousands of Arab Muslim men," Complaint ¶ 47, App. to Pet. for Cert. 164a, that many of these men were designated by high-ranking FBI officials as being " 'of high interest,' " *id.,* ¶¶ 48, 50, at 164a,and that in many cases, including Iqbal's, this designation was made "because of the race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity," *id.,* ¶ 49.The complaint further alleges that Ashcroft was the "principal architect of the policies and practices challenged," *id.,* ¶ 10, at 157a, and that Mueller "was instrumental in the adoption, promulgation, and implementation of the policies and practices challenged," *id.,* ¶ 11.According to the complaint, Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject [Iqbal] to these conditions of confinement as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." *Id.,* ¶ 96, at 172a-173a.The complaint thus alleges, at a bare minimum, that Ashcroft and Mueller knew of and condoned the discriminatory policy their subordinates carried out. Actually, the complaint goes further in alleging that Ashcroft and Muller affirmatively acted to create the discriminatory detention policy. If these factual allegations are true, Ashcroft and Mueller were, at the very least, aware of the discriminatory policy being implemented and deliberately indifferent to it.

Ashcroft and Mueller argue that these allegations fail to satisfy the "plausibility standard" of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Twombly.*They contend that Iqbal's claims are implausible because such high-ranking officials "tend not to be personally involved in the specific actions of lower-level officers down the bureaucratic chain of command."Brief for Petitioners 28. But this response bespeaks a fundamental misunderstanding of the enquiry that *Twombly* demands. *Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be. See *Twombly,* 550 U.S., at 555 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); *id.,* at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable"); see also *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"). The sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel. That is not what we have here.

**\*23** Under *Twombly,* the relevant question is whether, assuming the factual allegations are true, the plaintiff has stated a ground for relief that is plausible. That is, in *Twombly*'s words, a plaintiff must "allege facts" that, taken as true, are "suggestive of illegal conduct." 550 U.S., at 564, n. 8. In *Twombly,* we were faced with allegations of a conspiracy to violate § 1 of the Sherman Act through parallel conduct. The difficulty was that the conduct alleged was "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.,* at 554.We held that in that sort of circumstance, "[a]n allegation of parallel conduct is ... much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but

without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557 (brackets omitted). Here, by contrast, the allegations in the complaint are neither confined to naked legal conclusions nor consistent with legal conduct. The complaint alleges that FBI officials discriminated against Iqbal solely on account of his race, religion, and national origin, and it alleges the knowledge and deliberate indifference that, by Ashcroft and Mueller's own admission, are sufficient to make them liable for the illegal action. Iqbal's complaint therefore contains "enough facts to state a claim to relief that is plausible on its face." *Id.,* at 570.

I do not understand the majority to disagree with this understanding of "plausibility" under *Twombly.*Rather, the majority discards the allegations discussed above with regard to Ashcroft and Mueller as conclusory, and is left considering only two statements in the complaint: that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men ... as part of its investigation of the events of September 11," Complaint ¶ 47, App. to Pet. for Cert. 164a, and that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001,"*id.,* ¶ 69, at 168a.See *ante,* at 17.I think the majority is right in saying that these allegations suggest only that Ashcroft and Mueller "sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity,"*ante,* at 19, and that this produced "a disparate, incidental impact on Arab Muslims,"*ante,* at 18.And I agree that the two allegations selected by the majority, standing alone, do not state a plausible entitlement to relief for unconstitutional discrimination.

**\*24** But these allegations do not stand alone as the only significant, nonconclusory statements in the complaint, for the complaint contains many allega-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tions linking Ashcroft and Mueller to the discriminatory practices of their subordinates. See Complaint ¶ 10, App. to Pet. for Cert. 157a (Ashcroft was the "principal architect" of the discriminatory policy); *id.,* ¶ 11 (Mueller was "instrumental" in adopting and executing the discriminatory policy); *id.,* ¶ 96, at 172a-173a (Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject" Iqbal to harsh conditions "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest").

The majority says that these are "bare assertions" that, "much like the pleading of conspiracy in *Twombly,* amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim" and therefore are "not entitled to be assumed true."*Ante,* at 17 (quoting *Twombly,supra,* at 555). The fallacy of the majority's position, however, lies in looking at the relevant assertions in isolation. The complaint contains specific allegations that, in the aftermath of the September 11 attacks, the Chief of the FBI's International Terrorism Operations Section and the Assistant Special Agent in Charge for the FBI's New York Field Office implemented a policy that discriminated against Arab Muslim men, including Iqbal, solely on account of their race, religion, or national origin. See Complaint ¶¶ 47-53, App. to Pet. for Cert. 164a-165a. Viewed in light of these subsidiary allegations, the allegations singled out by the majority as "conclusory" are no such thing. Iqbal's claim is not that Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject" him to a discriminatory practice that is left undefined; his allegation is that "they knew of, condoned, and willfully and maliciously agreed to subject" him to a particular, discrete, discriminatory policy detailed in the complaint. Iqbal does not say merely that Ashcroft was the architect of some amorphous discrimination, or that Mueller was instrumental in an ill-defined constitutional violation; he alleges that they helped to create the discriminatory policy he has described. Taking the

complaint as a whole, it gives Ashcroft and Mueller " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Twombly,* 550 U.S., at 555 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (omission in original)).

That aside, the majority's holding that the statements it selects are conclusory cannot be squared with its treatment of certain other allegations in the complaint as nonconclusory. For example, the majority takes as true the statement that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001."Complaint ¶ 69, App. to Pet. for Cert. 168a; see *ante,* at 17.This statement makes two points: (1) after September 11, the FBI held certain detainees in highly restrictive conditions, and (2) Ashcroft and Mueller discussed and approved these conditions. If, as the majority says, these allegations are not conclusory, then I cannot see why the majority deems it merely conclusory when Iqbal alleges that (1) after September 11, the FBI designated Arab Muslim detainees as being of " 'high interest' " "because of the race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity," Complaint ¶¶ 48-50, App. to Pet. for Cert. 164a, and (2) Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed" to that discrimination, *id.,* ¶ 96, at 172a.By my lights, there is no principled basis for the majority's disregard of the allegations linking Ashcroft and Mueller to their subordinates' discrimination.

**\*25** I respectfully dissent.

Justice BREYER, dissenting.

I agree with JUSTICE SOUTER and join his dissent. I write separately to point out that, like the Court, I believe it important to prevent unwarranted litigation from interfering with "the proper execution of the work of the Government."*Ante,* at

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2009 WL 1361536 (U.S.)
**(Cite as: 2009 WL 1361536 (U.S.))**

21.But I cannot find in that need adequate justification for the Court's interpretation of *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and Federal Rule of Civil Procedure 8. The law, after all, provides trial courts with other legal weapons designed to prevent unwarranted interference. As the Second Circuit explained, where a Government defendant asserts a qualified immunity defense, a trial court, responsible for managing a case and "mindful of the need to vindicate the purpose of the qualified immunity defense," can structure discovery in ways that diminish the risk of imposing unwarranted burdens upon public officials. See *Iqbal v. Hasty,* 490 F.3d 143, 158 (2007). A district court, for example, can begin discovery with lower level government defendants before determining whether a case can be made to allow discovery related to higher level government officials. See *ibid.*Neither the briefs nor the Court's opinion provides convincing grounds for finding these alternative case-management tools inadequate, either in general or in the case before us. For this reason, as well as for the independently sufficient reasons set forth in JUSTICE SOUTER's opinion, I would affirm the Second Circuit.

U.S.,2009.
Ashcroft v. Iqbal
--- S.Ct. ----, 2009 WL 1361536 (U.S.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT B

--- F.3d ----                                                                    Page 1
--- F.3d ----, 2009 WL 1025375 (C.A.D.C.)
**(Cite as: 2009 WL 1025375 (C.A.D.C.))**

Only the Westlaw citation is currently available.

United States Court of Appeals,
District of Columbia Circuit.
CENTER FOR BIOLOGICAL DIVERSITY, Petitioner
v.
UNITED STATES DEPARTMENT OF the INTERIOR, Respondent
American Petroleum Institute, Intervenor.
**Nos. 07-1247, 07-1344.**

Argued Oct. 17, 2008.
Decided April 17, 2009.

**Background:** Non-profit activist organizations petitioned for review of an order of the Department of Interior approving a five-year program to expand leasing areas within outer continental shelf (OCS) off coast of Alaska for offshore oil and gas development alleging violations of the Outer Continental Shelf Lands Act (OCSLA), the National Environmental Policy Act (NEPA), and the Endangered Species Act (ESA).

**Holdings:** The Court of Appeals, Sentelle, Chief Judge, held that:
(1) organizations failed to establish standing to challenge Department's decision under a substantive standing theory;
(2) organizations established standing to challenge decision, under NEPA and OCSLA, under procedural standing theory;
(3) organizations' NEPA and ESA claims were not ripe;
(4) Department relied on substantial baseline evidence in approving five-year program, as required by OCSLA; and
(5) Department's sole reliance on shoreline study to measure environmental sensitivity of OCS areas was inadequate.

Vacated and remanded.

Rogers, Circuit Judge, filed a concurring opinion.

West Headnotes

**[1] Mines and Minerals 260 ☞5.1(1)**

260 Mines and Minerals
    260I Public Mineral Lands
       260I(A) Reservation and Disposal in General
         260k4.5 Leases by Government
           260k5.1 Federal Leases
              260k5.1(1) k. In General. Most Cited Cases
OCSLA establishes a procedural framework under which the Department of Interior may lease areas of the outer continental shelf (OCS) for purposes of exploring and developing the oil and gas deposits of the OCS's submerged lands. Outer Continental Shelf Lands Act, §§ 5, 8, 43 U.S.C.A. §§ 1334, 1337.

**[2] Mines and Minerals 260 ☞5.1(1)**

260 Mines and Minerals
    260I Public Mineral Lands
       260I(A) Reservation and Disposal in General
         260k4.5 Leases by Government
           260k5.1 Federal Leases
              260k5.1(1) k. In General. Most Cited Cases
In order to ensure the expeditious but orderly development of outer continental shelf (OCS) resources, OCSLA provides that the Department of Interior undertake a four-stage process in order to develop an offshore oil well; this multi-tiered approach was designed to forestall premature litigation regarding adverse environmental effects that will flow, if at all, only from the latter stages of OCS exploration and production. Outer Continental Shelf Lands Act, §§ 5, 8, 43 U.S.C.A. §§ 1334, 1337.

**[3] Mines and Minerals 260 ☞5.1(1)**

260 Mines and Minerals

260I Public Mineral Lands
   260I(A) Reservation and Disposal in General
     260k4.5 Leases by Government
      260k5.1 Federal Leases
        260k5.1(1) k. In General. Most Cited Cases

During the preparation stage of outer continental shelf (OCS) exploration and production, under OCSLA, in which the Department of Interior creates a leasing program by preparing a five-year schedule of proposed lease sales, prospective lease purchasers acquire no rights to explore, produce, or develop any of the areas listed in the leasing program. Outer Continental Shelf Lands Act, § 18, 43 U.S.C.A. § 1344.

