# EXHIBIT A



LEXSEE 129 S. CT. 1187

**WYETH, PETITIONER v. DIANA LEVINE**

**No. 06-1249**

**SUPREME COURT OF THE UNITED STATES**

*129 S. Ct. 1187; 173 L. Ed. 2d 51; 2009 U.S. LEXIS 1774; CCH Prod. Liab. Rep.*
*P18,176; 21 Fla. L. Weekly Fed. S 675*

**November 3, 2008, Argued**
**March 4, 2009, Decided**

**NOTICE:**

The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:  [***1]**
ON WRIT OF CERTIORARI TO THE SUPREME COURT OF VERMONT.
*Levine v. Wyeth, 183 Vt. 76, 944 A.2d 179, 2006 Vt. LEXIS 306 (2006)*

**DISPOSITION:**   Affirmed.

**SYLLABUS**

Petitioner Wyeth manufactures the antinausea drug Phenergan. After a clinician injected respondent Levine with Phenergan by the "IV-push" method, whereby a drug is injected directly into a patient's vein, the drug entered Levine's artery, she developed gangrene, and doctors amputated her forearm. Levine brought a state-law damages action, alleging, *inter alia,* that Wyeth had failed to provide an adequate warning about the significant risks of administering Phenergan by the IV-push method. The Vermont jury determined that Levine's injury would not have occurred if Phenergan's label included an adequate warning, and it awarded damages for her pain and suffering, substantial medical expenses, and loss of her livelihood as a professional musician. Declining to overturn the verdict, the trial court rejected Wyeth's argument that Levine's failure-to-warn claims were pre-empted by federal law because Phenergan's labeling had been approved by the federal Food and Drug Administration (FDA). The Vermont Supreme Court affirmed.

*Held:* Federal law does not pre-empt Levine's claim that Phenergan's label did  [***2] not contain an adequate warning about the IV-push method of administration. Pp. 6-25.

(a) The argument that Levine's state-law claims are pre-empted because it is impossible for Wyeth to comply with both the state-law duties underlying those claims and its federal labeling duties is rejected. Although a manufacturer generally may change a drug label only after the FDA approves a supplemental application, the agency's "changes being effected" (CBE) regulation permits certain preapproval labeling changes that add or strengthen a warning to improve drug safety. Pursuant to the CBE regulation, Wyeth could have unilaterally added a stronger warning about IV-push administration, and there is no evidence that the FDA would ultimately have rejected such a labeling change. Wyeth's cramped reading of the CBE regulation and its broad assertion that unilaterally changing the Phenergan label would have violated federal law governing unauthorized distribution and misbranding of drugs are based on the fundamental misunderstanding that the FDA, rather than the manufacturer, bears primary responsibility for drug labeling. It is a central premise of the Food, Drug, and Cosmetic Act (FDCA) and the FDA's  [***3] regulations that the manufacturer bears responsibility for the content of its label at all times. Pp. 11-16.

129 S. Ct. 1187, *; 173 L. Ed. 2d 51, **;
2009 U.S. LEXIS 1774, ***3; CCH Prod. Liab. Rep. P18,176

(b) Wyeth's argument that requiring it to comply with a state-law duty to provide a stronger warning would interfere with Congress' purpose of entrusting an expert agency with drug labeling decisions is meritless because it relies on an untenable interpretation of congressional intent and an overbroad view of an agency's power to pre-empt state law. The history of the FDCA shows that Congress did not intend to pre-empt state-law failure-to-warn actions. In advancing the argument that the FDA must be presumed to have established a specific labeling standard that leaves no room for different state-law judgments, Wyeth relies not on any statement by Congress but on the preamble to a 2006 FDA regulation declaring that state-law failure-to-warn claims threaten the FDA's statutorily prescribed role. Although an agency regulation with the force of law can pre-empt conflicting state requirements, this case involves no such regulation but merely an agency's assertion that state law is an obstacle to achieving its statutory objectives. Where, as here, Congress has not authorized a federal **[***4]** agency to pre-empt state law directly, the weight this Court accords the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness. Cf., *e.g., Skidmore v. Swift & Co., 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124.* Under this standard, the FDA's 2006 preamble does not merit deference: It is inherently suspect in light of the FDA's failure to offer interested parties notice or opportunity for comment on the pre-emption question; it is at odds with the available evidence of Congress' purposes; and it reverses the FDA's own longstanding position that state law is a complementary form of drug regulation without providing a reasoned explanation. *Geier v. American Honda Motor Co., 529 U.S. 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914,* is distinguished. Pp. 17-25.

*183 Vt. 76, 2006 VT 107, 944 A.2d 179,* affirmed.

**COUNSEL:** **Seth P. Waxman** argued the cause for petitioner. **Edwin S. Kneedler** argued the cause for the United States, as amicus curiae, by special leave of court. **David C. Frederick** argued the cause for respondent.

**JUDGES:** STEVENS, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion. THOMAS, J., filed an opinion concurring in the judgment. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and SCALIA, J.,

joined.

**OPINION BY:** STEVENS

**OPINION**

   **[*1190]** **[**56]** JUSTICE STEVENS delivered the opinion of the Court.

   Directly injecting the drug Phenergan into a patient's **[***5]** vein creates a significant risk of catastrophic consequences. A Vermont **[*1191]** jury found that petitioner Wyeth, the manufacturer of the drug, had failed to provide an adequate warning of that risk and awarded damages to respondent Diana Levine to compensate her for the amputation of her arm. The warnings on Phenergan's label had been deemed sufficient by the federal Food and Drug Administration (FDA) when it approved Wyeth's new drug application in 1955 and when it later approved changes in the drug's labeling. The question we must decide is whether the FDA's approvals provide Wyeth with a complete defense to Levine's tort claims. We conclude that they do not.

I

   Phenergan is Wyeth's brand name for promethazine hydrochloride, an antihistamine used to treat nausea. The injectable form of Phenergan can be administered intramuscularly or intravenously, and it can be administered intravenously through either the "IV-push" method, whereby the drug is injected directly into a patient's vein, or the "IV-drip" method, whereby the drug is introduced into a saline solution in a hanging intravenous bag and slowly descends through a catheter inserted in a patient's vein. The drug is corrosive and causes **[***6]** irreversible gangrene if it enters a patient's artery.

   Levine's injury resulted from an IV-push injection of Phenergan. On April 7, 2000, as on previous visits to her local clinic for treatment of a migraine headache, she received an intramuscular injection of Demerol for her headache and Phenergan for her nausea. Because the combination did not provide relief, she returned later that day and received a second **[**57]** injection of both drugs. This time, the physician assistant administered the drugs by the IV-push method, and Phenergan entered Levine's artery, either because the needle penetrated an artery directly or because the drug escaped from the vein into surrounding tissue (a phenomenon called

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page4 of 58

Page 3

129 S. Ct. 1187, *1191; 173 L. Ed. 2d 51, **57;
2009 U.S. LEXIS 1774, ***6; CCH Prod. Liab. Rep. P18,176

"perivascular extravasation") where it came in contact with arterial blood. As a result, Levine developed gangrene, and doctors amputated first her right hand and then her entire forearm. In addition to her pain and suffering, Levine incurred substantial medical expenses and the loss of her livelihood as a professional musician.

After settling claims against the health center and clinician, Levine brought an action for damages against Wyeth, relying on common-law negligence and strict-liability [***7] theories. Although Phenergan's labeling warned of the danger of gangrene and amputation following inadvertent intra-arterial injection, 1 Levine alleged that [*1192] the labeling was defective because it failed to instruct clinicians to use the IV-drip method of intravenous administration instead of the higher risk IV-push method. More broadly, she alleged that Phenergan is not reasonably safe for intravenous administration because the foreseeable risks of gangrene and loss of limb are great in relation to the drug's therapeutic benefits. App. 14-15.

> 1    The warning for "Inadvertent Intra-arterial Injection" stated: "Due to the close proximity of arteries and veins in the areas most commonly used for intravenous injection, extreme care should be exercised to avoid perivascular extravasation or inadvertent intra-arterial injection. Reports compatible with inadvertent intra-arterial injection of Phenergan Injection, usually in conjunction with other drugs intended for intravenous use, suggest that pain, severe chemical irritation, severe spasm of distal vessels, and resultant gangrene requiring amputation are likely under such circumstances. Intravenous injection was intended in all the cases reported [***8] but perivascular extravasation or arterial placement of the needle is now suspect. There is no proven successful management of this condition after it occurs. . . . Aspiration of dark blood does not preclude intra-arterial needle placement, because blood is discolored upon contact with Phenergan Injection. Use of syringes with rigid plungers or of small bore needles might obscure typical arterial backflow if this is relied upon alone. When used intravenously, Phenergan Injection should be given in a concentration no greater than 25 mg per mL and at a rate not to exceed 25 mg per minute. When administering any irritant drug intravenously, it is usually preferable to inject it through the tubing of an intravenous infusion set that is known to be functioning satisfactorily. In the event that a patient complains of pain during intended intravenous injection of Phenergan Injection, the injection should be stopped immediately to provide for evaluation of possible arterial placement or perivascular extravasation." App. 390.

Wyeth filed a motion for summary judgment, arguing that Levine's failure-to-warn claims were pre-empted by federal law. The court found no merit in either Wyeth's field [***9] pre-emption argument, which it has since abandoned, or its conflict pre-emption argument. With respect to the contention that there was an "actual conflict between a specific FDA order," id., at 21, and Levine's failure-to-warn action, the court reviewed the sparse correspondence between Wyeth and the FDA about Phenergan's labeling and found no evidence that Wyeth had "earnestly attempted" to strengthen the intra-arterial injection warning or that the FDA had "specifically disallowed" stronger language, id., at 23. The record, as then developed, "lack[ed] any evidence that the FDA set a ceiling on this matter." Ibid.

The evidence presented during the 5-day jury trial showed that the risk of intra-arterial injection or perivascular extravasation can be almost entirely eliminated through the use of [**58] IV-drip, rather than IV-push, administration. An IV drip is started with saline, which will not flow properly if the catheter is not in the vein and fluid is entering an artery or surrounding tissue. See id., at 50-51, 60, 66-68, 75. By contrast, even a careful and experienced clinician using the IV-push method will occasionally expose an artery to Phenergan. See id., at 73, 75-76. While Phenergan's [***10] labeling warned against intra-arterial injection and perivascular extravasation and advised that "[w]hen administering any irritant drug intravenously it is usually preferable to inject it through the tubing of an intravenous infusion set that is known to be functioning satisfactorily," id., at 390, the labeling did not contain a specific warning about the risks of IV-push administration.

The trial record also contains correspondence between Wyeth and the FDA discussing Phenergan's label. The FDA first approved injectable Phenergan in 1955. In 1973 and 1976, Wyeth submitted supplemental new drug applications, which the agency approved after

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page5 of 58

Page 4

129 S. Ct. 1187, *1192; 173 L. Ed. 2d 51, **58;
2009 U.S. LEXIS 1774, ***10; CCH Prod. Liab. Rep. P18,176

proposing labeling changes. Wyeth submitted a third supplemental application in 1981 in response to a new FDA rule governing drug labels. Over the next 17 years, Wyeth and the FDA intermittently corresponded about Phenergan's label. The most notable activity occurred in 1987, when the FDA suggested different warnings about the risk of arterial exposure, and in 1988, when Wyeth submitted revised labeling incorporating the proposed changes. The FDA did not respond. Instead, in 1996, it requested from Wyeth the labeling then in use and, without addressing [***11] Wyeth's 1988 submission, instructed it to "[r]etain verbiage in current label" regarding intra-arterial injection. *Id.*, at 359. After a few further changes to the labeling not related to intra-arterial injection, the FDA approved Wyeth's 1981 application in 1998, instructing that Phenergan's final printed label "must be identical" to the approved package insert. *Id.*, at 382.

Based on this regulatory history, the trial judge instructed the jury that it could [*1193] consider evidence of Wyeth's compliance with FDA requirements but that such compliance did not establish that the warnings were adequate. He also instructed, without objection from Wyeth, that FDA regulations "permit a drug manufacturer to change a product label to add or strengthen a warning about its product without prior FDA approval so long as it later submits the revised warning for review and approval." *Id.*, at 228.

Answering questions on a special verdict form, the jury found that Wyeth was negligent, that Phenergan was a defective product as a result of inadequate warnings and instructions, and that no intervening cause had broken the causal connection between the product defects and the plaintiff's injury. *Id.*, at 233-235. [***12] It awarded total damages of $ 7,400,000, which the court reduced to account for Levine's earlier settlement with the health center and clinician. *Id.*, at 235-236.

On August 3, 2004, the trial court filed a comprehensive opinion denying Wyeth's motion for judgment as a matter of law. After making findings of fact based on the trial record (supplemented by one letter that Wyeth found after the trial), the court rejected Wyeth's pre-emption arguments. It determined that there was no direct conflict between FDA regulations [**59] and Levine's state-law claims because those regulations permit strengthened warnings without FDA approval on an interim basis and the record contained evidence of at

least 20 reports of amputations similar to Levine's since the 1960's. The court also found that state tort liability in this case would not obstruct the FDA's work because the agency had paid no more than passing attention to the question whether to warn against IV-push administration of Phenergan. In addition, the court noted that state law serves a compensatory function distinct from federal regulation. *Id.*, at 249-252.

The Vermont Supreme Court affirmed. It held that the jury's verdict "did not conflict [***13] with FDA's labeling requirements for Phenergan because [Wyeth] could have warned against IV-push administration without prior FDA approval, and because federal labeling requirements create a floor, not a ceiling, for state regulation." *183 Vt. 76, 84, 944 A.2d 179, 184 (2006)*. In dissent, Chief Justice Reiber argued that the jury's verdict conflicted with federal law because it was inconsistent with the FDA's conclusion that intravenous administration of Phenergan was safe and effective.

The importance of the pre-emption issue, coupled with the fact that the FDA has changed its position on state tort law and now endorses the views expressed in Chief Justice Reiber's dissent, persuaded us to grant Wyeth's petition for certiorari. *552 U.S. ___ , 128 S. Ct. 1118, 169 L. Ed. 2d 845 (2008)*. The question presented by the petition is whether the FDA's drug labeling judgments "preempt state law product liability claims premised on the theory that different labeling judgments were necessary to make drugs reasonably safe for use." Pet. for Cert. *i*.

II

Wyeth makes two separate pre-emption arguments: first, that it would have been impossible for it to comply with the state-law duty to modify Phenergan's labeling without violating federal [***14] law, see *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982)*, and second, that recognition of Levine's state tort action creates an unacceptable "obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz, 312 U.S. 52, 67, 61* [*1194] *S. Ct. 399, 85 L. Ed. 581 (1941)*, because it substitutes a lay jury's decision about drug labeling for the expert judgment of the FDA. As a preface to our evaluation of these arguments, we identify two factual propositions decided during the trial court proceedings, emphasize two legal principles that guide our analysis,

and review the history of the controlling federal statute.

The trial court proceedings established that Levine's injury would not have occurred if Phenergan's label had included an adequate warning about the risks of the IV-push method of administering the drug. The record contains evidence that the physician assistant administered a greater dose than the label prescribed, that she may have inadvertently injected the drug into an artery rather than a vein, and that she continued to inject the drug after Levine complained of pain. Nevertheless, the jury rejected Wyeth's argument that the clinician's [***15] conduct was an intervening cause that absolved it of liability. See App. 234 (jury verdict), 252-254. In finding Wyeth negligent as well as strictly [**60] liable, the jury also determined that Levine's injury was foreseeable. That the inadequate label was both a but-for and proximate cause of Levine's injury is supported by the record and no longer challenged by Wyeth. 2

> 2     The dissent nonetheless suggests that physician malpractice was the exclusive cause of Levine's injury. See, *e.g.*, *post*, at 1 (opinion of ALITO, J.) ("[I]t is unclear how a 'stronger' warning could have helped respondent"); *post*, at 16-18 (suggesting that the physician assistant's conduct was the sole cause of the injury). The dissent's frustration with the jury's verdict does not put the merits of Levine's tort claim before us, nor does it change the question we must decide -- whether federal law pre-empts Levine's state-law claims.

The trial court proceedings further established that the critical defect in Phenergan's label was the lack of an adequate warning about the risks of IV-push administration. Levine also offered evidence that the IV-push method should be contraindicated and that Phenergan should never be administered [***16] intravenously, even by the IV-drip method. Perhaps for this reason, the dissent incorrectly assumes that the state-law duty at issue is the duty to contraindicate the IV-push method. See, *e.g.*, *post*, at 8, 25. But, as the Vermont Supreme Court explained, the jury verdict established only that Phenergan's warning was insufficient. It did not mandate a particular replacement warning, nor did it require contraindicating IV-push administration: "There may have been any number of ways for [Wyeth] to strengthen the Phenergan warning without completely eliminating IV-push administration."

*183 Vt., at 93, n. 2, 944 A. 2d, at 189, n. 2*. We therefore need not decide whether a state rule proscribing intravenous administration would be pre-empted. The narrower question presented is whether federal law pre-empts Levine's claim that Phenergan's label did not contain an adequate warning about using the IV-push method of administration.

Our answer to that question must be guided by two cornerstones of our pre-emption jurisprudence. First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996)* (internal quotation marks omitted); [***17] see *Retail Clerks v. Schermerhorn, 375 U.S. 96, 103, 84 S. Ct. 219, 11 L. Ed. 2d 179 (1963)*. Second, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police [*1195] powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Lohr, 518 U.S., at 485, 116 S. Ct. 2240, 135 L. Ed. 2d 700* (quoting *Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947))*. 3

> 3     Wyeth argues that the presumption against pre-emption should not apply to this case because the Federal Government has regulated drug labeling for more than a century. That argument misunderstands the principle: We rely on the presumption because respect for the States as "independent sovereigns in our federal system" leads us to assume that "Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996)*. The presumption thus accounts for the historic presence of state law but does not rely on the absence of federal regulation.

For its part, the dissent argues that the presumption against pre-emption should not apply to claims of implied [***18] conflict pre-emption at all, *post*, at 21, but this Court has long held to the contrary. See, *e.g.*, *California v. ARC America Corp., 490 U.S. 93, 101-102, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989)*; *Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 716, 105 S. Ct. 2371, 85 L. Ed. 2d 714*

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page7 of 58

Page 6

129 S. Ct. 1187, *1195; 173 L. Ed. 2d 51, **60;
2009 U.S. LEXIS 1774, ***18; CCH Prod. Liab. Rep. P18,176

*(1985)*; see also *Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 387, 122 S. Ct. 2151, 153 L. Ed. 2d 375 (2002)*. The dissent's reliance on *Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001)*, see *post*, at 21, and n. 14, is especially curious, as that case involved state-law fraud-on-the-agency claims, and the Court distinguished state regulation of health and safety as matters to which the presumption does apply. See *531 U.S., at 347-348, 121 S. Ct. 1012, 148 L. Ed. 2d 854*.

In order to identify the "purpose of **[**61]** Congress," it is appropriate to briefly review the history of federal regulation of drugs and drug labeling. In 1906, Congress enacted its first significant public health law, the Federal Food and Drugs Act, ch. 3915, 34 Stat. 768. The Act, which prohibited the manufacture or interstate shipment of adulterated or misbranded drugs, supplemented the protection for consumers already provided by state regulation and common-law liability. In the 1930's, Congress became increasingly concerned about unsafe drugs **[***19]** and fraudulent marketing, and it enacted the Federal Food, Drug, and Cosmetic Act (FDCA), ch. 675, 52 Stat. 1040, as amended, *21 U.S.C. § 301 et seq.* The Act's most substantial innovation was its provision for premarket approval of new drugs. It required every manufacturer to submit a new drug application, including reports of investigations and specimens of proposed labeling, to the FDA for review. Until its application became effective, a manufacturer was prohibited from distributing a drug. The FDA could reject an application if it determined that the drug was not safe for use as labeled, though if the agency failed to act, an application became effective 60 days after the filing. FDCA, § 505(c), 52 Stat. 1052.

In 1962, Congress amended the FDCA and shifted the burden of proof from the FDA to the manufacturer. Before 1962, the agency had to prove harm to keep a drug out of the market, but the amendments required the manufacturer to demonstrate that its drug was "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling" before it could distribute the drug. §§ 102(d)104(b), 76 Stat. 781, 784. In addition, the amendments required the manufacturer **[***20]** to prove the drug's effectiveness by introducing "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the

proposed labeling." § 102(d), *id.*, at 781.

As it enlarged the FDA's powers to "protect the public health" and "assure the safety, effectiveness, and reliability of **[*1196]** drugs," *id.*, at 780, Congress took care to preserve state law. The 1962 amendments added a saving clause, indicating that a provision of state law would only be invalidated upon a "direct and positive conflict" with the FDCA. § 202, *id.*, at 793. Consistent with that provision, state common-law suits "continued unabated despite . . . FDA regulation." *Riegel v. Medtronic, Inc., 552 U.S. ___, ___, 128 S. Ct. 999, 1018, 169 L. Ed. 2d 892, 914 (2008)* (GINSBURG, J., dissenting); see *ibid.*, n. 11 (collecting state cases). And when Congress enacted an express pre-emption provision for medical devices in 1976, see § 521, 90 Stat. 574 (codified at *21 U.S.C. § 360k(a)*), it declined to enact such a provision for prescription drugs.

In 2007, after Levine's injury **[**62]** and lawsuit, Congress again amended the FDCA. 121 Stat. 823. For the first time, it granted **[***21]** the FDA statutory authority to require a manufacturer to change its drug label based on safety information that becomes available after a drug's initial approval. § 901(a), *id.*, at 924-926. In doing so, however, Congress did not enact a provision in the Senate bill that would have required the FDA to preapprove all changes to drug labels. See S. 1082, 110th Cong., 1st Sess., § 208, pp. 107-114 (2007) (as passed) (proposing new § 506D). Instead, it adopted a rule of construction to make it clear that manufacturers remain responsible for updating their labels. See 121 Stat. 925-926.

## III

Wyeth first argues that Levine's state-law claims are pre-empted because it is impossible for it to comply with both the state-law duties underlying those claims and its federal labeling duties. See *de la Cuesta, 458 U.S., at 153, 102 S. Ct. 3014, 73 L. Ed. 2d 664*. The FDA's premarket approval of a new drug application includes the approval of the exact text in the proposed label. See *21 U.S.C. § 355; 21 CFR § 314.105(b) (2008)*. Generally speaking, a manufacturer may only change a drug label after the FDA approves a supplemental application. There is, however, an FDA regulation that permits a manufacturer to make certain changes to its label **[***22]** before receiving the agency's approval. Among other things, this "changes being effected" (CBE) regulation provides that if a manufacturer is changing a

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page8 of 58

Page 7

129 S. Ct. 1187, *1196; 173 L. Ed. 2d 51, **62;
2009 U.S. LEXIS 1774, ***22; CCH Prod. Liab. Rep. P18,176

label to "add or strengthen a contraindication, warning, precaution, or adverse reaction" or to "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product," it may make the labeling change upon filing its supplemental application with the FDA; it need not wait for FDA approval. *§§ 314.70(c)(6)(iii)(A), (C)*.

Wyeth argues that the CBE regulation is not implicated in this case because a 2008 amendment provides that a manufacturer may only change its label "to reflect newly acquired information."73 Fed. Reg. 49603, 49609. Resting on this language (which Wyeth argues simply reaffirmed the interpretation of the regulation in effect when this case was tried), Wyeth contends that it could have changed Phenergan's label only in response to new information that the FDA had not considered. And it maintains that Levine has not pointed to any such information concerning the risks of IV-push administration. Thus, Wyeth insists, it was impossible for it to discharge its state-law obligation **[\*\*\*23]** to provide a stronger warning about IV-push administration without violating federal law. Wyeth's argument misapprehends both the federal drug regulatory scheme and its burden in establishing a pre-emption defense.

We need not decide whether the 2008 CBE regulation is consistent with the FDCA and the previous version of the **[\*1197]** regulation, as Wyeth and the United States urge, because Wyeth could have revised Phenergan's label even in accordance with the amended regulation. As the FDA explained in its notice of the final rule, "'newly acquired information'" is not limited to new data, but also encompasses "new analyses of previously submitted data." *Id.*, at 49604. The rule accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent **[\*\*63]** developments: "[I]f the sponsor submits adverse event information to FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.'" *Id.*, at 49607; see also *id.*, at 49606.

The record is limited concerning what **[\*\*\*24]** newly acquired information Wyeth had or should have had about the risks of IV-push administration of Phenergan because Wyeth did not argue before the trial court that such information was required for a CBE

labeling change. Levine did, however, present evidence of at least 20 incidents prior to her injury in which a Phenergan injection resulted in gangrene and an amputation. See App. 74, 252. [4] After the first such incident came to Wyeth's attention in 1967, it notified the FDA and worked with the agency to change Phenergan's label. In later years, as amputations continued to occur, Wyeth could have analyzed the accumulating data and added a stronger warning about IV-push administration of the drug.

> 4   Levine also introduced evidence that Pfizer had withdrawn Vistaril, another antinausea drug, from intravenous use several decades earlier because its intravenous injection had resulted in gangrene and amputations. See App. 79.

Wyeth argues that if it had unilaterally added such a warning, it would have violated federal law governing unauthorized distribution and misbranding. Its argument that a change in Phenergan's labeling would have subjected it to liability for unauthorized distribution **[\*\*\*25]** rests on the assumption that this labeling change would have rendered Phenergan a new drug lacking an effective application. But strengthening the warning about IV-push administration would not have made Phenergan a new drug. See *21 U.S.C. § 321(p)(1)* (defining "new drug"); *21 CFR § 310.3(h)*. Nor would this warning have rendered Phenergan misbranded. The FDCA does not provide that a drug is misbranded simply because the manufacturer has altered an FDA-approved label; instead, the misbranding provision focuses on the substance of the label and, among other things, proscribes labels that fail to include "adequate warnings." *21 U.S.C. § 352(f)*. Moreover, because the statute contemplates that federal juries will resolve most misbranding claims, the FDA's belief that a drug is misbranded is not conclusive. See *§§ 331, 332, 334(a)-(b)*. And the very idea that the FDA would bring an enforcement action against a manufacturer for strengthening a warning pursuant to the CBE regulation is difficult to accept -- neither Wyeth nor the United States has identified a case in which the FDA has done so.

Wyeth's cramped reading of the CBE regulation and its broad reading of the FDCA's misbranding and **[\*\*\*26]** unauthorized distribution provisions are premised on a more fundamental misunderstanding. Wyeth suggests that the FDA, rather than the manufacturer, bears primary responsibility for drug

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page9 of 58

Page 8

129 S. Ct. 1187, *1197; 173 L. Ed. 2d 51, **63;
2009 U.S. LEXIS 1774, ***26; CCH Prod. Liab. Rep. P18,176

labeling. Yet through many amendments to the FDCA and to FDA regulations, it has remained a central premise of federal drug regulation that the **[*1198]** manufacturer bears responsibility for the content of its label at all times. It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market. See, *e.g.*, *21 CFR § 201.80(e)* (requiring a manufacturer to revise **[**64]** its label "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug"); *§ 314.80(b)* (placing responsibility for postmarketing surveillance on the manufacturer); *73 Fed. Reg. 49605* ("Manufacturers continue to have a responsibility under Federal law . . . to maintain their labeling and update the labeling with new safety information").

