1

2

3          UNITED STATES DISTRICT COURT

4      FOR THE NORTHERN DISTRICT OF CALIFORNIA

5              OAKLAND DIVISION

6

7  NATIVE VILLAGE OF KIVALINA, and       Case No:  C 08-1138 SBA
   CITY OF KIVALINA,
8                                        **ORDER GRANTING DEFENDANTS'**
              Plaintiffs,                **MOTIONS TO DISMISS FOR LACK**
9                                        **OF SUBJECT MATTER**
        vs.                              **JURISDICTION**
10
   EXXONMOBIL CORPORATION, et al.,       (Docket 171, 172, 175, 176, 177)
11
              Defendants.
12

13

14         Plaintiff Native Village of Kivalina (the Village) is the governing body of an Inupiat

15  Eskimo village of approximately 400 people who reside in the City of Kivalina (Kivalina),

16  which also is a plaintiff in this action.  The Complaint alleges that as a result of global

17  warming, the Arctic sea ice that protects the Kivalina coast from winter storms has diminished,

18  and that the resulting erosion and destruction will require the relocation of Kivalina's residents.

19  As defendants, the Village and Kivalina (collectively, Plaintiffs) have named twenty-four oil,

20  energy and utility companies[1] from whom they seek damages under a federal common law

21  claim of nuisance, based on their alleged contribution to the excessive emission of carbon

22  dioxide and other greenhouse gases which they claim are causing global warming.

23

24         [1] Defendants are:  (1) ExxonMobil Corporation; (2) BP P.L.C.; (3) BP America, Inc.;
    (4) BP Products North America, Inc.; (5) Chevron Corporation; (6) Chevron U.S.A., Inc.;
25  (7) ConocoPhilips Company; (8) Royal Dutch Shell P.L.C.; (9) Shell Oil Company; (10) Peabody
    Energy Corporation; (11) The AES Corporation; (12) American Electric Power Corporation;
26  (13) American Electric Power Services Corporation; (14) DTE Energy Company; (15) Duke
    Energy Corporation; (16) Dynergy Holdings, Inc.; (17) Edison International; (18) MidAmerican
27  Energy Holdings Company; (19) Mirant Corporation; (20) NRG Energy; (21) Pinnacle West
    Capital Corporation; (22) Reliant Energy, Inc.; (23) The Southern Company; and (24) Xcel Energy,
28  Inc.

1    The parties are presently before the Court on various Defendants' motions to dismiss for

2    lack of subject matter jurisdiction, pursuant to Federal Rules of Civil Procedure 12(b)(1) and

3    12(b)(6).  In their Rule 12(b)(1) motions, Defendants contend that Plaintiffs' claims are not

4    justiciable under the political question doctrine, and that Plaintiffs otherwise lack standing

5    under Article III of the United States Constitution.  Having read and considered the papers filed

6    in connection with this matter, and being fully informed, the Court hereby GRANTS

7    Defendants' motions to dismiss for lack of jurisdiction.  The Court, in its discretion, finds this

8    matter suitable for resolution without oral argument.  See Fed.R.Civ.P. 78(b).

9    **I.      BACKGROUND**

10           **A.      OVERVIEW**

11           The Village is a self-governing, federally-recognized Tribe of Inupiat Eskimos

12   established pursuant to the provisions of the Indian Reorganization Act of 1934, as amended in

13   1936.  Compl. ¶ 12.  Members of the Village reside in Kivalina, which is a unified municipality

14   incorporated under Alaska law in 1969 with a population of approximately 400 persons.  Id.

15   ¶ 1, 13, 15.  Kivalina is located at the tip of a six-mile long barrier reef, approximately seventy

16   miles north of the Arctic Circle, between the Chukchi Sea and the Kivalina and Wulik Rivers

17   on the Northwest coast of Alaska.  Id. ¶ 1.

18           The Kivalina coast is protected by Arctic sea ice that is present during the fall, winter

19   and spring.  Id. ¶¶ 4, 16.  The sea ice, which attaches to the Kivalina coast, acts as a barrier

20   against the coastal storms and waves that affect the coast of the Chukchi Sea.  Id. ¶ 16.  As a

21   result of global warming, however, the sea ice now attaches to the Kivalina coast later in the

22   year and breaks up earlier and is thinner and less extensive than before, thus subjecting

23   Kivalina to coastal storm waves and surges.  Id.  The resulting erosion has now reached the

24   point where Kivalina is becoming uninhabitable.  Id. ¶ 17.  Plaintiffs allege that as a result, the

25   Village will have to be relocated, at a cost estimated to range from $95 to $400 million.  Id.

26   ¶¶ 1, 17.

27

28

**B.    GLOBAL WARMING**

In recent years, much attention has been focused on the issue of global warming, which is not itself an event so much as it is a sequence of events.  Generally speaking, global warming refers to the build-up of carbon dioxide and methane (commonly referred to as "greenhouse gases") in the atmosphere which, in turn, causes the temperature of the planet to increase.  Id. ¶ 123.  Both carbon dioxide and methane are products of human activity.  Id. ¶¶ 124, 133.  Plaintiffs attribute the build-up of atmospheric carbon dioxide and methane to increases in the combustion of fossil fuels as well as fuel harvesting activities, such as coal mining and oil drilling.  Id. ¶¶ 124, 126, 167-69, 173, 180.

According to Plaintiffs, carbon dioxide and other greenhouse gas levels have been increasing steadily since the beginning of the industrial revolution in the 18th century, with more than a one-third increase having occurred since 1980.  Id. ¶ 125.  The emitted gases "rapidly mix in the atmosphere and cause the increase in the atmospheric concentration of carbon dioxide levels and other greenhouse gases worldwide."  Id. ¶ 254.  These gases remain in the atmosphere for centuries and "thus have a lasting effect on [the] climate."  Id. ¶ 124.  The carbon dioxide traps heat emitted by the sun which, in turn, increases the climactic temperature on Earth.  Id.  As the planet heats, the oceans become less efficient at removing carbon dioxide from the atmosphere.  Id. ¶ 127.  Likewise, the planet reflects less energy back into space which then causes "white, snowy, or icy areas" to darken and absorb more heat.  Id.  The increase in the surface temperature causes seawater to expand and sea levels to rise.  Id. ¶ 130.  In addition, sea levels are rising due to the melting of ice caps and glaciers resulting from increased temperatures.  Id. ¶ 131.  Plaintiffs allege that these events have, in turn, led to the loss of the Arctic sea ice that serves to protect Kivalina from winter storms.  Id. ¶ 4.

