FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIVE VILLAGE OF KIVALINA;
CITY OF KIVALINA,
                    *Plaintiffs-Appellants,*

                    v.

EXXONMOBIL CORPORATION; BP
P.L.C.; BP AMERICA, INC.; BP
PRODUCTS NORTH AMERICA, INC.;
CHEVRON CORPORATION; CHEVRON
U.S.A., INC.; CONOCOPHILLIPS
COMPANY; ROYAL DUTCH SHELL
PLC; SHELL OIL COMPANY;
PEABODY ENERGY CORPORATION;
THE AES CORPORATION; AMERICAN
ELECTRIC POWER COMPANY, INC.;
AMERICAN ELECTRIC POWER
SERVICES CORPORATION; DUKE
ENERGY CORPORATION; DTE
ENERGY COMPANY; EDISON
INTERNATIONAL; MIDAMERICAN
ENERGY HOLDINGS COMPANY;
PINNACLE WEST CAPITAL
CORPORATION; THE SOUTHERN
COMPANY; DYNEGY HOLDINGS, INC.;
XCEL ENERGY, INC.; GENON
ENERGY, INC.,
                    *Defendants-Appellees.*

No. 09-17490

D.C. No.
4:08-cv-01138-SBA

OPINION

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

11641

Argued and Submitted
November 28, 2011—San Francisco, California

Filed September 21, 2012

Before: Sidney R. Thomas and Richard R. Clifton,
Circuit Judges, and Philip M. Pro, District Judge.*

Opinion by Judge Thomas;
Concurrence by Judge Pro

---

*The Honorable Philip M. Pro, District Judge for the U.S. District Court
for the District of Nevada, sitting by designation.

## COUNSEL

Matthew F. Pawa (argued), Law Offices of Matthew. F. Pawa PC, Newton Centre, Massachusetts; Brent Newell, Center on Race, Poverty and the Environment, San Francisco, California; Steve W. Berman, Babara Mahoney, Hagens Berman Sobol Shapiro LLP, Seattle, Washington; Reed R. Kathrein, Hagens Berman Sobol Shapiro LLP, Berkeley, California; Gary E. Mason, Khushi Desai, The Mason Law Firm, Washington, D.C.; Heather Kendall-Miller, Native American Rights Fund, Anchorage, Alaska; Dennis Reich, Reich & Binstock, Houston, Texas; Christopher A. Seeger, Stephen A. Weiss, James A. O'Brien, Seeger Weiss LLP, New York, New York; Stephen D. Susman, H. Lee Godfrey, Eric J. Mayer, Susman Godfrey LLP, Houston, Texas; Terrell W. Oxford, Susman Godfrey LLP, Dallas, Texas; Marc M. Seltzer, Susman Godfrey, LLP, Los Angeles, California; Drew D. Hansen, Susman Godfrey LLP, Seattle, Washington, for the appellants-plaintiffs.

Jerome C. Roth, Scott W. Coyle, Munger, Tolles & Olson LLP, San Francisco, California; Ronald L. Olson, Daniel P. Collins, Munger, Tolles & Olson LLP, Los Angeles, California, for appellee-defendant Shell Oil Company.

Jonathan D. Hacker, O'Melveny & Myers LLP, Washington, DC; John F. Daum, O'Melveny & Myers, Los Angeles, California, for appellee-defendant ExxonMobil Corporation.

Andrew B. Clubok, Jeffrey Bossert Clark, Susan E. Engel, Joseph Cascio, Kirkland & Ellis LLP, Washington, DC, for appellee-defendant ConocoPhillips Company.

Robert Meaows, Tracie J. Renfroe, Jonathan L. Marsh, King & Spalding LLP, Houston, Texas; Lisa Kobialka, King & Spalding LLP, Redwood City, California, for appellees-defendants Chevron Corporation and Chevron U.S.A., Inc.

Matthew Heartney, Arnold & Porter LLP, Los Angeles, California; Philip Curtis, Arnold & Porter LLP, New York, New York, for appellees-defendants BP America, Inc., and BP Products North America, Inc.

Kevin P. O'Brien, Crowell & Morning LLP, San Francisco, California; Kathleen Taylor Sooy, Scott L. Winkelman, Tracy A. Roman, Crowell & Morning LLP, Washington, DC, for appellee-defendant Peabody Energy Corporation.

William A. Norris, Rex Heinke, Richard K. Welsh, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California; Paul E. Gutermann, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, for appellee-defendant The AES Corporation.

Peter D. Keisler, David T. Buente, Jr., Quin M. Sorenson, Sidley Austin LLP, Washington, DC; Samuel R. Miller, Sidley Austin LLP, San Francisco, California, for defendants-appellees American Electric Power Company; American Electric Power Service Corporation; and Duke Energy Corporation.

Shawn Patrick Regan, Hunton & Williams LLP, New York, New York; F. William Brownell, Normal W. Fichtorn, Alison

D. Wood, Hunton & Williams LLP, Washington, D.C.; Belynda B. Reck, Hunton & Williams LLP, Los Angeles, California, for appellees-defendants DTE Energy Company; Edison International; MidAmerican Energy Holdings Company; Pinnacle West Capital Corp; Southern Company.

Thomas A. Rector, Jones Day, San Francisco, California; Thomas E. Fennell, Michael L. Rice, Jones Day, Dallas, Texas; Kevin P. Holewinski, Jones Day, Washington, D.C., for appellee-defendant Xcel Energy, Inc.

Alexandra Walsh, Jeremy Levin, Baker Botts LLP, Washington, D.C., for appellee-defendant Dynergy Holdings, Inc; Reliant Energy, Inc.

Richard O. Faulk, Gardere Wynne Sewell LLP, Houston, Texas, for amici American Chemistry Council, Public Nuisance Fairness Coalition, American Coatings Association, and Property Casualty Insurers Association of America.

Sean H. Donahue, Sean H. Donahue Law Office, Washington, DC; Stephen F. Hinchman, West Bath, Maine, for amicus Solar Industry.

Victor E. Schwartz, Phil Goldberg, Christopher E. Appel, Shook, Hardy, & Bacon, LLP, Washington, DC; James A. Henderson, Jr., Frank B. Ingersoll, Cornell Law School, Ithaca, New York, for amici National Association of Manufacturers, National Federation of Independent Small Business Legal Center, and American Tort Reform Association.

Tristan L. Duncan, William F. Northrip, Shook, Hardy & Bacon LLP, Kansas City, Missouri; Richard H. Fallon, Jr. Cambridge, Massachusetts, for amicus Natso, Inc.