**[4] Environmental Law 149E ⟳577**

149E Environmental Law
   149EXII Assessments and Impact Statements
     149Ek577 k. Duty of Government Bodies to Consider Environment in General. Most Cited Cases

NEPA's requirements are essentially procedural in character, and are designed to ensure solicitude for the environment through formal controls and thereby help realize the substantive goal of environmental protection. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[5] Environmental Law 149E ⟳577**

149E Environmental Law
   149EXII Assessments and Impact Statements
     149Ek577 k. Duty of Government Bodies to Consider Environment in General. Most Cited Cases

Ultimately, NEPA ensures that an agency's approval of a project is a fully informed and well-considered decision. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[6] Environmental Law 149E ⟳528**

149E Environmental Law
   149EXI Plants and Wildlife

     149Ek528 k. Endangered, Threatened, or Sensitive Species. Most Cited Cases

The Endangered Species Act (ESA) is designed to ensure that endangered species are protected from government action. Endangered Species Act of 1973, § 2 et seq., 16 U.S.C.A. § 1531 et seq.

**[7] Environmental Law 149E ⟳537**

149E Environmental Law
   149EXI Plants and Wildlife
     149Ek535 Public Plans, Projects, and Approvals; Agency Action
      149Ek537 k. Consultation. Most Cited Cases

If an agency determines that its action will not affect any listed species or critical habitat under the ESA, then it is not required to consult with National Marine Fisheries Service (NMFS) or the Fish and Wildlife Service. Endangered Species Act of 1973, § 2 et seq., 16 U.S.C.A. § 1531 et seq.

**[8] States 360 ⟳190**

360 States
   360VI Actions
     360k190 k. Capacity of State to Sue in General. Most Cited Cases

Where a harm is widely shared, a sovereign, suing in its individual interest, has standing to sue where that sovereign's individual interests are harmed, wholly apart from the alleged general harm.

**[9] States 360 ⟳18.1**

360 States
   360I Political Status and Relations
     360I(B) Federal Supremacy; Preemption
      360k18.1 k. In General. Most Cited Cases

Only the United States, and not the states, may represent its citizens and ensure their protection under federal law in federal matters.

**[10] Administrative Law and Procedure 15A ⟳668**

15A Administrative Law and Procedure

15AV Judicial Review of Administrative De-
cisions
    15AV(A) In General
      15Ak665 Right of Review
        15Ak668 k. Persons Aggrieved or Af-
fected. Most Cited Cases

In order for a petitioner to establish standing to
challenge an agency action, a petitioner must
demonstrate that it has suffered a concrete and par-
ticularized injury that is caused by, or fairly trace-
able to, the act challenged in the litigation and re-
dressable by the court; where the petitioner is not
the object of an alleged government action or inac-
tion, standing is not precluded, but it is ordinarily
substantially more difficult to establish.

**[11] Administrative Law and Procedure 15A**
   **☞668**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative De-
cisions
     15AV(A) In General
      15Ak665 Right of Review
       15Ak668 k. Persons Aggrieved or Af-
fected. Most Cited Cases

For purposes of establishing standing to challenge
an agency action in cases where the petitioner is not
the object of the alleged action or inaction, causa-
tion and redressability ordinarily hinge on the ac-
tions of independent actors not before the courts
and whose exercise of broad and legitimate discre-
tion the courts cannot presume either to control or
to predict; accordingly, the petitioner bears the bur-
den of adducing facts showing that those third-party
choices have been or will be made in such manner
as to produce causation and permit redressability of
injury.

**[12] Environmental Law 149E ☞652**

149E Environmental Law
   149EXIII Judicial Review or Intervention
     149Ek649 Persons Entitled to Sue or Seek
Review; Standing
      149Ek652 k. Organizations, Associations,

and Other Groups. Most Cited Cases

**Mines and Minerals 260 ☞5.1(9.1)**

260 Mines and Minerals
   260I Public Mineral Lands
    260I(A) Reservation and Disposal in General
     260k4.5 Leases by Government
      260k5.1 Federal Leases
       260k5.1(9) Judicial Remedies
        260k5.1(9.1) k. In General. Most
Cited Cases

Non-profit activist organizations failed to establish
injury element of standing necessary to challenge
the Department of Interior's approval of five-year
program to expand leasing areas within the outer
continental shelf (OCS) off the coast of Alaska for
offshore oil and gas development under the Outer
Continental Shelf Lands Act (OCSLA), the Nation-
al Environmental Policy Act (NEPA), or the En-
dangered Species Act (ESA), under a substantive
standing theory, by alleging that climate change
might occur in the Artic environment if the leasing
program were allowed to proceed; injury was not
actual or imminent, or certainly impending, and
harm of climate change was not focused any more
on the activist organizations than it was on the re-
mainder of the world's population. Outer Continent-
al Shelf Lands Act, § 2 et seq., 43 U.S.C.A. § 1331
et seq.; National Environmental Policy Act of 1969,
§ 2 et seq., 42 U.S.C.A. § 4321 et seq.; Endangered
Species Act of 1973, § 2 et seq., 16 U.S.C.A. §
1531 et seq.

**[13] Administrative Law and Procedure 15A**
   **☞668**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative De-
cisions
     15AV(A) In General
      15Ak665 Right of Review
       15Ak668 k. Persons Aggrieved or Af-
fected. Most Cited Cases

In order to establish standing to challenge an
agency action, a party must demonstrate that it has

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

suffered an injury that affects it in a personal and individual way.

**[14] Administrative Law and Procedure 15A ☞668**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(A) In General
          15Ak665 Right of Review
            15Ak668 k. Persons Aggrieved or Affected. Most Cited Cases
A threatened injury, for purposes of establishing standing to challenge an agency action, must be certainly impending to constitute injury in fact.

**[15] Environmental Law 149E ☞652**

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek649 Persons Entitled to Sue or Seek Review; Standing
          149Ek652 k. Organizations, Associations, and Other Groups. Most Cited Cases

**Mines and Minerals 260 ☞5.1(9.1)**

260 Mines and Minerals
    260I Public Mineral Lands
        260I(A) Reservation and Disposal in General
        260k4.5 Leases by Government
          260k5.1 Federal Leases
            260k5.1(9) Judicial Remedies
              260k5.1(9.1) k. In General. Most Cited Cases
Non-profit activist organizations failed to demonstrate causal link between Department of Interior's approval of five-year program to expand leasing areas within outer continental shelf (OCS) off coast of Alaska for offshore oil and gas development and their particularized injury in having their enjoyment of species and ecosystems in their area threatened, as required to establish standing to challenge decision under Outer Continental Shelf Lands Act (OCSLA), National Environmental Policy Act (NEPA), or Endangered Species Act (ESA) on a substantive standing theory; organizations would have to argue that adoption of leasing program would bring about drilling, which would bring about more oil, which would be consumed, resulting in additional carbon dioxide being dispersed into the air, causing climate change adversely affecting animals and their habitat, and therefore, organizations' causal chain improperly relied on speculation that various different groups of actors not present in the case would act in a certain way in the future. Outer Continental Shelf Lands Act, § 2 et seq., 43 U.S.C.A. § 1331 et seq.; National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.; Endangered Species Act of 1973, § 2 et seq., 16 U.S.C.A. § 1531 et seq.

**[16] Administrative Law and Procedure 15A ☞668**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(A) In General
          15Ak665 Right of Review
            15Ak668 k. Persons Aggrieved or Affected. Most Cited Cases
To properly establish causation in standing context of challenging an agency action, the injury must be fairly traceable to the challenged action; that is, the plaintiff must show that it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff.

**[17] Administrative Law and Procedure 15A ☞668**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(A) In General
          15Ak665 Right of Review
            15Ak668 k. Persons Aggrieved or Affected. Most Cited Cases
The more attenuated or indirect the chain of causa-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion between the government's conduct and the plaintiff's injury, the less likely the plaintiff will be able to establish a causal link sufficient for standing to challenge the agency's action.

**[18] Administrative Law and Procedure 15A ⚖668**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(A) In General
           15Ak665 Right of Review
                15Ak668 k. Persons Aggrieved or Affected. Most Cited Cases
A plaintiff may have standing to challenge agency action if it can show that the agency failed to abide by a procedural requirement that was designed to protect some threatened concrete interest of the plaintiff; in such cases, the omission of a procedural requirement does not, by itself, give a party standing to sue, but rather a procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest.

**[19] Administrative Law and Procedure 15A ⚖668**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(A) In General
           15Ak665 Right of Review
                15Ak668 k. Persons Aggrieved or Affected. Most Cited Cases
A plaintiff seeking to establish standing to challenge agency action, by showing that the agency failed to abide by a procedural requirement that was designed to protect some threatened concrete interest of the plaintiff, must show that he is not simply injured as is everyone else, lest the injury be too general for court action, and suited instead for political redress.

**[20] Environmental Law 149E ⚖652**

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek649 Persons Entitled to Sue or Seek Review; Standing
           149Ek652 k. Organizations, Associations, and Other Groups. Most Cited Cases

**Mines and Minerals 260 ⚖5.1(9.1)**

260 Mines and Minerals
    260I Public Mineral Lands
        260I(A) Reservation and Disposal in General
        260k4.5 Leases by Government
           260k5.1 Federal Leases
                260k5.1(9) Judicial Remedies
                    260k5.1(9.1) k. In General. Most Cited Cases
Non-profit activist organizations established standing to challenge the Department of Interior's approval of five-year program to expand leasing areas within the outer continental shelf (OCS) off the coast of Alaska for offshore oil and gas development, under their procedural standing theory asserting climate change claims under OCSLA and NEPA, by showing they possessed a threatened particularized interest, namely their enjoyment of the indigenous animals of the Alaskan areas listed in the leasing program, by detailing in their affidavits definitive dates in the near future, and showing that the Department of Interior's adoption of an irrationally based leasing program could cause a substantial increase in the risk to their enjoyment of the animals affected by offshore drilling. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.; Outer Continental Shelf Lands Act, § 2 et seq., 43 U.S.C.A. § 1331 et seq.

**[21] Environmental Law 149E ⚖651**

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek649 Persons Entitled to Sue or Seek Review; Standing
           149Ek651 k. Cognizable Interests and In-

juries, in General. Most Cited Cases
Cognizable interest in desiring to use or observe an animal species, even for purely esthetic purposes, will not suffice on its own to establish standing to challenge a government action without any description of concrete plans, or indeed even any specification of when the plaintiff will be deprived of the opportunity to observe the potentially harmed species.