Indeed, prior to 2007, the FDA lacked the authority to order manufacturers to revise their labels. See 121 Stat. 924-926. When Congress granted the FDA this authority, it reaffirmed the manufacturer's **[***27]** obligations and referred specifically to the CBE regulation, which both reflects the manufacturer's ultimate responsibility for its label and provides a mechanism for adding safety information to the label prior to FDA approval. See *id.*, at 925-926 (stating that a manufacturer retains the responsibility "to maintain its label in accordance with existing requirements, including *subpart B of part 201* and *sections 314.70* and *601.12 of title 21, Code of Federal Regulations* (or any successor regulations)" (emphasis added)). Thus, when the risk of gangrene from IV-push injection of Phenergan became apparent, Wyeth had a duty to provide a warning that adequately described that risk, and the CBE regulation permitted it to provide such a warning before receiving the FDA's approval.

Of course, the FDA retains authority to reject labeling changes made pursuant to the CBE regulation in its review of the manufacturer's supplemental application, just as it retains such authority in reviewing all supplemental applications. But absent clear evidence that the FDA would not have approved a change to Phenergan's label, we will not conclude that it was impossible for Wyeth to comply with both federal and **[***28]** state requirements.

Wyeth has offered no such evidence. It does not argue that it attempted to give the kind of warning required by the Vermont jury but was prohibited from doing so by the FDA. [5] See Tr. of Oral Arg. 12-13; see

also Brief for United States as *Amicus Curiae* 25. And while it does suggest that the FDA intended to prohibit it from strengthening the warning about IV-push administration because the agency deemed such a warning inappropriate in reviewing Phenergan's drug applications, both the trial court and the Vermont Supreme Court rejected this account as a matter of fact. In its decision on Wyeth's motion for judgment as a matter of law, **[*1199]** the trial court found "no evidence in this record that either the FDA or the manufacturer gave **[**65]** more than passing attention to the issue of" IV-push versus IV-drip administration. App. 249. The Vermont Supreme Court likewise concluded that the FDA had not made an affirmative decision to preserve the IV-push method or intended to prohibit Wyeth from strengthening its warning about IV-push administration. *193 Vt., at 93, 944 A. 2d, at 188-189*. Moreover, Wyeth does not argue that it supplied the FDA with an evaluation or analysis concerning **[***29]** the specific dangers posed by the IV-push method. We accordingly cannot credit Wyeth's contention that the FDA would have prevented it from adding a stronger warning about the IV-push method of intravenous administration. [6]

5   The record would not, in any event, support such an argument. In 1988, Wyeth did propose different language for Phenergan's warning about intra-arterial injection, adapted from revisions the FDA proposed in 1987. See App. 339-341, 311-312. When the FDA approved Wyeth's application, it instructed Wyeth to retain the wording in its current label. During the trial court proceedings, Levine indicated that the language proposed in 1988 would have more strongly warned against IV-push administration. But the trial court and the Vermont Supreme Court found that the 1988 warning did not differ in any material respect from the FDA-approved warning. See *183 Vt. 76, 92, 944 A.2d 179, 189 (2006)* ("Simply stated, the proposed warning was different, but not stronger. It was also no longer or more prominent than the original warning . . . "); App. 248-250. Indeed, the United States concedes that the FDA did not regard the proposed warning as substantively different: "[I]t appears **[***30]** the FDA viewed the change as non-substantive and rejected it for formatting reasons." Brief for United States as *Amicus Curiae* 25; see also *183 Vt., at 93, 944 A. 2d, at 189.*

6   The dissent's suggestion that the FDA intended

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page10 of 58

Page 9

129 S. Ct. 1187, *1199; 173 L. Ed. 2d 51, **65;
2009 U.S. LEXIS 1774, ***30; CCH Prod. Liab. Rep. P18,176

to prohibit Wyeth from strengthening its warning does not fairly reflect the record. The dissent creatively paraphrases a few FDA orders -- for instance by conflating warnings about IV-push administration and intra-arterial injection, see, *e.g.*, *post*, at 9, 11-12, 15-16 -- to suggest greater agency attention to the question, and it undertakes a study of Phenergan's labeling that is more elaborate than any FDA order. But even the dissent's account does not support the conclusion that the FDA would have prohibited Wyeth from adding a stronger warning pursuant to the CBE regulation.

Impossibility pre-emption is a demanding defense. On the record before us, Wyeth has failed to demonstrate that it was impossible for it to comply with both federal and state requirements. The CBE regulation permitted Wyeth to unilaterally strengthen its warning, and the mere fact that the FDA approved Phenergan's label does not establish that it would have prohibited such a change.

IV

Wyeth [***31] also argues that requiring it to comply with a state-law duty to provide a stronger warning about IV-push administration would obstruct the purposes and objectives of federal drug labeling regulation. Levine's tort claims, it maintains, are pre-empted because they interfere with "Congress's purpose to entrust an expert agency to make drug labeling decisions that strike a balance between competing objectives." Brief for Petitioner 46. We find no merit in this argument, which relies on an untenable interpretation of congressional intent and an overbroad view of an agency's power to pre-empt state law.

Wyeth contends that the FDCA establishes both a floor and a ceiling for drug regulation: Once the FDA has approved a drug's label, a state-law verdict may not deem the label inadequate, regardless of whether there is any evidence that the FDA has considered the stronger warning at issue. The most glaring problem with this argument is that all evidence of Congress' purposes is to the contrary. Building on its 1906 Act, Congress enacted the FDCA to bolster consumer protection against harmful products. See *Kordel v. United States, 335 U.S. 345, 349, 69 S. Ct. 106, 93 L. Ed. 52 (1948)*; *United States v. Sullivan, 332 U.S. 689, 696, 68 S. Ct. 331, 92 L. Ed. 297 (1948)*. [***32] Congress did not provide a federal remedy for consumers harmed by unsafe or ineffective

drugs in the 1938 statute or in any subsequent amendment. Evidently, it determined that widely available state rights of action provided appropriate relief for injured consumers. [7] It [**66] may also have recognized that [*1200] state-law remedies further consumer protection by motivating manufacturers to produce safe and effective drugs and to give adequate warnings.

> [7]    Although the first version of the bill that became the FDCA would have provided a federal cause of action for damages for injured consumers, see H. R. 6110, 73d Cong., 1st Sess., § 25 (1933) (as introduced), witnesses testified that such a right of action was unnecessary because common-law claims were already available under state law. See Hearings on S. 1944 before a Subcommittee of the Senate Committee on Commerce, 73d Cong., 2d Sess., 400 (1933) (statement of W. A. Hines); see *id.*, at 403 (statement of J. A. Ladds) ("This act should not attempt to modify or restate the common law with respect to personal injuries").

If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision [***33] at some point during the FDCA's 70-year history. But despite its 1976 enactment of an express pre-emption provision for medical devices, see § 521, 90 Stat. 574 (codified at *21 U.S.C. § 360k(a)*), Congress has not enacted such a provision for prescription drugs. See *Riegel, 552 U.S., at ___, 128 S. Ct. 999, 1009, 169 L. Ed. 2d 892, 905*) ("Congress could have applied the pre-emption clause to the entire FDCA. It did not do so, but instead wrote a pre-emption clause that applies only to medical devices"). [8] Its silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness. As Justice O'Connor explained in her opinion for a unanimous Court: "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 166-167, 109 S. Ct. 971, 103 L. Ed. 2d 118 (1989)* (internal quotation marks omitted); see also *supra*, at 8 (discussing [***34] the

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page11 of 58

Page 10

129 S. Ct. 1187, *1200; 173 L. Ed. 2d 51, **66;
2009 U.S. LEXIS 1774, ***34; CCH Prod. Liab. Rep. P18,176

presumption against pre-emption).

> 8   In 1997, Congress pre-empted certain state requirements concerning over-the-counter medications and cosmetics but expressly preserved product liability actions. See *21 U.S.C. §§ 379r(e), 379s(d)* ("Nothing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State").

Despite this evidence that Congress did not regard state tort litigation as an obstacle to achieving its purposes, Wyeth nonetheless maintains that, because the FDCA requires the FDA to determine that a drug is safe and effective under the conditions set forth in its labeling, the agency must be presumed to have performed a precise balancing of risks and benefits and to have established a specific labeling standard that leaves no room for different state-law judgments. In advancing this argument, Wyeth relies not on any statement by Congress, but instead on the preamble to a 2006 FDA regulation governing the content and format of prescription drug labels. See Brief for Petitioner 8, 11, 42, 45, and 50 (citing *71 Fed. Reg. 3922 (2006)).* In that preamble, the FDA declared that the FDCA establishes **[***35]** "both a 'floor' and a 'ceiling,'" so that "FDA approval of labeling . . . preempts conflicting or contrary State law." *Id., at 3934-3935.* It further stated that certain state-law actions, such as those involving failure-to-warn claims, "threaten FDA's statutorily prescribed role as the expert Federal agency responsible for evaluating and regulating drugs." *Id., at 3935.*

This Court has recognized that an agency regulation with the force of **[**67]** law can pre-empt conflicting state requirements. See, *e.g., Geier v. American Honda Motor Co., 529 U.S. 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000); Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 713, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985).* In such cases, the Court has **[*1201]** performed its own conflict determination, relying on the substance of state and federal law and not on agency proclamations of pre-emption. We are faced with no such regulation in this case, but rather with an agency's mere assertion that state law is an obstacle to achieving its statutory objectives. Because Congress has not authorized the FDA to pre-empt state law directly, cf. *21 U.S.C. § 360k* (authorizing the FDA to determine the scope of the Medical Devices Amendments' pre-emption

clause), [9] the question is what weight **[***36]** we should accord the FDA's opinion.

> 9   For similar examples, see *47 U.S.C. §§ 253(a), (d) (2000 ed.)* (authorizing the Federal Communications Commission to pre-empt "any [state] statute, regulation, or legal requirement" that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service"); *30 U.S.C. § 1254(g) (2006 ed.)* (pre-empting any statute that conflicts with "the purposes and the requirements of this chapter" and permitting the Secretary of the Interior to "set forth any State law or regulation which is preempted and superseded"); and *49 U.S.C. § 5125(d) (2000 ed. and Supp. V)* (authorizing the Secretary of Transportation to decide whether a state or local statute that conflicts with the regulation of hazardous waste transportation is pre-empted).

In prior cases, we have given "some weight" to an agency's views about the impact of tort law on federal objectives when "the subject matter is technica[l] and the relevant history and background are complex and extensive." *Geier, 529 U.S., at 883, 120 S. Ct. 1913, 146 L. Ed. 2d 914.* Even in such cases, however, we have not deferred to an agency's *conclusion* that state law is pre-empted. Rather, **[***37]** we have attended to an agency's explanation of how state law affects the regulatory scheme. While agencies have no special authority to pronounce on pre-emption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines, 312 U.S, at 67, 61 S. Ct. 399, 85 L. Ed. 581;* see *Geier, 529 U.S., at 883, 120 S. Ct. 1913, 146 L. Ed. 2d 914; Lohr, 518 U.S., at 495-496, 116 S. Ct. 2240, 135 L. Ed. 2d 700.* The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness. Cf. *United States v. Mead Corp., 533 U.S. 218, 234-235, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001); Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944).*

Under this standard, the FDA's 2006 preamble does

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page12 of 58

Page 11

129 S. Ct. 1187, *1201; 173 L. Ed. 2d 51, **67;
2009 U.S. LEXIS 1774, ***37; CCH Prod. Liab. Rep. P18,176

not merit deference. When the FDA issued its notice of proposed rulemaking in December 2000, it explained that the rule would "not contain policies that have federalism implications or that preempt State law." *65 Fed. Reg. 81103*; see also 71 *id., at 3969* (noting that the "proposed rule did not propose to preempt state law"). In 2006, the agency finalized **[\*\*\*38]** the rule and, without offering States or other interested parties notice or opportunity for comment, articulated a sweeping position on the FDCA's pre-emptive effect in the regulatory preamble. The agency's **[\*\*68]** views on state law are inherently suspect in light of this procedural failure.

Further, the preamble is at odds with what evidence we have of Congress' purposes, and it reverses the FDA's own longstanding position without providing a reasoned explanation, including any discussion of how state law has interfered with the FDA's regulation of drug labeling during decades of coexistence. The FDA's 2006 position plainly does not reflect the agency's own view at all times relevant to this litigation. Not once prior to Levine's injury **[\*1202]** did the FDA suggest that state tort law stood as an obstacle to its statutory mission. To the contrary, it cast federal labeling standards as a floor upon which States could build and repeatedly disclaimed any attempt to pre-empt failure-to-warn claims. For instance, in 1998, the FDA stated that it did "not believe that the evolution of state tort law [would] cause the development of standards that would be at odds with the agency's regulations." 63 *id.*, at 66384. **[\*\*\*39]** It further noted that, in establishing "minimal standards" for drug labels, it did not intend "to preclude the states from imposing additional labeling requirements." *Ibid*. [10]

> 10  See also 44 Fed. Reg. 37437 (1979) ("It is not the intent of the FDA to influence the civil tort liability of the manufacturer"); *59 Fed. Reg. 3948 (1994)* ("[P]roduct liability plays an important role in consumer protection"); Porter, The *Lohr* Decision: FDA Perspective and Position, *52 Food & Drug L. J. 7, 10 (1997)* (former chief counsel to the FDA stating that the FDA regarded state law as complementing the agency's mission of consumer protection).

In keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the FDA traditionally regarded state law as a complementary form of drug regulation. The FDA has limited resources to monitor the 11,000 drugs on the market, [11] and

manufacturers have superior access to information about their drugs, especially in the postmarketing phase as new risks emerge. State tort suits uncover unknown drug hazards and provide incentives **[\*\*69]** for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate **[\*\*\*40]** injured persons to come forward with information. Failure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times. Thus, the FDA long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation. [12] **[\*1203]** The agency's 2006 preamble represents a dramatic change in position.

> 11  In 1955, the same year that the agency approved Wyeth's Phenergan application, an FDA advisory committee issued a report finding "conclusively" that "the budget and staff of the Food and Drug Administration are inadequate to permit the discharge of its existing responsibilities for the protection of the American public." Citizens Advisory Committee on the FDA, Report to the Secretary of Health, Education, and Welfare, H. R. Doc. No. 227, 84th Cong., 1st Sess., 53. Three recent studies have reached similar conclusions. See FDA Science Board, Report of the Subcommittee on Science and Technology: FDA Science and Mission at Risk 2, 6 (2007), online at http://www.fda.gov/ohrms/dockets/ac/07/briefing/2007-4329b_02_ence%20and%20Technology.pdf **[\*\*\*41]** (all Internet materials as visited Feb. 23, 2009, and available in Clerk of Court's case file) ("[T]he Agency suffers from serious scientific deficiencies and is not positioned to meet current or emerging regulatory responsibilities"); National Academies, Institute of Medicine, The Future of Drug Safety: Promoting and Protecting the Health of the Public 193-194 (2007) ("The [FDA] lacks the resources needed to accomplish its large and complex mission . . . . There is widespread agreement that resources for postmarketing drug safety work are especially inadequate and that resource limitations have hobbled the agency's ability to improve and expand this essential component of its mission"); GAO, Drug Safety: Improvement Needed in FDA's Postmarket Decision-making and

Case4:08-cv-01138-SBA Document188-1 Filed06/18/09 Page13 of 58

Page 12

129 S. Ct. 1187, *1203; 173 L. Ed. 2d 51, **69;
2009 U.S. LEXIS 1774, ***41; CCH Prod. Liab. Rep. P18,176

Oversight Process 5 (GAO-06-402, 2006), http://www.gao.gov/new.items/d06402.pdf ("FDA lacks a clear and effective process for making decisions about, and providing management oversight of, postmarket safety issues"); see also House Committee on Oversight and Government Reform, Majority Staff Report, FDA Career Staff Objected to Agency Preemption Policies 8 (2008) ("[T]he Office of Chief Counsel ignored the warnings from FDA **[***42]** scientists and career officials that the preemption language [of the 2006 preamble] was based on erroneous assertions about the ability of the drug approval process to ensure accurate and up-to-date drug labels").

12    See generally Brief for Former FDA Commissioners Drs. Donald Kennedy and David Kessler as *Amici Curiae;* see also Kessler & Vladeck, A Critical Examination of the FDA's Efforts To Preempt Failure-To-Warn Claims, *96 Geo. L. J. 461, 463 (2008); Bates v. Dow Agrosciences LLC, 544 U.S. 431, 451, 125 S. Ct. 1788, 161 L. Ed. 2d 687 (2005)* (noting that state tort suits "can serve as a catalyst" by aiding in the exposure of new dangers and prompting a manufacturer or the federal agency to decide that a revised label is required).

Largely based on the FDA's new position, Wyeth argues that this case presents a conflict between state and federal law analogous to the one at issue in *Geier.* There, we held that state tort claims premised on Honda's failure to install airbags conflicted with a federal regulation that did not require airbags for all cars. The Department of Transportation (DOT) had promulgated a rule that provided car manufacturers with a range of choices among passive restraint devices. *Geier, 529 U.S., at 875, 120 S. Ct. 1913, 146 L. Ed. 2d 914.* **[***43]** Rejecting an "'all airbag'" standard, the agency had called for a gradual phase-in of a mix of passive restraints in order to spur technological development and win consumer acceptance. *Id., at 879, 120 S. Ct. 1913, 146 L. Ed. 2d 914.* Because the plaintiff's claim was that car manufacturers had a duty to install airbags, it presented an obstacle to achieving "the variety and mix of devices that the federal regulation sought." *Id., at 881, 120 S. Ct. 1913, 146 L. Ed. 2d 914.*

Wyeth and the dissent contend that the regulatory scheme in this case is nearly identical, but, as we have

described, it is quite different. In *Geier,* the DOT conducted a formal rulemaking and then adopted a plan to phase in a mix of passive restraint devices. Examining the rule itself and the DOT's contemporaneous record, which revealed the factors the agency had weighed and the balance it had struck, we determined that state tort suits presented an obstacle to the federal scheme. After conducting our own pre-emption analysis, we considered the agency's explanation of how state law interfered with its regulation, regarding it as further support for our independent conclusion that the plaintiff's tort claim obstructed the federal regime.

By contrast, we have no occasion in this case to **[***44]** consider the pre-emptive effect of a specific agency regulation bearing the force of law. And the FDA's newfound opinion, expressed in its 2006 preamble, that state law "frustrate[s] the agency's implementation of its statutory mandate," *71 Fed. Reg. 3934,* does not merit deference for the reasons we have explained. [13] Indeed, the "complex and extensive" regulatory history and background relevant to this case, **[**70]** *Geier, 529 U.S., at 883, 120 S. Ct. 1913, 146 L. Ed. 2d 914,* undercut the FDA's recent pronouncements of pre-emption, as they reveal the longstanding coexistence of state and federal law and the FDA's traditional recognition of state-law remedies -- a recognition in place each time the agency reviewed Wyeth's Phenergan label. [14]

13    The United States' *amicus* brief is similarly undeserving of deference. Unlike the Government's brief in *Geier v. American Honda Motor Co., 529 U.S. 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000),* which explained the effects of state law on the DOT's regulation in a manner consistent with the agency's prior accounts, see *id., at 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914,* the Government's explanation of federal drug regulation departs markedly from the FDA's understanding at all times relevant to this case.

14    Wyeth's more specific contention -- that this case resembles **[***45]** *Geier* because the FDA determined that no additional warning on IV-push administration was needed, thereby setting a ceiling on Phenergan's label -- is belied by the record. As we have discussed, the FDA did not consider and reject a stronger warning against IV-push injection of Phenergan. See also App. 249-250 ("[A] tort case is unlikely to obstruct the

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page14 of 58

Page 13

129 S. Ct. 1187, *1203; 173 L. Ed. 2d 51, **70;
2009 U.S. LEXIS 1774, ***45; CCH Prod. Liab. Rep. P18,176

regulatory process when the record shows that the FDA has paid very little attention to the issues raised by the parties at trial").

[*1204] In short, Wyeth has not persuaded us that failure-to-warn claims like Levine's obstruct the federal regulation of drug labeling. Congress has repeatedly declined to pre-empt state law, and the FDA's recently adopted position that state tort suits interfere with its statutory mandate is entitled to no weight. Although we recognize that some state-law claims might well frustrate the achievement of congressional objectives, this is not such a case.

V

We conclude that it is not impossible for Wyeth to comply with its state and federal law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the FDCA. Accordingly, the judgment of the Vermont [***46] Supreme Court is affirmed.

*It is so ordered.*

**CONCUR BY:** BREYER; THOMAS

**CONCUR**

JUSTICE BREYER, concurring.

I write separately to emphasize the Court's statement that "we have no occasion in this case to consider the pre-emptive effect of a specific agency regulation bearing the force of law." *Ante*, at 24. State tort law will sometimes help the Food and Drug Administration (FDA) "uncover unknown drug hazards and [encourage] drug manufacturers to disclose safety risks." *Ante*, at 23. But it is also possible that state tort law will sometimes interfere with the FDA's desire to create a drug label containing a specific set of cautions and instructions. I also note that some have argued that state tort law can sometimes raise prices to the point where those who are sick are unable to obtain the drugs they need. See Lasagna, The Chilling Effect of Product Liability on New Drug Development, in The Liability Maze 334, 335-336 (P. Huber & R. Litan eds. 1991). The FDA may seek to determine whether and when state tort law acts as a help or a hindrance to achieving the safe drug-related medical care that Congress sought. *Medtronic, Inc. v. Lohr, 518 U.S. 470, 506, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996)*

(BREYER, J., concurring in part and concurring [***47] in judgment); cf. *Bates v. Dow Agrosciences LLC, 544 U.S. 431, 454-455, 125 S. Ct. 1788, 161 L. Ed. 2d 687 (2005)* (BREYER, J., concurring). It may seek to embody those determinations in lawful specific regulations describing, [**71] for example, when labeling requirements serve as a ceiling as well as a floor. And it is possible that such determinations would have pre-emptive effect. See *Lohr, supra*, at 505, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (opinion of BREYER, J.) (citing *Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985)*). I agree with the Court, however, that such a regulation is not at issue in this case.

JUSTICE THOMAS, concurring in the judgment.

I agree with the Court that the fact that the Food and Drug Administration (FDA) approved the label for petitioner Wyeth's drug Phenergan does not pre-empt the state-law judgment before the Court. That judgment was based on a jury finding that the label did not adequately warn of the risk involved in administering Phenergan through the IV-push injection method. Under federal law, without prior approval from the FDA, Wyeth could have "add[ed] or strengthen[ed]" information on its label about "a contraindication, warning, precaution, or adverse reaction," *21 CFR § 314.70(c)(6)(iii)(A) (2008)*, [*1205] [***48] or "about dosage and administration that is intended to increase the safe use of the drug product," *§ 314.70(c)(6)(iii)(C)*, in order to "reflect newly acquired information," including "new analyses of previously submitted data," about the dangers of IV-push administration of Phenergan, *73 Fed. Reg. 49603, 49609 (2008)*. It thus was possible for Wyeth to label and market Phenergan in compliance with federal law while also providing additional warning information on its label beyond that previously approved by the FDA. In addition, federal law does not give drug manufacturers an unconditional right to market their federally approved drug at all times with the precise label initially approved by the FDA. The Vermont court's judgment in this case, therefore, did not directly conflict with federal law and is not pre-empted.

I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's "purposes and objectives" pre-emption jurisprudence. Under this

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page15 of 58

Page 14

129 S. Ct. 1187, *1205; 173 L. Ed. 2d 51, **71;
2009 U.S. LEXIS 1774, ***48; CCH Prod. Liab. Rep. P18,176

approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy **[***49]** objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.

I

A

In order "to ensure the protection of our fundamental liberties," *Atascadero State Hospital v. Scanlon, 473 U.S. 234, 242, 105 S. Ct. 3142, 87 L. Ed. 2d 171 (1985)* (internal quotation marks omitted), the "Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft, 501 U.S. 452, 457, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991).* The Framers adopted this "'constitutionally mandated balance of power,'" *Atascadero State Hospital, supra, at 242, 105 S. Ct. 3142, 87 L. Ed. 2d 171,* to "reduce the risk of tyranny and abuse **[**72]** from either front," because a "federalist structure of joint sovereigns preserves to the people numerous advantages," such as "a decentralized government that will be more sensitive to the diverse needs of a heterogeneous society" and "increase[d] opportunity for citizen involvement in democratic processes," *Gregory, supra, at 458, 111 S. Ct. 2395, 115 L. Ed. 2d 410.* Furthermore, as the Framers observed, the "compound republic of America" provides "a double security . . **[***50]** . to the rights of the people" because "the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments." The Federalist No. 51, p. 266 (M. Beloff ed., 2d ed. 1987).

Under this federalist system, "the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the *Supremacy Clause.*" *Tafflin v. Levitt, 493 U.S. 455, 458, 110 S. Ct. 792, 107 L. Ed. 2d 887 (1990).* In this way, the *Supremacy Clause* gives the Federal Government "a decided advantage in [a] delicate balance" between federal and state sovereigns. *Gregory, 501 U.S., at 460, 111 S. Ct. 2395, 115 L. Ed. 2d 410.* "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States." *Ibid.* That is an "extraordinary power in a

federalist system." *Ibid.*

Nonetheless, the States retain substantial sovereign authority. *U.S. Const., Amdt. 10* ("The powers not delegated to **[*1206]** the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"); see also *Alden v. Maine, 527 U.S. 706, 713, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999); Printz v. United States, 521 U.S. 898, 918-922, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997);* **[***51]** *New York v. United States, 505 U.S. 144, 155-156, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992); Gregory, supra, at 457-459, 111 S. Ct. 2395, 115 L. Ed. 2d 410; Tafflin, supra, at 458, 110 S. Ct. 792, 107 L. Ed. 2d 887.* In accordance with the text and structure of the Constitution, "[t]he powers delegated by the proposed constitution to the federal government, are few and defined" and "[t]hose which are to remain in the state governments, are numerous and indefinite." The Federalist No. 45, at 237-238. Indeed, in protecting our constitutional government, "the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government." *Texas v. White, 74 U.S. 700, 7 Wall. 700, 725, 19 L. Ed. 227 (1869),* quoted in *New York v. United States, supra, at 162, 112 S. Ct. 2408, 120 L. Ed. 2d 120.*

As a result, in order to protect the delicate balance of power mandated by the Constitution, the *Supremacy Clause* must operate only in accordance with its terms. The clause provides:

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be **[***52]** bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." *Art. VI, cl. 2.*

With respect to federal laws, then, the *Supremacy Clause* gives "supreme" **[**73]** status only to those that are "made in Pursuance of" "[t]his Constitution." *Ibid.;* see 3 J. Story, Commentaries on the Constitution of the United States § 1831, p. 694 (1833) (hereinafter Story) ("It will

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page16 of 58

Page 15

129 S. Ct. 1187, *1206; 173 L. Ed. 2d 51, **73;
2009 U.S. LEXIS 1774, ***52; CCH Prod. Liab. Rep. P18,176

be observed, that the supremacy of the laws is attached to those only, which are made in pursuance of the constitution").