**C.    PROCEDURAL HISTORY**

Plaintiffs filed their Complaint on February 26, 2008.  The Complaint alleges four claims for relief:  (1) Federal Common Law:  Public Nuisance; (2) State Law:  Private and Public Nuisance; (3) Civil Conspiracy; and (4) Concert of Action.  Compl. ¶¶ 249-282.  As Defendants, Plaintiffs have named various oil companies, power companies and utility

1   providers, all of whom are alleged to be jointly and severally liable for causing damage to

2   Plaintiffs.  The Complaint does not seek injunctive relief nor does it specify a particular

3   amount of monetary damages.  However, Plaintiffs claim that the effects of global warming

4   mean that they will have to relocate the inhabitants of Kivalina at an estimated cost of $95

5   million to $400 million.  Id. ¶ 1.

6       Pursuant to the parties' stipulated scheduling order, Defendants filed various motions to

7   dismiss pursuant to Rules 12(b)(1) and 12(b)(6).  These motions are:  (a) Motion of Certain Oil

8   Company Defendants to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(1);

9   (b) Motion to Dismiss of Defendant Peabody Energy Corporation for lack of Subject Matter

10  Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) and for Failure to State a Claim Upon Which

11  Relief May be Granted Pursuant to Fed. R. Civ. P. 12(b)(6); (c) Motion of Certain Oil

12  Company Defendants to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(1);

13  (d) Motion of Certain Utility Defendants to Dismiss Plaintiffs' Civil Conspiracy Claim; and

14  (e) Utility Defendants' Motion to Dismiss.[2]

15      The threshold question presented by Defendants' motions is whether the Court has

16  subject matter jurisdiction over Plaintiffs' federal claim for common law nuisance.  In

17  particular, Defendants argue that under the political question doctrine, the Court lacks

18  jurisdiction to consider the merits of Plaintiffs' nuisance claim because its resolution will

19  require the Court to make policy determinations relating to the use of fossil fuels and other

20  energy sources and consider their value in relation to the environmental, economic and social

21  consequences of such use.  Defendants argue that such questions are inherently political and

22  that there are no judicially manageable standards available to adjudicate these issues.  As a

23  secondary basis for dismissal, Defendants argue that Plaintiffs lack standing under Article III to

24  pursue their global warming claims under a nuisance theory on the ground that their injury is

25

26  _____

27  [2] Certain groups of Defendants also filed Rule 12(b)(2) motions to dismiss for lack of
    personal jurisdiction.  Docket 138, 141.  The parties agreed that adjudication of such motions
    would occur, if necessary, after the Court resolves the motions under Rules 12(b)(1) and 12(b)(6).

28  See Docket 126 at 3.

1  not "fairly traceable" to the conduct of Defendants.  The Court analyzes each of these

2  contentions below.

3  **II.      LEGAL STANDARD**

4         "Federal courts are courts of limited jurisdiction.  They possess only that power

5  authorized by Constitution and statute, which is not to be expanded by judicial decree."  Rasul

6  v. Bush, 542 U.S. 466, 489 (2004) (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 511

7  U.S. 375, 377 (1994)).  The court is presumed to lack jurisdiction unless the contrary appears

8  affirmatively from the record.  DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 n.3 (2006).

9  Consistent with these basic jurisdictional precepts, the Ninth Circuit has articulated the

10  standard for surviving a motion to dismiss for lack of jurisdiction as follows:  "When subject

11  matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the

12  burden of proving jurisdiction in order to survive the motion.  A plaintiff suing in a federal

13  court must show in his pleading, affirmatively and distinctly, the existence of whatever is

14  essential to federal jurisdiction, and, if he does not do so, the court, on having the defect called

15  to its attention or on discovering the same, must dismiss the case, unless the defect be corrected

16  by amendment."  Tosco Corp. v. Communities for a Better Env't, 236 F.3d 495, 499 (9th Cir.

17  2001) (citations and internal quotations omitted).

18         A Rule 12(b)(1) challenge to subject matter jurisdiction can be "facial," in which case

19  the Court assumes the plaintiff's factual allegations to be true and draws all reasonable

20  inferences in its favor.  Doe v. See, 557 F.3d 1066, 1073 (9th Cir. 2009); Castaneda v. United

21  States, 546 F.3d 682, 684 n. 1 (9th Cir. 2008).  Or, the motion may be a "factual" or "speaking"

22  motion, where the movant may submit materials outside the pleadings to support its motion.  In

23  that case, "'[i]t then becomes necessary for the party opposing the motion to present affidavits

24  or any other evidence necessary to satisfy its burden of establishing that the court, in fact,

25  possesses subject matter jurisdiction.'"  Colwell v. Dep't of Health and Human Servs., 558

26  F.3d 1112, 1121 (9th Cir. 2009) (quoting St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir.

27  1989)).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court

28

must dismiss the action." Fed.R.Civ.P 12(h)(3).  The instant motions present a facial challenge only.

## III.   DISCUSSION

### A.   THE POLITICAL QUESTION DOCTRINE

Federal courts are courts of limited jurisdiction.  The power to hear a particular case is circumscribed by Article III of the Constitution, which extends federal judicial power only to actual "Cases" and "Controversies."  U.S. Const., art. III, § 2, cl. 1.  The Supreme Court "has recognized that the case-or-controversy limitation is crucial in maintaining the 'tripartite allocation of power' set forth in the Constitution."  DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) (internal quotations omitted).  Article III standing is thus a threshold requirement for federal court jurisdiction.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992).

"The Supreme Court has indicated that disputes involving political questions lie outside of the Article III jurisdiction of federal courts."  Corrie v. Caterpillar, Inc., 503 F.3d 974, 980 (9th Cir. 2007) (citing cases); Summers v. Earth Island Inst., --- U.S. ---, 129 S.Ct. 1142, 1148 (2009) ("courts have no charter to review and revise legislative and executive action"); Vieth v. Jubelirer, 541 U.S. 267, 277 (2004) ("the judicial department has no business entertaining the claim … because the question is entrusted to one of the political branches or involves no judicially enforceable rights."); see also United States v. Mandel, 914 F.2d 1215, 1222 (9th Cir. 1990) ("certain political questions are by their nature committed to the political branches to the exclusion of the judiciary.").