Ellen J. Gleberman, The Association of International Automobile Manufacturers, Inc., Arlington, Virginia; Raymond B. Ludwiszewski, Charles H. Haake, Gibson, Dunn & Crutcher

LLP, Washington, D.C., for amicus The Association of International Automobile Manufacturers.

Earl L. Hagstrom, Frederick D. Baker, Kelly Savage Day, Sedgwick, Detert, Moran & Arnold LLP, San Francisco, California, for amici Congressman Lamar Smith and Congressman F. James Sensenbrenner, Jr.

John C. Eastman, Center for Constitutional Jurisprudence, Chapman University School of Law, Orange, California; Anthony T. Caso, Law Office of Anthony T. Caso, Sacramento, California, for amicus Center for Constitutional Jurisprudence.

Daniel J. Popeo, Cory L. Andrews, Washington Legal Foundation, Washington, D.C.; Douglas M. Halsey, David P. Draigh, White & Case LLP, Miami, Florida, for amicus Washington Legal Foundation.

R.S. Radford, Damien M. Schiff, Pacific Legal Foundation, Sacramento, California, for amicus Pacific Legal Foundation.

Robin C. Conrad, Amar D. Sarwal, National Chamber Litigation Center, Washington, D.C.; Gregory G. Garre, Richard P. Bress, Gabriel K. Bell, Latham & Watkins LLP, Washington, DC, for amicus The Chamber of Commerce of the United States of America.

---

# OPINION

THOMAS, Circuit Judge:

The Native Village of Kivalina and the City of Kivalina (collectively "Kivalina") appeal the district court's dismissal of their action for damages against multiple oil, energy, and utility companies (collectively "Energy Producers").[1] Kivalina

---

[1]Defendants are: (1) ExxonMobil Corporation; (2) BP P.L.C.; (3) BP America, Inc.; (4) BP Products North America, Inc.; (5) Chevron Corpora-

alleges that massive greenhouse gas emissions emitted by the Energy Producers have resulted in global warming, which, in turn, has severely eroded the land where the City of Kivalina sits and threatens it with imminent destruction. Kivalina seeks damages under a federal common law claim of public nuisance.

The question before us is whether the Clean Air Act, and the Environmental Protection Agency ("EPA") action that the Act authorizes, displaces Kivalina's claims. We hold that it does.

I

The City of Kivalina sits on the tip of a six-mile barrier reef on the northwest coast of Alaska, approximately seventy miles north of the Arctic Circle. The city, which was incorporated as a unified municipality under Alaska state law in 1969, has long been home to members of the Village of Kivalina, a self-governing, federally recognized tribe of Inupiat Native Alaskans. The City of Kivalina has a population of approximately four hundred residents, ninety-seven percent of whom are Alaska Natives.

Kivalina's survival has been threatened by erosion resulting from wave action and sea storms for several decades. *See* City of Kivalina, Alaska: Local Hazards Mitigation Plan, Resolution 07-11 (Nov. 9, 2007). The villagers of Kivalina depend on the sea ice that forms on their coastline in the fall, winter,

---

tion; (6) Chevron U.S.A., Inc.; (7) Conocophillips Company; (8) Royal Dutch Shell PLC; (9) Shell Oil Company; (10) Peabody Energy Corporation; (11) The AES Corporation; (12) American Electric Power Company, Inc.; (13) American Electric Power Services Corporation; (14) Duke Energy Corporation; (15) DTE Energy Company; (16) Edison International; (17) Midamerican Energy Holdings Company; (18) Pinnacle West Capital Corporation; (19) The Southern Company; (20) Dynegy Holdings, Inc.; (21) Xcel Energy, Inc.; (22) Genon Energy, Inc.

and spring each year to shield them from powerful coastal storms. But in recent years, the sea ice has formed later in the year, attached later than usual, broken up earlier than expected, and has been thinner and less extensive in nature. As a result, Kivalina has been heavily impacted by storm waves and surges that are destroying the land where it sits. Massive erosion and the possibility of future storms threaten buildings and critical infrastructure in the city with imminent devastation. If the village is not relocated, it may soon cease to exist.[2]

Kivalina attributes the impending destruction of its land to the effects of global warming, which it alleges results in part from emissions of large quantities of greenhouse gases by the Energy Producers. Kivalina describes global warming as occurring through the build-up of carbon dioxide and methane (commonly referred to as "greenhouse gases") that trap atmospheric heat and thereby increase the temperature of the planet. As the planet heats, the oceans become less adept at removing carbon dioxide from the atmosphere. The increase in surface temperature also causes seawater to expand. Finally, sea levels rise due to elevated temperatures on Earth, which cause the melting of ice caps and glaciers. Kivalina contends that these events are destroying its land by melting the arctic sea ice that formerly protected the village from winter storms.

Kivalina filed this action against the Energy Producers, both individually and collectively, in District Court for the Northern District of California, alleging that the Energy Producers, as substantial contributors to global warming, are responsible for its injuries. Kivalina argued that the Energy

[2]"[I]t is believed that the right combination of storm events could flood the entire village at any time. . . . Remaining on the island . . . is no longer a viable option for the community." U.S. Gov't Accountability Office, GAO 04-142, Alaska Native Villages: Most Are Affected by Flooding and Erosion, but Few Qualify for Federal Assistance 30, 32 (2003).

Producers' emissions of carbon dioxide and other greenhouse gases, by contributing to global warming, constitute a substantial and unreasonable interference with public rights, including the rights to use and enjoy public and private property in Kivalina. Kivalina's complaint also charged the Energy Producers with acting in concert to create, contribute to, and maintain global warming and with conspiring to mislead the public about the science of global warming.

The Energy Producers moved to dismiss the action for lack of subject-matter jurisdiction, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *Native Vill. of Kivalina v. Exxonmobile Corp.*, 663 F. Supp. 2d 863, 868 (N.D. Cal. 2009). They argued that Kivalina's allegations raise inherently nonjusticiable political questions because to adjudicate its claims, the court would have to determine the point at which greenhouse gas emissions become excessive without guidance from the political branches. They also asserted that Kivalina lacked Article III standing to raise its claims because Kivalina alleged no facts showing that its injuries are "fairly traceable" to the actions of the Energy Producers.

The district court held that the political question doctrine precluded judicial consideration of Kivalina's federal public nuisance claim. *Id.* at 876-77. The court found that there was insufficient guidance as to the principles or standards that should be employed to resolve the claims at issue. *Id.* at 876. The court also determined that resolution of Kivalina's nuisance claim would require determining what would have been an acceptable limit on the level of greenhouse gases emitted by the Energy Producers and who should bear the cost of global warming. *Id.* Both of these issues, the court concluded, were matters more appropriately left for determination by the executive or legislative branch in the first instance. *Id.* at 877.