**[22] Environmental Law 149E ⬪662**

149E Environmental Law
   149EXIII Judicial Review or Intervention
     149Ek662 k. Ripeness. Most Cited Cases
Non-profit activist organizations' NEPA claims alleging the Department of the Interior, in approving five-year program to expand leasing areas within the outer continental shelf (OCS) off the coast of Alaska for offshore oil and gas development, failed to properly take account of climate change, and failed to adequately establish the baseline conditions of the program areas, were not ripe; at the point organizations filed their petitions, the Department had only approved the leasing program at issue, and no lease-sale had yet occurred, and therefore, the leasing program had not yet reached that "critical stage" where an irreversible and irretrievable commitment of resources had occurred that would adversely affect the environment. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[23] Environmental Law 149E ⬪662**

149E Environmental Law
   149EXIII Judicial Review or Intervention
     149Ek662 k. Ripeness. Most Cited Cases
Non-profit activist organizations' ESA claim alleging the Department of the Interior, in approving five-year program to expand leasing areas within the outer continental shelf (OCS) off the coast of Alaska for offshore oil and gas development, failed to engage in any consultation concerning the leasing program's impacts on threatened and endangered species, was not ripe, where Department

had just completed the first stage of the leasing program, which did not cause any harm to anything because it did not require any action or infringe on the welfare of animals. Endangered Species Act of 1973, § 7(a)(2), 16 U.S.C.A. § 1536(a)(2).

**[24] Mines and Minerals 260 ⬪5.1(9.1)**

260 Mines and Minerals
   260I Public Mineral Lands
     260I(A) Reservation and Disposal in General
       260k4.5 Leases by Government
         260k5.1 Federal Leases
           260k5.1(9) Judicial Remedies
             260k5.1(9.1) k. In General. Most Cited Cases
Non-profit activist organizations established standing to challenge Department of Interior's approval of five-year program to expand leasing areas within outer continental shelf (OCS) off coast of Alaska for offshore oil and gas development, under procedural standing theory alleging violations of OCSLA based on Department's approval of program without conducting sufficient biological baseline research and Department's reliance on insufficient National Oceanographic and Atmospheric Administration (NOAA) study, by showing they possessed a threatened particularized interest, namely their enjoyment of indigenous animals of Alaskan areas listed in program, that they had sufficiently immediate and definite interest in enjoyment of the animals, and that Department's adoption of irrationally based program could cause substantial increase in risk to their enjoyment of animals, and that court's setting aside and remand of program would redress harm. Outer Continental Shelf Lands Act, § 2 et seq., 43 U.S.C.A. § 1331 et seq.

**[25] Mines and Minerals 260 ⬪5.1(9.1)**

260 Mines and Minerals
   260I Public Mineral Lands
     260I(A) Reservation and Disposal in General
       260k4.5 Leases by Government
         260k5.1 Federal Leases
           260k5.1(9) Judicial Remedies

260k5.1(9.1) k. In General. Most Cited Cases

Non-profit activist organizations' claims challenging Department of Interior's approval of five-year program to expand leasing areas within outer continental shelf (OCS) off coast of Alaska for offshore oil and gas development, alleging violations of OCSLA based on Department's approval of program without conducting sufficient biological baseline research and Department's reliance on insufficient National Oceanographic and Atmospheric Administration (NOAA) study, were ripe for review, as both claims concerned OCSLA requirements that were implicated at the initial stage of a leasing program. Outer Continental Shelf Lands Act, § 2 et seq., 43 U.S.C.A. § 1331 et seq.

**[26] Mines and Minerals 260 ☞5.1(9.1)**

260 Mines and Minerals
   260I Public Mineral Lands
      260I(A) Reservation and Disposal in General
         260k4.5 Leases by Government
            260k5.1 Federal Leases
               260k5.1(9) Judicial Remedies
                  260k5.1(9.1) k. In General. Most Cited Cases

The court of appeals utilizes a "hybrid" standard of review when reviewing a leasing program for compliance with OCSLA.; findings of ascertainable fact are guided by the substantial evidence test, and the agency's policy judgments are reviewed to ensure that the decision is based on a consideration of the relevant factors and whether there has been a clear error of judgment. Outer Continental Shelf Lands Act, § 2 et seq., 43 U.S.C.A. § 1331 et seq.

**[27] Mines and Minerals 260 ☞5.1(9.1)**

260 Mines and Minerals
   260I Public Mineral Lands
      260I(A) Reservation and Disposal in General
         260k4.5 Leases by Government
            260k5.1 Federal Leases
               260k5.1(9) Judicial Remedies
                  260k5.1(9.1) k. In General. Most Cited Cases

The court of appeals gives substantial deference to the Secretary of Interior's interpretation of ambiguous provisions in OCSLA, so long as that interpretation is a permissible construction of the statute; however, a statutory interpretation that does not effectuate Congress' intent must fall. Outer Continental Shelf Lands Act, § 2 et seq., 43 U.S.C.A. § 1331 et seq.

**[28] Mines and Minerals 260 ☞5.1(1)**

260 Mines and Minerals
   260I Public Mineral Lands
      260I(A) Reservation and Disposal in General
         260k4.5 Leases by Government
            260k5.1 Federal Leases
               260k5.1(1) k. In General. Most Cited Cases

OCSLA concerns the local environmental impact of leasing activities in the outer continental shelf (OCS) and does not authorize, much less require, the Department of Interior to consider the environmental impact of post-exploration activities such as consuming fossil fuels on either the world at large, or the derivative impact of global fossil fuel consumption on OCS areas. Outer Continental Shelf Lands Act, § 2 et seq., 43 U.S.C.A. § 1331 et seq.

**[29] Mines and Minerals 260 ☞5.1(1)**

260 Mines and Minerals
   260I Public Mineral Lands
      260I(A) Reservation and Disposal in General
         260k4.5 Leases by Government
            260k5.1 Federal Leases
               260k5.1(1) k. In General. Most Cited Cases

Department of Interior relied on substantial baseline evidence in approving five-year program to expand leasing areas within outer continental shelf (OCS) off coast of Alaska for offshore oil and gas development, as required by OCSLA; the Department considered and chronicled the geological, biological, and environmental information of the area, and many of the area's inhabitants. Outer Con-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tinental Shelf Lands Act, § 2 et seq., 43 U.S.C.A. § 1331 et seq.

**[30] Mines and Minerals 260 🗝5.1(1)**

260 Mines and Minerals
    260I Public Mineral Lands
        260I(A) Reservation and Disposal in General
            260k4.5 Leases by Government
                260k5.1 Federal Leases
                    260k5.1(1) k. In General. Most Cited Cases
Outer Continental Shelf Lands Act (OCSLA) provision requiring a leasing program to include estimates of the appropriations and staff required to conduct environmental studies and prepare any environmental impact statement (EIS) simply requires that the Department of Interior estimate how many staff and how much money it needs to obtain environmental impact information; it does not require that the Department set forth a research plan detailing what exact environmental information the Department needs, or how or when the Department plans on obtaining that information. Outer Continental Shelf Lands Act, § 18(b)(3), 43 U.S.C.A. § 1344(b)(3).

**[31] Mines and Minerals 260 🗝5.1(1)**

260 Mines and Minerals
    260I Public Mineral Lands
        260I(A) Reservation and Disposal in General
            260k4.5 Leases by Government
                260k5.1 Federal Leases
                    260k5.1(1) k. In General. Most Cited Cases
Department of Interior's sole reliance on National Oceanographic and Atmospheric Administration (NOAA) study considering the different sensitivity of shoreline areas to oil spills to measure the environmental sensitivity of the potential outer continental shelf (OCS) leasing areas off coast of Alaska in five-year program to expand leasing areas within OCS for offshore oil and gas development was irrational, and therefore inadequate under Outer Continental Shelf Lands Act (OCSLA) provision re-

quiring agencies to consider the relative environmental sensitivity of different areas of the OCS; the NOAA study assessed only the effects of oil spills on shorelines, and the Department of Interior provided no explanation for how the environmental sensitivity of coastal shoreline areas could serve as a substitute for the environmental sensitivity of OCS areas. Outer Continental Shelf Lands Act, § 18(a)(2)(G), 43 U.S.C.A. § 1344(a)(2)(G).

On Petitions for Review of an Order of the Department of Interior.William J. Snape III argued the cause for petitioner Center for Biological Diversity. On the briefs were Matthew Vespa, Andrea A. Treece, Miyoko Sakashita, and Brendan R. Cummings.

Peter H. Van Tuyn argued the cause and filed the briefs for petitioners Native Village of Point Hope, et al. James B. Dougherty entered an appearance.

Janis M. Searles was on the brief for amici curiae Ocean Conservancy, et al. in support of petitioners.

Deborah A. Sivas was on the brief for amici curiae W. Michael Hanemann and Charles Kolstad in support of petitioners.

Sambhav N. Sankar, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was Ryan D. Nelson, Deputy Assistant Attorney General. Katherine W. Hazard, Attorney, entered an appearance.

Steven J. Rosenbaum argued the cause for intervenor. With him on the brief were Theodore L. Garrett, Mark W. Mosier, and Erik G. Milito.

Before: SENTELLE, Chief Judge, and GINSBURG and ROGERS, Circuit Judges.

Opinion for the Court filed by Chief Judge SENTELLE.

Concurring opinion filed by Circuit Judge RO-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GERS.

SENTELLE, Chief Judge:

**\*1** In August 2005, the United States Department of Interior (Interior) began the formal administrative process to expand leasing areas within the Outer Continental Shelf (OCS) for offshore oil and gas development between 2007 and 2012. This new five-year Leasing Program included an expansion of previous lease offerings in the Beaufort, Bering, and Chukchi Seas off the coast of Alaska. Petitioners filed independent petitions for review challenging the approval by the Secretary of the Interior (Secretary) of this Leasing Program on various grounds. Specifically, Petitioners argue that: (1) the Leasing Program violates both the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331-1356a, and the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4370f, because Interior failed to take into consideration both the effects of climate change on OCS areas and the Leasing Program's effects on climate change (the climate change claims); (2) the Leasing Program also violates both OCSLA and NEPA because Interior approved the Program without conducting sufficient biological baseline research for the three Alaskan seas, and further failed to provide a research plan detailing how it would obtain this baseline data before the next stage of the Program; (3) Interior violated the Endangered Species Act of 1973(ESA), 16 U.S.C. §§ 1531-1544, by failing to consult with either the U.S. Fish and Wildlife Service (Fish and Wildlife) or the National Marine Fisheries Service (NMFS) about potential harm to endangered species in the OCS planning areas before it adopted the Leasing Program; and (4) the Leasing Program violates OCSLA because it irrationally relied on an insufficient study by the National Oceanographic and Atmospheric Administration (the NOAA study) in assessing the environmental sensitivity of the OCS planning areas in the Leasing Program. We hold that Petitioners' NEPA-based climate change claim, Petitioners' NEPA baseline data claim, and Petitioners' ESA claim are not yet ripe for review. We therefore dismiss the petition with respect to these claims.