Federal laws "made in Pursuance" of the Constitution must comply with two key structural limitations in the Constitution that ensure that the Federal Government does not amass too much power at the expense of the States. The first structural limitation, which the parties have not raised in this case, is "the Constitution's conferral upon Congress of not all governmental powers, but only discrete, enumerated ones." *Printz, supra,* at 919, 117 S. Ct. 2365, 138 L. Ed. 2d 914; see also *United States v. Morrison,* 529 U.S. 598, 618, n. 8, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000); *New York v. United States, supra,* at 155-157, 112 S. Ct. 2408, 120 L. Ed. 2d 120; *McCulloch v. Maryland,* 17 U.S. 316, 4 Wheat. 316, 405, 4 L. Ed. 579 (1819) ("This government is acknowledged by all to be one of enumerated powers"). [1]

> 1   This structural [***53] limitation may be implicated in a pre-emption case if the federal law at issue is beyond the scope of Congress' enumerated powers. Expansion of congressional power through an "increasingly generous . . . interpretation of the commerce power of Congress," for example, creates "a real risk that Congress will gradually erase the diffusion of power between State and Nation on which the Framers based their faith in the efficiency and vitality of our Republic." *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 583-584, 105 S. Ct. 1005, 83 L. Ed. 2d 1016 (1985) (O'Connor, J., dissenting); see also *Marbury v. Madison,* 5 U.S. 137, 1 Cranch 137, 176, 2 L. Ed. 60 (1803) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written").

The second structural limitation is the complex set of procedures that Congress [*1207] and the President must follow to enact "Laws of the United States." See *INS v. Chadha,* 462 U.S. 919, 945-946, 103 S. Ct. 2764, 77 L. Ed. 2d 317 (1983) (setting forth the Constitution's Bicameral and Presentment Clauses, Art. I, § 7, cls. 2-3, which "prescribe and define the respective functions of the Congress and of the Executive in the legislative process"). "[T]he Framers were acutely [***54] conscious that the bicameral requirement and the Presentment Clauses would serve essential constitutional functions," *Chadha,* 462 U.S., at 951, 103 S. Ct. 2764, 77 L. Ed. 2d 317, by allowing the passage of legislation only after it has proceeded through "a step-by-step, deliberate and deliberative process," *id., at 959, 103 S. Ct. 2764, 77 L. Ed. 2d 317,* that was "finely wrought and exhaustively considered" by the Framers, *id., at 951, 103 S. Ct. 2764, 77 L. Ed. 2d 317.* The *Supremacy Clause* thus requires that pre-emptive effect be given only those to federal standards and policies that are set forth in, or necessarily follow from, the statutory text that was produced through the constitutionally required bicameral and presentment procedures. See 3 J. Story § 1831, at 694 (Actions of the Federal Government "which are not pursuant to its constitutional powers, but which are invasions of the residuary authorities of the smaller societies," are not "the supreme law of the land. They will be merely acts of usurpation, and will deserve to be treated as such").

B

In light of these constitutional principles, I have become "increasing[ly] reluctan[t] to expand federal statutes [**74] beyond their terms through doctrines of implied pre-emption." *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 459, 125 S. Ct. 1788, 161 L. Ed. 2d 687 (2005) (THOMAS, [***55] J., concurring in judgment in part and dissenting in part). My review of this Court's broad implied pre-emption precedents, particularly its "purposes and objectives" pre-emption jurisprudence, has increased my concerns that implied pre-emption doctrines have not always been constitutionally applied. Under the vague and "potentially boundless" doctrine of "purposes and objectives" pre-emption, *Geier v. American Honda Motor Co.,* 529 U.S. 861, 907, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000) (STEVENS, J., dissenting), for example, the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law. See, *e.g., Pharmaceutical Research and Mfrs. of America v. Walsh,* 538 U.S. 644, 678, 123 S. Ct. 1855, 155 L. Ed. 2d 889 (2003) (THOMAS, J., concurring in judgment) (referring to the "concomitant danger of invoking obstacle pre-emption based on the arbitrary selection of one purpose to the exclusion of others"); *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 388-391, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000) (SCALIA, J., concurring in judgment) (criticizing

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page17 of 58

Page 16

129 S. Ct. 1187, *1207; 173 L. Ed. 2d 51, **74;
2009 U.S. LEXIS 1774, ***55; CCH Prod. Liab. Rep. P18,176

the majority's reliance on legislative history to discern statutory intent when that **[\*\*\*56]** intent was "perfectly obvious on the face of th[e] statute"); *Geier, supra, at 874-883, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (relying on regulatory history, agency comments, and the Government's litigating position to determine that federal law pre-empted state law).

Congressional and agency musings, however, do not satisfy the Art. I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt state law under the *Supremacy Clause*. When analyzing the pre-emptive effect of federal statutes or regulations validly promulgated thereunder, "[e]vidence of pre-emptive purpose [must be] sought in the text and structure of the [provision] at issue" to comply with the Constitution. *CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 113 S. Ct.* **[\*1208]** *1732, 123 L. Ed. 2d 387 (1993)*; see also *New York v. FERC, 535 U.S. 1, 18, 122 S. Ct. 1012, 152 L. Ed. 2d 47 (2002)* ("[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressional delegated authority . . . [for] an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it" (internal quotation marks omitted; second alteration in original)); *Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 617, 117 S. Ct. 1590, 137 L. Ed. 2d 852 (1997)* **[\*\*\*57]** (THOMAS, J., dissenting) (noting that "treating unenacted congressional intent as if it were law would be constitutionally dubious"). Pre-emption analysis should not be "a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives, but an inquiry into whether the ordinary meanings of state and federal law conflict." *Bates, supra, at 459, 125 S. Ct. 1788, 161 L. Ed. 2d 687* (THOMAS, J., concurring in judgment in part and dissenting in part) (internal quotation marks and citation omitted); see also *Geier, supra, at 911, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (STEVENS., J., dissenting) ("[P]re-emption analysis is, **[\*\*75]** or at least should be, a matter of precise statutory [or regulatory] construction rather than an exercise in free-form judicial policymaking" (internal quotation marks omitted)). Pre-emption must turn on whether state law conflicts with the text of the relevant federal statute or with the federal regulations authorized by that text. See *Foster v. Love, 522 U.S. 67, 71, 118 S. Ct. 464, 139 L. Ed. 2d 369 (1997)* (finding that conflict pre-emption question "turn[ed] entirely on the meaning of the state and federal statutes"

at issue before the Court); see also *New York v. FERC, supra, at 19, 122 S. Ct. 1012, 152 L. Ed. 2d 47*.

II

This Court has determined that there are two categories of **[\*\*\*58]** conflict pre-emption, both of which Wyeth contends are at issue in this case. First, the Court has found pre-emption "where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce." *Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963)*. Second, the Court has determined that federal law pre-empts state law when, "under the circumstances of [a] particular case, [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941)*. [2]

> 2   The majority's pre-emption analysis relies in part on a presumption against pre-emption. *Ante*, at 8, and n. 3 (opinion of STEVENS, J.). Because it is evident from the text of the relevant federal statutes and regulations themselves that the state-law judgment below is not pre-empted, it is not necessary to decide whether, or to what extent, the presumption should apply in a case such as this one, where Congress has not enacted an express-pre-emption clause. Cf. *Altria Group, Inc. v. Good, 555 U.S. ___, ___, 129 S. Ct. 538, 172 L. Ed. 2d 398 (2008)* (THOMAS, J., dissenting) (rejecting the use of a presumption against **[\*\*\*59]** pre-emption in express pre-emption cases).

A

Wyeth first contends that "it would have been impossible for it to comply with the state-law duty to modify Phenergan's labeling without violating federal law." *Ante*, at 6 (opinion for the Court by STEVENS, J.). But, as the majority explains, the text of the relevant federal statutory provisions and the corresponding regulations do not directly conflict with the state-law judgment before us.

This Court has used different formulations of the standard to be used in deciding **[\*1209]** whether state and federal law conflict, and thus lead to pre-emption, under the "impossibility" doctrine. See, *e.g., Geier, supra*

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page18 of 58

Page 17

129 S. Ct. 1187, *1209; 173 L. Ed. 2d 51, **75;
2009 U.S. LEXIS 1774, ***59; CCH Prod. Liab. Rep. P18,176

, at 873, 120 S. Ct. 1913, 146 L. Ed. 2d 914 ("a case in which state law penalizes what federal law requires"); *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.,* 524 U.S. 214, 227, 118 S. Ct. 1956, 141 L. Ed. 2d 222 (1998) (AT&T) (when state-law claims "directly conflict" with federal law), cited in *Geier, supra,* at 874, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (describing *AT&T* as a "cas[e] involving impossibility"); *Florida Lime & Avocado Growers, supra,* at 142-143, 83 S. Ct. 1210, 10 L. Ed. 2d 248 ("where compliance with both federal and state regulations is a physical impossibility"). The Court has generally articulated a very narrow "impossibility standard," see *Crosby,* 530 U.S., at [**76] 372-373, 120 S. Ct. 2288, 147 L. Ed. 2d 352 [***60] (citing *Florida Lime & Avocado Growers, supra,* at 142-143, 83 S. Ct. 1210, 10 L. Ed. 2d 248); see also *Sprietsma v. Mercury Marine,* 537 U.S. 51, 64-65, 123 S. Ct. 518, 154 L. Ed. 2d 466 (2002); *United States v. Locke,* 529 U.S. 89, 109, 120 S. Ct. 1135, 146 L. Ed. 2d 69 (2000) -- in part because the overly broad sweep of the Court's "purposes and objectives" approach, see *infra,* at 13-23, has rendered it unnecessary for the Court to rely on "impossibility" pre-emption.

The Court, in fact, has not explained why a narrow "physical impossibility" standard is the best proxy for determining when state and federal laws "directly conflict" for purposes of the *Supremacy Clause.* There could be instances where it is not "physically impossible" to comply with both state and federal law, even when the state and federal laws give directly conflicting commands. See Nelson, Preemption, 86 Va. L. Rev. 225, 260-261 (2000). For example, if federal law gives an individual the right to engage in certain behavior that state law prohibits, the laws would give contradictory commands notwithstanding the fact that an individual could comply with both by electing to refrain from the covered behavior. *Ibid.* Therefore, "physical impossibility" may not be the most appropriate standard for determining whether the text [***61] of state and federal laws directly conflict. See *ibid.* (concluding that the *Supremacy Clause* does not limit direct conflicts to cases with "physically impossible" conflicts and arguing that evidence from the Founding supports a standard of "logical-contradiction"); see also *AT&T, supra,* at 227, 118 S. Ct. 1956, 141 L. Ed. 2d 222 (requiring that the state-law claims "directly conflict" with federal law); 3 Story § 1836, at 701 (suggesting instead that a state law is pre-empted by the *Supremacy Clause* when it is "*repugnant* to the constitution of the United States"

(emphasis added)).

Nonetheless, whatever the precise constitutional contours of implied pre-emption may be, I am satisfied that it does not operate against respondent's judgment below. The text of the federal laws at issue do not require that the state-court judgment at issue be pre-empted, under either the narrow "physical impossibility" standard, *Florida Lime & Avocado Growers, supra,* at 142-143, or a more general "direc[t] conflict" standard, *AT&T, supra, at 227, 118 S. Ct. 1956, 141 L. Ed. 2d 222.*

Under the FDA's "changes being effected" regulation, 21 CFR § 314.70(c)(6)(iii), which was promulgated pursuant to the FDA's statutory authority, it is physically possible for Wyeth to market Phenergan [***62] in compliance with federal and Vermont law. As the majority explains, Wyeth could have changed the warning on its label regarding IV-push without violating federal law. See *ante,* at 11-13. The "changes being effected" regulation allows drug manufacturers to change their labels without the FDA's preapproval if the changes "add or strengthen a contraindication, warning, precaution, or adverse [*1210] reaction," § 314.70(c)(6)(iii)(A), or "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product," § 314.70(c)(6)(iii)(C), in order to "reflect newly acquired information," including "new analyses [**77] of previously submitted data," 73 Fed. Reg. 49603, 49609. Under the terms of these regulations, after learning of new incidences of gangrene-induced amputation resulting from the IV-push administration of Phenergan, see *ante,* at 12-13, federal law gave Wyeth the authority to change Phenergan's label to "strengthen a . . . warning," "strengthen a . . . precaution," § 314.70(c)(6)(iii)(A), or to "strengthen an instruction about . . . administration [of the IV-push method] . . . to increase the safe use of the drug product," § 314.70(c)(6)(iii)(C). [***63] Thus, it was physically possible for Wyeth to comply with a state-law requirement to provide stronger warnings on Phenergan about the risks of the IV-push administration method while continuing to market Phenergan in compliance with federal law.

In addition, the text of the statutory provisions governing FDA drug labeling, and the regulations promulgated thereunder, do not give drug manufacturers an unconditional right to market their federally approved drug at all times with the precise label initially approved

Case4:08-cv-01138-SBA Document188-1 Filed06/18/09 Page19 of 58

Page 18

129 S. Ct. 1187, *1210; 173 L. Ed. 2d 51, **77;
2009 U.S. LEXIS 1774, ***63; CCH Prod. Liab. Rep. P18,176

by the FDA. Thus, there is no "direct conflict" between the federal labeling law and the state-court judgment. The statute prohibits the interstate marketing of any drug, except for those that are federally approved. See *21 U.S.C. § 355(a)* ("*No person shall* introduce or deliver for introduction into interstate commerce any new drug, *unless* an approval of an application filed pursuant to *subsection (b)* or *(j)* of this section is effective with respect to such drug" (emphasis added)). To say, as the statute does, that Wyeth may not market a drug without federal approval (*i.e.*, without an FDA-approved label) is not to say that federal approval gives Wyeth the unfettered right, for **[\*\*\*64]** all time, to market its drug with the specific label that was federally approved. Initial approval of a label amounts to a finding by the FDA that the label is safe for purposes of gaining federal approval to market the drug. It does not represent a finding that the drug, as labeled, can never be deemed unsafe by later federal action, or as in this case, the application of state law.

Instead, FDA regulations require a drug manufacturer -- after initial federal approval of a drug's label -- to revise the federally approved label "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug." *21 CFR § 201.80(e)*. Drug manufacturers are also required to "establish and maintain records and make reports" to the FDA about "[a]ny adverse event associated with the use of a drug in humans, whether or not considered drug related," after it has received federal approval. *§§ 314.80(a), (c), (j)*. In addition, the manufacturer must make periodic reports about "adverse drug experience[s]" associated with its drug and include "a history of actions taken since the last report because of adverse drug experiences (for example, labeling changes or studies **[\*\*\*65]** initiated)." *§§ 314.80(c)(2)(i)-(ii)*. When such records and reports are not made, the FDA can withdraw its approval of the drug. *§ 314.80(j)*; see also *21 U.S.C. § 355(e)* ("The Secretary may . . . withdraw the approval of an application . . . if the Secretary finds . . . that the applicant has failed to establish a system for maintaining required records, or has repeatedly or deliberately failed to maintain such records or to make required reports"). The FDA may also **[\*\*78]** determine that a drug is no longer safe for use based on "clinical or other experience, tests, or other scientific **[\*1211]** data." *Ibid.* (approval may be withdrawn if "the Secretary finds . . . that clinical or other experience, tests, or other scientific data show that such drug is unsafe for use under the conditions of

use upon the basis of which the application was approved").

The text of the statutory provisions and the accompanying regulatory scheme governing the FDA drug approval process, therefore, establish that the FDA's initial approval of a drug is not a guarantee that the drug's label will never need to be changed. And nothing in the text of the statutory or regulatory scheme necessarily insulates Wyeth from liability **[\*\*\*66]** under state law simply because the FDA has approved a particular label.

In sum, the relevant federal law did not give Wyeth a right that the state-law judgment took away, and it was possible for Wyeth to comply with both federal law and the Vermont-law judgment at issue here. The federal statute and regulations neither prohibited the stronger warning label required by the state judgment, nor insulated Wyeth from the risk of state-law liability. With no "direct conflict" between the federal and state law, then, the state-law judgment is not pre-empted. Cf. *AT&T, 524 U.S., at 221-226, 118 S. Ct. 1956, 141 L. Ed. 2d 222* (finding pre-emption where federal law forbade common carriers from extending communications privileges requested by state-law claims); *Foster, 522 U.S. 67, at 68-69, 118 S. Ct. 464, 139 L. Ed. 2d 369* (finding pre-emption where the federal statute required congressional elections on a particular date different from that provided by state statute).

B

Wyeth also contends that state and federal law conflict because "recognition of [this] state tort action creates an unacceptable 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Hines v. Davidowitz, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941)*, because it substitutes a lay jury's **[\*\*\*67]** decision about drug labeling for the expert judgment of the FDA." *Ante*, at 6-7. This Court's entire body of "purposes and objectives" pre-emption jurisprudence is inherently flawed. The cases improperly rely on legislative history, broad atextual notions of congressional purpose, and even congressional inaction in order to pre-empt state law. See *supra*, at 5-7. I, therefore, cannot join the majority's analysis of this claim, see *ante*, at 17-25, or its reaffirmation of the Court's "purposes and objectives" jurisprudence, *ante*, at 17-18 (analyzing congressional purposes); *ante*, at 20 (quoting the "'purposes and objectives'" pre-emption standard from *Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.*

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page20 of 58

Page 19

129 S. Ct. 1187, *1211; 173 L. Ed. 2d 51, **78;
2009 U.S. LEXIS 1774, ***67; CCH Prod. Liab. Rep. P18,176

*Ct. 399, 85 L. Ed. 581 (1941)*, and *Geier, 529 U.S., at 883, 120 S. Ct. 1913, 146 L. Ed. 2d 914); ante*, at 23-24, and nn. 13-14 (analyzing this case in light of *Geier, 529 U.S. 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914*).

1

The Court first formulated its current "purposes and objectives" pre-emption **[**79]** standard in *Hines* when it considered whether the federal Alien Registration Act pre-empted an Alien Registration Act adopted by the Commonwealth of Pennsylvania. The Court did not find that the two statutes, by their terms, directly conflicted. See *Hines, supra*, at 59-60, 61 S. Ct. 399, 85 L. Ed. 2d 581, and n. 1 (citing *Pa. Stat. Ann., Tit. 35, §§ 1801-1806* **[***68]** (Purdon Supp. 1940)); *312 U.S., at 60, 61 S. Ct. 399, 85 L. Ed. 2d 581*, and n. 5 (citing Act of June 28, 1940, 54 Stat. 670); *312 U.S., at 69-74, 61 S. Ct. 399, 85 L. Ed. 2d 581* (analyzing numerous extratextual sources and finding pre-emption without concluding that the terms of the federal and state laws directly conflict); see also *id., at 78, 61 S. Ct. 399, 85 L. Ed. 2d 581* (noting that "[i]t is conceded that the federal **[*1212]** act in operation does not at any point conflict with the state statute" (Stone, J., dissenting)). [3] Nonetheless, the Court determined that it was not confined to considering merely the terms of the relevant federal law in conducting its pre-emption analysis. Rather, it went on to ask whether the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id., at 67, 61 S. Ct. 399, 85 L. Ed. 2d 581*.

3   According to the Court, the Pennsylvania Act required:

"every alien 18 years or over, with certain exceptions, to register once each year; provide such information as is required by the statute, plus any 'other information and details' that the Department of Labor and Industry may direct; pay $ 1 as an annual registration fee; receive an alien identification card and carry it at all times; show the card whenever it may be demanded by any police **[***69]** officer or any agent of the Department of Labor and Industry; and exhibit the card as a condition precedent to registering a motor vehicle in his name or obtaining a license to operate one. . . . Nonexempt aliens who fail to register are subject to a fine . . . or imprisonment . . . . For failure to carry an identification card or

for failure to show it upon proper demand, the punishment is a fine . . . or imprisonment . . . ." *Hines, 312 U.S., at 59-60, 61 S. Ct. 399, 85 L. Ed. 2d 581* (footnote omitted).

The Court explained that the federal Alien Registration Act required:

"a single registration of aliens 14 years of age and over; detailed information specified by the Act, plus 'such additional matters as may be prescribed by the Commissioner, with the approval of the Attorney General'; finger-printing of all registrants; and secrecy of the federal files . . . . No requirement that aliens carry a registration card to be exhibited to police or others is embodied in the law, and only the wilful failure to register is made a criminal offense . . . ." *Id., at 60-61, 61 S. Ct. 399, 85 L. Ed. 2d 581*.

In so doing, the Court looked far beyond the relevant federal statutory text and instead embarked on its own freeranging speculation about what the purposes **[***70]** of the federal law must have been. See *id., at 69-74, 61 S. Ct. 399, 85 L. Ed. 2d 581*. In addition to the meaning of the relevant federal text, the Court attempted to discern "[t]he nature of the power exerted by Congress, the object sought to be attained, and the character of the obligations imposed by the law." *Id., at 70, 61 S. Ct. 399, 85 L. Ed. 2d 581*. To do so, the Court looked in part to public sentiment, noting that "[o]pposition to laws . . . singling out aliens as particularly dangerous and undesirable groups, is deep-seated in this country." *Ibid.* The Court also relied on statements by particular Members of Congress and on congressional inaction, finding it pertinent that numerous bills with requirements similar to Pennsylvania's law had failed to garner enough votes in Congress to become law. *Id., at 71-73, 61 S. Ct. 399, 85 L. Ed. 2d 581*, and nn. 32-34. Concluding that these sources revealed a federal purpose to "protect the personal liberties of law-abiding **[**80]** aliens through one uniform national registration system," the Court held that the Pennsylvania law was pre-empted. *Id., at 74, 61 S. Ct. 399, 85 L. Ed. 2d 581*.

Justice Stone, in dissent, questioned the majority's decision to read an exclusive registration system for aliens into a statute that did not specifically provide such exclusivity. See *id., at 75, 61 S. Ct. 399, 85 L. Ed. 2d 581*. **[***71]** He noted his concern that state power would be improperly diminished through a pre-emption

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page21 of 58

Page 20

129 S. Ct. 1187, *1212; 173 L. Ed. 2d 51, **80;
2009 U.S. LEXIS 1774, ***71; CCH Prod. Liab. Rep. P18,176

doctrine driven by the Court's "own conceptions of a policy which Congress ha[d] not expressed and which is not plainly to be inferred from the legislation which it ha[d] enacted." *Ibid.* In his view, nothing that Congress enacted had "denie[d] the states the practicable means of identifying their alien residents and of recording their whereabouts." *Id., at 78, 61 S. Ct. 399, 85 L. Ed. 2d 581.* Yet, the *Hines* majority employed pre-emption to override numerous state alien-registration laws even though enacted federal law "at no point conflict[ed] with the state legislation and [was] [*1213] harmonious with it." *Id., at 79, 61 S. Ct. 399, 85 L. Ed. 2d 581.* [4]

> [4]   According to Justice Stone, the *Hines* majority's analysis resembled an inquiry into whether the federal act "'occupied the field,'" rather than an application of simple pre-emption principles. *Id., at 78, 61 S. Ct. 399, 85 L. Ed. 2d 581* (dissenting opinion). Regardless of whether *Hines* involved field or conflict pre-emption, the dissent accurately observed that in assessing the boundaries of the federal law -- *i.e.,* the scope of its pre-emptive effect -- the Court should look to the federal statute itself, rather than speculate about Congress' [***72] unstated intentions. *Id., at 78-79, 61 S. Ct. 399, 85 L. Ed. 2d 581.* See *Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 616-617, 117 S. Ct. 1590, 137 L. Ed. 2d 852 (1997) (THOMAS, J., dissenting) (noting that "field pre-emption is itself suspect, at least as applied in the absence of a congressional command that a particular field be pre-empted").

2

   The consequences of this Court's broad approach to "purposes and objectives" pre-emption are exemplified in this Court's decision in *Geier,* which both the majority and the dissent incorporate into their analysis today. See *ante,* at 23-24, and nn. 13-14; *post,* at 6-9 (opinion of ALITO, J.). In *Geier,* pursuant to the National Traffic and Motor Vehicle Safety Act of 1966 (Safety Act), 80 Stat. 718, *15 U.S.C. § 1381 et seq. (1988 ed.),* the Department of Transportation (DOT) had promulgated a Federal Motor Vehicle Safety Standard that "required auto manufacturers to equip some but not all of their 1987 vehicles with passive restraints." *529 U.S., at 864-865, 120 S. Ct. 1913, 146 L. Ed. 2d 914.* The case required this Court to decide whether the Safety Act pre-empted a state

common-law tort action in which the plaintiff claimed that an auto manufacturer, though in compliance with the federal standard, should nonetheless have [***73] equipped a 1987 automobile with airbags. *Id., at 865, 120 S. Ct. 1913, 146 L. Ed. 2d 914.* The Court first concluded that the Safety Act's express pre-emption provision and its saving clause, read together, did not expressly pre-empt state common-law claims. See *id., at 867-868, 120 S. Ct. 1913, 146 L. Ed. 2d 914.* [5] The Court then proceeded to [**81] consider whether the state action was nonetheless pre-empted as an "obstacle" to the purposes of the federal law. The Court held that the state tort claim was pre-empted, relying in large part on comments that DOT made when promulgating its regulation, statements that the Government made in its brief to the Court, and regulatory history that related to the federal regulation of passive restraints. See *id., at 874-886, 120 S. Ct. 1913, 146 L. Ed. 2d 914.*

> [5]   The Safety Act's express pre-emption provision stated in part:
>
> "Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State . . . shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment[,] any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard." *15 U.S.C. § 1392(d) (1988 ed.).*
>
> The [***74] Safety Act also included a saving clause, which stated: "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." *§ 1397(k).* The majority and dissent in *Geier* agreed that the import of the express pre-emption provision and the saving clause, read together, was that by its terms, the Safety Act did not expressly pre-empt state common-law actions. See *Geier, 529 U.S., at 867-868, 120 S. Ct. 1913, 146 L. Ed. 2d 914; id., at 895-898, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (STEVENS, J., dissenting).