The political question doctrine is a species of the separation of powers doctrine and provides that certain questions are political as opposed to legal, and thus, must be resolved by the political branches rather than by the judiciary.  Corrie, 503 F.3d at 980.  "The political question doctrine serves to prevent the federal courts from intruding unduly on certain policy choices and value judgments that are constitutionally committed to Congress or the executive branch."  Koohi v. United States, 976 F.2d 1328, 1331 (9th Cir. 1992).  "A nonjusticiable political question exists when, to resolve a dispute, the court must make a policy judgment of a

1  legislative nature, rather than resolving the dispute through legal and factual analysis."

2  E.E.O.C. v. Peabody Western Coal Co., 400 F.3d 774, 785 (9th Cir. 2005).

3  In Baker v. Carr, 369 U.S. 186, 210 (1962), the Supreme Court set forth six independent

4  factors, any one of which demonstrates the presence of a non-justiciable political question:

> [1] a textually demonstrable constitutional commitment of the
> issue to a coordinate political department; or [2] a lack of
> judicially discoverable and manageable standards for resolving it;
> or [3] the impossibility of deciding without an initial policy
> determination of a kind clearly for nonjudicial discretion; or [4]
> the impossibility of a court's undertaking independent resolution
> without expressing lack of the respect due coordinate branches of
> government; or [5] an unusual need for unquestioning adherence
> to a political decision already made; or [6] the potentiality of
> embarrassment from multifarious pronouncements by various
> departments on one question.

11  "'[T]he first three Baker factors focus on the constitutional limitations of a court's jurisdiction,

12  while the final three are 'prudential considerations [that] counsel against judicial

13  intervention.'" Corrie, 574 F.3d at 981 (quoting Wang v. Masaitis, 416 F.3d 992, 996 (9th Cir.

14  2005)).

15  The six Baker factors have been grouped into three general inquiries: "(i) Does the

16  issue involve resolution of questions committed by the text of the Constitution to a coordinate

17  branch of Government?  (ii) Would resolution of the question demand that a court move

18  beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial

19  intervention?" Wang, 416 F.3d at 995 (citing Goldwater v. Carter, 444 U.S. 996, 997 (1979)

20  (Powell, J., concurring)). Under this distilled approach, the first inquiry covers Baker factor

21  one; the second inquiry covers Baker factors two and three; and the third covers Baker factor

22  four through six.  Id. at 995-996.  Any one of the Baker factors may be dispositive.  Alperin v.

23  Vatican Bank, 410 F.3d 532, 547 (9th Cir. 2005); United States v. Mandel, 914 F.2d 1215,

24  1222 (9th Cir. 1990).

25  **1.     Textual Commitment**

26  The first Baker factor examines whether there is "a textually demonstrable

27  constitutional commitment of the issue to a coordinate political department."  Baker, 369 U.S.

28  at 217.  "This factor recognizes that, under the separation of powers, certain decisions have

1  been exclusively committed to the legislative and executive branches of the federal

2  government, and are therefore not subject to judicial review."  McMahon v. Presidential

3  Airways, Inc., 502 F.3d 1331, 1358-59 (11th Cir. 2007).  The existence of "a textually

4  demonstrable constitutional commitment of the issue to a coordinate political department"

5  turns on an examination of the constitutional provisions governing the exercise of the power in

6  question.  See Powell v. McCormack, 395 U.S. 486, 519-520 (1969); Consejo de Desarrollo

7  Economico de Mexicali, A.C. v. United States, 482 F.3d 1157, 1172 (9th Cir. 2007) ("the

8  courts must, in the first instance, interpret the text in question and determine whether and to

9  what extent the issue is textually committed.").  Though there are few instances of "this sort of

10  textual commitment," courts may "infer the presence of a political question from the text and

11  structure of the Constitution."  Nixon v. United States, 506 U.S. 224, 240 (1993).  That being

12  said, a mandate to regulate a certain area is not the equivalent of delegating the exclusive

13  power to resolve that issue to another branch.  Id.  Rather, the issue is whether the Constitution

14  has given one of the political branches final responsibility for interpreting the scope and nature

15  of such a power.  Id.

16  Defendants argue that allowing Plaintiffs to proceed with their global warming claim

17  would run afoul of the first Baker factor "because it would intrude upon the political branches'

18  constitutionally committed authority over foreign policy."  Oil Defs.' Mot. at 22.  In particular,

19  Defendants maintain that Congress and the President have declined to adopt emission caps

20  absent an agreement from developing nations.  Id.  They further claim that the rationale for the

21  United States' position is two-fold:  (1) that a successful approach to global warming requires a

22  "global" approach that includes cooperation from both industrialized and developing nations;

23  and (2) this country could "find itself in an inferior bargaining position" with respect to future

24  diplomatic attempts to address this issue.  Id. at 22-23.  In view of these considerations,

25  Defendants contend that the Court's retroactive establishment of greenhouse gas emission caps

26  would "override the considered foreign policy judgment of the political branches…."  Id. at 23;

27  see also Utilities Defs.' Mot. at 8; Peabody Mot. at 11-12.

28

It is true, as a general matter, that "'foreign policy [is] the province and responsibility of the Executive.'" <u>Dep't of Navy v. Egan</u>, 484 U.S. 518, 529 (1988). "[T]he very nature of executive decisions as to foreign policy is political, not judicial." <u>Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.</u>, 333 U.S. 103, 111 (1948). "But the mere fact that foreign affairs may be affected by a judicial decision does not implicate abstention." <u>Khouzam v. Attorney Gen. of United States</u>, 549 F.3d 235, 250 (3rd Cir. 2008). In fact, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance[.]" <u>Baker</u>, 369 U.S. at 211. "This over-inclusive approach threatens to sweep all cases touching foreign relations beyond the purview of the courts-a practice warned against in Baker." <u>See</u> <u>Alperin</u>, 410 F.3d at 547. In fact, "<u>Baker</u> cautioned against 'sweeping statements' that imply all questions involving foreign relations are political ones.'" <u>Id.</u> at 544-45.

The indisputably international dimension of this particular environmental problem does not render the instant controversy a non-justiciable one. While Defendants have shown that global warming issues may implicate foreign policy and related economic issues, the fact that this case "touches foreign relations" does not ipso facto place it beyond the reach of the judiciary. <u>See</u> <u>Corrie</u>, 503 F.3d at 982. Tellingly, none of the Defendants cite to any express provision of the Constitution or provision from which it can be inferred that the power to make the final determination regarding air pollution or global warming has been vested in either the executive or legislative branch of the government. Given their failure to do so, the Court must presume that no such limitation exists. <u>See</u> <u>Davis v. Passman</u>, 442 U.S. 228, 242 (1979) ("At least in the absence of 'a textually demonstrable constitutional commitment of [an] issue to a coordinate political department,' … we presume that justiciable constitutional rights are to be enforced through the courts."). Accordingly, the first <u>Baker</u> factor is not implicated.