The district court also held that Kivalina lacked standing under Article III to bring a public nuisance suit. *Id.* at 880-82. The court found that Kivalina could not demonstrate either a

"substantial likelihood" that defendants' conduct caused plaintiff's injury nor that the "seed" of its injury could be traced to any of the Energy Producers. *Id.* at 878-81. The court also concluded that, given the remoteness of its injury claim, Kivalina could not establish that it was within sufficient geographic proximity to the Energy Producers' alleged "excessive" discharge of greenhouse cases to infer causation. *Id.* at 881-82. The court declined to exercise supplemental jurisdiction over the state law claims. *Id.* at 882-83.

We review a district court's dismissal for lack of subject-matter jurisdiction *de novo*. *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 979 (9th Cir. 2007). The dismissal may be affirmed "on any basis fairly supported by the record." *Id.* at 979. For the purpose of such review, this Court "must accept as true the factual allegations in the complaint." *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000); *see also United States v. Gaubert*, 499 U.S. 315, 327 (1991).

## II

## A

In contending that greenhouse gases released by the Energy Producers cross state lines and thereby contribute to the global warming that threatens the continued existence of its village, Kivalina seeks to invoke the federal common law of public nuisance. We begin, as the Supreme Court recently did in *American Electric Power Co., Inc. v. Connecticut* ("*AEP*"), 131 S. Ct. 2527, 2535 (2011), by addressing first the threshold questions of whether such a theory is viable under federal common law in the first instance and, if so, whether any legislative action has displaced it.

Despite the announced extinction of federal general common law in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938), the Supreme Court has articulated a "keener understanding" of the actual contours of federal common law. *AEP*,

131 S. Ct. at 2535. As Justice Ginsburg explained, "[t]he 'new' federal common law addresses 'subjects within the national legislative power where Congress has so directed' or where the basic scheme of the Constitution so demands." *Id.* (quoting Friendly, *In Praise of* Erie–*And of the New Federal Common Law*, 39 N.Y.U. L. Rev 383, 408 n.119, 421-22 (1964)). Sometimes, Congress acts directly. For example, Congress, in adopting the Employee Retirement Income Security Act ("ERISA"), expected federal courts to develop "a federal common law of rights and obligations under ERISA-regulated plans." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987). More often, federal common law develops when courts must consider federal questions that are not answered by statutes.

**[1]** Post-*Erie*, federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution. *AEP*, 131 S. Ct. at 2535; *see also Illinois v. City of Milwaukee* ("*Milwaukee I*"), 406 U.S. 91, 103 (1972) ("When we deal with air and water in their ambient or interstate aspects, there is a federal common law.") (footnote omitted); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) ("[T]he control of interstate pollution is primarily a matter of federal law.").

**[2]** Thus, federal common law can apply to transboundary pollution suits. Most often, as in this case, those suits are founded on a theory of public nuisance. Under federal common law, a public nuisance is defined as an "unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B(1) (1979). A successful public nuisance claim generally requires proof that a defendant's activity unreasonably interfered with the use or enjoyment of a public right and thereby caused the public-at-large substantial and widespread harm. *See Missouri v. Illinois*, 200 U.S. 496, 521 (1906) (stating that public nuisance actions "should be of serious magnitude, clearly and fully proved"); *Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d

309, 357 (2d Cir. 2009), *rev'd* 131 S. Ct. 2527 (2011) ("The touchstone of a common law public nuisance action is that the harm is widespread, unreasonably interfering with a right common to the general public.").

B

**[3]**  However, the right to assert a federal common law public nuisance claim has limits. Claims can be brought under federal common law for public nuisance only when the courts are "compelled to consider federal questions which cannot be answered from federal statutes alone." *City of Milwaukee v. Illinois* ("*Milwaukee II*"), 451 U.S. 304, 314 (1981) (citations and internal quotations omitted). On the other hand, when federal statutes directly answer the federal question, federal common law does not provide a remedy because legislative action has displaced the common law. Federal common law is subject to the paramount authority of Congress. *New Jersey v. New York*, 283 U.S. 336, 348 (1931).

If Congress has addressed a federal issue by statute, then there is no gap for federal common law to fill. *Milwaukee II*, 451 U.S. at 313-14. "Federal common law is used as a 'necessary expedient' when Congress has not 'spoken to a particular issue.' " *Cnty. of Oneida, N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 236-37 (1985) (quoting *Milwaukee II*).

"The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute speak[s] directly to [the] question at issue." *AEP*, 131 S. Ct. at 2537 (alterations in original) (internal citation and quotation marks omitted). Although plainly stated, application of the test can prove complicated. The existence of laws generally applicable to the question is not sufficient; the applicability of displacement is an issue-specific inquiry. For example, in *Milwaukee I*, the Supreme Court considered multiple statutes potentially affecting the federal question. 406 U.S. at

101-03. Concluding that no statute directly addressed the question, the Supreme Court held that the federal common law public nuisance action had not been displaced in that case. *Id.* at 107. The salient question is "whether Congress has provided a sufficient legislative solution to the particular [issue] to warrant a conclusion that [the] legislation has occupied the field to the exclusion of federal common law." *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 777 (7th Cir. 2011). Put more plainly, "how much congressional action is enough?" *Id.*

## C

**[4]** We need not engage in that complex issue and fact-specific analysis in this case, because we have direct Supreme Court guidance. The Supreme Court has already determined that Congress has directly addressed the issue of domestic greenhouse gas emissions from stationary sources and has therefore displaced federal common law. *AEP*, 131 S. Ct. at 2530, 2537.

**[5]** In *AEP*, eight states, the city of New York, and three private land trusts brought a public nuisance action against "the five largest emitters of carbon dioxide in the United States." *Id.* at 2533-34. The *AEP* plaintiffs alleged that "defendants' carbon-dioxide emissions created a 'substantial and unreasonable interference with public rights,' in violation of the federal common law of interstate nuisance," and sought injunctive relief through a court-ordered imposition of emissions caps. *Id.* at 2534. Concluding that the Clean Air Act already "provides a means to seek limits on emissions of carbon dioxide from domestic power plants," the Supreme Court in *AEP* held "that the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement" of such emissions. *Id.* at 2537-38.