Nevertheless, we conclude that Petitioners' remaining OCSLA-based challenges are all justiciable. Of these three remaining claims, Petitioners' OCSLA-based climate change claims and their OCSLA-rooted baseline data challenge ultimately lack merit and must fail. However, we find meritorious Petitioners' challenge to the Leasing Program on grounds that the Program's environmental sensitivity rankings are irrational. Accordingly, we vacate the Leasing Program, and remand the Program to the Secretary for reconsideration in accordance with this opinion.

## I. BACKGROUND

### A. Introduction

The Outer Continental Shelf is an area of submerged lands, subsoil, and seabed that lies between the outer seaward reaches of a state's jurisdiction and that of the United States. 43 U.S.C. § 1331(a). The OCS generally extends from 3 miles to 200 miles off the United States coast. This action concerns a Leasing Program approved by Interior that includes a potential expansion of previous lease offerings in the Beaufort, Bering, and Chukchi Seas off the coast of Alaska. Each of these seas is home to a number of species of wildlife. For instance, the Beaufort and Chukchi Seas are home to two polar bear populations. The North Pacific right whale, an endangered marine mammal, is known to inhabit the Bering Sea. Bowhead whales are also known to feed and migrate through each of these seas. In addition, a number of other species of whale, seals, the Pacific walrus, and various seabirds are indigenous to these seas.

**\*2** Three petitioners-Center for Biological Diversity, Alaska Wilderness League, and Pacific Environment-are non-profit activist organizations whose members have been working to preserve and protect the waters and living environments off the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

coast of Alaska. The remaining petitioner-the Native Village of Point Hope, Alaska-is a federally recognized tribal government whose members use the Chukchi Sea coast for subsistence hunting, fishing, whaling, and gathering, as well as cultural and religious activities.

B. Outer Continental Shelf Lands Act

[1][2] OCSLA establishes a procedural framework under which Interior may lease areas of the OCS for purposes of exploring and developing the oil and gas deposits of the OCS's submerged lands. *See* 43 U.S.C. §§ 1334, 1337; *see also California v. Watt (Watt I),* 668 F.2d 1290, 1295-1300 (D.C.Cir.1981). In order to ensure "the expeditious but orderly development of OCS resources," *Watt I,* 668 F.2d at 1297, OCSLA provides that Interior undertake a four-stage process in order to develop an offshore oil well. *See Sec'y of the Interior v. California,* 464 U.S. 312, 337, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). As we noted in *Watt I,* the leasing program's four-stage process is "pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent." *Watt I,* 668 F.2d at 1297. This multi-tiered approach was designed "to forestall premature litigation regarding adverse environmental effects that ... will flow, if at all, only from the latter stages of OCS exploration and production." *Sec'y of Interior,* 464 U.S. at 341, 104 S.Ct. 656.

[3] First, during the preparation stage, Interior creates a leasing program by preparing a five-year schedule of proposed lease sales. 43 U.S.C. § 1344. At this stage, "prospective lease purchasers acquire no rights to explore, produce, or develop" any of the areas listed in the leasing program. *Sec'y of Interior,* 464 U.S. at 338, 104 S.Ct. 656. Second, during the lease-sale stage, Interior solicits bids and issues leases for particular offshore leasing areas. 43 U.S.C. § 1337(a). Third, during the exploration stage, Interior reviews and determines whether to approve the lessees' more extensive exploration

plans. 43 U.S.C. § 1340. Interior allows this exploration stage to proceed only if it finds that the lessees' exploration plan "will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or archeological significance." 43 U.S.C. § 1340(g)(3). Fourth and final is the development and production stage. During this stage, Interior and those affected state and local governments review an additional and more detailed plan from the lessee. 43 U.S.C. § 1351. If Interior finds that the plan would "probably cause serious harm or damage ... to the marine, coastal or human environments," then the plan, and consequently the leasing program, may be terminated. 43 U.S.C. § 1351(h)(1)(D)(i).

**\*3** The Leasing Program at issue has only completed its first stage-preparation of the five-year program under Section 18 of OCSLA, 43 U.S.C. § 1344. Under Section 18, the Secretary is required to prepare, periodically revise, and maintain "an oil and gas leasing program" that consists of "a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which he determines will best meet national energy needs for the five-year period following its approval or reapproval." 43 U.S.C. § 1344(a). The Secretary must prepare and maintain a leasing program consistent with several principles. First, the Secretary must ensure that a leasing program is "conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the [OCS], and the potential impact of oil and gas exploration on other resource values of the [OCS] and the marine, coastal, and human environments." 43 U.S.C. § 1344(a)(1). Second, the Secretary must consider additional factors with respect to the timing and location of exploration, development, and production of oil and gas in particular OCS areas. These factors include, *inter alia:* a region's "existing information concerning the geographical, geological, and ecological characteristics"; "an

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

equitable sharing of developmental benefits and environmental risks among the various regions"; "the interest of potential oil and gas producers in the development of oil and gas resources"; "the relative environmental sensitivity and marine productivity of different areas of the [OCS]"; and "relevant environmental and predictive information for different areas of the [OCS]."43 U.S.C. §§ 1344(a)(2)(A), (B), (E), (G), (H). Next, Interior must ensure, "to the maximum extent practicable," that the timing and location of leasing occurs so as to "obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone."43 U.S.C. § 1344(a)(3). Finally Interior's leasing activities must ensure that winning lessees receive "fair market value for the lands leased and the rights conveyed by the Federal Government."43 U.S.C. § 1344(a)(4).

Other provisions of OCSLA that are relevant to the leasing process are Sections 18(b) and 20. *See*43 U.S.C. §§ 1344(b), 1346. Section 18(b) of OCSLA calls for Interior to include estimates of the appropriations and staff required to conduct and prepare the leasing program, including appropriations and staff estimates needed to conduct environmental studies and prepare an Environmental Impact Statement (EIS).43 U.S.C. § 1344(b)(3).Section 20 of OCSLA also provides that, subsequent to a first lease in a given area, the Secretary "shall conduct such additional studies to establish environmental information as he deems necessary and shall monitor the human, marine, and coastal environments of such area or region in a manner designed to provide time-series and data trend information."43 U.S.C. § 1346(b).

C. National Environmental Policy Act

*4 [4][5] NEPA's requirements are essentially "procedural in character," and are designed to "ensure solicitude for the environment through formal controls and thereby help realize the substantive goal of environmental protection."*North Slope Borough v. Andrus,* 642 F.2d 589, 598 (D.C.Cir.1980). Ultimately, NEPA ensures that an agency's approval of a project is "a fully informed and well-considered decision."*Id.* at 599 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Def. Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). To that end, the statute requires that each agency "assess the environmental consequences of 'major [f]ederal actions' by following certain procedures during the decision-making process."*Nevada v. Dep't of Energy,* 457 F.3d 78, 87 (D.C.Cir.2006) (quoting 42 U.S.C. § 4332(2)(C)). Before an agency may approve a particular project, it must prepare a "detailed statement ... [on, *inter alia,*] the environmental impact of the proposed action,""any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." 42 U.S.C. §§ 4332(2)(C)(i)-(iii). When faced with a multi-stage, pyramidic program such as the Leasing Program at issue here, NEPA's regulations allow an agency to conduct a tiered approach to preparing an EIS. *See*40 C.F.R. § 1508.28; *see also Nevada,* 457 F.3d at 91 & n. 9. Under this approach, an agency may issue a broader EIS at the earlier "need and site selection" stage of a program, and issue subsequent, more detailed environmental impact statements at the program's later, more site-specific stage. *See*40 C.F.R. § 1508.28.

D. Endangered Species Act

[6][7] The ESA is designed to ensure that endangered species are protected from government action. Under the ESA, each federal agency is required to ensure that any action undertaken by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical animal habitats. 16 U.S.C. § 1536(a)(2). If an agency concludes that its action "may affect" a listed species or critical habitat, then the agency must pursue either formal or informal consultation with the NMFS or Fish and Wildlife.

*See* 50 C.F.R. §§ 402.13, 402.14. If the agency determines that its action will not affect any listed species or critical habitat, however, then it is not required to consult with NMFS or Fish and Wildlife. *See Southwest Center for Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1447 (9th Cir.1996).

E. Leasing Program

The Five-Year Leasing Program in this case was first developed on August 24, 2005. 70 Fed.Reg. 49,669. After developing and publishing a draft proposed plan, *see* 71 Fed.Reg. 7064 (Feb. 10, 2006), and reviewing commentary to that draft plan, Interior published a "Proposed Plan" and an accompanying draft EIS. Finally, Interior published its "Proposed Final Plan" in April 2007 along with its Final EIS for the approval stage of the Leasing Program. This was submitted to Congress and the President, and was later approved by the Secretary of Interior. In total, the Leasing Program has scheduled 21 potential lease-sales between July 1, 2007 and June 30, 2012 in eight areas of the OCS. Four of those potential leasing areas are in the Beaufort, Bering, and Chukchi Seas off the Alaska coast. At the time the petitions challenging the approval of the Leasing Program were brought before this court, Interior had not yet conducted any lease-sales in these regions. Since that time, however, Interior has approved one lease-sale in the disputed Alaskan sea areas, Chukchi Sea Lease-Sale 193, which occurred on February 6, 2008. Petitioner Point Hope and others challenged this lease-sale in the federal district court for the District of Alaska.

## II. JURISDICTION

**\*5** The federal judiciary's role is limited to resolving cases and controversies. U.S. Const. art. III, § 2; *see also Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Accordingly, "before we reach the merits of any claim, we must first assure ourselves that the dispute lies within the

constitutional and prudential boundaries of our jurisdiction." *Util. Air Regulatory Group v. EPA,* 320 F.3d 272, 277 (D.C.Cir.2003) (quoting *La. Envtl. Action Network v. Browner,* 87 F.3d 1379, 1382 (D.C.Cir.1996)). Additionally, we must avoid "premature adjudication ... and also ... protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148-49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). We therefore must determine whether Petitioners have standing to bring their claims. We must also ensure that Petitioners' claims are ripe for review. For the following reasons, we hold that Petitioners' three OCSLA-based claims are justiciable. We also hold that Petitioners' NEPA-based climate change and baseline data challenges, and their ESA claim are not yet ripe for review.

A. Climate Change Claims

Petitioners claim that Interior violated both OCSLA and NEPA because Interior failed to consider both the economic and environmental costs of the greenhouse gas emissions associated with the Program and the effects of climate change on OCS areas. In support of their claims, Petitioners advance two different theories of standing. We address each in turn. We hold that Petitioners lack standing on their substantive climate change theory. We hold, however, that Petitioners have standing to bring their climate change claims under their procedural theory of standing.