   In particular, the majority found that DOT intended to "deliberately provid[e] the manufacturer[s] with a range of choices among different passive restraint devices" and to "bring about a mix of different devices introduced gradually over time," based on comments that

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page22 of 58

Page 21

129 S. Ct. 1187, *1213; 173 L. Ed. 2d 51, **81;
2009 U.S. LEXIS 1774, ***74; CCH Prod. Liab. Rep. P18,176

DOT made when promulgating its regulation, rather [*1214] than the Safety Act's text. *Id., at 875, 120 S. Ct. 1913, 146 L. Ed. 2d 914.* The majority also embarked on a judicial inquiry into "why and how DOT sought these objectives," *ibid.*, by considering regulatory history and the Government's brief, which described DOT's safety standard as "'embod[ying] the Secretary's policy judgment that safety would best be promoted if manufacturers installed *alternative* [***75] protection systems in their fleets rather than one particular system in every car,'" *id., at 881, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (quoting Brief for United States as *Amicus Curiae* in *Geier* v. *American Honda Motor Co.*, O. T. 1999, No. 98-1811, p. 25); see also *529 U.S., at 883-884, 120 S. Ct. 1913, 146 L. Ed. 2d 914.* Based on this "*ex post* administrative litigating position and inferences from regulatory history and final commentary," *id., at 910-911, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (STEVENS., J., dissenting), the Court found that the state action was pre-empted because it would have required manufacturers of all cars similar to that in which the plaintiff was injured to "install airbags rather than other passive restraint systems" and would have, therefore, "presented an obstacle to the variety and mix of devices that the federal regulation sought" to phase in gradually, *id., at 881, 120 S. Ct. 1913, 146 L. Ed. 2d 914.*

The Court's decision in *Geier* to apply "purposes and objectives" pre-emption based on agency comments, regulatory history, and agency litigating positions was especially flawed, given that it conflicted with the plain statutory text of the saving clause within the Safety Act, which explicitly preserved state common-law actions by providing that "[c]ompliance with any Federal motor vehicle safety standard [***76] issued under this subchapter does not exempt any person from any liability under common law," *15 U.S.C. § 1397(k) (1988 ed.).* [6] See *Engine* [**82] *Mfrs. Assn.* v. *South Coast Air Quality Management Dist., 541 U.S. 246, 252, 124 S. Ct. 1756, 158 L. Ed. 2d 529 (2004)* ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" (internal quotation marks omitted)); *West Virginia Univ. Hospitals, Inc.* v. *Casey, 499 U.S. 83, 98, 111 S. Ct. 1138, 113 L. Ed. 2d 68 (1991)* ("The best evidence of th[e] purpose [of a statute] is the statutory text adopted by both Houses of Congress and submitted to the President"). In addition, the Court's reliance on its divined purpose of the federal law -- to gradually phase in a mix of passive

restraint systems -- in order to invalidate [*1215] a State's imposition of a greater safety standard was contrary to the more general express statutory goal of the Safety Act "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents," *15 U.S.C. § 1381 (1988 ed.).* This Court has repeatedly stated that when statutory language is plain, it must be enforced according to its terms. See *Jimenez* v. *Quarterman, 555 U.S. ___, 129 S. Ct. 681, 172 L. Ed. 2d 475 (2009);* [***77] see also, *e.g., Dodd* v. *United States, 545 U.S. 353, 359, 125 S. Ct. 2478, 162 L. Ed. 2d 343 (2005); Lamie* v. *United States Trustee, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004); Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A., 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000).* The text in *Geier* "directly addressed the precise question at issue" before the Court, so that should have been "the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *National Assn. of Home Builders* v. *Defenders of Wildlife, 551 U.S. 644, ___, 127 S. Ct. 2518, 2534, 168 L. Ed. 2d 467, 486 (2007)* (internal quotation marks omitted). With text that allowed state actions like the one at issue in *Geier*, the Court had no authority to comb through agency commentaries to find a basis for an alternative conclusion.

6   In addition to the impropriety of looking beyond the plain text of the saving clause to regulatory history, DOT comments, and an administrative litigating position to evaluate the Safety Act's pre-emptive effect, it is unclear that the Court in *Geier* accurately assessed the federal objectives of the relevant federal law. As the dissent in *Geier* pointed out, the purpose of the Safety Act, as stated by Congress, was generally [***78] "'to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents.'" *Id., at 888-889, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (opinion of STEVENS, J.) (quoting *15 U.S.C. § 1381 (1988 ed.)*). On its face, that goal is of course consistent with a state-law judgment that a particular vehicle needed a passive restraint system that would better protect persons from death and injury during traffic accidents. Furthermore, the dissent observed that "by definition all of the standards established under the Safety Act . . . impose minimum, rather than fixed or maximum, requirements." *529 U.S., at 903, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (citing

Case4:08-cv-01138-SBA    Document188-1    Filed06/18/09    Page23 of 58

Page 22
129 S. Ct. 1187, *1215; 173 L. Ed. 2d 51, **82;
2009 U.S. LEXIS 1774, ***78; CCH Prod. Liab. Rep. P18,176

*15 U.S.C. § 1391(2) (1988 ed.)*). Thus, in the dissent's view, the requirements of the DOT regulation were not ceilings, and it was "obvious that the Secretary favored a more rapid increase" than required by the regulations. *529 U.S., at 903, 120 S. Ct. 1913, 146 L. Ed. 2d 914*. That goal also would be consistent with a state-law judgment finding that a manufacturer acted negligently when it failed to include an airbag in a particular car. See *id., at 903-904, 120 S. Ct. 1913, 146 L. Ed. 2d 914*.

Applying "purposes and objectives" pre-emption in *Geier*, as in any case, allowed this Court to vacate a judgment issued by another sovereign based on nothing more than assumptions [***79] and goals that were untethered from the constitutionally enacted federal law authorizing the federal regulatory standard that was before the Court. See *Watters v. Wachovia Bank, N. A., 550 U.S. 1, 44, 127 S. Ct. 1559, 167 L. Ed. 2d 389 (2007)* (STEVENS, J., dissenting) (noting that pre-emption "affects the allocation of powers among sovereigns"). "'[A]n agency literally [**83] has no power to act, let alone pre-empt the [law] of a sovereign State, unless and until Congress confers power upon it.'" *New York v. FERC, 535 U.S., at 18, 122 S. Ct. 1012, 152 L. Ed. 2d 47* (quoting *Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986)*). Thus, no agency or individual Member of Congress can pre-empt a State's judgment by merely musing about goals or intentions not found within or authorized by the statutory text. See *supra, at 5-7, 122 S. Ct. 1012, 152 L. Ed. 2d 47*.

The Court's "purposes and objectives" pre-emption jurisprudence is also problematic because it encourages an overly expansive reading of statutory text. The Court's desire to divine the broader purposes of the statute before it inevitably leads it to assume that Congress wanted to pursue those policies "at all costs" -- even when the text reflects a different balance. See *Geier, supra, at 904, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (STEVENS, J., dissenting) (finding no evidence [***80] that the DOT Secretary intended to advance the purposes of the safety standard "at all costs"); Nelson, *86 Va. L. Rev., at 279-280*. As this Court has repeatedly noted, "'it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.'" *E.g., Norfolk Southern R. Co. v. Sorrell, 549 U.S. 158, 171,*

*127 S. Ct. 799, 166 L. Ed. 2d 638 (2007)* (quoting *Rodriguez v. United States, 480 U.S. 522, 526, 107 S. Ct. 1391, 94 L. Ed. 2d 533 (1987) (per curiam)*). Federal legislation is often the result of compromise between legislators and "groups with marked but divergent interests." See *Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 93-94, 122 S. Ct. 1155, 152 L. Ed. 2d 167 (2002)*. Thus, a statute's text might reflect a compromise between parties who wanted to pursue a particular goal to different extents. See, *e.g., ibid.* (noting that the Family and Medical Leave Act's provision of only 12 workweeks [*1216] of yearly leave "was the result of compromise" that must be given effect by courts); *Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 257, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984)* (finding that a state law was not pre-empted though it allegedly frustrated a primary purpose of the Atomic Energy Act because the Act provided that its [***81] purpose was to be furthered only "to the extent it is consistent 'with the health and safety of the public'" (quoting *42 U.S.C. § 2013(d) (1982 ed.)*)); see also Manning, What Divides Textualists from Purposivists? *106 Colum. L. Rev. 70, 104 (2006)* ("Legislators may compromise on a statute that does not fully address a perceived mischief, accepting half a loaf to facilitate a law's enactment"). Therefore, there is no factual basis for the assumption underlying the Court's "purposes and objectives" pre-emption jurisprudence that every policy seemingly consistent with federal statutory text has necessarily been authorized by Congress and warrants pre-emptive effect. Instead, our federal system in general, and the *Supremacy Clause* in particular, accords pre-emptive effect to only those policies that are actually authorized by and effectuated through the statutory text.

3

The majority, while reaching the right conclusion in this case, demonstrates once again how application of [**84] "purposes and objectives" pre-emption requires inquiry into matters beyond the scope of proper judicial review. For example, the majority relies heavily on Congress' failure "during the . . . 70-year history" of the [***82] federal Food, Drug, and Cosmetic Act to enact an express pre-emption provision that addresses approval of a drug label by the FDA. *Ante*, at 18. That "silence on the issue, coupled with [Congress'] certain awareness of the prevalence of state tort litigation," the majority reasons, is evidence that Congress did not intend for federal approval of drug labels to pre-empt state tort

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page24 of 58

Page 23

129 S. Ct. 1187, *1216; 173 L. Ed. 2d 51, **84;
2009 U.S. LEXIS 1774, ***82; CCH Prod. Liab. Rep. P18,176

judgments. *Ibid.;* see also *ante,* at 17-18 (construing from inaction that Congress "[e]vidently [had] determined that widely available state rights of action provided appropriate relief"). Certainly, the absence of a statutory provision pre-empting all state tort suits related to approved federal drug labels is pertinent to a finding that such lawsuits are not pre-empted. But the relevance is in the fact that no statute explicitly pre-empts the lawsuits, and not in any inferences that the Court may draw from congressional silence about the motivations or policies underlying Congress' failure to act. See *Brown v. Gardner,* 513 U.S. 115, 121, 115 S. Ct. 552, 130 L. Ed. 2d 462 (1994) ("[C]ongressional silence lacks persuasive significance" (internal quotation marks omitted)); *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 85, 114 S. Ct. 2048, 129 L. Ed. 2d 67 (1994) ("[M]atters left unaddressed **[***83]** in [a comprehensive and detailed federal] scheme are presumably left subject to the disposition provided by state law"); *Camps Newfound,* 520 U.S., at 616, 117 S. Ct. 1590, 137 L. Ed. 2d 852 ("[O]ur pre-emption jurisprudence explicitly rejects the notion that mere congressional silence on a particular issue may be read as pre-empting state law").

In this case, the majority has concluded from silence that Congress believed state lawsuits pose no obstacle to federal drug-approval objectives. See *ante,* at 18. That is the required conclusion, but only because it is compelled by the text of the relevant statutory and regulatory provisions, not judicial suppositions about Congress' unstated goals. The fact that the Court reaches the proper conclusion does not justify its speculation about the reasons for congressional inaction. In this case, the Court has relied on the perceived congressional policies underlying inaction **[*1217]** to find that state law is *not* pre-empted. But once the Court shows a willingness to guess at the intent underlying congressional inaction, the Court could just as easily rely on its own perceptions regarding congressional inaction to give unduly broad pre-emptive effect to federal law. See, *e.g., Am. Ins. Ass'n v. Garamendi,* 539 U.S. 396, 401, 405-408, 429, 123 S. Ct. 2374, 156 L. Ed. 2d 376 (2003) **[***84]** (finding that Congress' failure to pass legislation indicating that it disagreed with the President's executive agreement supported, at least in part, the Court's determination that the agreement pre-empted state law). Either approach is illegitimate. Under the *Supremacy Clause,* state law is pre-empted only by federal law "made in Pursuance" of the *Constitution, Art. VI, cl. 2* -- not by extratextual considerations of the purposes underlying congressional

inaction. See *Hoffman v. Connecticut Dept. of Income Maintenance,* 492 U.S. 96, 104, 109 S. Ct. **[**85]** 2818, 106 L. Ed. 2d 76 (1989) (plurality opinion) (finding that policy arguments that "are not based in the text of the statute . . . are not helpful"); *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 194, 98 S. Ct. 2279, 57 L. Ed. 2d 117 (1978) ("Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute"). Our role, then, is merely "to interpret the language of the statute[s] enacted by Congress." *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 461, 122 S. Ct. 941, 151 L. Ed. 2d 908 (2002).

III

The origins of this Court's "purposes and objectives" pre-emption jurisprudence in *Hines,* and its broad application in cases like *Geier,* illustrate that this brand **[***85]** of the Court's pre-emption jurisprudence facilitates freewheeling, extratextual, and broad evaluations of the "purposes and objectives" embodied within federal law. This, in turn, leads to decisions giving improperly broad pre-emptive effect to judicially manufactured policies, rather than to the statutory text enacted by Congress pursuant to the Constitution and the agency actions authorized thereby. Because such a sweeping approach to pre-emption leads to the illegitimate -- and thus, unconstitutional -- invalidation of state laws, I can no longer assent to a doctrine that pre-empts state laws merely because they "stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law, *Hines, 312 U.S., at 67, 61 S. Ct. 399, 85 L. Ed. 2d 581,* as perceived by this Court. I therefore respectfully concur only in the judgment.

**DISSENT BY:** ALITO

**DISSENT**

JUSTICE ALITO, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

This case illustrates that tragic facts make bad law. The Court holds that a state tort jury, rather than the Food and Drug Administration (FDA), is ultimately responsible for regulating warning labels for prescription drugs. That result cannot be reconciled with *Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000), **[***86]** or general

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page25 of 58

Page 24

129 S. Ct. 1187, *1217; 173 L. Ed. 2d 51, **85;
2009 U.S. LEXIS 1774, ***86; CCH Prod. Liab. Rep. P18,176

principles of conflict pre-emption. I respectfully dissent.

I

The Court frames the question presented as a "narro[w]" one -- namely, whether Wyeth has a duty to provide "an adequate warning about using the IV-push method" to administer Phenergan. *Ante*, at 8. But that ignores the antecedent question of who -- the FDA or a jury in Vermont -- has the authority and responsibility for determining the "adequacy" of Phenergan's warnings. Moreover, it is unclear how a "stronger" warning could have helped respondent, see *ante*, at 16; after **[*1218]** all, the physician's assistant who treated her disregarded at least six separate warnings that are already on Phenergan's labeling, so respondent would be hard pressed to prove that a seventh would have made a difference. [1]

> [1]   Indeed, respondent conceded below that Wyeth *did* propose an adequate warning of Phenergan's risks. See Plaintiff Diana Levine's Memorandum in Opposition to Wyeth's Motion for Summary Judgment in *Levine* v. *American Home Products Corp.* (now Wyeth), No. 670-12-01 Wncv (Super. Ct. Washington Cty., Vt.), P7, p. 26. Specifically, respondent noted: "In 1988, Wyeth proposed language that would have prevented this accident by requiring **[***87]** a running IV and explaining why a running IV will address and reduce the risk [of intra-arterial injection]." *Ibid.* See also *id.*, at 24 ("Although not strong enough, this improved the labeling instruction, if followed, would have prevented the inadvertent administration of Phenergan into an artery . . . "). The FDA rejected Wyeth's proposal. See App. 359.

**[**86]** More to the point, the question presented by this case is not a "narrow" one, and it does not concern whether Phenergan's label should bear a "stronger" warning. Rather, the real issue is whether a state tort jury can countermand the FDA's considered judgment that Phenergan's FDA-mandated warning label renders its intravenous (IV) use "safe." Indeed, respondent's amended complaint alleged that Phenergan is "not reasonably safe for intravenous administration," App. 15, P6; respondent's attorney told the jury that Phenergan's label should say, "'Do not use this drug intravenously,'" *id.*, at 32; respondent's expert told the jury, "I think the drug should be labeled 'Not for IV use,'" *id.*, at 59; and

during his closing argument, respondent's attorney told the jury, "Thank God we don't rely on the FDA to . . . make the safe[ty] decision. **[***88]** You will make the decision. . . . The FDA doesn't make the decision, you do," *id.*, at 211-212. [2]

> [2]   Moreover, in the trial judge's final charge, he told the jury that "the critical factual issue which you must decide" is whether Phenergan's FDA-mandated label reflects a proper balance between "the risks and benefits of intravenous administration and the potential for injury to patients." *Id.*, at 220. See also *183 Vt. 76, 944 A.2d 179, 182 (2006)* (recognizing that respondent's argument is that Phenergan's "label should not have allowed IV push as a means of administration").

Federal law, however, *does* rely on the FDA to make safety determinations like the one it made here. The FDA has long known about the risks associated with IV push in general and its use to administer Phenergan in particular. Whether wisely or not, the FDA has concluded -- over the course of extensive, 54-year-long regulatory proceedings -- that the drug is "safe" and "effective" when used in accordance with its FDA-mandated labeling. The unfortunate fact that respondent's healthcare providers ignored Phenergan's labeling may make this an ideal medical-malpractice case. [3]   But turning a common-law tort suit into **[***89]** a "frontal assault" on the FDA's regulatory regime for drug labeling upsets the well-settled meaning of the *Supremacy Clause* and our conflict pre-emption jurisprudence. Brief for United States as *Amicus Curiae* 21.

> [3]   Respondent sued her physician, physician's assistant, and hospital for malpractice. After the parties settled that suit for an undisclosed sum, respondent's physician sent her a letter in which he admitted "responsibility" for her injury and expressed his "profoun[d] regre[t]" and "remors[e]" for his actions. 1 Tr. 178-179 (Mar. 8, 2004) (testimony of Dr. John Matthew); see also App. 102-103 (testimony of physician's assistant Jessica Fisch) (noting that her "sense of grief" was so "great" that she "would have gladly cut off [her own] arm" and given it to respondent). Thereafter, both the physician and the physician's assistant agreed to testify on respondent's behalf in her suit against Wyeth.

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page26 of 58

Page 25

129 S. Ct. 1187, *1218; 173 L. Ed. 2d 51, **86;
2009 U.S. LEXIS 1774, ***89; CCH Prod. Liab. Rep. P18,176

[*1219] II

A

To the extent that "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case," *Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996)* (internal quotation marks omitted), Congress made its "purpose" plain in authorizing the FDA -- not state tort juries -- to determine [***90] when and under what circumstances [**87] a drug is "safe." "[T]he process for approving new drugs is at least as rigorous as the premarket approval process for medical devices," *Riegel v. Medtronic, Inc., 552 U.S. ___, ___, 128 S. Ct. 999, 1018, 169 L. Ed. 2d 892, 914 (2008)*) (GINSBURG, J., dissenting), and we held that the latter pre-empted a state-law tort suit that conflicted with the FDA's determination that a medical device was "safe," *id., at ___, 128 S. Ct. 999, 1018, 169 L. Ed. 2d 892, 914* (opinion of the Court).

Under the Federal Food, Drug, and Cosmetic Act (FDCA), a drug manufacturer may not market a new drug before first submitting a new drug application (NDA) to the FDA and receiving the agency's approval. See *21 U.S.C. § 355(a)*. An NDA must contain, among other things, "the labeling proposed to be used for such drug," *§ 355(b)(1)(F)*, "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use," *§ 355(b)(1)(A)*, and "a discussion of why the benefits exceed the risks [of the drug] under the conditions stated in the labeling," *21 CFR § 314.50(d)(5)(viii) (2008)*. The FDA will approve an NDA only if the agency finds, among other things, that the drug is "safe [***91] for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof," there is "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof," and the proposed labeling is not "false or misleading in any particular." *21 U.S.C. § 355(d)*.

After the FDA approves a drug, the manufacturer remains under an obligation to investigate and report any adverse events associated with the drug, see *21 CFR § 314.80*, and must periodically submit any new information that may affect the FDA's previous conclusions about the safety, effectiveness, or labeling of the drug, *21 U.S.C. § 355(k)*. If the FDA finds that the

drug is not "safe" when used in accordance with its labeling, the agency "shall" withdraw its approval of the drug. *§ 355(e)*. The FDA also "shall" deem a drug "misbranded" if "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." *§ 352(j)*.

Thus, a drug's warning label "serves as the standard under which the FDA determines whether [***92] a product is safe and effective." *50 Fed. Reg. 7470 (1985)*. Labeling is "[t]he centerpiece of risk management," as it "communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively." *71 Fed. Reg. 3934 (2006)*. The FDA has underscored the importance it places on drug labels by promulgating comprehensive regulations -- spanning an entire part of the Code of Federal Regulations, see 21 CFR pt. 201, with seven subparts and 70 separate sections -- that set forth drug manufacturers' labeling obligations. Under those regulations, the FDA must be satisfied that a drug's warning label contains, among other things, "a summary of the essential scientific information needed for the safe and effective use of the drug," *§ 201.56(a)(1)*, including a [*1220] description of "clinically significant adverse reactions," "other potential safety hazards," "limitations in use imposed by them, . . . and steps that [**88] should be taken if they occur," *§ 201.57(c)(6)(i)*. Neither the FDCA nor its implementing regulations suggest that juries may second-guess the FDA's labeling decisions.

B

1

Where the FDA determines, in [***93] accordance with its statutory mandate, that a drug is on balance "safe," our conflict pre-emption cases prohibit any State from countermanding that determination. See, *e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 348, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001)* (after the FDA has struck "a somewhat delicate balance of statutory objectives" and determined that petitioner submitted a valid application to manufacture a medical device, a State may not use common law to negate it); *International Paper Co. v. Ouellette, 479 U.S. 481, 494, 107 S. Ct. 805, 93 L. Ed. 2d 883 (1987)* (after the EPA has struck "the balance of public and private interests so carefully addressed by" the federal permitting regime for water

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page27 of 58

Page 26

129 S. Ct. 1187, *1220; 173 L. Ed. 2d 51, **88;
2009 U.S. LEXIS 1774, ***93; CCH Prod. Liab. Rep. P18,176

pollution, a State may not use nuisance law to "upse[t]" it); *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 321, 101 S. Ct. 1124, 67 L. Ed. 2d 258 (1981)* (after the Interstate Commerce Commission has struck a "balance" between competing interests in permitting the abandonment of a railroad line, a State may not use statutory or common law to negate it).

Thus, as the Court itself recognizes, it is irrelevant in conflict pre-emption cases whether Congress "enacted an express pre-emption provision at some point during the FDCA's 70-year history." **[***94]** *Ante,* at 18; see also *Geier, 529 U.S., at 869, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (holding the absence of an express pre-emption clause "does *not* bar the ordinary working of conflict pre-emption principles"). Rather, the ordinary principles of conflict pre-emption turn solely on whether a State has upset the regulatory balance struck by the federal agency. *Id.,* at 884-885, 120 S. Ct. 1913, 146 L. Ed. 2d 914; see also *Chicago & North Western Transp. Co., supra, at 317, 101 S. Ct. 1124, 67 L. Ed. 2d 258* (describing conflict pre-emption as "a two-step process of first ascertaining the construction of the [federal and state laws] and then determining the constitutional question whether they are actually in conflict" (internal quotation marks omitted)).

2

A faithful application of this Court's conflict pre-emption cases compels the conclusion that the FDA's 40-year-long effort to regulate the safety and efficacy of Phenergan pre-empts respondent's tort suit. Indeed, that result follows directly from our conclusion in *Geier.*

*Geier* arose under the National Traffic and Motor Safety Vehicle Act of 1966, which directs the Secretary of the Department of Transportation (DOT) to "establish by order . . . motor vehicle safety standards," *15 U.S.C. § 1392(a) (1988 ed.),* which are defined as "minimum standard[s] **[***95]** for motor vehicle performance, or motor vehicle equipment performance," *§ 1391(2).* Acting pursuant to that statutory mandate, the Secretary of Transportation promulgated Federal Motor Vehicle Safety Standard 208, which required car manufacturers to include passive restraint systems (*i.e.,* devices that work automatically to protect occupants from injury during **[**89]** a collision) in a certain percentage of their cars built in or after 1987. See *49 CFR § 571.208 (1999).* Standard 208 did not require installation of any particular

type of passive restraint; instead, it gave manufacturers the option to install automatic **[*1221]** seatbelts, airbags, or any other suitable technology that they might develop, provided the restraint(s) met the performance requirements specified in the rule. *Ibid.*

Alexis Geier drove her 1987 Honda Accord into a tree, and although she was wearing her seatbelt, she nonetheless suffered serious injuries. She then sued Honda under state tort law, alleging that her car was negligently and defectively designed because it lacked a driver's-side airbag. She argued that Congress had empowered the Secretary to set only "minimum standard[s]" for vehicle safety. *15 U.S.C. § 1391(2).* She **[***96]** also emphasized that the National Traffic and Motor Safety Vehicle Act contains a saving clause, which provides that "[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." *§ 1397(k).*

Notwithstanding the statute's saving clause, and notwithstanding the fact that Congress gave the Secretary authority to set only "minimum" safety standards, we held Geier's state tort suit pre-empted. In reaching that result, we relied heavily on the view of the Secretary of Transportation -- expressed in an *amicus* brief -- that Standard 208 "'embodies the Secretary's policy judgment that safety would best be promoted if manufacturers installed *alternative* protection systems in their fleets rather than one particular system in every car.'" *529 U.S., at 881, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (quoting Brief for United States as *Amicus Curiae,* O. T. 1999, No. 98-1811, p. 25). Because the Secretary determined that a menu of alternative technologies was "safe," the doctrine of conflict pre-emption barred Geier's efforts to deem some of those federally approved alternatives "unsafe" under state tort law.

The same rationale applies here. Through Phenergan's **[***97]** label, the FDA offered medical professionals a menu of federally approved, "safe" and "effective" alternatives -- including IV push -- for administering the drug. Through a state tort suit, respondent attempted to deem IV push "unsafe" and "ineffective." To be sure, federal law does not prohibit Wyeth from contraindicating IV push, just as federal law did not prohibit Honda from installing airbags in all its cars. But just as we held that States may not compel the latter, so, too, are States precluded from compelling the

Case4:08-cv-01138-SBA Document188-1 Filed06/18/09 Page28 of 58

Page 27

129 S. Ct. 1187, *1221; 173 L. Ed. 2d 51, **89;
2009 U.S. LEXIS 1774, ***97; CCH Prod. Liab. Rep. P18,176

former. See also *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 155, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982)* ("The conflict does not evaporate because the [agency's] regulation simply permits, but does not compel," the action forbidden by state law). If anything, a finding of pre-emption is even more appropriate here because the FDCA -- unlike the National Traffic and Motor Safety Vehicle Act -- contains no evidence that Congress intended the FDA to set only "minimum standards," and the FDCA does not contain a saving clause. [4] See also *ante*, at 18 [*1222] [**90] (conceding Congress' "silence" on the issue).

> 4 To be sure, Congress recognized the principles of conflict pre-emption in the FDCA. See Drug Amendments of 1962, [***98] § 202, 76 Stat. 793 ("Nothing in the amendments made by this Act to the Federal Food, Drug, and Cosmetic Act shall be construed as invalidating any provision of State law . . . unless there is a direct and positive conflict between such amendments and such provision of State law"). But a provision that simply recognizes the background principles of conflict pre-emption is not a traditional "saving clause," and even if it were, it would not displace our conflict-pre-emption analysis. See *Geier v. American Honda Motor Co., 529 U.S. 861, 869, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000)* ("[T]he saving clause . . . does *not* bar the ordinary working of conflict pre-emption principles"); *id.*, at 873-874, 120 S. Ct. 1913, 146 L. Ed. 2d 914 ("The Court has . . . refused to read general 'saving' provisions to tolerate actual conflict both in cases involving impossibility *and* in 'frustration-of-purpose' cases" (emphasis deleted and citation omitted)).

### III

In its attempt to evade *Geier*'s applicability to this case, the Court commits both factual and legal errors. First, as a factual matter, it is demonstrably untrue that the FDA failed to consider (and strike a "balance" between) the specific costs and benefits associated with IV push. Second, as a legal matter, *Geier* [***99] does not stand for the legal propositions espoused by the dissenters (and specifically rejected by the majority) in that case. Third, drug labeling by jury verdict undermines both our broader pre-emption jurisprudence and the broader workability of the federal drug-labeling regime.