### 2.   <u>Scope of Judicial Expertise</u>

"The second <u>Goldwater</u> factor lumps together the second and third <u>Baker</u> inquiries— whether there is 'a lack of judicially discoverable and manageable standards' and whether a decision is impossible 'without an initial policy determination of a kind clearly for nonjudicial discretion.'" <u>Wang</u>, 416 F.3d at 996. As noted, the common inquiry presented by these two

1   factors is whether "resolution of the question demand[s] that a court move beyond areas of

2   judicial expertise[.]"  Id. at 995.

3

4               a)      **Judicially Discoverable and Manageable Standards**

5       In Alperin, the Ninth Circuit explained that focus of the second Baker factor is "not

6   whether the case is unmanageable in the sense of being large, complicated, or otherwise

7   difficult to tackle from a logistical standpoint.  Rather, courts must ask whether they have the

8   legal tools to reach a ruling that is 'principled, rational, and based upon reasoned distinctions.'"

9   410 F.3d at 552.  Thus, "[i]nstead of focusing on the logistical obstacles," the relevant inquiry

10  is whether the judiciary is *granting relief in a reasoned fashion* versus allowing the claims to

11  proceed such that they "merely provide 'hope' without a substantive legal basis for a ruling."

12  Id. (emphasis added).

13      Plaintiffs contend that "[t]he judicially discoverable and manageable standards here are

14  the same as they are in all nuisance cases."  Pls.' Opp'n at 63.  They assert that the salient

15  inquiry underlying their federal nuisance claim is whether Defendants contributed to "an

16  unreasonable interference with public rights[.]"  Id.  Resolution of what is "reasonable,"

17  Plaintiffs assert, is to be determined by examining whether the conduct involves a "significant

18  interference with the public health, the public safety, the public peace, the public comfort or the

19  public convenience" and whether the conduct is "of a continuing nature" or has produced a

20  "permanent or long lasting effect[.]"  Id.  However, the flaw in Plaintiffs' argument is that it

21  overlooks that the evaluation of a nuisance claim is not focused entirely on the

22  unreasonableness of the harm.  Rather, the factfinder must also balance the utility and benefit

23  of the alleged nuisance against the harm caused.

24      A public nuisance is defined as an "unreasonable interference with a right common to

25  the general public."  Restatement (Second) of Torts § 821(b)(1) (1979).  Whether the

26  interference is unreasonable turns on weighing "the gravity of the harm against the utility of the

27  conduct."  Id. § 821 cmt. e. "The unreasonableness of a given interference represents a

28  judgment reached by comparing the social utility of an activity against the gravity of the harm

1    it inflicts, taking into account a handful of relevant factors." <u>People ex rel. Gallo v. Acuna</u>, 14

2    Cal. 4th 1090, 1105 (1997) (citing Restatement (Second) of Torts, §§ 826-831).  Stated another

3    way, resolution of a nuisance claim is not based on whether the plaintiff finds the invasion

4    unreasonable, but rather, "whether reasonable persons generally, *looking at the whole situation*

5    impartially and objectively, would consider it unreasonable."  <u>Id.</u> (quotations and citation

6    omitted and emphasis added); <u>see also</u> <u>Florida East Coast Props., Inc. v. Metropolitan Dade</u>

7    <u>County</u>, 572 F.2d 1108, 1112 (5th Cir. 1978) ("In every case, the court must make a

8    comparative evaluation of the conflicting interests according to objective legal standards, and

9    the gravity of harm to the plaintiff must be weighed against the utility of the defendant's

10   conduct.").

11         Applying the above-discussed principles here, the factfinder will have to weigh, inter

12   alia, the energy-producing alternatives that were available in the past and consider their

13   respective impact on far ranging issues such as their reliability as an energy source, safety

14   considerations and the impact of the different alternatives on consumers and business at every

15   level.  <u>See</u> <u>People of the State of Calif. v. Gen. Motors Corp.</u>, 2007 WL 2726871 at *8 (N.D.

16   Cal., Sept. 17, 2007) ("Plaintiff's claim would require the Court to balance the competing

17   interests of reducing global warming emissions and the interests of advancing and preserving

18   economic and industrial development"); <u>see also</u> <u>Cook v. Rockwell Int'l. Corp.</u>, 580 F. Supp.

19   2d 1071, 1166 (D. Colo. 2006) ("To assess the utility of Defendants' conduct, the jury must

20   consider several factors, including the primary purpose of Defendants' conduct and the social

21   value of that purpose") (citing Restatement (Second) of Torts § 828 & cmt. e).  The factfinder

22   would then have to weigh the benefits derived from those choices against the risk that

23   increasing greenhouse gases would in turn increase the risk of causing flooding along the coast

24   of a remote Alaskan locale.  Plaintiffs ignore this aspect of their claim and otherwise fail to

25   articulate any particular judicially discoverable and manageable standards that would guide a

26   factfinder in rendering a decision that is principled, rational, and based upon reasoned

27   distinctions.  <u>See</u> <u>Alperin</u>, 410 F.3d at 552.

28

Plaintiffs next argue that the existence of judicially discoverable or manageable standards is exemplified by the long, prior history of air and water pollution cases. Pls.' Opp'n at 61-63. The Second Circuit in Connecticut v. Am. Elec. Power Co. Inc., –F.3d –, 2009 WL 2996729 (2d Cir. Sept. 21, 2009) (AEP) agreed with this reasoning in holding that the political question doctrine did not bar a nuisance lawsuit brought by eight states, a city and three land trusts against six electric power corporations "to cap and then reduce their carbon monoxide emissions." Id. at *1. With regard to the second Baker factor, the AEP court rejected the defendants' reliance on "uncertainties" regarding the precise effect of greenhouse gas emissions and noted that "federal courts have successfully adjudicated complex common law nuisance cases for over a century." Id. at *10. Based on the judiciary's history of addressing "new and complex problems," including those concerning environmental pollution, the court concluded that "[w]ell-settled principles of tort and public nuisance law provide appropriate guidance to the district court in assessing Plaintiffs' claims and federal courts are competent to deal with these issues" such that their global warming concerns can "be addressed through principled adjudication." Id. at *13. This Court is not so sanguine. While such principles may provide sufficient guidance in some novel cases, this is not one of them.