**[6]** This case presents the question in a slightly different context. Kivalina does not seek abatement of emissions;

rather, Kivalina seeks damages for harm caused by past emissions. However, the Supreme Court has instructed that the type of remedy asserted is not relevant to the applicability of the doctrine of displacement. In *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), Exxon asserted that the Clean Water Act preempted the award of maritime punitive damages. *Id.* at 484. The Supreme Court disagreed, noting that it had "rejected similar attempts to sever remedies from their causes of action." *Id.* at 489 (citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255-56 (1993)). In *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n.,* 453 U.S. 1, 4 (1981), the Supreme Court considered a public nuisance claim of damage to fishing grounds caused by discharges and ocean dumping of sewage. The Court held that the cause of action was displaced, including the damage remedy. *Id.* at 21-22. Thus, under current Supreme Court jurisprudence, if a cause of action is displaced, displacement is extended to all remedies.

[7] Certainly, the lack of a federal remedy may be a factor to be considered in determining whether Congress has displaced federal common law. *Milwaukee I*, 406 U.S. at 103. But if the federal common law cause of action has been displaced by legislation, that means that "the field has been made the subject of comprehensive legislation" by Congress. *Milwaukee II*, 451 U.S. at 314, 325. When Congress has acted to occupy the entire field, that action displaces any previously available federal common law action. *Id.* Under *Exxon* and *Middlesex*, displacement of a federal common law right of action means displacement of remedies. Thus, *AEP* extinguished Kivalina's federal common law public nuisance damage action, along with the federal common law public nuisance abatement actions.

The Supreme Court could, of course, modify the *Exxon/Middlesex* approach to displacement, and will doubtless have the opportunity to do so. But those holdings are consistent with the underlying theory of displacement and causes

of action. Judicial power can afford no remedy unless a right that is subject to that power is present. If a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived in another form.

The fact that the damage occurred before the EPA acted to establish greenhouse gas standards does not alter the analysis. The doctrine of displacement is an issue of separation of powers between the judicial and legislative branches, not the judicial and executive branches. *Michigan*, 667 F.3d at 777. When the Supreme Court concluded that Congress had acted to empower the EPA to regulate greenhouse gas emissions, *Massachusetts v. EPA*, 549 U.S. 497, 528-29 (2007), it was a determination that Congress had "spoken directly" to the issue by legislation. Congressional action, not executive action, is the touchstone of displacement analysis. *See AEP*, 131 S. Ct. at 2537.

Nor does the Supreme Court's displacement determination pose retroactivity problems. The Supreme Court confronted this theory in the *Milwaukee* cases, holding in *Milwaukee II* that amendments to the Clean Water Act, passed after the decision in *Milwaukee I*, displaced the previously recognized common law nuisance claim because Congress had now "occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency." *Milwaukee* II, 451 U.S. at 316. "[W]hen Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears." *Id.* at 314. Kivalina concedes that its civil conspiracy claim is dependent upon the success of the substantive claim, so it falls as well.

### III

**[8]** In sum, the Supreme Court has held that federal common law addressing domestic greenhouse gas emissions has

been displaced by Congressional action. That determination displaces federal common law public nuisance actions seeking damages, as well as those actions seeking injunctive relief. The civil conspiracy claim falls with the substantive claim. Therefore, we affirm the judgment of the district court. We need not, and do not, reach any other issue urged by the parties.

Our conclusion obviously does not aid Kivalina, which itself is being displaced by the rising sea. But the solution to Kivalina's dire circumstance must rest in the hands of the legislative and executive branches of our government, not the federal common law.

**AFFIRMED.**

PRO, District Judge, concurring:

The Native Village of Kivalina and the City of Kivalina (together "Kivalina") appeal the district court's dismissal of their federal common law public nuisance claim for damages against Appellees, who are oil, energy, and utility companies. In support of their federal common law nuisance claim, Kivalina alleges Appellees emit massive amounts of greenhouse gases that contribute to global warming which, in turn, has severely eroded the land where the City of Kivalina sits and threatens it with imminent destruction. Kivalina also brought conspiracy and concert of action claims which are dependent on their federal common law nuisance claim. Additionally, Kivalina brought a state law nuisance claim in the alternative to their federal common law claim. The district court dismissed the state law nuisance claim without prejudice to refiling in state court, and no one appeals that decision. Consequently, the question before us is whether Kivalina states a viable federal common law public nuisance claim for damages.

The majority opinion holds that the Clean Air Act ("CAA") and the Environmental Protection Agency ("EPA") action the Act authorizes displace Kivalina's claims. I write separately to address what I view as tension in Supreme Court authority on whether displacement of a claim for injunctive relief necessarily calls for displacement of a damages claim, and to more fully explain why I concur in the majority opinion's ultimate conclusion. I also write separately to express my view that Kivalina lacks standing.

I.

A.

"[F]ederal common law addresses subjects within national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands." *Am. Elec. Power Co., Inc. v. Connecticut ("AEP")*, 131 S. Ct. 2527, 2535 (2011) (internal quotation marks and citation omitted). Among the subjects which may call for application of federal common law is environmental protection, particularly issues involving "air and water in their ambient or interstate aspects." *Id.* (citation omitted).

However, once Congress addresses a question previously answered by resort to federal common law, the federal common law is displaced. *Id.* at 2537. A federal statute displaces federal common law whenever a "legislative scheme [speaks] directly to a question." *City of Milwaukee v. Illinois ("Milwaukee II")*, 451 U.S. 304, 315 (1981). To determine whether a legislative enactment directly speaks to the question at issue, the reviewing court must "assess[ ] the scope of the legislation and whether the scheme established by Congress addresses the problem formerly governed by federal common law." *Id.* at 315 n.8. This analysis begins with the assumption that Congress, not the federal courts, sets out the "appropriate standards to be applied as a matter of federal law." *Id.* at 317.

The law of federal displacement is easily stated, but best understood by examination of its application through a series of Supreme Court cases beginning with *Illinois v. City of Milwaukee ("Milwaukee I")*, 406 U.S. 91 (1972). In *Milwaukee I*, the State of Illinois brought a federal common law nuisance abatement suit under the Supreme Court's original jurisdiction against four cities and two sewage commissions located in Wisconsin, alleging the defendants were polluting Lake Michigan. 406 U.S. at 93. After determining it had jurisdiction over the action, the Supreme Court evaluated federal statutory law governing interstate water pollution. *Id.* at 101-03. Specifically, the Supreme Court noted that the Rivers and Harbors Act of March 3, 1899 granted the Army Corps of Engineers some power to oversee industrial pollution, the Federal Water Pollution Control Act "tighten[ed] control over discharges into navigable waters so as not to lower applicable water quality standards," the National Environmental Policy Act of 1969 directed federal governmental agencies to evaluate environmental issues in agency decision making, and the Fish and Wildlife Act of 1956 and Fish and Wildlife Coordination Act reflected Congress's "increasing concern with the quality of the aquatic environment as it affects the conservation and safeguarding of fish and wildlife resources." *Id.* at 101-02.