1. Petitioners' Substantive Theory of Standing

Under their substantive theory of standing, Petitioners argue that Interior's approval of the Program brings about climate change, which in turn adversely affects the species and ecosystems of those OCS areas, thereby threatening Petitioners' enjoyment of the OCS areas and their inhabitants. In other words, Petitioners contend that, absent Interior's

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

approval of the Program, the OCS areas at issue would not be subject to environmental impacts allegedly brought about by climate change associated with the burning of fossil fuels produced under the Program.

To begin with, the Supreme Court's recent decision in *Massachusetts v. EPA,* 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007), does not govern this issue. Its holding turned on the unique circumstances of that case, which are not present here. In *Massachusetts,* a group of private organizations petitioned the Environmental Protection Agency (EPA) to begin regulating emissions of four greenhouse gases, arguing that a rise in global temperatures and climatological changes resulted from an increase in the atmospheric concentration of greenhouse gases. After the EPA denied the petition, the petitioners-joined by the Commonwealth of Massachusetts-sought this Court's review of the EPA's denial of their petition. The EPA maintained that the petitioners lacked standing to bring such a petition because the harm that they alleged-the effect of greenhouse gas emissions on global warming-was widespread, and did not individually affect any of the petitioners. Accordingly, the EPA contended, petitioners failed to demonstrate a concrete and particularized injury required to show standing under Article III. After we upheld the EPA's denial of the petition without reaching a consensus on the standing issue, the Supreme Court decided on review that the petitioners had standing to bring their petition.

**\*6** [8] In its opinion, however, the Supreme Court made an effort to note that its finding was based on the uniqueness of the case before it. As the Court explained, it was "of considerable relevance that the party seeking review ... is a sovereign State and not, as it was in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), a private individual." *Massachusetts,* 549 U.S. at 518, 127 S.Ct. 1438.The Court noted further that it was critical that Massachusetts sought to assert its own rights as a state under the Clean Air Act, and

was not seeking to protect the rights of its citizens under the Clean Air Act. *Id.* at 520 n. 17, 127 S.Ct. 1438.In light of these unique circumstances, the Court afforded Massachusetts "special solicitude" in the Court's standing analysis due to Massachusetts's interests in ensuring the protection of the land and air within its domain, and its "well-founded desire to preserve its sovereign territory."*Id.* at 519, 520, 127 S.Ct. 1438.With respect to Massachusetts's injury, the Court found that Massachusetts "owns a substantial portion of the state's coastal property" that had already been harmed by the EPA's inaction, and that the EPA's failure to regulate these gases would cause additional harm to its shoreline. *Id.* at 523, 127 S.Ct. 1438.Though the Court found that the risks of climate change were widely shared because *global* sea levels had already begun to rise, it nevertheless concluded that Massachusetts had shown a sufficiently particularized injury because Massachusetts had alleged that its particular shoreline had actually been diminished by the effects of climate change. *Id.* In other words, by showing that climate change had diminished part of its own shoreline, Massachusetts itself had shown that it had been affected "in a personal and individual way" by the EPA's failure to regulate greenhouse gases. *Defenders of Wildlife,* 504 U.S. at 560 n. 1, 112 S.Ct. 2130.Thus, *Massachusetts* stands only for the limited proposition that, where a harm is widely shared, a sovereign, suing in its individual interest, has standing to sue where that sovereign's individual interests are harmed, wholly apart from the alleged general harm.

Assuming *arguendo* that Point Hope is a sovereign that might be entitled to "special solicitude" under *Massachusetts,* it is clear that *Massachusetts* does not govern this case. Point Hope does not allege anywhere that it has suffered its own individual harm apart from the general harm caused by climate change, and its derivative effects on Point Hope's members. Point Hope does not allege that Interior's acts will cause damage to, or otherwise adversely affect, any of its own territory. To the contrary,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

each of Petitioners' climate change claims are founded on Interior's Leasing Program actions and the effects of those actions on the climate in general. Moreover, to the extent that Petitioners allege that the Leasing Program caused any *actual* harm to any territory, this harm is limited to areas of the OCS-areas that are owned by the federal government, not by a state or Native American tribe. Aside from these allegations of generalized harm brought about by climate change, Petitioners have not demonstrated that climate change would directly cause any diminution of Point Hope's territory any more than anywhere else. Accordingly, without this necessary element being present, we find that *Massachusetts*'s limited holding does not extend to the standing analysis in this case.

**\*7** [9] Moreover, it is doubtful that Point Hope would be able to assert a quasi-sovereign claim on behalf of its members against the federal government, as Massachusetts had against the EPA. Both the majority and dissenting opinions in *Massachusetts* recognized the general rule that a sovereign is prohibited from bringing an action to protect its citizens from the operation of federal statutes. *See Massachusetts,* 549 U.S. at 520 n. 17, 127 S.Ct. 1438 (majority opinion); *id.* at 539, 127 S.Ct. 1438 (Roberts, C.J., dissenting); *see also Massachusetts v. Mellon,* 262 U.S. 447, 484-86, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). Here, Point Hope does not allege any specific harm that it has suffered individually as a result of Interior's actions in approving the Leasing Program. Instead, Point Hope is suing on behalf of its members and their individual interests. As the Court has long recognized, only the United States, and not the states, may represent its citizens and ensure their protection under federal law in federal matters. *See Mellon,* 262 U.S. at 485-86, 43 S.Ct. 597.

[10][11] Outside of the very limited factual setting of *Massachusetts,* the Supreme Court's decision in *Defenders of Wildlife* sets forth the test for standing. *See Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658 (D.C.Cir.1996). In order for a petitioner to es-

tablish standing, a petitioner must demonstrate that it has suffered a concrete and particularized injury that is caused by, or fairly traceable to, the act challenged in the litigation and redressable by the court. *Defenders of Wildlife,* 504 U.S. at 560-61, 112 S.Ct. 2130; *Fla. Audubon Soc'y,* 94 F.3d at 663.In cases such as this, where the petitioner is not the object of an alleged government action or inaction, "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife,* 504 U.S. at 562, 112 S.Ct. 2130 (quoting *Allen,* 468 U.S. at 758, 104 S.Ct. 3315). In cases such as this, causation and redressability ordinarily hinge on the actions of "independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Defenders of Wildlife,* 504 U.S. at 562, 112 S.Ct. 2130 (quoting *AS-ARCO, Inc. v. Kadish,* 490 U.S. 605, 615, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (opinion of Kennedy, J.)). Accordingly, the petitioner bears the burden of "adduc[ing] facts showing that those [third-party] choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Defenders of Wildlife,* 504 U.S. at 562, 112 S.Ct. 2130 (citing *Warth v. Seldin,* 422 U.S. 490, 505, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

[12][13][14] Petitioners' substantive theory of standing fails because Petitioners have not established either the injury or causation element of standing. First, it is well-established that a party must demonstrate that it has suffered an injury that affects it in a "personal and individual way." *Defenders of Wildlife,* 504 U.S. at 560 n. 1, 112 S.Ct. 2130.Standing analysis does not examine whether the environment in general has suffered an injury. *See Fla. Audubon Soc'y,* 94 F.3d at 665.And yet Petitioners' substantive argument focuses on just this type of injury: that climate change might occur in the Arctic environment if the Leasing Program is allowed to proceed. This type of injury is insufficient to establish standing for two reasons. First, Petitioners' alleged injury runs afoul of the require-

ment that a justiciable injury must be "actual or imminent, not conjectural or hypothetical."*Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130 (internal quotation marks omitted)."A threatened injury must be certainly impending to constitute injury in fact."*Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (internal quotation marks omitted). Petitioners can only aver that any significant adverse effects of climate change "may" occur at some point in the future. This does not amount to the actual, imminent, or "certainly impending" injury required to establish standing. Second, climate change is a harm that is shared by humanity at large, and the redress that Petitioners seek-to prevent an increase in global temperature-is not focused any more on these petitioners than it is on the remainder of the world's population. Therefore Petitioners' alleged injury is too generalized to establish standing.

**\*8** [15][16][17] Even if Petitioners were able to demonstrate an injury sufficient for standing, their substantive theory would still fail because Petitioners have failed to demonstrate a causal link between the government action by Interior and Petitioners' particularized injury. To properly establish causation, the injury must be " 'fairly' traceable to the challenged action."*Allen,* 468 U.S. at 751, 104 S.Ct. 3315.That is, the plaintiff must show that "it is substantially probable ... that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff."*Fla. Audubon Soc'y,* 94 F.3d at 663 (citing *Allen,* 468 U.S. at 753 n. 19, 104 S.Ct. 3315). The more attenuated or indirect the chain of causation between the government's conduct and the plaintiff's injury, the less likely the plaintiff will be able to establish a causal link sufficient for standing. *See Allen,* 468 U.S. at 757-58, 104 S.Ct. 3315.

In this case, Petitioners rely on too tenuous a causal link between their allegations of climate change and Interior's action in the first stage of this Leasing Program. In order to reach the conclusion that Petitioners are injured because of Interior's alleged failure to consider the effects of climate change with respect to the Leasing Program, Petitioners must argue that: adoption of the Leasing Program will bring about drilling; drilling, in turn, will bring about more oil; this oil will be consumed; the consumption of this oil will result in additional carbon dioxide being dispersed into the air; this carbon dioxide will consequently cause climate change; this climate change will adversely affect the animals and their habitat; therefore Petitioners are injured by the adverse effects on the animals they enjoy. Such a causal chain cannot adequately establish causation because Petitioners rely on the speculation that various different groups of actors not present in this case-namely, oil companies, individuals using oil in their cars, cars actually dispersing carbon dioxide-might act in a certain way in the future. Moreover, Petitioners' causal chain fails to take into account that, at each successive stage of the Leasing Program, the law requires that Interior conduct additional and more detailed assessments of the Program's potential effect on the proposed leasing areas. *See*43 U.S.C. §§ 1340(g)(3), 1351(h)(1)(D)(i). As mentioned previously, these additional analyses could scuttle a leasing program if the environmental effects of that program are found to be excessive. *See supra* Section I.B. Petitioners therefore also do not have standing because they cannot adequately establish causation. Accordingly, Petitioners' substantive theory of standing fails.

### 2. Petitioners' Procedural Theory of Standing

[18][19] Alternatively, Petitioners argue that they are injured by Interior's failure to comply with both OCSLA and NEPA requirements. Specifically, Petitioners claim that Interior violated both OCSLA and NEPA because Interior failed to consider both the economic costs of the greenhouse gas emissions associated with the Program and the effects of climate change on OCS areas. As the Supreme Court noted in *Defenders of Wildlife,* a plaintiff may have standing if it can show that an agency failed to abide by a procedural requirement that was

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

"designed to protect some threatened concrete interest" of the plaintiff. *Defenders of Wildlife,* 504 U.S. at 573 n. 8, 112 S.Ct. 2130.In such cases, the omission of a procedural requirement does not, by itself, give a party standing to sue. *Fla. Audubon Soc'y,* 94 F.3d at 664.Rather, "a procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest."*Id.* at 664-65.A plaintiff "must show that he is not simply injured as is everyone else, lest the injury be too general for court action, and suited instead for political redress."*Id.* at 667 n. 4.