### A

Phenergan's warning label has been subject to the FDA's strict regulatory oversight since the 1950's. For at least the last 34 years, the FDA has focused specifically on whether IV-push administration of Phenergan is "safe" and "effective" when performed in accordance with Phenergan's label. The agency's ultimate decision -- to retain IV push as one means for administering Phenergan, albeit subject to stringent warnings -- is reflected in the plain text of Phenergan's label (sometimes in boldfaced font and all-capital letters). And the record contains ample evidence that the FDA specifically considered and reconsidered the strength of Phenergan's IV-push-related warnings in light of new scientific and medical data. The majority's factual assertions to the contrary are mistaken.

### 1

The FDA's focus on IV push as a means of administering Phenergan dates back at least to 1975. In August of that year, several representatives [***100] from both the FDA and Wyeth met to discuss Phenergan's warning label. At that meeting, the FDA specifically proposed "that Phenergan Injection should not be used in Tubex tm." 2 Record 583, 586 (Plaintiff's Trial Exh. 17, Internal Correspondence from W. E. Langeland to File (Sept. 5, 1975) (hereinafter 1975 Memo)). "Tubex" is a syringe system used exclusively for IV push. See App. 43. An FDA official explained that the agency's concerns arose from medical-malpractice lawsuits involving IV push of the drug, see 1975 Memo 586, and that the FDA was aware of "5 cases involving amputation where the drug had been administered by Tubex together with several additional cases involving necrosis," *id.*, at 586-587. Rather than contraindicating Phenergan for IV push, however, the agency and Wyeth agreed "that there was a need for better instruction regarding the problems of intraarterial injection." *Id.*, at 587.

The next year, the FDA convened an advisory committee to study, among other things, the risks associated [**91] with the Tubex system and IV push. App. 294. At the conclusion of its study, the committee recommended an additional IV-push-specific warning for Phenergan's label, see *ibid.*, but did [***101] not recommend eliminating IV push from the drug label altogether. In response to the committee's recommendations, the FDA instructed Wyeth to make several changes to strengthen Phenergan's label,

Case4:08-cv-01138-SBA    Document188-1    Filed06/18/09    Page29 of 58

Page 28

129 S. Ct. 1187, *1222; 173 L. Ed. 2d 51, **91;
2009 U.S. LEXIS 1774, ***101; CCH Prod. Liab. Rep. P18,176

including the addition of upper case warnings related to IV push. See *id.*, at 279-280, 282-283.

[*1223] In 1987, the FDA directed Wyeth to amend its label to include the following text:

"'[1] When used intravenously, [Phenergan] should be given in a concentration no greater than 25 mg/ml and at a rate not to exceed 25 mg/minute. [2] Injection through a properly running intravenous infusion may enhance the possibility of detecting arterial placement.'" *Id.*, at 311-312.

The first of the two quoted sentences refers specifically to IV push; as respondent's medical expert testified at trial, the label's recommended rate of administration (not to exceed 25 mg per minute) refers to "IV push, as opposed to say being in a bag and dripped over a couple of hours." *Id.*, at 52. The second of the two quoted sentences refers to IV drip. See *id.*, at 15-16 (emphasizing that a "running IV" is the same thing as "IV drip").

In its 1987 labeling order, the FDA cited voluminous materials to "suppor[t]" its new and stronger [***102] warnings related to IV push and the preferability of IV drip. [5] *Id.*, at 313. One of those articles specifically discussed the relative advantages and disadvantages of IV drip compared to IV push, as well as the costs and benefits of administering Phenergan via IV push. [6] The FDA also cited published case reports from the 1960's of gangrene caused by the intra-arterial injection of Phenergan, [7] and the FDA instructed Wyeth to amend Phenergan's label in accordance with the [**92] latest medical research. [8] The FDA also studied drugs similar to Phenergan and cited numerous cautionary articles -- one of which urged the agency to consider contraindicating [*1224] such drugs for IV use altogether. [9]

5      The FDA cited numerous articles that generally discuss the costs and benefits associated with IV push. See, *e.g.*, Nahrwold & Phelps, Inadvertent Intra-Arterial Injection of Mephenteramine, 70 Rocky Mountain Medical J. 38 (Sept. 1973) (cited in App. 314, no. 14); Albo, Cheung, Ruth, Snyder, & Beemtsma, Effect of Intra-Arterial Injections of Barbituates, 120 Am. J. of Surgery 676 (1970) (cited in App. 314, no.

12); Corser, Masey, Jacob, Kernoff, & Browne, Ischaemia Following Self-administered Intra-arterial Injection [***103] of Methylphenidate and Diamorphine, 40 Anesthesiology 51 (1985) (cited in App. 314, no. 9); Correspondence Regarding Thiopental and Thiamylal (3 letters), 59 Anesthesiology 153 (1983) (cited in App. 314, no. 11); Miller, Arthur, & Stratigos, Intra-arterial Injection of a Barbituate, 23 Anesthesia Progress 25 (1976) (cited in App. 315, no. 19).

6      See Webb & Lampert, Accidental Arterial Injections, 101 Am. J. Obstetrics & Gynecology 365 (1968) (cited in App. 313, no. 5).

7      See Hager & Wilson, Gangrene of the Hand Following Intra-arterial Injection, 94 Archives of Surgery 86 (1967) (cited in App. 313, no. 7); Enloe, Sylvester, & Morris, Hazards of Intra-Arterial Injection of Hydroxyzine, 16 Canadian Anaesthetists' Society J. 425 (1969) (hereinafter Enloe) (noting "recent reports" of "the occurrence of severe necrosis and gangrene following [administration of] promethazine (Phenergan tm)" (cited in App. 314, no. 15)). See also Mostafavi & Samimi, Accidental Intra-arterial Injection of Promethazine HCl During General Anesthesia, 35 Anesthesiology 645 (1971) (reporting a case of gangrene, which required partial amputation of three fingers, after Phenergan was inadvertently pushed into an artery [***104] in the "antecubital" area); Promethazine, p. 7, in Clinical Pharmacology (Gold Standard Multimedia Inc. CD-ROM, version 1.16 (1998)) (noting that "[i]nadvertent intra-arterial injection [of Phenergan] can result in arteriospasm . . . and development of gangrene")).

8      Hager and Wilson noted that the most common reactions to intra-arterial injections of drugs like Phenergan include "[i]mmediate, severe, burning pain," as well as "blanching." 94 Archives of Surgery, at 87-88. The FDA required Wyeth to include Hager and Wilson's observations on Phenergan's label. See App. 311 (requiring the label to warn that "'[t]he first sign [of an intra-arterial injection] may be the patient's reaction to a sensation of fiery burning'" pain and "'[b]lanching'").

9      See Enloe 427 (discussing hydroxyzine -- an antihistamine with chemical properties similar to those of Phenergan -- and suggesting its

Case4:08-cv-01138-SBA Document188-1 Filed06/18/09 Page30 of 58

Page 29

129 S. Ct. 1187, *1224; 173 L. Ed. 2d 51, **92;
2009 U.S. LEXIS 1774, ***104; CCH Prod. Liab. Rep. P18,176

"temporary" benefits can never outweigh the risks of intra-arterial injection); see also Goldsmith & Trieger, Accidental Intra-Arterial Injection: A Medical Emergency, 22 Anesthesia Progress 180 (1975) (noting the risks of intra-arterial administration of hydroxyzine) (cited in App. 315, no. 18); Klatte, Brooks, [***105] & Rhamy, Toxicity of Intra-Arterial Barbituates and Tranquilizing Drugs, 92 Radiology 700 (1969) (same) (cited in App. 314, no. 13). With full knowledge of those risks, FDA retained IV push for Phenergan, although the agency required Wyeth to incorporate observations from the Enloe article into Phenergan's label. Compare Enloe 427 (arguing that "every precaution should be taken to avoid inadvertent intra-arterial injection," including the use of "an obviously well-functioning venoclysis"), with App. 312 (FDA's 1987 changes to Phenergan's label). In contrast, at some time around 1970, the FDA prohibited all intravenous use of hydroxyzine. See id., at 79 (testimony of Dr. Harold Green). The FDA's decision to regulate the two drugs differently -- notwithstanding (1) the agency's knowledge of the risks associated with both drugs and (2) the agency's recognition of the relevance of hydroxyzine-related articles and case reports in its regulation of Phenergan -- further demonstrates that the FDA intentionally preserved IV-push administration for Phenergan. See also Haas, Correspondence, 33 Anesthesia Progress 281 (1986) ("[Hydroxyzine's] restriction does not lie with the medicine itself, [***106] but in the practice and malpractice of intravenous techniques. Unfortunately, the practitioner who knows how to treat injection technique problems is usually not the practitioner with the intravenous technique problems").

In "support" of its labeling order, the FDA also cited numerous articles that singled out the inner crook of the elbow -- known as the "antecubital fossa" in the medical community -- which is both a commonly used injection site, see id., at 70 (noting that respondent's injection was pushed into "the antecubital space"), and a universally recognized high-risk area for inadvertent intra-arterial injections. One of the articles explained:

"Because of the numerous superficial positions the ulnar artery might occupy, it

has often been entered during attempted venipuncture [of the antecubital fossa]. . . . However, the brachial and the radial arteries might also be quite superficial in the elbow region . . . . The arterial variations of the arm, especially in and about the cubital fossa, are common and numerous. If venipuncture must be performed in this area, a higher index of suspicion must be maintained to forestall misdirected injections." Stone & Donnelly, The Accidental [***107] Intra-arterial Injection of Thiopental, 22 Anesthesiology 995, 996 (1961) (footnote omitted; cited in App. 315, no. 20). [10]

[*1225] [**93] Based on this and other research, the FDA ordered Wyeth to include a specific warning related to the use of the antecubital space for IV push. [11]

10  See also Engler, Freeman, Kanavage, Ogden, & Moretz, Production of Gangrenous Extremities by Intra-Arterial Injections, 30 Am. Surgeon 602 (1964) ("Accidental arterial injection most often occurs in the antecubital region because this is a favorite site for venopuncture and in this area the ulnar and brachial arteries are superficial and easily entered" (cited in App. 313, no. 6)); Engler, Gangrenous Extremities Resulting from Intra-arterial Injections, 94 Archives of Surgery 644 (1966) (similar) (cited in App. 314, no. 16); Lynas & Bisset, Intra-arterial Thiopentone, 24 Anaesthesia 257 (1969) ("Most [anesthesiologists] agree that injections on the medial aspect of the antecubital fossa are best avoided" (cited in App. 314, no. 8)); Waters, Intra-arterial Thiopentone, 21 Anesthesia 346 (1966) ("The risk of producing gangrene of the forearm by accidental injection of sodium thiopentone into an artery at the elbow has [***108] been recognised for many years" (cited in App. 314, no. 10)); see also Hager & Wilson, 94 Archives of Surgery, at 88 (emphasizing that one of the best ways to prevent inadvertent intra-arterial injections is to be aware of "aberrant or superficial arteries at the antecubital, forearm, wrist, and hand level"); Mostafavi & Samimi, supra (warning against antecubital injections).

11  See App. 311 (requiring Phenergan's label to warn that practitioners should "'[b]eware of the

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page31 of 58

Page 30

129 S. Ct. 1187, *1225; 173 L. Ed. 2d 51, **93;
2009 U.S. LEXIS 1774, ***108; CCH Prod. Liab. Rep. P18,176

close proximity of arteries and veins at commonly used injection sites and consider the possibility of aberrant arteries'").

2

When respondent was injured in 2000, Phenergan's label specifically addressed IV push in several passages (sometimes in lieu of and sometimes in addition to those discussed above). For example, the label warned of the risks of intra-arterial injection associated with "aspiration," which is a technique used only in conjunction with IV push. [12] The label also cautioned against the use of "syringes with rigid plungers," App. 390, which are used only to administer the drug via IV push. As respondent's medical expert testified at trial, "by talking plungers and rigid needles, that's the way you do it, [***109] to push it with the plunger." *Id.*, at 53 (testimony of Dr. John Matthew). Moreover, Phenergan's 2000 label devoted almost a full page to discussing the "Tubex system," see *id.*, at 391, which, as noted above, is used only to administer the drug via IV push.

> 12    "Aspiration" refers to drawing a small amount of blood back into the needle to determine whether the needle is in an artery or a vein. Ordinarily, arterial blood is brighter than venous blood -- but contact with Phenergan causes discoloration, which makes aspiration an unreliable method of protecting against intra-arterial injection. See *id.*, at 282. Therefore, the label warned that when using IV push, a medical professional should beware that "[a]spiration of dark blood does not preclude intra-arterial needle placement, because blood is discolored upon contact with Phenergan Injection." *Id.*, at 390.

While Phenergan's label very clearly authorized the use of IV push, it also made clear that IV push is the delivery method of last resort. The label specified that "[t]he preferred parenteral route of administration is by deep intramuscular injection." *Id.*, at 390. If an intramuscular injection is ineffective, then "it is usually preferable [***110] to inject [Phenergan] through the tubing of an intravenous infusion set that is known to be functioning satisfactorily." *Ibid.* See also *id.*, at 50-51 (testimony of respondent's medical expert, Dr. John Matthew) (conceding that the best way to determine that an IV set is functioning satisfactorily is to use IV drip). Finally, if for whatever reason a medical professional

chooses to use IV push, he or she is on notice that "**INADVERTENT INTRA-ARTERIAL INJECTION CAN RESULT IN GANGRENE OF THE AFFECTED EXTREMITY.**" *Id.*, at 391; see also *id.*, at 390 ("Under no circumstances should Phenergan Injection be given by intra-arterial injection due to the likelihood of severe arteriospasm and the possibility of resultant gangrene").

Phenergan's label also directs medical practitioners to choose veins wisely when using IV push:

> [**94] "Due to the close proximity of arteries and veins in the areas most commonly used for intravenous injection, extreme care should be exercised to avoid perivascular extravasation or inadvertent intra-arterial injection. Reports compatible with inadvertent intra-arterial injection of Phenergan Injection, usually in conjunction with other drugs intended for intravenous use, suggest [***111] that pain, severe chemical irritation, severe spasm of distal vessels, and resultant gangrene requiring amputation are likely under such circumstances." *Ibid.*

Thus, it is demonstrably untrue that, as of 2000, Phenergan's "labeling did not contain a specific warning about the risks of [*1226] IV-push administration." *Ante*, at 4. And whatever else might be said about the extensive medical authorities and case reports that the FDA cited in "support" of its approval of IV-push administration of Phenergan, it cannot be said that the FDA "paid no more than passing attention to" IV push, *ante*, at 6; nor can it be said that the FDA failed to weigh its costs and benefits, Brief for Respondent 50.

3

For her part, respondent does not dispute the FDA's conclusion that IV push has certain benefits. At trial, her medical practitioners testified that they used IV push in order to help her "in a swift and timely way" when she showed up at the hospital for the second time in one day complaining of "intractable" migraines, "terrible pain," inability to "bear light or sound," sleeplessness, hours-long spasms of "retching" and "vomiting," and when "every possible" alternative treatment had "failed." App. 40 (testimony [***112] of Dr. John Matthew); *id.*,

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page32 of 58

Page 31

129 S. Ct. 1187, *1226; 173 L. Ed. 2d 51, **94;
2009 U.S. LEXIS 1774, ***112; CCH Prod. Liab. Rep. P18,176

at 103, 106, 109 (testimony of physician's assistant Jessica Fisch).

Rather than disputing the benefits of IV push, respondent complains that the FDA and Wyeth underestimated its costs (and hence did not provide sufficient warnings regarding its risks). But when the FDA mandated that Phenergan's label read, "**INADVERTENT INTRA-ARTERIAL INJECTION CAN RESULT IN GANGRENE OF THE AFFECTED EXTREMITY,**" *id.*, at 391, and when the FDA required Wyeth to warn that "[u]nder no circumstances should Phenergan Injection be given by intra-arterial injection," *id.*, at 390, the agency could reasonably assume that medical professionals would take care not to inject Phenergan intra-arterially. See also *71 Fed. Reg. 3934* (noting that a drug's warning label "communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively"). Unfortunately, the physician's assistant who treated respondent in this case disregarded Phenergan's label and pushed the drug into the single spot on her arm that is *most* likely to cause an inadvertent intra-arterial injection.

As noted above, when the **[***113]** FDA approved Phenergan's label, it was textbook medical knowledge that the "antecubital fossa" creates a high risk of inadvertent intra-arterial injection, given the close proximity of veins and arteries. See *supra*, at 13-14; see also The Lippincott Manual of Nursing Practice 99 (7th ed. 2001) (noting, in a red-text "NURSING ALERT," that the antecubital fossa is "not recommended" **[**95]** for administering dangerous drugs, "due to the potential for extravasation"). [13] According to the physician's assistant who injured respondent, however, "[i]t never crossed my mind" that an antecubital injection of Phenergan could hit an artery. App. 110; see also *ibid.* ("[It] just wasn't something that I was aware of at the time"). Oblivious to the risks emphasized in Phenergan's warnings, the physician's assistant pushed a double dose of the drug into an antecubital artery over the course of "[p]robably about three to four minutes," *id.*, at 111; *id.*, at 105, notwithstanding respondent's complaints of a "'burn[ing]'" sensation that she subsequently described as "'one of the most extreme pains that I've ever felt,'" *id.*, at 110, 180-181. **[*1227]** And when asked why she ignored Phenergan's label and failed to stop pushing **[***114]** the drug after respondent complained of burning pains, the

physician's assistant explained that it would have been "just crazy" to "worr[y] about an [intra-arterial] injection" under the circumstances, *id.*, at 111.

> 13   In addition, respondent's own medical expert testified at trial that it is a principle of "basic anatomy" that the antecubital fossa contains aberrant arteries. See 2 Tr. 34-35 (Mar. 9, 2004) (testimony of Dr. Daniel O'Brien); see also *ibid.* (noting that Gray's Anatomy, which is "the Bible of anatomy," also warns of arteries in the antecubital space).

The FDA, however, did not think that the risks associated with IV push -- especially in the antecubital space -- were "just crazy." That is why Phenergan's label so clearly warns against them.

### B

Given the "balance" that the FDA struck between the costs and benefits of administering Phenergan via IV push, *Geier* compels the pre-emption of tort suits (like this one) that would upset that balance. The contrary conclusion requires turning yesterday's dissent into today's majority opinion.

First, the Court denies the existence of a federal-state conflict in this case because Vermont merely countermanded the FDA's determination that **[***115]** IV push is "safe" when performed in accordance with Phenergan's warning label; the Court concludes that there is no conflict because Vermont did not "mandate a particular" label as a "replacement" for the one that the jury nullified, and because the State stopped short of altogether "contraindicating IV-push administration." *Ante*, at 8. But as we emphasized in *Geier* (over the dissent's assertions to the contrary), the degree of a State's intrusion upon federal law is irrelevant -- the *Supremacy Clause* applies with equal force to a state tort law that merely countermands a federal safety determination and to a state law that altogether prohibits car manufacturers from selling cars without airbags. Compare *529 U.S., at 881-882, 120 S. Ct. 1913, 146 L. Ed. 2d 914*, with *id., at 902, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (STEVENS, J., dissenting). Indeed, as recently as last Term, we held that the *Supremacy Clause* pre-empts a "[s]tate tort law that requires a manufacturer's catheters to be safer, but hence less effective, than the model the FDA has approved . . . ." *Riegel, 552 U.S., at ___, 128 S. Ct. 999, 169 L. Ed. 2d 892, 914*). It did not matter there that the State stopped

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page33 of 58

Page 32

129 S. Ct. 1187, *1227; 173 L. Ed. 2d 51, **95;
2009 U.S. LEXIS 1774, ***115; CCH Prod. Liab. Rep. P18,176

short of altogether prohibiting the use of FDA-approved catheters -- just as it does not matter here that **[***116]** Vermont stopped short of altogether prohibiting an **[**96]** FDA-approved method for administering Phenergan. See also *Lohr, 518 U.S., at 504, 116 S. Ct. 2240, 135 L. Ed. 2d 700* (BREYER, J., concurring in part and concurring in judgment) (noting it would be an "anomalous result" if pre-emption applied differently to a state tort suit premised on the inadequacy of the FDA's safety regulations and a state law that specifically prohibited an FDA-approved design).

Second, the Court today distinguishes *Geier* because the FDA articulated its pre-emptive intent "without offering States or other interested parties notice or opportunity for comment." *Ante*, at 21; see also *ante*, at 24. But the *Geier* Court specifically rejected the argument (again made by the dissenters in that case) that conflict pre-emption is appropriate only where the agency expresses its pre-emptive intent through notice-and-comment rulemaking. Compare *529 U.S., at 885, 120 S. Ct. 1913, 146 L. Ed. 2d 914* ("To insist on a specific expression of agency intent to pre-empt, made after notice-and-comment rulemaking, would be in certain cases to tolerate conflicts that an agency, and therefore Congress, is most unlikely to have intended. The dissent, as we have said, apparently welcomes that result . . . . We **[***117]** do not"), with *id., at 908-910, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (STEVENS, J., dissenting) (emphasizing that "we generally expect an administrative regulation to declare any intention to **[*1228]** pre-empt state law with some specificity," and that "[t]his expectation . . . serves to ensure that States will be able to have a dialog with agencies regarding pre-emption decisions *ex ante* through the normal notice-and-comment procedures of the Administrative Procedure Act" (internal quotation marks omitted)). Indeed, pre-emption is arguably more appropriate here than in *Geier* because the FDA (unlike the DOT) declared its pre-emptive intent in the Federal Register. See 71 Fed. Reg. 3933-3936. Yet the majority dismisses the FDA's published preamble as "inherently suspect," *ante*, at 21, and an afterthought that is entitled to "no weight," *ante*, at 25. Compare *Lohr, supra, at 506, 116 S. Ct. 2240, 135 L. Ed. 2d 700* (opinion of BREYER, J.) (emphasizing that the FDA has a "special understanding of the likely impact of both state and federal requirements, as well as an understanding of whether (or the extent to which) state requirements may interfere with federal objectives," and that "[t]he FDA can translate

these understandings into particularized pre-emptive intentions **[***118]** . . . through statements in 'regulations, preambles, interpretive statements, and responses to comments'").

Third, the Court distinguishes *Geier* because the DOT's regulation "bear[s] the force of law," whereas the FDA's preamble does not. *Ante*, at 24; see also *ante*, at 19. But it is irrelevant that the FDA's preamble does not "bear the force of law" because the FDA's labeling decisions surely do. See *21 U.S.C. § 355*. It is well within the FDA's discretion to make its labeling decisions through administrative adjudications rather than through less-formal and less-flexible rulemaking proceedings, see *SEC v. Chenery Corp., 332 U.S. 194, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947)*, and we have never previously held that our pre-emption analysis turns on the agency's choice of the latter **[**97]** over the former. Moreover, it cannot be said that *Geier's* outcome hinged on the agency's choice to promulgate a rule. See *ante*, at 19, 24. The *Geier* Court relied -- again over the dissenters' protestations -- on materials other than the Secretary's regulation to explain the conflict between state and federal law. Compare *529 U.S., at 881, 120 S. Ct. 1913, 146 L. Ed. 2d 914*, with *id., at 899-900, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (STEVENS, J., dissenting), and *ante*, at 1-2 (BREYER, J., concurring).

Fourth, the Court **[***119]** sandwiches its discussion of *Geier* between the "presumption against pre-emption," *ante*, at 18, and heavy emphasis on "the longstanding coexistence of state and federal law and the FDA's traditional recognition of state-law remedies," *ante*, at 24. But the *Geier* Court specifically rejected the argument (again made by the dissenters in that case) that the "presumption against pre-emption" is relevant to the conflict pre-emption analysis. See *529 U.S., at 906-907, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (STEVENS, J., dissenting) ("[T]he Court simply ignores the presumption [against pre-emption]"). Rather than invoking such a "presumption," the Court emphasized that it was applying "ordinary," "longstanding," and "experience-proved principles of conflict pre-emption." *Id., at 874, 120 S. Ct. 1913, 146 L. Ed. 2d 914*. Under these principles, the sole question is whether there is an "actual conflict" between state and federal law; if so, then pre-emption follows automatically by operation of the *Supremacy Clause*. *Id., at 871-872, 120 S. Ct. 1913, 146 L. Ed. 2d 914*. See also *Buckman, 531 U.S., at 347-348, 121 S. Ct. 1012, 148 L. Ed. 2d 854* ("[P]etitioner's dealings with the FDA were

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page34 of 58

Page 33

129 S. Ct. 1187, *1228; 173 L. Ed. 2d 51, **97;
2009 U.S. LEXIS 1774, ***119; CCH Prod. Liab. Rep. P18,176

prompted by [federal law], and the very subject matter of petitioner's statements [to the FDA] were dictated by [federal law]. Accordingly -- and in contrast **[***120]** to situations implicating 'federalism concerns and the historic primacy of state regulation of matters of health and safety' -- no presumption **[*1229]** against pre-emption obtains in this case" (citation omitted)). [14]

14   Thus, it is not true that "this Court has long" applied a presumption against pre-emption in conflict pre-emption cases. *Ante*, at 9, n. 3 (majority opinion). As long ago as *Gibbons v. Ogden, 22 U.S. 1, 9 Wheat. 1, 210, 6 L. Ed. 23 (1824),* the Court inquired whether a state law "interfer[ed] with," was "contrary to," or "c[a]me into collision with" federal law -- and it did so without ever invoking a "presumption." See also Davis, Unmasking the Presumption in Favor of Preemption, *53 S. C. L. Rev. 967, 974 (2002)* (noting that many of the Court's early pre-emption cases "resulted in almost automatic preemption of concurrent state regulation"). In subsequent years the Court has sometimes acknowledged a limited "presumption against pre-emption," but it nonetheless remained an open question -- before today -- whether that presumption applied in conflict pre-emption cases. See *Crosby v. National Foreign Trade Council, 530 U.S. 363, 374, n. 8, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000)* ("We leave for another day a consideration in this context **[***121]** of a presumption against preemption"). Moreover, this Court has never held that the "presumption" applies in an area -- such as drug labeling -- that has long been "reserved for federal regulation." *United States v. Locke, 529 U.S. 89, 111, 120 S. Ct. 1135, 146 L. Ed. 2d 69 (2000).* See also *Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 347-348, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001).*

Finally, the *Geier* Court went out of its way to emphasize (yet again over the dissenters' objections) that it placed "some weight" on the DOT's *amicus* brief, which explained the agency's regulatory objectives and the **[**98]** effects of state tort suits on the federal regulatory regime. *529 U.S., at 883, 120 S. Ct. 1913, 146 L. Ed. 2d 914*; compare *id., at 910-911, 120 S. Ct. 1913, 146 L. Ed. 2d 914* (STEVENS, J., dissenting) (criticizing the majority for "uph[olding] a regulatory claim of frustration-of-purposes implied conflict pre-emption

based on nothing more than an *ex post* administrative litigating position and inferences from regulatory history and final commentary"). See also *Lohr, 518 U.S., at 496, 116 S. Ct. 2240, 135 L. Ed. 2d 700* (recognizing that the FDA is "uniquely qualified" to explain whether state law conflicts with the FDA's objectives). Yet today, the FDA's explanation of the conflict between state tort suits and the federal labeling regime, set forth in the **[***122]** agency's *amicus* brief, is not even mentioned in the Court's opinion. Instead of relying on the FDA's explanation of its own regulatory purposes, the Court relies on a decade-old and now-repudiated statement, which the majority finds preferable. See *ante*, at 21-22, 24, n. 13. Cf. *Riegel, 552 U.S., at ___, 128 S. Ct. 999, 1009, 169 L. Ed. 2d 892, 904)* (noting that "the agency's earlier position (which the dissent describes at some length and finds preferable) is . . . compromised, indeed deprived of all claim to deference, by the fact that it is no longer the agency's position" (citation omitted)); *Altria Group, Inc. v. Good, 555 U.S. ___, ___, 129 S. Ct. 538, 550, 172 L. Ed. 2d 398, 413 (2008))* (rejecting petitioners' reliance on the pre-emptive effect of the agency's "longstanding policy" because it is inconsistent with the agency's current one). And JUSTICE BREYER suggests that state tort suits may "help the [FDA]," *ante*, at 1 (concurring opinion), notwithstanding the FDA's insistence that state tort suits will "disrupt the agency's balancing of health risks and benefits," Brief for United States as *Amicus Curiae* 9.