The cases cited by Plaintiffs as well as the AEP court involved nuisance claims founded on environmental injuries far different than those alleged in the instant case.[3] The common thread running through each of those cases is that they involved a discrete number of "polluters" that were identified as causing a specific injury to a specific area. Yet, Plaintiffs themselves concede that considerations involved in the emission of greenhouse gases and the resulting effects of global warming are "entirely different" than those germane to water or air pollution cases. Pls.' Opp'n at 105. While a water pollution claim typically involves a discrete, geographically definable waterway, Plaintiffs' global warming claim is based on the

---

[3] For example, AEP cites two companion cases, Missouri v. Illinois, 180 U.S. 208 (1901) and Missouri v. Illinois, 200 U.S. 496 (1906), both of which involved suits by the State of Missouri and against the State of Illinois based on the latter's discharge of sewage into a channel that emptied into the Mississippi River. See AEP, 2009 WL 2996729 at *10. The next set of cases discussed by the AEP court involved claims brought against copper producers whose noxious emissions were destroying forests, orchards and crops in Georgia. Id. at *11.

emission of greenhouse gases from innumerable sources located throughout the world and *affecting the entire planet and its atmosphere*.  Pls.' Opp'n at 105.  Notably, Plaintiffs acknowledge that the global warming process involves "common pollutants that are mixed together in the atmosphere [that] cannot be similarly geographically circumscribed."  Id.

The sequence of events leading to the claimed injury also is distinguishable.  In a water pollution case, the discharge in excess of the amount permitted is presumed harmful.  See Tex. Indep. Producers and Royalty Owners Ass'n v. E.P.A., 410 F.3d 964, 974 (5th Cir. 2005) (Texas Indep. Producers).  In contrast, the harm from global warming involves a series of events disconnected from the discharge itself.  In a global warming scenario, emitted greenhouse gases combine with other gases in the atmosphere which *in turn* results in the planet retaining heat, which *in turn* causes the ice caps to melt and the oceans to rise, which *in turn* causes the Arctic sea ice to melt, which *in turn* allegedly renders Kivalina vulnerable to erosion and deterioration resulting from winter storms.  See Compl. ¶¶ 1, 4, 123-127, 254; Pls.' Opp'n at 105.

Despite the admitted and significant distinctions between a nuisance claim based on water or air pollution and one, such as the present, based on global warming, neither Plaintiffs nor AEP offers any guidance as to precisely what judicially discoverable and manageable standards are to be employed in resolving the claims at issue.  Although federal courts undoubtedly are well suited to resolve new and complex issues and cases, the Court is not persuaded that this is such a case.  Plaintiffs' global warming nuisance claim seeks to impose liability and damages on a scale unlike any prior environmental pollution case cited by Plaintiffs.  Those cases do not provide guidance that would enable the Court to reach a resolution of this case in any "reasoned" manner.  See Alperin, 410 F.3d at 552.  Consequently, the Court concludes that application of the second Baker factor precludes judicial consideration of Plaintiff's federal nuisance claim.

### b)   Initial Policy Determination

Equally problematic for Plaintiffs is the third Baker factor, which requires the Court to determine whether it would be impossible for the judiciary to decide the case "without an

1    initial policy determination of a kind clearly for nonjudicial discretion." <u>Baker</u>, 369 U.S. at

2    217.  A political question under this factor "exists when, to resolve a dispute, the court must

3    make a policy judgment of a legislative nature, rather than resolving the dispute through legal

4    and factual analysis." <u>EEOC v. Peabody W. Coal Co.</u>, 400 F.3d 774, 784 (9th Cir. 2005).  This

5    factor is aimed at preventing a court from "removing an important policy determination from

6    the Legislature."  <u>In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.</u>, 438 F. Supp.

7    2d 291, 297 (S.D.N.Y. 2006).

8          Plaintiffs emphasize that because they are not seeking injunctive relief, there is no need

9    for the Court to delve into the task of retroactively determining what emission limits *should*

10    *have* been imposed.  Pls.' Opp'n at 64-69.  This argument rests on the same faulty logic

11    discussed above; to wit, that Plaintiffs' nuisance claim can be resolved solely by examining the

12    reasonableness of the harm, while avoiding any consideration of the conduct causing the

13    nuisance.  As noted, Plaintiffs' federal nuisance claim inherently requires the factfinder to

14    consider both the harm experienced by Plaintiff as well as the utility or value of Defendants'

15    actions.  The fact that plaintiff is seeking damages as opposed to injunctive relief does not

16    counsel a different result.  Regardless of the relief sought, the resolution of Plaintiffs' nuisance

17    claim requires balancing the social utility of Defendants' conduct with the harm it inflicts.

18    That process, by definition, entails a determination of what would have been an acceptable

19    limit on the level of greenhouse gases emitted by Defendants.  <u>See</u> <u>GM</u>, 2007 WL 2726871 at

20    *8 ("regardless of the relief sought, the Court is left to make an initial decision as to what is

21    unreasonable in the context of carbon dioxide emissions.")

22          Plaintiffs also fail to confront the fact that resolution of their nuisance claim requires the

23    judiciary to make a policy decision about *who* should bear the cost of global warming.  Though

24    alleging that Defendants are responsible for a "substantial portion" of greenhouse gas

25    emissions, Compl. ¶ 3, Plaintiffs also acknowledge that virtually everyone on Earth is

26

27

28

1  responsible on some level for contributing to such emissions.[4]  Yet, by pressing this lawsuit,

2  Plaintiffs are in effect asking this Court to make a political judgment that the two dozen

3  Defendants named in this action should be the only ones to bear the cost of contributing to

4  global warming.  Plaintiffs respond that Defendants *should be* the ones held responsible for

5  damaging Kivalina allegedly because "they are responsible for more of the problem than

6  anyone else in the nation…."  Pls.' Opp'n at 68.  But even if that were true, Plaintiffs ignore

7  that the allocation of fault—and cost—of global warming is a matter appropriately left for

8  determination by the executive or legislative branch in the first instance.  The Court thus

9  concludes that the third <u>Baker</u> factor also militates in favor of dismissal.[5]

10  **B.    ARTICLE III STANDING**

11  Article III standing is a threshold requirement for federal court jurisdiction.  <u>Lujan v.</u>

12  <u>Defenders of Wildlife</u>, 504 U.S. 555, 559-60 (1992).  Under Article III of the Constitution,

13  federal judicial power extends only to "Cases" and "Controversies."  U.S. Const., art. III, § 2,

14  cl. 1.  "[I]n order to have Article III standing, a plaintiff must adequately establish: (1) *an*