The Supreme Court gave special attention to the Federal Water Pollution Control Act ("FWPCA"), which provided that while the primary responsibility for preventing and controlling water pollution lay with the States, "federal, not state, law . . . in the end controls the pollution of interstate or navigable waters." *Id.* at 102. The FWPCA included procedures for abatement of pollution if a State failed to act, including a potential suit by the Attorney General. *Id.* at 102-03. The Supreme Court nevertheless found that none of the identified enactments displaced Illinois's federal common law public nuisance claim, in part because the FWPCA specifically provided that there was no intent to displace state or interstate actions to abate water pollution with federal enforcement

actions. *Id.* at 104. The Supreme Court nevertheless declined to hear the case in its original jurisdiction, instead directing Illinois to bring the action in federal district court. *Id.* at 108.

In *Milwaukee I*, the Supreme Court acknowledged that "[i]t may happen that new federal laws and new federal regulations may in time pre-empt the field of federal common law of nuisance." *Id.* at 107. This prediction was realized in *Milwaukee II*. Following the Supreme Court's suggestion in *Milwaukee I*, Illinois re-filed its federal common law nuisance abatement suit in federal district court. *Milwaukee II*, 451 U.S. at 310. Congress thereafter enacted the Federal Water Pollution Control Act Amendments of 1972, also known as the Clean Water Act ("CWA"). *Id.* Under the amendments, it was "illegal for anyone to discharge pollutants into the Nation's waters except pursuant to a permit." *Id.* at 310-11 (citing 33 U.S.C. §§ 1311, 1342). The EPA was charged with administering the Act, and to the extent the EPA set effluent limitations on any particular pollutant, those limitations were incorporated into any permit. *Id.* at 311. The defendants operated their sewer systems under permits obtained from the Wisconsin state agency which was granted permitting authority under EPA's supervision. *Id.* The defendants did not "fully comply" with their permits' requirements, however, and the state permitting agency brought an enforcement action in state court. *Id.* The state court entered a judgment setting effluent limitations and requiring construction of sewage overflow controls. *Id.*

In the meantime, the State of Illinois continued to pursue its federal common law nuisance abatement action in federal court. *Id.* Illinois won at the trial level, and obtained injunctive relief ordering construction of facilities to eliminate sewer overflows and to achieve specified limits on effluents. *Id.* "Both the aspects of the decision concerning overflows and concerning effluent limitations . . . went considerably beyond the terms of [the defendants'] previously issued permits and the enforcement order of the state court." *Id.* at 312.

On appeal, the Supreme Court held that the CWA displaced Illinois's federal common law public nuisance abatement action because Congress had "occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency." *Id.* at 317. Specifically, the Supreme Court found the CWA established "an all-encompassing program of water pollution regulation. *Every* point source discharge is prohibited unless covered by a permit, which directly subjects the discharger to the administrative apparatus established by Congress to achieve its goals." *Id.* at 318 (footnote omitted). This comprehensive treatment of water pollution left "no room for courts to attempt to improve on that program with federal common law." *Id.* at 319.

The Supreme Court did not rely only on the comprehensive nature of the regulatory scheme. It evaluated the particular nuisance abatement claims brought by Illinois to determine whether Congress spoke directly to the particular question at issue. With respect to the requested relief for effluent limitations, the Supreme Court noted that the EPA had set effluent limitations and that the defendants' permits incorporated those limitations. *Id.* at 319-20. Consequently, there was "no question" that Congress had addressed the problem of effluent limitations and therefore there was "no basis for a federal court to impose more stringent limitations than those imposed under the regulatory regime by reference to federal common law." *Id.* at 320. The Court reached a similar conclusion with respect to the requested relief for construction of controls for overflows because overflows were nothing more than point source discharges fully covered by the permitting process under the Act. *Id.* at 320-21. Accordingly, there was "no 'interstice' here to be filled by federal common law." *Id.* at 323. Moreover, the Supreme Court noted that one reason federal common law was needed in *Milwaukee I* was the lack of forum for Illinois to protect its rights, but this problem had been resolved through the CWA's scheme, which allowed

affected States the opportunity to participate in the permitting process. *Id.* at 325-26.

Finally, the Supreme Court rejected the argument that language in the CWA's citizen-suit provision preserved a federal common law remedy. *Id.* at 328-29. Subsection 505(e) of the CWA provided:

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

*Id.* at 328 (emphasis omitted). The Supreme Court concluded this did not preserve the federal common law nuisance abatement claim because the language meant only that the specific subsection providing for a citizen suit does not revoke other remedies, but it did not mean that "the Act as a whole does not supplant formerly available federal common-law actions." *Id.* at 328-29.

Neither *Milwaukee I* nor *Milwaukee II* involved damages claims. Both were for abatement of a nuisance and sought injunctive relief. However, the dissent in *Milwaukee II* argued that legislative history indicated Congress did not intend for the CWA to preclude actions for damages even if the alleged polluter was in compliance with regulatory standards under the Act. *Id.* at 343, 346 n.21.

The majority in *Milwaukee II* did not comment on the availability of a federal common law nuisance claim for damages under the CWA until it decided *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1 (1981), approximately two months later. In *Middlesex*, an organization whose members harvested fish and an individual member of that organization brought suit in federal dis-

trict court against various governmental agencies and officials in New York, New Jersey, and the United States Government. 453 U.S. at 4. The plaintiffs alleged that waste materials were being discharged into interstate waterways which were polluting the Atlantic Ocean, resulting in a massive algae growth which negatively affected fishing and related industries in the Atlantic. *Id.* at 4-5. The plaintiffs brought statutory claims under the FWPCA, the Marine Protection, Research, and Sanctuaries Act of 1972 ("MPRSA"), the National Environmental Policy Act of 1969, state law environmental statutes, and the Federal Tort Claims Act. *Id.* at 5 n.6. The plaintiffs also brought claims under various provisions of the United States Constitution, federal common law, and state tort law. *Id.* The plaintiffs sought injunctive relief, declaratory relief, compensatory damages, and punitive damages. *Id.* at 5.

The Supreme Court held that it need not decide whether private parties such as the plaintiffs in *Middlesex* could bring a federal common law nuisance claim for damages because the FWPCA displaced the federal common law of nuisance in the area of water pollution as the Court held in *Milwaukee II*, and the MPRSA likewise displaced federal common law with respect to ocean dumping. *Id.* at 21-22. The dissent in *Middlesex* noted the apparent conflict between this result and legislative history which suggested that Congress intended that a common law action for damages caused by pollution would not be barred even where the defendant had complied with the FWPCA's requirements. *Id.* at 31 & n.15. *Middlesex* thus holds that where a federal common law nuisance claim for injunctive relief is displaced, a federal common law nuisance claim for damages claim likewise is displaced.