**\*9** [20][21] Petitioners may bring both their OCSLA- and NEPA-based climate change claims under their procedural standing theory. Petitioners have shown that they possess a threatened particularized interest, namely their enjoyment of the indigenous animals of the Alaskan areas listed in the Leasing Program. The Supreme Court has noted that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."*Defenders of Wildlife,* 504 U.S. at 562-63, 112 S.Ct. 2130.This interest, however, will not suffice on its own "without any description of concrete plans, or indeed even any specification of *when* " the plaintiff will be deprived of the opportunity to observe the potentially harmed species. *Id.* at 564, 112 S.Ct. 2130.Petitioners' affidavits demonstrate a sufficiently immediate and definite interest in enjoyment of the animals. Petitioners' members have detailed in their affidavits definitive dates in the near future. Second, Petitioners have shown, solely for the sake of an Article III standing analysis, that Interior's adoption of an irrationally based Leasing Program could cause a substantial increase in the risk to their enjoyment of the animals affected by the offshore drilling, and that our setting aside and remanding of the Leasing Program would redress their harm.

**B. NEPA Climate Change and Baseline Data Claims**

[22] We next consider the justiciability of Petitioners' climate change and baseline data claims under NEPA. Petitioners contend that Interior failed to account for (1) the present and future impact of climate change on the Program areas, and (2) the impact on climate change of the additional consumption caused by the Program. They also contend that Interior has effectively conceded that there is insufficient data detailing the baseline biological condition of the Beaufort, Bering, and Chukchi Seas in the Leasing Program because Interior has admitted that there are gaps in the baseline research for these areas. Petitioners argue that Interior cannot adequately describe the affected areas, as required by 40 C.F.R. § 1502.15, until it conducts additional research to close these gaps, and completely establish the baseline conditions. Interior's failure to conduct this research to close the baseline data gaps therefore violates NEPA. In addition, Petitioners contend that Interior has violated 40 C.F.R. § 1502.22 because Interior has not disclosed to what extent this baseline information is either unavailable or absent, and has failed to provide this information, which is required to assess the environmental condition of 40 C.F.R. § 1502.15.

Here, Petitioners' NEPA-based claims are not ripe due to the multiple stage nature of the Leasing Program. This court's decision in *Wyoming Outdoor Council v. United States Forest Service,* 165 F.3d 43 (D.C.Cir.1999), is instructive here. In *Wyoming Outdoor Council,* the court was faced with a NEPA challenge to a multi-stage on-shore leasing program similar to the Leasing Program at hand. The *Wyoming Outdoor Council* petitioners argued that the Forest Service violated NEPA because it approved an oil-and-gas leasing program without first determining whether an adequate site-specific environmental review had been performed. As here, the petitioners' challenge in *Wyoming Outdoor Council* was brought at the early stage of the program that involved only "the identification and mapping of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

areas that might be suitable for leasing."*Id.* at 45.The court dismissed the petitioners' NEPA challenge as unripe, finding that an agency's NEPA obligations mature only once it reaches a "critical stage of a decision which will result in 'irreversible and irretrievable commitments of resources' to an action that will affect the environment."*Id.* at 49 (quoting *Mobil Oil Corp. v. FTC,* 562 F.2d 170, 173 (2d Cir.1977)). In the context of multiple-stage leasing programs, we ultimately held that "the point of irreversible and irretrievable commitment of resources and the concomitant obligation to fully comply with NEPA do not mature until leases are issued."*Wyoming Outdoor Council,* 165 F.3d at 49.

**\*10** Applying this reasoning here, Petitioners' NEPA challenges are not ripe for review. At the point that Petitioners filed their petitions, Interior had only approved the Leasing Program at issue. No lease-sales had yet occurred. The Leasing Program here had therefore not yet reached that "critical stage" where an "irreversible and irretrievable commitment of resources" has occurred that will adversely affect the environment. *See id.*

Additionally, any harm that might befall Petitioners by having to wait until the actual leasing stage to bring their claims is outweighed by the harm to Interior (and other agencies). Allowing a petitioner to bring such NEPA challenges to a leasing program when no rights have yet been implicated, or actions taken, would essentially create an additional procedural requirement for all agencies adopting any segmented program. This would impose too onerous an obligation, and would require an agency to divert too many of its resources at too early a stage in the decision-making process. By contrast, Petitioners suffer little by having to wait until the leasing stage has commenced in order to receive the information it requires. In the meantime, as Interior points out, no drilling will have occurred, and consequently, no harm will yet have occurred to the animals or their environment.[FN1]

Petitioners argue, however, that the Supreme Court's decision in *Ohio Forestry Association, Inc.*

*v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998), forestalls a conclusion that their NEPA challenges are not ripe. Specifically, Petitioners point to the Court's statement that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper."*Id.* at 737, 118 S.Ct. 1665.Accordingly, Petitioners argue that their NEPA claims are justiciable because, as the Court noted, they cannot get any riper.

*Ohio Forestry* does not control. First, the case concerned a claim that the Forest Service had violated the National Forest Management Act of 1976 (NFMA), and whether that claim was ripe for review. The quotation Petitioners rely on was therefore dicta. *See id.* at 737, 118 S.Ct. 1665.True, considered dicta of the Supreme Court has long been regarded as forceful, even though it is not binding. *See Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821). Nevertheless, in Ohio Forestry, the Court did not opine that the obligation to conduct research under NEPA begins the moment an OCSLA Leasing Program is adopted, as Petitioners suggest. *Ohio Forestry,* 523 U.S. at 737, 118 S.Ct. 1665.To the contrary, the Supreme Court did not address when the obligation to provide research under NEPA began. *Id.* The Court noted only that NEPA claims do not get any riper than they are at the moment a violation occurred. *Id.* It was not resolving the point at which such a violation would occur. *Id. Wyoming Outdoor Council,* by contrast, fills in this gap by stating that a NEPA obligation commences once the agency reaches a "critical stage of a decision"-specifically, the leasing stage. *Wyoming Outdoor Council,* 165 F.3d at 49.It stands to reason that, applying *Ohio Forestry,* Petitioners' NEPA claims would not get any riper than at the time NEPA's obligation commenced and was disregarded. That obligation has not yet occurred because Interior has only reached the Leasing Program issuance stage, and has not yet begun the leasing stage. Accordingly, *Ohio Forestry* does not alter our analysis.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*11** For these reasons, Petitioners' NEPA claims are not ripe.

C. ESA Claim

[23] When it approved the Leasing Program, Interior stated that it did not need to engage in any consultation concerning the Program's impacts on threatened and endangered species at this preliminary stage of the Program. Instead, Interior indicated that it would comply with the ESA's Section 7 requirements once the Program reached its later stages. *See* 16 U.S.C. § 1536. Petitioners argue that Interior's failure to conduct such a consultation at the approval stage of the Leasing Program violates 16 U.S.C. § 1536(a)(2). Interior counters that Petitioners' Section 7 claim is unripe.

Section 7 of the ESA clearly sets forth that:

Each Federal agency shall, in consultation with [either the Fisheries Service or the Fish and Wildlife Services], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined ... to be critical.

16 U.S.C. § 1536(a)(2). Accordingly, an agency must consult with NMFS or Fish and Wildlife if the agency concludes that its action "may affect" a listed species or critical habitat. *See* 50 C.F.R. §§ 402.13, 402.14.

In order to resolve the ripeness of Petitioners' ESA claim, our inquiry must therefore focus on whether an agency's approval of a leasing program "may affect" a listed species or critical habitat. Petitioners argue that we should consider the Leasing Program's potential effect on endangered species as a whole in resolving this issue. In other words, Petitioners advocate a "but for" approach: if, because of events traceable to the agency's adoption of the multiple-stage leasing plan, it is possible that an en-

dangered species will be affected, then the agency must consult with NMFS or Fish and Wildlife. Interior advocates more of a "proximate cause" approach, viewing each stage of the agency action as a separate intervening act, and linking any effect on endangered species to that particular stage.

Our holding in *North Slope Borough v. Andrus,* 642 F.2d 589 (D.C.Cir.1980), best informs the resolution of this issue. In *North Slope,* representatives of environmental organizations and native Alaskans sought to enjoin Interior from carrying out a leasing program for oil and gas development in the Beaufort Sea. Importantly, the leasing program in *North Slope* had already reached the lease-sale stage; the program had been approved by the Secretary, but no bids had been accepted, and no leases had been executed. *Id.* at 593-94.Nevertheless, as in this case, the *North Slope* petitioners argued that Interior's failure to consult with NMFS and Fish and Wildlife violated Section 7 of the ESA. Assuming without deciding that a lease sale and all subsequent program activities constituted "agency action" under the ESA, we held that "satisfaction of the ESA mandate that no endangered life be jeopardized must be measured in view of the full contingent of OCSLA checks and balances and all mitigating measures adopted in pursuance thereof."*North Slope,* 642 F.2d at 609.The segmented nature of OCSLA Leasing Programs is such a mitigating measure because it allows "graduated compliance with environmental and endangered life standards, [thereby making] ESA requirements more likely to be satisfied both in an ultimate and a proximate sense."*Id.* In other words, courts must consider the ESA's requirements in light of each particular leasing program stage at issue because those stages are there by design.

**\*12** Applying the reasoning in *North Slope* to the facts before us, we conclude that Petitioners' ESA claim is not yet ripe. Given the multi-stage nature of leasing programs under OCSLA, we must consider any environmental effects of a leasing program on a stage-by-stage basis, and correspond-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ingly evaluate ESA's obligations with respect to each particular stage of the program. Regardless of whether there has been an agency action under the ESA, the completion of the first stage of a leasing program does not cause any harm to anything because it does not require any action or infringe on the welfare of animals. The welfare of animals is, by design, only implicated at later stages of the program, each of which requires ESA consultation and additional environmental review by Interior. *See id.* at 608-09.In addition, at this initial stage, leasing programs may list areas that Interior does not intend to lease. It is therefore not certain, at least at this initial stage of the Leasing Program, that any of the endangered species in the areas at issue may be affected by the Program, as the proposed leases in these areas might never come to pass. As a result, both this court and the Secretary of the Interior "would benefit from postponing review until the policy in question has sufficiently 'crystallized' by taking on a more definite form."*Venetian Casino Resort, LLC v. EEOC,* 409 F.3d 359, 364 (D.C.Cir.2005) (citing *City of Houston v. Dep't of Hous. & Urban Dev.,* 24 F.3d 1421, 1430-31 (D.C.Cir.1994)). Any hardship to Petitioners from delaying review of their ESA claim until after Interior moves beyond this initial stage of the Leasing Program is insufficient to outweigh the institutional interests of the court and Interior.FN2 Petitioners' ESA challenge at this initial stage of the Leasing Program is therefore premature. *See Atl. States Legal Found. v. EPA,* 325 F.3d 281, 284-85 (D.C.Cir.2003).