*Geier* does not countenance the use of state tort suits to second-guess the FDA's labeling decisions. And the Court's contrary **[***123]** conclusion has potentially far-reaching consequences.

C

By their very nature, juries are ill-equipped to perform the FDA's cost-benefit-balancing function. As we explained in *Riegel*, juries tend to focus on the risk of a **[*1230]** particular product's design or warning label that arguably contributed to a particular plaintiff's injury, not on the overall benefits of that design or label; "the patients who reaped those benefits are not represented in court." *552 U.S., at ___, 128 S. Ct. 999, 1008, 169 L. Ed. 2d 892, 903*. Indeed, patients like respondent are the only ones whom tort juries ever see, and for a patient like respondent -- who has already suffered a tragic accident -- Phenergan's risks are no longer a matter of probabilities and potentialities.

Case4:08-cv-01138-SBA   Document188-1   Filed06/18/09   Page35 of 58

Page 34

129 S. Ct. 1187, *1230; 173 L. Ed. 2d 51, **98;
2009 U.S. LEXIS 1774, ***123; CCH Prod. Liab. Rep. P18,176

In contrast, the FDA has the benefit of the long view. Its drug-approval determinations consider the interests of all potential users of a drug, including "those who would suffer without new medical [products]" if juries in all 50 States were free to contradict the FDA's expert determinations. *Id., at ___, 128 S. Ct. 999, 1009, 169 L. Ed. 2d 892, 904).* And the FDA conveys its warnings with one voice, rather than whipsawing the medical community with 50 (or more) potentially conflicting ones. After today's **[***124]** ruling, however, parochialism may prevail.

The problem is well illustrated by **[**99]** the labels borne by "vesicant" drugs, many of which are used for chemotherapy. As a class, vesicants are much more dangerous than drugs like Phenergan, [15] but the vast majority of vesicant labels -- like Phenergan's -- either allow or do not disallow IV push. See Appendix, *infra.* Because vesicant extravasation can have devastating consequences, and because the potentially lifesaving benefits of these drugs offer hollow solace to the victim of such a tragedy, a jury's cost-benefit analysis in a particular case may well differ from the FDA's.

> [15] Vesicants may cause "blistering, severe tissue injury, or tissue necrosis" upon extravasation -- even if the drug is not injected into an artery. See, *e.g.,* Schulmeister, Administering Vesicants, 9 Clinical J. of Oncology Nursing 469, 469-470 (2005). See also *ante,* at 4 (majority opinion) (noting that Phenergan is labeled as an "irritant"); cf. Brief for Anju Budhwani et al. as *Amici Curiae* 15 (suggesting Phenergan should be considered a "vesicant").

For example, consider Mustargen (mechlorethamine HCl) -- the injectable form of mustard gas -- which can be used as an anticancer **[***125]** drug. Mustargen's FDA-approved label warns in several places that "**This drug is HIGHLY TOXIC**." [16] Indeed, the drug is so highly toxic:

> "Should accidental eye contact occur, copious irrigation for at least 15 minutes with water, normal saline or a balanced salt ophthalmic irrigating solution should be instituted immediately, followed by prompt ophthalmologic consultation. Should accidental skin contact occur, the affected part must be irrigated

immediately with copious amounts of water, for at least 15 minutes while removing contaminated clothing and shoes, followed by 2% sodium thiosulfate solution. Medical attention should be sought immediately. Contaminated clothing should be destroyed." [17]

Yet when it comes to administering this highly toxic drug, the label provides that "the drug may be injected *directly into any suitable vein,* [but] it is injected preferably into the rubber or plastic tubing of a flowing intravenous infusion set. This reduces the possibility of severe local reactions due to extravasation or high concentration of the drug." (Emphasis added.) Similarly, the FDA-approved labels for other powerful chemotherapeutic vesicants -- **[*1231]** including Dactinomycin, Oxaliplatin, Vinblastine, **[***126]** and Vincristine -- specifically allow IV push, notwithstanding their devastating effects when extravasated.

> [16] FDA, Oncology Tools Product Label Details, online at http://www.accessdata.fda.gov/scripts/cder/onctools/labels.cfm?GN=meclorethamine,%20nitrogen%20mustard (as visited Mar. 2, 2009, and available in Clerk of Court's case file).
>
> [17] *Ibid.*

The fact that the labels for such drugs allow IV push is striking -- both because vesicants are much more dangerous than Phenergan, and also because they are so frequently extravasated, see Boyle & Engelking, Vesicant Extravasation: Myths and Realities, 22 Oncology Nursing Forum 57, 58 (1995) (arguing that the rate of extravasation is "considerably higher" than 6.4% of all vesicant administrations). Regardless of the FDA's reasons for not contraindicating IV push for these drugs, it is odd (to say the least) that a jury in Vermont can now order for Phenergan **[**100]** what the FDA has chosen not to order for mustard gas. [18]

> [18] The same is true of FDA's regulation of hydroxyzine. See n. 9, *supra.*

* * *

To be sure, state tort suits can peacefully coexist with the FDA's labeling regime, and they have done so for decades. *Ante,* at 17-18. But this case is far from **[***127]** peaceful coexistence. The FDA told Wyeth that

129 S. Ct. 1187, *1231; 173 L. Ed. 2d 51, **100;
2009 U.S. LEXIS 1774, ***127; CCH Prod. Liab. Rep. P18,176

Phenergan's label renders its use "safe." But the State of Vermont, through its tort law, said: "Not so."

The state-law rule at issue here is squarely pre-empted. Therefore, I would reverse the judgment of

the Supreme Court of Vermont.

APPENDIX TO OPINION OF ALITO, J.

| Vesicant [1] | IV Push [2] |
|---|---|
| Dactinomycin | Specifically allowed |
| Mechlorethamine (Mustargen) | Specifically allowed |
| Oxaliplatin | Specifically allowed |
| Vinblastine | Specifically allowed |
| Vincristine | Specifically allowed |
| Bleomycin | Neither mentioned nor prohibited |
| Carboplatin | Neither mentioned nor prohibited |
| Dacarbazine | Neither mentioned nor prohibited |
| Mitomycin | Neither mentioned nor prohibited |
| Carmustine | Not prohibited; IV drop recommended |
| Cisplatin | Not prohibited; IV drop recommended |
| Epirubicin | Not prohibited; IV drop recommended |
| Etoposide | Not prohibited; IV drop recommended |
| Ifosfamide | Not prohibited; IV drop recommended |
| Mitoxantrone | Not prohibited; IV drop recommended |
| Paclitaxel | Not prohibited; IV drop recommended |
| Teniposide | Not prohibited; IV drop recommended |
| Vinorelbine | Not prohibited; IV drop recommended |
| Daunorubicin | Prohibited |
| Doxorubicin | Prohibited |

1   Wilkes & Barton-Burke, 2008 Oncology Nursing Drug Handbook 27-33 (2008) (Table [***128] 1.6).

2   IV-push information is derived from the "dosage and administration" sections of individual drug labels (available in Clerk of Court's case file).

129 S. Ct. 1870, *; 173 L. Ed. 2d 812, **;
2009 U.S. LEXIS 3306, ***; 21 Fla. L. Weekly Fed. S 839



1 of 4 DOCUMENTS

**BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, ET AL.,
PETITIONERS v. UNITED STATES ET AL. SHELL OIL COMPANY,
PETITIONER v. UNITED STATES ET AL.**

**Nos. 07-1601 and 07-1607**

**SUPREME COURT OF THE UNITED STATES**

*129 S. Ct. 1870*; *173 L. Ed. 2d 812*; *2009 U.S. LEXIS 3306*; *21 Fla. L. Weekly Fed. S 839*

**February 24, 2009, Argued
May 4, 2009, Decided** *

\* Together with No. 07-1607, Shell Oil Co. v. United States et al., also on
certiorari to the same court.

**NOTICE:**

The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:  [***1]**
ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.
*United States v. Burlington N. & Santa Fe Ry. Co., 520 F.3d 918, 2008 U.S. App. LEXIS 6135 (9th Cir. Cal., 2008)*

**DISPOSITION:**   Reversed and remanded.

**SYLLABUS**

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) is designed to promote the cleanup of hazardous waste sites and to ensure that cleanup costs are borne by those responsible for the contamination. In 1960, Brown & Bryant, Inc. (B&B), an agricultural chemical distributor, began operating on a parcel of land located in Arvin, California. B&B later expanded onto an adjacent parcel owned by petitioners Burlington Northern and Santa Fe Railway Company and Union Pacific Railroad Company (Railroads). As part of its business, B&B purchased and stored various hazardous chemicals, including the pesticide D-D, which it bought from petitioner Shell Oil Company (Shell). Over time, many of these chemicals spilled during transfers and deliveries, and as a result of equipment failures.

Investigations of B&B by the California Department of Toxic Substances Control and the federal Environmental Protection Agency (Governments) revealed significant soil and ground water contamination and in 1989, the Governments exercised their CERCLA authority to clean  [***2] up the Arvin site, spending over $ 8 million by 1998. Seeking to recover their costs, the Governments initiated legal action against Shell and the Railroads. The District Court ruled in favor of the Governments, finding that both the Railroads and Shell were potentially responsible parties under CERCLA -- the Railroads because they owned part of the facility, and Shell because it had "arranged for disposal . . . of hazardous substances," *42 U.S.C. § 9607(a)(3)*, through D-D's sale and delivery. The District Court apportioned liability, holding the Railroads liable for 9% of the Governments' total response costs, and Shell liable for 6%. On appeal, the Ninth Circuit agreed that Shell could be held liable as an arranger under *§ 9607(a)(3)* and affirmed the District Court's decision in that respect. Although the Court of Appeals agreed that the harm in this case was theoretically capable of apportionment, it found the facts present in the record insufficient to support apportionment, and therefore held Shell and the Railroads jointly and severally liable for the Governments' response costs.

*Held:*

1. Shell is not liable as an arranger for the contamination at the Arvin facility. Section *§ 9607(a)(3)* [***3] liability may not extend beyond the limits of the statute itself. Because CERCLA does not specifically define what it means to "arrang[e] for" disposal of a hazardous substance, the phrase should be given its ordinary meaning. In common parlance, "arrange"

implies action directed to a specific purpose. Thus, under § 9607(a)(3)'s plain language, an entity may qualify as an arranger when it takes intentional steps to dispose of a hazardous substance. To qualify as an arranger, Shell must have entered into D-D sales with the intent that at least a portion of the product be disposed of during the transfer process by one or more of § 6903(3)'s methods. The facts found by the District Court do not support such a conclusion. The evidence shows that Shell was aware that minor, accidental spills occurred during D-D's transfer from the common carrier to B&B's storage tanks after the product had come under B&B's stewardship; however, it also reveals that Shell took numerous steps to encourage its distributors to *reduce* the likelihood of spills. Thus, Shell's mere knowledge of continuing spills and leaks is insufficient grounds for concluding that it "arranged for" D-D's disposal. Pp. 8-13.

2. **[***4]** The District Court reasonably apportioned the Railroads' share of the site remediation costs at 9%. Calculating liability based on three figures -- the percentage of the total area of the facility that was owned by the Railroads, the duration of B&B's business divided by the term of the Railroads' lease, and the court's determination that only two polluting chemicals (not D-D) spilled on the leased parcel required remediation and that those chemicals were responsible for roughly two-thirds of the remediable site contamination -- the District Court ultimately determined that the Railroads were responsible for 9% of the remediation costs. The District Court's detailed findings show that the primary pollution at the site was on a portion of the facility most distant from the Railroad parcel and that the hazardous-chemical spills on the Railroad parcel contributed to no more than 10% of the total site contamination, some of which did not require remediation. Moreover, although the evidence adduced by the parties did not allow the District Court to calculate precisely the amount of hazardous chemicals contributed by the Railroad parcel to the total site contamination or the exact percentage **[***5]** of harm caused by each chemical, the evidence showed that fewer spills occurred on the Railroad parcel and that not all of them crossed to the B&B site, where most of the contamination originated, thus supporting the conclusion that the parcel contributed only two chemicals in quantities requiring remediation. Pp. 13-19.

*520 F.3d 918*, reversed and remanded.

**COUNSEL: Kathleen M. Sullivan** argued the cause for petitioner in 07-1607.

**Maureen E. Mahoney** argued the cause for petitioners in No. 07-1601.

**Malcolm L. Stewart** argued the cause for respondents.

**JUDGES:** STEVENS, J., delivered the opinion of the

Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, SOUTER, THOMAS, BREYER, and ALITO, JJ., joined. GINSBURG, J., filed a dissenting opinion.

**OPINION BY:** STEVENS

**OPINION**

   **[*1874]** **[**818]** JUSTICE STEVENS delivered the opinion of the Court.

In 1980, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 94 Stat. 2767, as amended, *42 U.S.C. §§ 9601-9675*, in response to the serious environmental and health risks posed by industrial pollution. See *United States v. Bestfoods, 524 U.S. 51, 55, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998)*. The Act was designed to promote the "'timely cleanup of hazardous waste sites'" and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination. *Consol. Edison Co. of N. Y., Inc. v. UGI Utils., Inc., 423 F.3d 90, 94 (CA2 2005)*; see also *Meghrig v. KFC Western, Inc., 516 U.S. 479, 483, 116 S. Ct. 1251, 134 L. Ed. 2d 121 (1996)*; **[***6]** *Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (CA1 1986)*. These cases raise the questions whether and to what extent a party associated with a contaminated site may be held responsible for the full costs of remediation.

I

In 1960, Brown & Bryant, Inc. (B&B), began operating an agricultural chemical distribution business, purchasing pesticides and other chemical products from suppliers such as Shell Oil Company (Shell). Using its own equipment, B&B applied its products to customers' farms. B&B opened its business on a 3.8 acre parcel of former farmland in Arvin, California, and in 1975, expanded operations onto an adjacent .9 acre parcel of land owned jointly by the Atchison, Topeka & Santa Fe Railway Company, and the Southern Pacific Transportation Company (now known respectively as the Burlington Northern and Santa Fe Railway Company and Union Pacific Railroad Company) (Railroads). Both parcels of the Arvin **[*1875]** facility were graded toward a sump and drainage pond located on the southeast corner of the primary parcel. See Appendix, *infra*. Neither the sump nor the drainage pond was lined until 1979, allowing waste water and chemical runoff from the facility to seep **[***7]** into the ground water below.

During its years of operation, B&B stored and distributed various hazardous chemicals on its property. Among these were the herbicide dinoseb, sold by Dow Chemicals, and the pesticides D-D and Nemagon, both sold by Shell. Dinoseb was stored in 55-gallon drums

129 S. Ct. 1870, *; 173 L. Ed. 2d 812, **;
2009 U.S. LEXIS 3306, ***; 21 Fla. L. Weekly Fed. S 839

and 5-gallon containers on a concrete slab outside B&B's warehouse. Nemagon was stored in 30-gallon drums and [**819] 5-gallon containers inside the warehouse. Originally, B&B purchased D-D in 55-gallon drums; beginning in the mid-1960's, however, Shell began requiring its distributors to maintain bulk storage facilities for D-D. From that time onward, B&B purchased D-D in bulk. [1]

> 1 Because D-D is corrosive, bulk storage of the chemical led to numerous tank failures and spills as the chemical rusted tanks and eroded valves.

When B&B purchased D-D, Shell would arrange for delivery by common carrier, f.o.b. destination. [2] When the product arrived, it was transferred from tanker trucks to a bulk storage tank located on B&B's primary parcel. From there, the chemical was transferred to bobtail trucks, nurse tanks, and pull rigs. During each of these transfers leaks and spills could -- and often did -- occur. Although [***8] the common carrier and B&B used buckets to catch spills from hoses and gaskets connecting the tanker trucks to its bulk storage tank, the buckets sometimes overflowed or were knocked over, causing D-D to spill onto the ground during the transfer process.

> 2 F.o.b. destination means "the seller must at his own expense and risk transport the goods to [the destination] and there tender delivery of them . . . ." U. C. C. § 2-319(1)(b) (2001). The District Court found that B&B assumed "stewardship" over the D-D as soon as the common carrier entered the Arvin facility. App. to Pet. for Cert. in No. 07-1601, p. 124a.

Aware that spills of D-D were commonplace among its distributors, in the late 1970's Shell took several steps to encourage the safe handling of its products. Shell provided distributors with detailed safety manuals and instituted a voluntary discount program for distributors that made improvements in their bulk handling and safety facilities. Later, Shell revised its program to require distributors to obtain an inspection by a qualified engineer and provide self-certification of compliance with applicable laws and regulations. B&B's Arvin facility was inspected twice, and in 1981, [***9] B&B certified to Shell that it had made a number of recommended improvements to its facilities.

Despite these improvements, B&B remained a "'[s]loppy' [o]perator." App. to Pet. for Cert. in No. 07-1601, p. 130a. Over the course of B&B's 28 years of operation, delivery spills, equipment failures, and the rinsing of tanks and trucks allowed Nemagon, D-D and dinoseb to seep into the soil and upper levels of ground water of the Arvin facility. In 1983, the California Department of Toxic Substances Control (DTSC) began investigating B&B's violation of hazardous waste laws,

and the United States Environmental Protection Agency (EPA) soon followed suit, discovering significant contamination of soil and ground water. Of particular concern was a plume of contaminated ground water located under the facility that threatened to leach into an adjacent [*1876] supply of potential drinking water. [3]

> 3 The ground water at the Arvin site is divided into three zones. The A-zone is located 60-80 feet below the ground. It has been tested and found to have high levels of contamination. The B-zone is located 150 feet below ground. Although the B-zone is not currently used as a source of drinking water, it has the potential [***10] to serve as such a source. No contamination has yet been found in that zone. The C-zone is an aquifer located 200 feet below ground. It is the sole current source of drinking water and, thus far, has suffered no contamination from the Arvin site.

Although B&B undertook some efforts at remediation, by 1989 it had become insolvent and ceased all operations. That same year, the Arvin facility was added to the National [**820] Priority List, see 54 Fed. Reg. 41027, and subsequently, DTSC and EPA (Governments) exercised their authority under 42 U.S.C. § 9604 to undertake cleanup efforts at the site. By 1998, the Governments had spent more than $ 8 million responding to the site contamination; their costs have continued to accrue.

In 1991, EPA issued an administrative order to the Railroads directing them, as owners of a portion of the property on which the Arvin facility was located, to perform certain remedial tasks in connection with the site. The Railroads did so, incurring expenses of more than $ 3 million in the process. Seeking to recover at least a portion of their response costs, in 1992 the Railroads brought suit against B&B in the United States District Court for the Eastern District of [***11] California. In 1996, that lawsuit was consolidated with two recovery actions brought by DTSC and EPA against Shell and the Railroads.

The District Court conducted a 6-week bench trial in 1999 and four years later entered a judgment in favor of the Governments. In a lengthy order supported by 507 separate findings of fact and conclusions of law, the court held that both the Railroads and Shell were potentially responsible parties (PRPs) under CERCLA -- the Railroads because they were owners of a portion of the facility, see 42 U.S.C. §§ 9607(a)(1)-(2), and Shell because it had "arranged for" the disposal of hazardous substances through its sale and delivery of D-D, see § 9607(a)(3).

Although the court found the parties liable, it did not impose joint and several liability on Shell and the Railroads for the entire response cost incurred by the

Governments. The court found that the site contamination created a single harm but concluded that the harm was divisible and therefore capable of apportionment. Based on three figures -- the percentage of the total area of the facility that was owned by the Railroads, the duration of B&B's business divided by the term of the Railroads' lease, and **[***12]** the Court's determination that only two of three polluting chemicals spilled on the leased parcel required remediation and that those two chemicals were responsible for roughly two-thirds of the overall site contamination requiring remediation -- the court apportioned the Railroads' liability as 9% of the Governments' total response cost. [4] Based on estimations of chemicals spills of Shell **[*1877]** products, the court held Shell liable for 6% of the total site response cost.

> 4   Although the Railroads did not produce precise figures regarding the exact quantity of chemical spills on each parcel in each year of the facility's operation, the District Court found it "indisputable that the overwhelming majority of hazardous substances were released from the B&B parcel." *Id.*, at 248a. The court explained that "the predominant activities conducted on the Railroad parcel through the years were storage and some washing and rinsing of tanks, other receptacles, and chemical application vehicles. Mixing, formulating, loading, and unloading of ag-chemical hazardous substances, which contributed most of the liability causing releases, were predominantly carried out by B&B on the B&B parcel." *Id.*, at 247a-248a.

The **[***13]** Governments appealed the District Court's apportionment, and Shell cross-appealed the court's finding of liability. The Court of Appeals acknowledged that Shell did not qualify as a "traditional" arranger under *§ 9607(a)(3)*, insofar as it had not contracted with B&B to directly dispose of a hazardous waste product. *520 F.3d 918, 948 (CA9 2008).* Nevertheless, the court stated that Shell could still be held liable under a **[**821]** "'broader' category of arranger liability" if the "disposal of hazardous wastes [wa]s a foreseeable byproduct of, but not the purpose of, the transaction giving rise to" arranger liability. *Ibid.* Relying on CERCLA's definition of "disposal," which covers acts such as "leaking" and "spilling," *42 U.S.C. § 6903(3)*, the Ninth Circuit concluded that an entity could arrange for "disposal" "even if it did not intend to dispose" of a hazardous substance. *520 F.3d at 949.*

Applying that theory of arranger liability to the District Court's findings of fact, the Ninth Circuit held that Shell arranged for the disposal of a hazardous substance through its sale and delivery of D-D:

"Shell arranged for delivery of the

substances to the site by its subcontractors; was aware of, and to **[***14]** some degree dictated, the transfer arrangements; knew that some leakage was likely in the transfer process; and provided advice and supervision concerning safe transfer and storage. Disposal of a hazardous substance was thus a necessary part of the sale and delivery process." *Id., at 950.*

Under such circumstances, the court concluded, arranger liability was not precluded by the fact that the purpose of Shell's action had been to transport a useful and previously unused product to B&B for sale.

On the subject of apportionment, the Court of Appeals found "no dispute" on the question whether the harm caused by Shell and the Railroads was capable of apportionment. *Id., at 942.* The court observed that a portion of the site contamination occurred before the Railroad parcel became part of the facility, only some of the hazardous substances were stored on the Railroad parcel, and "only some of the water on the facility washed over the Railroads' site." *Ibid.* With respect to Shell, the court noted that not all of the hazardous substances spilled on the facility had been sold by Shell. Given those facts, the court readily concluded that "the contamination traceable to the Railroads and Shell, **[***15]** with adequate information, would be allocable, as would be the cost of cleaning up that contamination." *Ibid.* Nevertheless, the Court of Appeals held that the District Court erred in finding that the record established a reasonable basis for apportionment. Because the burden of proof on the question of apportionment rested with Shell and the Railroads, the Court of Appeals reversed the District Court's apportionment of liability and held Shell and the Railroads jointly and severally liable for the Governments' cost of responding to the contamination of the Arvin facility.

The Railroads and Shell moved for rehearing en banc, which the Court of Appeals denied over the dissent of eight judges. See *id., at 952* (Bea, J., dissenting). We granted certiorari to determine whether Shell was properly held liable as an entity that had "arranged for disposal" of hazardous substances within the meaning of *§ 9607(a)(3)*, and whether Shell and the Railroads were properly held liable for all response costs incurred by EPA and the State of California. See *554 U.S. ___, 129 S. Ct. 30, 171 L. Ed. 2d 931 (2008).* **[*1878]** Finding error on both points, we now reverse.

II

CERCLA imposes strict liability for environmental contamination upon four broad **[***16]** classes of PRPs:

129 S. Ct. 1870, *; 173 L. Ed. 2d 812, **;
2009 U.S. LEXIS 3306, ***; 21 Fla. L. Weekly Fed. S 839

[**822] "(1) the owner and operator of a vessel or a facility,

"(2) any person [5] who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

"(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

"(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . ." *42 U.S.C. § 9607(a)*.

Once an entity is identified as a PRP, it may be compelled to clean up a contaminated area or reimburse the Government for its past and future response costs. See *Cooper Industries, Inc. v. Aviall Services, Inc.,* 543 U.S. 157, 161, 125 S. Ct. 577, 160 L. Ed. 2d 548 (2004). [6]

5    For purposes of the statute, [***17] a "person" is defined as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." *42 U.S.C. § 9601(21)*.
6    Under CERCLA, PRPs are liable for: "(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

"(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

"(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

"(D) the costs of any health assessment or

health effects study carried out under *section 9604(i)* of this title." *§ 9607(a)(4)*.

In these cases, it is undisputed that the Railroads qualify as PRPs under both *§§ 9607(a)(1) and 9607(a)(2)* because they owned the land leased by B&B at the time of the contamination and continue to own it now. The more difficult question is whether Shell also qualifies as a PRP under *§ 9607(a)(3)* [***18] by virtue of the circumstances surrounding its sales to B&B.

To determine whether Shell may be held liable as an arranger, we begin with the language of the statute. As relevant here, *§ 9607(a)(3)* applies to an entity that "arrange[s] for disposal . . . of hazardous substances." It is plain from the language of the statute that CERCLA liability would attach under *§ 9607(a)(3)* if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance. It is similarly clear that an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination. See *Freeman v. Glaxo Wellcome, Inc.,* 189 F.3d 160, 164 (CA2 1999); *Florida Power* [*1879] *& Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1318 (CA11 1990). Less clear is the liability attaching [**823] to the many permutations of "arrangements" that fall between these two extremes -- cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the "sale" of a hazardous substance are less than clear. In such cases, [***19] courts have concluded that the determination whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a "disposal" or a "sale" and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions. See *Freeman,* 189 F.3d at 164; *Pneumo Abex Corp. v. High Point, Thomasville & Denton R. Co.,* 142 F.3d 769, 775 (CA4 1998) ("'[T]here is no bright line between a sale and a disposal under CERCLA. A party's responsibility . . . must by necessity turn on a fact-specific inquiry into the nature of the transaction'" (quoting *United States v. Petersen Sand & Gravel, Inc.,* 806 F. Supp. 1346, 1354 (ND Ill. 1992))); *Florida Power & Light Co.,* 893 F.2d at 1318.