15  *injury in fact* (i.e., a concrete and particularized invasion of a legally protected interest); (2)

16  *causation* (i.e., a fairly traceable connection between the alleged injury in fact and the alleged

17  conduct of the defendant); and (3) *redressability* (i.e., it is likely and not merely speculative

18  that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)."  <u>Sprint</u>

19  <u>Commc'n Co., L.P. v. APCC Servs., Inc.</u>, --- U.S. ---, 128 S.Ct. 2531, 2535 (2008) (citing

20  <u>Lujan</u>, 504 U.S. at 560-561) (internal quotations and alterations omitted); <u>Stormans, Inc. v.</u>

21  <u>Selecky</u>, 571 F.3d 960, 970 (9th Cir. 2009).  The party invoking federal jurisdiction bears the

22

23  [4] To the extent that the combustion of fossil fuels is causing global warming, it is evident that any person, entity or industry which uses or consumes such fuels bears at least some
24  responsibility for Plaintiffs' harm.  Plaintiffs readily acknowledge that the "transportation sector" is responsible for an "enormous quantity" of greenhouse gas emissions.  Pls.' Opp'n at 98.
25  Nonetheless, Plaintiffs have chosen not to include any members of the transportation sector in this lawsuit.  The seemingly arbitrary selection of Defendants, coupled with the gravity and extent of
26  the harm alleged in this case, underscores the conclusion that the allocation of responsibility for global warming is best left to the executive or legislative branch.

27  [5] Given the Court's conclusions regarding the second and third <u>Baker</u> factors, the Court does not reach the parties arguments regarding the remaining <u>Baker</u> factors which, in any event,
28  largely mirror the argument analyzed above.

burden of establishing these elements which are the "irreducible constitutional minimum" requirements of standing.  Lujan, 504 U.S. at 560-61.

The standing dispute in this case centers on what the Supreme Court has defined as "the causation requirement" of standing, i.e., fair traceability.  Bennett v. Spear, 520 U.S. 154, 167 (1997).  "To show causation, the plaintiff must demonstrate a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220, 1227 (9th Cir. 2008); Ecological Rights Found. v. Pacific Lumber Co., 230 F.3d 1141, 1152 (9th Cir. 2000).  "Although the "traceability" of a plaintiff's harm to the defendant's actions need not rise to the level of proximate causation, Article III *does* require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact."  Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1225 (10th Cir. 2008) (citations and internal quotations omitted and emphasis added).

## 1.      Contribution to the Injury

Plaintiffs concede they are unable to trace their alleged injuries to any particular Defendant but instead claim that they need not do so.  According to Plaintiffs, for purposes of establishing standing, they need only allege that Defendants "contributed" to their injuries. Pls.' Opp'n at 97-98.  Their "contribution" approach to Article III causation derives from cases involving claims brought under the Clean Water Act, such as P.I.R.G. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 72 (3d Cir. 1990) (Powell Duffryn).  In that case, a public interest group and others brought a citizen suit under the Clean Water Act accusing the defendant of violating its discharge permit by discharging industrial waste into a local waterway.  In its motion for summary judgment, Defendant argued that plaintiff could not establish to "a reasonable scientific certainty" that defendant's operations harmed the waterway.  Id. at 71-72. The district court denied summary judgment on the ground that defendant's violation of the

discharge permits, standing alone, was sufficient to demonstrate that plaintiff's injury was fairly traceable to defendant's conduct.  Id.[6]

On appeal, the Fourth Circuit agreed with defendant that "a permit exceedance alone" is insufficient to meet the causation prong of the test for standing, but concluded that there nonetheless were sufficient facts to establish causation.  Id. at 72.  The court explained:  "The requirement that plaintiffs' injuries be 'fairly traceable' to the defendant's conduct does not mean that plaintiffs must show to a scientific certainty that defendant's effluent, and defendant's effluent alone, caused the precise harm suffered by the plaintiffs." Id.  According to the court, the "fairly traceable" requirement "is not equivalent to a requirement of tort causation," and as such, the plaintiffs "need only show that there is a '*substantial likelihood*' that defendant's conduct caused plaintiffs' harm."  Id.  (emphasis added).  "In a Clean Water Act case, *this likelihood* may be established by showing that a defendant has 1) discharged some pollutant in concentrations greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or *contributes* to the kinds of injuries alleged by the plaintiffs."  Id. (emphasis added).  With regard to the last element, the court noted that water pollution cases often involve "several parties discharging into the affected waterway," and as such, "[i]n order to obtain standing, plaintiffs need not sue every discharger in one action, since the pollution of any one may be shown to cause some part of the injury suffered."  Id. n.8.

Subsequently, in Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149 (4th Cir. 2000) (Gaston Copper), the court adopted similar reasoning in holding that various environmental organizations had standing to bring a citizens suit under the Clean Water Act against a smelting operator accused of illegally discharging a variety of pollutants into a

---

[6] The purpose of the Federal Water Pollution Control Act (referred to as the Clean Water Act) is to restore and maintain the nation's waters and to eliminate the discharge of pollutants into waterways.  See 33 U.S.C. § 1251(a).  Under the Act, corporations may not discharge pollutants into navigable waterways, unless they obtain a National Pollution Discharge Elimination System permit, which limits the amount of effluent (pollution) that may be discharged.  See 33 U.S.C. §§ 1311(a), 1342. Compliance with the terms and conditions of the permit constitutes compliance with the Act.  Id. § 1342(k).

South Carolina waterway.  The district court had dismissed the case on the ground that plaintiffs failed to present evidence showing that the chemical content of the waterways were affected by the defendant's facility or that plaintiffs were negatively affected by the defendants' conduct.  Id. at 159.  In reversing the district court, the court of appeal rejected the suggestion that it must be shown to a "scientific certainty" that defendant's act of discharging effluent beyond the scope of its permit caused the precise harm suffered by the plaintiffs.  Id. at 161.  "Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged."  Id.  "Where a plaintiff has pointed to a polluting source as the *seed of his injury*, and the owner of the polluting source has supplied no alternative culprit, the 'fairly traceable' requirement can be said to be fairly met."  Id. at 162 (emphasis added).  However, the court also cautioned that to be "fairly traceable," the plaintiff must lie in the "discharge zone of a polluter" and not "so far downstream that their injuries cannot be fairly traced to that defendant."  Id.