However, the Supreme Court's ruling in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), appears to be a departure from *Middlesex*. In *Exxon*, various classes of plaintiffs brought federal maritime common law claims seeking compensatory damages for injuries arising out of the Exxon Valdez oil tanker spill off the Alaskan coast. 554 U.S. at 475-

76, 479. Additionally, a subclass of plaintiffs sought punitive damages under federal maritime common law. *Id.* at 479. The defendants stipulated to negligence and liability for compensatory damages. *Id.* However, the parties disputed whether the defendants were liable for punitive damages. *Id.* at 479-80. A jury found the defendants liable for $5 billion in punitive damages. *Id.* at 481.

On appeal, the Supreme Court considered whether the CWA displaced the availability of punitive damages under federal maritime common law. *Id.* at 488-89. The Supreme Court rejected the defendants' argument that the CWA's penalties for water pollution preempted common law punitive damages remedies available under maritime law. *Id.* Title 33 U.S.C. § 1321(o) specifically preserved damages claims "under any provision of law" for anyone harmed by a discharge of oil or other hazardous substance as against any owner or operator of a vessel, although it did not specify the source of law for any such damages claim, federal or state. *Id.* at 488. The Supreme Court rejected the argument that "any tort action predicated on an oil spill is preempted unless § 1321 expressly preserves it"—a position which the defendants did not attempt to defend—because the Court found it "too hard to conclude that a statute expressly geared to protecting 'water,' 'shorelines,' and 'natural resources' was intended to eliminate *sub silentio* oil companies' common law duties to refrain from injuring the bodies and livelihoods of private individuals." *Id.* at 488-89.

The Court also rejected the defendants' argument that although the CWA did not displace compensatory damages, it displaced punitive damages for economic loss. *Id.* The Supreme Court stated that "nothing in the statutory text points to fragmenting the recovery scheme this way, and we have rejected similar attempts to sever remedies from their causes of action." *Id.* at 489 (citing *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 255-56 (1984)). The Supreme Court saw "no clear indication of congressional intent to occupy the entire

field of pollution remedies," and allowing punitive damages for private harms would not have "any frustrating effect on the CWA remedial scheme, which would point to preemption." *Id.*

In reaching this conclusion, the Supreme Court specifically distinguished *Middlesex* and *Milwaukee II* on the basis that the plaintiffs' common law nuisance claims in those two cases "amounted to arguments for effluent-discharge standards different from those provided by the CWA. Here, [the plaintiffs'] private claims for economic injury do not threaten similar interference with federal regulatory goals with respect to 'water,' 'shorelines,' or 'natural resources.' " *Id.* at 489 n.7.

While *Exxon* stated that the Court has rejected "attempts to sever remedies from their causes of action," *id.* at 489, *Exxon* made this pronouncement in the context of examining whether one form of damages ought to be severed from another form of damages without any statutory textual basis for doing so. The *Exxon* Court was not evaluating whether a claim for damages is of a different character than a claim for injunctive relief. In fact, the case upon which *Exxon* relied for that statement, *Silkwood*, likewise disapproved of an attempt to sever compensatory and punitive damages, but its overall holding suggests that severing rights and remedies is appropriate as between damages and injunctive relief in some circumstances.

*Silkwood* involved state common law tort claims brought by the estate of a woman injured by nuclear contamination from a nuclear plant at which she worked. 464 U.S. at 243. The jury awarded compensatory and punitive damages, despite evidence that the plant operator complied with most federal regulations governing nuclear safety at the plant. *Id.* at 244-45. The defendant plant operator argued that its compliance with the federal regulations precluded an award of punitive damages. *Id.* at 245. The Supreme Court rejected that argument, concluding that although Congress granted a fed-

eral entity, the Nuclear Regulatory Commission, exclusive authority to regulate safety matters at nuclear power plants, and thus states could not enjoin nuclear power plants from operating for failure to comply with state safety standards, Congress nevertheless intended to allow damages awards under state law. *Id.* at 250-51, 256. Indeed, the Supreme Court concluded that congressional silence on the matter of damages claims, and its failure to provide a federal remedy for injured persons, made it "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Id.* at 251.

*Silkwood* dealt with federal preemption of state law claims, and thus is not directly applicable to a federal displacement analysis. *See Milwaukee II*, 451 U.S. at 316-17. However, to the extent *Exxon* cited it in support of the proposition that compensatory and punitive damages generally are not severed absent a statutory basis to do so, that is all the weight *Silkwood* can bear. Under *Silkwood*, a state law claim for injunctive relief would be preempted by federal law because safety regulation at nuclear facilities is a matter exclusively within federal authority, while a state law damages claim nevertheless would not be preempted. Consequently, *Silkwood* supports the conclusion that the right and the remedy may indeed be severed when the particular claim at issue seeks injunctive relief versus damages.[1]

---

[1] It is not inexorably the rule that the unavailability of one remedy necessarily precludes the availability of another remedy arising out of the same asserted right or injury. *See, e.g.*, *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518-19 (1992) (holding that while state law warning or labeling requirements were preempted by federal tobacco labeling laws, (and thus a state law action for injunctive relief requiring any such labeling would be preempted), state law damages claims based on smoking-related injuries were not preempted); *Ex Parte Young*, 209 U.S. 123 (1908) (permitting a suit in federal court to prospectively enjoin a state official acting in his official capacity even though a similar claim for damages could not be brought in federal court due to the Eleventh Amendment).

## B.

Against this backdrop of cases under the CWA, the Supreme Court in recent years has addressed the applicability of the CAA to greenhouse gases and whether the CAA displaces federal common law. In *Massachusetts v. EPA*, the Supreme Court evaluated a claim by several states, local governments, and private entities that the EPA had abdicated its responsibility under the CAA to regulate the emissions of greenhouse gases from motor vehicles. 549 U.S. 497, 505, 510, 514 (2007). The Supreme Court held that greenhouse gases fell within the CAA's definition of "air pollutant" under 42 U.S.C. § 7602(g), and the EPA therefore has the statutory authority to regulate the emission of greenhouse gases from new motor vehicles. *Id.* at 532.