**D. OCSLA-based NOAA Study and Baseline Information Claims**

Finally, we conclude that we do have jurisdiction over both of Petitioners' remaining OCSLA-based claims. Specifically, Petitioners argue that the Leasing Program violates OCSLA because Interior approved the Program without conducting sufficient biological baseline research. Petitioners also contend that the Leasing Program violates Section 18(a)(2)(G) of OCSLA because it relied on an in-

sufficient NOAA study in assessing the environmental sensitivity of the OCS planning areas in the Leasing Program. *See* 43 U.S.C. § 1344(a)(2)(G).

[24][25] First, as we did with Petitioners' OCSLA-based climate change claims, we conclude that Petitioners have standing to bring these remaining two OCSLA-based claims. Petitioners have shown that they possess a threatened particularized interest, namely their enjoyment of the indigenous animals of the Alaskan areas listed in the Leasing Program, and that they have a sufficiently immediate and definite interest in enjoyment of the animals. Second, Petitioners have also shown, solely for the sake of Article III standing analysis, that Interior's adoption of an irrationally based Leasing Program could cause a substantial increase in the risk to their enjoyment of the animals affected by the offshore drilling, and that our setting aside and remand of the Leasing Program would redress their harm. We also conclude that both of these remaining OCSLA-based claims are ripe for review, as both concern OCSLA requirements that are implicated at the initial stage of a leasing program. Accordingly, we may also proceed to the merits of these two claims.

## III. MERITS OF THE REMAINING JUSTICIABLE CLAIMS

### A. Standard of Review

**\*13** [26][27] This court utilizes a "hybrid" standard of review when reviewing a leasing program for compliance with OCSLA. *See Watt I,* 668 F.2d at 1300.Findings of ascertainable fact are guided by the substantial evidence test. *Id.* at 1302.Under this standard, evidence upon which a finding is made must be "more than a scintilla," but may be less than a preponderance of the evidence. *FPL Energy Maine Hydro LLC v. FERC,* 287 F.3d 1151, 1160 (D.C.Cir.2002). An agency's policy judgments are reviewed to ensure that "the decision is based on a consideration of the relevant factors and whether there has been a clear error of judgment."*Watt I,*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

668 F.2d at 1302.This court gives substantial deference to the Secretary of Interior's interpretation of ambiguous provisions in OCSLA, so long as that interpretation is a "permissible construction of the statute." *See id.* at 1302-03.However, a statutory interpretation that does not effectuate Congress' intent must fall. *Id.* at 1303.

## B. OCSLA-based Climate Change Claims

Petitioners raise two distinct but related OCSLA-based climate change claims. First, Petitioners argue that the Secretary violated sections 18(a)(1) and (a)(3) of OCSLA by failing to account for the environmental costs resulting from consumption of the fossil fuels extracted from the OCS. Second, Petitioners contend that Interior violated section 18(a)(2) of OCSLA because Interior failed to adequately consider climate change caused by consumption of these fossil fuels and the present and future impact of climate change on OCS areas as section 18(a)(2)(H) requires. To the extent these claims concern Interior's alleged failure to consider the effects brought about by *consumption* of oil and gas extracted under the Program, we hold that OCSLA does not require Interior to consider the global environmental impact of oil and gas consumption before approving a Leasing Program. Therefore, OCSLA does not require Interior to consider the further derivative environmental impact that oil and gas consumption has on OCS areas. Accordingly, Petitioners' OCSLA climate change claims fail.

[28] Contrary to Petitioners' claims, the text of OCSLA does not require Interior to consider the impact of *consuming* oil and gas extracted under an offshore Leasing Program. Under Section 18(a) of OCSLA, Interior must prepare Leasing Programs so that "the size, timing, and location of leasing activity ... will best meet national energy needs."43 U.S.C. § 1344(a).Section 18(a)(1) states further that Interior must consider the values of resources "contained in the outer Continental Shelf," as well as "the potential impact of oil and gas *exploration* on other resource values of the [OCS] and the mar-

ine, coastal and human environments."43 U.S.C. § 1344(a)(1) (emphasis added). Similarly, section 18(a)(3) states that "[t]he Secretary shall select the timing and location of leasing ... so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone."43 U.S.C. § 1344(a)(3). We noted in *Watt I* that such a cost-benefit analysis of oil and gas extraction under section 18(a)(3) is satisfactory when an individual area's potential benefits are weighed against its potential costs. *See Watt I,* 668 F.2d at 1318.The Secretary therefore need only consider the "potential for environmental damage" on a localized area basis. And, under section 18(a)(2), Interior is required to determine the impacts of "exploration, development, and production" of oil and gas. As the statutory language and our precedent show, Interior's obligations under OCSLA extend to assessing the relative impacts of production and extraction of oil and gas on the localized areas in and around where the drilling and extraction occurred. Interior need not consider the impacts of the *consumption* of oil and gas after it has been extracted from the OCS. OCSLA therefore concerns the local environmental impact of leasing activities in the OCS and does not authorize-much less require-Interior to consider the environmental impact of post-exploration activities such as consuming fossil fuels on either the world at large, or the derivative impact of global fossil fuel consumption on OCS areas.

**\*14** Moreover, Interior's continuing duty to promulgate five-year Leasing Programs under OCSLA renders Interior's consideration of the effects of oil and gas consumption unnecessary. Petitioners argue that Interior's consideration of the environmental impacts of greenhouse emissions associated with the Program might have altered Interior's ultimate decisions concerning the Program's leasing activities, such that the OCS areas at issue here might not have been included in the Program. But Petitioners' argument ignores the fact that Interior's decisions about the size and location of leasing areas or the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

timing of oil and gas extraction do not affect the impact that *consuming* oil and gas may have on climate change. That environmental impact is the same regardless of where and how the oil and gas are extracted. Therefore, even if, as Petitioners assert, Interior were not to adopt the Program at issue here, Interior's continuing duty to promulgate Leasing Programs would compel it to promulgate a different Leasing Program, potentially approving oil and gas extraction from other areas of the OCS. This extraction would presumably lead to the same overall consumption effects as those under the current Program.

Petitioners' consumption-related claims appear to stem from the flawed premise that, before Interior approves an offshore oil and gas Leasing Program, it must first consider whether it should extract oil and gas from the OCS at all. But Congress has already decided that the OCS should be used to meet the nation's need for energy. Indeed, OCSLA instructs Interior to ensure that oil and gas are extracted *from the OCS* in an expeditious manner that minimizes the *local* environmental damage to the OCS. *See* 43 U.S.C. § 1344. Interior simply lacks the discretion to consider any global effects that oil and gas consumption may bring about. Interior was therefore correct to point out in its EIS that the more expansive effect of oil and gas consumption is a matter for the Congress to consider "when decisions are made regarding the role of oil and gas generally, including domestic production and imports, in the Nation's overall energy policy." Consequently, it was unnecessary for Interior to consider the climate change effects brought about by the consumption of oil and gas-either as oil and gas consumption affects the global environment generally or the OCS areas specifically.

Interior's decision to limit its inquiry to the effect of the Program's *production* activities on climate change is consistent with its obligations under OCSLA, and was not error. Here, there is no doubt that Interior considered the effects of the Program's production activities on climate change generally, and

the present and future impact of climate change on the local OCS areas. In the EIS, which Interior incorporated by reference in its Program approval, Interior estimated the total amount of greenhouse gas emissions that would result from leasing, exploration, and development in the OCS, and examined the cumulative impact of these emissions on the global environment. Interior also noted that potential impacts are "most pronounced in [the] Arctic Subregion," and could affect the areas of Alaska in which Petitioners assert an interest. Accordingly, Petitioners' OCSLA-based climate change claims fail.

**C. OCSLA Baseline Information Claim**

**\*15** In their OCSLA baseline data claim, Petitioners contend that Interior lacked sufficient baseline biological information for the Chukchi, Beaufort, and Bering Seas to rationally approve the Leasing Program. According to Petitioners, Section 20(b) of OCSLA requires Interior to establish, update, and monitor baseline information for OCS planning areas in a leasing program. *See* 43 U.S.C. § 1346(b). Petitioners argue that, despite this obligation, Interior has admitted that gaps exist in the data for the Beaufort, Bering, and Chukchi Seas. Notwithstanding the existence of these information gaps, Interior has indicated that it will defer the gathering of this data to fill these gaps until the Leasing Program reaches the later stages. Though Petitioners concede that Interior is not required to conduct all the comprehensive baseline research before approving the Leasing Program, Petitioners nevertheless argue that, in order for Interior to comply with OCSLA, Interior must either conduct comprehensive baseline research to fill these information gaps, or provide a research plan detailing how Interior intends to obtain this information before the next OCSLA stages. Petitioners argue that such a research plan is implicitly required by Section 18(b)(3) of OCSLA, which sets forth Interior's obligation to provide appropriations and staffing estimates for conducting environmental studies and preparing an EIS. *See* 43 U.S.C. § 1344(b)(3). Interior's failure to

comply with either requirement before approving the Leasing Program has prevented Interior from fully considering Section 18(a)(2)'s factors, which, in turn, has skewed Interior's balancing of those factors under Section 18(a)(3) of OCSLA. *See* 43 U.S.C. §§ 1344(a)(2)-(3). As a result, Petitioners argue, the Leasing Program lacks any rational support.

This argument is wholly without merit. Though Section 20(b) imposes a requirement to conduct additional studies to establish environmental information for a particular area, this obligation commences "*[s]ubsequent to the leasing and development*" of that area. 43 U.S.C. § 1346(b) (emphasis added). Where, as here, Interior has merely completed the approval stage of a leasing program, Section 20(b)'s additional research requirements are not yet implicated. Indeed, Petitioners' proper concession that Interior is not required to complete its comprehensive baseline research prior to approving the Leasing Program confirms this interpretation. In fact, this concession undermines Petitioners' argument that such research is required at the initial program approval stage. Having made such a concession, Petitioners cannot now credibly argue that Section 20(b) of OCSLA somehow required Petitioners to complete this research before the Leasing Program was approved.