Although we agree that the question whether *§ 9607(a)(3)* liability attaches is fact intensive and case specific, such liability may not extend beyond the limits of the statute itself. Because CERCLA does not specifically define what it means to "arrang[e]" for disposal of a hazardous substance, see, *e.g., United States v. Cello-Foil Prods., Inc.,* 100 F.3d 1227, 1231 (CA6 1996); *Amcast Indus. Corp. v. Detrex Corp.,* 2 F.3d 746, 751 (CA7 1993); [***20] *Florida Power & Light*

129 S. Ct. 1870, *; 173 L. Ed. 2d 812, **;
2009 U.S. LEXIS 3306, ***; 21 Fla. L. Weekly Fed. S 839

*Co.*, 893 F.2d at 1317, we give the phrase its ordinary meaning. *Crawford v. Metro. Gov't of Nashville & Davidson County*, 555 U.S. ____, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009); *Perrin v. United States*, 444 U.S. 37, 42, 100 S. Ct. 311, 62 L. Ed. 2d 199 (1979). In common parlance, the word "arrange" implies action directed to a specific purpose. See Merriam-Webster's Collegiate Dictionary 64 (10th ed. 1993) (defining "arrange" as "to make preparations for: plan[;] . . . to bring about an agreement or understanding concerning"); see also *Amcast Indus. Corp.*, 2 F.3d at 751 (words "'arranged for' . . . imply intentional action"). Consequently, under the plain language of the statute, an entity may qualify as an arranger under *§ 9607(a)(3)* when it takes intentional steps to dispose of a hazardous substance. See *Cello-Foil Prods., Inc.*, 100 F.3d at 1231 ("[I]t would be error for us not to recognize the indispensable role that state of mind must play in determining whether a party has 'otherwise arranged for disposal . . . of hazardous substances'").

The Governments do not deny that the statute requires an entity to "arrang[e] for" disposal; however, they interpret that phrase by reference to the statutory term "disposal," which [***21] the Act broadly defines as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water." 42 U.S.C. § 6903(3); see also § 9601(29) (adopting the definition of "disposal" contained in the Solid Waste Disposal Act). [7] The Governments assert that by including unintentional acts such [**824] as "spilling" and "leaking" in the definition of disposal, Congress intended to impose liability on entities not only when they directly dispose of waste products but also when they engage in legitimate sales of [*1880] hazardous substances [8] knowing that some disposal may occur as a collateral consequence of the sale itself. Applying that reading of the statute, the Governments contend that Shell arranged for the disposal of D-D within the meaning of *§ 9607(a)(3)* by shipping D-D to B&B under conditions it knew would result in the spilling of a portion of the hazardous substance by the purchaser or common carrier. See Brief for United States 24 ("Although the delivery of a useful product was the ultimate *purpose* of the arrangement, Shell's continued participation in the delivery, with knowledge that spills and leaks would result, was [***22] sufficient to establish Shell's intent to dispose of hazardous substances"). Because these spills resulted in wasted D-D, a result Shell anticipated, the Governments insist that Shell was properly found to have arranged for the disposal of D-D.

   7   "Hazardous waste" is defined as "a solid waste, or combination of solid wastes, which . . . may . . . pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or

disposed of, or otherwise managed." *§ 6903(5)(B)*; *§ 9601(29)*.
   8   CERCLA defines "hazardous substance" to include a variety of chemicals and toxins including those designated by EPA as air pollutants, water pollutants, and solid wastes. *§ 9601(14)*.

While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity "planned for" the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product. In order to qualify as an arranger, Shell must have entered into [***23] the sale of D-D with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in *§ 6903(3)*. Here, the facts found by the District Court do not support such a conclusion.

Although the evidence adduced at trial showed that Shell was aware that minor, accidental spills occurred during the transfer of D-D from the common carrier to B&B's bulk storage tanks after the product had arrived at the Arvin facility and had come under B&B's stewardship, the evidence does not support an inference that Shell intended such spills to occur. To the contrary, the evidence revealed that Shell took numerous steps to encourage its distributors to *reduce* the likelihood of such spills, providing them with detailed safety manuals, requiring them to maintain adequate storage facilities, and providing discounts for those that took safety precautions. Although Shell's efforts were less than wholly successful, given these facts, Shell's mere knowledge that spills and leaks continued to occur is insufficient grounds for concluding that Shell "arranged for" the disposal of D-D within the meaning of *§ 9607(a)(3)*. Accordingly, we conclude [***24] that Shell was not liable as an arranger for the contamination that occurred at B&B's Arvin facility.

III

Having concluded that Shell is not liable as an arranger, we need not decide whether the Court of Appeals erred in reversing the District Court's apportionment of Shell's liability for the cost of remediation. We must, however, determine whether the Railroads were properly held jointly and [**825] severally liable for the full cost of the Governments' response efforts.

The seminal opinion on the subject of apportionment in CERCLA actions was written in 1983 by Chief Judge Carl Rubin of the United States District Court for the Southern District of Ohio. *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802. After reviewing CERCLA's

history, Chief Judge Rubin concluded that although the [*1881] Act imposed a "strict liability standard," *id., at 805*, it did not mandate "joint and several" liability in every case. See *id., at 807*. Rather, Congress intended the scope of liability to "be determined from traditional and evolving principles of common law[.]" *Id., at 808*. The *Chem-Dyne* approach has been fully embraced by the Courts of Appeals. See, *e.g., In re Bell Petroleum Services, Inc., 3 F.3d 889, 901-902 (CA5 1993)*; [***25] *United States v. Alcan Aluminum Corp., 964 F.2d 252, 268 (CA3 1992)*; *O'Neil v. Picillo, 883 F.2d 176, 178 (CA1 1989)*; *United States v. Monsanto Co., 858 F.2d 160, 171-173 (CA4 1988)*.

Following *Chem-Dyne*, the courts of appeals have acknowledged that "[t]he universal starting point for divisibility of harm analyses in CERCLA cases" is § 433A of the Restatement (Second) of Torts. *United States v. Hercules, Inc., 247 F.3d 706, 717 (CA8 2001)*; *Chem-Nuclear Systems, Inc. v. Bush, 352 U.S. App. D.C. 23, 292 F.3d 254, 259 (CADC 2002)*; *United States v. R. W. Meyer, Inc., 889 F.2d 1497, 1507 (CA6 1989)*. Under the Restatement,

"when two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused. *Restatement (Second) of Torts, §§ 433A, 881 (1976)*; Prosser, Law of Torts, pp. 313-314 (4th ed. 1971) . . . . But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm. *Restatement (Second) of Torts, § 875*; Prosser, at 315-316." *Chem-Dyne Corp., 572 F. Supp., at 810*.

In other [***26] words, apportionment is proper when "there is a reasonable basis for determining the contribution of each cause to a single harm." *Restatement (Second) of Torts § 433A(1)(b), p. 434 (1963-1964)*.

Not all harms are capable of apportionment, however, and CERCLA defendants seeking to avoid joint and several liability bear the burden of proving that a reasonable basis for apportionment exists. See *Chem-Dyne Corp., 572 F. Supp., at 810* (citing *Restatement (Second) of Torts § 433B (1976)*) (placing burden of proof on party seeking apportionment). When two or more causes produce a single, indivisible harm, "courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm." *Restatement (Second) of Torts § 433A, Comment i, p. 440 (1963-1964)*.

Neither the parties nor the lower courts dispute the principles that govern apportionment in CERCLA cases, and both the District Court and Court of Appeals agreed that the harm created by the contamination of the Arvin site, although singular, was theoretically capable of apportionment. The question then is whether the record provided a reasonable basis for the District Court's [***27] conclusion [**826] that the Railroads were liable for only 9% of the harm caused by contamination at the Arvin facility.

The District Court criticized the Railroads for taking a "'scorched earth,' all-or-nothing approach to liability," failing to acknowledge any responsibility for the release of hazardous substances that occurred on their parcel throughout the 13-year period of B&B's lease. According to the District Court, the Railroads' position on liability, combined with the Governments' refusal to acknowledge the potential divisibility of the harm, complicated the apportioning of liability. See App. to Pet. for Cert. in No. 07-1601, at 236a-237a ("All parties . . . effectively abdicated providing any helpful arguments to the court and have left the court to independently perform the equitable apportionment [*1882] analysis demanded by the circumstances of the case"). [9] Yet despite the parties' failure to assist the court in linking the evidence supporting apportionment to the proper allocation of liability, the District Court ultimately concluded that this was "a classic 'divisible in terms of degree' case, both as to the time period in which defendants' conduct occurred, and ownership existed, [***28] and as to the estimated maximum contribution of each party's activities that released hazardous substances that caused Site contamination." *Id.*, at 239a. Consequently, the District Court apportioned liability, assigning the Railroads 9% of the total remediation costs.

9    As the Governments point out, insofar as the District Court made reference to equitable considerations favoring apportionment, it erred. Equitable considerations play no role in the apportionment analysis; rather, apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs. See generally *United States v. Hercules, Inc., 247 F.3d 706, 718-719 (CA8 2001)*; *United States v. Brighton, 153 F.3d 307, 318-319 (CA6 1998)*; *Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1513 (CA11 1996)*. As the Court of Appeals explained, "[a]pportionment . . . looks to whether defendants may avoid joint and several liability by establishing a fixed amount of damage for which they are liable," while contribution actions allow jointly and severally liable PRPs to recover from each other on the basis of equitable considerations. *520 F.3d 918, 939-940 (CA9 2008)*; see also *42 U.S.C. §*

*9613(f)(1)* [***29] (providing that, "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate"). The error is of no consequence, however, because despite the District Court's reference to equity, its actual apportionment decision was properly rooted in evidence that provided a reasonable basis for identifying the portion of the harm attributable to the Railroads.

The District Court calculated the Railroads' liability based on three figures. First, the court noted that the Railroad parcel constituted only 19% of the surface area of the Arvin site. Second, the court observed that the Railroads had leased their parcel to B&B for 13 years, which was only 45% of the time B&B operated the Arvin facility. Finally, the court found that the volume of hazardous-substance-releasing activities on the B&B property was at least 10 times greater than the releases that occurred on the Railroad parcel, and it concluded that only spills of two chemicals, Nemagon and dinoseb (not D-D), substantially contributed to the contamination that had originated on the Railroad parcel and that those two chemicals had contributed [***30] to two-thirds of the overall site contamination requiring remediation. The court then multiplied .19 by .45 by .66 (two-thirds) and rounded up to determine that the Railroads were responsible for approximately 6% of the remediation costs. "Allowing for calculation errors up to 50%," the court concluded [**827] that the Railroads could be held responsible for 9% of the total CERCLA response cost for the Arvin site. *Id.*, at 252a.

The Court of Appeals criticized the evidence on which the District Court's conclusions rested, finding a lack of sufficient data to establish the precise proportion of contamination that occurred on the relative portions of the Arvin facility and the rate of contamination in the years prior to B&B's addition of the Railroad parcel. The court noted that neither the duration of the lease nor the size of the leased area alone was a reliable measure of the harm caused by activities on the property owned by the Railroads, and -- as the court's upward adjustment confirmed -- the court had relied on estimates rather than specific and detailed records as a basis for its conclusions.

Despite these criticisms, we conclude that the facts contained in the record reasonably supported [***31] the apportionment of [*1883] liability. The District Court's detailed findings make it abundantly clear that the primary pollution at the Arvin facility was contained in an unlined sump and an unlined pond in the southeastern portion of the facility most distant from the Railroads' parcel and that the spills of hazardous chemicals that occurred on the Railroad parcel contributed to no more than 10% of the total site contamination, see *id.*, at 247a-248a, some of which did not require remediation. With those background facts in mind, we are persuaded that it was reasonable for the court to use the size of the leased parcel and the duration of the lease as the starting point for its analysis. Although the Court of Appeals faulted the District Court for relying on the "simplest of considerations: percentages of land area, time of ownership, and types of hazardous products," *520 F.3d at 943*, these were the same factors the court had earlier acknowledged were *relevant* to the apportionment analysis. See *id., at 936, n.18* ("We of course agree with our sister circuits that, if adequate information is available, divisibility may be established by 'volumetric, chronological, or other types of evidence,' [***32] including appropriate geographic considerations" (citations omitted)).

The Court of Appeals also criticized the District Court's assumption that spills of Nemagon and dinoseb were responsible for only two-thirds of the chemical spills requiring remediation, observing that each PRP's share of the total harm was not necessarily equal to the quantity of pollutants that were deposited on its portion of the total facility. Although the evidence adduced by the parties did not allow the court to calculate precisely the amount of hazardous chemicals contributed by the Railroad parcel to the total site contamination or the exact percentage of harm caused by each chemical, the evidence did show that fewer spills occurred on the Railroad parcel and that of those spills that occurred, not all were carried across the Railroad parcel to the B&B sump and pond from which most of the contamination originated. The fact that no D-D spills on the Railroad parcel required remediation lends strength to the District Court's conclusion that the Railroad parcel contributed only Nemagon and dinoseb in quantities requiring remediation.

The District Court's conclusion that those two chemicals accounted for only [***33] two-thirds of the contamination requiring remediation finds less support in the record; however, any miscalculation on that point is harmless [**828] in light of the District Court's ultimate allocation of liability, which included a 50% margin of error equal to the 3% reduction in liability the District Court provided based on its assessment of the effect of the Nemagon and dinoseb spills. Had the District Court limited its apportionment calculations to the amount of time the Railroad parcel was in use and the percentage of the facility located on that parcel, it would have assigned the Railroads 9% of the response cost. By including a two-thirds reduction in liability for the Nemagon and dinoseb with a 50% "margin of error," the District Court reached the same result. Because the District Court's ultimate allocation of liability is supported by the evidence and comports with the apportionment principles outlined above, we reverse the Court of Appeals' conclusion that the Railroads are subject to joint and

129 S. Ct. 1870, *; 173 L. Ed. 2d 812, **;
2009 U.S. LEXIS 3306, ***; 21 Fla. L. Weekly Fed. S 839

several liability for all response costs arising out of the contamination of the Arvin facility.

IV

For the foregoing reasons, we conclude that the Court of Appeals erred by holding Shell [***34] liable as an arranger under CERCLA for the costs of remediating environmental contamination at the Arvin, California [*1884] facility. Furthermore, we conclude that the District Court reasonably apportioned the Railroads' share of the site remediation costs at 9%. The judgment is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

APPENDIX

[SEE APPENDIX IN ORIGINAL]

**DISSENT BY:** GINSBURG

**DISSENT**

[**830] JUSTICE GINSBURG, dissenting.

Although the question is close, I would uphold the determinations of the courts below that Shell qualifies as an arranger within the compass of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). See *42 U.S.C. § 9607(a)(3)*. As the facts found by the District Court bear out, App. to Pet. for Cert. in No. 07-1601, pp. 113a-129a, 208a-213a, Shell "arranged for disposal . . . of hazardous substances" owned by [*1885] Shell when the arrangements were made. [1]

> 1  "Disposal" is defined in *42 U.S.C. § 6903(3)* to include "spilling [or] leaking" of "any . . . hazardous waste into or on any land or water so that [the] . . . hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged [***35] into any waters."

In the 1950's and early 1960's, Shell shipped most of its products to Brown and Bryant (B&B) in 55-gallon drums, thereby ensuring against spillage or leakage during delivery and transfer. *Id.,* at 89a, 115a. Later, Shell found it economically advantageous, in lieu of shipping in drums, to require B&B to maintain bulk storage facilities for receipt of the chemicals B&B purchased from Shell. *Id.,* at 115a. By the mid-1960's, Shell was delivering its chemical to B&B in bulk tank truckloads. *Id.,* at 89a, 115a. As the Court recognizes, "bulk storage of the chemical led to numerous tank failures and spills as the chemical rusted tanks and eroded valves." *Ante,* at 2-3, n. 1.

Shell furthermore specified the equipment to be used

in transferring the chemicals from the delivery truck to B&B's storage tanks. App. to Pet. for Cert. in No. 07-1601, pp. 120a-122a, 124a. [2] In the process, spills and leaks were inevitable, indeed spills occurred every time deliveries were made. *520 F.3d 918, 950-951 (CA9 2008)*. See also App. to Pet. for Cert. in No. 07-1601, pp. 119a-122a ("It is undisputed that spills were inherent in the delivery process that Shell arranged . . . .").

> 2  Shell shipped [***36] the chemicals to B&B "F.O.B. Destination." At oral argument, the Court asked Shell's counsel: Suppose there had been "no transfer of ownership until the delivery [was] complete?" In that event, counsel responded, "Shell would have been the owner of the waste." Tr. of Oral Arg. 8. The Court credits the fact that at the time of the spills, the chemicals, having been shipped "F.O.B. Destination," "had come under B&B's stewardship." *Ante,* at 12. In my view, CERCLA liability, or the absence thereof, should not turn, in any part, on such an eminently shipper-fixable specification as "F.O.B. Destination."

That Shell sold B&B useful products, the Ninth Circuit observed, did not exonerate Shell from CERCLA liability, for the sales "necessarily and immediately result[ed] in the leakage of hazardous substances." *520 F.3d at 950*. The deliveries, Shell was well aware, directly and routinely resulted in disposals of hazardous substances (through spills and leaks) for more than 20 years. "[M]ere knowledge" may not be enough, *ante,* at 13, but Shell did not simply know of the spills and leaks without contributing to them. Given the control rein held by Shell over the mode of delivery and transfer, *520 F.3d at 950-951,* [***37] the lower courts held and I agree, Shell was properly ranked an arranger. Relieving Shell of any obligation to pay for the cleanup undertaken by the United States and California is hardly commanded by CERCLA's text, and is surely at odds with CERCLA's [**831] objective -- to place the cost of remediation on persons whose activities contributed to the contamination rather than on the taxpaying public.

As to apportioning costs, the District Court undertook an heroic labor. The Railroads and Shell, the court noted, had pursued a "'scorched earth,' all-or-nothing approach to liability. Neither acknowledged an iota of responsibility . . . . Neither party offered helpful arguments to apportion liability." App. to Pet. for Cert. in No. 07-1601, p. 236a, P455. Consequently, the court strived "independently [to] perform [an] equitable apportionment analysis." *Id.,* at 237a, P455. Given the party presentation principle basic to our procedural system, *Greenlaw v. United* [*1886] *States, 554 U.S. ___, ___, 128 S. Ct. 2559, 171 L. Ed. 2d 399 (2008) (slip op., at 5)*, it is questionable whether the court should have pursued the matter *sua sponte.* See *Castro v. United*

*States, 540 U.S. 375, 386, 124 S. Ct. 786, 157 L. Ed. 2d 778 (2003)* (SCALIA, J., concurring) ("Our adversary system is **[\*\*\*38]** designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."). Cf. Kaplan, von Mehren, & Schaefer, Phases of German Civil Procedure I, 71 Harv. L. Rev. 1193, 1224 (1958) (describing court's obligation, under Germany's Code of Civil Procedure, to see to it that the case is fully developed).

The trial court's mode of procedure, the United States urged before this Court, "deprived the government of a fair opportunity to respond to the court's theories of apportionment and to rebut their factual underpinnings -- an opportunity the governmen[t] would have had if those theories had been advanced by petitioners themselves." Brief for United States 41. [3] I would return these cases to the District Court to give all parties a fair opportunity to address that court's endeavor to allocate costs. Because the Court's disposition precludes that opportunity, I dissent from the Court's judgment.

As for, on brief, the United States observed: "[P]etitioners identify no record support for the district court's assumption that each party's contribution to the overall harm is proportional to the relative **[\*\*\*39]** volume of hazardous substances attributable to it." Brief for United States 45. And at oral argument, counsel for the United States stressed that the District Court "framed the relevant inquiry as what percentage of the contamination was attributable to the railroad parcel, to the Shell-controlled deliveries, and to the B&B parcel. But it made no finding . . . as to what the cost of [remediation] would have been . . . if the only source of contamination had been the railroad parcel." Tr. of Oral Arg. 52. See also *id.*, at 56 ("[T]he crucial question is what response costs the government would have been required to bear . . . if only the railroad parcel's contamination had been at issue . . . .").

3   For example, on brief, the United States observed: "[P]etitioners identify no record support for the district court's assumption that each party's contribution to the overall harm is proportional to the relative **[\*\*\*39]** volume of hazardous substances attributable to it." Brief for United States 45. And at oral argument, counsel for the United States stressed that the District Court "framed the relevant inquiry as what percentage of the contamination was attributable to the railroad parcel, to the Shell-controlled deliveries, and to the B&B parcel. But it made no finding . . . as to what the cost of [remediation] would have been . . . if the only source of contamination had been the railroad parcel." Tr. of Oral Arg. 52. See also *id.*, at 56 ("[T]he crucial question is what response costs the government would have been required to bear . . . if only the railroad parcel's contamination had been at issue . . . .").

Slip Copy                                                      Page 1

Slip Copy, 2009 WL 1649668 (S.D.N.Y.)

**(Cite as: 2009 WL 1649668 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re METHYL TERTIARY BUTYL ETHER
("MTBE") PRODUCTS LIABILITY LITIGA-
TION.
This document relates to: City of New York v. Am-
erada Hess Corp., et al., 04-CV-3417.
**Master File No. 1:00-1898.**
**MDL No. 1358 (SAS).**
**No. M21-88.**

June 9, 2009.

Robin Greenwald, Esq., Robert Gordon, Esq.,
Weitz & Luxenberg, P.C., New York, NY, for
Plaintiffs.

Victor M. Sher, Esq., Todd E. Robbins, Esq.,
Joshua G. Stein, Esq ., Nicholas G. Campins, Esq.,
Marnie E. Riddle, Esq., Sher Leff LLP, San Fran-
cisco, California, Susan Amron, New York, NY, for
Plaintiff City of New York.

Peter John Sacripanti, Esq., James A. Pardo, Esq.,
McDermott Will & Emery LLP, New York, NY,
for Defendants and Counsel for ExxonMobil.


### OPINION AND ORDER

SHIRA A. **SCHEINDLIN**, District Judge.


## I. INTRODUCTION

*1 In 2003, the City of New York (the "City") filed
a Complaint against various corporations for their
use and handling of the gasoline additive methyl
tertiary butyl ether ("MTBE"), alleging that the
MTBE contaminated, or threatened to contaminate,
the City's water supply.[FN1] The action was trans-
ferred to this district pursuant to section 1404 of

Title 28 of the United States Code.[FN2]

> FN1. This Opinion assumes familiarity
> with this Court's previous opinions, in
> which the facts underlying these actions
> are comprehensively discussed. For a thor-
> ough recitation of essentially similar fact
> allegations, see, for example, *In re Methyl
> Tertiary Butyl Ether Prods. Liab. Litig.*
> ("In re MTBE" ), 379 F.Supp.2d 348,
> 364-67 (S.D.N.Y.2005).

> FN2. The action was initially transferred to
> this Court pursuant to section 1407 of Title
> 28 of the United States Code as part of a
> large multi-district litigation ("MDL") in-
> volving MTBE.

Over the last five years, the City and defendants
have engaged in extensive discovery and motion
practice. The trial in this case is now imminent. De-
fendants move *in limine* to bar the City from seek-
ing punitive damages on any claim for which liabil-
ity is established under either the market share or
the commingled product theory.[FN3] For the follow-
ing reasons, defendants' motion is granted in part
and denied in part.

> FN3. *See* Defendants' Memorandum in
> Support of Their Motion to Bar Punitive
> Damages Based on Market Share or Com-
> mingled Product Theories ("Def.Mem.").
> Defendants move in the alternative for
> summary judgment on the City's "claims"
> for punitive damages. Because defendants'
> motion is properly considered as a motion
> *in limine,* their motion for summary judg-
> ment is denied. *See In re Methyl Tertiary
> Butyl Ether Prods. Liab. Litig.* ("In re
> MTBE" ), 517 F.Supp.2d 662, 666-67
> (S.D.N.Y.2007).


## II. BACKGROUND

**A. Allegations in Complaint**

The City of New York, as owner of a groundwater well system and surrounding City property, brings various claims alleging that defendants, as MTBE manufacturers, producers, distributors and sellers, caused MTBE to contaminate, or threaten to contaminate, the City's well system, soil and aquifers.[FN4] Because causation is an element of most of the claims, the City may recover only against those defendants who are responsible for the MTBE that contaminated, or threatens to contaminate, the City's wells.[FN5]

> FN4. The City's claims include common law property tort claims for trespass and nuisance; strict liability tort claims for defective product design and failure to warn; deceptive business practices claims for violations of section 349 of the New York General Business Law ("section 349"); strict liability claims for violations of Article 12 of the New York Navigation Law ("Article 12"); and a civil conspiracy claim. These actions are somewhat unusual among toxic tort/groundwater contamination actions in that plaintiff does not allege personal injuries.

> FN5. Although the City originally sued approximately fifty defendants, at this time the only remaining defendant is Exxon-Mobil, a manufacturer, refiner, distributor and retailer of gasoline.

In addition to claims against the owners of gasoline stations that allegedly leaked MTBE into groundwater, the City brings strict liability claims against the refiners and distributors of MTBE-infused gasoline. The City alleges that refiners mix their products together for transportation and distribution in such a manner that the gasoline sold at any given retail station contains the product of multiple refiners.[FN6] According to the City, the mixed gasoline forms a commingled, joint product and the individual molecules of MTBE are not distinguishable

by refiner or distributor. As a result, even in those instances where the City is able to trace a contamination to a particular gasoline station, the City has no direct method of proving which refiner(s) produced the MTBE-infused gasoline that leaked from the station. Similarly, if the City is able to show, through circumstantial evidence, that a refiner's product was more likely than not a part of the MTBE that contaminated the City's property, there is a good chance that each refiner was responsible for only a fraction of the MTBE that caused the contamination.[FN7]

> FN6. For a detailed discussion of the gasoline distribution network that supplies gas to much of New York, see *In re Methyl Tertiary Butyl Ether Prods. Liab. Lit.* ("*In re MTBE*"), 591 F.Supp.2d 259, 269-73 (S.D.N.Y.2008) (noting that gasoline supplied to Suffolk County "becomes commingled in the process, making it the joint product of all who have contributed to it along the way from refineries through pipelines and tankers to primary terminals and out again via ipipelines and barges to secondary terminals."(quotation marks omitted)).

> FN7. This Court has discussed the difficulties of establishing causation in the MTBE context on many occasions. Although the fungibility and blended nature of MTBE creates common issues across cases, each case raises a unique set of facts that requires individual attention.

**B. Alternative Theories of Liability**

To address similar difficulties in other cases within this MDL, this Court has permitted plaintiffs to proceed with various alternative theories of liability that are designed to ensure plaintiffs' right to redress and to apportion liability fairly among defendants. Each theory addresses a separate set of difficulties.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The *first* is concurrent wrongdoing: "When two or more tortfeasors act concurrently or in concert to produce a single [indivisible] injury, they may be held jointly and severally liable."[FN8]The New York Court of Appeals applied this theory in a case where water flowing from two sources due to two separate defendants' negligence caused an "indivisible" injury by becoming *"commingled...* [and] concentrating at the same locality, soaking through the wall into the plaintiffs' premises and injuring the plaintiffs' property."[FN9]Significantly, in concurrent wrongdoing cases, plaintiffs must prove in the usual manner that each defendant *caused* a *contribution* to the injury. However, unlike the traditional theory of causation, plaintiffs need not show that each defendant's actions, taken alone, would have caused the injury. The concurrent wrongdoing theory addresses the difficulty of determining *how much* each defendant's commingled product contributed to a single, indivisible injury. The theory resolves that difficulty by providing that "each tortfeasor is responsible for the entire result, even though his act alone might not have caused it."[FN10]The theory is similar to joint tortfeasor liability in that it imposes joint and several liability, but it differs from traditional joint tortfeasor liability in that it does not require that the tortfeasors acted in concert. And yet, a defendant cannot be held liable under the concurrent wrongdoing theory unless it is determined that the defendant's conduct contributed to the injury.