In contrast to Powell Duffryn and Gaston Copper, the Fifth Circuit in Tex. Indep. Producers rejected, in part, an action brought by the Natural Resources Defense Council (NRDC) seeking to challenge proposed regulations promulgated by the EPA as violative of the Clean Water Act.  Citing Gaston Copper, the court noted the now well-established principle that the plaintiff need not establish a nexus between the defendants' discharge of pollutants and plaintiffs' injury with "scientific certainty."  Tex. Indep. Producers, 410 F.3d at 973.  At the same time, the court recognized that the "contribution" approach to standing is dependent upon the plaintiffs' ability to plead and prove the defendant's "'polluting source as the seed of his injury, and [that] the owner of the polluting source has supplied no alternative culprit…'"  Id. at 974 (quoting in part Gaston Copper, 204 F.3d at 162).  Ultimately, the court held that the NRDC had failed to show that defendants were the "seed" of its injury, finding the "existing polluted condition" of at least three of the water bodies involved that had previously resulted from the discharge of raw billions of gallons of raw sewage from various sources flowing into those rivers annually.  Id.

1    Here, Plaintiffs acknowledge that the contribution principles upon which they rely have

2  arisen in the context of Clean Water Act cases, but insist that "there is no reason to assume that

3  the presence of a statutory scheme in those cases limits the rule that plaintiffs need only show

4  contribution in CWA actions alone."  Pls.' Opp'n at 98.  The Court disagrees.  There is a

5  critical distinction between a statutory water pollution claim versus a common law nuisance

6  claim.  Under the Clean Water Act, the amount of effluent that may be legally discharged is

7  strictly regulated "to protect the designated uses of the receiving waterways."  Gaston Copper,

8  204 F.3d at 157.  Thus, where the plaintiff shows that a defendant's discharge *exceeds*

9  Congressionally-prescribed federal limits, it is presumed for purposes of standing that "there is

10  a 'substantial likelihood' that defendant's conduct caused plaintiffs' harm," even if other

11  parties have also made similar discharges.  Id. at 72-73.  Only then is it permissible for the

12  plaintiff to rely on the notion that the defendant "contributed" to plaintiff's injury on the

13  ground that it may not be possible to trace the injury to a particular entity.  Sierra Club, Lone

14  Star Chapter v. Cedar Point Oil Co. Inc., 73 F.3d 546, 558 (5th Cir. 1996) ("Given the number

15  of entities discharging chemicals into Galveston Bay, it would be virtually impossible for any

16  of Sierra Club's members to trace his injuries to Cedar Point's discharge in particular.").  In

17  contrast, there are no federal standards limiting the discharge of greenhouse gases.  As a result,

18  no presumption arises that there is a substantial likelihood that any defendant's conduct harmed

19  plaintiffs.  Without that presumption, and especially given the extremely attenuated causation

20  scenario alleged in Plaintiffs' Complaint, is it entirely irrelevant whether any defendant

21  "contributed" to the harm because a discharge, standing alone, is insufficient to establish

22  injury.  See Texas Indep. Producers, 410 F.3d at 974 ("[e]stablishing a discharge does not also

23  establish an injury.").[7]

24

25    [7] In AEP, the court noted that the contribution prong of the Powell Duffryn test is not
dependent upon a showing that the discharge exceeded any federal limits because no such limits
26  exist as to carbon dioxide emissions.  2009 WL 2996729 at *29.  This reasoning is circular.  Powell
Duffryn held that to show fair traceability, the plaintiff must show a "substantial likelihood" that
27  defendant's conduct caused plaintiff's injury.  The tripartite test articulated in Powell Duffryn to
demonstrate the requisite "substantial likelihood" is stated in the conjunctive, not the disjunctive as
28  concluded by the AEP court.  C.f., Gaston Copper, 204 F.3d at 162 (finding that plaintiff had met
the Powell Duffryn test by showing that defendant exceeded its discharge permit limits and that the

2.      "Seed" of the Injury

Even if the contribution theory were applicable outside the context of a statutory water pollution claim, it is simply is inapposite where, as here, Plaintiffs have not alleged that the "seed" of their injury can be traced to any of the Defendants.  See Texas Indep. Producers, 410 F.3d at 974; Gaston Copper, 204 F.3d at 162.  Plaintiffs allege that the genesis of the global warming phenomenon dates back centuries and is a result of the emission of greenhouse gases by a multitude of sources *other than* the Defendants.  Compl. ¶¶ 124-25.  The Complaint further alleges that the level of atmospheric carbon dioxide, "the most significant greenhouse gas emitted by human activity," has been increasing steadily "since the dawn of the industrial revolution in the 18th century, and more than one-third of the increase has occurred since 1980."  Id.  Significantly, the source of the greenhouse gases are undifferentiated and cannot be traced to any particular source, let alone defendant, given that they "rapidly mix in the atmosphere" and "inevitably merge[] with the accumulation of emissions in California and the rest of the world."  Id. ¶¶ 254, 10.

In view of the Plaintiffs' allegations as to the undifferentiated nature of greenhouse gas emissions from all global sources and their worldwide accumulation over long periods of time, the pleadings makes clear that there is no realistic possibility of tracing any particular alleged effect of global warming to any particular emissions by any specific person, entity, group at any particular point in time.  See Pls.' Opp'n at 105.  Plaintiffs essentially concede that the genesis of global warming is attributable to numerous entities which individually and cumulatively over the span of centuries created the effects they now are experiencing.  Even accepting the allegations of the Complaint as true and construing them in the light most favorable to Plaintiffs, it is not plausible to state which emissions—emitted by whom and at what time in the last several centuries and at what place in the world—"caused" Plaintiffs' alleged global warming related injuries. Thus, Plaintiffs have not and cannot show that

_____

waterway in dispute was within the range of the discharge). As such, it is illogical to conclude that the mere contribution of greenhouse gases into the atmosphere is sufficient to establish that a plaintiff's injury is fairly traceable to a defendant's conduct.

1   Defendants' conduct is the "seed of [their] injury."  To the contrary, there are, in fact, a

2   multitude of "alternative culprit[s]" allegedly responsible for the various chain of events

3   allegedly leading to the erosion of Kivalina.  See Texas Indep. Producers, 410 F.3d at 974.