The Supreme Court subsequently evaluated whether the CAA displaced federal common law nuisance abatement claims based on greenhouse gas emissions in *AEP*. In *AEP*, several States, a city, and three private land trusts brought federal common law nuisance abatement claims against four private power companies and the federal Tennessee Valley Authority. 131 S. Ct. at 2532. The *AEP* plaintiffs sought injunctive relief in the form of emissions caps on the five defendants, whom the complaints identified as the five largest carbon dioxide emitters in the United States. *Id.* at 2534. The Supreme Court held that the CAA "and the EPA actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants." *Id.* at 2537. The Supreme Court noted that greenhouse gases were air pollutants subject to EPA regulation after *Massachusetts*, and the CAA "speaks directly" to carbon dioxide emissions from stationary sources such as the *AEP* defendants' plants. *Id.*

To reach this conclusion, the Supreme Court analyzed the scope of the CAA with respect to regulation of stationary sources:

> Section 111 of the Act directs the EPA Administrator to list "categories of stationary sources" that "in [her] judgment . . . caus[e], or contribut[e] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." [42 U.S.C.] § 7411(b)(1)(A). Once EPA lists a category, the agency must establish standards of performance for emission of pollutants from new or modified sources within that category. § 7411(b)(1)(B); *see also* § 7411(a)(2). And, most relevant here, § 7411(d) then requires regulation of existing sources within the same category. For existing sources, EPA issues emissions guidelines, *see* 40 C.F.R. § 60.22, .23 (2009); in compliance with those guidelines and subject to federal oversight, the States then issue performance standards for stationary sources within their jurisdiction, § 7411(d)(1).

*Id.* at 2537-38 (footnote omitted). The Supreme Court also evaluated the enforcement mechanisms of emission standards in the CAA, including enforcement by States, by the EPA, and a citizen-suit provision pursuant to which "any person" may enforce emission standards in federal court. *Id.* at 2538 (citing 42 U.S.C. § 7604(a)). Additionally, States and private parties may petition the EPA to set an emission standard if EPA has not done so. *Id.* (citing 42 U.S.C. § 7607(b)). The Supreme Court concluded that the CAA "thus provides a means to seek limits on emissions of carbon dioxide from domestic power plants—the same relief the plaintiffs seek by invoking federal common law." *Id.*

The Supreme Court concluded the *AEP* plaintiffs' federal common law nuisance abatement claim therefore was displaced, even though EPA had not yet set emission standards for carbon dioxide: "The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from power plants; the delegation is what displaces federal common law." *Id.* The EPA's decision

whether to regulate was itself subject to judicial review, but Congress through the CAA entrusted the "complex balancing" involved in assessing the appropriate amount of regulation of greenhouse gases to the EPA in the first instance, not the federal courts. *Id.* at 2539 (citing 42 U.S.C. §§ 7411(a), (b), (c)(1), (d), (j)(1)(A)). Congress designated EPA to address these competing concerns because an "expert agency is surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions." *Id.* at 2539. Allowing federal judges to "set limits on greenhouse gas emissions in face of a law empowering EPA to set the same limits," would upset the scheme Congress set forth in the CAA. *Id.* at 2540.

## C.

Under *AEP*, federal common law nuisance abatement claims are displaced by the CAA. And under *Middlesex*, if federal common law nuisance abatement claims are displaced, so are federal common law nuisance damages claims.

While *Exxon* suggests a different result, *Exxon* appears to depart from *Milwaukee II* and *Middlesex*. *Exxon* concluded that the savings clause in 33 U.S.C. § 1321(o) preserved federal maritime common law damages claims despite Congress's provision of other federal remedies in § 1321. *Exxon*, 554 U.S. at 488-89. The savings clause in section 1321(o)(1) provides:

> Nothing in this section shall affect or modify in any way the obligations of any owner or operator of any vessel, or of any owner or operator of any onshore facility or offshore facility to any person or agency under any provision of law for damages to any publicly owned or privately owned property resulting from a discharge of any oil or hazardous substance or from the removal of any such oil or hazardous substance.

Section 1321(o)(1) is similar to the citizen suit provision in the CWA, which provides that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation to seek any other relief . . . ." 33 U.S.C. § 1365(e). *Milwaukee II* concluded this language did not preserve federal common law nuisance claims:

> The subsection is common language accompanying citizen-suit provisions and we think that it means only that the provision of such suit does not revoke other remedies. It most assuredly cannot be read to mean that the Act as a whole does not supplant formerly available federal common-law actions but only that the particular section authorizing citizen suits does not do so.

451 U.S. at 328-29. Section 1321(o) did not specify that it was preserving federal maritime common law damages claims in the face of a federal enactment on the subject of federal remedies for oil spills any more than § 1365(e) stated it was preserving federal common law nuisance claims in the face of the CWA. *Exxon*'s interpretation of this clause appears to be at odds with *Milwaukee II*.

*Exxon* also seems to stray from *Middlesex*. *Exxon*'s reasoning for distinguishing *Middlesex* on the basis of the requested remedy is not entirely clear. *Exxon* either failed to acknowledge that the *Middlesex* plaintiffs sought damages as well as injunctive relief, or it concluded that the amount of damages requested in *Middlesex* effectively would have enjoined the defendants from engaging in ocean dumping, essentially setting a different effluent standard.

*Exxon*'s departure from *Milwaukee II* and *Middlesex* may be explained by the fact that the defendants in *Exxon* apparently did not argue that the federal maritime common law claim was displaced in its entirety and conceded liability and

compensatory damages. Another explanation may be that the *Exxon* Court viewed § 1321 as not so comprehensive as to displace federal maritime common law negligence claims for damages, unlike the CWA provisions the *Milwaukee II* Court found displaced federal common law nuisance claims.

Regardless of *Exxon*'s effect on the viability of federal maritime common law negligence claims for damages under § 1321, *Milwaukee II*, *Middlesex*, *AEP*, and the comprehensive nature of the CAA lead to the conclusion that Kivalina's federal common law nuisance claim for damages in this case is displaced. Congress has spoken directly to the question of what remedies are available under federal law for air pollution. The CAA sets forth a comprehensive regulatory scheme committed to an expert agency, coupled with a variety of enforcement mechanisms, including enforcement by States, the EPA, and private parties. Consequently, the lack of a federal damages remedy is not indicative of a gap which federal common law must fill. Congress could have included a federal damages cause of action in the CAA, and it may add one at any time, but thus far it has opted not to do so. By supplying a federal remedy Congress chose not to provide, this Court would not be "filling a gap," it would be "providing a different regulatory scheme" than the one chosen by Congress. *Milwaukee II*, 451 U.S. at 324 n.18.

Displacement of the federal common law does not leave those injured by air pollution without a remedy. Once federal common law is displaced, state nuisance law becomes an available option to the extent it is not preempted by federal law. *AEP*, 131 S. Ct. at 2540 ("In light of our holding that the Clean Air Act displaces federal common law, the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act."). The district court below dismissed Kivalina's state law nuisance claim without prejudice to refiling it in state court, and Kivalina may pursue whatever remedies it may have under state law to the extent their claims are not preempted.

I therefore concur in the majority opinion that the CAA and the EPA action the Act authorizes displace Kivalina's claims. Because Kivalina's federal common law nuisance damages claim is displaced, the Court need not address the open question of whether Kivalina is the type of party that can bring a federal common law nuisance claim. *See AEP*, 131 S. Ct. at 2536-37 (noting that the Supreme Court had "not yet decided whether private citizens . . . may invoke the federal common law of nuisance to abate out-of-state pollution," but concluding the question was "academic" because the plaintiffs' federal common law nuisance claim was displaced by the CAA).

## II.

The district court found Kivalina lacked standing. Standing is a jurisdictional issue deriving from the "case or controversy" requirement of Article III of the United States Constitution. *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000). Standing depends on "whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy, and serves to ensure that legal questions presented to the court will be resolved in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Hall v. Norton*, 266 F.3d 969, 975 (9th Cir. 2001) (quotations, alterations, and internal citation omitted).

The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The nature of that burden depends on the stage of the litigation. *Am. Fed'n of Gov't Emps. Local 1 v. Stone*, 502 F.3d 1027, 1032 (9th Cir. 2007). A plaintiff must support each element of the standing inquiry "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Consequently, at the dismissal stage, the Court accepts as true all factual allegations in the complaint and

draws all reasonable inferences therefrom in the nonmoving party's favor. *Ass'n for L.A. Deputy Sheriffs v. Cnty. of L.A.*, 648 F.3d 986, 991 (9th Cir. 2011). A complaint's "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 907 (9th Cir. 2011) (alteration, citation, and internal quotation marks omitted). However, the complaint must allege sufficient facts plausibly establishing each element of the standing inquiry. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Lujan*, 504 U.S. at 561; *Barnum Timber Co. v. EPA*, 633 F.3d 894, 899 (9th Cir. 2011).

To establish standing under Article III of the Constitution, a plaintiff must show "(1) injury in fact; (2) causation; and (3) likelihood that the injury will be redressed by a favorable decision." *Am. Civil Liberties Union of Nev. v. Lomax*, 471 F.3d 1010, 1015 (9th Cir. 2006). Specifically with respect to causation, the plaintiff must demonstrate that its injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Pritikin v. Dep't of Energy*, 254 F.3d 791, 797 (9th Cir. 2001) (alterations in original) (citation omitted). The "line of causation" between the defendant's action and the plaintiff's harm must be "more than 'attenuated.' " *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (quoting *Allen v. Wright*, 468 U.S. 737, 757 (1984)). However, a "causal chain does not fail simply because it has several 'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausib[le].' " *Id.* (quoting *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)). But where the causal chain "involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries, . . . the causal chain [is] too weak to support standing at the pleading stage." *Id.* (citations and internal quotation marks omitted).

Kivalina alleges that it is located at the tip of a barrier reef, and that global warming has harmed Kivalina because sea ice which used to protect Kivalina from coastal storms, waves, and surges now forms later in the year, attaches to the coast later, breaks up earlier, and is less extensive. Kivalina thus is more exposed to storm waves and surges which are eroding the land upon which Kivalina sits to such an extent that Kivalina must relocate. According to the Complaint, Appellees are various oil, energy, and utility companies who annually emit millions of tons of greenhouse gases, and whom Kivalina thus identifies as "substantial contributors" to global warming.

Kivalina's Complaint describes global warming as follows:

> Energy from the sun heats the Earth, which re-radiates the energy to space. Carbon dioxide and other greenhouse gases absorb some of the outgoing infrared energy, raising the temperature of the Earth's atmosphere. Carbon dioxide is by far the most significant greenhouse gas emitted by human activity. . . . A large fraction of carbon dioxide emissions persist in the atmosphere for several centuries, and thus have a lasting effect on climate. Atmospheric concentrations of carbon dioxide and other greenhouse gases continue to increase as each year's emissions are added to those that came before. Carbon dioxide levels in the atmosphere have increased by 35 percent since the dawn of the industrial revolution in the 18th century, and more than one-third of the increase has occurred since 1980. . . . Processes on land and in the oceans that remove carbon dioxide from the atmosphere are unable to keep pace with these emissions. As a result, the natural carbon cycle is out of balance and carbon dioxide levels in the atmosphere are increasing every year. . . . The global linear warming trend over the last 50 years is twice that of the previous 50 years. . . . The Arctic

is warming at approximately twice the global average.

According to the Complaint, global warming and the recognition of its potential implications are "not new," with observations, calculations, and predictions as to its effect dating back as far as the late 1800s.

Kivalina alleges specifically with respect to Appellees that greenhouse gas emissions from Appellees' operations "no matter where such operations are located, rapidly mix in the atmosphere and cause an increase in the atmospheric concentration of carbon dioxide and other greenhouse gases worldwide. The heating that results from the increased carbon dioxide and other greenhouse gas concentrations to which defendants contribute cause specific, identifiable impacts in Kivalina." Kivalina further alleges that Appellees "knew that their individual greenhouse gas emissions were, in combination with emissions and conduct of others, contributing to global warming and causing injuries to entities such as the Plaintiffs."

Kivalina has not met the burden of alleging facts showing Kivalina plausibly can trace their injuries to Appellees. By Kivalina's own factual allegations, global warming has been occurring for hundreds of years and is the result of a vast multitude of emitters worldwide whose emissions mix quickly, stay in the atmosphere for centuries, and, as a result, are undifferentiated in the global atmosphere. Further, Kivalina's allegations of their injury and traceability to Appellees' activities is not bounded in time. Kivalina does not identify when their injury occurred nor tie it to Appellees' activities within this vast time frame. Kivalina nevertheless seeks to hold these particular Appellees, out of all the greenhouse gas emitters who ever have emitted greenhouse gases over hundreds of years, liable for their injuries.

It is one thing to hold that a State has standing to pursue a statutory procedural right granted to it by Congress in the

CAA to challenge the EPA's failure to regulate greenhouse gas emissions which incrementally may contribute to future global warming. *See Massachusetts*, 549 U.S. at 516-20. It is quite another to hold that a private party has standing to pick and choose amongst all the greenhouse gas emitters throughout history to hold liable for millions of dollars in damages.

III.

For the reasons articulated above, I concur in the majority's conclusion that the CAA displaces Kivalina's federal common law nuisance claim for damages. Additionally, I would hold that Kivalina lacks standing.