[29] Even if Petitioners were able to rely on Section 20(b) to support their claim that the Leasing Program was irrational due to gaps in the baseline data, this argument would falter because, based on the record, Interior relied on substantial baseline evidence in approving the Leasing Program. As its final EIS demonstrates, Interior considered and chronicled the geological, biological, and environmental information of the Beaufort, Bering, and Chukchi Seas, and many of their inhabitants. To be sure, a review of areas as wide and diversely populated as these Arctic seas will likely miss some of the seas' myriad inhabitants. These gaps in information, however, must be considered in conjunction with the "pyramidic structure" of a five-year leasing pro-

gram. *Watt I,* 668 F.2d at 1297. At this early stage of the Leasing Program, the existence of some gaps in the baseline data for these three seas is not fatal to the Leasing Program. This is also tempered by the fact that Interior has recognized that such gaps exist and has indicated its intention to conduct additional research to close them. *North Slope,* 642 F.2d at 613 (affirming the district court's denial of petitioners' OCSLA claim that research was insufficient because Interior acknowledged that "[m]ore research is necessary; the research is being done").

**\*16** [30] Petitioners are therefore left with their only remaining argument: to comply with OCSLA, Interior must provide a research plan detailing how it attempts to obtain the necessary baseline information before the next stage of the Leasing Program. However, OCSLA does not set forth a requirement that Interior must provide such a plan for obtaining this baseline data. Petitioners' claim that Section 18(b)(3) implicitly sets forth such a requirement is off the mark. Section 18(b)(3) states that a leasing program "shall include estimates of the appropriations and staff required to ... conduct environmental studies and prepare any environmental impact statement." 43 U.S.C. § 1344(b)(3). In other words, Section 18(b)(3) simply requires that Interior *estimate* how many staff and how much money it needs to obtain environmental impact information. It does not require that Interior set forth a research plan detailing what exact environmental information Interior needs, or how or when Interior plans on obtaining that information. Petitioners' interpretation is therefore counter to the clear language of the statute. Accordingly, Petitioners' baseline data claim must fail.

### D. NOAA Study Claim

[31] Section 18(a)(2)(G) of OCSLA requires agencies to consider "the relative environmental sensitivity of ... different areas of the outer Continental Shelf." 43 U.S.C. § 1344(a)(2)(G). In its efforts to comply with this requirement, Interior ranked the environmental sensitivity of various program areas

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

in terms of only one factor: the "physical characteristics" of the shoreline of those areas. This ranking was based on Interior's use of the Environmental Sensitivity Index, developed by NOAA, which considered the sensitivity of different shoreline areas to oil spills, and ranked them on that basis. The study ranked each area on a scale of 1 to 10 (with 10 being a rating for an area most likely to be damaged long-term by oil spills). Petitioners contend that Interior's sole reliance on this study to measure the environmental sensitivity of the potential OCS leasing areas in the Leasing Program renders the Program improper. Interior counters that this court has stated that Section 18(a)(2)(G)"provides no method by which environmental sensitivity ... [is] to be measured."*Watt I,* 668 F.2d at 1311.Accordingly, Interior argues that its adoption of the NOAA shoreline study to determine environmental sensitivity of OCS areas is a policy judgment that is entitled to substantial deference.

Interior's argument is not consistent with controlling precedent. Our decisions in *California v. Watt (Watt II),* 712 F.2d 584 (D.C.Cir.1983), and *Watt I* set forth the standard for Interior's compliance with Section 18(a)(2)(G). In *Watt II,* we affirmed our holding in *Watt I* that all that is required for compliance with Section 18(a)(2)(G) is "that the Secretary make a good faith determination of the relative environmental sensitivity ... of the various regions based upon the best 'existing information' available to him."*Watt II,* 712 F.2d at 596 (quoting *Watt I,* 668 F.2d at 1313). Accordingly, the Secretary was "free to choose any methodology 'so long as it is not irrational.'"*Watt II,* 712 F.2d at 596 (quoting *Watt I,* 668 F.2d at 1320). The Secretary's decision is not irrational so long as it is "based on a consideration of the relevant factors."*Watt I,* 668 F.2d at 1317.

**\*17** Interior's interpretation of Section 18(a)(2)(G) is irrational. It was not based on a consideration of the relevant factors set forth therein.Section 18(a)(2)(G) states clearly that an agency must assess the environmental sensitivity of "different

areas *of the outer Continental Shelf* " in order to make its determination of when and where to explore and develop additional areas for oil. 43 U.S.C. § 1344(a)(2)(G) (emphasis added). Based on this language alone, Interior's use of the NOAA study runs afoul of this provision because it assesses only the effects of oil spills on shorelines. Interior provides no explanation for how the environmental sensitivity of coastal shoreline areas can serve as a substitute for the environmental sensitivity of OCS areas, when the coastline and proposed leasing areas are so distant from each other. This interpretation runs directly counter to the statutory language.

Moreover, though *Watt II* and *Watt I* afforded Interior a great deal of leeway in determining how to comply with Section 18(a)(2)(G), they did not give Interior carte blanche to wholly disregard a statutory requirement out of convenience. The law plainly requires that Interior examine and compare the environmental sensitivity of different areas of the OCS. Though the law allows Interior to consider the environmental sensitivity of onshore areas to OCS development, it plainly does not allow Interior to consider *only* onshore areas. Interior's sole focus on the environmental sensitivity of shoreline areas to OCS development therefore falls short of what Section 18(a)(2)(G) requires. Accordingly, Interior's Section 18(a)(2)(G) analysis is inadequate.

Our conclusion that Interior failed to properly conduct an environmental sensitivity analysis under Section 18(a)(2)(G) does not end our inquiry. We have consistently linked the adequacy of Interior's analysis under Section 18(a)(2) with its analysis under Section 18(a)(3).*See Watt II,* 712 F.2d at 599 & n. 75;*Watt I,* 668 F.2d at 1318.Section 18(a)(3) requires that, when preparing a leasing program, Interior select, "to the maximum extent practicable," the "timing and location of leasing ... so as to obtain a proper balance between the potential for environmental damage, potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone."43 U.S.C. § 1344(a)(3). In es-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

sence, these three elements are "a condensation of the factors specified in section 18(a)(2)."*Watt I,* 668 F.2d at 1315.Though Section 18(a)(3) does not define specifically how Interior shall balance these three elements, *Watt I,* 668 F.2d at 1315, it stands to reason that a flawed consideration of Section 18(a)(2) factors hinders Interior's ability to obtain a proper balance of the factors under Section 18(a)(3). Interior's failure to properly consider the environmental sensitivity of different areas of the OCS-areas *beyond* the Alaskan coastline-has therefore also hindered Interior's ability to comply with Section 18(a)(3)'s balancing requirement.

**\*18** Consequently, on remand, the Secretary must first conduct a more complete comparative analysis of the environmental sensitivity of different areas "*of the outer Continental Shelf,*" 43 U.S.C. § 1344(a)(2)(G) (emphasis added), and "must at least attempt to identify those areas whose environment and marine productivity are most and least sensitive to OCS activity." *Watt I,* 668 F.2d at 1313.Though Interior may ultimately conclude as a result of this additional analysis that the shorelines of the Beaufort, Bering, and Chukchi Seas are the areas that are most sensitive to OCS development, such a conclusion cannot be reached without considering the effects of development on areas of the OCS in addition to the shoreline. Once Interior has conducted its Section 18(a)(2)(G) analysis, Interior must then determine whether its reconsideration of the environmental sensitivity analysis warrants the exclusion of any proposed area in the Leasing Program. *See Watt I,* 668 F.2d at 1314.Finally, having reconsidered its Section 18(a)(2) analysis, Interior must reassess the timing and location of the Leasing Program "so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone," as required by Section 18(a)(3).43 U.S.C. § 1344(a)(3).

## IV. RELIEF

Section 23(c)(6) of OCSLA provides that, on review, a court of appeals "may affirm, vacate, or modify any order or decision or may remand the proceedings to the Secretary for such further action as it may direct."43 U.S.C. § 1349(c)(6). Petitioners request that we vacate the Leasing Program and remand the Program to Interior for additional reconsideration. In light of Interior's failure to properly consider the relative environmental sensitivity and marine productivity of different areas of the OCS under Section 18(a)(2)(G), and its derivative failure to strike a proper balance incorporating environmental and coastal zone factors under Section 18(a)(3), we grant the relief requested. Therefore, we vacate the Leasing Program and remand the Program to the Secretary for reconsideration in accordance with this opinion.

So ordered.

ROGERS, Circuit Judge, concurring:

I join the court's opinion, but I write separately to emphasize two points. First, because the court holds petitioners have standing to bring their climate change claims on their "procedural theory" of standing, Op. at ---- - ----, it is unnecessary for the court to reach the question whether petitioners would also have standing under their "substantive theory" of standing, Op. at ---- - ----, *see, e.g., U.S. Telecom Ass'n v. FCC,* 295 F.3d 1326, 1331 n. 4 (D.C.Cir.2002). Determining the precise scope of the holding on standing in *Massachusetts v. EPA,* 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007), and whether the Native Village of Point Hope has identified by affidavit particularized harms to its culture and way of life from climate change sufficient to establish Article III standing, for example, remain for another day, *see Gersman v. Group Health Ass'n, Inc.,* 975 F.2d 886, 897 (D.C.Cir.1992). Second, as this appeal concerns only stage one of the Secretary's 5-Year Leasing Program (2007-2012) under OCSLA, the court has no occasion to opine regarding the Secretary's discretion to consider the global effects of oil and gas consumption, Op. at ----, other than to hold that the Secretary is not required by OCSLA to consider

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

such effects at stage one.

> FN1. Petitioners claim that Interior's adoption of the Program could result in further exploration and seismic testing by third parties in the Program areas. Petitioners fail to point to any evidence that the Program itself authorizes anyone to conduct seismic testing or engage in any other activity detrimental to wildlife in the Program areas. Nor does anything in the record suggest that seismic testing or other exploration activities have been or will be conducted without being separately authorized by the Secretary of Interior. *Cf.* 30 C.F.R. § 251.4 (requiring permit for geological and geophysical exploration, including seismic testing and test drilling, of the OCS); Mineral Mgmt Svc., Dep't of the Interior, Recent G & G Permit Applications, Alaska OCS Region, http://www.mms.gov/alaska/re/recentgg/recentgg.htm (last visited Mar. 30, 2009). Moreover, the fact that Interior conducted one lease-sale in the Chukchi Sea since the time these petitions for review were filed does not make either Petitioners' NEPA claims or its ESA claim more ripe because Interior apparently undertook the additional requisite steps under NEPA and ESA prior to conducting that one lease-sale. *See* Chukchi Sea Planning Area Oil and Gas Lease Sale 193 and Seismic Surveying Activities in the Chukchi Sea, 72 Fed.Reg. 32,860 (June 14, 2007) (notice of availability of a Final Environmental Impact Statement). Point Hope and others have challenged the validity of this lease-sale in federal court in Alaska, and it is not at issue here.

> FN2. *See* note 1, *supra.*

C.A.D.C.,2009.
Center for Biological Diversity v. U.S. Dept. of Interior

--- F.3d ----, 2009 WL 1025375 (C.A.D.C.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.