FN8. *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.* (*"In re MTBE"* ), 447 F.Supp.2d 289, 297 (S.D.N.Y.2006) (quoting *Ravo v. Rogatnick,* 70 N.Y.2d 305,311-12(1987)).

FN9. *Slater v. Mersereau,* 64 N.Y. 138, 146 (1876) (emphasis added).

FN10. *Hill v. Edmonds,* 270 N.Y.S.2d 1020, 1021 (2d Dep't 1966).*Accord Slater,* 64 N.Y. at 146 ("[A]lthough the act of each, alone and of itself, might not have caused the entire injury, under the circum-

stances presented, there is no good reason why each should not be liable for the damages caused by the different acts of all.").

**\*2** The *second* theory is market share liability. "Market share liability is an evidentiary tool that allows a plaintiff to prove causation."[FN11]The New York Court of Appeals applied this theory in a case where plaintiff was injured by a defective pharmaceutical pill but it was impossible to determine which of many manufactures produced the pill.[FN12]The Court adopted a market-share theory, which created a presumption that each manufacturer selling pills into the national market caused plaintiff's injury.[FN13]Unlike the concurrent wrongdoing theory, the market-share theory "provides an exception to the general rule that a plaintiff must prove that the defendant's conduct was a cause-in-fact of the injury."[FN14]As such, a defendant may be held partially liable under the market-share theory without any showing that the defendant caused, or contributed, to the injury. Indeed, the New York Court of Appeals held that "there should be no exculpation of a defendant who, although a member of the market ..., appears not to have caused a particular plaintiff's injury."[FN15]Also unlike the concurrent wrongdoing theory, liability is not joint and several but is apportioned by market share.[FN16]

FN11. *In re MTBE,* 517 F.Supp.2d at 668. *Accord Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222 (2001).

FN12.*See Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 502 (1989).

FN13.*See id.* at 512.

FN14. *In re MTBE,* 447 F.Supp.2d at 299.

FN15. *Hymowitz,* 73 N.Y.2d at 512 (apportioning liability based upon "the amount of risk of injury each defendant created to the public-at-large").

FN16.*See In re MTBE,* 447 F.Supp.2d at

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

300 (quotation marks omitted).

The *third* theory is the commingled theory of liability. Because this theory "incorporat[es] elements of concurrent wrongdoing" and market share liability,[FN17] it has been difficult to describe.

FN17.*Id.* at 301.

[U]nder the "commingled product theory" of market share liability, when a plaintiff can prove that certain gaseous or liquid products (e.g., gasoline, liquid propane, alcohol) of many refiners and manufacturers were present in a completely commingled or blended state at the time and place that the harm or risk of harm occurred, and the commingled product caused plaintiff's injury, each refiner or manufacturer is deemed to have caused the harm. A defendant must be able to exculpate itself by proving that its product was not present at the relevant time or in the relevant place, and therefore could not be part of the commingled or blended product.[FN18]

FN18.*Id.*

This hybrid theory was introduced to strike a balance between the concurrent wrongdoing and the market-share theories. Although the concurrent wrongdoing theory is well-suited to torts caused by a commingled product, this Court explained that the theory did not apply to many of these cases because "it would be fundamentally unfair to hold these defendants jointly and severally liable" given the likelihood that "each defendant's contribution to the total volume of MTBE-containing gasoline in any particular well was very small."[FN19]Similarly, although the market-share theory does not fit the facts of cases where the plaintiff can prove that the defendants' products were part of the commingled product causing the injury, that theory offers an equitable solution to the apportionment of damages. Hence, the commingled product theory adopts, with slight adjustments, the concurrent wrongdoing theory of liability and the market-share theory of apportioning damages.[FN20]

FN19. *In re MTBE,* 379 F.Supp.2d at 378.

FN20. For further discussion and clarification, see *In re MTBE,* 591 F.Supp.2d at 244-45 ("The commingled product theory lies somewhere between market share and concurrent wrongdoing. It is similar to concurrent wrongdoing ... because it addresses a situation in which multiple defendants have contributed to an indivisible injury. It is similar to market share in that it shifts the burden to defendants to exculpate themselves from liability.").*See also In re MTBE,* 379 F.Supp.2d at 377-79.

**\*3** Even though this Court has previously addressed the question, the parties again raise the issue of whether the commingled theory permits a finding of liability against a defendant without proof that the defendant's conduct contributed to the injury. When the theory was introduced, this Court stated that, unlike the market-share theory, the "conceptual basis" for the commingled theory is that "defendants' products were *actually present* and *contributed to the injury.*"[FN21]This Court further explained that, under the commingled theory,

FN21. *In re MTBE,* 379 F.Supp.2d at 378 (emphasis added).

[T]he product of each supplier is *known* to be present. It is also known that the commingled product caused the harm. What is *not known* is what percentage of each supplier's goods is present in the blended product that caused the harm.[FN22]

FN22.*Id.* at 379.In a more recent opinion, this Court stated that "because the gasoline that has contaminated plaintiffs' wells was undeniably the commingled product of numerous manufacturers, there is a good chance that many of the defendants held liable, if not the majority, actually did cause plaintiffs' injury." *In re MTBE,* 591 F.Supp.2d at 275. This phrase, however,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

has been misunderstood. It simply means that while the commingled product caused the injury, it is unlikely that the product of a defendant, in isolation, caused the injury. *See infra* note 55.

## C. Punitive Damages Based on Market Share

In the *Suffolk County* action, this Court held that when the "plaintiffs rely on market share liability to prove causation for a particular well, they are precluded from arguing that punitive damages are available for that well."[FN23] In reaching that holding, this Court emphasized two points in predicting how the New York Court of Appeals would decide the issue.[FN24]

FN23. *In re MTBE,* 517 F.Supp.2d at 672.

FN24. *See Motorola Credit Corp. v. Uzan,* 509 F.3d 74, 80 (2d Cir.2007) ("In a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the [fact-finder] may consider in determining their amount, are questions of state law."(quotation marks omitted)).

*First,* the Court in *Hymowitz* acknowledged-and sought to minimize-the inequities imposed on defendants when plaintiffs utilize market share liability. One inequity resulted from the inexactness of apportioning liability based on the *national market:* the *Hymowitz* Court adopted "a market share theory using a national market" for "essentially practical reasons."[FN25] In so doing, the *Hymowitz* Court was "aware that the adoption of a national market will likely result in a *disproportion* between the liability of individual manufacturers and the actual injuries each manufacturer caused in this State,"[FN26] which that Court sought to minimize. Based on that analysis, this Court noted that "allowing punitive damages [in the *Suffolk* MTBE

action] would magnify any inaccuracies between the harm done and the relief provided by particular defendants" particularly because "each jury will only be permitted to award a ratio or multiplier [of compensatory damages], rather than any dollar figure."[FN27] Thus, following the lead of the *Hymowitz* Court, this Court found that one reason not to permit punitive damages is that such damages would increase the inherent uncertainties of the market-share approach. Similarly, equity counseled against permitting punitive damages against a defendant that plaintiffs could not prove had caused their injuries.

FN25. 73 N.Y.2d at 511.

FN26. *Id.* at 511-12 (emphasis added).

FN27. *In re MTBE,* 517 F.Supp.2d at 670.

Further, practical considerations supported not permitting punitive damages. In particular, this Court noted that the market-share "theory relies on the assumption that plaintiffs cannot prove which defendant injured them."[FN28] Because plaintiffs should be encouraged "to make every effort to identify the particular defendants who caused the harm ... rather than lumping all defendants together to find the deepest pockets among them," practical considerations weighed in favor of withholding punitive damages from cases where plaintiffs rely on market share.[FN29]

FN28. *Id.*

FN29. *Id.* at 671.

## D. Due Process and Excessive Awards

*4 In a series of cases, the Supreme Court has recognized that the Due Process Clause of "the Constitution imposes certain limits, in respect both to procedures for awarding punitive damages and to amounts forbidden as 'grossly excessive.' "[FN30] In determining whether an award is grossly excessive, a punitive award that is more than ten times the

compensatory award is more likely to be excessive, but this ratio is not dispositive.[FN31] Rather, a balancing test is used and the "excessiveness decision depends upon the reprehensibility of the defendant's conduct, whether the award bears a reasonable relationship to the actual and potential harm caused by the defendant to the plaintiff, and the difference between the award and sanctions authorized or imposed in comparable cases."[FN32] The amount of the punitive award may be based only on the harm, or potential harm, suffered by plaintiffs, not by non-parties.[FN33]

FN30. *Philip Morris U.S.A. v. Williams,* 549 U.S. 346, 352 (2007).

FN31. *See State Farm Mut. Automobile Ins. Co. v. Campbell,* 538 U . S. 408, 425 (2003)* ("[W]e have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award.").

FN32. *Philip Morris,* 549 U.S. at 353.

FN33. *See id.*

In evaluating "the potential harm the defendant's conduct could have caused ... the plaintiff,"[FN34] courts look to "whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct [to the plaintiff] as well as the harm that actually has occurred."[FN35] In one case, the Court noted that although the disparity between the punitive award and the *compensatory* award may have appeared "shocking," the punitive award was not grossly excessive because the disparity between the punitive award and the "potential loss" to plaintiffs was not shocking.[FN36]

FN34. *Id.* at 354.

FN35. *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 460 (1993) (plurality opinion) (emphasis in original).

FN36. *Id.* at 462 (plurality opinion).

**E. Parties' Arguments**

Defendants argue that, for purposes of punitive damages, the commingled theory raises the same concerns as the market-share theory. In particular, defendants argue that "under both theories defendants face liability for compensatory damages without proof that they caused or contributed to the harm."[FN37] "That lack of actual proof of causation, and the absence of a nexus between the injury and the conduct of any particular defendant, should bar punitive damages against defendants."[FN38] Defendants further argue that "it would be unconstitutional to permit a plaintiff to recover *punitive damages* without direct proof that the defendant in question actually caused the harm."[FN39] Indeed, defendants argue that "[e]ven if the commingled theory establishes that *every* Defendant contributed to *every* alleged harm," it would still be unconstitutional to apply punitive damages based on a commingled theory because "the Constitution prohibits punitive damages that are disproportionate to *actual harm* caused by a particular defendant."[FN40] According to defendants, under the commingled theory the *amount* of compensatory damages is based on market share, which cannot "serve as a meaningful measure of actual harm for purposes of the all-important ratio."[FN41] Finally, defendants argue that market share liability reflects potential harm to *non-parties,* whereas the Constitution prohibits punitive awards that are based on potential or actual harm to non-parties.

FN37. Def. Mem. at 4.

FN38. *Id.* at 3.

FN39. *Id.* at 18.

FN40. Defendants' Reply to Plaintiff City of New York's Opposition to Defendants' Motion to Bar Punitive Damages Based on the Market Share and Commingled Product Theories ("Def.Rep.") at 4 (emphasis ad-

ded).

FN41.*Id.* at 5.

**\*5** The City does not contest, for purposes of this decision, that punitive damages would be inappropriate under the market-share theory because "the City is no longer seeking damages based on the theory of market share liability."FN42 The City argues that punitive damages should be available under the commingled theory, however, because, "of the defendants held liable under the commingled product theory *all defendants,* not just a single defendant, blended their products into the product that caused the harm, and therefore *all defendants,* not just a single defendant, proximately caused the harm."FN43 Thus, the City intends to prove that " '*all* defendants contributed to the commingled gasoline that caused contamination in plaintiffs' wells.' "FN44 In order to make this showing, the City intends to rely on an expert who recently testified that "for the Defendants that supplied MTBE gasoline into the gasoline distribution system that supplied the [relevant geographical area of New York], over time it is a *virtual certainty* that their MTBE-gasoline is present in any release that occurred while they were doing that supplying."FN45

> FN42. Plaintiff City of New York's Opposition to Defendants' Motion to Bar Punitive Damages Based on the Market Share and Commingled Theories of Liability at 4 (quotation marks omitted).
>
> FN43.*Id.* at 5.
>
> FN44.*Id.* at 7 (quoting *In re MTBE,* 591 F.Supp.2d at 268 (emphasis added)).
>
> FN45.*Id.* (quoting Expert Rebuttal Report of Bruce F. Burke, Feb. 6, 2009) (emphasis added).

## III. APPLICABLE LAW

The Federal Rules of Evidence favor the admission of all relevant evidence.FN46 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."FN47 A district court will "exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds."FN48 "Indeed, courts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context."FN49 Moreover, a court's ruling regarding a motion in limine " 'is subject to change when the case unfolds .... Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling.' "FN50

> FN46.*See*Fed.R.Evid. 402.
>
> FN47.Fed.R.Evid. 401.
>
> FN48. *United States v. Ozsusamlar,* 428 F.Supp.2d 161, 164 (S.D . N.Y.2006).
>
> FN49. *United States v. Chan,* 184 F.Supp.2d 337, 340 (S.D.N.Y.2002).
>
> FN50. *Palmeri v. Defaria,* 88 F.3d 136, 139 (2d Cir.1996) (quoting *Luce v. United States,* 469 U.S. 38, 41-42 (1984)).

## IV. DISCUSSION

### A. Proof of Causation

On the most crucial issue, there is no disagreement: for purposes of this trial, punitive damages will not be available against a defendant if the City is unable to prove that the defendant caused or contributed to the injury. The principal disagreement therefore relates not to the operation of punitive damages but to the operation of the commingled product theory; specifically, the issue is whether a showing that a defendant is liable under the commingled theory necessarily means that the plaintiff has shown that the defendant caused or contributed

to the injury.

In many respects, the disagreement, stated in these broad terms, requires no resolution. The Court has described the commingled theory in different ways over the years. But nomenclature is not important. What is important is that, for punitive damages to be available for a claim based on the commingled theory, the jury must be carefully instructed that it cannot find a defendant liable unless it finds that *that* defendant's MTBE was actually "present in a completely commingled or blended state at the time and place that the harm or risk of harm occurred."[FN51] Of course, the City may attempt to make this showing through circumstantial evidence, including competent expert evidence, credited by a jury, that MTBE from a refiner defendant is, more likely than not, present in every release that contaminated the City's wells.[FN52] However, in order to prove that a particular defendant is liable under the commingled theory, it is *not* enough for the City to prove that "gasoline from *many* refiners and manufacturers" was present in the commingled product.[FN53] That is, unlike the market-share theory, no *presumption* of causation applies. Rather, the City must prove, by a preponderance of the evidence, that MTBE of the particular defendant was actually in the commingled product that caused the contamination.

FN51. *In re MTBE,* 447 F.Supp.2d at 300.

FN52. *Cf. In re Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831, 837 (2d Cir.1992) (discussing cases that found "proof of causation sufficient in the absence of identification of the precise product that injured a given plaintiff" and holding, under New York law, that causation was adequately proved against a particular defendant based on evidence that "asbestos-containing products made by the defendants were used interchangeably throughout the shipyard, and ... the environment was extremely dusty with asbestos fibers").*See also O'Brien v. National*

*Gypsum Co.,* 944 F.2d 69, 73 (2d Cir.1991) (upholding jury's finding of causation based on "testimony that asbestos products were used interchangeably on virtually all of the warships under construction in the Navy Yard"); *Johnson v. Celotex Corp.,* 899 F.2d 1281, 1286 (2d Cir.1990) (upholding jury's finding of causation based on the circumstantial evidence that defendants' asbestos-containing products were present on particular ships and that asbestos fibers were "[a]ll over the deck").

FN53. *In re MTBE,* 591 F.Supp.2d at 275 (emphasis added) (quotation marks omitted).

**\*6** So understood, the commingled theory is very different from the market-share theory, where causation is presumed rather than established. Under the commingled theory, the City must prove that MTBE supplied by a defendant was part of the commingled product that caused the contamination (or threatened contamination) of a given well. The City must show, in other words, that each defendant *contributed-in-fact* to the injury. What sets the commingled theory apart from the traditional theory of causation is that the City need not show that each individual defendant's contribution, *taken alone,* would have caused an injury. Rather, to establish liability against a particular defendant with respect to an individual well, the City must show that (a) the defendant's MTBE was present in a commingled product and (b) "the *commingled product* [rather than defendant's product *alone* ] caused plaintiff's injury."[FN54] This rule is important in the context of this litigation because defendants strongly urge that *minimal* concentrations of MTBE cause no injury. The commingled theory, much like the concurrent wrongdoing theory, provides that it is no defense for a defendant to argue that its contribution, taken alone, caused no injury. The real issue is whether the *commingled product* caused an injury and, if so, whether a de-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

fendant's MTBE *contributed* to that commingled product.[FN55]

> FN54. *In re MTBE,* 447 F.Supp.2d at 301 (emphasis added).

> FN55. Accordingly, the language quoted above suggesting that the commingled product theory need not involve proof that each defendant caused plaintiff's injury should be taken to mean that, under the commingled theory, a defendant can be held liable for contributing to the *commingled product that caused an indivisible injury* even though defendant's contribution, taken alone, did not individually "cause plaintiff's injury." *In re MTBE,* 591 F.Supp.2d at 275.

For these reasons, the decision to bar punitive damages when liability is based on the market-share theory is easily distinguished. That decision rested largely on the fact that, in the market-share context, plaintiffs are unable to identify which defendants contributed to the injury. Permitting punitive damages without proof of causation was deemed improper because (a) it is inequitable to impose punitive damages on a defendant for whom no causal nexus to the injury was established and (b) it would create perverse incentives because there would be no impetus for plaintiffs to identify the actual defendants that contributed to the injury.

Here, by contrast, the City will prevail against a defendant on the commingled theory only if the City can prove that the defendant actually contributed to the injury. This extinguishes the inequity of exposing a defendant to punitive damages that is not shown to have contributed to the injury. Further, there is no need to incentivize the City to identify the wrongdoers under the commingled theory because, for liability to attach in this action, it will have already done so. It is true that the City may not have identified the precise extent of each defendant's contribution, but this is because a commingled and fungible product, by definition, resists

such proof. However, for apportionment purposes, one or both parties will be required to identify,[FN56] as near as possible, the extent of a defendant's contribution. For both reasons, punitive damages would not create any perverse incentives.

> FN56. The issue of which party bears the burden of proof for apportionment is raised in another motion in limine and will not be decided here.

**B. Apportionment**

**\*7** The remaining issue is whether the difficulty in determining the portion of the harm (or potential harm) that each defendant caused is consistent with the imposition of punitive damages. This issue raises both equitable and Constitutional concerns, which are discussed in turn.

*First,* in denying punitive damages based on market share, this Court quoted the *Hymowitz* Court's observation that the decision to adopt a *national market* for determining market share liability would result in a "disproportion" between, on the one hand, each defendant's apportioned liability and, on the other, the likely harm, or potential harm, each defendant imposed on plaintiffs, who haled from *this State.*[FN57] This Court noted that punitive damages, based on a multiplier, would amplify this inaccuracy.

> FN57. *In re MTBE,* 517 F.Supp.2d at 670. *Accord Hymowitz,* 73 N.Y.2d at 512 (noting that "[the Court's] [national] market share theory cannot be founded upon the belief that, over the run of cases, liability will approximate causation in this State. Nor does the use of a national market provide a reasonable link between liability and the risk created by a defendant to a particular plaintiff.").

In the commingled setting, this Court has stated that "liability is several only and is apportioned by proof of a defendant's share of the market at the

time of the injury."FN58 This Court has not yet decided "who bears the burden of proof on this issue."FN59 Further, the Court has not yet decided whether the relevant market is the national market, the market that supplies gasoline to the city or state, the market that supplies gasoline to the stations from which the gasoline leaked, when that station can be identified, or some other market.FN60 However, this Court has stated that a "defendant must be able to exculpate itself by proving that its product was not present *at the relevant time or in the relevant place,* and therefore could not be part of the commingled or blended product."FN61 Because the markets that are used to apportion liability and to establish exculpation must be the same markets on pain of potential inconsistencies,FN62 and because the commingled theory is designed to apportion liability fairly in the face of uncertainty, it follows that apportionment should be based, as near as possible, on each defendant's share of the actual market that supplied gasoline to the commingled product that contaminated the City's wells-*i.e.,* on each defendant's share of the gasoline in the relevant place and at the relevant times.FN63 In this way, a defendant's share of the relevant market should coincide as nearly as possible with its share of the MTBE in the contaminating product.FN64

> FN58. *In re MTBE,* 591 F.Supp.2d at 274 n. 72. The City argues in another motion in limine that joint and several liability should apply to some of its claims against defendant. For now, it is enough to note that even if joint and several liability were to apply to any of the City's claims, the defendant would retain its rights to contribution and the award would be reduced by the settling parties' equitable share. *See* N.Y. C.P.L.R. § 1401 (providing that "two or more persons who are subject to liability for damages for the same ... injury to property ... may claim contribution among them whether or not an action has been brought or a judgment has been

rendered against the person from whom contribution is sought.").*See also* N.Y. G.O.L. § 15-108 (providing that plaintiff's award against a non-settling party shall be "reduced in the amount of the [settling] tortfeasor's equitable share of the damages").

> FN59. *Id.*

> FN60. *Cf. In re MTBE,* 379 F.Supp.2d at 375-76 (listing various markets courts have used to determine market share); *Hymowitz,* 73 N.Y.2d at 709-12 (discussing same at more length).

> FN61. *In re MTBE,* 447 F.Supp.2d at 300 (emphasis added).

> FN62. For example, if the national market were chosen for apportionment and the station-supplying market were chosen for exculpation, a defendant might exculpate itself by showing that its gasoline was not supplied to the station responsible for the spill and yet be liable on the ground that it had a share in the national market.

> FN63. In this context, this Court expects to adhere to the decision in *Suffolk County* that "the time that the risk of harm-the contamination of groundwater-occurred is an issue of fact for the jury" and "the place the harm or risk of harm occurred is the capture zone of each well." *In re MTBE,* 591 F.Supp.2d at 275.

> FN64. Of course, this too may be shown through circumstantial evidence, including evidence of defendant's market share of the gasoline sent to the City, or the region, during the years of the alleged leaks.

Accordingly, the gap between the apportioned liability and a defendant's share of the harm is significantly less than in the market-share context. Indeed, there may be no gap at all.FN65 For this reason, the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

concern for magnifying inaccuracies is not great. Further, although *potential harm* to plaintiffs is a permissible ground for punitive damages in New York, the *Hymowitz* Court emphasized that a defendant's share of the *national* market does not reflect potential harm to plaintiffs. As discussed below, this concern is not present here. Therefore, practical and equitable considerations do not support precluding the City from seeking punitive damages in this case.

> FN65. Proof of a defendant's share of the relevant market may establish, by a preponderance of the evidence, the extent of that defendant's share of the commingled product that in fact caused the injury. If so, there is no gap at all between the apportionment and the defendant's share of the liability.

**\*8** *Second,* in reference to defendants' Constitutional arguments, to the extent (if any) that proof of a defendant's share of the relevant market does not constitute proof of that defendant's share of the responsibility for the City's injury, the defendant's market share clearly reflects the *potential* harm that the defendant imposed on the City, which is a permissible Constitutional ground for punitive damages. That is, if a defendant delivered a certain percentage of MTBE-infused gasoline to the City's stations, then that percentage represents the best measure of the potential harm that the defendant imposed on the City.[FN66] Even if this measure is not exact, there is no requirement that the measure of potential harm be exact.[FN67]

> FN66. Defendants argue that apportioning liability based on market share necessarily reflects potential harm to everyone in the market, including non-parties, but that when assessing punitive damages the jury may not consider the potential harm to non-parties. Although correct, this argument misses the point. In a market that is narrowed to one in which plaintiff is a potential victim of every market transaction,

a defendant's market share reflects the potential harm that defendant imposed on plaintiff. Although market share also represents potential harm to non-parties, the jury will be carefully instructed only to consider the potential harm to the City in assessing the amount of punitive damages. Further, because the calculation of compensatory damages is based on the value of the City's injury, the compensatory damages awarded will reflect potential harm to the City alone.

> FN67. *Cf. TXO,* 509 U.S. at 462 (plurality opinion) ("While petitioner stresses the shocking disparity between the punitive award and the compensatory award, that shock dissipates when one considers the potential loss to respondents, in terms of reduced or eliminated royalties payments, had petitioner succeeded in its illicit scheme. Thus, even if the actual value of the 'potential harm' to respondents is not between $5 million and $8.3 million, but is closer to $4 million, or $2 million, or even $1 million, the disparity between the punitive award and the potential harm does not, in our view, jar one's constitutional sensibilities.").

More broadly, defendants incorrectly suggest that in order to allow the jury to consider punitive damages, the jury must be able to calulate each defendant's exact contribution to the injury because without that calculation the "all-important ratio" test cannot be performed.[FN68] Defendants seem to overlook that the ratio-test is an inexact benchmark, which is never dispositive,[FN69] and that the imposition of punitive damages always requires juries, and reviewing courts, to balance non-quantifiable values, such as the reprehensibility of each defendant's conduct.[FN70] Further, punitive damages are frequently imposed in cases of serious injury, which defy precise compensatory calculation. Finally, the common practice of imposing punitive

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

damages in joint and several liability cases shows that punitive damages are available when the compensatory damages do not reflect defendant's actual (or potential) share of the harm to plaintiffs.[FN71]

> **FN68.** Def. Rep. at 5.

> **FN69.** *See State Farm,* 538 U.S. at 425 ("[T]hese ratios are not binding, they are instructive").*See also DiSorbo v. Hoy,* 343 F.3d 172, 187 (2d Cir.2003) (noting that reasonableness review "does not entail a 'simple mathematical formula' " and concluding that " 'the use of a multiplier to assess punitive damages is not the best tool' " in the circumstances of that case (quoting *Lee v. Edwards,* 101 F.3d 805, 810-11 (2d Cir.1996))).

> **FN70.** *Cf. BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575 (1996) ("[T]he most important indicium of the [award's] reasonableness ... is the degree of reprehensibility of the defendant's conduct.").

> **FN71.** It might be argued that in joint and several liability cases, the compensatory damages do represent a defendant's share of the harm because, *by operation of law,* each defendant is liable for the full amount of the damages. But the same could be said in the context of commingled liability: to the extent that apportioned damages do not reflect a defendant's actual share of contaminants in the commingled product, each defendant, *by operation of law,* is liable for that share of the commingled product that corresponds to its share of the relevant market.

## V. CONCLUSION

For the foregoing reasons, defendants' motion *in limine* is granted in part and denied in part. If the City relies on market share liability to prove causation for a particular well, it is precluded from ar-

guing that punitive damages are available for that well, and is further precluded from presenting evidence that is relevant solely to punitive damages as to that well. If the City relies on the commingled product theory to establish liability, it is not precluded from arguing that punitive damages are available, or from presenting evidence of punitive damages, for that well. The Clerk of the Court is directed to close this motion (document # 95 in 04-CV-3417; document # 2306 in 00-CV-1898).

SO ORDERED:

S.D.N.Y.,2009.
In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation
Slip Copy, 2009 WL 1649668 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.