4               **3.      Zone of Discharge**

5           The above notwithstanding, the Powell Duffryn test simply has no application in this

6   case given the remoteness of the injury claim.  "[T]o satisfy the 'fairly traceable' causation

7   requirement, there must be a distinction between 'the plaintiffs who lie within the discharge

8   zone of a polluter and those who are so far downstream that their injuries cannot fairly be

9   traced to that defendant.'"  Id. at 973 (quoting in part Gaston Copper, 204 F.3d at 162); Friends

10  of the Earth, Inc. v. Crown Cent. Petroleum Corp., 95 F.3d 358, 361 (5th Cir. 1996) ("some

11  'waterways' covered by the CWA may be so large that plaintiffs should rightfully demonstrate

12  a more specific geographic or other causative nexus in order to satisfy the 'fairly traceable'

13  element of standing.").  Thus, for example, an eighteen mile distance between the point of

14  discharge and the area of plaintiff's use of the body of water would be considered "too large to

15  infer causation."  Id. (citation omitted).  Likewise, in Texas Indep. Producers, the Fifth Circuit

16  held that "where the specific water bodies used by NRDC members run a great distance [i.e.,

17  hundreds of miles], … discharges in those water bodies [are] insufficient to establish the

18  discharges are within the zone to infer causation."  410 F.3d at 973.

19          Here, the allegations of the Complaint demonstrate that Plaintiffs are not within the

20  zone of discharge.  This is not an instance in which Plaintiffs' use of their property is

21  negatively impacted affected by virtue of their proximity to the discharge, similar to discharges

22  of effluent into waterways.  Indeed, Plaintiffs concede that "[i]t would be *impossible* to trace

23  the pathway of any particular greenhouse gas emission, as each combines in the atmosphere

24  with other emissions, to create the effects described in plaintiffs' Complaint."  Pls.' Opp'n at

25  105 (emphasis added).  Plaintiffs' only response is that the relevant geographical area should

26  be "the entire world, given the inherent nature of global warming."  Pls.' Opp'n at 98.  That

27  reasoning, however, suggests that every inhabitant on this Earth is within the zone of discharge,

28

thereby effectively eliminating the issue of geographic proximity in any case involving harms caused by global warming.

The tenuousness of Plaintiffs' standing is further exemplified by their theory of causation. Unlike water pollution cases in which the discharges of effluent in excess of the permitted amount are deemed harmful, Plaintiffs' arguments depend on an attenuated sequence of events that purportedly follow from the Defendants' alleged "excessive" discharge of greenhouse gases. Id. ¶ 4, 123-125, 127, 130, 131. As succinctly stated by the Supreme Court in Allen v. Wright, "The links in the chain of causation between the challenged … conduct and the asserted injury are far too weak for the chain as a whole to sustain [Plaintiffs'] standing." 468 U.S. 737, 759 (1984). That observation is especially apropos in the instant case where the Plaintiffs' claim for damages is dependent on a series of events far removed both in space and time from the Defendants' alleged discharge of greenhouse gases. See Center for Biological Diversity v. U.S. Dept. of Interior, 563 F.3d 466, 478 (D.C. Cir. 2009) (causal link between government approval of offshore leases for gas and oil development and climate change was "too tenuous" to demonstrate standing); c.f., Benefiel v. Exxon Corp., 959 F.2d 805, 807 (9th Cir. 1992) (holding that the aftereffects of a massive oil spill were too remote to establish causation for increased gasoline prices).

## C. SPECIAL SOLITUDE

Finally, Plaintiffs contend that they are entitled to relaxed standing requirements based upon the "special solitude" generally afforded to sovereigns. Pls.' Opp'n at 106-109. This argument derives from Massachusetts v. EPA, 549 U.S. 497 (2007), a case where the State of Massachusetts along with private environmental organizations filed a rulemaking petition requesting the EPA to regulate carbon dioxide emissions from new motor vehicles. Id. at 518. In finding that plaintiffs had standing, the Supreme Court acknowledged "the special position and interest of Massachusetts" and noted that it "is of considerable relevance that the party seeking review here is a sovereign State and not … a private individual." Id. at 518. The Court explained that "[w]hen a State enters the Union, it surrenders certain sovereign prerogatives," such as those relating to "exercise of its police powers to reduce in-state motor-

1  vehicle emissions….”  Id. at 519.  Such “sovereign prerogatives,” the Court noted, are now

2  vested in the federal government, which has charged the EPA with the responsibility of

3  protecting states by prescribing standards applicable to motor vehicle pollution.  Id. at 519-520.

4  States, nonetheless, retain the procedural right to challenge rulemaking by the EPA “as

5  arbitrary and capricious.”  Id. at 520.  The Supreme Court concluded that “[g]iven that

6  procedural right and Massachusetts’ stake in protecting its quasi-sovereign interests, the

7  Commonwealth is entitled to special solicitude in our standing analysis.”  Id.

8  　　　　Plaintiffs are not entitled to any “special solitude” under the circumstances presented.

9  Unlike Massachusetts, Plaintiffs are not seeking to enforce any procedural rights concerning an

10 agency’s rulemaking authority.  Rather, Plaintiffs claim is one for damages directed against a

11 variety of private entities.  Nor may Plaintiffs rely on the “quasi sovereign interests” referenced

12 by the Supreme Court.  The special solitude recognized by the Court is predicated on the rights

13 a State relinquishes to the federal government when it “enters the Union.”  Id. at 519.  This

14 rationale does not apply to Plaintiffs, which did not surrender its sovereignty as the price for

15 acceding to the Union.  Even if the special solitude mentioned in Massachusetts applied to

16 Plaintiffs, they still would lack standing.  As discussed above, Plaintiffs lack standing on the

17 basis of the political question doctrine and based on their inability to establish causation under

18 Article III.  Even a relaxed application of the requisite standing requirements would not

19 overcome these fatal flaws in Plaintiffs’ case.

20 　　　　**D.**　　**SUPPLEMENTAL STATE LAW CLAIMS**

21 　　　　Aside from their first claim for common law nuisance, all of Plaintiffs’ remaining

22 claims are based upon state law.  A district court may decline to exercise supplemental

23 jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction.

24 28 U.S.C. § 1367(c)(3); Imagineering, Inc. v. Kiewit Pacific Co., 976 F.2d 1303, 1309 (9th Cir.

25 1992).  Therefore, the Court declines to assert supplemental jurisdiction over the remaining

26 state law claims which are dismissed without prejudice to their presentation in a state court

27 action.

28

**IV.    CONCLUSION**

The Court concludes that Plaintiffs' federal claim for nuisance is barred by the political question doctrine and for lack of standing under Article III.  Accordingly,

IT IS HEREBY ORDERED THAT Defendants' motions to dismiss for lack of jurisdiction are GRANTED.  The remaining motions to dismiss are DENIED as moot. Plaintiffs' state law claims are dismissed without prejudice to refiling in state court.  The Clerk shall close the file and terminate all pending matters.

IT IS SO ORDERED.

Dated:  September 30, 2009

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge